APPEAL,CLOSED,TYPE−D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00804−BAH
### *Internal Use Only*

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE et al v. JACKSON et al | Date Filed: 03/18/2025 |
| Assigned to: Judge Beryl A. Howell | Date Terminated: 05/19/2025 |
| Related Case:  1:25−cv−01090−BAH | Jury Demand: None |
| Cause: 05:0706 Judicial Review of Agency Actions | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **UNITED STATES INSTITUTE OF PEACE** | represented by | **Alyssa Howard Card** |

**UNITED STATES INSTITUTE OF PEACE**  represented by  **Alyssa Howard Card**
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
202−778−1800
Email: ahoward@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
202−778−1800
Email: bjernigan@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
(410) 949−1146
Fax: (410) 659−0436
Email: wmurphy@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1100
Washington, DC 20036

(202) 778−1822
Fax: (202) 822−8106
Email: agoldfarb@zuckerman.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN J. SULLIVAN**
*Ambassador, in his official capacity as*
*Chair of the Board of Directors of the*
*United States Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JUDY ANSLEY**
*in her official capacity as a member of*
*the Board of Directors of the United*
*States Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSEPH L. FALK**
*in his official capacity as a member of the*
*Board of Directors of the United States*
*Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KERRY KENNEDY**
*in her official capacity as a member of the Board of Directors of the United States Institute of Peace*

represented by  **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARY SWIG**
*in her official capacity as a member of the Board of Directors of the United States Institute of Peace*

represented by  **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NANCY ZIRKIN**                    represented by   **Alyssa Howard Card**
*in her official capacity as a member of*          (See above for address)
*the Board of Directors of the United*             *LEAD ATTORNEY*
*States Institute of Peace*                         *ATTORNEY TO BE NOTICED*

                                                   **Ben Jernigan**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **William James Murphy**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Andrew Nathan Goldfarb**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEORGE E. MOOSE**                 represented by   **Alyssa Howard Card**
*Ambassador; in his official capacities as*        (See above for address)
*Acting President of the United States*            *LEAD ATTORNEY*
*Institute of Peace and as an ex officio*          *ATTORNEY TO BE NOTICED*
*member of the Board of Directors of the*
*United States Institute of Peace*                 **Ben Jernigan**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **William James Murphy**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Andrew Nathan Goldfarb**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KENNETH JACKSON**                 represented by   **Brian P. Hudak**
*in his official capacity as Assistant to the*     U.S. ATTORNEY'S OFFICE FOR THE
*Administrator for Management and*                 DISTRICT OF COLUMBIA
*Resources for USAID and in his*                   601 D Street, NW

4

*purported capacity as acting president of*
*the United States Institute of Peace*

Washington, DC 20530
(202) 252−2549
Fax: (202) 252−2599
Email: brian.hudak@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
UNITED STATES ATTORNEY'S
OFFICE
601 D Street, NW
Washington, DC 20001
202−252−2525
Email: joseph.carilli@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sam Escher**
DOJ−USAO
601 D Street NW
# 7.1527
Washington, DC 20530
(202) 252−2531
Email: sam.escher@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE**　　　　represented by　**Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE TEMPORARY**　　　represented by　**Brian P. Hudak**
**ORGANIZATION**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY GLEASON**
*in her official capacity as the Acting*
*Administrator of U.S. DOGE Service and*
*U.S. DOGE Service Temporary*
*Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES M. BURNHAM**
*in his official capacity as an employee of*
*the U.S. DOGE Service or the U.S.*
*DOGE Service Temporary Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JACOB ALTIK**
*in his official capacity as an employee of*
*the U.S. DOGE Service or the U.S.*
*DOGE Service Temporary Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATE CAVANAUGH**
*in his official capacity as an employee of*
*the U.S. DOGE Service or the U.S.*
*DOGE Service Temporary Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO RUBIO**
*in his official capacity as the U.S. Secretary of State and in his official capacity as an ex officio member of the USIP Board of Directors*

represented by  **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**
*in his official capacity as the U.S. Secretary of Defense and in his official capacity as an ex officio member of the USIP Board of Directors*

represented by  **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER A. GARVIN**
*Vice Admiral, in his official capacity as President of the National Defense University and in his official capacity as an ex officio member of the USIP Board of Directors*

represented by  **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **DONALD J. TRUMP**<br>*in his official capacity as President of the United States of America* | represented by | **Brian P. Hudak**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Joseph F. Carilli , Jr.**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Sam Escher**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **TRENT MORSE**<br>*in his official capacity as Deputy Director of Presidential Personnel in the White House Presidential Personnel Office, the White House Office, and the Executive Office of the President of the United States* | represented by | **Brian P. Hudak**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Joseph F. Carilli , Jr.**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Sam Escher**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **113 FORMER SENIOR MILITARY AND FOREIGN POLICY OFFICIALS** | represented by | **Rebecca S. LeGrand**<br>LEGRAND LAW PLLC<br>1100 H Street NW<br>Suite 1220<br>Washington, DC 20005<br>202−587−5725<br>Email: rebecca@legrandpllc.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025** | represented by | **Michael L Shenkman**<br>BAILEY & GLASSER, LLP<br>1055 Thomas Jefferson Street, NW<br>Suite 540<br>Washington, DC 20007<br>202−857−1197<br>Email: mshenkman@baileyglasser.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|

| 03/18/2025 | 1 | COMPLAINT *For Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number ADCDC−11551408) filed by JOHN J. SULLIVAN, UNITED STATES INSTITUTE OF PEACE, MARY SWIG, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons)(Goldfarb, Andrew) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 2 | Emergency MOTION for Temporary Restraining Order *and for an Immediate Administrative Stay* by UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY, MARY SWIG. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Text of Proposed Order)(Goldfarb, Andrew) (Entered: 03/18/2025) |
| 03/18/2025 | 3 | NOTICE of Appearance by Andrew Nathan Goldfarb on behalf of All Plaintiffs (Goldfarb, Andrew) (Entered: 03/18/2025) |
| 03/19/2025 | 4 | NOTICE of Appearance by Alyssa Howard Card on behalf of All Plaintiffs (Card, Alyssa) (Entered: 03/19/2025) |
| 03/19/2025 | | Case Assigned to Judge Beryl A. Howell. (zjd) (Entered: 03/19/2025) |
| 03/19/2025 | 5 | STANDING ORDER. Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah4) (Entered: 03/19/2025) |
| 03/19/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on plaintiffs' 2 Motion for a Temporary Restraining Order on March 19, 2025 at 2:00 PM, in Courtroom 26A− In Person before Judge Beryl A. Howell; DIRECTING defendants to file any written response to plaintiffs' motion by March 19, 2025 at 12:00 PM; and ORDERING plaintiffs to serve defendants with a copy of this Order immediately upon receipt to ensure that counsel for defendants has sufficient notice to appear at the hearing. Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah4) (Entered: 03/19/2025) |
| 03/19/2025 | | Set/Reset Deadlines/Hearings: Defendants Response To Plaintiff's Motion due no later than 12:00PM on 3/19/2025. Motion Hearing set for 3/19/2025 at 2:00 PM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 03/19/2025) |
| 03/19/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for March 19, 2025 at 2:00PM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 03/19/2025)** |
| 03/19/2025 | 6 | SUMMONS (13) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/19/2025) |

| 03/19/2025 | 7 | NOTICE of Appearance by Ben Jernigan on behalf of All Plaintiffs (Jernigan, Ben) (Entered: 03/19/2025) |
|---|---|---|
| 03/19/2025 | 8 | NOTICE of Appearance by Joseph F. Carilli, Jr on behalf of All Defendants (Carilli, Joseph) (Entered: 03/19/2025) |
| 03/19/2025 | 9 | Memorandum in opposition to re 2 Motion for TRO, filed by AMY GLEASON, JAMES M. BURNHAM, JACOB ALTIK, NATE CAVANAUGH, MARCO RUBIO, PETE HEGSETH, PETER A GARVIN, DONALD J. TRUMP, KENNETH JACKSON, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Hudak, Brian) (Entered: 03/19/2025) |
| 03/19/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 3/19/2025 re 2 Emergency Motion for Temporary Restraining Order. The Court Heard Oral Arguments From The Parties. For Reasons Stated On The Record, The Court Denies 2 Emergency Motion for Temporary Restraining Order and for an Immediate Administrative Stay. The Court Directs The Parties To Meet And Confer and File Either Joint Or Individual Expedited Briefing Schedule due no later than 2:00PM On March 20, 2025. (Court Reporter LISA EDWARDS.) (mac) (Entered: 03/19/2025) |
| 03/19/2025 | | MINUTE ORDER (paperless) DENYING plaintiffs' 2 Motion for a Temporary Restraining Order ("Pls.' Mot."). Plaintiffs did not make the sufficient showings of likelihood of success on the merits and likelihood of suffering irreparable harm to warrant issuance of the extraordinary relief of a temporary restraining order ("TRO"). *See Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (describing the four factors necessary for granting a preliminary injunction or TRO).<br><br>Regarding likelihood of success on the merits, the unique position of the U.S. Institute of Peace, as a Congressionally established independent nonprofit corporation, makes it too difficult to determine on the present record whether the President's removal of the Board members and the remaining three *ex officio* members' appointment of a new Institute President was lawful and thus whether DOGE's intrusion on the property was permitted. On the one hand, the Institute is statutorily described as "an independent nonprofit corporation" and charitable organization, 22 U.S.C. § 4603(b), and its employees are expressly "not considered officers and employees of the Federal Government," except for certain purposes, *id.* § 4606(f)(1). On the other, the Institute's leadership is appointed by the President and confirmed by the Senate, *id.* § 4605(b)(4); the Board has two Cabinet members sitting *ex officio, id.* § 4605(b)(1)−(2); and the Institute itself admits it is subject to FOIA, *see* FOIA, UNITED STATES INSTITUTE FOR PEACE, https://www.usip.org/freedom−information−act−foia, which applies to executive branch entities. In addition, as defendants point out, the Institute has grant−making authority with public funds, *id.* §§ 4603(c), 4604(b)(1), (d), 4606(b); is tasked with making reports to Congress, *id.* § 4604(c)(3); and may obtain services from the General Services Administration, *id.* § 4604(o). Moreover, plaintiffs' counsel seemed to concede, by invoking *Humphrey's Executor*, 295 U.S. 602 (1935) (involving statutory removal protections for executive branch agencies with quasi−legislative and quasi−judicial functions), that the Institute is an executive branch entity. Notwithstanding that the Presidents' removal of the five plaintiff Board members violated the applicable statutory removal provisions, 22 U.S.C. § 4605(f), depending on the precise nature of the Institute, some of those removal provisions, namely *id.* § 4605(f)(3), may be constitutionally suspect under *Myers v. United States*, 272 U.S. 52 (1926), for reserving a role for Congress in the removal process. *See* |

*Morrison v. Olson*, 487 U.S. 654, 686 (1988) (describing that takeaway from *Myers*). Upon further consideration, the Institute may be deemed to sit outside of the executive branch, or the removal protections may be deemed appropriately enforceable within the Supreme Court's jurisprudence, but plaintiffs did not demonstrate as much in this expedited posture. *See generally*, Pls.' Mot. (not addressing *Myers* or *Humphrey's Executor*).

Plaintiffs also did not demonstrate irreparable harm because their alleged harm was dependent on their success on the merits. Plaintiffs cited as their irreparable harm their inability to carry out their statutory functions and the harm to the Institute based on defendants' intent to reduce it to the "statutory minimums" and defendants' alleged destruction of the Institute's property. Compl. 1 ¶¶ 59−65. Those harms, however, are dependent on plaintiffs' success on the merits. Plaintiffs' counsel can only represent the Institute—and thus properly assert the harms of the Institute—to the extent that plaintiff Board members and former President of the Institute, George Moose, were wrongfully removed. Plaintiffs likewise only suffer harm in their official capacities—the capacities in which they pled, Compl. ¶¶ 7−11—if they must lawfully remain members of the Board. While the allegations of records and property destruction, *see e.g.*, Pls.' Mot. at 3, and defendants' threatening and aggressive confrontation, involving the deployment of law enforcement officers from three different agencies, in interactions with employees at the U.S. Institute of Peace are deeply troubling, the extraordinary relief of the TRO is not warranted at this time.

The parties are DIRECTED to jointly propose a schedule for summary judgment briefing by March 20, 2025 at 2:00 PM.

Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah4) (Entered: 03/19/2025)

| | | |
|---|---|---|
| 03/20/2025 | 10 | NOTICE of Appearance by Sam Escher on behalf of All Defendants (Escher, Sam) (Entered: 03/20/2025) |
| 03/20/2025 | 11 | Joint MOTION for Briefing Schedule *Setting Expedited Briefing Schedule* by UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY, MARY SWIG. (Attachments: # 1 Text of Proposed Order Proposed Order)(Jernigan, Ben) Modified event on 3/21/2025 (znmw). (Entered: 03/20/2025) |
| 03/20/2025 | | MINUTE ORDER (paperless), upon consideration of the parties' 11 Joint Motion for Expedited Briefing ISSUING the following SCHEDULING ORDER:<br><br>(1) By March 24, 2025, plaintiffs will file any amended complaint (though defendants' obligation to respond is stayed pending further order of the Court);<br><br>(2) By April 4, 2025, plaintiffs will file their motion for summary judgment;<br><br>(3) By April 11, 2025, defendants will file any cross−dispositive motion and opposition to plaintiffs' motion;<br><br>(4) By April 18, 2025, plaintiffs will file their opposition to defendants' cross−motion and reply in support of their motion;<br><br>(5) By April 25, 2025, defendants will file any reply in support of their cross−motion. |

| | | |
|---|---|---|
| | | Any hearing, if necessary, will be held the week of April 28, 2025.<br><br>Signed by Judge Beryl A. Howell on March 20, 2025. (lcbah4) (Entered: 03/20/2025) |
| 03/21/2025 | | Set/Reset Deadlines: Amended Pleadings due by 3/24/2025. Summary Judgment Motion due by 4/4/2025. Defendants Cross Dispositive Motion And Opposition To Plaintiff's Motion due by 4/11/2025. Plaintiffs Opposition to Defendant's Cross−Motion And Reply In Support OF Their Motion due by 4/18/2025. Defendants Reply In Support Of Their Cross−Motion due by 4/25/2025. (mac) (Entered: 03/21/2025) |
| 03/21/2025 | | NOTICE OF ERROR re 11 Motion for Order; emailed to bjernigan@zuckerman.com, cc'd 17 associated attorneys — The PDF file you docketed contained errors: 1. **Please note the following for future filings; do not refile document**, 2. Signature on Filing Must Match PACER Account (mg, ) (Entered: 03/21/2025) |
| 03/24/2025 | 12 | AMENDED COMPLAINT against All Defendants filed by JOHN J. SULLIVAN, UNITED STATES INSTITUTE OF PEACE, MARY SWIG, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I − Redline of Amended Complaint, # 10 Summons)(Goldfarb, Andrew) (Entered: 03/24/2025) |
| 03/24/2025 | 13 | SEALED DOCUMENT re 12 Amended Complaint filed by UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY, MARY SWIG(This document is SEALED and only available to authorized persons.)(Goldfarb, Andrew) Modified to add link on 3/25/2025 (znmw). (Entered: 03/24/2025) |
| 03/31/2025 | 14 | MOTION for Order *Pursuant to the All Writs Act to Suspend Transfer of Property and for Status Conference* by NANCY ZIRKIN, GEORGE E. MOOSE, UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, MARY SWIG. (Attachments: # 1 Exhibit Exhibit A − Resolution, # 2 Exhibit Exhibit B − Email Correspondence, # 3 Text of Proposed Order Proposed Order)(Goldfarb, Andrew). Added MOTION for Status Conference on 4/1/2025 (mg). (Entered: 03/31/2025) |
| 03/31/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 14 Motion for Order Pursuant to All Writs Act and for Status Conference, DIRECTING defendants to file any position on that Motion by 3:00 pm today, March 31, 2025, and further DIRECTING the parties to appear in−person for a status conference on April 1, 2025 at 10:00 am in Courtroom 26A. Signed by Judge Beryl A. Howell on March 31, 2025. (lcbah4) (Entered: 03/31/2025) |
| 03/31/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for April 1, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: https://www.dcd.uscourts.gov/sites/dcd/files/Standing%20Order%20No.%2024−31_001.pdf. Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of |

| | | |
|---|---|---|
| | | entry to future hearings, or other sanctions deemed necessary by the Court.(mac) (Entered: 03/31/2025) |
| 03/31/2025 | | Set/Reset Deadlines/Hearings: Defendant's Position On Motion due no later than 3:00PM on 3/31/2025. Status Conference set for 4/1/2025 at 10:00 AM in Courtroom 26A− In Person (Audio Line Available) before Judge Beryl A. Howell. (mac) (Entered: 03/31/2025) |
| 03/31/2025 | 15 | Memorandum in opposition to re 14 Motion for Order, filed by AMY GLEASON, TRENT MORSE, JAMES M. BURNHAM, JACOB ALTIK, NATE CAVANAUGH, MARCO A. RUBIO, PETER B. HEGSETH, PETER A. GARVIN, DONALD J. TRUMP, KENNETH JACKSON, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Exhibit 1 (Form 1334), # 2 Exhibit 2 (Bd. Resolution), # 3 Exhibit 3 (Letter), # 4 Exhibit 4 (OMB Waiver), # 5 Text of Proposed Order)(Hudak, Brian) (Entered: 03/31/2025) |
| 04/01/2025 | 16 | REPLY to opposition to motion re 14 Motion for Order, *Pursuant to the All Writs Act to Suspend Transfer of Property and for Status Conference* filed by NANCY ZIRKIN, GEORGE E. MOOSE, UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, MARY SWIG. (Goldfarb, Andrew) (Entered: 04/01/2025) |
| 04/01/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Status Conference held on 4/1/2025. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 04/01/2025) |
| 04/01/2025 | 17 | NOTICE of Appearance by William James Murphy on behalf of All Plaintiffs (Murphy, William) (Entered: 04/01/2025) |
| 04/01/2025 | 18 | TRANSCRIPT OF MOTION HEARING before Judge Beryl A. Howell held on March 19, 2025; Page Numbers: 1−94. Date of Issuance: April 1, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354−3269. Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 4/22/2025. Redacted Transcript Deadline set for 5/2/2025. Release of Transcript Restriction set for 6/30/2025.(Edwards, Lisa) (Entered: 04/01/2025) |
| 04/01/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 14 Motion for Order Pursuant to All Writs Act to Suspend Transfer of Property ("Pls.' Mot."), defendants' 15 Opposition ("Defs.' Opp'n"), plaintiffs' 16 Reply, and the arguments made at a motion hearing held on April 1, 2025, DENYING plaintiffs' 14 Motion in part as |

MOOT and in part on the merits.

On March 31, 2025, plaintiffs filed the pending motion requesting that the Court urgently enjoin defendants' "proposed transfer" of property from the U.S. Institute of Peace ("USIP") to the executive branch's General Services Administration ("GSA") under the All Writs Act, 28 U.S.C. § 1651(a), because such transfer "has the potential substantially to impair this Court's jurisdiction to grant relief to Plaintiffs," Pls.' Mot. at 1, "or, in the alternative,... that the Court schedule a status conference to address the issue as soon as practicable," *id.* Plaintiffs' request for a hearing on the motion was promptly granted and hearing scheduled for the following day—today—with an opportunity for defendants to file an opposition prior to the hearing.

Defendants clarified at the hearing that transfer to GSA of the USIP building and all of the personal property contained therein, was completed on Saturday, March 29, 2025. *See* Defs.' Opp'n [15−1], Ex. 1 (GSA form for intra−executive branch transfer signed on Mar. 27, 2025); *id.*, Ex. 3 (undated letter from new USIP President to GSA requesting the transfer without reimbursement); *id.*, Ex. 4 (letter from Director of OMB approving the transfer, dated Mar. 29, 2025). With respect to the USIP property already transferred, the deal is no longer merely "proposed" but done, rendering plaintiffs' requested relief moot as to that property.

With respect to any other USIP property that has not yet been transferred, including USIP's Endowment held, according to plaintiffs' counsel, in various bank accounts totaling over $20 million, plaintiffs must demonstrate their entitlement to relief under the All Writs Act. This statute empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

The first issue to address when invoking the All Writs Act is whether the requested relief is "necessary or appropriate in aid of [this Court's] jurisdiction." *Id.* While plaintiffs raise concern about real property and financial property being transferred to the U.S. government and this Court's inability to promptly transfer them back, *see* Pls.' Mot. ¶ 8 (citing the Quiet Title Act, which bars entry of a preliminary injunction to dispossess the United States of real property, 28 U.S.C. § 2409a(c)) and ¶ 9 (describing how the only recourse for restoring financial assets would be a Tucker Act suit before the Court of Federal Claims), plaintiffs conceded orally that this Court would still have jurisdiction over the merits of this suit if the property were transferred. The suit would not be moot because some relief would still be possible. An order halting transfer of the property thus is not necessary or appropriate to aid this Court's jurisdiction to resolve the ultimate dispute.

Second, plaintiffs cannot demonstrate a likelihood of success on the merits, which is required to obtain an injunction to preserve the status quo between the parties under the All Writs Act in this Circuit. *See Belbacha v. Bush*, 520 F.3d 452, 458−59 (D.C. Cir. 2008); *Kiyemba v. Obama*, 561 F.3d 509, 513 n.3 (D.C. Cir. 2009) (interpreting *Belbacha* as requiring that even if the court has the power to preserve the status quo pursuant to the All Writs Act, the party must still satisfy the four factors for issuing a preliminary injunction to obtain that relief); *see also Shoop v. Twyford*, 596 U.S. 811, 820 (2022) ("We have made clear that a petitioner cannot use that [All Writs] Act to circumvent statutory requirements or otherwise binding procedural rules."). Plaintiffs cite to *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004), which

14

does not require satisfaction of the four−factor test for a preliminary injunction for an "All Writs Act injunction," Pls.' Mot. at 5, but the Eleventh Circuit's different approach is not applicable here. *See* Samuel L. Ferenc, Note, *Clear Rights and Worthy Claimants: Judicial Intervention in Administrative Action under the All Writs Act*, 118 COLUM. L. REV. 127, 150−55 (2018) (distinguishing between the D.C. Circuit's approach and the Eleventh Circuit's anomalous approach in *Klay*); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir. 2005) (holding that plaintiffs cannot "use the All Writs Act in order to circumvent the requirements for preliminary injunctive relief").

As explained in the prior order denying plaintiffs' request for a temporary restraining order, plaintiffs have not demonstrated on the current record before the Court that they are likely to succeed on the merits of their ultra vires claims about the removal of USIP's Board members and President. *See* Minute Order (Mar. 19, 2025). Despite further discussion of the issue during the status conference today, ambiguity persists given the paucity of apposite law regarding USIP's proper classification as an "independent establishment" or "Government corporation" that rests outside of or within the executive branch and whether it qualifies as an agency, *see* 5 U.S.C. §§ 103−105. Indeed, plaintiffs conceded at the hearing that their reply brief cites to authority on this issue not previously provided to the Court and, further, that this issue will be more fully addressed in the expedited summary judgment briefing being prepared by the parties that will be helpful in making a thorough assessment of the merits.

For these reasons, plaintiffs' motion is DENIED.

Signed by Judge Beryl A. Howell on April 1, 2025. (lcbah4) (Entered: 04/01/2025)

| | | |
|---|---|---|
| 04/04/2025 | 19 | MOTION for Summary Judgment by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Statement of Facts)(Goldfarb, Andrew) (Entered: 04/04/2025) |
| 04/04/2025 | 20 | SUPPLEMENTAL MEMORANDUM re 19 *Exhibits to R.56.1 Statement* by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12 − Place Holder, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Text of Proposed Order)(Goldfarb, Andrew) Modified event and added link on 4/9/2025 (mg). (Entered: 04/05/2025) |
| 04/05/2025 | 21 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Ex. 12 − UNDER SEAL, # 2 Exhibit Proposed Order)(Goldfarb, Andrew) (Entered: 04/05/2025) |

| 04/05/2025 | 22 | Amended MOTION for Summary Judgment Corrected re 19 Motion for Summary Judgment by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Goldfarb, Andrew) Modified on 4/8/2025 to add link (mg). (Entered: 04/05/2025) |
|---|---|---|
| 04/07/2025 | 23 | TRANSCRIPT OF PROCEEDINGS, before Judge Beryl A. Howell, held on 4−01−2025. Page Numbers: 1 − 87. Date of Issuance: 4−07−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/28/2025. Redacted Transcript Deadline set for 5/8/2025. Release of Transcript Restriction set for 7/6/2025.(Davila, Elizabeth) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 21 Motion to Seal Exhibit, DIRECTING the Clerk of Court to place under seal plaintiffs' Exhibit 12, and DIRECTING plaintiffs to post on the public docket a redacted copy of the same exhibit. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah4) (Entered: 04/07/2025) |
| 04/07/2025 | 28 | SEALED DOCUMENT (Exhibit 12) filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. re 20 Motion for Summary Judgment. (This document is SEALED and only available to authorized persons.)(mg) (Entered: 04/09/2025) |
| 04/08/2025 | 24 | NOTICE OF FILING REDACTED DOCUMENT to 20 MOTION for Summary Judgment *Exhibits to R.56.1 Statement* by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN (Attachments: # 1 Exhibit Ex. 12 − Redacted)(Goldfarb, Andrew) (Entered: 04/08/2025) |
| 04/08/2025 | 25 | NOTICE of Appearance by Rebecca S. LeGrand on behalf of 113 Former Senior Military and Foreign Policy Officials (LeGrand, Rebecca) (Entered: 04/08/2025) |
| 04/08/2025 | 26 | Unopposed MOTION for Leave to File Amicus Brief by 128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Shenkman, Michael) Modified relief on 4/9/2025 (mg). (Entered: 04/08/2025) |
| 04/08/2025 | 27 | |

| | | |
|---|---|---|
| | | MOTION for Leave to File Amicus Brief by 113 Former Senior Military and Foreign Policy Officials. (Attachments: # 1 Exhibit 1 (Proposed Amicus Brief), # 2 Text of Proposed Order)(LeGrand, Rebecca) (Entered: 04/08/2025) |
| 04/09/2025 | 29 | SUMMONS (1) Issued Electronically as to TRENT MORSE. (mg) (Entered: 04/09/2025) |
| 04/09/2025 | | MINUTE ORDER (paperless) GRANTING 128 Employees' 26 Unopposed Motion for Leave to File Amicus Brief and 113 Former Senior Military and Foreign Policy Officials' 27 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 9, 2025. (lcbah4) (Entered: 04/09/2025) |
| 04/09/2025 | 30 | AMICUS BRIEF by 128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025. (znmw) (Entered: 04/10/2025) |
| 04/09/2025 | 31 | AMICUS BRIEF by 113 FORMER SENIOR MILITARY AND FOREIGN POLICY OFFICIALS. (znmw) (Entered: 04/10/2025) |
| 04/11/2025 | 32 | MOTION for Summary Judgment by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Hudak, Brian) (Entered: 04/11/2025) |
| 04/11/2025 | 33 | Memorandum in opposition to re 22 Motion for Summary Judgment, 19 Motion for Summary Judgment filed by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Hudak, Brian) (Entered: 04/11/2025) |
| 04/18/2025 | 34 | REPLY to opposition to motion re 19 Motion for Summary Judgment, 32 Motion for Summary Judgment, *Consolidated Opposition to Cross−Motion for Summary Judgment* filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Statement of Facts, # 2 Declaration, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Text of Proposed Order)(Goldfarb, Andrew) (Entered: 04/18/2025) |
| 04/18/2025 | 35 | Consolidated Memorandum in opposition to re 32 MOTION for Summary Judgment filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (See docket entry 34 to view document). (mg) (Entered: 04/22/2025) |
| 04/23/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on the pending cross−motions for summary judgment on Thursday, May 1 at 11:00 AM, in Courtroom 26A, in person. Signed by Judge Beryl A. Howell on April 23, 2025. (lcbah4) (Entered: 04/23/2025) |
| 04/24/2025 | | |

| | | |
|---|---|---|
| | | Set/Reset Hearings: Motion Hearing set for 5/1/2025 at 11:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 04/24/2025) |
| 04/25/2025 | 36 | REPLY to opposition to motion re 32 Motion for Summary Judgment, filed by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Hudak, Brian) (Entered: 04/25/2025) |
| 04/28/2025 | | MINUTE ORDER (paperless) VACATING the scheduled hearing for Thursday, May 1, and DIRECTING the parties to appear for a hearing on the pending cross−motions for summary judgment on Wednesday, May 14 at 10:00 AM, in Courtroom 26A, in person. Signed by Judge Beryl A. Howell on April 28, 2025. (lcbah4) (Entered: 04/28/2025) |
| 04/30/2025 | | Set/Reset Hearings: Motion Hearing set for 5/14/2025 at 10:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 04/30/2025) |
| 05/13/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for May 14, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB). **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 05/13/2025)** |
| 05/14/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 5/14/2025 re 22 Amended Motion for Summary Judgment 32 Motion for Summary Judgment and 19 Motion for Summary Judgment. The Court Heard Oral Arguments From The Parties And Will Reserve Decision. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 05/14/2025) |
| 05/14/2025 | | MINUTE ORDER (paperless) DIRECTING defendants to file by 2:00 PM on May 15, 2025, any supplemental briefing in response to the Court's question distinguishing USIP from the entities described as "private, non−profit corporations" in the D.C. Circuit emergency panel's opinion in *Widakuswara v. Lake*, No. 25−5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025). Signed by Judge Beryl A. Howell on May 14, 2025. (lcbah4) (Entered: 05/14/2025) |
| 05/15/2025 | | Set/Reset Deadlines: Defendants Supplemental Briefing due no later than 2:00PN On 5/15/2025. (mac) (Entered: 05/15/2025) |
| 05/15/2025 | 37 | SUPPLEMENTAL MEMORANDUM to re Order, filed by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Hudak, Brian) (Entered: 05/15/2025) |
| 05/16/2025 | 38 | TRANSCRIPT OF PROCEEDINGS before Judge Beryl A. Howell, held on 5−14−2025; Page Numbers: 1 − 109. Date of Issuance: 5−16−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242. Transcripts may be ordered by |

| | | |
|---|---|---|
| | | submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/6/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025.(Davila, Elizabeth) (Entered: 05/16/2025) |
| 05/19/2025 | 39 | ORDER GRANTING plaintiffs' 22 Motion for Summary Judgment and denying defendants' 32 Cross−Motion for Summary Judgment. See Order for further details. The Clerk of Court is directed to close this case. Signed by Judge Beryl A. Howell on May 19, 2025. (lcbah4) (Entered: 05/19/2025) |
| 05/19/2025 | 40 | MEMORANDUM OPINION regarding plaintiffs' 22 Motion for Summary Judgment and defendants' 32 Cross−Motion for Summary Judgment. Signed by Judge Beryl A. Howell on May 19, 2025. (lcbah4) (Entered: 05/19/2025) |
| 05/21/2025 | 41 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 40 Memorandum & Opinion, 39 Order on Motion for Summary Judgment, by JAMES M. BURNHAM, KENNETH JACKSON, DONALD J. TRUMP, NATE CAVANAUGH, PETER A. GARVIN, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, JACOB ALTIK, MARCO RUBIO, PETER B. HEGSETH, U.S. DOGE SERVICE, TRENT MORSE, AMY GLEASON. Fee Status: No Fee Paid. Parties have been notified. (Hudak, Brian) (Entered: 05/21/2025) |
| 05/21/2025 | 42 | MOTION to Stay *Pending Appeal* by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 05/21/2025) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE FOR PEACE,
et al.,

Plaintiffs,

v.

KENNETH JACKSON,
Assistant to the Administrator for
Management and Resources for USAID, et al.,

Defendants.

Civil Action No. 25-0804 (BAH)

## NOTICE OF APPEAL

Defendants respectfully provide notice that they hereby appeal to the United States Court

of Appeals for the District of Columbia Circuit from the Court's Order of May 19, 2025 (ECF

No. 39), and supporting Memorandum Opinion (ECF No. 40), which granted Plaintiffs' motion

for summary judgment and denied Defendants' motion for summary judgment.

Dated: May 21, 2025
        Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____/s/ Brian P. Hudak_____
        BRIAN P. HUDAK
        Chief, Civil Division
        601 D Street, NW
        Washington, DC 20530
        (202) 252-2549

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-cv-804 (BAH) |
| v. | **Judge Beryl A. Howell** |
| KENNETH JACKSON, *in his official capacity*, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

The U.S. Institute of Peace ("USIP" or "the Institute") was created by Congress 40 years

ago in a statute signed by President Ronald Reagan. By design, USIP was established by the two

political branches to advance a safer, more peaceful world with the specific tasks of conducting

research, providing training on peacemaking techniques, and promoting peaceful conflict

resolution abroad—without formally involving the U.S. government in foreign disputes. To

ensure the independence of the Institute, Congress stated this intent explicitly in the organic

statute, which declares USIP's status as an "independent nonprofit corporation," 22 U.S.C.

§ 4603(b), and imposed certain prerequisites for the exercise of presidential power to remove

USIP's board members, *id.* § 4605(f). Since then, Congress has endorsed USIP's important

work by continuing to fund the Institute through appropriations bills signed by seven different

Presidents from both major political parties, including the current President during his first term

in office.

In a drastic and abrupt change of course, within the first month of his second term,

President Trump unilaterally decided that USIP is "unnecessary," issuing Executive Order 14217

("EO 14217") § 1, 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025), to this effect, and then his

1

Administration rushed through actions, including removal of Board members, to reach the professed goal of reducing all of USIP's operations and personnel to the bare minimum to perform only mandated statutory tasks, while ignoring the broader statutory goals set out for this organization to fulfill.  These unilateral actions were taken without asking Congress to cease or reprogram appropriations or by recommending that Congress enact a new law to dissolve or reduce the Institute or transfer its tasks to another entity, despite the President's constitutional duties either to "take care" of "faithfully execut[ing]" the laws, U.S. CONST. art. II, § 3, cl. 4, or to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient," *id.*, cl. 1.

Instead, the current Administration decided to effectuate the President's Executive Order 14217 through blunt force, backed up by law enforcement officers from three separate local and federal agencies.  The Administration removed the Institute's leadership, including plaintiff Board members and its president in contravention of statutory limitations, and had personnel from a newly created federal office, called the Department of Government Efficiency ("DOGE"), forcibly take over the Institute's headquarters on March 17, 2025.  With a newly installed USIP president, the Administration then handed off USIP's property for no consideration and abruptly terminated nearly all of its staff and activities around the world.  *See* Hearing on Cross-Mots. for Summ. J. Tr. ("XMSJ Hr'g") at 13:4-15:6 (5/14/25), ECF No. 38 (plaintiffs' counsel representing that only four employees are left at USIP's headquarters and only "a handful" overseas, and that "zero" programmatic activities are occurring at USIP); *id.* at 59:14-60:17 (defendants' counsel representing that only five employees are left and that "the Institute is currently in the operational posture of being at or reducing to its statutory minimum").

The question before this Court is whether these unilateral actions by the President and his Administration are legal under duly enacted statutes and the U.S. Constitution. Since the outset of this lawsuit challenging the President's removal of all but the *ex officio* members of the Institute's Board—after which all other challenged actions were effectuated—the parties have taken opposite views of the legality of these actions based on their divergent characterizations of the Institute's relationship to the U.S. government: plaintiffs assert that USIP is a "congressionally established" yet "free-standing nonprofit," Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at 1, ECF No. 22, not part of the federal government at all, XMSJ Tr. Hr'g at 8:6-8, while defendants assert that USIP is an "Executive Branch component of the Nation's federal government exercising executive power through executive functions," Defs.' Cross. Mot. for Summ. J., Mem. in Supp. & Opp'n to Pls.' MSJ ("Defs.' Opp'n") at 1, ECF No. 32. No court before has addressed this novel question of where precisely the Institute falls within our constitutional structure, though the answer to this question has implications for the legality under the U.S. Constitution of the President's exercise of removal power in a manner that violates the applicable statute.

The Institute is unique in its structure and function—neither a traditional Executive branch agency nor an entirely private nonprofit corporation. A close evaluation of USIP's organic statute and its practical operations indicates that the arguments ably presented on both sides have some merit, but both end up taking leaps to reach conclusions that are unsupported by the factual record and current jurisprudence. This Court concludes that, despite exhibiting qualities of nongovernmental organizations ("NGOs"), USIP has strong governmental ties and must be considered a part of the federal government, at least for purposes of resolving the constitutional separation-of-powers questions posed here. At the same time, USIP does not

exercise governmental, let alone executive, power under the Constitution and is not part of the Executive branch.  Instead, USIP supports both the Executive and Legislative branches as an independent think tank that carries out its own international peace research, education and training, and information services.

As an independent entity exercising inconsequential government power and *de minimis*, if any, executive power, Congress's ability to restrict the President's removal power is even greater than that outlined in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), *Seila Law v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), and the Supreme Court's other seminal presidential removal power cases.  Applying those cases, Congress's restrictions on the President's removal power of USIP Board members are squarely constitutional, and the President and his Administration's acts to the contrary are unlawful and *ultra vires*.  The actions that have occurred since then—at the direction of the President to reduce USIP to its "statutory minimums"—including the removal of USIP's president, his replacement by officials affiliated with DOGE, the termination of nearly all of USIP's staff, and the transfer of USIP property to the General Services Administration ("GSA"), were thus effectuated by illegitimately-installed leaders who lacked legal authority to take these actions, which must therefore be declared null and void.

*        *        *

To aid in review of this Memorandum Opinion, given its length required to address the novel constitutional and other issues raised in the parties' pending dispositive motions, an overview is provided.  **Part I** reviews the relevant factual and procedural background in this case regarding the Institute (**section A**), the Administration's actions that instigated this litigation

(**section B**), and the prior motions and rulings in this case leading to the expedited dispositive motions resolved here (**section C**).

**Part II** provides the legal standards governing the parties' cross-motions for summary judgment, under Federal Rule of Civil Procedure 56.

**Part III** addresses the merits and disposition of the pending motions. **Section A** considers whether USIP is part of the Executive branch under our Constitution and thus subject to the President's Article II removal authority. **Subsection 1** holds that USIP is part of the federal government such that constitutional separation-of-powers principles apply, but **subsection 2** holds that USIP does not exercise executive powers and is not part of the Executive branch, and so the President had no constitutional authority under Article II to remove the Institute's Board members. Consequently, the USIP Act's for-cause and other removal protections were valid, and the President acted *ultra vires*, violating those provisions. **Section B** goes on to consider whether that conclusion would change if USIP *were* part of the Executive branch and concludes that it would not. USIP is led by a multi-member board of experts and exercises *de minimis*, if any, executive power, so under binding precedent, including *Humphrey's Executor* and *Seila Law*, the statutory for-cause and other removal protections are constitutional. **Section C** explains how these conclusions mean that plaintiffs prevail on Counts One, Two, Three, Four, and Six in their Amended Complaint. **Section D** describes the requirements for injunctive relief and determines both the declaratory relief to which plaintiffs are entitled and the specific injunctive relief plaintiffs shall be afforded.

**Part IV** provides a brief conclusion summarizing the disposition of the pending cross-motions for summary judgment.

I.    **BACKGROUND**

The background and procedural history relevant to the pending cross-motions are described below.

A.    **Organizational Background**

USIP was established in 1984 under the Department of Defense Authorization Act of 1985, Pub. L. No. 98-525, tit. XVII sec. 1701-1712, 98 Stat. 2492, 2649, (1984), *codified at* 22 U.S.C. §§ 4601-4611.  Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶ 1, ECF No. 20;[1] 22 U.S.C. § 4603(a) ("There is hereby established the United States Institute of Peace.").  The effort to create USIP was bipartisan in nature, led by two former World War II veterans, Senators Mark Hatfield and Spark Matsunaga, who had long envisioned a national "peace academy."  Amicus Br. of 113 Former Sr. Military & Foreign Policy Gov't Officials ("Sr. Officials Amicus Br.") at 10, ECF No. 31; *The Origins of USIP*, U.S. INSTITUTE OF PEACE, https://web.archive.org/web/20241127185853/https://www.usip.org/about/origins-usip (last visited May 14, 2025).  As the statute mentions, a "Commission on Proposals for the National Academy of Peace and Conflict resolution, created by the Education Amendments of 1978, recommended establishing an academy as a highly desirable investment for further the Nation's interest in promoting peace."  22 U.S.C. § 4601(a)(7); REPORT OF THE COMMISSION ON PROPOSALS FOR THE NATIONAL ACADEMY OF PEACE AND CONFLICT RESOLUTION, *To Establish the United States Academy of Peace* ("Comm'n Rep.") (1981).  Specifically, the Commission spent about a year hearing from people in the field, assessing peace-promoting organizations, and evaluating "the current state of peace learning and its use."  Comm'n Rep. at 2.  The Commission saw a "federal role" for "international peace research, education and training, and

---

[1]        Unless otherwise noted, cited facts submitted by plaintiffs are undisputed.  *See* Pls.' SUMF; Defs.' Responses to Pls.' SUMF ("Defs.' Resp."), ECF No. 32-1.

information services," *id.* at xiii, and proposed "an interdisciplinary institution devoted to international peace" to further that interest, *id.* at 1.  The Institute's organic statute, implementing this vision, was signed into law by President Reagan.

Described below are various aspects of how the Institute operates, including its statutory framework, statutory purposes, funding sources, activities, interactions with other government entities, and internal governance structure.

### 1.    *Statutory Framework*

Congress defined USIP as an "independent nonprofit corporation and an organization described in section 170(c)(2)(B) of Title 26," 22 U.S.C. § 4603(b), which provides for corporations or foundations "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes," 26 U.S.C. § 170(c)(2)(B).  USIP has the powers of a D.C. nonprofit corporation, except for the ability to dissolve itself.  *See* 22 U.S.C. § 4604(a) (referencing section 5(o) of the District of Columbia Nonprofit Corporation Act, D.C. Code 29-412.01 *et seq*.); District of Columbia Nonprofit Corporation Act, Pub. L. No. 87-569, sec. 5(o), 76 Stat. 265, 268 (1962) (regarding a corporation's authority to "cease its corporate activities and surrender its corporate franchise").[2]  USIP likewise may not issue stock to transfer its ownership. *See* 22 U.S.C. § 4603(b).

### 2.    *Purposes*

The Institute's organic statute describes its purpose as "establish[ing] an independent, nonprofit, national institute to serve the people and the Government through the widest possible

---

[2]    Defendants agree that other provisions of the D.C. Code—aside from those outlining a nonprofit corporation's powers (section 5 of Pub. L. 87-569, or D.C. Code Title 29, Ch. 4, Subchapter III, § 29-403, "purposes and powers")—do not apply.  *See* XMSJ Hr'g Tr. at 68:8-69:23.  Therefore, USIP's organic statute, *see infra* Part I.A.7, not any provision of the D.C. Code, controls removal of USIP Board members and officers.  *Cf.* D.C. Code § 29-406.08(e) ("Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons.").

7

range of education and training, basic and applied research opportunities, and peace information

services on the means to promote international peace and the resolution of conflicts among the

nations and peoples of the world without recourse to violence." *Id.* § 4601(b). That section—the

"Congressional declaration of findings and purposes"—discusses the need for stronger research,

training, and information dissemination in peaceful conflict resolution techniques. *See id.*

§ 4601. Specifically, Congress identified a "national need to examine the disciplines in the

social, behavioral, and physical sciences and the arts and humanities . . . to bring together and

develop new and tested techniques to promote peaceful . . . relations in the world." *Id.*

§ 4601(a)(4). In addition, Congress described "a need for Federal leadership to expand and

support the existing international peace and conflict resolution efforts of the Nation and to

develop new comprehensive peace education and training programs, basic and applied research

projects, and programs providing peace information." *Id.* § 4601(a)(6).

      To meet these identified needs, the political branches envisioned a "national institution

devoted to international peace research, education and training and information services," *id.*

§ 4601(a)(5), using words such as an "academy," *id.* § 4601(a)(7), or "institute strengthening and

symbolizing the fruitful relation between the world of learning and the world of public affairs,"

*id.* § 4601(a)(8). To carry out this goal of establishing such an "academy" or "institute,"

Congress provided funding and guidance on tasking, with protections to ensure the Institute's

independence.

      **3.**    *Funding*

      USIP receives annual appropriations from Congress to carry out its mission and may also

obtain funds through private donations and governmental grants, as well as by charging fees and

subscriptions for its publications and educational activities. *Id.* §§ 4609(a), 4604(h)(1),

4604(h)(3), 4604(i)-(j). Unlike Executive branch agencies, USIP may seek appropriations

directly from Congress, relegating the Office of Management and Budget ("OMB") to submitting comments on the budget request at the time of transmittal. *Id.* § 4608(a). Private gifts and contributions may only be used for the development and maintenance of its headquarters or other facilities and for hospitality purposes. *Id.* § 4604(h)(3)(A)-(B).

USIP's distinctive headquarters (prior to the challenged acts in this case) on Washington, D.C.'s Constitution Avenue were funded through $70 million of private contributions and $99 million of funds appropriated specially by Congress. Pls.' SUMF ¶¶ 6, 9. The headquarters were owned by USIP and maintained by USIP with private funds. *Id.* ¶ 9. While the United States owns the land on which USIP's headquarters are located, USIP had administrative jurisdiction of that property, pursuant to a transfer effected in 1996. *Id.* ¶¶ 7-8; Am. Compl., Ex. B, Letter from Sec'y of Navy to President of USIP (Nov. 21, 1996), ECF No. 12-2 (transferring administrative jurisdiction over the real property to USIP); *id.*, Ex. C, Notice of Transfer of Jurisdiction (Nov. 8, 2013), ECF No. 12-3 (transferring an adjacent parcel of land).

USIP is congressionally authorized both to retain appropriated funds not used in a given year, *see* 22 U.S.C. § 4609(b), and to collect private funds, in a separate private endowment, *see id.* § 4603(c) (describing the "Endowment of the United States Institute for Peace"). Prior to the events leading to the instant dispute, the Institute's Endowment held $15 million of private donations and $10 million of rolled-over appropriations. *See* Pls.' SUMF ¶ 11.

Upon liquidation or dissolution of the Institute, all assets must revert to the U.S. Treasury. 22 U.S.C. § 4610.

### 4. *Activities*

USIP's activities, as set out in the organic statute, focus on research, training, and the promotion of peaceful conflict resolution techniques. Congress instructed the Institute to establish various fellowship, scholarship, and award programs, *id.* §§ 4604(b)(1), (b)(10), (c), as

well as a research program on peace to investigate "the causes of war," "peace theories," and the "experiences of the United States and other nations in resolving conflicts," *id.* § 4604(b)(3). Congress further provided that the Institute should "develop programs to make international peace and conflict resolution research, education, and training more available and useful." *Id.* § 4604(b)(4). In this regard, Congress mentioned the creation of handbooks and practical materials, the publication and dissemination of the Institute's work product, and offering trainings and symposia. *Id.* §§ 4604(b)(4), (b)(6)-(8). Apart from providing its own education, the Institute is instructed to promote and support peace education and research at the graduate and postgraduate levels and authorized to make grants to educational institutions for such purposes. *Id.* §§ 4604(b)(5), (d). All of this work may be facilitated by forming relationships with public and private institutions. *Id.* § 4604(b)(2).

USIP is also statutorily authorized to respond to requests for conducting investigations, examinations, studies, and reports "on any issue within the Institute's competence." *Id.* § 4604(e). Such requests may, for instance, come from Congress. In fact, USIP regularly briefs members of Congress and their staff. Pls.' SUMF ¶ 60. USIP also engages in specific ad-hoc projects, one example being the Iraq Study Group. A bipartisan group of members of Congress asked USIP in 2006 to facilitate a study group comprised of various federal government officials with support from independent nonprofit institutions to provide a fresh perspective on the situation in Iraq. *Id.* ¶ 60(a). USIP organized expert working groups, developed briefing papers, provided analysis, and coordinated meetings. *Id.* In 2020, Congress specifically directed, as codified in law, USIP to develop the "Gandhi-King Global Academy," a professional training institute to develop and disseminate nonviolent conflict resolution curricula. *Id.*; *see also*

10

Consolidated Appropriations Act of 2021, Pub. L. 116-260, sec. 333-34, 134 Stat. 1182, 3115-16

(2020) (describing the Academy and the "Gandhi-King Scholarly Exchange Initiative").

In addition to its headquarters in Washington, D.C., USIP has global applied research

offices abroad, where staff members carry out specific projects, facilitate conflict resolution

discussions, and teach and share nonviolent conflict management techniques.  *See* Pls.' Mem. at

7; Pls.' SUMF ¶ 59.

To facilitate these statutory tasks, USIP may request information from various

government entities—just like any other private person—pursuant to the Freedom of Information

Act ("FOIA").  22 U.S.C. § 4604(b)(9).  USIP also serves as a clearinghouse for the

dissemination of information "from the field of peace learning" to the public and to government

personnel, *id.* § 4604(b)(8), and is subject itself to FOIA, *id.* § 4607(i).  Congress made clear,

however, that USIP is not to advance its mission independently via petition to political bodies—

prohibiting its "influenc[ing] the passage or defeat of any legislation by the Congress" or state,

local, or global legislative bodies, unless asked to testify.  *Id.* § 4604(n).

## 5.    *Interactions with Other Government Entities*

Aside from the ways in which USIP interacts with Congress and Executive branch

agencies to further directly its peace-promoting goals, *i.e.*, by responding to congressional and

agency inquiries, filing FOIA requests for information, or publishing work product, its organic

statute also provides for various administrative touchpoints with other government entities.  For

instance, USIP may obtain support from the GSA on a reimbursable basis, despite retaining

ownership of its headquarters building (prior to the Administration's actions leading to this

dispute).  *Id.* § 4604(o).[3]

---

[3]    GSA owns and leases 8,397 buildings for the federal government, including post offices, courthouses and office buildings that house government offices, like the Department of Justice and Department of Labor.  *See*

11

Further, despite maintaining substantial independence over its finances—as evidenced by USIP having a private firm do its annual audits and USIP being authorized to make its own budgetary request to Congress—USIP must report its annual audit to Congress and allow OMB to comment on its budget requests.  *Id.* §§ 4607(g)-(h), 4608(a).[4]  USIP must also make biennial reports to Congress and the President, *id.* § 4611, and report notice of its board meetings, which may be provided in the Federal Register, *id.* § 4605(h)(3).

More consequentially, USIP may only continue to use "United States" "U.S." or any other reference to the U.S. government in its name or seal if Congress continues to appropriate funds to the organization.  *Id.* § 4603(e)(2).  Thus, the Institute's titular affiliation with the U.S. government is contingent on Congress's annual approval of appropriations.

### 6.    *Leadership and Staff*

USIP is led by a Board of Directors consisting of fifteen voting members: three *ex officio* members (the Secretary of State, the Secretary of Defense, and the National Defense University President) and twelve members, who are appointed by the President of the United States and confirmed by the Senate ("appointed members").  *Id.* § 4605(b).  By statute, "not more than eight voting members of the Board . . . may be members of the same political party."  *Id.* § 4605(c).  The twelve appointed members may serve up to two four-year terms.  *Id.* § 4605(e)(1), (e)(4).  Congress required that the appointed members have "appropriate practical or academic experience in peace and conflict resolution efforts of the United States," *id.* § 4605(d)(1), and be independent of the federal government since they may not be "[o]fficers" or "employees of the

---

*Inventory of GSA Owned and Leased Properties*, GSA, https://www.gsa.gov/tools-overview/buildings-and-real-estate-tools/inventory-of-gsa-owned-and-leased-properties (last visited Apr. 21, 2025); *id.*, *GSA Properties*, https://www.gsa.gov/real-estate/gsa-properties (last visited Apr. 21, 2025).

[4]    KPMG, a private accounting firm, does audits for USIP.  Pls.' SUMF ¶ 33; *see also* 22 U.S.C. § 4607(g) (stating that audits should be conducted "by independent certified public accountants or independent licensed public accountants").

United States Government," *id.* § 4605(d)(2). Every three years, the Board elects a Chairman

from among the appointed members. *Id.* § 4605(h)(1). The Board meets at least semiannually,

at any time a meeting is called by the chairman or at the request of five members of the Board.

*Id.* § 4605(h)(2). The quorum for such meetings is a majority of members of the Board. *Id.*

The Board members appoint a president and other officers of USIP as necessary. *Id.*

§ 4606(a). The president of USIP is a nonvoting, *ex officio* member of the Board and serves for

a defined term of years. *Id.* The president may hire and terminate employees as he sees fit to

carry out the purposes of the Institute. *Id.* § 4606(c).

USIP officers and employees are considered federal employees only for limited, express

purposes. They are subject to the Federal Torts Claims Act ("FTCA") as federal employees are,

and they are treated as federal employees for some compensation and benefits-related purposes,

*see id.* § 4606(f)(1), although they are paid via a private payroll and receive benefits through

private plans, *see* Pls.' SUMF, Ex. 7, Decl. of Former USIP Pres. Amb. Moose ("Third Moose

Decl.") ¶ 4, ECF No. 20-7; Pls.' Opp'n Exhibits, Ex. 9, Decl. of Former USIP CFO Allison

Blotzer ¶ 3, ECF No. 34-11. Their compensation is set by the president of USIP, "governed by

the provisions of Title 5 relating to classification and General Schedule pay rates." 22 U.S.C.

§ 4606(c).

Despite USIP having its own independent staff, other federal employees may join USIP

for a particular assignment. The president of USIP may request that a federal officer be assigned

"by an appropriate department, agency, or congressional official or member of Congress." 22

U.S.C. § 4606(d)(1). The Secretary of State, Secretary of Defense, and Director of the CIA may

also assign employees and officers from their own agencies to the Institute "on a rotating basis to

be determined by the Board." *Id.* § 4606(d)(2).

USIP is "liable for the acts of its directors, officers, employees, and agents when acting within the scope of their authority" and thus does not have sovereign immunity.  *Id.* § 4603(d). The Institute may defend itself, as well as affirmatively sue, in any court of competent jurisdiction, and is generally represented by private counsel.  *Id.* § 4604(k); Pls.' SUMF ¶ 32; Defs.' Resp. ¶ 32 (noting that USIP on occasion has been represented by DOJ).

### 7.    *The President's Statutory Removal Authority*

Appointed board members are subject to statutory removal protections and "may be removed by the President" of the United States under three circumstances.  First, the President may remove a Board member under a classic for-cause provision.  *See* 22 U.S.C. § 4605(f)(1). "[I]n consultation with the Board," the President may remove a Board member "for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties."  *Id.* Second, the President may remove a Board member "upon the recommendation of eight voting members of the Board."  *Id.* § 4605(f)(2).  No cause is required if the eight voting members agree, *see id.* § 4605(c), and given that the President may have up to eight members on the Board of his own political party, the President could presumably remove a Board member for political reasons.  Third, the President may remove a Board member without cause if certain congressional committees agree.  *Id.* § 4605(f)(3).  He needs "a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate."  *Id.*   In short, the President may remove a Board member for cause, upon recommendation of a majority of the Board, or upon recommendations of two House and two Senate committees.

14

## B.    Factual Background

Prior to any of the events giving rise to this litigation, USIP's president was Ambassador

George Moose, who previously served as Chair of the USIP Board and, for many years prior, as

Ambassador to the Republics of Benin and Senegal and Asisstant Secretary of State for African

Affairs.  Pls.' SUMF ¶ 31.  The Board consisted of 10 appointed members: five Republicans

(Amb. John Sullivan, Judy Ansley, Jonathan Burks, Michael Singh, and Roger Zakheim), and

five Democrats (Nancy Zirkin, Joseph Falk, Kerry Kennedy, Mary Swig, and Edward Gabriel).

*Id*.  ¶¶ 20-30.[5]  Two seats were vacant.  *Id*. ¶ 30.  The other voting members of the Board were,

*ex officio*, Secretary of State Marco Rubio, Secretary of Defense Pete Hegseth, and Vice Admiral

Peter Garvin.  *Id*. ¶¶ 17-19.  The Institute employed over 400 employees.  *Id*. ¶ 52.

On February 19, 2025, President Trump issued EO 14217, Commencing the Reduction of

the Federal Bureaucracy, which ordered the downsizing of "elements . . . that the President has

determined are unnecessary."  § 1, 90 Fed. Reg. at 10577.  "The non-statutory components and

functions" of certain "governmental entities" are to be "eliminated to the maximum extent

consistent with applicable law," and the entities are to "reduce the performance of their statutory

functions and associated personnel to the minimum presence and function required by law."  *Id.*

§ 2(a).  The President, in other words, ordered a virtual elimination of four congressionally

created entities—USIP being one.  *Id.*

Moving swiftly, President Moose and USIP outside counsel met the day after issuance of

EO 14217, on February 20, with several Trump administration officials tasked to efficiency-

promoting projects (like EO 14217).  Pls.' SUMF ¶ 36.  Those officials asserted that the only

statutory requirements of USIP are the existence of a Board, the appointment of a president, the

---

[5]    The Board had 11 appointed members until March 14, 2025, when one appointed Board member resigned.
Pls.' SUMF ¶ 16; Defs.' SUMF ¶ 16.

payment of incidental expenses, and the submission of certain reports to Congress and the

Executive branch. *Id*. ¶ 36. Amb. Moose and USIP's counsel explained that USIP is an

"independent nonprofit organization outside of the executive branch of the federal government."

*See id*. ¶ 36; Defs.' Resp. ¶ 36 (disputing that USIP is outside of the Executive branch but not

that USIP's counsel so asserted); *see also* Am. Compl., Ex. D, Decl. of George Foote, USIP

Outside Counsel ("Foote Decl.") ¶ 5, ECF No. 12-4. Amb. Moose soon after became aware that

DOGE was trying to determine the identity of USIP's private security contractor. Compl., Ex.

A, Decl. of Amb. Moose ¶ 9 ("First Moose Decl."), ECF No. 1-2.

Notwithstanding being informed of USIP's view of its independence, as confirmed by its

outside legal counsel, and the apparent controversy surrounding this issue, the Administration

began disassembling USIP. On Friday, March 14, 2025, Trent Morse of the White House

Presidential Personnel Office emailed all appointed Board members "[o]n behalf of President

Donald J. Trump," that their positions were "hereby terminated, effective immediately." *See*

Pls.' SUMF ¶¶ 38-39; *id*., Ex. 12, ECF No. 20-12. The emails provided no legal or factual

justification for the terminations and did not purport to meet any statutory requirement under 22

U.S.C. § 4605(f). Pls.' SUMF ¶¶ 40-42. That same day, a resolution was signed by the

remaining three *ex officio* voting Board members removing President Moose and replacing him

with an individual named Kenneth Jackson. *Id*. ¶ 43. When alerted by Board members about

these purported termination emails, outside counsel for USIP continued to impress upon DOGE

officials that USIP is outside of the control of the Executive branch and that he had informed the

Board members that these emails had no legal effect. *See* Foote Decl. ¶¶ 7-8.

Rather than engaging with outside counsel or seeking recourse for clarification in a court

of law, representatives from DOGE attempted to enter USIP headquarters, but were denied entry.

Pls.' SUMF ¶ 45. USIP's outside counsel sent an email to DOGE's general counsel reiterating the view of USIP's status as "an independent nonprofit organization outside of the control of the Executive branch," and further advising that DOGE representatives required the USIP president's approval or a warrant to enter USIP headquarters and offering to discuss the matter. Foote Decl. ¶¶ 6-8. No DOGE or other Administration official sent any response to this email. *Id*. The DOGE officials tried again later, accompanied by agents of the Federal Bureau of Investigation ("FBI"), to enter USIP headquarters, but were denied entry. Pls.' SUMF ¶ 45; First Moose Decl. ¶ 11-12; Foote Decl. ¶ 9.

Undeterred, DOGE officials, in conjunction with the FBI and the Administration's newly installed Chief of the Criminal Division of the D.C. U.S. Attorney's Office ("DC-USAO") continued their efforts over the weekend to take control of the USIP premises. On Sunday, two FBI agents visited a "senior USIP security official at his home" to determine how to gain access to the building. Pls.' SUMF ¶ 46; Foote Decl. ¶ 10. That manager was on medical leave and was taken off guard by the visit. Foote Decl. ¶ 10. USIP outside counsel contacted one of the FBI agents and requested that all inquiries be directed toward him, given the underlying legal issues with the President's removal of the Board. *See id.* The FBI agent expressed that he was "hyper aware" of the issues. *Id.*

Nonetheless, the FBI on Sunday also contacted USIP's Chief Security Officer, Colin O'Brien, seeking information about USIP security procedures. *See* Am. Compl., Ex. G, Decl. of Colin O'Brien, Chief Security Officer of USIP ("O'Brien Decl.") ¶ 3, ECF No. 12-7. The FBI agent, the same one who had communicated with outside counsel and was thus apprised of the legal advice about USIP's independence, threatened that O'Brien was "the subject of an investigation by the Department of Justice into the incident that took place at USIP on Friday,

March 14, 2025, when USIP denied building entry to DOGE staff and FBI agents," despite, as the agent well knew, that O'Brien and others were acting in response to advice by outside legal counsel. *Id.* ¶ 3; Foote Decl. ¶ 10. O'Brien received the FBI's call while at work and feared that the FBI would be awaiting him for questioning when he returned home. O'Brien Decl. ¶ 3.

The DC-USAO Criminal Division Chief became involved the same Sunday, calling outside counsel to seek access to the USIP building and resources for unnamed individuals and stating "a suspicion that USIP may be engaging in criminal behavior." Foote Decl. ¶ 12 ("I later received a call from Jonath[a]n Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of Columbia."). This same DC-USAO official called again later on Sunday to say he was requesting that representatives for Secretaries Rubio and Hegseth be able to inspect books and records. *Id.* Outside counsel informed the DC-USAO official that he would be happy to facilitate such access upon a formal written request. *Id.* ¶ 13. Then, the DC-USAO official stated that "unnamed representatives of Secretary Hegseth would be at the USIP headquarters building the next day and would expect access to the USIP information systems." *Id.* ¶ 15. He threatened to investigate criminally anyone who obstructed their access. *Id.* ("He said that as Chief of the Criminal Division, he would criminally investigate USIP and anyone who 'obstructed' their access to USIP's computer systems."); Pls.' SUMF ¶ 47.

Upon O'Brien's recommendation, Amb. Moose and outside counsel decided to suspend USIP's contract with Inter-Con, its private security firm, out of concern that DOGE or the FBI would coerce Inter-Con employees into facilitating access. O'Brien Decl. ¶ 4; Pls.' SUMF ¶ 48. This concern turned out to be prescient.

On Monday, March 17, 2025, a tense sequence of events unfolded at USIP Headquarters in downtown Washington, D.C. Under the duress of threats relayed by DOGE officials of loss of

all of its government contracts, four employees of Inter-Con arrived at USIP Headquarters.  TRO Hr'g Tr. at 36:3-16 (3/19/25), ECF No. 18; Pls.' SUMF ¶ 49; Foote Decl. ¶ 16; O'Brien Decl. ¶ 8.  Their badges had been deactivated, due to the suspension of the Inter-Con contract, but these formerly contracted security personnel gained access to USIP's headquarters when a fifth employee arrived with a physical key that had not yet been restored to USIP's custody.  Pls.' SUMF ¶ 49; *see also* O'Brien Decl. ¶¶ 5-6; Foote Decl. ¶¶ 16-17.  Outside counsel informed them that they were trespassing.  O'Brien Decl. ¶ 7; Foote Decl. ¶ 18.  USIP officers immediately formally terminated the entire Inter-Con contract.  Pls.' SUMF ¶ 48; O'Brien Decl. ¶ 9.

The Inter-Con staff proceeded to USIP's arms room, where USIP's firearms are stored.  O'Brien Decl. ¶ 10; Foote Decl. ¶ 18.  Fearing a violent standoff, Amb. Moose and O'Brien initiated a building lockdown and called the D.C. Metropolitan Police Department ("MPD") to report the trespass.  *See* Pls.' SUMF ¶ 50; O'Brien Decl. ¶¶ 11, 14; Foote Decl. ¶¶ 18-19.  DOGE officials attempted to gain access through various doors but were unable to do so.  O'Brien Decl. ¶ 12.

In the meantime, Jackson, who had been designated as USIP's president by the three *ex officio* Board members the prior Friday, contacted outside counsel and asked to speak.  Foote Decl. ¶ 21.  Jackson was outside of the headquarters, but the "circus" outside—people from the media and photographers who had gathered on scene—prevented them from speaking there.  *Id.* ¶¶ 21-23.  They agreed to meet on Zoom, but Jackson never showed up for the video conference conversation.  *Id.* ¶ 23.

MPD arrived at USIP's headquarters and allowed DOGE officials, including Jackson, to enter the building behind them.  Pls.' SUMF ¶ 51; Foote Decl. ¶ 25; O'Brien Decl. ¶¶ 16-17.

O'Brien initiated a higher-level, full building lockdown. O'Brien Decl. ¶ 18. DOGE officials asked him to escort them throughout the building, but O'Brien refused; he would not have been able to do so because of the building shutdown. *Id.* ¶ 19. MPD instead escorted outside counsel, Amb. Moose, and O'Brien (and later, all USIP personnel) out of the building without allowing them to retrieve their belongings. Pls.' SUMF ¶ 51; Foote Decl. ¶ 26. At that point, about fifteen police officers and multiple vehicles were outside of the building. Foote Decl. ¶ 27.

While waiting outside, O'Brien was informed that the FBI was en route, and he observed two diplomatic security officers from the Department of State arrive and enter the building. O'Brien Decl. ¶¶ 22-23; First Moose Decl. ¶ 12 (representing that DOGE officials returned to the building with FBI agents after they were initially denied access by USIP staff). He then observed MPD retrieve lock-picking equipment from a vehicle and gain entrance through a building door on Constitution Avenue. O'Brien Decl. ¶ 25. O'Brien and other USIP personnel received requests from DOGE personnel or others working with them to gain further access to the USIP building and USIP computer systems. *Id.* ¶¶ 27-28.

In short, over that weekend and Monday, FBI officials visited a USIP employee on medical leave in his home, an FBI agent called and threatened investigation of another USIP employee, the DC-USAO Chief of the Criminal Division called outside counsel twice and threatened criminal investigation of outside counsel and anyone who interfered with DOGE accessing USIP physical premises and systems, and law enforcement officers from three separate agencies converged at the headquarters where they escorted Amb. Moose and other USIP officers off the premises.

Two days later, DOGE officials were able to access USIP computer systems through USIP IT personnel, Am. Compl., Ex. A, Decl. of Amb. Moose ("Second Moose Decl.") ¶¶ 5-11,

20

ECF No. 12-1 (describing one employee who drove from Georgia to aid DOGE access), and then attempted to cut off personnel access to funds and were suspected of dumping financial records into shred bins. *Id.* ¶ 12-14; *see also* Pls.' Mot. for TRO, Ex. B, ECF No. 2-3 (photograph purportedly taken on March 18, 2025, of paper records in trash can marked "SHRED"). DOGE officials proceeded to strip USIP logos and monikers from the walls inside of the building. Second Moose Decl. ¶ 15.

On March 21, 2025, newly installed USIP president Jackson fired six USIP employees, referencing their at-will employment status. *See* Pls.' SUMF ¶ 53; *id.*, Ex. 13, ECF No. 20-13. Just one week later, nearly all of the Institute's employees were fired, presumably also by Jackson. *See* Pls.' SUMF ¶ 54; *id.*, Decl. of Terry Jones, Former VP of Human Resources ("Jones Decl.") ¶ 5, Ex. 4, ECF No. 20-4.

Around this time in late March, a resolution signed by two of the three *ex officio* Board members, Secretaries Rubio and Hegseth, removed USIP President Jackson and replaced him with Nate Cavanaugh, one of the DOGE-affiliated officials who had been working on disassembling USIP. *Id.* ¶ 55; Defs.' Opp'n to Pls.' Mot. Pursuant to All Writs Act ("Defs.' Opp'n to Pls.' All Writs Mot."), Ex. 2 ("Resolutions") at 1-4, ECF No. 15-2. That same resolution set the groundwork for disposing of USIP's assets. The resolution removed USIP's Chief Financial Officer and Chief Operating Officer and terminated all officers of the Endowment. *See* Resolutions at 1, 3; Pls.' SUMF ¶ 57. A newly appointed president of the Endowment was instructed by Secretaries Hegseth and Rubio to transfer all of the Endowment's assets to USIP, and Cavanaugh was instructed, also by Hegseth and Rubio, to transfer all of USIP's assets, including assets received from the Endowment, to GSA. *See* Resolutions at 1, 3; Pls.' SUMF ¶¶ 55, 57.

Cavanaugh executed documents to transfer the USIP headquarters building to GSA, without compensation, via a series of undated documents sometime around the end of March. *See* Defs.' Opp'n to Pls.' All Writs Mot., Request for Transfer of Excess Real and Related Personal Property ("Request for Transfer"), Ex. 1, ECF No. 15-1; *id.*, Letter from Cavanaugh to GSA Adm'r Ehikian Ex. 3, ECF No. 15-3; *id.*, Letter from OMB Director Vought to Ehikian, Ex. 4, ECF No. 15-4; Pls.' SUMF ¶ 56.  Included in that transfer appears to be the various assets within USIP's headquarters.  *See* Request for Transfer.  The headquarters have been, or are in the process of being, leased to the Department of Labor.  *See* Pls.' SUMF ¶ 58.  Plaintiffs represent that the funds in USIP's Endowment have also been transferred, but they do not know their destination.  *See* XMSJ Hr'g Tr. at 12:22-13:3.

USIP now has only four or five employees and is conducting no programmatic activities. *See* XMSJ Hr'g Tr. at 13:4-15:6.  Defendants take the position that USIP is only required to undertake statutory functions using mandatory language, such as "shall."  *Id.* at 59:23-60:14. Thus, in the Administration's view, the detailed statutory tasks laid out in 22 U.S.C. §§ 4604(b)(1)-(10), 4604(c)-(g), which are all introduced by the phrase "the Institute *may*," can be ignored.  *See* XMSJ Hr'g Tr. at 59:23-60:14.  Even the mandatory programs, however, appear to have been halted.  *See id.* at 14:14-15:6; Pls.' SUMF, Decl. of Alli Alourdes Phillips ("Phillips Decl.") ¶¶ 2, 5, Ex. 31, ECF No. 20-31 (describing the Gandhi-King Global Academy and how it was shut down).

### C.    Procedural History

On March 18, 2025, the Institute and five of its purportedly terminated appointed Board members sued then-USIP president Jackson, U.S. DOGE Service, U.S. DOGE Service Temporary Organization, several DOGE officials including Cavanaugh, Secretaries Rubio and Hegseth, Vice Admiral Garvin, and President Trump, alleging *ultra vires* actions, separation-of-

powers violations, and violations of the USIP organic statute, as well as trespass to real and personal property. *See* Compl., ECF No. 1. Those plaintiffs immediately sought a temporary restraining order ("TRO") and an administrative stay, given that, at the time, the named defendants were entering USIP's headquarters and allegedly engaging in immediate seizing of property and property damage, including the alleged destruction of financial records. *See* Pls.' Mot. for TRO at 3, ECF No. 2-1; *id.*, Pls.' Mem. in Supp. Mot. for TRO, ECF No. 2-1; *id.*, Ex. B (photograph of paper records in "SHRED"-marked trash can). They sought to restore all removed Board members to their positions, as well as Amb. Moose, though not all those fired were plaintiffs in the litigation. *See id.*, Proposed TRO, ECF No. 2-4; TRO Hr'g Tr. at 7:1-8:6, 11:11-21. Plaintiffs also sought to eject defendants from USIP's headquarters and revoke their access to electronic property. *See* TRO Hr'g Tr. at 7:1-8:6. The Court held a hearing on the request for a TRO the following day, on March 19, 2025.

Plaintiffs provided no argument, at the hearing or in their papers, on the Court's authority to issue an administrative stay, so the parties and Court focused on the propriety of a TRO, which demands a showing of a likelihood of success on the merits, *Ramirez v. Collier*, 595 U.S. 411, 421 (2022). *See* TRO Hr'g Tr. at 21:10-22:17. On that front, the parties took completely divergent views about the nature of the Institute. Plaintiffs insisted that USIP was entirely independent from the federal government, *see id.* at 15:10-25, while defendants insisted that USIP was an Executive branch agency subject to presidential control. *See* Defs.' Opp'n to Pls.' TRO at 1-2, ECF No. 9 (contending dispute was non-justiciable as an intra-executive branch conflict). On this expedited timeline, neither side provided a fulsome analysis of the powers actually exercised by USIP to allow for a determination of where the Institute falls within the federal government, if at all, nor did either provide a nuanced analysis of how such an entity

could be governmental without its presidentially appointed Board being subject to absolute

presidential control.  For instance, plaintiffs provided little to no analysis of how to analyze the

President's removal authority if the Court concluded that defendants were correct that USIP was

a governmental entity and were, additionally, correct that USIP, in fact, did fall within the

Executive branch.  *See* TRO Hr'g Tr. at 67:10-21 (plaintiffs' counsel mentioning *Humphrey's*

*Executor* only briefly on rebuttal); Pls.' Mem. in Supp. TRO; Defs.' Opp'n to Pls.' TRO.

      Without full briefing on the complex constitutional and novel question about the nature

of this unique Institute, this Court determined that the Institute and its five terminated Board

members had not yet demonstrated a likelihood of success on the merits or irreparable harm

entitling them to the requested temporary injunctive relief.  *See* Min. Order (Mar. 19, 2025)

(denying the TRO).  In accord with the parties' request, the Court set a schedule for expedited

briefing of dispositive motions.  *See* Min. Order (Mar. 20, 2025).

      A few days later, the existing plaintiffs filed an amended complaint, adding to the

previously listed plaintiffs both Ambassador Moose and Nancy Zirkin (a former Democratic

appointed Board member), collectively "plaintiffs."  *See* Am. Compl., ECF No. 12.  These

plaintiffs reasserted their claims in both their official and individual capacities.  *See id.*  Plaintiffs

also added Trent Morse to the existing defendants, collectively "defendants," and added an

additional claim under the Administrative Procedure Act ("APA").  *See id.* ¶¶ 100-102.  The

operative amended complaint now contains the following seven claims: defendants acted *ultra*

*vires* in attempting to exert control over USIP (Count One), *id.* ¶¶ 71-77; defendants violated 22

U.S.C. § 4605(f) in removing the USIP Board members without satisfying the statutory

provisions (Count Two), *id.* ¶¶ 78-85; defendants Rubio, Hegseth, and Garvin acted *ultra vires*

and in violation of 22 U.S.C. § 4605 in removing Amb. Moose as president of USIP (Count

Three), *id.* ¶¶ 86-92; defendants Jackson, Rubio, Hegseth, and Garvin acted *ultra vires* and in

violation of 22 U.S.C. § 4605 in appointing Jackson as the new president of USIP (Count Four),

*id.* ¶¶ 93-99; defendants Jackson, Rubio, Hegseth, and Garvin, the latter three acting in their

official capacities as Secretary of State, Secretary of Defense, and President of the National

Defense University, respectively, violated the APA by taking actions that were unlawful,

arbitrary and capricious, abuses of discretion, in excess of authority, without observance of

required procedure, and not otherwise in accordance with law (Count Five), *id.* ¶¶ 100-02; and

defendants Jackson, U.S. DOGE Service, and U.S. DOGE Service Temporary Organization

committed trespass in entering USIP headquarters without permission and future trespass in

intending to seize personal property, records, and computer systems (Count Six), *id.* ¶¶ 103-14.

Plaintiffs additionally request declaratory relief on all of those claims.  *Id.* ¶¶ 115-16 (Count

Seven).

After the Amended Complaint was filed, and as described *infra* in Part I.B., defendants

proceeded to terminate the Institute's employees and appoint yet another new president, who was

then instructed to transfer all of USIP's assets to GSA.  In response, plaintiffs moved, on March

31, 2025, pursuant to the All Writs Act, 28 U.S.C. § 1651, to suspend what they believed was the

imminent transfer of property.  *See* Pls.' All Writs Act ("AWA") Mot., ECF No. 14.  After a

hearing held the next day, this Court denied the relief, in part, because the headquarters had

already been transferred to GSA the prior weekend and also the requested relief was not

"necessary or appropriate in aid of" the Court's "jurisdiction" to qualify under the AWA.  *See*

Min. Order (Apr. 1, 2025).  Plaintiffs further had not demonstrated a likelihood of success on the

merits.  *See id.*

25

Plaintiffs then moved for expedited summary judgment.  *See* Pls.' Mem.  Former

terminated employees of USIP and former senior military and foreign affairs officials filed

amicus briefs.  *See* Amicus Br. of 128 Emps. of USIP Purportedly Terminated ("Terminated

Emps. Amicus Br."); ECF No. 30; Sr. Officials Amicus Br.  Defendants opposed and cross-

moved for summary judgment.  *See* Defs.' Opp'n.  Plaintiffs filed a combined opposition to

defendants' motion and a reply in support of plaintiffs' motion.  Pls.' Opp'n & Pls.' Reply ("Pls.'

Opp'n"), ECF No. 34.  Defendants lastly filed a reply in support of their summary judgment

motion.  Defs.' Reply in Supp. Summ. J. ("Defs.' Reply"), ECF No. 36.  The Court heard oral

argument on these motions on May 14, 2025.  *See* XMSJ Hr'g Tr.  These expedited cross-

motions for summary judgment are now ripe for resolution.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under the

governing law," meaning that "factual disputes that are 'irrelevant or unnecessary' do not affect

the summary judgment determination."  *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019)

(quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  A dispute is only "genuine" if

"the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*

(citation omitted).  Thus, "[i]n considering a motion for summary judgment, judges must ask

themselves not whether they think 'the evidence unmistakably favors one side or the other but

whether a fair-minded jury could return a verdict for the plaintiff on the evidence

presented,'" because that evidence is such that "the jury could reasonably find for the

plaintiff." *Stoe v. Barr*, 960 F.3d 627, 638-39 (D.C. Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.   DISCUSSION

Plaintiffs argue that they should prevail on their claims because USIP's Board members were wrongfully terminated, rendering invalid all subsequent actions taken on behalf of USIP under defendants' leadership, because the President's removal power is subject to statutory requirements, which were ignored.  *See* Pls.' Mem. at 36-37.  This argument is predicated on plaintiffs' view that USIP is not a governmental entity and, regardless, is neither an Executive branch entity nor exercises executive powers.  *See id.* at 15-29; XMSJ Hr'g Tr. at 8:6-8.  In addition, plaintiffs contend that defendants' actions in effectively ceasing the Institute's activities, terminating its staff, and otherwise seemingly dissolving the Institute (by transferring its assets, terminating its contracts, etc.) are separately unlawful because these actions violate USIP's organic statute and are arbitrary and capricious under the APA.  *See* Pls.' Mem. at 37-38.

Defendants counter that the statutory removal protections for USIP's Board members are unconstitutional under the Constitution's Article II because USIP is an Executive branch entity wielding executive power that does not fit within the narrow exception to the President's broad removal authority as outlined in *Humphrey's Executor*.  *See* Defs.' Opp'n at 6-26.  According to defendants, all of their actions were therefore lawful, and plaintiffs' additional claims all fail.  *See id.* at 27-30.  Defendants further argue that injunctive relief is unavailable and would be improper here and that plaintiff Board members cannot sue on behalf of the Institute.  *See id.* at 7-8, 30-33.

The instant claims present novel and complicated questions, starting with whether USIP, congressionally created to be an independent nonprofit corporation, is a governmental entity.  If

so, the next question is whether USIP is independent of the Executive branch, such that the President may not exercise inherent Article II removal authority over USIP Board members in contravention of Congress's statutory boundaries. Finally, even if USIP is a governmental entity properly placed in the Executive branch for purposes of constitutional analysis, as defendants urge, the next crucial question is whether the President's Article II removal authority is improperly infringed by the statutory removal protections for USIP's Board members. No caselaw provides binding answers to these questions involving USIP or any similar entity, and the Constitution—necessarily short, to last the test of time—provides only the scarcest of instruction.

As a backdrop to the discussion that follows, however, certain legal guideposts are clear. First, the President's exercise of any unilateral removal authority is limited to Executive branch officers, a principle confirmed in every removal power case decided by the Supreme Court. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 126 (1926) ("In the absence of any specific provision to the contrary, the power of appointment to *executive office* carries with it, as a necessary incident, the power of removal." (emphasis added)); *Humphrey's Ex'r*, 295 U.S. at 627-28 ("[T]he necessary reach of the [*Myers*] decision goes far enough to include all purely executive officers. It goes no farther; much less does it include an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President."); *Wiener v. United States*, 357 U.S. 349, 353 (1958) ("[*Humphrey's*] drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body 'to exercise its judgment without the leave or hindrance of any other official or any department of the government,' as to whom a power of removal exists only

28

if Congress may fairly be said to have conferred it." (internal citations omitted) (quoting *Humphrey's Ex'r*, 295 U.S. at 625-26)); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988) ("The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II."); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.* ("*PCAOB*")*, 561 U.S. 477, 483 (2010) (explaining that because all executive power is vested in the President, who must "take Care that the Laws be faithfully executed" and "perform all the great business of the State" (quoting 30 WRITINGS ON GEORGE WASHINGTON 334 (J. Fitzpatrick ed. 1939)), he must have the power of appointment and the power of removal "to keep these officers accountable" (citing Art. II, § 1, cl. 1; *id.* § 3)); *Seila L.*, 591 U.S. at 214 ("The view that prevailed, as most consonant to the text of the Constitution and to the requisite responsibility and harmony in the Executive Department, was that the executive power included a power to oversee *executive* officers through removal." (emphasis added) (citation and internal quotations omitted)); *Collins v. Yellen*, 594 U.S. 220, 252 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote.").

Second, and an inexorable result of the first point, is that the President's constitutional removal authority does not extend as far as his power to appoint. Put another way, just because the President has appointment power does not mean he has absolute removal power when the Constitution or Congress provides otherwise for governmental entities not located within the

Executive branch nor exercising executive power.  Defendants acknowledge that the Supreme

Court's current jurisprudence extends only this far.  XMSJ Hr'g Tr. at 62:20-66:15 (In response

to the Court's query, "Would you agree that the jurisprudence, the Supreme Court law binding

on this Court, has to date only s[aid] that the President's absolute removal power is as to

executive branch agencies exercising more than *de minimis* executive power?," defendants'

counsel confirmed, "I believe that is where the Supreme Court's jurisprudence has been.").[6]

A careful examination of relevant judicial authorities, as applied to USIP's statutory

purposes and tasking, and its operations, make clear that although USIP may be considered a

governmental entity for the constitutional questions raised in the instant lawsuit about the scope

of the President's removal authority, USIP does not exercise executive power so as to invoke

concern about the President's Article II removal power.  Even if USIP were an Executive branch

agency, however, the Supreme Court's reasoning in *Humphrey's Executor* would apply *a fortiori*

here.  The Board members' removal without cause was therefore unlawful, and plaintiffs prevail

on Counts One and Two (removal of the Board members was *ultra vires* and violated 22 U.S.C.

§ 4605(f)).  Defendants' subsequent actions that flowed from the improper removal of USIP's

leadership in March 2025 are thus also unlawful, such that summary judgment for plaintiff is

also appropriate for Counts Three (removal of USIP president Amb. Moose was unlawful), Four

---

[6]        Defendants' counsel, however, suggested that the Supreme Court could go further and recognize
presidential removal power under the Constitution beyond the bounds of Article II—essentially, removal power
coextensive with appointment power, except presumably for those presidential appointments subject to
constitutional protection under Article III—despite the stark departure from separation-of-powers principles that
would represent.  *See* XMSJ Hr'g Tr. at 65:21-24 (defendants' counsel stating, "But one caveat, I don't think [the
Supreme Court has] considered a case of an entity where the President has appointment power that falls outside of
the executive branch," prompting the Court's follow-up question, "So . . . if USIP is found not to be an executive
branch agency, this might be its first opportunity . . . to decide that?",  to which defendants' counsel responded,
"Perhaps").

30

(appointment of the new USIP presidents was unlawful), and Six (trespass of defendants on

USIP property).[7]

In sum, for the reasons explained below, plaintiffs' summary judgment motion is granted,

and defendants' cross-summary judgment motion is denied.[8]

### A.    USIP Does Not Exercise Article II Executive Power Such that USIP is Subject to the President's Constitutional Removal Authority.

Plaintiffs argue that USIP is a "non-executive nonprofit corporation," not part of the

Executive branch, and therefore "Article II has nothing to say about the removal of [its] Board."

Pls.' Mem. at 2, 14-15.  Defendants, on the other hand, insist that USIP is an "establishment of

the United States," citing 22 U.S.C. § 4603(a) ("There is hereby established the United States

Institute of Peace."), and as such, it must "fall into one of three branches."  Defs.' Opp'n at 3, 9-

10, 13.  Defendants then reach the swift conclusion that because USIP does not exercise judicial

or legislative power and, further, operates in the area of foreign policy, USIP must be "part of the

executive branch."  *Id.* at 13-14.  With these predicates in place, defendants reason that the

---

[7]      Given that no additional relief is available to plaintiffs if they were to succeed on the merits of Count Five, *see* XMSJ Hr'g Tr. at 52:8-15, the APA claim asserted in that count need not be considered.

[8]      Defendants make several threshold arguments that plaintiffs' claims are improper, but none are persuasive. First, defendants contend that plaintiffs' counsel does not represent the Institute, which is named a plaintiff, because only the present leadership of the Institute (Cavanaugh, Secretaries Hegseth and Rubio, and Garvin) have the power to authorize suit.  *See* Defs' Opp'n at 7-8 (citing 22 U.S.C. § 4604(k)); Defs.' Reply at 19-20.  Yet, if the removal of plaintiff Board members and former USIP president, Amb. Moose, are found to be unlawful, Amb. Moose remains in charge of USIP and thus can authorize suit, and has done so.  *See* Pls.' SUMF, USIP Bylaws § 5, ECF No. 20-37 (giving the president responsibility for "day-to-day administration of the affairs of the Institute").  Second, defendants argue that plaintiffs cannot file suit in their former official capacities because they lack the power of those offices.  Defs.' Opp'n at 9.  This, too, assumes the removal of the plaintiff appointed members was lawful, when that is the very legal question to be resolved here.  Regardless, plaintiffs, in the Amended Complaint, also sued in their individual capacities, so defendants' point has no practical effect on plaintiffs' claims.  Finally, defendants argue that plaintiffs improperly sued Jackson in his official capacity at USAID, where Jackson was the Assistant to the Administrator for Management and Resources, *see id.*, but Jackson did not take any of the actions at issue in this case in that capacity—he took the actions alleged in this lawsuit as the president of USIP, as plaintiffs clearly allege, *see* Am. Compl. at 2 (suing Jackson in his "purported capacity as acting president of [USIP]").  In any case, no claim turns on the proper inclusion of Jackson as a defendant, given that the current president of USIP (Cavanaugh) was also named, so any necessary relief may run against him.  *See id.*

President has removal authority over USIP's leadership under Article II of the Constitution. *See id.* at 18, 23.

The classification of USIP as a government entity that sits within the Executive branch, as defendants insist it does, bears on the President's constitutional removal authority. As explained, the President's Article II removal authority only extends as far as the Executive branch. The Supreme Court explained in *Seila Law* that the President has the constitutional "ability to remove executive officials" because they "must remain accountable to the President, whose authority they wield" under Article II of the Constitution. 591 U.S. at 213; *see also id.* at 214 (quoting *Myers*, 272 U.S. at 163-64, for the principle that "Article II 'grants to the President' the 'general administrative control of those executing the laws, including the power of appointment *and removal* of executive officers'" (emphasis in original)). Even under the broadest vision of the unitary executive theory—where all the power of the Executive branch is "*unified*" in the President to "ensure both vigor and accountability," *Harris v. Bessent* ("*Harris III*"), No. 25-5057, 2025 WL 980278, at *3-4 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring) (emphasis in original) (second passage quoting *Seila L.*, 591 U.S. at 240 (Thomas, J., concurring in part and dissenting in part)), *vacated en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025)— presidential removal authority only extends as far as officials in that branch. *See id.* at *4 ("[T]he president of the United States [is] '. . . personally responsible for *his* branch.'" (emphasis added) (quoting Akhil Reed Amar, AMERICA'S CONSTITUTION: A BIOGRAPHY 197 (2005))). The Constitution does not grant the President removal authority over other government or nongovernment officials writ large. While the President appoints Article III judges, for instance, he has no power to remove them.

32

USIP has qualities of both a government entity and an NGO.  While USIP may be considered part of the government for constitutional purposes—meaning regardless of any statutory classification, the Institute is subject to at least some provisions of the Constitution— USIP nevertheless does not exercise executive power and thus does not sit under Article II as an Executive branch entity.

### 1.    *USIP is Part of the Federal Government for Purposes of a Constitutional Separation-of-Powers Analysis.*

Defendants conclude that USIP is part of the federal government because USIP was created by federal statute, indeed "established" by Congress, 22 U.S.C. § 4603(a), is led by a Board of presidential appointees, including Cabinet officials, and has "various other hallmarks of being part of the federal government."  Defs.' Opp'n at 10.  They further highlight multiple statutory provisions governing USIP, including that USIP is **(1)** authorized to use the name and seal of the United States, 22 U.S.C. § 4603(e), **(2)** subject to FOIA, *id.* § 4607(i), **(3)** required to publish notices of board meetings (and may do so in the Federal Register), *id.* § 4605(h)(3), **(4)** funded almost exclusively by appropriations, *id.* § 4604(h)(3), **(5)** prohibited from issuing stock and thus having private ownership, *id.* § 4603(b), and **(6)** able to obtain services and support from GSA, *id.* § 4604(o).  Defs.' Opp'n at 10.  Moreover, **(7)** USIP's assets revert to the Treasury upon liquidation, 22 U.S.C. § 4610, and USIP's employees are subject to **(8)** the FTCA, *id.* § 4606(f)(1), **(9)** federal statutes establishing employee benefits, *id.*, **(10)** federal statutes determining compensation, *id.* §§ 4605(i), 4606(a), 4606(c), and **(11)** federal statutory requirements for reimbursement of travel expenses, *id.* § 4605(j).  Defs.' Opp'n at 10-11.

In addition to these federal statutes treating USIP as a federal entity, OMB annually lists USIP as a "federal entity," pursuant to the Inspector General Act of 1978, which requires OMB to identify "federal entities," and government manuals and websites list USIP as part of the

33

federal government.  *Id.* at 11-13 (citing 5 U.S.C. § 415(a)(2)); GSA, *United States Institute of Peace*, USA.GOV: A-Z INDEX OF U.S. GOVERNMENT DEPARTMENTS AND AGENCIES, https://www.usa.gov/agencies/united-states-institute-of-peace (last visited May 18, 2025) (the GSA website with a list of "government departments and agencies," including USIP); Pls.' SUMF, Ex. 23, The United States Government Manual current edition ("USG Manual"), ECF No. 20-23 (including USIP).  *But cf.* Pls.' Mem. at 22-23 (noting that USIP is classified outside of the Executive branch, as a quasi-official agency, in that manual).  Finally, defendants rely on *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 399 (1995), where the Supreme Court held that Amtrak—despite being a for-profit corporation and expressly identified in its organic statute as "not an agency or establishment of the United States government"—is part of the government for purposes of the First Amendment, to argue that USIP should be treated the same here.  Defs.' Opp'n at 12-13.

Plaintiffs, on the other hand, avoid answering in their briefing whether "USIP might for certain purposes properly be considered part of the government writ large," Pls.' Mem. at 16, though acknowledging the complexity of that question, given the vast array of corporations formed by the federal government yet operating independently, *see id.* at 15-16.[9]  At the hearing, however, plaintiffs took the emphatic position that USIP is not part of the federal government.  *See* XMSJ Hr'g Tr. at 8:6-8.  Regardless, both in their briefing and at the hearing, plaintiffs insist that USIP is not part of the Executive branch and not subject to the President's Article II power.  *Id.* at 16.

---

[9]    A non-answer on the issue of whether USIP is part of the federal government does not constitute a concession, contrary to defendants' insistence.  *See* Defs.' Reply at 12; *see also* Pls.' Opp'n at 9 ("Defendants are simply wrong when they suggest that . . . Plaintiffs 'concede' that USIP is 'part of the federal government.' . . . Instead, Plaintiffs submit that Defendants' attempt to categorize USIP as part of the federal government in a general sense is both overly simplistic and beside the point.").

Plaintiffs are correct that even if USIP is part of the government for constitutional purposes, as relevant here, that will not resolve the key question—whether USIP exercises executive power and is part of the Executive branch.  If USIP is *not* part of the government for such purposes, however, USIP *cannot* be part of the Executive branch.  *See Kim v. FINRA, Inc.*, 698 F. Supp. 3d 147, 163 (D.D.C. 2023) ("Because FINRA is likely not a state actor, Plaintiff's Article II [appointments and removal] challenges are unlikely to succeed.").  Courts, thus, often begin with the threshold inquiry whether an entity should properly be considered part of the federal government before determining its placement in the federal constitutional scheme.  *See, e.g.*, *id.* at 162-63.  In *Free Enterprise Fund*, 561 U.S. 477, the Supreme Court considered a challenge to the double for-cause removal protections provided to members of the PCAOB, a non-profit corporation whose members and employees are not considered government officers or employees for statutory purposes.  *Id.* at 484.  The Court first established that "the parties agree[d] that the Board is 'part of the Government' for constitutional purposes, and that its members are 'Officers of the United States' who 'exercise significant authority pursuant to the laws of the United States'" before explaining that PCAOB operates as a subordinate to the Securities and Exchange Commission ("SEC"), *id.* at 485-86 (internal citation omitted) (first quoting *Lebron*, 513 U.S. at 397; and then quoting *Buckley v. Valeo*, 424 U.S. 1, 125-26 (1976)), which would make the Board part of the Executive branch, and then continuing to the merits of the claims challenging the statutory for-cause removal restrictions on presidential power. Turning first, therefore, to this threshold question, for the reasons explained below, the Court concludes that USIP acts as part of the federal government for constitutional, separation-of-powers purposes.

a.    ***Diversity of Congressionally Created Entities***

35

As a general matter, USIP, like many other congressionally created corporations, has both governmental and nongovernmental qualities—appropriately termed a "hybrid" or "boundary" organization.  KEVIN R. KOSAR, CONG. RSCH. SERV., RL30533, THE QUASI GOVERNMENT: HYBRID ORGANIZATIONS WITH BOTH GOVERNMENT AND PRIVATE SECTOR LEGAL CHARACTERISTICS (2011), https://sgp.fas.org/crs/misc/RL30533.pdf; Anne Joseph O'Connell, *Bureaucracy at the Boundary*, 162 U. PA. L. REV. 841 (2014).  Such organizations exist on a spectrum, ranging from some entities created to be more privately operated, separate and independent of the federal government, and others more closely operationally linked so as in fact to be part of the federal government.

At the more private end of the spectrum, Congress has chartered both for-profit and nonprofit entities that exist nearly entirely independently of the government.  Congress established Howard University, for instance, in the 1800s.  An Act to Incorporate Howard University in the District of Columbia, 14 Stat. 438 (1867); *see also* Pls.' Mem. at 15.  Howard received federal appropriations at the time, and still receives grants today, but has always been privately managed by trustees not selected by the government.

Congress has also chartered (largely in the twentieth century) nearly one hundred nonprofit corporations under Title 36—housing "patriotic and national organizations"—that are similarly independent.  *See* 36 U.S.C. § 20101 *et seq*.; Pls.' Opp'n at 2, 6 (referencing Title 36 organizations); Defs.' Reply at 15.  These include well-known entities such as the Boy Scouts of America, *see id.* § 30901 ("Boy Scouts of America . . . is a body corporate and politic of the District of Columbia."); the United States Olympic and Paralympic Committee, 36 U.S.C. § 220502 ("The corporation is a federally chartered corporation."); and the American National Red Cross, *id.* § 300101(a) ("The American National Red Cross . . . is a Federally chartered

instrumentality of the United States and a body corporate and politic in the District of

Columbia.").  The "federal designation" is largely "honorific" as they "do not receive direct

appropriations, they exercise no federal powers, their debts are not covered by the full faith and

credit of the United States, and they do not enjoy original jurisdiction in the federal courts."

O'Connell, *supra*, at 860 (quoting Kosar, *supra*, at 23).  They are generally managed by boards

of directors or governors without government interference and are merely required to make

annual reports to Congress on their activities and share their accounting audits.  *See, e.g.*, 36

U.S.C. § 300104 (establishing a private Board of Governors for the American Red Cross); *id.*

§ 220504 (establishing a private board of directors for the U.S. Olympic Committee); *id.* § 10101

(audits); *id.* § 30908 (annual report on activities).[10]

Other largely independent but still hybrid organizations are not created by Congress at

all.  FINRA, for instance, is a self-regulatory organization that performs a "supervisory role over

the securities industry, subject to oversight from the SEC," per 15 U.S.C. § 78s.  *Scottsdale*

*Capital Advisors Corp. v. FINRA, Inc.*, 678 F. Supp. 3d 88, 94 (D.D.C. 2023), *reversed in part*

*sub nom. Alpine Sec. Corp. v. FINRA, Inc.*, 121 F.4th 1314 (D.C. Cir. 2024).  Structurally,

FINRA is a Delaware not-for-profit corporation governed by a board of 22 people selected by

FINRA's members and not appointed by any governmental official.  *Id.* at 95.  FINRA is also

funded privately—via membership fees, fines, penalties, and sanctions.  *Id.*

---

[10]    Congress has also chartered independent for-profit corporations. Comsat is a classic example.  In 1962, Congress chartered the Communications Satellite Corporation as a private corporation under the District of Columbia Business Corporation Act.  Communications Satellite Act of 1962, Pub. L. No. 87-624, sec. 102(c), 76 Stat. 419 (describing it as a "private corporation"); *Lebron*, 513 U.S. at 390-91.  Comsat was "capitalized entirely with private funds," and "controlled by its private shareholders." *Lebron*, 513 U.S. at 390-91.  Despite clearly operating in the private sector, being explicitly designated as "not . . . an agency or establishment of the United States Government," and having private shareholders, Comsat's leadership was influenced by the federal government: The President appointed incorporators to serve as the initial board of directors and thereafter appointed a small minority (three) of the fifteen directors on the board.  *See id.*; 76 Stat. at 423-24, sec. 301-304.

Moving along the spectrum toward organizations with closer ties to the federal government, Congress has chartered corporations that exist mostly in the private sector—"unhindered by the restraints of bureaucracy and politics"—but are subject to greater governmental control via presidential appointment of their leadership. *Lebron*, 513 U.S. at 391. For instance, the Corporation for Public Broadcasting was chartered in 1967 as a "nonprofit corporation," "not . . . an agency or establishment of the United States Government," but managed by a board of directors appointed by the President, with advice and consent of the Senate. 47 U.S.C. § 396(b)-(c)(1); *Lebron*, 513 U.S. at 391. Likewise, the Legal Services Corporation, which "provid[es] financial support for legal assistance in noncriminal proceedings" to the indigent, was established as a "private nonmembership nonprofit corporation" but whose eleven board of directors are "appointed by the President, by and with advice and consent of the Senate." 42 U.S.C. §§ 2996b(a)-2996c(a); *Lebron*, 513 U.S. at 391. Similarly, Amtrak is a for-profit Congressionally created corporation, "not a department, agency, or instrumentality of the United States Government," 49 U.S.C. §§ 24301(a)(2)-(3), but its leadership consists of a board of directors, the majority of whom are appointed by the President, *id.* § 24302(a)(1).

The early banks of the United States were also of this hybrid character. The Second Bank of the United States, the subject of *McCulloch v. Maryland*, 4 Wheat. 316 (1819), incorporated in 1816, was owned in part by the United States, which held 20% of its stock, and led in part by Presidential appointees—5 of the 25 directors were selected by the President, with the rest to be elected by shareholders other than the United States. *Lebron*, 513 U.S. at 386-87. Congress continued to create countless for-profit corporations—some controlled by the U.S. Government (either via total stock ownership or the President's appointment of the majority of

38

board members) and some not.  *See id.* at 387-89.  Such corporations proliferated throughout the

Great Depression and World War II eras, eventually leading to legislation providing for federal

audits of these corporations and dissolution of many.  *See id.* at 388-90.[11]

Closer to the interdependent-with-government end of the spectrum, some nonprofit

organizations exist within or as an adjunct to federal agencies.  For instance, PCAOB is a

nonprofit corporation created by Congress to oversee public company auditing, expressly "not an

agency or establishment of the United States Government."  15 U.S.C. § 7211(a)-(b).  The

members of the Board are not "officer[s] or employee[s] of or agent[s] for the Federal

Government by reason of such service."  *Id.* § 7211(b).  Yet, the Board is directly appointed and

overseen by the SEC, and the rules promulgated by the Board are subject to the SEC's approval.

*Free Enter. Fund*, 561 U.S. at 484-85.  The Supreme Court treated PCAOB as a part of the

Executive branch in analyzing the President's constitutional removal authority over its Board

members.  *See id.* at 484-85, 495, 508-09.

In short, the political branches have been creative in establishing or supporting entities

embodying varying degrees of independence from the federal government, as reflected in

statutory terms codifying express statements of independence, the extent of federal government

funding through appropriations or grants, government control through ownership or leadership

appointment, government oversight through auditing and reporting, and otherwise.  This makes

distinguishing government entities from nongovernmental organizations a matter requiring a

case-by-case assessment.

### b.    *Legal Framework*

---

[11]    Fannie Mae, which provides mortgage-backed securities, was one such Depression-era corporation.  As an
investor-owned publicly traded corporation, Fannie Mae operated largely independently until the economic collapse
in 2008, when Fannie Mae was placed into government conservatorship.  *See* Kosar, *supra*, at 8-10.

An organization may be deemed a government entity for some purposes and not for others.  Sometimes Congress is explicit about an entity's status for a particular statutory purpose. For instance, Congress specified that PCAOB's employees are not considered employees of the federal government.  *See* 15 U.S.C. § 7211 ("No member or person employed by . . . the Board shall be deemed to be an officer or employee of . . . the Federal Government by reason of such service.").  That provision makes clear that PCAOB employees are not subject to federal pay scales.  *See Free Enter. Fund*, 561 U.S. at 484-85 ("The Board can thus recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale.").  Take, also, for example, the Legal Services Corporation, which is explicitly made subject to FOIA and thus considered part of the government for purposes of responding to record requests from the public.  *See* 42 U.S.C. § 2996d(g).

Other times, however, Congress does not specify an entity's status for a particular purpose, and its general label—whether a "nonprofit corporation," "federally chartered instrumentality," or "not an establishment of the federal government"—is not dispositive for all purposes.[12]  A case-by-case analysis based on the particular purpose is then required.  Illustrative of such an analysis is the D.C. Circuit's consideration, in *Dong v. Smithsonian Institute*, 125 F.3d 877, 878-83 (D.C. Cir. 1997), of whether the Smithsonian Institution is an "agency" under the Privacy Act based on that statute's particular definition of "agency" and the features of the Institution in its organic statute, leading to the conclusion that the Privacy Act did not apply.  *See infra* Part III.A.2.

---

[12]    The Congressional Research Service ("CRS"), in line with various academics, has sorted these entities into categories based on their interaction and affiliation with the federal government and given them various labels—*e.g.*, "government-sponsored enterprises" and "agency-related nonprofits."  Kosar, *supra*, at 7, 12. Those categories, however, have limited legal significance and likewise do not shed light on whether an entity is considered governmental for a particular purpose, let alone situated within the Executive branch.

40

Importantly, Congress's label alone cannot dictate whether an entity is governmental for *constitutional* purposes, which falls outside of Congress's purview.  In *Lebron*, the Supreme Court explained that a statutory disavowal of a federal government status indeed "deprives Amtrak of sovereign immunity from suit," but a statute could not resolve "Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions."  513 U.S. at 392.  As the Court later put it, "[c]ongressional pronouncements, though instructive as to matters within Congress' authority to address, are not dispositive of [a corporation's] status as a governmental entity for purposes of separation of powers analysis under the Constitution."  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 51 (2015) (internal citations omitted).

Rather, for such constitutional questions, a corporation is part of the government when the corporation satisfies three factors: "[(1)] the Government creates [the] corporation by special law, [(2)] for furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors for that corporation."  *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (alterations in original) (quoting *Lebron*, 513 U.S. at 400).  In *Lebron*, the Supreme Court used that framework to hold that the First Amendment applied to Amtrak.  Amtrak was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal government appointees."  513 U.S. at 398.  Six of the corporation's "eight externally named directors (the ninth is named by a majority of the board itself) are appointed directly by the President of the United States."  *Id.* at 397.  Consequently, the Supreme Court concluded that Amtrak is a state actor and "part of the Government" for the purposes of "individual rights guaranteed against the Government by the Constitution."  *Id.* at 394, 398.

41

That same three-factor inquiry applies to constitutional separation-of-powers questions. *See Ass'n of Am. R.R.*, 575 U.S. at 55 ("[T]he structural principles secured by the separation of powers protect the individual as well." (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011))).[13]  The Supreme Court in *Department of Transportation v. Association of American Railroads* considered a challenge to Amtrak's authority to issue "metrics and standards" addressing the "performance and scheduling of passenger railroad services" based on the ground that Amtrak is a private entity and such authority was an unconstitutional private delegation of power.  *Id.* at 45.  Without reaching the separation of powers or Appointments Clause questions raised, the Supreme Court reversed the D.C. Circuit's determination that Amtrak was a private entity.  Upon considering Amtrak's creation, purpose, and control, the Court concluded that "Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions," explaining that "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit."  *Id.* at 53-54.[14]

Specifically, regarding Amtrak's creation and control, the Court examined its "ownership and corporate structure," noting as pertinent that the "Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock" and that Amtrak's Board consists of eight presidential appointees (of nine total members), for whom Congress carefully outlined requirements for the President to consider, including experience in the transportation industry, partisan balance, and consultation with leaders of both parties of Congress, and whose salaries

---

[13]    Neither side in this case cited in their briefing to *Association of American Railroads*, despite both parties discussing *Lebron*.  Given that *Association of American Railroads* builds upon *Lebron* in a context more relevant here (separation of powers), its framework is instructive.

[14]    While the Supreme Court in neither *Lebron, see* 531 U.S. at 398, nor *Association of American Railroads, see* 575 U.S. at 51-55, delineated its analysis into three discrete factors, though considering the same type of qualities, the D.C. Circuit has distilled the analysis into such parts, *see Herron*, 861 F.3d at 167, and thus that framework is adopted here.

are subject to congressional limits.  *Id.* at 51-52.  Regarding Amtrak's objectives and

accountability, the Court noted the government's "substantial, statutorily mandated supervision"

of Amtrak and observed that "rather than advancing its own private economic interests, Amtrak

is required to pursue numerous, additional goals defined by statute" in the government interest, is

required to make regular reports to Congress and the President, and is the subject of regular

congressional hearings.  *Id.* at 52-53 (citing, *e.g.*, the obligation to "provide efficient and

effective intercity passenger rail mobility," 49 U.S.C. § 24101(b), and "provide reduced fares to

the disabled and elderly," *id.* § 24307(a)).  Importantly, Congress "has mandated certain aspects

of Amtrak's day-to-day operations," requiring consideration of specific factors when making

decisions, for instance, and Amtrak is "dependent on federal financial support."  *Id.* at 53.  The

Court also noted that Amtrak is subject to "substantial transparency and accountability

mechanisms," *id.* at 55, including being subject to FOIA and budget oversight and

"supervis[ion]" by the political branches and being required to maintain an inspector general as a

"designated Federal entity" "under the Inspector General Act."  *Id.* at 52-55.  The Court

concluded because of Amtrak's "significant ties to the Government" and the political branches'

"extensive[] supervis[ion] and substantial[] fund[ing]" of "its priorities, operations, and

decisions," Amtrak acted "as a governmental entity" rather than "an autonomous private

enterprise."  *Id.* at 53.

### c.    *Application to USIP*

Applying this three-factor inquiry here, USIP is part of the federal government for

constitutional separation-of-powers purposes.  Although USIP is statutorily defined as an

"independent nonprofit corporation," 22 U.S.C. § 4603(b), "the practical reality of federal

control and supervision prevails over Congress' disclaimer of" USIP's status, *Ass'n of Am. R.R.*,

43

575 U.S. at 55.[15]  First, USIP was created by special statute, outlining the goals, structure, and

obligations of the organization.  *See Herron*, 861 F.3d at 167; *Lebron*, 513 U.S. at 397.  Neither

plaintiffs nor defendants seem to dispute that basic premise.

Second, that statute makes clear USIP's purpose to achieve governmental objectives

through articulated activities that are monitored by Congress.  *See Lebron*, 513 U.S. at 397;

*Ass'n of Am. R.R.*, 575 U.S. at 52-53.  In the section of USIP's organic statute entitled

"Congressional declaration of findings and purposes," Congress described "a national need to

examine" various "disciplines" "to bring together and develop new and tested techniques to

promote peaceful economic, political, social, and cultural relations in the world" and recognized

"a need for Federal leadership to expand and support the existing international peace and conflict

resolution efforts of the Nation and to develop new comprehensive peace education and training

programs, basic and applied research projects, and programs providing peace information."  22

U.S.C. § 4601(a)(4), (6).  Congress explained that the statute aimed to establish a "national

institute to serve the people and the government through the widest possible range of education

and training, basic and applied research opportunities, and peace information services."  *Id.*

§ 4601(b).  In the section entitled "powers and duties," Congress offered ten specific activities

for the Institute to carry out, ranging from broad ("enter into formal and informal relationships

with other institutions") to highly specific ("establish a Jennings Randolph Program for

International Peace and appoint, for periods up to two years, scholars and leaders in peace").  *Id.*

§ 4604(b)(1), (4).  That same section also instructs a specific award that USIP should make every

---

[15]    For the same reason, USIP's own definition cannot be dispositive of its status.  *See* Sr. Officials' Amicus
Br. at 5 (citing USIP's 2020-2022 Strategic Plan: "USIP's distinct status—as *formally independent but with a
special link to the U.S. government*—enables [it] to serve as a trusted *connector* among foreign governments, civil
societies, and U.S. government officials"); *see also* Pls.' Opp'n at 13 (citing USIP's biennial reports that emphasize
the Institute's independence).

year and describes the kind of "extension and outreach activities" the Institute should engage in. *Id.* § 4604(c), (d).

USIP certainly has broad discretion in carrying out these activities, since much of the language used by Congress is permissive, *e.g.*, *id.* § 4604(b) ("The Institute, acting through the Board, may—"), and Congress does not set specific deadlines, metrics, or mechanisms to monitor success or dictate day-to-day operations. USIP's Board, as plaintiffs point out, chooses its own projects and initiatives, independent of the government, based on the Institute's priorities. *See* Pls.' Opp'n at 22-23; Third Moose Decl. ¶¶ 9-12 ("When foreign governments or other organizations contact USIP to work together on projects, we do not obtain U.S. government approval when agreeing to undertake these activities. Again, if they align with USIP's mission and we have the capacity to engage with these groups, we may do so."). By contrast, Amtrak's statute is more specific, setting out a list of "priorities in selecting and scheduling projects," mandating maintenance of specific rails, and dictating certain procurement requirements, as the Supreme Court noted in *Association of American Railroads*. 575 U.S. at 53; 49 U.S.C. § 24902(b).

Congress nevertheless makes clear USIP's objectives and ensures that USIP's activities are furthering governmental aims. In addition to suggesting certain award and fellowship programs, in § 4604(b)-(c), Congress has specifically instructed USIP to develop the Gandhi-King Global Academy, Pub. L. 116-260, 134 Stat. 3115, sec. 334 (2020). Further, Congress maintains oversight over USIP through the annual appropriations process, which much like Amtrak, *see* 575 U.S. at 53, the Institute relies on substantially for its funding, *see* 22 U.S.C. §§ 4609(a), 4604(h)(3) (private funds may only be used for the development and maintenance of its headquarters or other facilities and for hospitality purposes). USIP's ongoing use of "United

45

States," "U.S.," or any other reference to the United States government in its name, seal, or emblem is also contingent on these annual appropriations, demonstrating that USIP was designed to, at least in significant part, further the country's interests and is subject to ongoing review of that goal. *See id.* § 4603(b). Finally, USIP is subject to the similar "transparency and accountability mechanisms" as Amtrak, 575 U.S. at 55: FOIA, 22 U.S.C. § 4607(i), including congressional determination of its budget with input from OMB, *id.* § 4609; *id.* § 4608(a), and regular reports to Congress and the President, *id.* § 4611.[16] USIP is also required to publish notice of its Board meetings and invited to do so in the Federal Register. *Id.* § 4605(h)(3).

Plaintiffs argue that USIP was intended to "stand apart from the policymaking branches and act as a resource to strengthen the work not just of the U.S. government, but also of 'existing institutions providing programs in international affairs, diplomacy, conflict resolution, and peace studies,' as well as 'government, private enterprise, and voluntary associations,'" Pls.' Opp'n at 12 (quoting 22 U.S.C. § 4601(a)(5)), suggesting that USIP's creation was not "in furtherance of governmental objectives," *Herron*, 861 F.3d at 167. The existence of additional aims does not undercut the coexistent *governmental* purpose of USIP, made apparent in the same section of the statute. 22 U.S.C. § 4601(b) (describing the purpose of USIP to "serve the people and the Government"). Moreover, plaintiffs' point that USIP's Board has fiduciary duties to the Institute and not any political branch does not conflict with USIP's overall governmental purpose. Pls.' Opp'n at 14; Pls.' Mem. at 17-18. Amtrak's board members likewise have fiduciary duties to the corporation but both entities exercise those duties in ways consistent with the statutory

---

[16] Like Amtrak, USIP is also designated as a "federal entity" under the Inspector General Act, *see* 5 U.S.C. § 415(a)(2), *e.g.*, List of Designated Federal Entities & Federal Entities, 59 Fed. Reg. 43598, 43599 (Aug. 24, 1994); Defs.' Opp'n at 11. This fact is not probative, however, considering that USIP is audited by a private accounting firm, not an Inspector General, and USIP was included from 1994 to 2014 but seemingly not before or after. *See* Pls.' Opp'n at 17; Pls.' SUMF ¶ 33.

governmental mandates.  *See Lebron*, 513 U.S. at 397 (noting that the corporate form does not allow the corporation to evade its governmental obligations).

Third, USIP is subject to government ownership and control in the relevant sense.  *See Ass'n for Am. R.R.*, 575 U.S. at 51-52.  The government "retains for itself permanent authority to appoint a majority of the directors" of USIP.  *Herron*, 861 F.3d at 167.  In fact, the President appoints *all* of USIP's voting Board members with advice and consent of the Senate (the three *ex officio* members who are appointed for other positions and the twelve specifically for USIP's Board); the only other Board member, the president of USIP, who does not vote, is selected by the fifteen appointed Board members.  *See* 22 U.S.C. §§ 4605(b), 4606(a).  Much like the Amtrak board members, the USIP Board members are to be selected, in part, based on their expertise and experience in the area and to create a partisan balance.  22 U.S.C. § 4605(c)-(d); *Ass'n of Am. R.R.*, 575 U.S. at 51-52 (noting those factors as consistent with governmental control).  USIP also, while functionally independent, is owned by the government in the sense that the organization cannot issue stock to be owned by anyone else, 22 U.S.C. § 4603(b), and cannot dissolve itself, *id.* § 4604(a), and, if dissolved, its assets would go to the U.S. Treasury, *id.* § 4610.[17]  In short, USIP "was created by the Government, is controlled by the Government, and operates for the Government's benefit."  *Ass'n of Am. R.R.*, 575 U.S. at 53.

Plaintiffs point to an older Supreme Court case, *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee* ("*USOC*"), 483 U.S. 522 (1987), presumably to bolster the argument that USIP falls outside of the federal government entirely.  Pls.' Opp'n at 6-7, 9-10.  The Court

---

[17]    Plaintiffs contest the relevance of the reversion of funds to the Treasury upon dissolution, noting that "any tax-exempt nonprofit organization that is dissolving" must "distribute its remaining assets only to another tax-exempt organization . . ., or to the federal government, or to a state or local government."  Pls.' Opp'n at 20.  By this measure of ownership, then, plaintiffs contend "the government (federal or state) would 'own' every single extant tax-exempt nonprofit."  *Id.*  Plaintiffs may be correct that this fact could not be dispositive, but the explicit notation that USIP's funds must revert to the Treasury—and not a state government or other nonprofit—weighs in favor of viewing the Institute as a governmental entity.

47

there considered whether the Olympic Committee was subject to the Fifth Amendment when the

Committee took steps to protect its intellectual property.  After noting that the Committee had a

corporate charter and received some governmental funding, neither of which were dispositive

characteristics of a governmental entity, the Court focused on whether the Committee performed

"functions that have been 'traditionally the *exclusive* prerogative' of the Federal Government."

*Id.* at 544 (emphasis in original) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)).

The conduct and coordination of amateur sports were not "traditional government function[s],"

*id.* at 545, nor was the "choice of how to enforce its exclusive right to use the word 'Olympic,'"

so the Committee was not considered a governmental actor, *id.* at 547.  Indeed, as plaintiffs

emphasize, "USIP's NGO functions in conflict resolution" are ones also performed by private

entities.  Pls.' Opp'n at 6-7.  The functional test proposed in *USOC*, however, was not employed

in the later cases involving Amtrak, as plaintiffs readily admit.  Pls.' Opp'n at 10 ("A few years

later, the Supreme Court employed a different analysis, and barely cited *U.S. Olympic

Committee*, in determining that Amtrak was subject to the First Amendment when deciding what

advertisements could be displayed in New York's Penn Station.").  For purposes of

constitutional separation-of-powers questions, *Association of American Railroads* is most on

point—and there, the "traditional[ly]" private or public nature of the corporation's functions

were not dispositive.

      Plaintiffs point to various other characteristics of USIP as relevant in discerning its

character and function, but none carry much weight for purposes of constitutional separation-of-

powers questions.  Plaintiffs point out, for example, that Congress described USIP as a charitable

organization under the tax code, citing 26 U.S.C. § 170(c)(2)(B), which applies to 501(c)(3)

organizations, not public entities or political subdivisions.  *See* Pls.' Opp'n at 20-21.  "If

48

Congress intended for the Institute to be owned by the 'United States,'" plaintiffs argue, USIP would not have been so classified. *Id.* at 21. Again, however, Congress's classifications are not controlling. *Lebron* and *Association of American Railroads* instruct courts to look to the organization's creation, structure, objectives, and degree of governmental control—a practical inquiry—rather than statutory labels and categorizations. For that same reason, classifications by other bodies, such as USIP's classification by the U.S. Government Manual, a publication by the Office of the Federal Register within the National Archives and Records Administration, and by the Congressional Research Service, as "quasi-official," are likewise unavailing for this purpose. Pls.' Mem. at 22-23; Pls.' SUMF, Ex. 25, The United States Government Manual 2009/2010, ECF No. 20-25 (noting that the Manual defines "quasi-official agency" as "not executive agencies under the definition of 5 U.S.C. § 105 but are required by statute to publish certain information on their programs and activities in the Federal Register"); *see also* USG Manual, ECF No. 20-23; Kosar, *supra*, at 6 (noting that USIP is classified as a "quasi-official agency" under the Government Manual and noting that Amtrak likewise used to have that same descriptor).[18]

Plaintiffs also note that USIP lacks sovereign immunity and is a distinct legal entity. Pls.' Mem. at 3; Pls.' Opp'n at 11-12; 22 U.S.C. §§ 4603(d), 4604(k). Again, those are statutory determinations that do not resolve the entity's constitutional status, as the Court in *Lebron* explained. *See* 513 U.S. at 392 (Congress' "statutory disavowal of Amtrak's agency status deprive[d] Amtrak of sovereign immunity from suit" but did not resolve Amtrak's status for constitutional purposes).

---

[18]     Even less probative, then, is the fact that USIP's former website—which now appears defunct—used a ".org" instead of a ".gov" domain name. *See* Terminated Emps. Amicus Br. at 5.

Finally, plaintiffs emphasize that USIP's Board members and employees are not employees or officers of the U.S. government, except for purposes of the FTCA and certain compensation and benefits purposes.  22 U.S.C. § 4606(f)(1); Pls.' Mem. at 17; Pls.' Opp'n at 12, 15-16.  The statute, in fact, says this twice, also separately emphasizing that "officers and employees of the United States Government may not be appointed to the Board."  22 U.S.C. § 4605(d)(2).  Further, USIP employees are paid on a private payroll, Pls.' Add'l SUMF ¶ 12, ECF No. 34-1, receive privately administered benefits, Pls.' Opp'n Exhibits, Ex. 5, Exec. Office of the President Memo re: Employee Benefits Coverage (Mar. 11, 1988), ECF No. 34-7; Pls.' Opp'n at 12 & n.6 (explaining that 5 U.S.C. § 8914 precluded nongovernmental employees from receiving federal benefits); Pls.' Add'l SUMF ¶ 13, and their salaries are guided—not mandated—by statute, at least per a 1987 OPM memo, Pls.' Opp'n, Ex. 4, OPM Memo (Oct. 2, 1987), ECF No. 34-6.  USIP employees do not take an oath of office or receive government personnel forms.  *See* Terminated Emps. Amicus Br. at 8.

Again, Congress's disavowal of governmental employee status has important statutory implications but cannot dictate whether USIP operates as a governmental entity under the Constitution.  *See Lebron*, 513 U.S. at 592.  PCAOB's Board members and other employees are not "officer[s] or employee[s] or agent[s] for the Federal Government" either.  15 U.S.C. § 7211(b).  Though the Court in *Free Enterprise* did not have to consider that fact because the parties agreed that "the Board is 'part of the government' for constitutional purposes, . . . and that its members are 'Officers of the United States'" for such purposes, 561 U.S. at 485-86, the Court interpreted § 7211(b) as describing employees' status only "for statutory purposes" *id.* at 485-86 ("[d]espite the provisions specifying that Board members are not Government officials

50

for *statutory* purposes" (emphasis added)), seemingly recognizing that section's limited relevance to the constitutional separation-of-powers inquiry.

Plaintiffs' statutory arguments thus cannot avoid the key characteristics that make USIP part of the federal government for constitutional separation-of-powers purposes.

### 2.    *USIP is Not Part of the Executive Branch.*

As stated earlier, a threshold finding that USIP is a government entity does not resolve the case. Given that defendants have offered no theory of why the President would have constitutional authority unilaterally to remove USIP Board members if they are not part of the Executive branch and do not exercise executive power, the determination that USIP may be a governmental entity is insufficient. The ultimate question remains—whether USIP is subject to the President's Article II removal authority.[19]

This question is not resolved easily by analogous precedent. Despite concluding that Amtrak was a government entity, the Supreme Court did not make any finding as to whether Amtrak was in the Executive branch in either *Lebron*, 513 U.S. 374, or *Association of American Railroads*, 575 U.S. 43, nor did the D.C. Circuit on remand of *American Railroads*, despite resolving the Due Process and Appointments Clause issues at hand. *See generally Ass'n of Am. R.R. v. Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016) (holding that Amtrak's power to regulate

---

[19]    As plaintiffs point out, *Collins*, 594 U.S. 220, supports the point that for questions about the President's removal powers, a determination that an entity is merely part of the federal government is insufficient and what matters is whether that entity is part of the Executive branch. *See* Pls.' Opp'n at 11. In *Collins*, the Supreme Court considered whether a for-cause removal restriction on a single leader of an agency (the Federal Housing Finance Agency ("FHFA")) was constitutional. An amicus raised the argument that the director of the FHFA acted as a private party when conducting its role as a conservator or receiver and on this basis, Congress could limit the President's removal authority. *See id.* at 254. Without suggesting that the President could exercise removal authority over entities acting in a private capacity or even within the government but outside of Article II, the Court instead reasoned that the particular way in which the director acts as a receiver is through "implementation of a legislative mandate," which is the "very essence of 'execution' of the law," so "the FHFA clearly exercises executive power" and the President's constitutional removal authority applied. *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 733 (1986)).

its competitors violated the Due Process Clause and that the arbitrator appointed to resolve

rulemaking disagreements between Amtrak and the Federal Railroad Administration was an

"Officer" under the Constitution); *see also Ass'n of Am. R.R. v. Dep't of Transp.*, 896 F.3d 539

(D.C. Cir. 2018) (reviewing, on a second appeal, the propriety of the remedy for the

constitutional violations).[20]  In *Dong*, the D.C. Circuit implicitly assumed the Smithsonian

Institute was a government entity to conclude it was not an Executive branch agency for the

narrow purpose of the statutory definition in the Privacy Act, without further consideration of

whether the Smithsonian is subject to Article II for other purposes.  *See* 125 F.3d at 883.

 For defendants, the answer to whether USIP is part of the Executive branch flows easily

from the answer to the threshold issue: USIP is part of the federal government and does not

exercise legislative or judicial power.  Defs.' Opp'n 13-14.  Based on the assumption that "[a]

component of the federal government must fall into one of three branches," defendants use

process-of-elimination reasoning to conclude that USIP must be part of the Executive branch.

*Id.*  Defendants argue as an additional point that USIP, in fact, exercises core executive powers.

---

[20]      To be more specific, the D.C. Circuit on remand held that the Passenger Rail Investment and Improvement
Act ("PRIIA") "violates the Fifth Amendment's Due Process Clause by authorizing an economically self-interested
actor to regulate its competitors."  821 F.3d at 23.  The PRIIA provision at issue "task[ed] Amtrak and the Federal
Railroad Administration (FRA) with jointly developing performance metrics and standards," problematically
providing "a means of enforcing Amtrak's statutory priority over other trains"—*i.e.*, over its competitors.  *Id.*  This
discussion did not opine on whether Amtrak is part of the Executive branch, explaining only that just because
Amtrak is not an autonomous private enterprise does not mean it is not economically self-interested.  *See id.* at 31-
32.  The court made a single passing comment that the FRA and Amtrak are "subdivisions in the same branch," 821
F.3d at 35, which might be read to suggest they both belong to the Executive branch, but the court did not engage in
further analysis.  The D.C. Circuit further held that the PRIIA violates the Appointments Clause for delegating
regulatory power to an improperly appointed arbitrator, who, as a principal officer could not be appointed by the
Surface Transportation Board, but rather had to be appointed by the President.  *See id.* at 39.  While describing
Amtrak and the FRA's joint rulemaking as "agency action" might suggest Amtrak is part of Article II, the court
never went so far as to say that.  *Id.*  The court merely held that the *arbitrator* role described in the statute was a
principal "Officer" under the Constitution and thus could not be appointed by a mere head of a department.  *See id.*
        The D.C. Circuit's second post-remand opinion likewise did not opine on whether Amtrak is part of the
Executive branch.  *See* 896 F.3d 539.  A sole comment may imply that the opinion so assumed: "Finally, the
dissenting opinion notes that the Administration is housed 'in the same branch' of an Executive agency as Amtrak.
Dissent Op. at 557."  896 F.3d at 548.  Again, the court engaged in no further discussion on that point.

*See id.* at 14-16.  At first blush, this reasoning has attraction, but closer scrutiny reveals that both defendants' assumption and their analysis of USIP's powers are flawed.

### a.    *Exclusivity of Three Branches of the Federal Government*

Defendants' assumption that every federal entity falls neatly within one branch is not correct.  Federal entities may be classified as legislative for one purpose but treated as executive for others.  For instance, the Government Accountability Office ("GAO"), led by the Comptroller General, is generally part of the Legislative branch.  GAO is explicitly described as "an instrumentality of the United States Government independent of the executive departments," 31 U.S.C. § 702(a), "part of the legislative branch," Reorganization Act of 1949, Pub. L. No. 81-109, sec. 7, 63 Stat. 203, 205, and "an agent of Congress," Accounting and Auditing Act of 1950, Pub. L. No. 81-784, ch. 946, sec. 111(d), 64 Stat. 832, 835.  Consequently, in *Bowsher v. Synar*, 478 U.S. 714 (1986), the Supreme Court held that as part of the Legislative branch for constitutional purposes, the Comptroller General could not exercise executive powers under the Constitution, so his apparent authority to implement a statute determining certain budget calculations and to dictate budgetary cuts in the presidential budget request was invalid.  *See id.* at 733-736.  Nonetheless, the definition of "executive agency," under 5 U.S.C. § 105, which applies to the APA and other statutes governing executive agencies, explicitly includes GAO.  *See id.* § 104(2) (including GAO as an "independent establishment," which is one type of executive agency).

As with the first threshold question of whether USIP is part of the federal government, all that matters here is how USIP is classified for *constitutional* separation-of-powers purposes (not any statutory purposes), but that too can be a complicated inquiry, given that a single entity may exercise multiple different types of authority and "governmental power cannot always be readily characterized with only one . . . labe[l]."  *Mistretta v. United States*, 488 U.S. 361, 393 (1989)

(alterations in original) (quoting *Bowsher*, 478 U.S. at 749 (Stevens, J., concurring in the judgment)).  Executive branch entities, for instance, may carry out adjudicative, rulemaking, and enforcement functions, which courts have labeled in various ways.  *See, e.g.*, *Seila L.*, 591 U.S. at 216-17 (describing how *Humphrey's Executor* upheld removal restrictions for multimember Executive branch entities, like the Federal Trade Commission ("FTC"), with "'quasi-judicial' or 'quasi-legislative' functions"); *id.* at 216 n.2 (describing those functions as fundamentally "executive" under the Constitution); *Wilcox v. Trump*, -- F. Supp. 3d --, 2025 WL 720914, at *7 (D.D.C. Mar. 6, 2025) (describing such quasi-judicial and quasi-legislative powers of the National Labor Relations Board ("NLRB")).  A Judicial branch entity may also carry out rulemaking functions, in lieu of any "judicial power" at all.  *See Mistretta*, 488 U.S. at 384-97 (describing the U.S. Sentencing Commission and holding that it is part of the Judicial branch for a constitutional separation-of-powers analysis); 28 U.S.C. § 991(a) ("There is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission.").  The Vice President, too, though not an entity *per se*, explicitly carries out cross-branch duties, acting as both an aide to the President and the President of the Senate.  *See* U.S. CONST. art. I, § 3, cl. 4; *see generally* Roy E. Brownell II, *A Constitutional Chameleon: The Vice President's Place Within the American System of Separation of Powers*, 24 KAN. J.L. & PUB. POL'Y 1 (2014).  Despite the importance of separation of powers into separate branches, the Supreme Court has recognized "that our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" *Mistretta*, 488 U.S. at 381 (quoting *Buckley*, 424 U.S. at 121).

Further, not every federal government entity sits within a particular branch at all.  The grand jury, for example, is an independent entity "not . . . textually assigned . . . to any of the branches described in the first three Articles." *United States v. Williams*, 504 U.S. 36, 47 (1992).  Though the grand jury operates "under judicial auspices," the Supreme Court has described its "institutional relationship with the Judicial Branch" as one "at arm's length," characterized by only very limited "power . . . to fashion . . . rules of grand jury procedure" and call the jurors together and administer their oaths.  *Id.* at 47, 50.  The Supreme Court has also stated that Congress can create "'offices' in the generic sense and provide such method of appointment to those 'offices' as it chooses" without the leaders being "Officers of the United States" under Article II of the Constitution (providing for presidential appointment of such officers, *see* U.S. CONST. art. II, § 2, cl. 2), if they operate in an area "removed from the administration and enforcement of the public law" or "perform duties only in aid of those functions that Congress may carry out by itself." *Buckley*, 424 U.S. at 138-39; *see also id.* at 139-41 (holding that the Federal Election Commission, whose members were not appointed by the President, could not administer the statute through rulemaking, determinations of eligibility for funds, advisory opinions, enforcement actions, etc.).

Plaintiffs point to the Smithsonian Institution as an example of a government establishment that cannot easily reside within any of the three branches.  *See* Pls.' Opp'n at 7-8.  Indeed, both parties seem to agree that the Smithsonian Institution does not exercise executive power, *see id.*; Defs.' Opp'n at 23, but also does not engage in adjudications or rulemaking, *see* Pls.' Opp'n at 7.  Its leadership also comes from all three branches—its Board of Regents includes members of Congress, the Chief Justice, and the Vice President.  *See* 20 U.S.C. § 42(a).  While no case has held that the Smithsonian Institution does or does not fall into one of the

tripartite branches under the Constitution, that example counsels caution in understanding all congressionally created or chartered entities that may be considered part of the federal government to fall necessarily within one of the first three Articles.

Put simply, entities that perform nongovernmental functions or functions distinct from the three branches (like the grand jury), do not necessarily reside within a particular branch of the federal government.

Defendants' arguments to the contrary are unpersuasive.  To begin, defendants stick to the assumption that all government entities must fall within one of the three branches, painting the grand jury as an anomaly and the Smithsonian Institution as an "exceedingly rare" "exception[]," and citing cases that emphasize the separation of the three branches.  XMSJ Hr'g Tr. at 80:23-81:22 (suggesting the Smithsonian was one of the rare entities "intended to be outside of the three branches"); Defs.' Reply at 2-6.  Defendants are correct that the three branches are separate, such that legislative power is not generally exercised by the Executive branch and vice versa.  *See* Defs.' Reply at 3-6.  Yet, defendants' cases emphasizing such differentiation among the branches say nothing about entities that exercise nongovernmental— non-legislative, non-judicial, and non-executive—powers.  *See id.* at 4-5 (citing *Buckley*, 424 U.S. at 138-139, which, in defendants' own terms, reinforces the uncontroversial "need for government components exercising executive authorities to be located in the Executive Branch"); *id.* at 5-6 (citing *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991), which merely reiterated that the Legislative branch cannot exercise executive powers); *id.* at 6 (citing *INS v. Chadha*, 462 U.S. 919, 951 (1983), which simply emphasized that the government was divided into three categories and each branch must remain confined to its category).

56

Defendants point to *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 202-03 (1928), as suggesting that all government entities fall within one of three branches, because there, the Supreme Court applied process-by-elimination reasoning to determine that a committee created by the Philippine Legislature to control or manage a government-owned corporation was part of the Executive branch.  *See* Defs.' Reply at 5-6.  The Court had explained that the Philippines government followed separation-of-powers principles akin to the U.S. Constitution, and reasoned that the powers of the committee "are not legislative in character, and . . . not judicial[, so t]he fact that they do not fall within the authority of either of these two constitutes logical ground for concluding that they do fall within that of the remaining one of the three among which the powers of government are divided."  *Springer*, 277 U.S. at 201-03.  The Court did not rely on that deduction alone, however, and instead went on to explain why the committee's powers were executive in nature: "The appointment of managers (in this instance corporate directors) of property or a business, is essentially an executive act which the Legislature is without capacity to perform directly or through any of its members."  *Id.* at 203.  As the Court later summarized the holding in *Springer*: "Because the Organic Act of the Philippine Islands incorporated the separation-of-powers principle, and because the challenged statute authorized two legislators to perform the *executive function of controlling the management of the government-owned corporations*, the Court held the statutes invalid."  *Metro. Wash. Airports Auth.*, 501 U.S. at 275 (emphasis added).  That the Court mentioned the lack of any legislative or judicial powers as part of its determination that a Filipino committee is part of their Executive branch does not reflect a firm holding that no entity of the U.S. government can exist outside of the three branches.[21]

---

[21] Notably, the great legal minds Justices Holmes and Brandeis both dissented from *Springer*, and Justice Holmes noted that "we do not and cannot carry out the distinction between legislative and executive action with

In sum, complex government entities are not always easily classified within the three branches, and further, an entity may be part of the government, in a broad sense—created by Congress for governmental purposes and controlled by the government, *see supra* section III.A.1.b—without exercising governmental powers, executive, judicial or legislative, at all.[22] Defendants' process-of-elimination approach therefore holds little water. The relevant inquiry is whether USIP sits specifically within the Executive branch.

**b.    *Determination of an Entity's Constitutional Status***

When considering a separation-of-powers question requiring the determination of whether an entity sits within a particular branch, existing case law provides some guide but no clear test or discrete list of factors to consider, in contrast to the question of whether an organization is a governmental entity, as discussed *supra* in Part III.A.1.b. An entity's organic statute is a good place to start. In *Kuretski v. Commissioner of Internal Revenue Service* ("*C.I.R.*"), 755 F.3d 929 (D.C. Cir. 2014), the D.C. Circuit considered whether presidential removal of Tax Court judges violated separation of powers, evaluating first to which branch the Tax Court belonged. *See id.* at 932, 939-42. To start, the Court observed that the Tax Court was explicitly established by Congress "as an Executive Branch agency rather than an Article III

---

mathematical precision and divide the branches into watertight compartments, were it ever desirable to do so, which I am far from believing that it is, or that the Constitution requires." 277 U.S. at 211 (Holmes, J., dissenting). Justices Holmes and Brandeis recognized as early on as the 1920s that the complexities of governance required a more nuanced understanding of the federal constitutional structure.

[22]    Defendants' citation to *National Horseman's Benevolent and Protective Association v. Black*, 53 F.4th 869, 872-73 (5th Cir. 2022), is not to the contrary. Defs.' Reply at 3. The court there sustained a private nondelegation doctrine challenge to a congressionally created private entity that regulates horseracing through "formulat[ion] [of] detailed rules on an array of topics" without approval or review by any executive agency. *Nat'l Horseman's*, 53 F.4th at 872. The court explained the problem with "vesting government power in a private entity not accountable to the people," when "the Constitution vests federal power only in the three branches of the government." *Id.* at 872-73. That case did not opine on the meaning of "federal power," however, or whether entities that do not exercise federal power can be part of the government, let alone within or outside a particular branch. The Fifth Circuit merely held that entities with rulemaking or regulatory authority must be part of the federal government or closely overseen (with "pervasive surveillance and authority") by a component of it. *Id.* at 881-82.

tribunal." *Id.* at 940.  In *Mistretta*, the Supreme Court evaluated a similar question—whether presidential for-cause removal authority and the Sentencing Commission's rulemaking power violated separation of powers.  *See* 488 U.S. at 383-84.  The Court took as a given that Congress had assigned the Sentencing Commission explicitly to the Judicial branch and thus began with the presumption that it was appropriate there.  *Id.* at 385.

In both cases, the statutory denominations served merely as a launching point.  The decisions ultimately turned on the function of the entities in question—what powers they exercised in *constitutional* terms.  In *Kuretski*, the plaintiff argued the Tax Court was part of Article III, and indeed, the Supreme Court had previously explicitly stated that the Tax Court exercised "judicial power."  *See* 755 F.3d at 938-42 (citing *Freytag v. C.I.R.*, 501 U.S. 868, 891 (1991), which held that the Tax Court "exercises a portion of the judicial power of the United States" and thus qualified as a "Court of Law" for purposes of the Appointments Clause).  The D.C. Circuit nonetheless rejected that argument, reasoning that although as an adjudicatory body, the Tax Court exercised judicial power in some *generic* or "enlarged sense," the Tax Court did not occupy a judicial role under Article III.  *See id.* at 941-43 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 592 U.S. 272, 280 (1856)).  As an adjudicator of "public rights," the Tax Court did not decide cases or controversies under Article III, and its role "interpreting and applying the revenue laws" was consistent with Executive branch responsibilities.  *Id.* at 939-40, 943-44.  The court thus concluded that the Tax Court exercised Article II, rather than Article III judicial, power and sat in the Executive branch.  *Id.* at 943.  That holding was not undermined by statutory recognition (also reiterated in *Freytag*) of the Tax Court's independence from the Executive branch, *see* 26 U.S.C. § 7441 ("The Tax Court is not an agency of, and shall be independent of, the Executive branch of the Government."), which the

court considered to be about "functional" rather than "constitutional independence," nor of the

Tax Court's creation by Article I, *see id.* ("established under article I of the Constitution of the

United States"), which is true of all Executive branch agencies. *Kuretski*, 755 F.3d at 943.[23]

Similarly, in *Mistretta*, the Court evaluated the Sentencing Commission's rulemaking and

administrative functions to conclude these functions were not "more appropriately performed by

the other Branches" and did not "undermine the integrity of the Judiciary." 488 U.S. at 385.

Despite the "peculiar[ity]" of locating the Commission in the Judicial branch, given that "it is

not a court and does not exercise *judicial* power," placement there did not cause any

constitutional problem given that the necessary administrative or rulemaking duties carried out

by such an "auxiliar[y] bod[y]," "[b]ecause of their close relation to the central mission of the

Judicial Branch," are "not more appropriate for another Branch." *Id.* at 384-85, 389-90

(emphasis added). In short, its function, in aid of the judiciary, made "appropriate" the

Sentencing Commission's placement in the Judicial branch.

In addition to an entity's powers, its supervision and control may be indicative of where

the entity sits. For instance, in *Free Enterprise Fund*, the Court implicitly held that PCAOB

belonged to the Executive branch, given that the SEC—an Executive branch agency—oversaw

its duties and appointed its board members. *See* 561 U.S. at 486-87, 492. Neither appointment

nor removal authority, however, is dispositive. Regarding appointment, several entities outside

---

[23] *Kuretski*, like *Springer*, includes language emphasizing the three discrete branches of government and suggesting that if an entity does not belong to two branches, it likely belongs to the third. *See* 755 F.3d at 943 ("We have explained that Tax Court judges do not exercise the 'judicial power of the United States' pursuant to Article III. We have also explained that Congress's establishment of the Tax Court as an Article I legislative court did not transfer the Tax Court to the Legislative Branch. It follows that the Tax Court exercises its authority as part of the Executive Branch."). That does not undercut, however, indications previously described that *some* entities, particularly those more removed from core governmental responsibilities, *see, e.g.*, *Buckley*, 424 U.S. at 138-39, may not belong in any branch at all. *See supra* Part III.A.2.a. In fact, *Kuretski*, like *Springer*, did not rely merely on process of elimination but rather noted explicitly that the Tax Court "is in the business of interpreting and applying the internal revenue laws" and that Congress had formed the Court as an Executive branch agency. 755 F.3d at 939-40, 943.

of the Executive branch are led by presidential appointees: The Comptroller General is appointed by the President yet considered to be part of the Legislative branch. *See* 31 U.S.C. § 703(a)(1); *Bowsher*, 478 U.S. at 731-33. The Sentencing Commissioners are, too, appointed by the President, despite being part of the Judicial branch, as of course, are judges themselves. *See Mistretta*, 488 U.S. at 368, 396-97.

Regarding removal, entities outside of the Executive branch may also be subject to presidential removal pursuant to statute. Sentencing Commissioners, for example, are removable by the President for cause, but *Mistretta* held that this did not diminish the independence of the judiciary or of the Commission itself. *See id.* at 409-10. Such removal authority is not constitutional in origin, considering that the Commission is not part of Article II, but Congress in creating an entity could confer such limited authority to the President without sacrificing its non-executive nature. *See id.* While the Court in *Bowsher* strongly relied on Congress's removal authority over the Comptroller General to hold that the General's exercise of certain executive powers was impermissible as an encroachment on the Executive branch, the Court did not go so far as to hold that removal power always dictates an entity's constitutional location. *See id.* at 732. It rather relied on long-standing concerns, as articulated in Supreme Court precedent, about Congress reserving power unto itself over removal of executive officers. *See id.* at 724-32; *see also Humphrey's Executor*, 295 U.S. at 626-27 (holding that *Myers* held that Congress could not require advice and consent of the Senate as a prerequisite to presidential removal of an Executive branch official).

### c.    *Application to USIP*

Applying these lessons to determine whether USIP belongs to the Executive branch, both parties seem to agree that USIP's powers—as outlined in its organic statute and exercised in practice—ultimately define its constitutional character. *See* Pls.' Mem. at 24-29; Defs.' Opp'n at

21 n.4; Defs.' Reply at 8 ("[W]hether the institute serves an executive function or is vested executive power turns not just on how it operates, but also on its congressional design."); Defs.' Supp'l Mem. at 4, ECF No. 37 (explaining that the power exercised by an officer determine the officer's constitutional classification for purposes of a removal question).[24]  Starting briefly with its organic statute, USIP stands apart from both *Kuretski* and *Mistretta*.  Notably, Congress did not assign USIP to any branch at all, though by labeling it an "independent nonprofit corporation," suggested that USIP was *not* an Executive branch entity.  22 U.S.C. § 4603(b); *see also* Comm'n Rep. at 179 (noting, in its recommendation to create what became USIP, that despite presidential appointments of Board members, "the Academy is not an Executive Branch institution").  This stands in contrast to other government entities for which Congress has been clear when assigning entities to the Executive branch.  *Compare* 22 U.S.C. § 4603(b), *with* 20 U.S.C. § 3411 ("There is established an executive department to be known as the Department of Education."), *and* 29 U.S.C. § 153 ("The National Labor Relations Board . . . is continued as an agency of the United States."); *see also* Pls.' Mem. at 19 nn.14-16 (citing numerous statutes where Congress has clearly labeled entities as part of the Executive branch, including where they are also simultaneously described as corporations); Pls.' Opp'n at 17-18.[25]

---

[24]    Defendants later in their briefing seem to question whether the "practical work" of USIP is relevant, as compared to its statutory "functions and authorities assigned by Congress."  Defs.' Reply at 18.  This focus on the statute does not appear to help defendants, however.  The statute, by its terms, focuses solely on educational, research, and scholarly projects, *see infra*, and thus appears even less "executive" than the work of USIP in operation.  At the hearing, defendants agreed that both statutory instruction and practical operation are relevant.  *See* XMSJ Hr'g Tr. at 76:11-77:17.

[25]    In its initial years, USIP clearly understood Congress to have made the Institute separate from the Executive branch.  *See Oversight of the U.S. Institute of Peace: Hearing Before the S. Comm. on Labor & Human Resources and the S. Comm. on Foreign Rels.*, 100th Cong. 6 (1987) (statement of Hon. John Norton Moore, Chairman of Board of Dirs. of USIP) ("The legislative history of our enabling statute, and indeed the statutory text itself, makes clear that the United States Institute of Peace was not designed to become part of the Executive Branch. We believe that one of the greatest accomplishments of our early months in existence was the establishment of this independence."); Terminated Emps. Amicus Br. at 5; Pls.' Add'l SUMF ¶ 1 (citing an early USIP report to Congress and the President stating that the Institute refrains from "policy making and dispute intervention" because USIP is "not an agency of Congress or the Executive Branch"); Pls.' Opp'n at 21.  Perhaps for this reason, the National

Other provisions of the USIP Act, or lack thereof, also suggest that Congress did not envision USIP as part of Article II, even if USIP may be properly considered part of the government for constitutional purposes. In particular, the statute's explicit statements that USIP's Board members and employees are not officers or employees of the federal government seem to remove USIP from Article II, 22 U.S.C. §§ 4605(d)(2), 4606(f)(1), as does the requirement that USIP receive annual appropriations to continue using the "United States" as a prefix in its name, *id.* § 4603(e)(2). Congress's choice to apply affirmatively to USIP certain statutes and services ordinarily applied automatically to Executive branch agencies, such as FOIA, the FTCA, and GSA support, also suggests Congress did not envision USIP as part of Article II. *See* 22 U.S.C. §§ 4607(i), 4606(f)(1), 4604(o); 5 U.S.C. § 552 (applying FOIA to "agenc[ies]"); 28 U.S.C. § 1346 (applying the FTCA to cases where the United States is a defendant); *supra* n.3; Pls.' Mem. at 21-22; Pls.' Opp'n at 16.

Defendants point to different statutory provisions as support for finding that USIP is an Executive branch entity. Defendants contend that USIP's organic statute, which states "[t]here is hereby established the United States Institute of Peace," 22 U.S.C. § 4603(a), as a "nonprofit corporation," *id.* § 4603(b), makes the Institute a wholly owned corporation of the United States, under 5 U.S.C. § 103(1), which, in turn, makes it an Executive branch agency, under *id.* § 105.

---

Archives and Records Administration ("NARA") has long classified USIP as a "quasi-official agency" in the U.S. Government Manual; quasi-official agencies are not listed as part of the Executive branch. *See* USG Manual; Pls.' Mem. at 22-23; Pls.' SUMF ¶ 72; Defs.' Resp. ¶ 72 (discounting the Manual as simply reflecting information given from the entities themselves and not reflecting anyone else's view); Defs.' Opp'n at 18. Practical independence is not constitutional independence, however, *see Kuretski*, 755 F.3d at 943, and President Reagan, who issued a signing statement along with the USIP Act asserting his constitutional at-will removal authority of its Board members, did not see USIP as having the latter, Defs.' Opp'n at 8; Presidential Statement on Signing the Department of Defense Authorization Act, 1985 (Oct. 19, 1984), https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-authorization-act-1985.

The longstanding recognition of USIP's independence is probative and certainly favors a finding that USIP sits outside of the Executive branch for constitutional purposes, but these observations are ultimately not dispositive, given that the entity's powers and functions are most crucial. *See supra* Part III.A.2.b.

Defs.' Opp'n at 20-21.  Indeed, the United States created and controls the Institute, which is barred from issuing stock to anyone else, and retains its funds upon dissolution—making it the only conceivable owner.  *See id.* (citing 22 U.S.C. §§ 4603(a)-(b), 4605, 4610).  Alternatively, defendants argue that USIP is an "independent establishment," under 5 U.S.C. § 104(1), given that it is "established" by the United States and "independent," *see* 22 U.S.C. § 4603(a)-(b), which also makes it an "executive agency," under 5 U.S.C. § 105.  *See* Defs.' Opp'n at 21.  These points, highlighted during hearings for the TRO and Motion to Suspend Transfer of Property, *see* TRO Hr'g at 49:4-9; Hr'g for Mot. to Suspend Prop. Transfer at 66:2-70:3 (4/1/25), ECF No. 23, demonstrate the extent that Congress intended for USIP to be treated as an agency for additional statutory purposes—Title 5, in particular, includes the Administrative Procedure Act and the Inspector General Act.  Yet, the fact that Congress did not suggest more concretely in USIP's organic statute that USIP was in a particular branch suggests Congress did not envision USIP exercising Article II power.  In any event, as already explained *supra* in Parts III.A.1.b and III.A.2.a-b (noting, for instance, the inclusion of GAO as an "executive agency" under this Title), the powers exercised by an entity, not Congress's statutory classifications, are dispositive of an entity's constitutional character.[26]

Most crucially, USIP does not exercise executive power in the constitutional sense.  The Executive branch, per the Constitution, "execute[s]," or administers, the laws.  *See* U.S. CONST. art II.  Put plainly, that means "interpreting a law enacted by Congress to implement the

---

[26]    As defendants explain in their supplemental memorandum, for the purposes of a constitutional removal question, what matters is "whether the officer exercises executive power, not the label attached."  Defs.' Supp'l Mem. at 4.  Defendants point to the helpful example of *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341-42 (D.C. Cir. 2012), which holds that, despite the Library of Congress's title and classification as a "congressional agency" for some purposes, the Librarian is considered a "component of the Executive Branch" for purposes of an Appointments Clause question under the Constitution because "the powers in the Library," such as promulgating regulations, applying statutes to affected parties, and setting certain rates and terms case-by-case, are executive in nature.  *See* Defs.' Supp'l Mem. at 4.

legislative mandate," *Bowsher*, 478 U.S. at 732-33, and enforcing it, by judicial lawsuit or

otherwise, *see Buckley*, 424 U.S. at 138.  Implementing the law through adjudications or

rulemaking may also be considered Executive branch activities.  *See Kuretski*, 755 F.3d at 938-

41 (discussing adjudication); *Buckley*, 424 U.S. at 140-41 (recognizing rulemaking as commonly

performed by Executive branch entities); *Dong*, 125 F.3d at 879 (describing as "typical[]

executive activity" "administer[ing] federal statues, prosecut[ing] offenses, [and] promulgat[ing]

rules and regulations").  By contrast, purely "investigative and informative activities" are not

executive and rather "fall[] into the same general category as those powers which Congress

might delegate to one of its own committees."  *Buckley*, 424 U.S. at 137.

Apart from those core duties, the Executive branch also wields significant power over

foreign affairs, appointing ambassadors, making treaties, recognizing foreign nations, and

"engaging in direct diplomacy with foreign heads of states and their ministers."  *Zivotofsky ex*

*rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13-14 (2015).  The President's leadership of the military also

confers certain powers over war and peace, though formal declarations of course require acts of

Congress.  *See* U.S. CONST. art. II, § 2, cl. 1; *id.* art. I, § 8, cl. 11.

USIP's activities, by contrast, are solely focused on research, education, and scholarship.

USIP does not execute, enforce, administer, interpret, or implement any law.  "It does not make

binding rules of general application or determine rights and duties through adjudication.  It issues

no orders and performs no regulatory functions."  *Dong*, 125 F.3d at 882.  USIP's purpose,

rather, is to provide "the widest possible range of *education and training, basic and applied*

*research opportunities, and peace information services* on the means to promote international

peace and the resolution of conflicts among the nations and peoples of the world without

recourse to violence."  22 U.S.C. § 4601(b) (emphasis added).  Section 4604, which provides

USIP's "powers and duties," lists 10 "specific activities"—all of which are related to the

development and dissemination of information.  *Id.* § 4604(b) ((1) "establish a Jennings

Randolph Program for International Peace and appoint . . . scholars and leaders . . . to pursue

scholarly inquiry," (2) "enter into formal and informal relationships with other institutions," (3)

"establish a Jeannette Rankin Research Program on Peace to conduct research and make

studies," (4) "develop programs to make international peace and conflict resolution research,

education, and training more available," (5) "provide, promote, and support peace education and

research programs," (6) "conduct training, symposia, and continuing education programs," (7)

"develop, for publication or other public communication, and disseminate, the carefully selected

products of the Institute," (8) "establish a clearinghouse and other means for disseminating

information," (9) "secure directly" from federal entities under FOIA "information necessary to

enable the Institute to carry out the purposes of this chapter," (10) "establish the Spark M.

Matsunaga Scholars Program").  USIP may also make grants and conduct outreach activities—

but only for the purposes of supporting research, promoting the study of international peace,

educating individuals, assisting the Institute in its information services programs, and assisting

the Institute in the study of conflict resolution, and promoting the other purposes outlined.  *Id.*

§ 4604(d).  USIP can serve federal entities as well, but again, only in these capacities:

"investigat[ing], examin[ing], study[ing], and report[ing] on any issue within the Institute's

competence."  *Id.* § 4604(e).  USIP has no residual statutory authority to engage generally in

foreign diplomacy or foreign peacemaking expeditions.

Research, educational, and scholarly tasks are not "executive" under our constitutional

scheme, nor are they legislative, judicial, or governmental at all.  USIP's powers and duties are

akin to those carried out by private organizations—universities, NGOs, etc.—as evident by the

partnerships the USIP Act contemplates. *See, e.g.*, 22 U.S.C. §§ 4604(b)(5), (10), 4604(d)

(describing collaborations with educational institutions). To the extent they are considered

governmental, *Buckley* made clear that such "investigative and informative activities" are of the

kind that Congress might delegate to one of its own committees—thus not executive in nature.

424 U.S. at 137.

 While international peace and conflict resolution are, as subject areas, associated with

foreign affairs, which falls primarily under the President's purview, the Executive branch does

not control everything touching that subject area, contrary to defendants' suggestion. *See* Defs.'

Opp'n at 16-17; *Zivotofsky*, 576 U.S. at 19-21 (2015) (declining "to acknowledge" an

"unbounded power" of the President "over foreign affairs" and emphasizing that "[i]t is not for

the President alone to determine the whole content of the Nation's foreign policy"). An entity's

powers, not its subject matter, dictate its constitutional role. *See Kuretski*, 755 F.3d at 941-42

(rejecting that just because something involves a suit in court, it falls within Article III).

 Importantly, USIP's powers are not serving the Executive branch's foreign affairs

function: USIP does not wage war, conclude peace agreements, recognize foreign nations,

establish foreign policy, make treaties, negotiate with foreign sovereigns for agreements binding

on the United States, or transact with other states or maintain diplomatic relations on behalf of

the government. *See* Defs.' Opp'n at 15-16 (describing the President's foreign affairs authority

as encompassing these powers); Defs.' Reply at 9; Pls.' SUMF, Ex. 36, Decl. of Frank Aum,

Senior Expert on Northeast Asia ("Aum Decl.") ¶ 4, ECF No. 20-36 ("At USIP, I never engaged

in any work that entailed executive branch authorities or obligations, such as implementing U.S.

government policy, executing or enforcing U.S. laws, negotiating or signing treaties or

agreements, conducting diplomacy, representing official U.S. government policies and interests,

or swearing an oath as a federal employee.").  Congress has elsewhere been explicit when

entities are expected to be involved in foreign affairs to implement foreign policy on behalf of

the President.  *See, e.g.*, 22 U.S.C. § 3305(a)-(b) (establishing the American Institute in Taiwan

as a "nonprofit corporation incorporated under the laws of the District of Columbia" to "enter[]

into, perform[], and enforce[], in the manner and to the extent directed by the President" any

"agreement or transaction relative to Taiwan"); Pls.' Mem. at 26.  Nothing in the USIP Act

suggests USIP should even implement foreign policy, agreements, or transactions otherwise

created by the Executive branch.

Nor does USIP serve as some kind of auxiliary body, directly facilitating the Executive

branch's foreign affairs work.  *Cf. Mistretta*, 488 U.S. at 389-90 (describing the Sentencing

Commission as an auxiliary body supporting the judiciary and thus part of the Judicial branch

despite not exercising traditional judicial powers); *Free Enter. Fund*, 561 U.S. at 486-87, 492

(impliedly determining that the PCAOB is part of the Executive branch because it acts "under

the SEC's oversight, particularly with respect to the issuance of rules or the imposition of

sanctions (both of which are subject to Commission approval and alteration)").  In a broad sense,

USIP furthers governmental aims pursuant to its statutory mandate, aiding foreign policy by

advancing the country's knowledge of foreign conflicts and peaceful paths to resolution.  *See*

*supra* Part III.A.1.c (explaining that USIP has a governmental purpose).  Yet, USIP does not act

at the direction of the President or any other executive officer.  *Cf.* 22 U.S.C. § 3305(b) (statutory

directions to the American Institute in Taiwan).  USIP selects its own projects, initiatives, and

efforts, without Executive branch consultation (aside from consultation with the *ex officio* Board

members who have other Executive branch roles), in furtherance of its own priorities.  *See* Third

Moose Decl. ¶¶ 5-12; *see also, e.g.*, Pls.' SUMF, Ex. 34, Decl. of Scott Worden, Director of

Afghanistan and Central Asia Programs ("Worden Decl.") ¶ 6, ECF No. 20-34 (explaining that he wrote and published pieces on national security issues never reviewed or cleared by U.S. government officials); Pls.' Opp'n at 22-23.  USIP can do studies and projects requested by government officials—but they are not mandated to do so—and many of these derive from congressional committees rather than Executive branch officials.  *See* Third Moose Decl. ¶¶ 5-7; 22 U.S.C. § 4604(e) ("The Institute *may respond* to the request of a department or agency of the United States Government to investigate, examine, study, and report on any issue within the Institute's competence." (emphasis added)); Pls.' Opp'n at 25-26; Pls.' SUMF ¶ 60; *see also id*. ¶ 63 (asserting that USIP also takes on projects for foreign and NGO groups); Defs.' Resp. ¶ 63 (disputing only that this makes USIP independent from the Executive branch).  USIP, for instance, "regularly briefs Members and their staffs upon request," and facilitates study groups formed by Congress, such as the Iraq Study Group, convening officials from all parts of government and with support from NGOs like an institute for public policy at Rice University.  Pls.' SUMF ¶ 60; *id.*, Ex. 1, Decl. of Paul Hughes, leader of the Iraq Study Group ¶¶ 5-15, ECF No. 20-1; *id.*, Ex. 2, Iraq Study Group Fact Sheet ¶ 2, ECF No. 20-2 ("The Bush administration was not involved in creating the ISG."); Pls.' Mem. at 26.[27]

Defendants point to USIP's on-the-ground operations to depict USIP as an active foreign diplomacy agent of the Executive branch whose educational and scholarly efforts are merely incidental to its diplomatic missions.  *See* Defs.' Opp'n at 14-17.  To be sure, USIP conducts activities abroad to facilitate peace and avoid conflict that may look, at first glance, like foreign

---

[27]    Defendants concede that "members of Congress can engage internationally," but posit that "they do so in furtherance of their legislative powers and duties—not executive ones."  Defs.' Reply at 9.  Defendants fail to explain how this helps illustrate USIP's exercise of *executive* powers.  USIP generally "engage[s] internationally" "in furtherance of its" *nongovernmental*, educational and research powers and duties—not executive ones.  Even when conducting a project to aid the legislature, USIP is doing so in service of its educational, information-gathering, and peace-disseminating mission.

69

diplomacy.  USIP's on-the-ground efforts nevertheless do not constitute exercises of Article II

power for several reasons.

First, these programs are, at their core, research and educational rather than diplomatic or

policymaking in nature.  Research, at times, requires information gathering in the field, and

teaching sometimes occurs as-applied.  The Institute's programs that foster dialogues to gather

information, explore potential paths to ending conflicts, and promote nonviolent resolution

techniques are thus all derivative of and in furtherance of its educational and research missions.

For instance, when serving as a third-party neutral in a peace mediation, USIP is not furthering

an Executive branch foreign policy but rather teaching others how to resolve conflict peacefully

by facilitating conversation.  *See* Pls.' Opp'n at 1-2 (describing USIP as a "non-governmental

neutral facilitator of conflict resolution dialogues and trainings around the world"); *see, e.g.*, Pls.'

SUMF, Ex. 27, Decl. of Andrew Wells-Dang, Senior Expert on Southeast Asia ¶ 3, ECF No. 20-

27 (describing facilitating online youth dialogues to foster healing from past wars and

displacement, using "community development and adult education practices"); *id.*, Ex. 30, Decl.

of Nichole Cochran, Program Officer ("Cochran Decl.") ¶ 3, ECF No. 20-30 (describing training

programs for grade school teachers in peaceful interpersonal conflict resolution to foster

nonviolent behaviors among youth in Myanmar, in partnership with pro-democracy groups

there).  Other interactions with foreign groups are likewise in service of information-gathering,

research, and study.  *See, e.g.*, *id.*, Ex. 35, Decl. of Tegan Blaine, Director of Program on

Climate, Environment, and Conflict ("Blaine Decl.") ¶¶ 4-5, ECF No. 20-35 (describing

partnering with communities in Somalia to learn about "the intersection of climate, security, and

other conflict drivers" and conducting meetings and trainings for U.S. security partners in Africa

related to climate security).  USIP does not establish policy, form strategy, or make agreements,

70

as the Executive branch does.  *See* Blaine Decl. ¶¶ 3-4 (explaining that USIP's learnings from

such projects are shared with government stakeholders but USIP plays no role and has no insight

into how such information is "used in practice" to inform "strategic terrain decisions" or even

budget priorities of its partners).[28]

Defendants contend that the educational and information-gathering aspects of such

activities are inconsequential because—much like DOJ attorneys' research, training, and conflict

resolution work, which is educational and scholarly in nature but in service of enforcement of the

law, a core executive function—USIP's activities are all in furtherance of the United States'

foreign affairs executive function.  *See* Defs.' Opp'n at 16-17.  By focusing on individual

activities, defendants argue, plaintiffs overlook their fundamental *purpose*—missing the forest

for the trees.  *See id*.  As plaintiffs retort, however, USIP's educational activities *are* the forest.

Pls.' Opp'n at 25 n.16.  Contrary to defendants' suggestion, USIP's sole statutory mandate is the

development and dissemination of information related to peace and conflict resolution

techniques; everything else is merely incidental to that.  *See* 22 U.S.C. § 4601 *et seq.*; *contra*

Defs.' Opp'n at 14-17; Defs.' Reply at 10 (framing USIP's purpose overly broadly as promoting

peace and resolving conflicts).  USIP has no broader foreign affairs mission itself, and

defendants do not connect USIP's activities to any particular Executive branch program or entity

to explain how USIP is directly facilitating the exercise of such powers.  All of USIP's goals and

activities, *see* 22 U.S.C. §§ 4601, 4604, are research, educational, or scholarly in nature.

---

[28]    The Commission that originally proposed USIP made clear that the envisioned Academy was focused on education and research, not making policy.  *See* Comm'n Rep. at xiii ("The Commission specifically recommends that the Academy itself not engage in policymaking or dispute intervention."); *id.* at 170 ("Other than establishing its own policies, the Academy should not participate in policy decisions of any federal or non-federal body.  The Academy may undertake studies on policy-relevant peace issues of concern to federal agencies, but its distance from operations along with the American tradition of academic freedom will shield its inquiries from result-directed influence.").

71

Second, because USIP never represents the U.S. government in its interactions abroad, by definition, USIP cannot be considered to conduct foreign diplomacy—or wield any executive power as understood in Article II, or even governmental power, at all.  While defendants are correct that *official* diplomacy is "quintessential[ly] executive," Defs.' Opp'n at 15, they ignore that USIP acts as a completely independent, nongovernmental organization when engaging with foreign groups.  *See* Pls.' Mem. at 7 & nn.6-7 (describing how USIP engages in "Track 1.5 and Track 2 diplomacy," which refers to "talks" where "non-governmental experts drive informal dialogue" and, in Track 2 diplomacy, no official governmental representatives participate); *id.* (describing "diplomacy" as a misnomer for such actions); Terminated Emps. Amicus Br. at 4 (describing Track 2 diplomacy); Worden Decl.¶ 5 (describing how USIP hosted meetings with stakeholders in Afghanistan "because we were viewed as non-governmental and created a neutral space for peacebuilders to engage in open dialogue"); Aum Decl. ¶ 4 ("At no point during my USIP tenure, whether in my research or in my public and private engagements, did I represent that I was a part of the U.S. government or was implementing U.S. government policy.").  USIP employees travel not as government officials but as private citizens, allowing them to go to places where U.S. government officials are not permitted.  *See* Pls.' Opp'n at 23 n.12; Pls.' SUMF, Ex. 8, Decl. of Brian Harding, Senior Expert for Southeast Asia and the Pacific Islands ("Harding Decl.") ¶ 4, ECF No. 20-8 (describing how USIP is outside of the Chief of Mission authority which controls governmental travel, 22 U.S.C. § 3927(b)); Worden Decl. ¶ 4 ("For my overseas travel, I did not have to receive any Embassy clearance or notification.").

In fact, the value in having USIP organize and conduct trainings and promote peaceful resolution abroad is that USIP can do so without burdensome bureaucracy and without carrying the sometimes-controversial clout of the U.S. government.  *See, e.g.*, Pls.' SUMF, Ex. 10, Decl.

of Dr. Gavin Helf, Senior Expert on Central Asia at USIP ¶¶ 5-6 (describing how USIP

facilitated discussions between policy experts and former advisors about how to address the

border dispute between Kyrgyzstan and Tajikistan, its non-governmental status being crucial to

hosting participants "otherwise not . . . able to meet in an official setting"); Phillips Decl. ¶ 3

(explaining how the State Department requested a particular project because "we are not a

federal agency and are able to travel to places quickly where federal employees are often not

allowed"); Sr. Officials Amicus Br. at 3, 7 (noting "Congress's considered and intentional

decision to create an institution that would operate independently precisely so that it could

perform work that Congress deemed most appropriately performed outside the Executive

Branch, none of which is executive in nature."); *id.* at 8-9 (describing USIP's work convening

tribal sheikhs to limit violence in south Baghdad to aid U.S. military efforts there after hundreds

of servicemembers were inexplicably injured and killed).[29]  If USIP is not acting on behalf of the

United States in such interactions, it cannot be wielding the government's executive power.[30]

     USIP's work could perhaps be described as "soft diplomacy," but there is nothing strange

about soft diplomacy, as opposed to official diplomacy, occurring outside of the Executive

---

[29]    *See also id.*, Ex. 28, Decl. of Christopher Bosley, Acting Director of the Countering Violent Extremism team ¶ 3, ECF No. 20-28 (describing, after the fall of ISIS, conversing with representatives from Albania, Iraq, Kazakhstan, etc. to understand more candidly the sensitivities and social dynamics involved in the U.S. government's efforts to repatriate former terrorist fighters); Aum Decl. ¶ 3 (describing meeting with North Korean representatives to informally "discuss ways to improve U.S.-North Korea relations," which was only possible as a nongovernment official); Harding Decl. ¶ 6 (describing USIP's discreet facilitation of ceasefire efforts in the Philippines, made possible by USIP's independent status); Cochran Decl. ¶ 3 (explaining that some of the pro-democracy groups in Myanmar distrust the United States); Pls.' SUMF, Ex. 33, Decl. of Mary Speck, Senior Advisor to the Latin America Program ("Speck Decl.") ¶ 3, ECF No. 20-33 (explaining that local leaders in Guatemala, where they foster dialogues between local officials and citizens to reduce violence, do not trust the U.S. government); Blaine Decl. ¶ 4 (describing how they were able to provide analysis on climate security in Somalia by going to places where U.S. government officials are unable to travel).

[30]    Defendants alluded at the hearing to a potential tension between the conclusion that USIP is a government entity, *see supra* Part III.A.1, and an understanding of USIP employees acting as non-governmental officials when engaging in field work abroad.  *See* XMSJ Hr'g Tr. at 78:4-16.  That tension, though, is merely superficial.  As previously stated, an entity may be governmental for purposes of a constitutional analysis without exercising governmental power, *see supra* Part III.A.2.a; here, USIP is formally subject to separation-of-powers principles in the Constitution, but its officers are not wielding executive power.

branch.  NGOs are extensively involved in similar democracy-promoting efforts abroad.  *See* Pls.' Opp'n at 27 (referencing the work of the National Endowment for Democracy and the Carter Center and describing soft power as usually originating outside of government); Pls.' SUMF ¶ 61.  Private congressionally chartered organizations may, too, be involved in diplomacy or decisions that affect foreign diplomacy.  *See* Pls.' Opp'n at 6-7; 36 U.S.C. § 300102(1)-(2) (establishing that the Red Cross will carry out certain treaty obligations on behalf of the United States); *USOC*, 483 U.S. at 545 n.27 (describing the Olympic Committee's decision not to send U.S. athletes to Moscow for the 1980 Olympics in light of tension between the U.S. and Soviet Union); *id.* at 547 ("[T]he USOC is not a governmental actor.").  The Judicial and Legislative branches also interact with foreign officials to promote peace and American interests.  *See, e.g.*, Terminated Emps. Amicus Br. at 2-3 & n.5 (describing how in the 1960s, "Presidents and Secretaries of State routinely asked Chief Justice Earl Warren to foster friendships with other countries that Cold War politics precluded the Executive Branch from so engaging directly," and still today, "the Judicial Conference of the United States" maintains an "International Relations Committee").

Again, although the act of meeting and conversing with foreign groups may *seem* executive in nature, without any indication that USIP is doing so on behalf of President (or the United States at all), this activity alone lacks any Article II provenance and thus does not place USIP within the Executive branch.  Just as in *Kuretski*, where the Tax Court seemed, on the surface, to be judicial in nature, but closer analysis revealed that the Tax Court did not exercise judicial power in the Article III sense, the fact that USIP's activities somewhat resemble certain foreign affairs functions has no purchase since USIP is not exercising any executive power as understood in Article II.

74

Aside from involvement in foreign policy, defendants also argue that USIP's authority to issue grants from federal appropriations is a "clear example[] of [an] executive function." Defs.' Opp'n at 17. Plaintiffs counter that private nonprofit entities regularly receive federal funds and then reissue them as grants to other entities, *see* Pls.' Mem. at 28, and emphasize that USIP does not administer any detailed statutory regime when administering grants, in contrast, for example, to the Federal Election Commission's administration of public campaign funds as discussed in *Buckley*, 424 U.S. at 140-41. Indeed, the D.C. Circuit has explained that the ability to "make[] decisions" about "how federal grant money was spent" "does not always mean that [an entity] is a government agency." *Dong*, 125 F.3d at 881-82 (quoting *Pub. Citizen Health Rsch. Grp. v. Dep't of Health, Educ. & Welfare*, 668 F.2d 537, 543 (D.C. Cir. 1981)). "To the extent that [USIP] devotes part of its own budget to funding grants and fellowships, it appears to be no different from any private research university which receives federal funds and enjoys some control over their use." *Id.* at 882. Defendants offer no response to this point, which seems to set USIP apart from executive agencies that determine how the government should distribute funds. *See generally* Defs.' Opp'n; Defs.' Reply at 10 n.1 (contending defendants did not waive an argument about grantmaking but offering no substantive response on the distinction made by plaintiffs); Pls.' Opp'n at 28 n.19.

Regarding supervision and control of USIP, USIP's Board members, of course, are appointed and removable for-cause and via other enumerated mechanisms by the President, and three Executive branch officials sit on USIP's Board *ex officio*. USIP thus has a strong link to the Executive branch. As stated, however, that authority is not dispositive where USIP does not exercise Executive branch power—executing and enforcing the laws. *Cf. Mistretta*, 488 F.3d at 409-11 (Sentencing Commission is part of the Judicial branch despite presidential appointment

and removal authority); *see also* Defs.' Opp'n at 19-20 (admitting that appointment by the

President and confirmation of the Senate is not dispositive of an agency's classification as part of

the Executive branch).  USIP instead, as an entity focused on collection and dissemination of

information, through research and teaching, exercises largely nongovernmental power.

In sum, despite the President's statutory appointment and for-cause removal authority

over USIP Board members and USIP's overlapping area of expertise with the Executive branch,

USIP does not exercise executive powers in the Article II sense.  *Kuretski* made clear that

*looking* executive, or judicial, on the surface, is not enough.  *See* 755 F.3d at 939-43.  USIP's

educational, scholarly, and research activities are *not* executive in nature, *see Buckley*, 424 U.S.

at 137, 139, nor in exclusive furtherance of Executive branch priorities, given that USIP

independently selects all projects undertaken based on its own priorities—with no obligation to

accept requests from either congressional or executive groups.  Importantly, when USIP engages

with foreign entities abroad, USIP does so as an independent body, *not* on behalf of the U.S.

government.  At most, USIP is an external partner to, rather than an arm of, the Executive

branch.  USIP thus does not wield the President's Article II power and cannot be considered part

of the Executive branch for removal purposes.

USIP's existence outside of the Executive branch is the end of the inquiry.  As explained

earlier, the President has no constitutional removal authority outside of the Executive branch.

President Trump's removal of the ten board members here was thus unlawful, violating 22

U.S.C. § 4605(f).  The Court's analysis need not go further.

### B.    Even if USIP is Subject to the President's Constitutional Removal Authority under Article II, USIP Board Members' Statutory For-Cause Removal Protections Are Constitutional.

Plaintiffs argue, alternatively, that even assuming USIP is part of Article II, the statutory

removal protections for its appointed Board members are constitutional under *Humphrey's*

*Executor*. *See* Pls.' Mem. at 29. For completeness, this alternative argument is considered, and the outcome is the same because USIP does not exercise executive power.

Applying principles from *Humphrey's Executor* and its progeny, the same reasons why USIP is not part of the Executive branch are why statutory restrictions on Board members' removal would not be problematic even if USIP were an Article II entity. In *Myers v. United States*, the Supreme Court recognized that the President has a general power of removal over "purely executive officers," *Humphrey's Executor*, 295 U.S. at 632 (describing *Myers*'s holding), and held that Congress could not reserve for itself a role in that removal decision. *See Myers*, 272 U.S. at 107, 175-76 (holding that a statute requiring advice and consent of the Senate to remove postmaster general was unconstitutional). Less than a decade later, in *Humphrey's Executor*, with six of the same justices as in the *Myers* opinion, the Court made clear that neither the Constitution nor *Myers* enshrined "illimitable" presidential removal authority over the officers of independent agencies. 295 U.S. at 629; *Morrison*, 487 U.S. at 687 (recognizing this holding in *Humphrey's Executor*). Rather, the Court there upheld for-cause removal restrictions (*i.e.*, removal only for "inefficiency, neglect of duty, or malfeasance in office") on the FTC as a multi-member, nonpartisan board of experts with staggered terms that exercises quasi-legislative and quasi-judicial authority. *Humphrey's Ex'r*, 295 U.S. at 623-24, 629. The Court recognized the President's Article II removal authority was diminished in that context. *Id.* at 628.

Since then, the Supreme Court has affirmed and preserved this precedent. In *Wiener v. United States*, 357 U.S. 349 (1958), the Court upheld for-cause removal protections for the three members of the War Claims Commission, an adjudicatory body tasked with resolving claims for compensation against foreign adversaries arising from World War II. *Id.* at 349-50, 356. Thirty years later in *Morrison*, the Supreme Court again recognized that the President does not have

77

absolute removal authority for officers with adjudicatory functions and further explained that the

permissibility of removal restrictions did not turn on whether the officers' functions were

"'quasi-legislative' or 'quasi-judicial,'" 487 U.S. at 691, as opposed to executive in nature,

instead looking to the degree to which they impeded the President's ability to execute the laws.

*See id.* at 691-93 (upholding removal protections for independent counsel contained in the Ethics

in Government Act).  In *Free Enterprise Fund*, the Supreme Court struck down the

permissibility of double for-cause removal protections for the PCAOB members but

affirmatively declined to reexamine *Humphrey's* and instead reiterated that "Congress can, under

certain circumstances, create independent agencies run by principal officers appointed by the

President, whom the President may not remove at will but only for good cause."  561 U.S. at

483.

　　　　More recently, in *Seila Law*, while considering removal protections for a single-headed

agency, the Consumer Financial Protection Bureau, the Supreme Court reaffirmed that Congress

could provide for-cause removal protections to officers like those in *Humphrey's Executor*: "a

multimember body of experts, balanced along partisan lines," with "staggered" terms "enabl[ing]

the agency to accumulate technical expertise," that "performed legislative and judicial

functions," duties "neither political nor executive" in the constitutional sense.  591 U.S. at 216;

*see also id.* at 215-17.  In other words, "multimember expert agencies that do not wield

substantial executive power" are not subject to at-will presidential removal under the

Constitution.  *Id.* at 218.  Numerous cases in the lower courts have applied *Humphrey's Executor*

to uphold removal protections for similarly constituted multimember boards, including the

NLRB, the Consumer Product Safety Commission ("CPSC"), and the FTC itself.[31]  Though the

---

[31]　　　For the NLRB, *see Wilcox v. Trump*, 2025 WL 720914; *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356,
2024 WL 5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL 5004534, at *6

precedent has recently come under attack, defendants agree that *Humphrey's Executor* remains

binding.  *See* Defs.' Opp'n at 25; *Wilcox*, 2025 WL 720914, at *10 (describing defendants'

position that *Humphrey's Executor* has been repudiated); *id.* at *10-14 (explaining why

*Humphrey's Executor* remains binding); *Harris v. Bessent* ("*Harris IV*"), Nos. 25-5037, 25-5057,

2025 WL 1021435, at *1-2 (D.C. Cir. Apr. 7, 2025) (en banc) (explaining that the Supreme

Court has reaffirmed and not overturned *Humphrey's Executor* and *Wiener*).

    USIP's leadership consists of a multimember board with all of the characteristics that

warranted upholding removal protections in *Humphrey's Executor*.  Regarding the makeup of

that Board, like the FTC, USIP's Board is partisan balanced by statute (with no more than eight

of the fifteen voting members of the same political party).  *See* 22 U.S.C. § 4605(c); *Humphrey's*

*Ex'r*, 295 U.S. at 624; *Seila L.*, 591 U.S. at 216.  Its members must be experts in their field.  *See*

22 U.S.C. § 4605(d) ("Each individual appointed to the Board under subsection (b)(4) shall have

appropriate practical or academic experience in peace and conflict resolution efforts of the

United States."); *Humphrey's Ex'r*, 295 U.S. at 624; *Seila L.*, 591 U.S. at 216.  Their terms are

multiple years (up to two terms of four years each) and staggered to preserve the accumulation of

technical expertise and knowledge.  *See* 22 U.S.C. § 4605(e); *Seila L.*, 591 U.S. at 216.

---

(W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-cv-445, 2024 WL 4594709, at *7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*, No. 24-cv-2717, 2024 WL 4188068, at *9 (N.D. Ill. Sep. 13, 2024); *YAPP USA Automotive Sys., Inc v. NLRB* , 748 F. Supp. 3d 497, 505-11 (E.D. Mich. 2024).

    For the FTC, *see Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024).

    For the CPSC, *see Leachco Inc. v. CPSC*, 103 F.4th 748, 761-62 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025); *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 351-52 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024); *United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL 1116062, at *4 (D. Mass. Mar. 14, 2024).

USIP also exercises *de minimis*, if any, executive power under the Constitution.[32]  As previously explained, USIP's activities are largely nongovernmental in nature, "removed from the administration and enforcement of the public law."  *Buckley*, 424 U.S. at 139; *see supra* Part III.A.2.c.  USIP offers trainings, facilitates study groups, and conducts research—both traditional and on-the-ground.  *See supra* Part III.A.2.c.  USIP interacts with foreign groups to promote peaceful conflict resolution techniques, but USIP does not develop or implement American foreign policy, meet with official foreign representatives, or make foreign agreements.  *See id.*; *cf.* 22 U.S.C. § 3305(a) (describing the American Institute of Taiwan, which is explicitly directed to implement the President's foreign policy and any applicable agreements).  USIP's work may, at times, inform Executive branch decisions, but USIP does not act at the behest of the U.S. government, neither Congress nor the Executive branch.  *See supra* Part III.A.2.c.  Importantly, USIP does not do any of its work abroad *as* the U.S. government or representing any official part of it.  *See id.*  USIP therefore does not carry out any of the President's foreign affairs power.

USIP also does not engage in any execution of the law—either in the most traditional enforcement sense, or through adjudications, rulemaking, or interpretation of the law.  *See id.*  USIP does not determine private citizens' rights to public benefits, issue orders, investigate violations of the law, or impose sanctions, unlike the entities in *Humphrey's Executor* and *Wiener*.  *Cf. Humphrey's Ex'r*, 295 U.S. at 628 (describing the FTC's responsibility to "administer[] the provisions of the statute in respect of 'unfair methods of competition'"); *Wiener*, 357 U.S. at 350 (describing the War Claims Commission as adjudicating claims for compensating those with injuries from enemies during World War II); *see also Wilcox*, 2025 WL

---

[32]    The parties appear to agree that whether USIP exercises something more than *de minimis* executive power is the proper inquiry under *Seila Law*.  Pls.' Mem. at 29 (arguing that even under such a narrow interpretation, they should prevail); Defs.' Reply at 17-18.

720914, at *8 (describing the NLRB's authority to issue cease-and-desist orders and adjudicate unfair labor practices); *Dong*, 125 F.3d at 879 (describing such activities as "typically executive").

Even if USIP *were* exercising some degree of the Executive branch's foreign affairs power, that would not take USIP outside the scope of *Humphrey's Executor*. The War Claims Commission in *Wiener* assessed "claims for compensating internees, prisoners of war, and religious organizations, . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II" and distributed funds from foreign sources accordingly. 357 U.S. at 350; *see also id.* at 355. That function was a product of President's foreign affairs power to "settle claims of American nationals against foreign governments"—an issue of "international diplomacy." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415-16 (2003) (noting generally that settling claims of American nationals against foreign governments is an issue of international diplomacy). Yet, the War Claims Commission was not considered "purely executive" so as to differentiate it from the FTC and take it outside of *Humphrey's Executor*. *See Wiener*, 357 U.S. at 356. As defendants note, the Court in *Wiener* "did not examine the subject matter of that body or use it in rendering its decision." Defs.' Opp'n at 27. That lack of discussion on the subject area does not, as defendants suggest, *see id.*, imply that the Court was ignorant of it, but rather indicates that the subject simply did not matter. *See* Pls.' Mem. at 33. The bottom line is that an entity conducting some activity relating to foreign affairs is not necessarily exercising executive power under the Constitution.

Defendants argue that *Humphrey's Executor* and *Wiener* do not apply to USIP because USIP does not exercise quasi-judicial or quasi-legislative authority like the FTC and War Claims Commission and does not operate as an adjudicatory body or in a legislative capacity. *See* Defs.'

81

Opp'n at 26.  The exercise of quasi-judicial or quasi-legislative authority, however, was not dispositive to those decisions; rather, those decisions used those terms to describe how the agencies were exercising something *other than core executive* authority.  *See Seila L.*, 591 U.S. at 218 (describing *Humphrey's* holding as allowing for-cause removal protections for "multimember expert agencies that do not wield substantial executive power").  The fact that USIP is exercising neither purely executive, nor quasi-judicial or quasi-legislative authority here—rather exercising minimal to no governmental authority at all—means the reasoning of those decisions applies *a fortiori*.[33]  An entity does not become *more* subject to presidential control because it exercises far less overall governmental power of any kind.  In contrast to agencies like the FTC and NLRB that exercise quasi-judicial and quasi-legislative authority, USIP has no decision-making authority, authority to direct the activities of citizens through rulemaking, or authority to impact their rights or distribute their property.  USIP, in short, as an institution of research and teaching, has far less authority and is in far less need of executive control to promote political accountability and prevent unchecked exercise of government power.  *See Seila L.*, 591 U.S. at 213-15 (describing the President's removal authority as furthering the need for such accountability).

---

[33]    In fact, *Seila Law* characterizes quasi-judicial and quasi-legislative powers as fundamentally executive under our constitutional scheme.  *See* 591 U.S. at 216 n.2 ("As we observed in *Morrison . . .*, '[I]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered "executive," at least to some degree.' *Id.*, at 690, n. 28.  *See also Arlington v. FCC*, 569 U.S. 290, 305, n. 4, (2013) (even though the activities of administrative agencies 'take "legislative" and "judicial" forms,' 'they are exercises of—indeed, under our constitutional structure they must be exercises of—the "executive Power"' (quoting Art. II, § 1, cl. 1))."). The fact that USIP does not exercise such powers at all cannot make it *more* executive and thus more subject to the President's removal authority.

    In any case, to the extent that an exercise of quasi-legislative or quasi-judicial powers matters, USIP exhibits some quasi-legislative power, as described *supra* Part III.A.2.c (discussing USIP's powers and activities), by making reports to Congress, conducting investigations, performing research, and facilitating congressional study groups.  *See* Pls.' Opp'n at 31-32; *see also Humphrey's Ex'r*, 295 U.S. at 628; *Seila L.*, 591 U.S. at 215; *Buckley*, 424 U.S. at 137.  That USIP cannot "influence congressional action," per 22 U.S.C. § 4604(n), does not mean USIP cannot engage in legislative support functions to provide reliable information for use by policy-makers, as defendants suggest.  Defs.' Reply at 18.

82

In any event, to the extent that the exercise of quasi-judicial or quasi-legislative authority is relevant in demonstrating the need for an agency's independence from the President and thus justifying removal protections, that rationale also applies here. In *Humphrey's Executor*, the Court recognized the importance of adjudication conducted "with entire impartiality" based not on politics but "trained judgment" and expertise. 295 U.S. at 624 ("The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality."); *see also Seila L.*, 591 U.S. at 216. That same virtue of political independence is central to USIP's work. USIP's information-gathering and promotion of peaceful conflict resolution through conversations with unofficial foreign groups and factions can only occur, as previously explained, because USIP is independent from the Executive branch. *See supra* Part III.A.2, n.29 and accompanying text. USIP can meet with local stakeholders who are skeptical of the U.S. government to resolve conflict and reduce violence that could otherwise cause harm to American interests. *See id.* Just as with adjudicatory bodies like the FTC and NLRB, Congress struck a careful balance in creating USIP—providing opportunities for Executive branch input (*e.g.*, with Cabinet members serving on the Board), while protecting Board members from at-will removal to ensure the Institute has sufficient independence to achieve the statutory tasks Congress set out.

Further, in response to plaintiffs' argument that USIP does not wield "substantial executive authority," as *Seila Law* narrowly defined the inquiry under *Humphrey's Executor*, Pls.' Mem. at 31 (quoting *Seila L.*, 591 U.S. at 218); Pls.' Opp'n at 29 n.20, defendants contend that the degree of agency authority is not relevant under *Collins*, 594 U.S. at 252. Defs.' Opp'n at 26-27.[34] The Court in *Collins* rejected the argument that because the Federal Housing Finance

---

[34]    Ironically, as plaintiffs point out, the Solicitor General has adopted this language as the test under *Humphrey's Executor*. *See* Pls.' Opp'n at 29 (quoting the Solicitor General explaining that the *Humphrey's* "exception . . . extends only to 'multimember expert agencies *that do not wield substantial executive power*,'" App. to Stay the Judgments of the U.S. Dist. Ct. for the Dist. of Columbia & Request for Admin. Stay at 3, *Trump v.*

Authority has more limited enforcement and regulatory authority compared to the CFPB, for which the Court struck down removal protections in *Seila Law*, Congress should have "greater leeway to restrict the President's" removal authority.  594 U.S. at 251.  The Court explained that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." *Id.* at 251-52.  The concerns about electoral accountability for "the subordinates" "carry[ing] out [the President's] duties as the head of the Executive Branch" apply "whenever an agency does important work." *Id.* at 252.  How this observation helps defendants is unclear.  Plaintiffs do not try to distinguish between USIP's regulatory authority and that of some other agency: USIP simply does not exercise any executive power that the President needs to control at all.  *See* Pls.' Opp'n at 30; *see also Harris III*, 2025 WL 980278, at *22 (Henderson, J., concurring) (explaining that because *Collins* involved a single head of any agency rather than a multimember board, "it is not clear that *Collins*' instruction not to weigh up the nature and breadth of an agency's authority extends to multimember boards"); *Morrison*, 487 U.S. at 691-93 (evaluating the permissibility of removal restrictions based on the degree to which they impeded the President's ability to execute the laws).

Defendants additionally cite to a signing statement drafted by President Reagan when he signed the USIP Act in 1984.  *See* Defs.' Opp'n at 8 (citing Presidential Statement on Signing the Department of Defense Authorization Act, 1985 ("Presidential Signing Statement") (Oct. 19, 1984), https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-

---

*Wilcox*, No. 24A, 2025 WL 1101716 (S. Ct. Apr. 2025) (emphasis in original) (quoting *Seila Law*, 591 U.S. at 218)).  On reply, defendants appear to change course and embrace the "substantial executive power" inquiry.  *See* Defs.' Reply at 16-17 ("[T]he *Humphrey's Executor* exception only applies when an agency exercises no substantial executive power. *Seila L.*, 591 U.S. at 216.  That is, while insubstantial or incidental exercises of executive authority will not, under *Humphrey's Executor*, force a court to invalidate for-cause removal protections of an otherwise quasi-judicial or quasi-legislative agency, an agency that predominately exercises executive functions plainly exercises substantial executive power.").

84

authorization-act-1985).  Reagan stated that the Act was "neither intended to, nor has the effect

of, restricting the President's constitutional power to remove" USIP Board members.

Presidential Signing Statement.  A signing statement expressing disagreement with part of a

statute is reflective of nothing more than the President's failure to convince Congress to make

the changes he desired.  In any case, the President's view that a statutory provision is

unconstitutional is simply not authoritative.  *See In re Aiken Cnty.*, 725 F.3d 255, 261 (D.C. Cir.

2013) (explaining that "the President . . . may decline to follow [a] statutory mandate or

prohibition if the President concludes that it is unconstitutional," such as through a signing

statement, but only "unless and until a final Court decision in a justiciable case says that a

statutory mandate or prohibition on the Executive Branch is constitutional").

      Finally, the Court in *Seila Law* made several observations about why removal protections

for multimember boards are less of a threat to the President's ability to execute the laws and

political accountability than removal protections for single-head agencies that illustrate why

USIP's removal protections are constitutionally permissible here.  At bottom, the Court

expressed concern about a single leader of an agency, a "holdover Director from a competing

political party who is dead set *against*" the President's agenda.  591 U.S. at 225 (emphasis in

original).  A multimember structure with staggered terms, however, allows the President to exert

control as vacancies arise through his appointment power, and the new appointees can constrain

the remaining leaders.  *See id.* at 225.  Moreover, the multimember structure prevents unilateral

decision-making by an unelected official who could be subject to capture by private interests; a

multimember board "avoids concentrating power in the hands of any single individual."  *Id.* at

222-23.

All of these virtuous features are especially present in USIP.  The President has ample control of the Board.  Board members have four-year terms that are staggered, allowing every President to exercise his appointment power.  *See* 22 U.S.C. § 4605(e).  Moreover, three of the Board's members—the Secretary of Defense, Secretary of State, and President of the National Defense University—are subject to at-will removal, *id.*, and given the partisan balance requirements, *id.* § 4605(c), the "constituency is guaranteed to always track the political party of the President." Defs.' Opp'n at 1; *see also id.* at 19.[35]  The President's Cabinet members may also supplement USIP's staff on certain projects, as the Secretary of State, Secretary of Defense, and CIA can "assign officers and employees of his respective department or agency, on a rotating basis to be determined by the Board, to the Institute."  22 U.S.C. § 4606(d)(2).  Those factors protect political accountability through the President.  Additionally, the Board also consists of fifteen voting members, *id.* § 4605(b)—a large body that avoids the risk of unilateral decision-making and is thus more insulated from private capture or personal whims that could impede democratic ideals.

The President also has broader for-cause removal power for USIP than he does for other multimember agencies, such as the FTC ("inefficiency, neglect of duty, or malfeasance in office," *Humphrey's Executor*, 295 U.S. at 619) or the NLRB ("upon notice and hearing, for neglect of duty or malfeasance in office," 29 U.S.C. § 153(a)), diminishing any constitutional concerns.  Similar to those agencies, the President can remove an appointed Board member "in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect

---

[35]     Given that only eight members can be of the same political party, an outgoing President will leave behind no more than five of his party (given that the three *ex officio* members will follow him out and leave three vacancies).  *See* 22 U.S.C. § 4605(c).  The incoming President can therefore guarantee, through appointments, majority control by his party.

of duties, or inability to discharge duties." 22 U.S.C. § 4605(f)(1). That is a classic for-cause

removal clause with a minor procedural requirement (to consult with the Board) even less

burdensome than the notice and hearing requirement for the NLRB. With USIP, however, the

President may also remove a Board member without cause if eight members of the Board so

recommend—an option that seems readily available should there be a political disagreement,

given that the President will likely always have a majority of members of his party. *Id.*

§ 4605(f)(2). Further, the President can remove a Board member without cause upon a

recommendation of a majority of the members of the Committee on Foreign Affairs and the

Committee on Education and Labor of the House, or majority of the members of the Committee

on Foreign Relations and the Committee on Labor and Human Resources of the Senate. *Id.*

§ 4605(f)(3).[36]

The ability for the President to monitor and guide USIP in these ways does not, as

defendants suggest, mean that USIP is actually a political entity and thus part of Article II. That

question, as discussed, turns on what powers USIP exercises and the functions it serves. *See*

*supra* Part III.A.2. Rather, such presidential influence reflects a careful balance struck by

---

[36]    Section 4605(f)(3) does not reflect an impermissible reservation of removal authority by Congress, as
admonished in *Myers*, 272 U.S. 52. The Court there held unconstitutional a statutory removal restriction that
required the President to receive advice and consent from the Senate before removing a postmaster general, which
was an unconstitutional exertion of legislative authority over the Executive branch. *See generally id.*; *see also*
*Wilcox*, 2025 WL 720914, at *13 (explaining the takeaway from *Myers* as "[w]hile Congress may structure
executive branch offices via statute and legislate about the roles of executive branch officers, including standards for
their removal, Congress cannot reserve for itself an active role in the removal decision"); Defs.' Reply at 19 (hinting
at such a problem). Section 4605(f)(3) does not pose the same concern for two reasons. First, USIP is not part of
the Executive branch and does not exercise executive power in constitutional terms, so the problem in *Myers* and
*Bowsher*, 478 U.S. at 732, where officers exercising executive powers were subject to legislative removal—allowing
the legislature to exert undue control over the Executive branch—is not applicable. Even if USIP were part of the
Executive branch, the fact that Congress may not act unilaterally to remove USIP Board members (instead requiring
presidential assent) also protects USIP from undue legislative oversight.
       Second, the role envisioned for Congress here, unlike the restriction in *Myers*, does not exert a check on the
President's removal authority in any way because congressional consent is not needed at all for presidential removal.
Section 2605(f)(3) is an option for presidential removal *in addition* to the classic for-cause clause in (f)(1), thus
representing an expansion, not a constriction, of Presidential removal authority. The President can remove a Board
member for-cause, § 4605(f)(1) without Congress playing any role at all; if the President would like to remove a
Board member at-will, he can also do so if certain members of Congress agree, *id.* § 4605(f)(3).

Congress: Congress created an entity that is subject to a certain amount of political control to ensure that the entity fulfills its statutory mandate and does not act in ways inconsistent with government interests but that operates independently and nonpolitically to exhibit stability, consistency, and neutrality concomitant with its existence as a peace-promoting and conflict-reducing organization. *See* Pls.' Opp'n at 14; Comm'n Rep. at 179 (describing the need for the Institute to be "insulat[ed] from diverting and perhaps damaging policy demands while ensuring responsiveness to policy interests, particularly at the federal level"). Regardless, even if these factors of political control by the President do make USIP a part of Article II, they resolve any presidential removal power concerns. The Constitution does not confer an absolute removal authority even over executive entities, as the discussion of *Humphrey's*, *Wiener*, and *Seila* have illustrated here.

*     *     *

The Court in *Humphrey's* closed the opinion by stating that "between the decision in the *Myers* case, which sustains the unrestrictable power of the President to remove purely executive officers, and our present decision that such power does not extend to an office such as that here involved, there shall remain a field of doubt." 295 U.S. at 632. On that spectrum, from *Myers*-like pure executive officers on one end, to multimember boards with quasi-judicial and quasi-legislative responsibilities like the FTC on the other, USIP is on the far side of the FTC—even further afield from *Myers*. USIP exercises no meaningful executive power—whether construed as "pure executive" or quasi-judicial or quasi-legislative in nature. Though USIP's governmental qualities allow for the Constitution to apply and for the Court to engage in this separation-of-powers inquiry, USIP does not fit within the Executive branch and, even if it does,

88

due to its lack of exercise of executive power, is not subject to at-will presidential removal

authority in contravention of statutory limits.

### C.    Plaintiffs Prevail on Counts One, Two, Three, Four, and Six.

Given that 22 U.S.C. § 4605(f), providing USIP Board members with removal

protections, is not unconstitutional, the President's removal of all appointed Board members was

unlawful, *ultra vires*, and a violation of that provision of the USIP Act.  Plaintiffs therefore

prevail on Count One (*ultra vires* action) and Count Two (violation of § 4605(f)).  *See* Am.

Compl. ¶¶ 71-85.[37]  The unlawfulness of the President's removal decisions also renders unlawful

all of the actions that flowed from that.  The three *ex officio* members, acting just the three of

them, did not have the authority to remove Amb. Moose as president of USIP.  That decision

required an act of the legitimately constituted Board, which given the unlawfulness of the

removals, consisted of ten other members.  *See* 22 U.S.C. § 4606(a) ("The Board shall appoint

the president of the Institute.").  Plaintiffs therefore also prevail on Count Three.  *See* Am.

Compl. ¶¶ 86-92.  Likewise, the appointments of defendants Jackson and Cavanaugh as

President of the Institute by a subset of the Board, consisting solely of the three *ex officio*

members, was not a valid action taken by USIP's Board and is likewise void, so plaintiffs prevail

on Count Four.  *See id.* ¶¶ 93-99; XMSJ Hr'g Tr. at 50:10-51:4, 58:22-59:10 (both parties

agreeing that Cavanaugh is included under Count Four because he is automatically substituted

for Jackson as the new USIP president in his official capacity).

Plaintiffs are additionally entitled to summary judgment on their trespass and ejectment

claim in Count Six against defendants Jackson, U.S. DOGE Service, and U.S. DOGE Service

---

[37]    Plaintiffs alternatively argue that that they should "prevail on Count[] I . . . for the independent reason that Defendants have unlawfully ceased the Institute's corporate activities, in contravention of the USIP Act," Pls.' Mem. at 38, but, given that plaintiffs prevail on Count One on the basis of defendants' unlawful removal of USIP's Board members, this alternative argument need not be considered.

Temporary Organization. Am. Compl. ¶¶ 103-14. At the time when defendants entered USIP's headquarters building (mid-March 2025), that building lawfully belonged to USIP, and because removal of plaintiffs was unlawful, plaintiff Board members, Amb. Moose, and non-plaintiff Board members were still lawfully in control of the property. Plaintiffs have demonstrated that USIP, not the U.S. government, privately owned the building and in fact had paid significant private funds to build it, and USIP maintained jurisdiction over the real property on which the building sat. *See* Letter from Sec'y of Navy to President of USIP (Nov. 21, 1996) (transferring administrative jurisdiction over the real property to USIP); Notice of Transfer of Jurisdiction; Pls.' SUMF ¶¶ 7-9 ("The building was initially funded with about $70 million of private contributions and $99 million of funds specially appropriated by Congress."). Defendants therefore did not have lawful authority to enter USIP's headquarters when its president so forbade. *See* XMSJ Hr'g Tr. at 51:10-18 (plaintiffs' counsel stating that "normally, the president of the entity would be able to determine who can come in" to the building).

Further, because USIP's Board members and president Moose were wrongfully removed, defendant Cavanaugh was also not legally appointed and had no authority to transfer the property from USIP to GSA. *See* Defs.' Opp'n to Pls.' All Writs Act Motion, Exs. 1, 3, and 4, ECF No. 15-1, 15-3, 15-4 (documents effectuating transfer of property from USIP to GSA). That transfer is thus null and void, and plaintiffs maintain rightful ownership of property. *See Est. of Ellis by Clark v. Hoes*, 677 A.2d 50, 51 (D.C. 1996) ("[A] common law action in ejectment . . . asserts a claim to real property wrongfully in the possession of another.").[38]

---

[38] Defendants argue merely that "there can be no trespass" because the "ex officio members did in fact appoint Jackson to be the Institute's president." Defs.' Opp'n at 29. Defendants' sole objection to the trespass claim, therefore, presumes the other claims' success on the merits—that the *ex officio* members' appointment of Jackson was valid, when it was not.

### D.    Relief

Plaintiffs are entitled to relief on Counts One, Two, Three, Four, and Six.[39]  Plaintiffs

request both declaratory and injunctive relief.  *See* Pls.' Proposed Order, ECF No. 20-38.

### 1.    *Declaratory Relief*

Defendants do not contest that plaintiffs are entitled to declaratory relief if they prevail on

the merits.  In addition to the straightforward declarations stemming from prevailing on the legal

claims as already articulated and to which plaintiffs are entitled, *see supra* Part III.C, plaintiffs

request a number of more detailed declarations.

First, plaintiffs request that all actions taken or authorized by Jackson or Cavanaugh at

the time they were acting as presidents of USIP be declared null and void.  *See* Pls.' Proposed

Order at 2.  Indeed, because of their improper appointment, all actions taken by defendants

Jackson and Cavanaugh for USIP were *ultra vires* and lacked legal effect.  In defendants' words,

it is "all fruit of a poisonous tree."  XMSJ Hr'g Tr. at 61:10-11.  Notably, defendants make no

effort to defend any actions by Jackson or Cavanaugh in the event their appointments are found

to be invalid.  For example, defendants do not even suggest here that such actions were ratified

by a lawful president or a lawful constituency of USIP's Board or that they are immunized by

some remnant of the *de facto* officer doctrine.  *See Ryder v. United States*, 515 U.S. 177, 180-85

(1995) (noting that the Court applied that doctrine, which confers "validity upon acts performed

by a person acting under the color of official title even though it is later discovered that the

legality of that person's appointment or election to office is deficient," in cases like *Buckley*, 424

U.S. at 142, but limiting those cases to their facts and declining to apply it there); *Guedes v.*

---

[39]    Plaintiffs also pled a "freestanding Declaratory Judgment Act Claim," Count Seven.  Defs.' Opp'n at 30;
Am. Compl. ¶¶ 115-16.  Indeed, as defendants point out, that Act does not provide an independent cause of action.
Defs.' Opp'n at 30; *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2021) (holding the Act does not "provide a cause
of action").  Plaintiffs are nonetheless entitled to declaratory relief as a remedy on their other claims.

*Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 12 (D.C. Cir. 2019) (describing how ratification can make valid an action previously undertaken by an unlawfully appointed officer); *see generally* Defs.' Opp'n.  Plaintiffs are therefore entitled to a declaration on this point as requested.

Second, plaintiffs request that "the transfer of USIP's financial assets to GSA be declared unlawful, null and void, and without legal effect."  Pls.' Proposed Order at 2.  Given that transfers of any USIP assets effectuated by Jackson or Cavanaugh were indeed invalid for the same reason as just explained, the transfers must be considered void.

Third, plaintiffs request a declaration that the "resolution adopted by two Directors purportedly appointing Adam Amar as president of the Endowment of the United States Institute of Peace Fund and authorizing and instructing him to transfer all of the Endowment's assets to USIP was unlawful, null and void, and without legal effect." *Id.*  While plaintiffs did not separately challenge Amar's appointment and the removal of the former Endowment president, this appointment was improper for the same reasons as were Jackson and Cavanaugh's appointments under Count Four.  *See supra* Part III.C.  An act of two *ex officio* members did not constitute a valid decision by the Board.  Likewise, any actions subsequently taken by Amar, such as transferring assets out of the Endowment, were invalid because Amar lacked authority to take such actions.

### 2.    *Injunctive Relief*

In addition to declarations, to be entitled to injunctive relief, plaintiffs must demonstrate (1) they have suffered an irreparable injury, (2) remedies available at law are inadequate to compensate for this injury, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *Monsanto Co v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S.

92

388, 391 (2006)). Defendants contest the availability of injunctive relief, notwithstanding plaintiffs' success on the merits. Defs.' Opp'n at 30-32.

### a.    *Irreparable Harm and Inadequate Remedies at Law*

Plaintiffs have demonstrated that they, as officials of the Institute and the Institute, are suffering irreparable harm that cannot be remedied in the absence of an injunction.[40] Given that the removals of plaintiffs as Board members and president of USIP were void, they remain in their positions so as to be able to assert injuries on behalf of the Institute. *See supra* n.8.

First, plaintiff Board members suffer a recognized irreparable harm from the "unlawful removal from office by the President" and "the obviously disruptive effect" that such removal has on the organization's leadership. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983); *Wilcox*, 2025 WL 720914, at *15. Plaintiffs have been "deprived of a presidentially appointed and congressionally confirmed position of high importance," eliminating their ability to carry out their congressional mandate in furthering the development of peace studies—which cannot be retroactively cured by money damages. *Wilcox*, 2025 WL 720914, at *15. Plaintiff Moose has likewise been deprived of a unique, irreplicable position to carry out USIP's important mission.[41]

---

[40]    These two factors are often considered together. *See, e.g.*, *Wilcox*, 2025 WL 720914, at *15 n.20.

[41]    Some cases have suggested that plaintiffs do not suffer irreparable harm from deprivation of operating in a congressionally created position where the entity continues to operate. *See, e.g.*, *English v. Trump*, 279 F. Supp. 3d 307, 335-36 (D.D.C. 2018) (considering challenge brought by Deputy Director of the CFPB in the absence of any concern that the CFPB was shutting down). In *Berry* and *Wilcox*, by contrast, the challenged removals resulted in a complete shut-down of the agency's work. Here, technically USIP still exists with its three *ex officio* board members and Cavanaugh as president, but defendants' actions here call into question whether USIP will continue to operate in the future and have foreclosed the possibility that, without injunctive relief, USIP will operate in a fashion similar to how it did previously. "[B]ecause [plaintiffs] can likely establish that [they are] the lawful president [and directors] of the organization, [their] right to serve in that role is inextricably intertwined with the organization's survival." *See Aviel v. Gor*, -- F. Supp. 3d --, 2025 WL 1009035, at *11 (D.D.C. Apr. 4, 2025). That harm is thus not similar to *English* and not remediable by monetary damages. Regardless, plaintiffs have demonstrated multiple other forms of harm experienced here.

Second, plaintiffs and the Institute suffer from a loss of USIP's independence and a harm to its reputation. *See* Pls.' Mem. at 41-42; *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (citing cases for the principle that reputational harm is irreparable absent an injunction). As explained, much of USIP's work is contingent upon relationships of trust and community partnerships around the world that allow USIP to develop insights and promote principles of peaceful conflict resolution. *See supra* Part III.A.2.c. The ability of USIP—and plaintiffs—to carry out that work is harmed if the Institute and its leaders are seen as political agents of the U.S. government. *See Harris v. Bessent* ("*Harris I*"), -- F. Supp.3d --, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18, 2025) ("By vindicating their rights to occupy those offices, these plaintiffs act as much in their own interests as those of their [Institute]. . . . Striking at the independence of these officials accrues harm to their offices, as well."); *Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence [of the removal power] threatens the independence of a commission.").[42]

Third, the actions taken by defendants Jackson and Cavanaugh after the removal of plaintiffs, including termination of staff and the transfer of property, Pls.' SUMF ¶¶ 52-54, 56; Pls.' Add'l SUMF ¶ 6, have resulted in USIP's loss of significant human capital and expertise (both that of leaders and staff members) developed over years of experience and a unique building that is symbolic of USIP's mission. *See* Pls.' Mem. at 40. Regarding the loss of talent and expertise, courts have recognized "the difficulty, if not impossibility, of quantifying in monetary terms the injury from losing highly skilled and experienced employees." *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024); *see also Beacon*

---

[42]    Plaintiffs also express concern about loss of donor confidence and the resultant financial harm this would impose. Pls.' Mem. at 41. Such potential loss of donations is both difficult to quantify and too speculative on the record in this case to warrant equitable relief.

*Assocs.*, 308 F. Supp. 3d at 288-89 (recognizing that without employees' "institutional knowledge and reputation" an organization may be at a "strategic disadvantage").  Regarding USIP's distinctive headquarters building, which was transferred to GSA, that asset and its location in downtown Washington, D.C., cannot be simply replaced by money and the purchase of an alternative property.  "The USIP building is unique—its design intended to reflect and functionally aid the Institute's mission."  Pls.' SUMF ¶ 77.  Moreover, "the Institute's headquarters building . . . at last sight maintained a display of five carved doves in the foyer, each bearing the name of a staff member who was lost in a conflict zone."  Terminated Emps. Amicus Br. at 9.  All of those losses will greatly hamper the Institute's ability to carry out its statutory functions and make it more difficult for plaintiffs, upon return to their roles, to fulfill their responsibilities.

## b.    *Balance of the Equities and Public Interest*

The balance of the equities and public interest favor injunctive relief here.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese two factors merge"); *see also Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (applying the merged factors in permanent injunction context).  Defendants have no cognizable interest in unlawfully exercising removal power over USIP Board members or in retaining control of an Institute that is premised on such unlawful actions.  Should the President wish to exercise more control over the Institute, he could seek to satisfy the 22 U.S.C. § 4605(f) requirements—either removing plaintiffs for cause or removing plaintiffs upon recommendation of other Board members or with consent of certain congressional committees.  Should the President wish to reduce USIP's activities, he could have his Secretaries of State or Defense encourage the Board members to make changes or encourage Congress to reduce the Institute's funding.  He has no cognizable interest, either, in eliminating a

congressionally established entity. "[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Harris I*, 2025 WL 521027, at *9 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

Putting aside USIP's important work and any benefits such work may accrue to American citizens, the public surely has an interest in government officials following the law. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The public also has an interest in independent entities retaining their operational status consistent with the political branches' joint judgments embodied in statute, notwithstanding the political whims of a given president, who has constitutional duties to fulfill in faithfully taking care to execute laws and who has multiple legally permissible mechanisms to alter prior political branch judgments. *See Harris I*, 2025 WL 521027, at *9.

Defendants suggest that the equities instead weigh in their favor because "if Plaintiffs are reinstated and the government prevails after appellate review, any actions the Institute takes with Plaintiffs as directors will need to be reconsidered by the future directors, which may interfere with the Institute's ability to address future actions and interfere with the GSA's ability to utilize the building." Defs.' Opp'n at 32. "The possibility of future changes in the law is not enough, however, to permit . . . unlawful termination[s]." *Wilcox*, 2025 WL 720914, at *17. Defendants' unlawful actions have already so severely interfered with the Institute's functioning that they cannot now claim that undoing such unlawful actions will be against the public interest. Plaintiffs are therefore entitled to injunctive relief.

   c.    ***Plaintiffs' Entitlement to Requested Remedies***

96

Considering the specific form that injunctive relief should take, plaintiffs' Proposed

Order requests directions in four areas, each of which is discussed below.  *See* Pls.' Proposed

Order.

### (i)    *Resuming Plaintiff Board Members' Positions on the Board*

Plaintiffs first request an order "that the Institute's Board members duly appointed under

22 U.S.C. § 4605(b)(4) shall continue to serve in accordance with 22 U.S.C. § 4605(e) and may

be removed only in conformity with 22 U.S.C. § 4605(f)."  *Id.* at 2.  Defendants argue that this

relief would be improper for three reasons.  First, defendants posit that "*de jure* reinstatement of

a principal officer is beyond the equitable authority of the court to impose" because it

"impinges" on the President's power to control the executive branch."  Defs.' Opp'n at 30-31

(quoting *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025)).

As an initial matter, plaintiffs are not part of the Executive branch, so this concern about

infringing on the President's "conclusive and preclusive" authority to control his subordinates,

*id.* at 30, is easily dismissed.  More significantly, plaintiff Board members need not formally

reinstated to positions they never lost.  Plaintiffs thus can achieve all the practical relief they

need by an order declaring the initial removal void *ab initio* and enjoining defendants from

interfering with plaintiffs' resumption of responsibilities as Board members.  *See, e.g.*, *Wilcox*,

2025 WL 720914, at *16; *Harris v. Bessent* ("*Harris II*"), -- F. Supp. 3d --, No. 25-412 (RC),

2025 WL 679303, at *10-12 (D.D.C. Mar. 4, 2025); *Severino v. Biden*, 71 F.4th 1038, 1042-43

(D.C. Cir. 2023) (holding that a plaintiff's injury was redressable because the court could

"reinstate a wrongly terminated official '*de facto*,' even without a formal presidential

reappointment").

97

Second, defendants assert that this Court cannot enjoin the President in his official duties, suggesting reinstating plaintiffs would constitute an injunctive order against the President. Defs.' Opp'n at 31.  Defendants are mistaken: In *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), the D.C. Circuit made clear that injunctive relief could run against inferior officials who could *de facto* reinstate a plaintiff by allowing him to exercise the privileges of office, which would just as well remedy the plaintiff's harm.  *See id.* at 980; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" (second alteration in original) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment))).

Third, defendants argue that reinstatement of a public official was not a remedy historically available at equity, so this Court cannot "restrain by injunction the removal of a [public] officer."  Defs.' Opp'n at 31-32 (alteration in original) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).  This argument ignores the fact, however, that plaintiffs are not asking for a formal injunction against removal or ordering reinstatement—rather, only a declaration making their terminations void *ab initio* and an injunction allowing plaintiffs to carry on their positions as they did before.  *See Grundmann v. Trump*, -- F. Supp.3d --, 2025 WL 782665, at *16 (D.D.C. Mar. 12, 2025) (explaining that the lack of any remedy for formal reinstatement at equity "does not clearly extend to *de facto* reinstatement; nor does the Government offer a theory for how it could").[43]

---

[43]    In any case, as plaintiffs point out, Pls.' Opp'n at 42, reinstatement was previously available as a legal remedy through a writ of mandamus.  *See White v. Berry*, 171 U.S. 366, 377 (1898).  So, if the fact that unlawful removal of public officials was historically addressed through legal writs (such as mandamus) instead of equitable injunctions means equitable relief is unavailable here, "a writ of mandamus would likely be available, and the

Relief allowing plaintiffs to continue their roles as Board members without interference is therefore proper.  Nevertheless, such injunctive relief will run only against subordinate defendants (not the President) and will be limited to the plaintiff Board members named before this Court.  "[I]njunctive relief should be no broader than necessary to provide full relief to the aggrieved party."  *Free Speech Coal., Inc. v. Att'y Gen.*, 974 F.3d 408, 430 (3d Cir. 2020) (alteration in original) (quoting *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 170 (3d Cir. 2011)).  Plaintiff Board members' harms (being deprived of their positions, loss of independence, and harm to reputation) will be fully remedied by a declaration that the Board members' removals were unlawful and an injunction forbidding interference with their resumption of duties.

### (ii)    Resuming Plaintiff Moose's Position as USIP President

Plaintiffs next request an order that "Ambassador Moose may not be removed or in any way treated as having been removed, or otherwise be obstructed from his ability to carry out his respective duties, except as provided in . . . 22 U.S.C. §§ 4601-611."  Pls.' Proposed Order at 2.  Such injunctive relief follows from the declaration that Amb. Moose's removal was unlawful under 22 U.S.C. § 4606(a), given that the Board members' removal was unlawful, so the *ex officio* Board member defendants had no authority to remove him.  Defendants do not raise any concerns with relief for Amb. Moose apart from the relief for other Board members.

### (iii)    Enjoining Further Trespass Against Property

---

effective relief provided to plaintiff[s] would be the same."  *Wilcox*, 2025 WL 720914, at *16 n.22; *Swan*, 100 F.3d at 976 n.1 (noting "that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty").  Plaintiffs indeed referenced 18 U.S.C. § 1361, which allows district courts to issue writs of mandamus, in their Amended Complaint.  *See* Am. Compl. at 18, 19, 21, 22 (mentioning this statute in Counts One through Four).

Plaintiffs request an order that "Defendants are enjoined from further trespass against the real and personal property belonging to the Institute and its employees, contractors, agents, and other representatives." Pls.' Proposed Order at 3. Defendants likewise do not specifically challenge this relief. The requested relief flows from the declaration that defendants' transfer of property out of USIP was invalid because they lacked the legal authority to effectuate the transfer (as illegitimate presidents of USIP). The headquarters building remains in USIP's possession, as does any personal property within it, and defendants may not take further action to reassign or transfer it.[44] This relief cannot run against those defendants who are *ex officio* Board members since, as lawful members of the Board, these three defendants may access USIP headquarters.

### (iv)    Enjoining Defendants from Maintaining Control over Institute Resources or Name.

Lastly, plaintiffs request that defendants be "enjoined from maintaining, retaining, gaining, or exercising any access or control over the Institute's offices, facilities, computer systems, or any other records, files, or resources, and from acting or purporting to act in the name of Institute, and from using the Institute's name, emblem, badge, seal and any other mark of recognition of the Institute." *Id.* At the hearing, plaintiffs amended this request to exclude the *ex officio* members of the Board from this injunction, given that due to their roles, they may

---

[44]    In plaintiffs' motion for relief under the All Writs Act to suspend defendants' transfer of property to GSA, plaintiffs expressed concern about getting the property returned by GSA even were the transfer found to have been improper. *See* Pls.' Mot. to Suspend Transfer of Prop. ¶¶ 8-9, ECF No. 14. Plaintiffs anticipated that in such an "event Defendants [would be] likely to contend that Plaintiffs' only recourse is to file a new complaint under the Quiet Title Act" with respect to real property and "seek relief from the Court of Federal Claims under the Tucker Act" for personal property, "including financial assets." *Id.* Defendants, however, have not so contended. *See* Defs.' Opp'n; *see also* Defs.' Opp'n to Mot. to Suspend Prop., ECF No. 15 (not making that argument). No precise details are set out in the order as to how the voided transfer of property shall be restored to plaintiffs, and no more should be necessary for the Administration and all of its components to comply fully and in good faith with the order issued to restore the USIP headquarters based on the declaration that the transfers undertaken by defendants were invalid and *ultra vires* and that defendants may not unlawfully enter or seize USIP property.

lawfully, to the extent allowed by their Board positions, control, maintain, and access USIP's records and in certain contexts, use USIP's name and mark.  XMSJ Hr'g Tr. at 53:11-54:12. Defendants do not specifically challenge this requested relief, and plaintiffs are so entitled, as amended.

## IV.    CONCLUSION

The President second-guessed the judgment of Congress and President Reagan in creating USIP 40 years ago, and the judgment of every Congress since then, including in 2024, in appropriating funds to USIP, when he deemed this organization to be "unnecessary" three months ago in EO 14217.  The President and his subordinates then used brute force and threats of criminal process to take over USIP's headquarters, despite being cautioned that this organization did not fall within the Executive branch and its leadership was not subject to the President's unilateral Executive branch removal power.  This Administration then went even further, taking severe actions to dissemble USIP, including terminating its appointed Board members, its expert management, its dedicated staff and contractors located in both Washington, D.C. and around the world, and dispersing its assets and headquarters building.  These actions against USIP were unlawful.

USIP ultimately exercises no Executive branch power under the Constitution but operates, through research, educational teaching, and scholarship, in the sensitive area of global peace.  In creating this organization, Congress struck a careful balance between political accountability, on the one hand, and partisan independence and stability, on the other. Presidential appointment of Board members and the presence of two Cabinet members and the National Defense University President helps ensure that USIP's work is supportive of and consonant with U.S. interests, while removal protections and partisan balance requirements

101

ensure the accrual of expertise over time, long-term strategic prioritization, and insulation from political whims.

  The Constitution makes clear that the President's constitutional authority only extends as far as Article II, but even Article II does not grant him absolute removal authority over his subordinates, under current binding caselaw precedent.  Outside of Article II, he has little constitutional authority to act at all.  The President's efforts here to take over an organization outside of those bounds, contrary to statute established by Congress and by acts of force and threat using local and federal law enforcement officers, represented a gross usurpation of power and a way of conducting government affairs that unnecessarily traumatized the committed leadership and employees of USIP, who deserved better.

  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 19, 2025

_____
**BERYL A. HOWELL**
United States District Judge

102

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KENNETH JACKSON, *in his official capacity*, *et al.*,<br><br>Defendants. | Civil Action No. 25-cv-804 (BAH)<br><br>**Judge Beryl A. Howell** |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for summary judgment, ECF No. 22, defendants' cross motion for summary judgment, ECF No. 32, the legal memoranda, exhibits and declarations submitted in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that plaintiffs' motion for summary judgment, ECF No. 22, is **GRANTED**; it is further

**ORDERED** that defendants' cross-motion for summary judgment, ECF No. 32, is **DENIED**; it is further

**ORDERED** that plaintiffs are granted judgment in their favor on Counts One, Two, Three, Four, and Six of the Amended Complaint, ECF No. 12; it is further

**DECLARED** that the purported removal of members of the Board of Directors of the United States Institute of Peace ("USIP") duly appointed under 22 U.S.C. § 4605(b)(4), was unlawful, in violation of 22 U.S.C. § 4605(f), *ultra vires*, and therefore null, void, and without legal effect; it is further

1

**DECLARED** that plaintiff Board members who were purportedly terminated remain members of the USIP Board and may be removed by the United States President only pursuant to the terms of 22 U.S.C. § 4605(f); it is further

**DECLARED** that the purported removal of Ambassador George Moose as acting president of the Institute by a resolution adopted by less than a majority of the duly appointed Board of Directors of USIP was invalid, and therefore null, void, and without legal effect; it is further

**DECLARED** that the purported appointments of Kenneth Jackson and Nate Cavanaugh to the positions of president of USIP pursuant to resolutions adopted by less than a majority of the duly appointed Board of Directors of USIP were invalid and therefore null, void, and without legal effect; it is further

**DECLARED** that Amb. Moose therefore remains president of USIP and may be removed only by a duly constituted Board of Directors, under 22 U.S.C. § 4606; it is further

**DECLARED** that all actions taken or authorized by Kenneth Jackson or Nate Cavanaugh as acting presidents of USIP were invalid and therefore null, void, and without legal effect; it is further

**DECLARED** that, given the illegitimate appointment of Nate Cavanaugh to the position as USIP president, the actions and documents by which he purportedly transferred USIP's headquarters, located at 2301 Constitution Avenue, NW, Washington, DC 20037, to the General Services Administration were invalid and therefore null, void, and without legal effect; it is further

**DECLARED** that the transfer of USIP's other financial or physical assets to the General Services Administration was likewise invalid, null void, and without legal effect; it is further

**DECLARED** that the resolution adopted by two *ex officio* Directors of USIP's Board purportedly appointing Adam Amar as president of the Endowment of the USIP Fund and authorizing and instructing him to transfer any and all of the Endowment's assets to USIP was invalid, null, void, and without any legal effect; it is further

**ORDERED** that plaintiff Board members duly appointed under 22 U.S.C. § 2605(b)(4) shall continue to serve in accordance with § 4605(e) and may not be removed or treated in any way as having been removed, or otherwise obstructed from carrying out their duties, except in accordance with § 4605(f); it is further

**ORDERED** that USIP Acting President Amb. Moose shall continue to serve in accordance with § 4606(a) and may not be removed or treated in any way as having been removed, or otherwise obstructed from carrying out his duties, except in accordance with §§ 4601-11; it is further

**ORDERED** that defendants, except for the *ex officio* members of USIP's Board of Directors to the extent their official positions allow, are **ENJOINED** from further trespass against the real and personal property belonging to the Institute and its employees, contractors, agents, and other representatives; it is further

**ORDERED** that defendants, except for the *ex officio* members of USIP's Board of Directors to the extent their official positions allow, are **ENJOINED** from maintaining, retaining, gaining, or exercising any access or control over the Institute's offices, facilities, computer systems, or any other records, files, or resources, and from acting or purporting to act in the name of Institute, and from using the Institute's name, emblem, badge, seal and any other mark of recognition of the Institute; it is further

3

**ORDERED** that the defendants who are *ex officio* members of USIP's Board of Directors may not act unilaterally or in any combination of the three of them together, without additional consent constituting a majority of members of the duly constituted USIP Board of Directors, to transfer any of USIP's assets; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Date:  May 19, 2025

*This is a final and appealable order.*

_____
**BERYL A. HOWELL**
United States District Judge