**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5185

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

UNITED STATES INSTITUTE OF PEACE, *et al.*,

*Plaintiffs-Appellees*,

v.

KENNETH JACKSON, *et al.*,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-804-BAH, The Honorable Beryl A. Howell, District Judge

_____

**MOTION OF PLAINTIFFS-APPELLEES TO FILE REPLY IN SUPPORT
OF PETITION FOR REHEARING EN BANC AND
APPLICATION FOR EMERGENCY ADMINISTRATIVE STAY**

_____

ANDREW N. GOLDFARB
JACOBUS P. VAN DER VEN
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800

WILLIAM J. MURPHY
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 332-0444

*Counsel for Plaintiffs-Appellees*

July 14, 2025

Pursuant to the July 2 Clerk's Order in the above-captioned action and Circuit Rule 25, Plaintiffs-Appellees ("Appellees") respectfully request leave of the Court to file a brief reply in support of their pending Petition for Rehearing En Banc and Application for Emergency Administrative Stay. The proposed reply is attached as Exhibit 1. Defendants-Appellants ("Appellants") take no position on the motion.

Appellees seek leave to file a brief reply because Appellants' July 11 response (i) distorts the irreparable impact on USIP if the stay of the district court's order remains in effect during Appellants' merits appeal, including by relying on incorrect factual statements about USIP's ability to reverse the damage inflicted by Appellants during the time they controlled the organization; and (ii) fails to acknowledge Defendant Cavanaugh's intent to fire (again) virtually all USIP employees and wind-down all USIP functions, which he executed on July 11 within hours of Appellants filing their response. In addition, Appellants ask this Court to keep in place, during the pendency of the merits appeal, the stay panel's abandonment of the *Humphey's Executor* exception in favor of a standard that, as applied by the stay panel without regard for the district court's careful factfinding, departs from precedent and expands the President's at-will removal powers contrary to historical practice and Congressional intent.

A brief reply is warranted for Appellees to clarify the record and address these issues.

July 14, 2025

Respectfully submitted,

*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb
Jacobus P. van der Ven
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
agoldfarb@zuckerman.com
cvanderven@zuckerman.com

William J. Murphy
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 332-0444
wmurphy@zuckerman.com

*Counsel for Plaintiffs-Appellees*

# EXHIBIT 1

**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5185

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————

UNITED STATES INSTITUTE OF PEACE, *et al.*,

*Plaintiffs-Appellees*,

v.

KENNETH JACKSON, *et al.*,

*Defendants-Appellants*.

———————

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-804-BAH, The Honorable Beryl A. Howell, District Judge

———————

**[PROPOSED] REPLY IN SUPPORT OF PETITION FOR
REHEARING EN BANC AND APPLICATION FOR
EMERGENCY ADMINISTRATIVE STAY**

———————

ANDREW N. GOLDFARB
JACOBUS P. VAN DER VEN
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800

WILLIAM J. MURPHY
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 332-0444

*Counsel for Plaintiffs-Appellees*

July 14, 2025

As discussed in the Petition, the stay panel erred as a matter of law and seriously misunderstood the factual record in treating Congress's decision to establish a non-profit corporation to promote peaceful conflict resolution as creating an executive branch agency that the Constitution requires to be subject to presidential at-will removal.

Legally, the panel painted with much too broad a brush in treating any foreign affairs-related activity as executive. Congress also plays a constitutional role in foreign affairs. Indeed, congressional delegations and committees and staff also engage with foreign officials and groups; foreign affairs policy is not wholly and inherently executive. Because USIP does not act for, or at the instance of, the Executive Branch when it promotes peaceful conflict resolution between opposing foreign parties, it does not encroach on the President's constitutional authority to represent the United States government overseas. USIP's structure was designed to allow it to act independently, and by including the Secretaries of State and Defense and the President of the National Defense University as *ex officio* board members, to promote alignment with United States interests. Defendants-Appellants advance no claim that USIP has done anything harmful to United States foreign policy interests during the period after the District Court's injunction and before the stay—or indeed at any other time in the last 40 years.

Factually, the stay panel's truncated account of the summary judgment record omits the undisputed facts thoroughly analyzed in the District Court's opinion that place USIP outside the Executive Branch and without executive power. The record shows that USIP's status as an independent non-profit corporation was crucial to its success as an aide to Congress and in promoting peaceful conflict resolution of disputes to which the United States is not a party and would not be welcomed in a governmental role.

## I.

The government suggests (Opp. 15) that the merits panel can address these errors following briefing and argument. But if the stay remains in place, there almost certainly will be nothing left of USIP by the time a merits panel has an opportunity to issue a decision.

DOGE's first round of control over USIP inflicted severe harm that was not undone by the District Court's injunction. Contrary to the government's assertion (*id.*), USIP did not "fully" recover its assets after the District Court's order—in fact, the government did not return *$13 million* that DOGE transferred from USIP's private bank accounts. Declaration of George Moose in Supp. of En Banc Pet. ¶ 5.

("Moose Decl.").[1] The loss of those funds forced USIP to operate with a skeletal team and to initiate a substantial reduction-in-force program for its expert, experienced workforce. *Id.* ¶ 6. The government's attempt to minimize the damage to USIP as merely "superficial harm to the physical property" (Opp. 15) ignores the full record of institutional and organizational harms that USIP experienced, and that will be compounded if the government is able to complete its shuttering of USIP while its merits appeal proceeds.

Congress has not authorized dissolution of USIP. *See* Mem. Op. at 2, *USIP v. Jackson* ("Op."). Yet within hours after Appellants filed their Opposition to the Petition, Defendant Nate Cavanaugh terminated nearly all of USIP's staff, retaining only a few employees to conduct close-out activities and wind down USIP. Moose Decl. ¶¶ 9-10. In short, Cavanaugh and the other Appellants are shutting USIP down, which is something USIP's president and board have no authority to do. Congress expressly withheld from USIP, and reserved for itself, the usual power of a non-profit corporation to cease operations. 22 U.S.C. § 4604(a) (withholding the power of USIP to cease operations under section 5(o) of the District of Columbia Nonprofit Corporation Act); Op. 7 (discussing that provision). Appellees' initial

---

[1] The refusal to return the unlawfully transferred funds was in addition to a rescission of $15 million of USIP's $55 million appropriation that the administration has proposed. The administration did not ask Congress to zero USIP out, as it did with other proposed rescissions.

4

steps to partially restore USIP's ability to function after the District Court entered the preliminary injunction have been wiped out. If all activity is shut down by the government, for a second time, while the merits appeal is decided (and a briefing schedule has not yet been set), the damage to USIP's ability to retain staff and restore its functions, to hire and retain qualified staff in the future, and to re-establish USIP's reputation as a reliable, trusted, independent actor in conflict resolution and peacebuilding will be too great for USIP to survive. *See* Moose Decl. ¶¶ 13-14.[2]

## II.

The government's stay motion claimed that USIP exercised "considerable" executive power comparable to the NLRB and that a stay was warranted, even though USIP is led by a multi-member bipartisan board of experts, relying on the holding of the Supreme Court's stay order in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025). Stay at 1, 2, 19; Reply at 7. That is the same argument the Solicitor General is now making in its stay motion in *Trump v. Boyle*, No. 25A11, a case addressing the removal of the board of the Consumer Product Safety Commission. Stay at 3. It

---

[2] Appellants now urge the Court to disregard harm to USIP, claiming without citation that USIP is not a proper plaintiff. (Opp. 15). Appellants did not meaningfully present that argument in their stay application, and it lacks merit. USIP has the statutory capacity to sue and be sued, and USIP's acting president authorized suit on USIP's behalf.

5

was also the basis for a stay issued by a motions panel of this Court in *Grundmann v. Trump*, No. 25-5165 (July 3, 2025) ("The Supreme Court's reasoning applies fully to the FLRA, which possesses powers substantially similar to those of the NLRB.").

But the stay panel in this case did not use the NLRB as a benchmark. Nor did it compare what it labeled (incorrectly) USIP's "executive" power to the scope of the FTC's power at the time of *Humphrey's Executor*, 292 U.S. 602 (1935), or the War Claims Commission's power to decide claims implicating foreign affairs in *Wiener v. United States*, 357 U.S. 349 (1958). *Cf.* Op. 81; *Wilcox* Stay Reply at 6-7.[3] Instead, it applied to USIP's multi-member board the same test that the Supreme Court applied in *Seila Law* to an agency headed by a single officer. Bearing in mind the government's consistent position that administrative adjudication is a form of executive power, the reasoning of the stay panel would eliminate entirely the *Humphrey's Executor* exception for multi-member boards—a position that goes far beyond *Wilcox*.[4]

---

[3] Likewise, the government argues in its Reply Brief on the merits in *Wilcox* that "both the NLRB and MSPB exercise powers beyond those approved in *Humphrey's Executor*." 2025 WL 1092793, at *7.

[4] As then-Judge Kavanaugh noted in his dissenting opinion in *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 185–86 (D.C. Cir. 2018), multi-member boards are different in constitutionally significant ways from single-officer-headed

6

## III.

Unlike the District Court, which carefully analyzed USIP's unique structure, Op. 3, 33 (describing USIP as combining features of a governmental entity and an NGO), the government's executive power analysis treats USIP as if it were an ordinary executive agency, disregarding Congress's long tradition of creating entities that are not part of the executive and have not been subject to at-will presidential removal. *See* Op. 36-39. That history includes the monetary policies that provide a pedigree for Federal Reserve independence.[5] The Supreme Court recently invoked part of that history in explaining why its stay order in *Wilcox*

---

agencies, even if they wield similar powers, so it makes sense for the threshold for invalidating removal restrictions to be different. *See Seila L. LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 237 (2020) (plurality) (addressing severability and positing that Congress might solve the constitutional defect by "converting the CFPB into a multimember agency"). The *Wilcox* stay order indicates that the Supreme Court is likely not to extend an exception for multi-member boards to agencies that exercise more power than the 1935 FTC, not that the Court intends to eliminate the exception.

[5] Congress created the Sinking Fund Commission "to purchase U. S. securities following the Revolutionary War, [which] was run by a 5-member Commission, and three of those Commissioners were part of the President's Cabinet and therefore removable at will. See An Act Making Provision for the Reduction of the Public Debt, ch. 47, 1 Stat. 186 (1790)." *Collins v. Yellen*, 594 U.S. 220, 253 n.19 (2021). The First Bank of the United States was established as a corporation whose shareholders (not the president) chose the directors. Act of Feb. 25, 1791 § 4, 1 Stat. 191, 192. "Of the twenty-five directors who led the [Second] Bank [of the United States], the President could appoint and remove only five. See Act of Apr. 10, 1816, § 8, 3 Stat. 269." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 274 (2020) (Kagan, J. concurring in part).

7

would not necessarily subject the Federal Reserve to at-will presidential removal, *see* 145 S. Ct. at 1415, but the history is broader and deeper than power over monetary policy. It includes a myriad of for-profit and non-profit corporations and establishments like the Smithsonian Institution whose governing board includes as *ex officio* members officials the president could not constitutionally remove. Op. 55.

USIP's basic structure as an independent non-profit corporation is important to analyzing whether it can be assigned to the executive branch and whether its activities can be characterized as the exercise of Article II powers. The district court described many aspects of USIP's structure that are inconsistent with its being considered as part of the Executive Branch, including its budgetary independence, and the fact that its employees are not in federal service, do not receive federal benefits, and are paid from USIP's private bank accounts, not from the Treasury. Congress expressly made some statutes applicable to USIP, like FOIA, but in doing so only underscored that USIP was not a part of the Executive Branch to which those laws would apply as a matter of course. Op. 63. Of greatest significance to the Article II question, USIP does not regulate, enforce, or make policy for the Executive Branch. Op. 65-74 (discussing USIP's foreign affairs activities); *id.* at 75 (discussing USIP's grantmaking).

8

USIP's distinct structure is particularly salient to understanding why its conflict resolution activities cannot fairly be characterized as the exercise of executive power—as a matter of law and structure, and not simply predicated on USIP's own "belief," as the government asserts (Opp. 11). That is why, unlike Executive Branch personnel, USIP staff are not subject to Chief of Mission authority when abroad. The undisputed summary judgment record showed, and the District Court found, that in actual practice as well as by statutory design, USIP does not represent the United States government. And when it engages overseas USIP is understood by all concerned not to represent the United States government. Rather, when it conducts peacebuilding research and training, and when it brings together parties in conflict, USIP acts like other international NGOs that promote nonviolent resolution of such conflicts.

\*\*\*

While the current President can certainly disagree with the policy judgments of Congress and his six predecessors to establish and maintain USIP as an independent non-profit corporation authorized to engage in a range of activities to promote the peaceful resolution of conflicts, the President cannot seek to shut USIP down and eliminate its statutory functions through the unlawful means of firing the board members whom Congress protected from such arbitrary actions.

9

| | |
|---|---|
| July 14, 2025 | Respectfully submitted,<br><br>/s/ Andrew N. Goldfarb<br>Andrew N. Goldfarb<br>Jacobus P. van der Ven<br>ZUCKERMAN SPAEDER LLP<br>2100 L Street, NW, Suite 400<br>Washington, DC 20037<br>Tel: (202) 778-1800<br>agoldfarb@zuckerman.com<br>cvanderven@zuckerman.com<br><br>William J. Murphy<br>ZUCKERMAN SPAEDER LLP<br>100 East Pratt Street, Suite 2440<br>Baltimore, MD 21202-1031<br>Telephone: (410) 332-0444<br>wmurphy@zuckerman.com<br><br>*Counsel for Plaintiffs-Appellees* |

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the applicable type-volume limitation set forth in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 1,528 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(f).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word Office in a proportionally spaced typeface (Times New Roman, 14 point).

*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.*, <br><br>         Plaintiffs-Appellees, <br><br> v. <br><br> KENNETH JACKSON, *et al.*, <br><br>         Defendants-Appellants. | No. 51-5185 |

**DECLARATION OF GEORGE E. MOOSE IN SUPPORT OF PLAINTIFFS-APPELLEES' PROPOSED REPLY IN SUPPORT OF PETITION FOR REHEARING EN BANC AND APPLICATION FOR EMERGENCY ADMINISTRATIVE STAY**

I, George E. Moose, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I was appointed as the Acting President and Chief Executive Officer of the United States Institute of Peace (USIP) by the USIP Board of Directors in April 2024.

2. In my capacity in this position, I oversaw all of USIP's activities until my purported termination by the three *ex officio* board members on March 14, 2025.

3. On May 19, 2025, upon issuance of the District Court's summary

1

judgment order in this case, I immediately resumed my activities as acting president. As I stated in a prior declaration, it was apparent upon the resumption of my duties that after March 17, 2025, all programmatic activity of the Institute had effectively ceased. Prior to the Court's May 19 order, the handful of employees who were not fired, both in the U.S. office and overseas (including contractors), had, at defendants' direction, been focused on shutting down any remaining projects.

4. Because of budget limitations, I was able to re-hire only a "landing team" to actively begin to restore USIP's function consistent with our mission as set out in the USIP Act. I placed all other USIP employees on administrative furlough.

5. Our ability to re-start USIP's activities was limited in significant part because the government did not return $13 million of USIP's funds that Defendants-Appellees had transferred from USIP's private bank accounts before the District Court's May 19 decision.

6. Recognizing the need to operate under significant budget restrictions caused by the DOGE takeover of USIP and transfer of its funds, we were forced to initiate a major reduction-in-force initiative, even though it severely compromised USIP's ability to carry out its mission authorized by Congress.

2

7. After a motions panel stayed the District Court order on June 27, 2025, I again relinquished my position as Acting President to Defendant Cavanaugh in compliance with the stay order. Working cooperatively with government counsel, USIP for the second time transferred control of its building to the government, even though the building is privately owned and not a property belonging to the U.S. Government.

8. Since June 27, I have continued to remain in contact with USIP staff, including those who had been rehired after May 19 as part of the skeletal landing team. In the days leading up to July 11, I learned that Mr. Cavanaugh intended to terminate virtually all USIP employees, both those on the landing team as well as those on administrative furlough.

9. On Friday, July 11, a few hours after Defendants-Appellants filed their opposition to the Plaintiff-Appellants' petition for en banc review of the June 27 stay order, Mr. Cavanaugh implemented this plan, sending out notices of immediate termination to virtually all employees, both from the landing team as well as furloughed staff. Furloughed staff were told that their termination was effective as of May 31, even though I was Acting President on that date.

10. The July 11 firings have been publicly reported. *See* https://www.cnn.com/2025/07/12/politics/us-institute-of-peace-employees-

3

*experience-mass-firings.* According to the news article, a fired employee reported that the few remaining staff have been retained "to conduct close-out activities and wind down USIP." Likewise, my own understanding from employees of USIP is that Mr. Cavanaugh intends to cease USIP's operations.

11. Had Mr. Cavanaugh wished to conduct an orderly drawdown of the Institute's staff, he could simply have adopted the carefully developed and legally compliant reduction-in-force plan that was already being implemented at my direction. Instead, he chose a plan and a process that were far more harmful and disruptive to employees and the organization, leaving in place a skeletal workforce incapable of fulfilling even the government's own definition of the Institute's "minimum statutory requirements."

12. As a result of the July 11 firings, all of USIP's programmatic activities will stop immediately. For example, my understanding is that all but one employee working on the Gandhi-King Global Academy (which previously employed over 30 people) were fired on July 11, and that lone employee was retained only to sunset the program. The Gandhi-King Global Academy is a program mandated by Congress.

13. From my experience as USIP's Acting President, my conversations with USIP employees, and the challenges we have faced in our efforts to restart

USIP activities since the District Court's May 19 order, it is my firm conviction that USIP will not survive as an organization if the stay order remains in effect during the merits appeal of the district court's decision. Our dedicated, expert employees will, by necessity, seek other employment. And USIP will not be able to attract and retain employees with appropriate experience who are committed to USIP's difficult, time-consuming research and peacebuilding work, because USIP will be perceived as an undependable employer with uncertain independence from the bodies that make and implement official U.S. foreign policy.

14. In addition, the damage that USIP's reputation and standing as an effective, good-faith partner in peacebuilding research, training, and facilitation activities sustained during the two months that Defendants-Appellees controlled the organization will be compounded if USIP is shuttered and left under DOGE's control. In short, USIP will no longer be trusted as a reliable, independent actor in the conflict-resolution field.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing declaration is true and correct.

Executed in Washington, DC, this 14th of July, 2025.

Signed: /s/ *George E. Moose*

Print Name: George E. Moose