**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

UNITED STATES INSTITUTE OF PEACE, et al.,

Plaintiffs-Appellees,

v.

KENNETH JACKSON, in his official capacity as Assistant to the
Administrator for Management and Resources for USAID, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney
  General*

MARK R. FREEMAN
SHARON SWINGLE
McKAYE L. NEUMEISTER
COURTNEY E. ALBINI
  *Attorneys, Appellate Staff
  Civil Division, Room 7511
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 598-7329*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiffs in district court, and appellees here, are the United States Institute of Peace (USIP)[1]; Ambassador John J. Sullivan, in his official capacity as USIP's former Board Chairman; Nancy Zirkin, Judy Ansley, Joseph L. Falk, Kerry Kennedy, and Mary Swig, in their official capacities as former USIP Board members; and Ambassador George E. Moose, in his official capacity as USIP's former Acting President and former ex officio Board member.  Defendants in district court, and appellants here, are Kenneth Jackson, Amy Gleason, James M. Burnham, Jacob Altik, Nate Cavanaugh, Secretary Marco Rubio, Secretary Peter B. Hegseth, Vice Admiral Peter A. Garvin, Trent Morse, and President Donald J. Trump, in their official capacities; the U.S. DOGE Service, and the U.S. DOGE Service Temporary Organization.

A group of "113 Former Senior Military and Foreign Policy Officials" filed a brief as amici curiae in district court.  A group of 128 former USIP

---

[1] The federal government's position is that USIP is not properly named as a plaintiff in this action.

employees and personal service contractors, who were terminated on March 28, 2025, also filed a brief as amici curiae in district court.

No other amici or intervenors participated before the district court or have entered an appearance in this Court.

### B.  Rulings Under Review

Appeal No. 25-5185 arises from the district court suit *United States Institute of Peace v. Jackson*, No. 1:25-cv-804 (D.D.C.), before Judge Beryl A. Howell.  The rulings under review are the district court's grant of summary judgment for declaratory and injunctive relief (JA294-297) and accompanying memorandum opinion (JA298-399), issued on May 19, 2025. The court's opinion will be published in the Federal Supplement Third Series and is available at 2025 WL 1428641.

### C.  Related Cases

This appeal has not previously been before this Court.  *Pippenger v. U.S. DOGE Service*, No. 1:25-cv-1090 (D.D.C. filed Apr. 10, 2025), involves a similar challenge to the President's removal of USIP's Board members.

Counsel are aware of several cases pending within this Court that, although they do not involve substantially the same parties, involve similar constitutional challenges to the removal of officers of Executive Branch agencies: *Harris v. Bessent*, No. 25-5037 (D.C. Cir.) (No. 1:25-cv-412 (D.D.C.)) (MSPB); *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.) (No. 1:25-cv-

334 (D.D.C.)) (NLRB); *Aviel v. Gor*, No. 25-5105 (D.C. Cir.) (No. 1:25-cv-778 (D.D.C.)) (Inter-American Foundation); *Grundmann v. Trump*, No. 25-5165 (D.C. Cir.) (No. 1:25-cv-425 (D.D.C.)) (Federal Labor Relations Authority); *Slaughter v. Trump*, No. 25-5261 (D.C. Cir.) (No. 1:25-cv-909 (D.D.C.)) (FTC); *LeBlanc v. United States Privacy & Civil Liberties Oversight Board*, No. 25-5197 (D.C. Cir.) (No. 1:25-cv-542 (D.D.C.)) (U.S. Privacy and Civil Liberties Oversight Board); *Harper v. Bessent*, No. 25-5268 (No. 1:25-cv-1294 (D.D.C.)) (National Credit Union Administration); *Storch v. Hegseth*, No. 1:25-cv-415 (D.D.C.) (Office of Inspector General); *Brehm v. Marocco*, No. 1:25-cv-660 (D.D.C.) (U.S. African Development Foundation); *Cristosal Human Rights v. Marocco*, No. 1:25-cv-857 (D.D.C.) (Inter-American Foundation); *Abramowitz v. Lake*, No. 1:25-cv-887 (D.D.C.) (United States Agency for Global Media); *Samuels v. Trump*, No. 1:25-cv-1069 (D.D.C.) (EEOC); *Corporation for Public Broadcasting v. Trump*, No. 1:25-cv-1305 (D.D.C.) (Corporation for Public Broadcasting); *Rural Development Innovations Ltd. v. Marocco*, No. 1:25-cv-1631 (D.D.C.) (Inter-American Foundation); *Perlmutter v. Blanche*, No. 1:25-cv-1659 (D.D.C.) (U.S. Copyright Office); *Brown v. Trump*, No. 1:25-cv-1764 (D.D.C.) (NTSB).

*/s/ Courtney E. Albini*
Courtney E. Albini

# TABLE OF CONTENTS

**Page**

GLOSSARY

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ............................................................3

STATEMENT OF THE ISSUES..................................................................3

PERTINENT STATUTES AND REGULATIONS.........................................3

STATEMENT OF THE CASE .....................................................................4

      A.     Statutory Background .................................................. 4

      B.     Factual Background..................................................... 9

      C.     Prior Proceedings ......................................................12

SUMMARY OF ARGUMENT ......................................................................15

STANDARD OF REVIEW .......................................................................... 16

ARGUMENT ................................................................................................ 16

I.     The President Has Constitutional Authority To Remove Members Of USIP's Board At Will........................................................ 16

      A.     USIP Exercises Executive Authority as Part of the Executive Branch.......................................................17

             1.     USIP is a governmental entity for purposes of the separation of powers.......................................17

             2.     USIP performs foreign-affairs functions as part of the Executive Branch. ......................................... 20

iv

B.    The President Has Constitutional Authority to Remove USIP Board Members at Will. ................................................... 35

    1.    The President's presumptive power of removal and its limited exceptions. ..................................................... 35

    2.    USIP exercises substantial executive authority and thus its Board members must be subject to at-will removal. ............................................................................ 46

II.    The District Court Erred In Ordering The Reinstatement Of Principal Officers The President Had Already Removed. ................. 50

CONCLUSION ............................................................................ 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
    654 F.2d 758 (D.C. Cir. 1980) ........................................................ 57, 58

*American Bankers Ass'n v. National Credit Union Admin.*,
    934 F.3d 649 (D.C. Cir. 2019) ............................................................... 16

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
    64 F.4th 1354 (D.C. Cir. 2023) .................................................. 16, 58, 59

*Baker v. Carr*,
    369 U.S. 186 (1962) ........................................................................ 52, 53

*Barnes v. Kline*,
    759 F.2d 21 (D.C. Cir. 1984) .................................................................. 60

*Bessent v. Dellinger*,
    145 S. Ct. 515 (2025) ....................................................................... 51, 53

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) .............................................................................. 43

*Bowsher v. Synar*,
    478 U.S. 714 (1986) .............................................................................. 49

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................................. 26

*Burke v. Barnes*,
    479 U.S. 361 (1987) .............................................................................. 60

*Carlson v. Green*,
    446 U.S. 14 (1980) ............................................................................... 44

*CFPB v. Seila Law LLC*,
    923 F.3d 680 (9th Cir. 2019) ................................................................ 42

*Cheney, In re*,
    406 F.3d 723 (D.C. Cir. 2005) ............................................................... 57

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004) ................................................... 57

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ................................................. 40

*Collins v. Yellen*,
    594 U.S. 220 (2021) ....................................... 45, 46, 61

*Consolidated Edison Co. v. Ashcroft*,
    286 F.3d 600 (D.C. Cir. 2002) ................................. 57

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    98 F.4th 646 (5th Cir. 2024) ................................... 58

*Davis v. Passman*,
    442 U.S. 228 (1979) ............................................... 43

*Dellinger v. Bessent*,
    No. 25-5028, 2025 WL 559669
    (D.C. Cir. Feb. 15, 2025) ........................... 50-51, 51, 54

*Department of Transp. v. Association of Am. R.Rs.*,
    575 U.S. 43 (2015) .......................... 17, 18, 19, 20, 31

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ............................................... 58

*Egbert v. Boule*,
    596 U.S. 482 (2022) ............................................... 44

*Exela Enter. Solutions, Inc. v. NLRB*,
    32 F.4th 436 (5th Cir. 2022) ................................... 36

*FCC v. Consumers' Rsch.*,
    145 S. Ct. 2482 (2025) ........................................... 30

*Federal Baseball Club of Baltimore v. National League
    of Professional Baseball Clubs*,
    259 U.S. 200 (1922) ............................................... 43

*Federal Mar. Comm'n v. South Carolina State Ports Auth.*,
    535 U.S. 743 (2002) ........................................... 29-30

*Flast v. Cohen,*
    392 U.S. 83 (1968) ............................................................... 42

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ................................................. 1-2, 7, 36

*Goldey v. Fields,*
    606 U.S. 942 (2025) ........................................................... 44

*Great Lakes Dredge & Dock Co. v. Huffman,*
    319 U.S. 293 (1943) ........................................................... 56

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ........................................................... 52

*Harris v. Bessent,*
    No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) .............. 51

*Haviland v. Butz,*
    543 F.2d 169 (D.C. Cir. 1976) ............................................. 43

*Heckler v. Ringer,*
    466 U.S. 602 (1984) ........................................................... 57

*Hein v. Freedom From Religion Found., Inc.,*
    551 U.S. 587 (2007) ........................................................... 43

*Herron v. Fannie Mae,*
    861 F.3d 160 (D.C. Cir. 2017) ......................................... 17, 18

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ................................. 2, 14, 15, 37, 38, 39, 41,
                                  42, 43, 46, 48, 49, 52

*INS v. Chadha,*
    462 U.S. 919 (1983) ........................................................... 30

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    684 F.3d 1332 (D.C. Cir. 2012) ............................ 20, 21, 29, 31

*Kennedy v. Braidwood Mgmt., Inc,*
    145 S. Ct. 2427 (2025) ....................................................... 40

*K.O. by & through E.O. v. Sessions,*
41 F.4th 664 (D.C. Cir. 2022) ..................................................... 44

*Kuretski v. Commissioner,*
755 F.3d 929 (D.C. Cir. 2014) ................................ 20-21, 31, 32

*Lebron v. National R.R. Passenger Corp.,*
513 U.S. 374 (1995)........................................ 7, 17, 18, 19, 20, 31

*MediNatura, Inc. v. FDA,*
998 F.3d 931 (D.C. Cir. 2021) ................................................... 59

*Mississippi v. Johnson,*
71 U.S. (4 Wall.) 475 (1867)................................................ 51, 56

*Morrison v. Olson,*
487 U.S. 654 (1988) ........................................................... 36, 40

*Myers v. United States,*
272 U.S. 52 (1926) ..................................................... 36, 37, 49, 52

*National Nurses United, In re,*
47 F.4th 746 (D.C. Cir. 2022) ................................................... 57

*Newdow v. Roberts,*
603 F.3d 1002 (D.C. Cir. 2010)................................................. 56

*Printz v. United States,*
521 U.S. 898 (1997) ................................................................ 33

*Samuels v. Mackell,*
401 U.S. 66 (1971).................................................................. 56

*Sawyer, In re,*
124 U.S. 200 (1888) ................................................... 52, 53, 56

*Schneider v. Kissinger,*
412 F.3d 190 (D.C. Cir. 2005) ......................................... 21, 22

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) ....................... 2, 14, 15, 30, 35, 36, 37, 39,
40, 41, 42, 45, 46, 59

*Severino v. Biden,*
  71 F.4th 1038 (D.C. Cir. 2023) ........................................................ 42, 55

*Springer v. Government of the Philippine Islands,*
  277 U.S. 189 (1928) .................................................................................. 31

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) .................................................... 51, 55, 57

*Tel-Oren v. Libyan Arab Republic,*
  726 F.2d 774 (D.C. Cir. 1984) .............................................................. 48

*Trump v. Boyle,*
  145 S. Ct. 2653 (2025) .......................................................................... 59

*Trump v. United States,*
  603 U.S. 593 (2024) ................................................................... 3, 36, 50

*Trump v. Wilcox,*
  145 S. Ct. 1415 (2025) .................................................................. 2, 47, 59

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ........................................................................ 21, 22

*United States v. Perkins,*
  116 U.S. 483 (1886) .............................................................................. 36

*Walton v. House of Representatives,*
  265 U.S. 487 (1924) .............................................................................. 53

*White v. Berry,*
  171 U.S. 366 (1898) ........................................................................ 52, 53

*Wiener v. United States,*
  357 U.S. 349 (1958) ........................................................... 39, 40, 49, 52

*Youngstown Sheet & Tube Co. v. Sawyer,*
  357 U.S. 349 (1958) .............................................................................. 39

*Zivotofsky v. Kerry,*
  576 U.S. 1 (2015) ............................................................................ 21, 22

**U.S. Constitution:**

U.S. Const. art. I, § 6, cl. 2 ..................................................... 28

U.S. Const. art. II, § 1, cl. 1..................................................... 1, 35

U.S. Const. art. II, §§ 2-3 ..........................................................21

U.S. Const. art. II, § 2, cl. 2..................................................... 8, 37

U.S. Const. art. II, § 3 ................................................. ... 1, 35, 61

**Statutes:**

Department of State, Foreign Operations, and Related Programs
   Appropriations Act, 2021, Pub. L. No. 116-260,
   div. K, tit. I, 134 Stat. 1182 (2020) .......................................... 10

Department of State, Foreign Operations, and Related Programs
   Appropriations Act, 2022, Pub. L. No. 117-103,
   div. K., tit. I, 136 Stat. 49 (2022)...........................................9-10

Department of State, Foreign Operations, and Related Programs
   Appropriations Act, 2023, Pub. L. No. 117-328,
   div. K, tit. I, 136 Stat. 4459 (2022)........................................... 9

United States Institute of Peace Act:
   Pub. L. No. 98-525, tit. XVII, 98 Stat. 2492 (1984) ........................... 4, 18
   22 U.S.C. § 4601.............................................................. 3, 4, 22, 34
   22 U.S.C. § 4601(a)(1)......................................................... 4
   22 U.S.C. § 4601(a)(3)......................................................... 4, 22, 23
   22 U.S.C. § 4601(a)(6) ........................................................ 5, 22
   22 U.S.C. § 4601(a)(7)......................................................... 4
   22 U.S.C. § 4601(b) ...........................................................5, 18
   22 U.S.C. § 4603(b) ...........................................................7, 19, 20
   22 U.S.C. § 4603(e)(2) ........................................................ 4, 7, 32
   22 U.S.C. § 4604.............................................................. 7
   22 U.S.C. § 4604(b)(1) ........................................................ 5, 6, 26, 32, 47
   22 U.S.C. § 4604(b)(3)........................................................5, 6, 26, 27, 32, 47
   22 U.S.C. § 4604(b)(4)........................................................ 5, 26, 33, 47
   22 U.S.C. § 4604(b)(6)........................................................ 6
   22 U.S.C. § 4604(b)(8)........................................................ 6, 27, 32
   22 U.S.C. § 4604(b)(9)........................................................ 6, 27

22 U.S.C. § 4604(b)(10) ............................................................... 5, 32, 47
22 U.S.C. § 4604(c) ............................................................................ 5, 32
22 U.S.C. § 4604(d) ........................................................... 6, 25, 26, 47
22 U.S.C. § 4604(d)(3) ................................................................................ 6
22 U.S.C. § 4604(d)(6) ........................................................................ 6, 33
22 U.S.C. § 4604(e) ............................................................................. 6, 27
22 U.S.C. § 4604(h) ..................................................................................... 19
22 U.S.C. § 4604(h)(1) ......................................................................... 6, 27
22 U.S.C. § 4604(h)(3) ............................................................................... 7
22 U.S.C. § 4604(m) ...................................................................... 5, 22, 23
22 U.S.C. § 4605(a) .............................................................................. 8, 37
22 U.S.C. § 4605(b) ........................................................................ 8, 19, 29
22 U.S.C. § 4605(b)(1)-(3) ............................................................... 7, 19
22 U.S.C. § 4605(b)(4) .............................................................................. 37
22 U.S.C. § 4605(c) .............................................................................. 8, 29
22 U.S.C. § 4605(e) .................................................................................... 50
22 U.S.C. § 4605(f) ....................................... 1, 8, 9, 28, 50, 54, 56
22 U.S.C. § 4605(f)(3) ............................................................................... 49
22 U.S.C. § 4606(a) ..................................................................................... 8
22 U.S.C. § 4606(d)(2) ............................................................................... 7
22 U.S.C. § 4606(f)(1) ................................................................................. 7
22 U.S.C. § 4607(g)-(h) ..................................................................... 7, 19
22 U.S.C. § 4608(a) .................................................................................... 19
22 U.S.C. § 4609 ................................................................................... 7, 19
22 U.S.C. § 4610 .................................................................................. 7, 19
22 U.S.C. § 4611 .................................................................................. 7, 20

5 U.S.C. § 594(1) ....................................................................................... 35

7 U.S.C. § 3157 .......................................................................................... 26

7 U.S.C. § 7633 .......................................................................................... 26

10 U.S.C. § 2165 ........................................................................................ 34

15 U.S.C. § 271 .......................................................................................... 34

15 U.S.C. § 313c ........................................................................................ 34

20 U.S.C. § 956 .......................................................................................... 34

22 U.S.C. § 10010(b)(1) ........................................................................... 24

22 U.S.C. § 2656d .................................................................. 26

22 U.S.C. § 2651a(b)(3) ....................................................... 26

22 U.S.C. § 2719a ................................................................. 34

28 U.S.C. § 530C(a)(4) ......................................................... 26

28 U.S.C. § 561(a) ................................................................. 35

28 U.S.C. § 566(a) ................................................................. 35

28 U.S.C. § 566(e)(1)(A) ....................................................... 35

28 U.S.C. § 1291 ..................................................................... 3

28 U.S.C. § 1331 ..................................................................... 3

28 U.S.C. § 1361 ..................................................................... 3

28 U.S.C. § 1651 ..................................................................... 3

28 U.S.C. § 2201 ..................................................................... 3

28 U.S.C. § 2202 ..................................................................... 3

40 U.S.C. § 301 ..................................................................... 35

42 U.S.C. § 241(a)(3) ............................................................ 26

42 U.S.C. §§ 281-282 ............................................................ 34

42 U.S.C. §§ 1861-1862 ........................................................ 34

42 U.S.C. § 2000c-3 .............................................................. 26

42 U.S.C. § 7112 .................................................................... 26

49 U.S.C. § 330 ..................................................................... 26

**Court Orders:**

*U.S. Inst. of Peace v. Jackson*, No. 25-5185,
    2025 WL 1840572 (D.C. Cir. June 27, 2025) ............ 2, 10, 12, 14, 15, 17, 31

**Legislative Materials:**

130 Cong. Rec. 27,311 (1984) ........................................................ 28

H.R. 1249, 98th Cong. (1984) .................................................................... 28

H.R. Rep. No. 98-1080 (1984) ............................................................. 8, 28

S. 564, 98th Cong. (1983) ........................................................................ 28

S. Rep. No. 98-194 (1983) ........................................................................ 27

**Other Authorities:**

*Administration of the John F. Kennedy Centennial Commission*,
    41 Op. O.L.C. 1 (2017) .................................................................. 27

Admin. Conf. of the U.S., *About ACUS*,
    https://perma.cc/NJ59-6A46 ...................................................... 35

Britt Clennett, *Cambodian official praises Trump's role in
    'bringing peace' as ceasefire with Thailand takes hold*,
    ABC News (July 29, 2025), https://perma.cc/J74K-SRNQ .................... 24

Exec. Order 14,217, *Commencing the Reduction of the
    Federal Bureaucracy*, 90 Fed. Reg. 10,577 (Feb. 25, 2025) ......... 12, 13, 60

GSA, *Congressional Services*
    (Apr. 14, 2025), https://perma.cc/BZQ3-SPS6 .................................. 35

GSA, *Courthouse Program*
    (May 28, 2025), https://perma.cc/VYV7-QXY2 .................................. 35

Miranda Jeyaretnam, *Trump Brokers Ceasefire to End
    '12 Day War' Between Israel and Iran*, Time
    (June 24, 2025), https://perma.cc/YXA2-LWBP?type=image ............... 24

*Power of the President to Remove Members of the
    Tennessee Valley Authority from Office*,
    39 Op. Att'y Gen. 145 (1938) ........................................................ 38-39

Nat'l Archives, *Statement on
    Signing the Department of Defense Authorization Act, 1985*
    (Oct. 19, 1984), https://perma.cc/B3JB-3JZQ .................................. 9, 28

U.S. Army Sec. Assistance Command, U.S. Army,
    *History of USASAC*, https://perma.cc/X6HA-GGR6 .............................. 24

U.S. Army Sec. Assistance Command Pub. Affs., *SATMO helping Liberia professionalize its military force with instructor training* (May 24, 2023), https://perma.cc/6YH9-RPDF. ...................... 24

USIP, *USIP Announces New Grants* (Dec. 23, 2022), https://perma.cc/3LL7-4YZY .................................................................12

## GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| FTC | Federal Trade Commission |
| GSA | General Services Administration |
| JA | Joint Appendix |
| MSPB | Merit Systems Protection Board |
| NLRB | National Labor Relations Board |
| USIP | United States Institute of Peace |

## INTRODUCTION

The Constitution vests the entirety of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. As the Supreme Court has long held, that executive power encompasses the authority to remove those who aid the President in carrying out his duties—including, in this case, Board members of the United States Institute of Peace (USIP), an Executive Branch agency. Yet the district court countermanded the President's removal of plaintiff Board members from their positions, ordering their reinstatement to their former offices. It also held that subsequent actions undertaken after those removals to reform USIP were null and void. That extraordinary relief causes grave harm to the separation of powers by permitting principal officers to wield executive power over the President's objection and undermining the President's ability to exercise his core Article II authority.

The district court wrongly concluded that the President lacks authority to remove USIP's Board members except under the conditions set out in 22 U.S.C. § 4605(f). Those statutory restrictions are unconstitutional. The President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Public Co. Acct.*

*Oversight Bd.*, 561 U.S. 477, 513-14 (2010). The Supreme Court in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), recognized a limited exception to at-will removal for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 216 (2020). But that exception does not encompass USIP, which is part of the Executive Branch and plainly exercises substantial executive power. *See U.S. Inst. of Peace v. Jackson*, No. 25-5185, 2025 WL 1840572, at *1-2 (D.C. Cir. June 27, 2025) (per curiam) (granting stay pending appeal).

Moreover, under longstanding precedent, permanent equitable relief reinstating principal executive officers is unavailable. Even apart from the fact that plaintiffs' claims fail on the merits, the balance of hardships and the public interest also do not warrant an injunction, as "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Reinstatement impinges on the President's "conclusive and preclusive" "power of removal in executive agencies," which "disables the Congress from acting upon the subject," and means that "the courts have

no power to control the President's discretion." *Trump v. United States*, 603 U.S. 593, 607, 609 (2024) (citation modified). At bottom, the public interest is best served by permitting the elected President to determine who ought to be entrusted with the Constitution's executive power. The district court's order should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1361, 1651, 2201, and 2202, and 22 U.S.C. § 4601. JA27. On May 19, 2025, the district court granted plaintiffs' summary judgment motion and issued declaratory and permanent injunctive relief. JA297-300. The government timely filed a notice of appeal on May 21, 2025. JA400. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

**1.** Whether the President has authority under Article II of the Constitution to remove at will members of the Board of Directors of USIP.

**2.** Whether the district court exceeded its remedial authority in ordering the reinstatement of principal officers the President determined should no longer be entrusted with executive power.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.**    In the midst of the Cold War, "people throughout the world [we]re fearful of nuclear war, … divided by war and threats of war, [and] experiencing … hostilities from rapid international change and real and perceived conflicts over interests."  United States Institute of Peace Act, Pub. L. No. 98-525, tit. XVII, § 1702, 98 Stat. 2492, 2649-50 (1984) (USIP Act) (codified at 22 U.S.C. § 4601).   Under those circumstances, Congress identified a "deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict."  22 U.S.C. § 4601(a)(1).  And Congress recognized that "many potentially destructive conflicts among nations and peoples have been resolved constructively and with cost efficiency at the international, national, and community levels through proper use of such techniques as negotiation, conciliation, mediation, and arbitration."  *Id.* § 4601(a)(3).

In light of the urgency of the moment, and citing "the Nation's interest in promoting international peace," Congress created USIP.   22 U.S.C. § 4601(a)(7).  Bearing the moniker of the United States, *id.* § 4603(e)(2), USIP was founded as "a living institution embodying the heritage, ideals, and concerns of the American people," *id.* § 4601(a)(1).  Congress envisioned that

USIP would "serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." *Id.* § 4601(b). Accordingly, by design, USIP would fulfill "a need for *Federal* leadership to expand and support the existing international peace and conflict resolution efforts of the Nation." *Id.* § 4601(a)(6) (emphasis added).

**2.** Congress imbued USIP with the "[g]eneral authority" to "do any and all lawful acts and things necessary or desirable to carry out the objectives and purposes of this chapter." 22 U.S.C. § 4604(m). And Congress also delineated activities for USIP to engage in to carry out those objectives, supplying specific directives to guide the exercise of its powers. Specifically, USIP is authorized to "establish" and administer two specific peace programs and a scholarship program, *id.* § 4604(b)(1), (3), (10); administer an annual award program, *id.* § 4604(c); and "develop" additional "programs to make international peace and conflict resolution research, education, and training more available and useful," *id.* § 4604(b)(4). As part of those activities, USIP provides "stipends, grants, fellowships, and other support to … leaders and scholars" from home and

abroad and "conduct[s] training, symposia, and continuing education programs" for "practitioners, policymakers, [and] policy implementers," including "noncitizens." *Id.* § 4604(b)(1), (6).

USIP further "undertake[s] extension and outreach activities ... by making grants and entering into contracts with [various] institutions" and "public departments and agencies." 22 U.S.C. § 4604(d). Such grants and contracts can be made for various purposes, including to "educate and train individuals in peace and conflict resolution theories, methods, techniques, programs, and systems" and to "promote the other purposes of this chapter." *Id.* § 4604(d)(3), (6). "[A]t least one-fourth of the Institute's annual appropriations" are required to "be paid to such nonprofit and official public institutions" through grants and contracts. *Id.* § 4604(d).

Additionally, USIP is authorized to "establish a clearinghouse ... for disseminating information"—including "classified information"—"from the field of peace learning." 22 U.S.C. § 4604(b)(8). And USIP can secure and work with classified information in carrying out various activities, including undertaking requested studies and reports or contracts for classified research. *See id.* § 4604(b)(3), (b)(9), (e), (h)(1).

**3.** Although its organic statute provides that, for statutory purposes, USIP shall be organized as "an independent nonprofit

corporation," 22 U.S.C. § 4603(b), for constitutional purposes USIP is a governmental entity subject to executive control. *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995); *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 485-86 (2010). As discussed above, USIP's duties and functions are prescribed by statute. *See* 22 U.S.C. § 4604. USIP funds this work through congressional appropriations, *id.* § 4609 (with the exception of outside gifts or contributions that may only be used to maintain its facility or provide hospitality, *id.* § 4604(h)(3)). USIP is prohibited from issuing stock, *id.* § 4603(b), and upon its dissolution, its assets "shall revert to the United States Treasury," *id.* § 4610. The Federal Tort Claims Act applies to the acts of USIP's officers and employees. *Id.* § 4606(f)(1).

Additionally, USIP is authorized to operate using "'United States' or 'U.S.' or any other reference to the United States Government or Nation in its title or in its corporate seal, emblem, badge, or other mark of recognition." 22 U.S.C. § 4603(e)(2). And its everyday functions are subject to executive oversight. *See id.* §§ 4605(b)(1)-(3), 4606(d)(2). Among other things, USIP must annually submit reports to the President "detailing [its] progress ... in carrying out" its statutory purposes. *Id.* § 4611. USIP must also undergo annual audits and report them to the President. *Id.* § 4607(g)-(h).

USIP operates under the leadership of a Board of Directors, 22 U.S.C. § 4605(a), composed of three voting ex officio members—the Secretaries of State and Defense and the president of the National Defense University—and 12 members "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 4605(b). This appointment method—employed for officers of the United States, U.S. Const. art. II, § 2, cl. 2—was used for USIP to "avoi[d] any possible constitutional questions." H.R. Rep. No. 98-1080, at 352 (1984) (Conf. Rep.). While no more than eight Board members can be from the same political party, 22 U.S.C. § 4605(c), this allows for majority control of the Board by the President's political party. USIP's Board, in turn, selects USIP's president. *Id.* § 4606(a).

Congress provided that the President can remove Board members (1) "in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties"; (2) "upon the recommendation of eight voting members of the Board"; or (3) "upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate." 22 U.S.C. § 4605(f). When President Ronald Reagan signed the USIP Act

into law, he noted these provisions could not be invoked to interfere with the President's constitutional authority to remove Board members at will. Nat'l Archives, *Statement on Signing the Department of Defense Authorization Act, 1985* (Oct. 19, 1984), https://perma.cc/B3JB-3JZQ ("I have been advised by the Attorney General that [22 U.S.C. § 4605(f)], relating to the President's power to remove members of the Board of Directors of the Institute, *is neither intended to, nor has the effect of, restricting the President's constitutional power to remove those officers.*" (emphasis added)).

## B. Factual Background

In exercising its statutory authority, USIP plays a significant role in the realm of international peace negotiation. USIP has a "presence in twenty-six countries around the world, including seven field offices." JA22. As of March 2025, it employed 414 employees and personal service contractors to carry out its functions. JA22. And Congress regularly appropriates around $50 million for USIP's annual operating expenses. Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. I, 136 Stat. 4459, 4981 (2022) ($55 million); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022, Pub. L. No. 117-103, div. K., tit. I, 136 Stat. 49, 572

(2022) ($54 million); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2021, Pub. L. No. 116-260, div. K, tit. I, 134 Stat. 1182, 1699 (2020) ($45 million).

As plaintiffs explain, "pursuant to [USIP's] congressional mandate," it carries out its work in "clos[e]" "collaborat[ion]" with "presidential administrations."  JA458.  In order "to be responsive to Administration priorities," USIP is in "constant communication with a wide spectrum of Executive branch agencies … to ensure that its work furthers common goals." JA458.  It views its role as "advanc[ing] U.S. national security and seek[ing] to make America safer, stronger and more prosperous, by reducing the risk that the United States will be drawn into costly foreign wars."  JA456.

Accordingly, through the exercise of its statutory authority, USIP "engages in extensive activities within the domain of the President's foreign affairs powers."  *U.S. Inst. of Peace v. Jackson*, No. 25-5185, 2025 WL 1840572, at *2 (D.C. Cir. June 27, 2025) (per curiam).  Most significantly, as plaintiffs' own filings in this litigation demonstrate, "USIP has engaged in peacebuilding with conflict parties, armed groups, key civil society actors, and other stakeholders" abroad, efforts which "have led to peace discussions and, ultimately, peace agreements."  JA532; *see* JA517 (explaining that USIP "convene[s] and facilitate[s] dialogue between groups in conflict").

For instance, in the southern Philippines, USIP "discreetly facilitate[d] ceasefire efforts" between the Philippines government and the Moro Islamic Liberation Front in advance of "local elections."  JA520-21.  Its efforts to "engage both sides directly as a third party" were successful, and "[t]he ceasefire did not break down."  JA521.  In the South Caucasus region, "USIP facilitated informal conversations with the Azerbaijani and Armenian Embassies about what would be needed by both sides to reach a peace agreement ending their 30-plus year war," ultimately leading to such an agreement in March 2025.  JA524.  In Iraq, USIP worked "to facilitate reconciliation between Iraqi tribes."  JA496.  Elsewhere in the Middle East, USIP has "br[ought] together trusted Palestinian, Israeli, and regional interlocutors to work together on problem-solving related to post-conflict recovery and stabilization in Gaza."  JA533.  In Afghanistan, USIP successfully "convene[d] a variety of Afghan and international stakeholders at USIP's office" in Kabul and "created a neutral space for peacebuilders to engage in open dialogue" there.  JA759.

USIP also works with foreign governments to "conduc[t] conflict analysis" and "provid[e] USIP-developed policy options to consider to foreign governments within USIP's expertise."  JA514-15.  For instance, in

June 2024, USIP "provided options for top Ukrainian leadership which were based … on USIP's analysis of the issues." JA515.

USIP further "shapes foreign affairs in the interest of the United States through the exercise of soft power," *Jackson*, 2025 WL 1840572, at *2, by means of its funding and training programs that support foreign actors. For example, USIP's 2022 grant competition focused on reforming multilateral peacebuilding and issued grants to foreign recipients, including South Africa's Centre for the Study of Violence and Reconciliation and the University of Toronto. USIP, *USIP Announces New Grants* (Dec. 23, 2022), https://perma.cc/3LL7-4YZY. And USIP fields "[r]equests from foreign governments" to "hos[t] events and speeches from foreign officials … or peacebuilding trainings for foreign government entities." JA514-15.

### C. Prior Proceedings

**1.** On February 19, 2025, the President issued Executive Order 14,217, directing that "[t]he non-statutory components and functions of [certain identified] governmental entities shall be eliminated to the maximum extent consistent with applicable law." Exec. Order 14,217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10,577, 10,577 (Feb. 25, 2025). "[S]uch entities" were also ordered to "reduce the performance of their statutory functions and associated personnel to the

minimum presence and function required by law." *Id.* USIP was among the identified entities. *Id.*

The White House Presidential Personnel Office subsequently notified USIP's appointed Board members they had been terminated. JA313, 785-89. The remaining ex officio Board members thereafter removed the then-acting president of USIP and designated Kenneth Jackson, and later Nate Cavanaugh, as acting presidents. *See* JA461, 480. Under new leadership, USIP transferred title of its headquarters building to the General Services Administration (GSA). JA484-89.

**2.** Six of USIP's terminated Board members and its former president brought suit, challenging their removals and the subsequent actions taken by newly designated leadership. *See* JA19-46. On May 19, 2025, the district court entered summary judgment for plaintiffs, holding that the President's removal of Board members was ultra vires and the removals and subsequent actions of the agency were without legal effect. JA386-99. The court agreed with defendants that USIP is part of the federal government for purposes of constitutional separation-of-powers principles. JA340-48. The court concluded, however, that USIP is not part of the Executive Branch and thus not subject to the President's Article II removal authority. JA348-73. The court also concluded that, even assuming USIP is

subject to Article II, its statutory removal restrictions are constitutional under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), because USIP is led by a multimember, politically balanced board of experts and exercises at most *de minimis* executive power. JA373-86. The court ordered that plaintiffs shall continue to serve as Board members and president and enjoined defendants from purporting to act on behalf of USIP and from maintaining or exercising any access or control over USIP's property and systems. JA296.

A unanimous panel of this Court stayed the district court's order pending appeal. *See Jackson*, 2025 WL 1840572, at *2. The panel reasoned that, "[a]s a general rule, the President may remove executive officers at will," subject to a "narrow exception for 'multimember expert agencies that do not wield substantial executive power' and that exercise 'quasi-judicial' or 'quasi-legislative' power." *Id.* at *1 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 217-18 (2020)). The panel concluded that the government "is likely to succeed on its claim that the [USIP] Board's removal protections are unconstitutional" "[b]ecause the Institute exercises substantial executive power[s]" in the "domain of the President's foreign affairs powers." *Id.* at *1-2. The panel further concluded that "[t]he President faces irreparable harm from not being able to fully exercise his executive powers," which

"outweighs any harm the removed board members may face." *Id.* at *2. Finally, the panel determined "a stay is in the public interest because the people elected the President, not the removed board members, to wield the executive power." *Id.*

The Court subsequently denied plaintiffs' petition for rehearing en banc of the panel's stay order. Order 1 (July 25, 2025).

## SUMMARY OF ARGUMENT

**I.** The Constitution generally vests the President with authority to remove principal executive officers at will. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213-14 (2020). The Supreme Court has recognized two narrow exceptions to the President's removal power—one for certain inferior officers (not at issue here), *id.* at 217, and another for multimember agencies that exercise "no part of the executive power" and "do not wield substantial executive power," *id.* at 215, 218 (quotation marks omitted). Because USIP is a governmental organization in the Executive Branch wielding substantial executive power, it does not fit within the narrow exception established by *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its Board members are removable at will.

**II.** Separately, the district court erred by ordering that plaintiffs be fully reinstated as Board members. The district court's order amounts to *de*

*jure* reinstatement beyond the equitable authority of the court. A court may not enjoin the President in performance of his official duties, including the appointment and removal of principal officers. Accordingly, when principal officers have challenged their removals from office, they have historically sought legal remedies like backpay, not reinstatement. Finally, even if plaintiffs could demonstrate they prevail on the merits, equitable considerations weigh sufficiently in favor of the government that the entry of a permanent injunction was an abuse of discretion.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo. *American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d 649, 662 (D.C. Cir. 2019). The grant of permanent injunctive relief is reviewed for abuse of discretion. *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1361 (D.C. Cir. 2023).

## ARGUMENT

## I. The President Has Constitutional Authority To Remove Members Of USIP's Board At Will.

The Constitution empowers the President to remove at will principal officers leading a freestanding component within the Executive Branch and exercising substantial executive power, such as members of USIP's Board.

**A.  USIP Exercises Executive Authority as Part of the Executive Branch.**

   **1.  USIP is a governmental entity for purposes of the separation of powers.**

As the district court correctly determined, USIP is part of the federal government for purposes of constitutional separation-of-powers principles. JA330-48; *see also USIP v. Jackson*, No. 25-5185, 2025 WL 1840572, at *1 n.1 (D.C. Cir. June 27, 2025) (per curiam).

The Supreme Court has established a three-part framework "for determining whether a 'Government-created and -controlled corporation' is a government actor for constitutional purposes." *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (alteration omitted) (quoting *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)).  To qualify as governmental, Congress must have (1) "create[d] the corporation by special law," (2) "for the furtherance of governmental objectives," and (3) "retain[ed] for [the government] permanent" control over the corporation.  *Id.* (alteration omitted) (quoting *Lebron*, 513 U.S. at 400).

Applying that framework, the Supreme Court has determined that Amtrak is a governmental entity for purposes of the First Amendment and separation-of-powers principles.  *See Lebron*, 513 U.S. at 397-400; *Department of Transp. v. Association of Am. R.Rs.* (*AAR*), 575 U.S. 43, 51-55 (2015).  As that Court explained, "[t]he political branches created Amtrak,

control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget." *AAR*, 575 U.S. at 55; *see Lebron*, 513 U.S. at 397-98. And as this Court subsequently reasoned, although Congress had made "a statutory disclaimer" of Amtrak's status as a governmental entity, "'the practical reality of federal control and supervision' … controls when determining an entity's status." *Herron*, 861 F.3d at 168 (quoting *AAR*, 575 U.S. at 55); *see Lebron*, 513 U.S. at 392-93 ("[I]t is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its action.").

Similarly here, the nature and purpose of USIP's creation, and permanent government control over its operations, demonstrate that USIP is a governmental entity for purposes of separation-of-powers analysis. USIP was established by special law "for the very purpose of pursuing federal governmental objectives." *Lebron*, 513 U.S. at 398; *see* USIP Act § 1702, 98 Stat. at 2649-50. Specifically, USIP's objective is "to serve the people and the Government" by "promot[ing] international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." 22 U.S.C. § 4601(b); *see* JA341-44.

Moreover, USIP operates "under the direction and control of federal governmental appointees." *Lebron*, 513 U.S. at 398. Of the 15 voting members of USIP's Board of Directors, three are ex officio members with other Executive Branch positions—the Secretaries of State and Defense, and the president of the National Defense University—and the remaining 12 are appointed by the President with the advice and consent of the Senate. 22 U.S.C. § 4605(b). The federal government also controls USIP's ownership. *See AAR*, 575 U.S. at 51-52. USIP is prohibited from issuing stock, and thus, having private owners or members. 22 U.S.C. § 4603(b). And upon USIP's dissolution, all of its assets would revert to the Treasury. *Id.* § 4610.

Further, USIP is "dependent on federal financial support." *AAR*, 575 U.S. at 53. It is funded by congressional appropriations and prohibited from receiving non-governmental sums to fund any operations apart from certain facilities and hospitality costs. 22 U.S.C. §§ 4604(h), 4609; *see* JA305-06, 342. The political branches also supervise USIP's operations. *See AAR*, 575 U.S. at 52-53. In addition to the sitting Executive Branch officials on its Board, *see* 22 U.S.C. § 4605(b)(1)-(3), USIP's budget requests are subject to review and comment by the Office of Management and Budget, *id.* § 4608(a). And USIP is required to undergo annual audits, which must be reported to the President and each House of Congress, *id.* § 4607(g)-(h), and to make

biennial reports to Congress and the President "detailing the progress [USIP] has made in carrying out the purposes of this chapter," *id.* § 4611.

USIP must therefore be considered a governmental entity for purposes of the separation-of-powers issues in this case. Its organic statute provides that USIP is an "independent nonprofit corporation," 22 U.S.C. § 4603(b), and such congressional disclaimers can help inform an entity's "status as a Government entity for purposes of matters that are within Congress's control—for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the Administrative Procedure Act," *Lebron*, 513 U.S. at 392. But as with Amtrak, for constitutional purposes "the practical reality of federal control and supervision prevails over Congress' disclaimer of [USIP's] governmental status." *AAR*, 575 U.S. at 55.

## 2. USIP performs foreign-affairs functions as part of the Executive Branch.

As a governmental entity, USIP is necessarily situated within the Executive Branch given the role that it plays in the Nation's foreign affairs.

**a.** In assessing whether a federal entity is part of the Executive Branch for separation-of-powers purposes, this Court looks to the powers it exercises. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341-42 (D.C. Cir. 2012); *Kuretski v. Commissioner*, 755 F.3d

929, 939-45 (D.C. Cir. 2014). Here, USIP possesses powers "generally associated in modern times with executive agencies." *Intercollegiate Broad. Sys.*, 684 F.3d at 1342.

**i.** Most fundamentally, USIP is a governmental entity participating in foreign affairs, a field uniquely committed to the Executive Branch.

"Article II … provides allocation of foreign relations and national security powers to the President, the unitary chief executive." *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005). "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (quotation marks omitted). In particular, the President has the power "to make Treaties," to "appoint Ambassadors," and to "receive Ambassadors and other public Ministers." U.S. Const. art. II, §§ 2-3. Relatedly, the President has "the power to open diplomatic channels … by engaging in direct diplomacy with foreign heads of state and their ministers," and the "exclusive recognition power," which "encompasses the authority to acknowledge, in a formal sense, the legitimacy of other states and governments, including their territorial bounds." *Zivotofsky v. Kerry*, 576 U.S. 1, 13-14, 17 (2015).

The Supreme Court has accordingly "described the President as possessing 'plenary and exclusive power' in the international arena and 'as the sole organ of the federal government in the field of international relations.'" *Schneider*, 412 F.3d at 195 (quoting *Curtiss-Wright Exp. Corp.*, 299 U.S. at 320). Although Congress has some "lawmaking power in the field of international relations," "[t]he President ... ha[s] a unique role in communicating with foreign governments." *Zivotofsky*, 576 U.S. at 21. USIP was expressly created to assist the Executive Branch's efforts in international peacekeeping and diplomacy, including by working with foreign governments and other foreign actors. *See* 22 U.S.C. § 4601. The nature of USIP's functions is thus uniquely executive, given the President's independent constitutional authority in this sphere.

USIP is authorized to "do any and all lawful acts and things necessary or desirable to carry out the objectives and purposes" of its enabling act. 22 U.S.C. § 4604(m). Among those objectives is to fill "a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation," which involves "such techniques as negotiation, conciliation, mediation, and arbitration." *Id.* § 4601(a)(3), (6). To further this purpose, USIP carries out direct engagement activities abroad to "facilitate peace and avoid conflict," including "serving as a third-party

neutral in a peace mediation." JA366-67; *see* JA532 ("USIP has engaged in peacebuilding with conflict parties, armed groups, key civil society actors, and other stakeholders" which "have led to peace discussions and, ultimately, peace agreements."). USIP has a strategic presence in "twenty-six countries around the world, including seven field offices," JA22, in order to help mitigate "potentially destructive conflicts among nations" that could impact American national security, 22 U.S.C. § 4601(a)(3); *see* JA456 ("The Institute advances U.S. national security and seeks to make America safer, stronger and more prosperous … .").

Plaintiffs' own declarations demonstrate that USIP communicates directly with representatives of foreign governments in its diplomatic efforts. *See* JA743 (explaining that USIP acts "as a convener" in "implementing track 1.5 dialogues," "which bring together government officials with nongovernmental entities"); JA545-48 (explaining "Track One and a Half Diplomacy"); JA759 (explaining that former program director at USIP "frequently met with … foreign government officials"). For example, in Southeast Asia, "USIP was asked by both the Philippines government and the former combatants … to discreetly facilitate ceasefire efforts between the two sides." JA521. And "USIP facilitated informal conversations with the

Azerbaijani and Armenian Embassies" about a potential peace agreement. JA524.

Facilitating the foreign policy of the United States by brokering peace among foreign governments and other warring parties on the international stage is plainly an exercise of executive power under our Constitution. Indeed, the President and the Department of State regularly engage in such efforts. *See, e.g.*, Miranda Jeyaretnam, *Trump Brokers Ceasefire to End '12 Day War' Between Israel and Iran*, Time (June 24, 2025), https://perma.cc/YXA2-LWBP?type=image; Britt Clennett, *Cambodian official praises Trump's role in 'bringing peace' as ceasefire with Thailand takes hold*, ABC News (July 29, 2025), https://perma.cc/J74K-SRNQ.

Similarly, Congress has expressly authorized the Secretary of State to act "through … [USIP]" to "provide assistance for the purpose of professionalizing the Sudanese security and intelligence services." 22 U.S.C. § 10010(b)(1). That objective is similar to those pursued by other quintessentially Executive Branch entities. *See, e.g.*, U.S. Army Sec. Assistance Command, U.S. Army, *History of USASAC*, https://perma.cc/X6HA-GGR6; U.S. Army Sec. Assistance Command Pub. Affs., *SATMO helping Liberia professionalize its military force with instructor training* (May 24, 2023), https://perma.cc/6YH9-RPDF.

Additionally, when USIP learns "valuable information" in working abroad and with foreign groups—sometimes in regions or from groups to which other Executive Branch agencies do not have access—USIP shares that information "to assist U.S. government representatives in their assessments." JA533 (discussing information from gathering of "Palestinian, Israeli, and regional interlocutors" regarding "post-conflict recovery and stabilization in Gaza"); *see* JA764 (explaining that from work in Somalia and Ethiopia, USIP provided to other government entities "analysis … along with other information gathered from a range of sources … to guide their decisions"). Such on-the-ground information gathering and sharing, to facilitate the Executive Branch's foreign-affairs activities, is also an executive function.

**ii.** In furtherance of its role in foreign affairs, USIP exercises various powers shared by other Executive Branch agencies.

USIP has the power to "mak[e] grants and ente[r] into contracts with [educational] institutions … [and] public departments and agencies" to "initiate, strengthen, and support basic and applied research on international peace and conflict resolution," "train individuals in peace and conflict resolution theories, methods, techniques, programs, and systems," and "promote the other purposes of this chapter." 22 U.S.C. § 4604(d). At

least one quarter of USIP's annual appropriations must be paid out through such grants. *Id.* USIP's grant-making and contracting authorities are consistent with the functions of other executive agencies.[2] As the Supreme Court held in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), "determinations of eligibility for funds" is a function "usually performed by independent regulatory agencies or by some department in the Executive Branch" and represents "a significant governmental duty." *Id.* at 140-41.

USIP is also empowered to establish and develop programs on "international peace and conflict resolution research, education, and training." 22 U.S.C. § 4604(b)(1), (3), (4). Other executive agencies exercise similar powers in developing and administering programs to implement federal policy.[3] "[D]etermining which activities would be fitting and proper" to effectuate statutory purposes, and "planning, developing, and carrying out such activities," have long been understood to constitute "'purely executive

---

[2] *See, e.g.*, 28 U.S.C. § 530C(a)(4) (Department of Justice); 22 U.S.C. § 2656d (Department of State); 42 U.S.C. § 241(a)(3) (Department of Health and Human Services); *id.* § 2000c-3 (Department of Education); 49 U.S.C. § 330 (Department of Transportation); 7 U.S.C. §§ 3157, 7633 (Department of Agriculture).

[3] *See, e.g.*, 42 U.S.C. § 7112 (Department of Energy "administ[ers] ... Federal energy policy and programs," including by "develop[ing] plans and programs for dealing with domestic energy production and import shortages"); 22 U.S.C. § 2651a(b)(3) (Department of State "implement[s] ... United States public diplomacy policies and activities, including international educational and cultural exchange programs").

functions.'" *Administration of the John F. Kennedy Centennial Commission*, 41 Op. O.L.C. 1, 2-3 (2017) (citation modified); *see* S. Rep. No. 98-194, at 2 (1983) (recognizing that "plan[ning], sponsor[ing], and conduct[ing]" activities are "executive responsibilities" requiring presidential appointment).

Additionally, like other Executive Branch agencies, in carrying out its statutorily prescribed activities, USIP works with classified materials. Indeed, USIP is specifically authorized to "secure directly" from "any Federal department or agency" any classified information necessary to carry out its work. 22 U.S.C. § 4604(b)(9). And USIP is directed to "utiliz[e] to the maximum extent possible … classified materials from the Department of State, the Department of Defense, and the intelligence community" in establishing a program to study "the causes of war and other international conflicts and the elements of peace," as well as to "establish a clearinghouse … for disseminating … classified information … from the field of peace learning to the public and to government personnel." *Id.* § 4604(b)(3), (8). And USIP may fulfill requests and contracts for classified research. *Id.* § 4604(e), (h)(1).

**iii.** Unsurprisingly, it has thus been the longstanding position of the United States that USIP is a part of the Executive Branch.

In passing the USIP Act, Congress changed the proposed composition of the Board "to provide that all voting directors would be Presidential appointees confirmed by the Senate, *thus avoiding any possible constitutional questions*." H.R. Rep. No. 98-1080, at 352 (emphasis added); 130 Cong. Rec. 27,311-12 (1984) ("[T]he compromise included a change in the composition of the Institute's Board of Directors to avoid any constitutional problems which were feared under the composition originally proposed in S. 564 and H.R. 1249."); S. 564, 98th Cong. § 6(b) (1983) (proposing that Board include four members of Congress); H.R. 1249, 98th Cong. § 6(d) (1984) (same). Congress thus recognized that USIP Board members are officers of the United States, and as such, members of Congress could not hold those positions. *See* U.S. Const. art. I, § 6, cl. 2.

In subsequently signing the organic statute into law, President Reagan recognized that such members are Executive Branch officers, referencing his "constitutional power to remove" "members of the Board of Directors" of USIP and explaining the view of the Attorney General that § 4605(f) does not restrict that power. Nat'l Archives, *Statement on Signing the Department of Defense Authorization Act, 1985* (Oct. 19, 1984), https://perma.cc/B3JB-3JZQ.

Indeed, it would be particularly incongruous for USIP to exist outside of the Executive Branch given that three of its ex officio Board members—the Secretaries of State and Defense, and the president of the National Defense University—are clearly Executive Branch officials. *See* 22 U.S.C. § 4605(b). And the Board is designed to be controlled by the President's political party. *See id.* § 4605(c). Such presidential appointment and control underscore USIP's executive status. *See Intercollegiate Broad. Sys.*, 684 F.3d at 1341 (citing presidential appointment and removal as factor in concluding that Library of Congress was a "'component of the Executive Branch'").

**b.** The district court nevertheless held that, despite being part of the federal government and engaging in "'soft diplomacy,'" JA370, USIP is not part of the Executive Branch. *See* JA358-73. That holding was erroneous.

**i.** The district court's conclusion was premised on its view that USIP exists outside of the three branches as "an independent entity exercising inconsequential governmental power," JA298, that operates as "an external partner to, rather than an arm of, the Executive Branch," JA370. But that extraordinary conclusion is both internally inconsistent and in fatal tension with precedent of the Supreme Court and this Court.

Under the Constitution, there is no such thing as truly "independent" federal entities comprising a "fourth branch" of government. *See Federal*

*Mar. Comm'n v. South Carolina. State Ports Auth.*, 535 U.S. 743, 773 (2002) (Breyer, J., dissenting) ("'[I]ndependent' agencies, are more appropriately considered to be part of the Executive Branch."); *Seila Law LLC v. CFPB*, 591 U.S. 197, 240, 241 (2020) (Thomas, J., concurring in part and dissenting in part) (explaining that the "Constitution as written"—with "defined structural limitations … and the clear vesting of executive power in the President"—does not countenance "a *de facto* fourth branch of Government—independent agencies"). Indeed, "[t]he Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983). Accordingly, even agencies perceived as "independent" "sit uncomfortably at the outer periphery of the Executive Branch." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2517 (2025) (Kavanaugh, J., concurring).

As a component of the federal government, USIP thus must fall into one of three branches: the Legislative, the Executive, or the Judicial Branch. There is no serious claim that USIP exercises legislative or judicial power; it necessarily follows that USIP engages in its governmental activities as part of the Executive Branch. The Supreme Court and this Court have both

employed that process-of-elimination approach in determining where a governmental entity was situated. *See Springer v. Government of the Philippine Islands*, 277 U.S. 189, 202-03 (1928) ("The fact that [the duties at issue] do not fall within the [legislative or judicial] authority ... constitutes logical ground for concluding that they do fall within that of the remaining one of the three among which the powers of government are divided."); *Kuretski*, 755 F.3d at 943 ("Tax Court judges do not exercise the 'judicial power of the United States' .... Congress's establishment of the Tax Court as an Article I legislative court did not transfer the Tax Court to the Legislative Branch. It follows that the Tax Court exercises its authority as part of the Executive Branch."). Regardless, USIP's exercise of "substantial executive power[s]" in the "domain of the President's foreign affairs powers," *Jackson*, 2025 WL 1840572, at *1-2, affirmatively places it in the Executive Branch.

ii.     The district court also emphasized that Congress labeled USIP an "'independent nonprofit corporation,'" and "did not assign USIP to any branch at all." JA359. But as the court itself recognized, it is not congressional labels but "the powers exercised by an entity" that are "dispositive." JA356, 360 n.25, 361; *see AAR*, 575 U.S. at 50-51; *Lebron*, 513 U.S. at 392-93; *see also Intercollegiate Broad. Sys.*, 684 F.3d at 1341-42.

Similarly, the district court found it significant that USIP does not purport to represent the U.S. government and instead holds itself out as an "independent, nongovernmental organization when engaging with foreign groups." JA369. But as established (*supra* Part I.A.1), USIP *is* a governmental entity for purposes of this analysis, *see* JA330-48; and it uses the name of the United States in carrying out its activities, 22 U.S.C. § 4603(e)(2). The fact that an entity has some "functional independence" does not negate its "constitutional status"; as this Court has stressed, "Congress may afford the officers of [certain] entities a measure of independence from other executive actors, but they remain Executive-Branch officers subject to presidential removal." *Kuretski*, 755 F.3d at 943-44.

**iii.** The district court also concluded that USIP "does not execute, enforce, administer, interpret, or implement any law." JA362. That assertion is belied by USIP's enabling statute, which tasks it with "establish[ing]" and administering two specific peace programs and a scholarship program, 22 U.S.C. § 4604(b)(1), (3), (10); administering an annual award program, *id.* § 4604(c); "establish[ing]" an information dissemination system that includes classified information, *id.* § 4604(b)(8); and "develop[ing]" additional "programs to make international peace and

conflict resolution research, education, and training more available and useful," *id.* § 4604(b)(4). Significantly, USIP uses grants and contracts to "promote" the various "purposes" of the USIP Act. *Id.* § 4604(d)(6). USIP thus implements the Act through its grant-making and by establishing and administering the programs Congress authorized to be conducted under its purview. "[A]dminister[ing] the laws enacted by Congress" by "implement[ing] [federal] program[s]" thereunder are quintessential executive functions. *Printz v. United States*, 521 U.S. 898, 922 (1997).

Although USIP does not engage in rulemakings, adjudications, or enforcement actions to directly regulate and enforce the law against private parties, JA361-62, that is inapposite. Executing the law *against private parties* is not necessary to be considered a component of the Executive Branch. Rather, various executive entities primarily execute the law through other means, such as developing and administering programs to implement federal policy, or managing tasks focused on internal government administration.

The district court further characterized USIP's activities as "solely focused on research, education, and scholarship," JA362, asserting that such "tasks are not 'executive,'" JA363. As an initial matter, that characterization of USIP's activities is obviously wrong with respect to USIP's direct

facilitation of peace negotiations and international conflict resolution.  *See* JA521 (explaining that USIP "facilitate[d] ceasefire efforts" in the Philippines, "engag[ing] both sides directly as a third party").  More fundamentally, the court's ultimate conclusion is erroneous; there are multiple research and educational entities that are clearly part of the Executive Branch.[4]  Unlike with "private organizations—universities, NGOs, etc.," JA363, the purpose of federal research and educational entities is to further the underlying interests and objectives of the Nation, as determined by the Executive Branch.  That is precisely the purpose for which Congress established USIP.  *See* 22 U.S.C. § 4601.  The district court's view that USIP acts "in furtherance of its own priorities," JA365, and "is not furthering an Executive branch foreign policy," JA367, is contrary to the statute and plaintiffs' own understanding of USIP's role.  *See* JA457-58 (explaining that USIP "collaborates closely with the Executive branch with respect to its programmatic priorities" "pursuant to its congressional mandate").

---

[4] *See, e.g.*, 22 U.S.C. § 2719a (Foreign Service Institute); 15 U.S.C. § 271 (National Institute of Standards and Technology); 15 U.S.C. § 313c (National Weather Service); 10 U.S.C. § 2165 (National Defense University); 42 U.S.C. §§ 281-282 (National Institutes of Health); 42 U.S.C. §§ 1861-1862 (National Science Foundation); 20 U.S.C. § 956 (National Endowment for the Humanities).

And finally, the district court noted that USIP "supports both the Executive and Legislative branches" with its "research, education and training, and information services." JA301; *see* JA363-64, 379 n.33. But the work of other Executive Branch entities sometimes also involves supporting the other branches of government, like the U.S. Marshals Service, *see* 28 U.S.C. §§ 561(a), 566(a), 566(e)(1)(A); the Administrative Conference of the United States, *see* 5 U.S.C. § 594(1); Admin. Conf. of the U.S., *About ACUS*, https://perma.cc/NJ59-6A46; or the General Services Administration, *see* 40 U.S.C. § 301; GSA, *Congressional Services* (Apr. 14, 2025), https://perma.cc/BZQ3-SPS6; GSA, *Courthouse Program* (May 28, 2025), https://perma.cc/VYV7-QXY2. The fact that an entity provides reports or services to Congress, in its administration of federal laws and programs, does not render it independent from the Executive Branch.

## B. The President Has Constitutional Authority to Remove USIP Board Members at Will.

### 1. The President's presumptive power of removal and its limited exceptions.

**a.** Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). The President and Vice-President are the only elected

officials within the entire Executive Branch, and responsibility to the electorate requires that those wielding the President's executive authority must remain accountable to the President. *Id.* at 224. Accordingly, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund*, 561 U.S. at 513-14. "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514. It is thus well established that the President's removal power "is essential to the performance of his Article II responsibilities," *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 445 (5th Cir. 2022), and Congress cannot control the President's "conclusive and preclusive" removal authority "with respect to 'executive officers of the United States whom he has appointed,'" *Trump v. United States*, 603 U.S. 593, 608-09 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926)).

The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 204. First, the Court has held that "Congress could provide tenure protections to certain *inferior* officers with narrowly defined duties." *Id.*[5] Second, *Humphrey's*

---

[5] *See, e.g.*, *United States v. Perkins*, 116 U.S. 483 (1886); *Morrison v. Olson*, 487 U.S. 654 (1988).

*Executor* held that Congress could "give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Those exceptions represent the "outermost constitutional limits of permissible congressional restrictions on the President's removal power" under current precedent. *Id.* at 218 (quotation marks omitted).

There is no question that USIP's Board members are principal officers rather than inferior officers: Board members are appointed by the President with Senate confirmation, 22 U.S.C. § 4605(b)(4); *see* U.S. Const. art. II, § 2, cl. 2; oversee their own department, and are not subservient to any other principal officer, *see* 22 U.S.C. § 4605(a). Thus, the relevant question is whether USIP can be said to perform only "legislative and judicial functions" and therefore fall within the *Humphrey's Executor* exception. *Seila Law*, 591 U.S. at 216.

In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of Federal Trade Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 623. Despite reaffirming the then-recent holding in *Myers v. United States*, 272 U.S. 52 (1926), that the President has

"unrestrictable power ... to remove purely executive officers," the Court concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President." *Humphrey's Executor*, 295 U.S. at 628, 632. Instead, *Humphrey's Executor* understood the FTC to be a "body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or as a judicial aid." *Id.* at 628. Those duties, according to the Court, "c[ould ]not in any proper sense be characterized as an arm or an eye of the executive." *Id.* The Court understood the FTC not to be exercising executive power at all but rather to "ac[t] in part quasi legislatively and in part quasi judicially." *Id.* On that understanding, *Humphrey's Executor* upheld the provision restricting the removal of FTC Commissioners.

Soon after *Humphrey's Executor* was decided, its reach across the Executive Branch was understood to be limited. In 1938, Attorney General Robert Jackson explained that *Humphrey's Executor* did not apply to the Tennessee Valley Authority, which "does not exercise quasi-legislative or quasi-judicial functions," and thus the President enjoyed his "ordinary power to remove executive officers appointed by him." *Power of the President to Remove Members of the Tennessee Valley Authority from Office*, 39 Op.

Att'y Gen. 145, 146-47 (1938).  Thus, whatever the bounds "of congressional control" for quasi-judicial, quasi-legislative agencies, the President's "exclusive power of removal in executive agencies ... continued to be asserted and maintained."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 n.4 (1952) (Jackson, J., concurring).  That limitation was reiterated in *Seila Law*, which explained that *Humphrey's Executor* is limited to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions" that exercise no executive power.  591 U.S. at 217 (quoting *Humphrey's Executor*, 295 U.S. at 632).

Under *Humphrey's Executor*, the Supreme Court has sustained removal restrictions for the head of an executive agency on a single occasion. In *Wiener v. United States*, 357 U.S. 349 (1958), the Court held that the President lacked authority to remove a member of the War Claims Commission—a temporary agency created solely to hear and adjudicate benefits claims for "internees, prisoners of war, and religious organizations" who suffered injury "at the hands of the enemy" in World War II.  *Id.* at 349-50.  Although Congress did not impose any statutory removal restrictions, *id.* at 352, the Court held that the Commission's "tasks require absolute freedom from Executive interference," *id.* at 353.  The Court thus

held that the President could not remove a member of the Commission under "[t]he philosophy of *Humphrey's Executor*." *Id.* at 356.[6]

But the assumption on which *Humphrey's Executor* and *Wiener* rest—that those agencies' "quasi-legislative" and "quasi-judicial" powers were not actually executive power under the Constitution—has since been "repudiated" by the Supreme Court. *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part and dissenting in part). Executive agencies "since the beginning of the Republic" have made rules and conducted adjudications. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). While "[t]hese activities take 'legislative' and 'judicial' forms," they remain "exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *Id.* In other words, *Humphrey's Executor*'s conclusion that the 1935 FTC "did not exercise executive power has not withstood the test of time," *Seila Law*, 591 U.S. at 216 n.2, and "it is hard to dispute that" the agency's powers "would at the present time be considered 'executive,' at least to some degree," *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988).

_____

[6] The Supreme Court has since made clear that it will not infer removal restrictions, and Congress must "use very clear and explicit language" to "take away the power of at-will removal from an appointing officer." *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2448 (2025) (quotation marks omitted).

Because *Humphrey's Executor* rests on repudiated reasoning, the decision can be understood as precedential only as to the specific question it resolved. Nothing in *Humphrey's Executor*'s holding establishes a categorical approval for removal protections for multimember agencies that exercise materially different and materially greater executive power than the 1935 FTC.

Indeed, *Seila Law* confirms that *Humphrey's Executor*'s holding does not even include "latent powers that the [1935 FTC] may have had" but which were "not alluded to by the Court." *Seila Law*, 591 U.S. at 219 n.4. The Court instructed that *Humphrey's Executor* must be understood "on its own terms," *id.*, and that it approved removal restrictions for "an officer who occupies no place in the executive department and who exercises no part of the executive power," *Humphrey's Executor*, 295 U.S. at 628. Thus, while the *Seila Law* dissenters detailed the various and substantial executive powers that the 1935 FTC possessed, including investigations, enforcement actions, adjudications, rulemaking, and litigation authority, *Seila Law*, 591 U.S. at 286 n.10 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part), the Court explained that "what matters" for judging the constitutionality of different agencies "is the set of powers the

[*Humphrey's Executor*] Court considered as the basis for its decision," *id.* at 219 n.4 (majority opinion).

Through its involvement in the Executive Branch's foreign-affairs functions, USIP wields executive power in a manner meaningfully different and greater than the FTC powers considered in *Humphrey's Executor*. *Humphrey's Executor* thus cannot be stretched beyond its facts to uphold removal protections for an agency that "possesses substantially more executive power than the FTC did back in 1935." *CFPB v. Seila Law LLC*, 923 F.3d 680, 683 (9th Cir. 2019) (upholding the CFPB's removal restrictions), *vacated and remanded*, 591 U.S. 197. *Humphrey's Executor* does not extend so far, and after *Seila Law*, "only a very narrow reading of" that case "is still good law," meaning there is little "left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring).

Reading *Humphrey's Executor* as confined to the precise considerations then before the Court is consistent with how the Supreme Court and courts of appeals have applied binding precedent whose underlying foundations have since been eroded. For example, *Flast v. Cohen*, 392 U.S. 83 (1968), held that taxpayers have standing to challenge

statutes "authorizing the use of federal funds in a way that allegedly violates the Establishment Clause." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007) (plurality opinion). But the Supreme Court has refused to extend *Flast* to encompass other alleged violations of the Constitution or to challenges to executive expenditures not dictated by statute. *Id.* at 609-10 (collecting cases). Instead, *Flast* has a "narrow application" and "has largely been confined to its facts." *Id.* at 609 (quotation marks omitted).

The courts have likewise narrowly applied *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), which held that the sport of baseball was not subject to the antitrust laws, reasoning that baseball games were played and completed in a single state and thus were not interstate commerce even if teams continually travelled across state lines. *Id.* at 208-09. The Supreme Court has since rejected that understanding of interstate commerce, and it is "clear … the principle enunciated in *Federal Baseball* … is not to be extended to other businesses." *Haviland v. Butz*, 543 F.2d 169, 175 (D.C. Cir. 1976).

Similarly, the Supreme Court has held that under circumstances presented in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); *Davis v. Passman*, 442 U.S. 228 (1979); and

*Carlson v. Green*, 446 U.S. 14 (1980), courts may infer a damages cause of action directly under the Constitution. But the Court has stressed that, if there is "any reason to think that Congress might be better equipped to create a damages remedy," the courts may extend those cases no further. *Egbert v. Boule*, 596 U.S. 482, 492 (2022); *accord Goldey v. Fields*, 606 U.S. 942, 944 (2025). "The Supreme Court has [thus] effectively made clear that the only occasions in which a damages remedy can be implied for a constitutional violation are those with the exact kind of facts that gave rise to three *Bivens* cases." *K.O. by & through E.O. v. Sessions*, 41 F.4th 664, 665 (D.C. Cir. 2022) (Silberman, J., concurring).

**b.** The district court purported to apply the standard from *Seila Law* and inquire whether USIP "'wield[s] substantial executive power." JA375 (quotation marks omitted); *see* JA377 n.32; JA380. But the court ultimately considered factors that are irrelevant to that analysis, asking whether presidential control over USIP was needed to "promote political accountability," JA379, whether protection from at-will removal was needed to ensure "sufficient independence to achieve the statutory tasks Congress set out," JA380, and whether the President had control over USIP through other means, JA383-84. Such considerations might be relevant if the court

had been writing on a blank slate, but they have no place in the actual inquiry here.

Accordingly, because USIP exercises "substantial executive power," *Seila Law*, 591 U.S. at 218, it falls outside the exception for multimember agencies recognized in *Seila Law*. Indeed, even this articulation of the test may be overly tolerant of restrictions on the President's removal authority. After *Seila Law*, the Supreme Court clarified that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Collins v. Yellen*, 594 U.S. 220, 253 (2021); *see also id.* at 273 (Kagan, J., concurring in part and concurring in the judgment) (stating that the *Collins* majority "exten[ded]" *Seila Law*'s holding and dropped the qualifier of "significant" executive power); *id.* at 293 (Sotomayor, J., concurring in part and dissenting in part) (noting that the "words" "significant executive power" "appear nowhere in today's decision" (quotation marks omitted)). Under this articulation, *any* exercise of executive power subjects an agency head to the President's control.

The point in *Collins* was that once the Court had determined that a federal agency exercised executive power, it presumptively fell within the

President's control of at-will removal, and courts are not well-suited to craft judicial exceptions to the Constitution's structure for the chain-of-command in the Executive Branch. "At-will removal ensures that" principal officers "'will depend, as they ought, on the President, and the President on the community" and "[t]hese purposes are implicated whenever an agency does important work," which courts are not "well-suited" to weigh and compare. *Collins*, 594 U.S. at 252-53 (quotation marks omitted).

*Collins* thus suggests that the district court further erred in assessing the degree of authority exercised by USIP and concluding that, even if USIP exercised some executive power, it was not enough to require at-will removal. *See* JA379 ("Even if USIP *were* exercising some degree of the Executive branch's foreign affairs power, that would not take USIP outside the scope of *Humphrey's Executor*."); *see also* JA377-81. In any event, because USIP exercises substantial executive authority, *see infra* Part I.B.2, under any articulation of the test, the statutory limitations on the President's removal of officials from that body are invalid.

> **2.    USIP exercises substantial executive authority and thus its Board members must be subject to at-will removal.**

**a.**    USIP wields substantial executive authority and is not a "mere legislative or judicial aid." *Seila Law*, 591 U.S. at 218. It performs clearly

executive functions in a field of significant importance to the Executive Branch: foreign affairs. Given those substantial executive powers, Congress may not restrict the President's constitutional authority to remove USIP's Board members. The district court's conclusion that USIP nonetheless exercises no executive power, and that Congress can restrict the removal of its agency heads, constitutes an unprecedented intrusion into the Executive Branch's foreign-affairs power, and impinges on the President's removal authority even more severely than in other substantive contexts.

As discussed, USIP is empowered to discharge quintessential executive duties. USIP establishes and develops various programs to carry out its statutory purposes, 22 U.S.C. § 4604(b)(1), (3), (4), (10); and makes grants to nonprofit and public institutions to do the same, *id.* § 4604(d). Significantly, those statutory purposes are to further the foreign-affairs interests of the United States by assisting peace efforts internationally. Through such activities, USIP clearly "exercise[s] considerable executive power." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025).

**b.** In concluding that USIP does not exercise substantial executive power, the district court emphasized that USIP "does not determine private citizens' rights to public benefits, issue orders, investigate violations of the law, or impose sanctions, unlike the entities in *Humphrey's Executor* and

*Wiener*." JA377. But those are hardly the only forms of executive power that can qualify as substantial. USIP implements a federal statute aimed at furthering the Nation's foreign policy agenda, using its discretion regarding how best to administer various funding, training, and on-the-ground peacebuilding programs in service of those statutory objectives. In other words, USIP executes federal law relevant in the realm of foreign affairs.

In concluding to the contrary, the district court defined the President's "foreign affairs function" as limited to negotiating or entering agreements on behalf of the United States, JA364; *see* JA377, and emphasized that "USIP does not … meet with official foreign representatives," JA377. As plaintiffs' own declarations demonstrate, however, USIP engages directly with foreign government officials in its on-the-ground peacebuilding efforts. *See* JA520-21; JA524; JA759-60. And facilitating peace negotiations between foreign parties is a crucial element of the Executive Branch's diplomatic role in fostering international peace and avoiding foreign entanglements. *See, e.g.*, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 805 (D.C. Cir. 1984) (Bork, J., concurring) (referencing Camp David accords and centrality of Middle East in "American foreign relations for at least the last fifteen years").

Contrary to the district court's suggestion, JA378, the Supreme Court's decision in *Wiener* does not permit a federal agency to exercise the

President's foreign-affairs powers without being subject to at-will removal. As discussed, the premise of *Wiener* has since been repudiated. *See supra* pp.38-40. In any event, USIP does not exercise the "quasi-judicial" powers that defined the Commission in *Wiener*. 357 U.S. at 354-55. Its peace-brokering functions can only be described as exercises of executive power.

**c.** Finally, and independently, whatever the outer scope of *Humphrey's Executor*, the decision does not permit Congress to "draw to itself" "the power to remove or the right to participate in the exercise of that power." *Myers*, 272 U.S. at 161; *see Bowsher v. Synar*, 478 U.S. 714, 721-27 (1986). Congress violated that constraint here by permitting *some* removals without cause or Board approval but only with the approval of members of certain congressional committees. *See* 22 U.S.C. § 4605(f)(3). The fact that Congress cannot "unilaterally" remove Board members, JA384 n.36, is inapposite. The removal provisions represent an unconstitutional effort by Congress to "aggrandize itself at the expense" of the Executive Branch, *Bowsher*, 478 U.S. at 727 (quotation marks omitted), by giving members of Congress a role in the removal process.

**II.** **The District Court Erred In Ordering The Reinstatement Of Principal Officers The President Had Already Removed.**

**A.** The district court further erred by ordering that plaintiffs' removal is "null, void, and without legal effect," that plaintiffs "remain members of the USIP Board," and that plaintiffs "shall continue to serve … and may not be removed or treated in any way as having been removed … except in accordance with § 4605(f)." JA294-96. Under the court's order, plaintiffs will continue serving as principal executive officers until the expiration of their four-year terms, 22 U.S.C. § 4605(e), even though the President has determined that they ought not be entrusted with executive authority. The grant of an impermissibly broad remedy in the form of reinstatement is an independent basis for this Court to reverse the district court's order.

**1.** The district court's *de jure* reinstatement of a principal officer is beyond the equitable authority of the court to impose because reinstatement impinges on the President's "conclusive and preclusive" "power of removal in executive agencies," which "disables the Congress from acting upon the subject," and means that "the courts have no power to control the President's discretion.'" *Trump*, 603 U.S. at 607, 609 (citation modified); *see Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025)

(Katsas, J., dissenting); *Bessent v. Dellinger*, 145 S. Ct. 515, 516-18 (2025) (Gorsuch, J., dissenting from order holding application in abeyance) (voting to stay reinstatement of removed Special Counsel on ground that district court exceeded its remedial authority); *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting) ("[T]he injunctive relief concocted by the district court is wholly unprecedented and transgresses historical limits on our equitable authority."). As Judge Katsas explained, there would be no doubt of "grave and irreparable" injury if the district court had ordered reinstatement of a dismissed Secretary of State, and any differences between the Department of State and USIP "g[o] to the extent—not the character—of the President's injury." *Dellinger*, 2025 WL 559669, at *16 (Katsas, J., dissenting).

The Supreme Court recognized long ago that a court "has no jurisdiction … to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). The appointment and removal of principal officers is specifically entrusted to the President, *see Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996), and thus a court may not, by injunction, order the reinstatement of a principal officer the President has removed. Accordingly, when principal officers have been removed from their posts, they generally have challenged that removal in

suits for backpay. *See, e.g.*, *Humphrey's Executor*, 295 U.S. at 618 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (similar); *Wiener*, 357 U.S. 349-51 (similar). That rule reflects the obvious Article II problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive officer removed by the President. The President cannot be compelled to retain the services of a principal officer whom he has removed from office.

The district court's reinstatement order also exceeds the scope of the court's equitable powers, which is limited to those remedies "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is … well settled that a court of equity has no jurisdiction over the appointment and removal of public officers … ." *In re Sawyer*, 124 U.S. 200, 212 (1888). Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a *federal* officer" reflect "a traditional limit upon equity jurisdiction"); *White v. Berry*, 171 U.S. 366, 377 (1898)

("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." (quotation marks omitted)); *accord Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting from order holding application in abeyance) (observing that "courts of equity at the time of the founding were apparently powerless" to stop the removal of executive officers).

The district court's order cannot be squared with these precedents. The court declared that plaintiffs "remain members of the USIP Board" and ordered that they "shall continue to serve ... and may not be removed or treated in any way as having been removed, or otherwise obstructed from carrying out their duties." JA295-96. This amounts to *de jure* reinstatement.

**2.** These equitable principles precluding reinstatement of a removed officer apply equally to subordinates. Nothing in *Baker* or *Sawyer* suggests that the longstanding principle that "traditional limit[s] upon equity jurisdiction" prohibit a court from "staying removal of a *federal* officer" do not apply as long as an injunction runs to a subordinate officer. *See Baker*, 369 U.S. at 231 (first citing *Sawyer*, 124 U.S. 200; then citing *Walton v. House of Representatives*, 265 U.S. 487 (1924); and then citing *White*, 171 U.S. 366). Furthermore, only the President has the authority to appoint, remove, and supervise agency heads, so any relief ordered by a court that

prevents the Board members' removals "necessarily targets the President." *Dellinger*, 2025 WL 559669, at *13 n.2 (Katsas, J., dissenting). Regardless of whom the order formally applies to, and however styled, an order that has the effect of reinstating a principal executive officer removed by the President violates both Article II and the limits on a court's equitable powers.

The district court relied on this Court's decisions in *Swan* and *Severino* to suggest that it could circumvent these limitations through "*de facto*" reinstatement by ordering "inferior officials" to treat removed officers as if they had been returned to office. JA394-95. But, as an initial matter, the district court's actual order went much further. Although not disputing that it could not enjoin the President, *see* JA395, the court appears to have enjoined the President when it "ORDERED" that plaintiffs "may not be removed"—*i.e.*, by the President—"except in accordance with § 4605(f)," JA296. And despite purporting to limit itself to some form of *de facto* reinstatement, the court "DECLARED" that plaintiffs' removal was "null, void, and without legal effect" and "ORDERED" that plaintiffs "shall continue to serve" as Board members. JA294, 296. This amounts to *de jure* reinstatement and goes beyond what this Court has even suggested, let alone held, may be available, *i.e.*, reinstating plaintiffs "*de facto*" by having subordinates "trea[t]" plaintiffs as if they were Board members. *See*

*Severino*, 71 F.4th at 1042-43 (quotation marks omitted) (confirming that the President "is the only person with the power to reappoint" an official who has been removed and "[i]nferior officials could not 'officially' reinstate a member of [a] board" (quoting *Swan*, 100 F.3d at 980)).

The district court also overread *Severino* and *Swan*. Those cases did not address a number of the remedial issues just discussed. And because the Court upheld the challenged removals in those cases, it had no occasion to impose a remedy. The Court has thus never permitted a "*de facto*" reinstatement. Rather, in the context of finding that the plaintiffs in those cases had standing to challenge removal by the President, the Court stated that it would be possible to grant "at least some of the relief" being sought by ordering some form of "*de facto*" reinstatement, such as, "at least in principle," "access" to a plaintiff's "former office," "includ[ing]" a plaintiff in "meetings," and "permit[ting] him to cast votes." *Severino*, 71 F.4th at 1042-43 (quotation marks omitted) (quoting *Swan*, 100 F.3d at 980). It is unclear what that could or would actually entail. *See id.* All that was necessary for finding standing was the possibility of providing "some of the privileges of [an] office." *Id.* at 1043. To the extent that the Court has suggested that an injunction could require full reinstatement, that was dicta. And that dicta would conflict with, among other things, the established

principle that equitable power may not be used to "restrain by injunction the removal of a [public] officer," *Sawyer*, 124 U.S. at 212.

**3.** The district court purported to sidestep these impediments to relief by framing its relief largely as a declaratory judgment. *See* JA394. But the same principles foreclose declaratory relief. The Declaratory Judgments Act "was not devised to deprive courts of … their freedom to withhold relief upon established equitable principles." *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943). Because "an injunction" to restrain the removal of an executive officer "would be impermissible," "declaratory relief should … be denied as well." *Samuels v. Mackell*, 401 U.S. 66, 73 (1971). Just as courts lack jurisdiction to enjoin the President's performance of official duties, *Mississippi*, 71 U.S. (4 Wall.) at 501, courts have "never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). The district court's order violates those principles. *See* JA295 (declaring that Board members "may be removed by the *United States President* only pursuant to the terms of 22 U.S.C. § 4605(f)" (emphasis added)).

**B.** The district court also erred when it suggested that if "equitable relief is unavailable here, … 'mandamus would *likely* be available.'" JA395 n.43 (emphasis added). Mandamus is a "drastic and extraordinary remedy

reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quotation marks omitted).  It requires that plaintiffs establish (1) "a clear right to relief"; (2) that defendants have "a clear duty to act"; and (3) that "no other adequate remedy [is] available." *In re National Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (quotation marks omitted).  Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consolidated Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002).  This Court has recognized that such a question is "difficult," *Swan*, 100 F.3d at 981, and plaintiffs here have not established that the President owes a "clear nondiscretionary duty" to reinstate them to office, *Heckler v. Ringer*, 466 U.S. 602, 616 (1984).  The President's selection of who should lead an Executive Branch agency is certainly not a mere ministerial task.  Moreover, plaintiffs have alternative remedies, including actions for backpay.  Mandamus would thus not be appropriate.

Additionally, this Court has long recognized that "mandamus is itself governed by equitable considerations and is to be granted only in the exercise of sound discretion." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quotation marks omitted); *see also In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) (explaining that mandamus is

discretionary "even if the plaintiff overcomes all these hurdles"). It must "be found by a court to be clear and compelling on both legal and equitable grounds for a writ to issue." *13th Reg'l Corp.*, 654 F.2d at 760. After *Seila Law*, the removal restrictions here are unconstitutional—and at a minimum their constitutionality is highly suspect. *Cf. Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 98 F.4th 646, 650 (5th Cir. 2024) (Oldham, J., joined by seven other judges, dissenting from denial of rehearing en banc). Especially given that the equitable factors weigh decisively in the government's favor, mandamus would not be proper.

C. Even where a plaintiff has prevailed on the merits, "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1361 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). Thus, even if the Court concludes that plaintiffs should prevail on the merits, it should reverse the grant of a permanent injunction because the district court abused its discretion in granting equitable relief to reinstate plaintiffs. This Court has made clear that when granting a permanent injunction, the district court must consider "the balance of hardships between the plaintiff and defendant" and whether "the public interest would

not be disserved by a permanent injunction." *Id.* at 1364 (quotation marks omitted). The "public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

The equitable factors weigh decisively in the government's favor here. In *Wilcox*, the Supreme Court stayed district court orders reinstating members of the MSPB and NLRB and premised that stay on its observation that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." 145 S. Ct. at 1415; *see Trump v. Boyle*, 145 S. Ct. 2653 (2025) (reiterating same equitable calculus for Consumer Product Safety Commission).

The district court's order works an extraordinary harm to the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 591 U.S. at 203. As a result of the order, six people whom the President has chosen to remove from office will exercise executive power over the President's objection. Indeed, as reinstated Board members, plaintiffs would be capable of voting on initiatives, including the funding of grants or the pursuit of various diplomatic endeavors, that are inconsistent with the President's intent that USIP be "reduc[ed in] the performance of

[its] statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order 14,217, 90 Fed. Reg. at 10,577. That sort of harm to the Executive, and to the separation of powers, is transparently irreparable.

Conversely, forgoing reinstatement would not harm plaintiffs. Although removal deprives them of employment and salary, the traditional remedy for such claims has been an award of backpay, not reinstatement. Backpay would not enable plaintiffs to perform the duties of their former offices, and the district court concluded that plaintiffs were harmed by being "'deprived of a presidentially appointed and congressionally confirmed position of high importance,' eliminating their ability to carry out their congressional mandate." JA390. But those duties are vested in the offices, and plaintiffs have no personal right to exercise the powers of an office after having been removed. The notion that public officials "have a separate private right, akin to a property interest, in the powers of their offices" is "alien to the concept of a republican form of government." *Barnes v. Kline*, 759 F.2d 21, 50 (D.C. Cir. 1984) (Bork, J., dissenting), *judgment vacated sub nom.*, *Burke v. Barnes*, 479 U.S. 361 (1987). Executive power belongs to the President, not to plaintiffs.

In granting permanent relief, the district court also pointed to alleged harms to USIP, namely the "'disruptive effect' that such removal has on the organization's leadership." JA390-92. But USIP itself is not properly viewed as a plaintiff in this litigation. Only six former Board members and the Board's former president are plaintiffs, meaning that a majority of the voting members of the formerly constituted Board did not authorize filing suit.

Finally, if the government prevails after all review, any actions taken by the Board with plaintiffs as members will be called into question and potentially voidable, upsetting expectations and risking placing regulated parties in a whipsaw. *See Collins*, 594 U.S. at 259 (explaining that plaintiffs contesting agency action based on unconstitutional removal restrictions can show "compensable harm" if "the President had attempted to remove [an agency head] but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal"). Plaintiffs' claimed equities cannot outweigh the grave and unprecedented harm this injunction causes to the separation of powers and the President's authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

# CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
SHARON SWINGLE
McKAYE L. NEUMEISTER
  */s/ Courtney E. Albini*
COURTNEY E. ALBINI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7511*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-7329*
  *Courtney.Albini2@usdoj.gov*

August 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,896 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ Courtney E. Albini*
Courtney E. Albini

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

_/s/ Courtney E. Albini_
Courtney E. Albini

**ADDENDUM**

# TABLE OF CONTENTS

22 U.S.C. § 4601 ................................................................ A1

22 U.S.C. § 4603 (excerpt) ................................................ A2

22 U.S.C. § 4604 ................................................................ A3

22 U.S.C. § 4605 ................................................................ A8

22 U.S.C. § 4606 (excerpt) .............................................. A12

22 U.S.C. § 4607 (excerpt) .............................................. A13

22 U.S.C. § 4609 ............................................................... A14

22 U.S.C. § 4610 ............................................................... A15

22 U.S.C. § 4611 ............................................................... A15

**22 U.S.C. § 4601**

## § 4601. Congressional declaration of findings and purposes

**(a)** The Congress finds and declares that--

    **(1)** a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict;

    **(2)** people throughout the world are fearful of nuclear war, are divided by war and threats of war, are experiencing social and cultural hostilities from rapid international change and real and perceived conflicts over interests, and are diverted from peace by the lack of problem-solving skills for dealing with such conflicts;

    **(3)** many potentially destructive conflicts among nations and peoples have been resolved constructively and with cost efficiency at the international, national, and community levels through proper use of such techniques as negotiation, conciliation, mediation, and arbitration;

    **(4)** there is a national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities with regard to the history, nature, elements, and future of peace processes, and to bring together and develop new and tested techniques to promote peaceful economic, political, social, and cultural relations in the world;

    **(5)** existing institutions providing programs in international affairs, diplomacy, conflict resolution, and peace studies are essential to further development of techniques to promote peaceful resolution of international conflict, and the peacemaking activities of people in such institutions, government, private enterprise, and voluntary associations can be strengthened by a national institution devoted to international peace research, education and training, and information services;

    **(6)** there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information;

    **(7)** the Commission on Proposals for the National Academy of Peace and Conflict Resolution, created by the Education Amendments of 1978,

recommended establishing an academy as a highly desirable investment to further the Nation's interest in promoting international peace;

**(8)** an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs, would be the most efficient and immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts; and

**(9)** the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence.

**(b)** It is the purpose of this chapter to establish an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence.

## 22 U.S.C. § 4603

## § 4603. United States Institute of Peace

### (a) Establishment

There is hereby established the United States Institute of Peace.

### (b) Status; restrictions

The Institute is an independent nonprofit corporation and an organization described in section 170(c)(2)(B) of Title 26. The Institute does not have the power to issue any shares of stock or to declare or pay any dividends.

**\* \* \***

### (e) Trade name and trademark rights; vested rights protected; condition for use of Federal identity

**(1)** The Institute has the sole and exclusive right to use and to allow or refuse others the use of the terms "United States Institute of Peace", "Jennings Randolph Program for International Peace", "Spark M. Matsunaga Medal of Peace", and "Endowment of the United States Institute of Peace" and the use of any official United States Institute of Peace emblem, badge, seal, and other mark of recognition or any colorable simulation thereof. No powers or privileges hereby granted

shall interfere or conflict with established or vested rights secured as of September 1, 1981.

**(2)** Notwithstanding any other provision of this chapter, the Institute may use "United States" or "U.S." or any other reference to the United States Government or Nation in its title or in its corporate seal, emblem, badge, or other mark of recognition or colorable simulation thereof in any fiscal year only if there is an authorization of appropriations for the Institute for such fiscal year provided by law.

## 22 U.S.C. § 4604

### § 4604. Powers and duties

### (a) District of Columbia nonprofit-corporative powers

The Institute may exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act consistent with this chapter, except for section 5(o) of the District of Columbia Nonprofit Corporation Act.

### (b) Description of specific activities

The Institute, acting through the Board, may--

**(1)** establish a Jennings Randolph Program for International Peace and appoint, for periods up to two years, scholars and leaders in peace from the United States and abroad to pursue scholarly inquiry and other appropriate forms of communication on international peace and conflict resolution and, as appropriate, provide stipends, grants, fellowships, and other support to the leaders and scholars;

**(2)** enter into formal and informal relationships with other institutions, public and private, for purposes not inconsistent with this chapter;

**(3)** establish a Jeannette Rankin Research Program on Peace to conduct research and make studies, particularly of an interdisciplinary or of a multidisciplinary nature, into the causes of war and other international conflicts and the elements of peace among the nations and peoples of the world, including peace theories, methods, techniques, programs, and systems, and into the experiences of the United States and other nations in resolving conflicts with justice and dignity and without violence as they pertain to the advancement of international peace and conflict resolution, placing particular emphasis on realistic approaches to

past successes and failures in the quest for peace and arms control and utilizing to the maximum extent possible United States Government documents and classified materials from the Department of State, the Department of Defense, and the intelligence community;

**(4)** develop programs to make international peace and conflict resolution research, education, and training more available and useful to persons in government, private enterprise, and voluntary associations, including the creation of handbooks and other practical materials;

**(5)** provide, promote, and support peace education and research programs at graduate and postgraduate levels;

**(6)** conduct training, symposia, and continuing education programs for practitioners, policymakers, policy implementers, and citizens and noncitizens directed to developing their skills in international peace and conflict resolution;

**(7)** develop, for publication or other public communication, and disseminate, the carefully selected products of the Institute;

**(8)** establish a clearinghouse and other means for disseminating information, including classified information that is properly safeguarded, from the field of peace learning to the public and to government personnel with appropriate security clearances;

**(9)** secure directly, upon request of the president of the Institute to the head of any Federal department or agency and in accordance with section 552 of Title 5 (relating to freedom of information), information necessary to enable the Institute to carry out the purposes of this chapter if such release of the information would not unduly interfere with the proper functioning of a department or agency, including classified information if the Institute staff and members of the Board who have access to such classified information obtain appropriate security clearances from the Department of Defense and the Department of State; and

**(10)** establish the Spark M. Matsunaga Scholars Program, which shall include the provision of scholarships and educational programs in international peace and conflict management and related fields for outstanding secondary school students and the provision of scholarships to outstanding undergraduate students, with program participants and recipients of such scholarships to be known as "Spark M. Matsunaga Scholars".

## (c) Annual award of Spark M. Matsunaga Medal of Peace

**(1)(A)** The Institute, acting through the Board, may each year make an award to such person or persons who it determines to have contributed in extraordinary ways to peace among the nations and peoples of the world, giving special attention to contributions that advance society's knowledge and skill in peacemaking and conflict management. The award shall include the public presentation to such person or persons of the Spark M. Matsunaga Medal of Peace and a cash award in an amount of not to exceed $25,000 for any recipient.

**(B)(i)** The Secretary of the Treasury shall strike the Spark M. Matsunaga Medal of Peace with suitable emblems, devices, and inscriptions which capture the goals for which the Medal is presented. The design of the medals shall be determined by the Secretary of the Treasury in consultation with the Board and the Commission of Fine Arts.

**(ii)** The Spark M. Matsunaga Medal of Peace shall be struck in bronze and in the size determined by the Secretary of the Treasury in consultation with the Board.

**(iii)** The appropriate account of the Treasury of the United States shall be reimbursed for costs incurred in carrying out this subparagraph out of funds appropriated pursuant to section 4609(a)(1) of this title.

**(2)** The Board shall establish an advisory panel composed of persons eminent in peacemaking, diplomacy, public affairs, and scholarship, and such advisory panel shall advise the Board during its consideration of the selection of the recipient of the award.

**(3)** The Institute shall inform the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate and the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives about the selection procedures it intends to follow, together with any other matters relevant to making the award and emphasizing its prominence and significance.

## (d) Description of extension and outreach activities

The Institute may undertake extension and outreach activities under this chapter by making grants and entering into contracts with institutions of postsecondary, community, secondary, and elementary education (including combinations of such institutions), with public and private educational,

training, or research institutions (including the American Federation of Labor--the Congress of Industrial Organizations) and libraries, and with public departments and agencies (including State and territorial departments of education and of commerce). No grant may be made to an institution unless it is a nonprofit or official public institution, and at least one-fourth of the Institute's annual appropriations shall be paid to such nonprofit and official public institutions. A grant or contract may be made to--

**(1)** initiate, strengthen, and support basic and applied research on international peace and conflict resolution;

**(2)** promote and advance the study of international peace and conflict resolution by educational, training, and research institutions, departments, and agencies;

**(3)** educate the Nation about and educate and train individuals in peace and conflict resolution theories, methods, techniques, programs, and systems;

**(4)** assist the Institute in its publication, clearinghouse, and other information services programs;

**(5)** assist the Institute in the study of conflict resolution between free trade unions and Communist-dominated organizations in the context of the global struggle for the protection of human rights; and

**(6)** promote the other purposes of this chapter.

## (e) Services for Federal agencies

The Institute may respond to the request of a department or agency of the United States Government to investigate, examine, study, and report on any issue within the Institute's competence, including the study of past negotiating histories and the use of classified materials.

## (f) Contracts for operation of Institute

The Institute may enter into personal service and other contracts for the proper operation of the Institute.

## (g) Personnel; administrative assistance

The Institute may fix the duties of its officers, employees, and agents, and establish such advisory committees, councils, or other bodies, as the efficient administration of the business and purposes of the Institute may require.

## (h) Grants and contracts; gifts and contributions; domestic and foreign restrictions

**(1)** Except as provided in paragraphs (2) and (3), the Institute may obtain grants and contracts, including contracts for classified research for the Department of State, the Department of Defense, the Arms Control and Disarmament Agency, and the intelligence community, and receive gifts and contributions from government at all levels.

**(2)** The Institute and the legal entity described in section 4603(c) of this title may not accept any gift, contribution or grant from a foreign government, any agency or instrumentality of such government, any international organization, or any corporation or other legal entity in which natural persons who are nationals of a foreign country own, directly or indirectly, more than 50 percent of the outstanding capital stock or other beneficial interest in such legal entity.

**(3)** Notwithstanding any other provision of this chapter, the Institute and the legal entity described in section 4603(c) of this title may not obtain any grant or contract or receive any gift or contribution from any private agency, organization, corporation or other legal entity, institution, or individual, except such Institute or legal entity may accept such a gift or contribution to--

**(A)** purchase, lease for purchase, or otherwise acquire, construct, improve, furnish, or maintain a suitable permanent headquarters, any related facility, or any site or sites for such facilities for the Institute and the legal entity described in section 4603(c) of this title; or

**(B)** provide program-related hospitality, including such hospitality connected with the presentation of the Spark M. Matsunaga Medal of Peace.

## (i) Fees for periodicals and other materials

The Institute may charge and collect subscription fees and develop, for publication or other public communication, and disseminate, periodicals and other materials.

## (j) Participation fees and costs

The Institute may charge and collect fees and other participation costs from persons and institutions participating in the Institute's direct activities authorized in subsection (b).

## (k) Civil actions

The Institute may sue and be sued, complain, and defend in any court of competent jurisdiction.

### (l) Corporate mark of recognition and colorable simulations

The Institute may adopt, alter, use, and display a corporate seal, emblem, badge, and other mark of recognition and colorable simulations thereof.

### (m) General authority

The Institute may do any and all lawful acts and things necessary or desirable to carry out the objectives and purposes of this chapter.

### (n) Legislative influencing-activity prohibition; communications or testimony of personnel

The Institute shall not itself undertake to influence the passage or defeat of any legislation by the Congress of the United States or by any State or local legislative bodies, or by the United Nations, except that personnel of the Institute may testify or make other appropriate communication when formally requested to do so by a legislative body, a committee, or a member thereof.

### (o) Administrative services from General Services Administration

The Institute may obtain administrative support services from the Administrator of General Services and use all sources of supply and services of the General Services Administration on a reimbursable basis.

### 22 U.S.C. § 4605

### § 4605. Board of Directors

### (a) Vested powers

The powers of the Institute shall be vested in a Board of Directors unless otherwise specified in this chapter.

### (b) Membership

The Board shall consist of fifteen voting members as follows:

> **(1)** The Secretary of State (or if the Secretary so designates, another officer of the Department of State who was appointed with the advice and consent of the Senate).

**(2)** The Secretary of Defense (or if the Secretary so designates, another officer of the Department of Defense who was appointed with the advice and consent of the Senate).

**(3)** The president of the National Defense University (or if the president so designates, the vice president of the National Defense University).

**(4)** Twelve individuals appointed by the President, by and with the advice and consent of the Senate.

## (c) Political affiliation

Not more than eight voting members of the Board (including members described in paragraphs (1) through (4) of subsection (b)) may be members of the same political party.

## (d) Qualifications

**(1)** Each individual appointed to the Board under subsection (b)(4) shall have appropriate practical or academic experience in peace and conflict resolution efforts of the United States.

**(2)** Officers and employees of the United States Government may not be appointed to the Board under subsection (b)(4).

## (e) Term of office: commencement and termination, interim and remainder service, limitation

**(1)** Members of the Board appointed under subsection (b)(4) shall be appointed to four year terms, except that--

**(A)** the term of six of the members initially appointed shall be two years, as designated by the President at the time of their nomination;

**(B)** a member may continue to serve until his or her successor is appointed; and

**(C)** a member appointed to replace a member whose term has not expired shall be appointed to serve the remainder of that term.

**(2)** The terms of the members of the Board initially appointed under subsection (b)(4) shall begin on January 20, 1985, and subsequent terms shall begin upon the expiration of the preceding term, regardless of when a member is appointed to fill that term.

**(3)** The President may not nominate an individual for appointment to the Board under subsection (b)(4) prior to January 20, 1985, but shall

submit the names of eleven nominees for initial Board membership under subsection (b)(4) not later than ninety days after that date. If the Senate rejects such a nomination or if such a nomination is withdrawn, the President shall submit the name of a new nominee within fifteen days.

**(4)** An individual appointed as a member of the Board under subsection (b)(4) may not be appointed to more than two terms on the Board.

**(5)** The term of a member of the Board shall not commence until the member is confirmed by the Senate and sworn in as a member of the Board.

## (f) Removal from office

A member of the Board appointed under subsection (b)(4) may be removed by the President--

**(1)** in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties;

**(2)** upon the recommendation of eight voting members of the Board; or

**(3)** upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate.

A recommendation made in accordance with paragraph (2) may be made only pursuant to action taken at a meeting of the Board, which may be closed pursuant to the procedures of subsection (h)(3). Only members who are present may vote. A record of the vote shall be maintained. The President shall be informed immediately by the Board of the recommendation.

## (g) Conflict of interests

No member of the Board may participate in any decision, action, or recommendation with respect to any matter which directly and financially benefits the member or pertains specifically to any public body or any private or nonprofit firm or organization with which the member is then formally associated or has been formally associated within a period of two years, except that this subsection shall not be construed to prohibit an ex officio

member of the Board from participation in actions of the Board which pertain specifically to the public body of which that member is an officer.

## (h) Meetings; Chairman; Vice Chairman; quorum; notice in Federal Register; closure

Meetings of the Board shall be conducted as follows:

**(1)** The President shall stipulate by name the nominee who shall be the first Chairman of the Board. The first Chairman shall serve for a term of three years. Thereafter, the Board shall elect a Chairman every three years from among the directors appointed by the President under subsection (b)(4) and may elect a Vice Chairman if so provided by the Institute's bylaws.

**(2)** The Board shall meet at least semiannually, at any time pursuant to the call of the Chairman or as requested in writing to the Chairman by at least five members of the Board. A majority of the members of the Board shall constitute a quorum for any Board meeting.

**(3)** All meetings of the Board shall be open to public observation and shall be preceded by reasonable public notice. Notice in the Federal Register shall be deemed to be reasonable public notice for purposes of the preceding sentence. In exceptional circumstances, the Board may close those portions of a meeting, upon a majority vote of its members present and with the vote taken in public session, which are likely to disclose information likely to affect adversely any ongoing peace proceeding or activity or to disclose information or matters exempted from public disclosure pursuant to subsection (c) of section 552b of Title 5.

## (i) Compensation

A director appointed by the President under subsection (b)(4) shall be entitled to receive the daily equivalent of the annual rate of basic pay in effect for grade GS-18 of the General Schedule under section 5332 of Title 5 for each day during which the director is engaged in the performance of duties as a member of the Board.

## (j) Travel expenses

While away from his home or regular place of business in the performance of duties for the Institute, a director shall be allowed travel expenses, including a per diem in lieu of subsistence, not to exceed the expenses

allowed persons employed intermittently in Government service under section 5703(b) of Title 5.

## 22 U.S.C. § 4606

### § 4606. Officers and employees

### (a) Appointment, compensation and status of president of Institute and other officers

The Board shall appoint the president of the Institute and such other officers as the Board determines to be necessary. The president of the Institute shall be a nonvoting ex officio member of the Board. All officers shall serve at the pleasure of the Board. The president shall be appointed for an explicit term of years. Notwithstanding any other provision of law limiting the payment of compensation, the president and other officers appointed by the Board shall be compensated at rates determined by the Board, but no greater than that payable for level I of the Executive Schedule under chapter 53 of Title 5.

* * *

### (d) Assignment of Federal officers or employees to the Institute

(1) The president may request the assignment of any Federal officer or employee to the Institute by an appropriate department, agency, or congressional official or Member of Congress and may enter into an agreement for such assignment, if the affected officer or employee agrees to such assignment and such assignment causes no prejudice to the salary, benefits, status, or advancement within the department, agency, or congressional staff of such officer or employee.

(2) The Secretary of State, the Secretary of Defense, and the Director of Central Intelligence each may assign officers and employees of his respective department or agency, on a rotating basis to be determined by the Board, to the Institute if the affected officer or employee agrees to such assignment and such assignment causes no prejudice to the salary, benefits, status, or advancement within the respective department or agency of such officer or employee.

* * *

### (f) Federal employment status only for stated purposes

(1) Officers and employees of the Institute shall not be considered officers and employees of the Federal Government except for purposes of

the provisions of Title 28, which relate to Federal tort claims liability, and the provisions of Title 5, which relate to compensation and benefits, including the following provisions: chapter 51 (relating to classification); subchapters I and III of chapter 53 (relating to pay rates); subchapter I of chapter 81 (relating to compensation for work injuries); chapter 83 (relating to civil service retirement); chapter 87 (relating to life insurance); and chapter 89 (relating to health insurance). The Institute shall make contributions at the same rates applicable to agencies of the Federal Government under the provisions of Title 5 referred to in this section.

**(2)** The Institute shall not make long-term commitments to employees that are inconsistent with rules and regulations applicable to Federal employees.

\* \* \* \*


## 22 U.S.C. § 4607

## § 4607. Procedures and records

\* \* \*

## (g) Audits

The accounts of the Institute shall be audited annually in accordance with generally accepted auditing standards by independent certified public accountants or independent licensed public accountants, certified or licensed by a regulatory authority of a State or other political subdivision of the United States. The audit shall be conducted at the place or places where the accounts of the Institute are normally kept. All books, accounts, financial records, files, and other papers, things, and property belonging to or in use by the Institute and necessary to facilitate the audit shall be made available to the person or persons conducting the audit, and full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians shall be afforded to such person or persons.

## (h) Report of audit to Congress; copies for public

The Institute shall provide a report of the audit to the President and to each House of Congress no later than six months following the close of the fiscal year for which the audit is made. The report shall set forth the scope of the audit and include such statements, together with the independent auditor's opinion of those statements, as are necessary to present fairly the Institute's

assets and liabilities, surplus or deficit, with reasonable detail, including a statement of the Institute's income and expenses during the year, including a schedule of all contracts and grants requiring payments in excess of $5,000 and any payments of compensation, salaries, or fees at a rate in excess of $5,000 per year. The report shall be produced in sufficient copies for the public.

**(i) Freedom of information provisions applicable**

The Institute and its directors, officers, employees, and agents shall be subject to the provisions of section 552 of Title 5 (relating to freedom of information).

## 22 U.S.C. § 4609

### § 4609. Funding

**(a) Authorization of appropriations**

#### (1) In general

For the purpose of carrying out this chapter, there are authorized to be appropriated such sums as may be necessary for fiscal years 2009 through 2014.

#### (2) Availability

Funds appropriated pursuant to the authority of paragraph (1) shall remain available until expended.

**(b) Transfer of unobligated funds; reports of use of funds to Congress and President**

The Board of Directors may transfer to the legal entity authorized to be established under section 4603(c) of this title any funds not obligated or expended from appropriations to the Institute for a fiscal year, and such funds shall remain available for obligation or expenditure for the purposes of such legal entity without regard to fiscal year limitations. Any use by such legal entity of appropriated funds shall be reported to each House of the Congress and to the President of the United States.

**(c) Contractual authority**

Any authority provided by this chapter to enter into contracts shall be effective for a fiscal year only to such extent or in such amounts as are provided in appropriation Acts.

**(d) Extension**

Any authorization of appropriations made for the purposes of carrying out this chapter shall be extended in the same manner as applicable programs are extended under section 1226a of Title 20.

## 22 U.S.C. § 4610

### § 4610. Dissolution or liquidation

Upon dissolution or final liquidation of the Institute or of any legal entity created pursuant to this chapter, all income and assets of the Institute or other legal entity shall revert to the United States Treasury.

## 22 U.S.C. § 4611

### § 4611. Biennial reports to President and Congress; comments, findings, and recommendations; Congressional Committee hearings

Beginning two years after October 19, 1984, and at intervals of two years thereafter, the Chairman of the Board shall prepare and transmit to the Congress and the President a report detailing the progress the Institute has made in carrying out the purposes of this chapter during the preceding two-year period. The President may prepare and transmit to the Congress within a reasonable time after the receipt of such report the written comments and recommendations of the appropriate agencies of the United States with respect to the contents of such report and their recommendations with respect to any legislation which may be required concerning the Institute. After receipt of such report by the Congress, the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate may hold hearings to review the findings and recommendations of such report and the written comments received from the President.