No. 25-5185

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

UNITED STATES INSTITUTE OF PEACE, et al.,

Plaintiffs-Appellees,

v.

KENNETH JACKSON, in his official capacity as Assistant to the
Administrator for Management and Resources for USAID, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**JOINT APPENDIX**
**VOLUME I**

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
McKAYE L. NEUMEISTER
COURTNEY E. ALBINI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7511*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-7329*

# TABLE OF CONTENTS

**Page**

## VOLUME I

Docket Sheet ............................................................. JA1

Amended Complaint for Declaratory and Injunctive Relief
(Mar. 24, 2025), Dkt. 12 ...................................... JA17

Pls. Statement of Material Facts as to Which There Is No
Genuine Dispute (Apr. 4, 2025), Dkt. 19-1 .........................JA47

Defs. Responses to Pls. Statement of Facts Not in Genuine
Dispute and Statements of Undisputed Material Facts
(Apr. 11, 2025), Dkt. 32-1.........................................JA73

Pls. (I) Reply in Support of Statement of Material Facts Not in
Genuine Dispute, (II) Response to Defs. Statement of
Undisputed Material Facts, and (III) Additional Undisputed
Material Facts in Response to the Cross-Motion
(Apr. 18, 2025), Dkt. 34-1 ...................................JA107

Transcript of Summary Judgment Hearing
(May 14, 2025), Dkt. 38 ...................................JA185

Order Granting Pls. Motion for Summary Judgment
(May 19, 2025), Dkt. 39 ...................................JA294

Memorandum Opinion Granting Pls. Motion for
Summary Judgment (May 19, 2025), Dkt. 40 ............................... JA298

Notice of Appeal (May 21, 2025), Dkt. 41 ...........................JA400

Order Denying Defs. Motion for Stay Pending Appeal
(May 23, 2025), Dkt. 46 ...................................JA401

## <u>VOLUME II – EXHIBITS</u>

Exhibits to Pls. Motion for an Immediate Administrative Stay
  and for a Temporary Restraining Order (Mar. 18, 2025)
    Declaration of Colin O'Brien, Dkt. 2-2 ....................................... JA408
    Photo, Dkt. 2-3 ............................................................................ JA415
    Proposed Order, Dkt. 2-4 ............................................................ JA417

Exhibits to Amended Complaint (Mar. 24, 2025)
    Amended Declaration of George E. Moose, Dkt. 12-1 ..................... JA419
    Letter from John H. Dalton, Department of the Navy, to
        Dr. Richard H. Solomon, U.S. Institute of Peace (USIP)
        (Nov. 21, 1996), Dkt. 12-2 ..................................................... JA426
    Notice of Transfer of Jurisdiction Over Certain Real Property
        in the District of Columbia, Dkt. 12-3 .................................... JA429
    Declaration of George Foote, Dkt. 12-4 ...................................... JA448
    Letter from George Moose, USIP, to Russell T. Vought, OMB
        (Mar. 5, 2025), Dkt. 12-5 ....................................................... JA455
    Resolution of USIP Board of Directors, Dkt. 12-6 ...................... JA460
    Declaration of Colin O'Brien, Dkt. 12-7 ..................................... JA462
    Declaration of Shira Lowinger, Dkt. 12-8 ................................... JA469

Exhibits to Pls. Motion Pursuant to the All Writs Act for a
  Status Conference and to Suspend Transfer of Institute
  Property to GSA (Mar. 31, 2025)
    Image of Resolution of USIP Board of Directors, Dkt. 14-1 ......... JA475
    Email from Andrew Goldfarb to Brian Hudak, Dkt. 14-2 ............ JA478
    Proposed Order, Dkt. 14-3 .......................................................... JA482

Exhibits to Defs. Opposition to Motion Pursuant to the All
  Writs Act (Mar. 31, 2025)
    Request for Transfer of Excess Real and Related Personal
        Property, Dkt. 15-1 ................................................................. JA484
    Resolution of USIP Board of Directors, Dkt. 15-2 ...................... JA485
    Letter from Nate Cavanaugh, USIP, to Stephen Ehikian,
        GSA, Dkt. 15-3 ....................................................................... JA489
    Letter from Russell T. Vought, OMB, to Stephen Ehikian,
        GSA (Mar. 29, 2025), Dkt. 15-4 .............................................. JA491
    Proposed Order, Dkt. 15-5 .......................................................... JA492

Exhibits to Pls. Statement of Material Facts as to Which There Is No
  Genuine Dispute (Apr. 4, 2025)
    Declaration of Paul Hughes, Dkt. 20-1 .......................................JA493
    Iraq Study Group Fact Sheet, Dkt. 20-2.......................................JA598
    Declaration of Allison Blotzer, Dkt. 20-3 .................................. JA502
    Declaration of Terry Jones, Dkt. 20-4 ..........................................JA505
    Declaration of Mary Swig, Dkt. 20-5 ........................................... JA508
    Declaration of Joseph Falk, Dkt. 20-6 ........................................JA510
    Declaration of George E. Moose, Dkt. 20-7.................................. JA512
    Declaration of Brian Harding, Dkt. 20-8 ................................... JA518
    Declaration of Catherine Dale, Dkt. 20-9....................................JA522
    Declaration of Dr. Gavin Helf, Dkt. 20-10...................................JA526
    Declaration of Samantha Robinson, Dkt. 20-11 ........................ JA530
    Place Holder for Exhibit 12, Dkt. 20-12 ......................................JA534
    Letter from Kenneth Jackson, USIP, to Colin O'Brien
      (Mar. 21, 2025), Dkt. 20-13 .....................................................JA535
    Declaration of Michael V. Phelan, Dkt. 20-14 .............................JA537
    Jeffrey Mapendere, *Track One and a Half Diplomacy and the
      Complementarity of Tracks*, Culture of Peace Online
      Journal, Dkt. 20-15 ................................................................. JA541
    Lia Sokol, *Multi-Track Diplomacy Explained*, NTI
      (Apr. 19, 2022), Dkt. 20-16 ......................................................JA558
    Return of Organization Exempt From Income Tax, Dkt. 20-17 ...JA563
    VADM Peter A. Garvin, USN, Dkt. 20-18....................................JA607
    Appointment Affidavits, Dkt. 20-19 .............................................JA610
    USIP Press Release, *New Board Members Begin Tenure at
      U.S. Institute of Peace* (Oct. 16, 2008), Dkt. 20-20 ...............JA612
    USIP Press Release, *New Members for USIP Board of
      Directors Sworn In* (June 7, 2011), Dkt. 20-21 ......................JA621
    U.S. Government Manual, *About Us*, Dkt. 20-22 ....................... JA628
    U.S. Government Manual, Dkt. 20-23.......................................... JA630
    U.S. Government Manual (1988-89), Dkt. 20-24 ........................JA653
    U.S. Government Manual (2009-10), Dkt. 20-25 ........................JA667
    S. Rep. No. 98-244 (Sept. 27, 1983), Dkt. 20-26........................ JA680
    Declaration of Andrew Wells-Dang, Dkt. 20-27 ..........................JA728
    Declaration of Christopher Bosley, Dkt. 20-28............................ JA731
    Declaration of Mary Glantz, Dkt. 20-29.....................................JA736
    Declaration of Nicole Cochran, Dkt. 20-30.................................JA740
    Declaration of Alli Aloudes Phillips, Dkt. 20-31...........................JA745
    Declaration of [Maria Antonia Montes], Dkt. 20-32 ..................JA749

iii

Declaration of Mary Speck, Dkt. 20-33 .......................................JA753

Declaration of Scott Worden, Dkt. 20-34....................................JA757

Declaration of Tegan Blaine, Dkt. 20-35.....................................JA761

Declaration of Frank Aum, Dkt. 20-36........................................JA766

Amended and Restated Bylaws of USIP (July 19, 2024),
    Dkt. 20-37....................................................................JA770

Proposed Order, Dkt. 20-38 .......................................................JA781

Exhibit 12 to Pls. Statement of Material Facts (Apr. 8, 2025)
    Emails from Trent Morse (Mar. 14, 2025) [REDACTED],
    Dkt. 24-1 .....................................................................JA784

Exhibit to Defs. Cross-Motion for Summary Judgment
    (Apr. 11, 2025), Proposed Order, Dkt. 32-2 .....................JA790

Exhibits to Pls. Consolidated Reply in Support of Their Motion for
    Summary Judgment and Opposition to Defs. Cross-Motion for
    Summary Judgment (April 18, 2025)
    Declaration of Andrew N. Goldfarb, Dkt. 34-2 ...........................JA791

USIP Biennial Report (1987), Dkt. 34-3.......................................JA793

USIP Biennial Report (1989), Dkt. 34-4 ......................................JA847

USIP Biennial Report (1991), Dkt. 34-5 ......................................JA932

Letter from Rhoda G. Lawrence, OPM, to Raymond P. Kogut,
    Office of Admininistration (Oct. 2, 1987), Dkt. 34-6.............JA1030

Memo. from Raymond P. Kogut, Office of Admininistration,
    to Charles Duryea Smith, USIP (Mar. 11, 1988), Dkt. 34-7...JA1033

Email from Nate Cavanaugh to Nick Turner
    (Apr. 12, 2025), Dkt. 34-8 .............................................JA1035

Vera Institute/DOGE: Teams Call Notes (Apr. 15, 2025),
    Dkt. 34-9......................................................................JA1037

Supplemental Declaration of George E. Moose, Dkt. 34-10 ...... JA1041

Declaration of Allison Blotzer, Dkt. 34-11 ..................................JA1045

Proposed Order, Dkt. 34-12.......................................................JA1048

Exhibit to Mot. to Stay Pending Appeal (May 21, 2025)
    Proposed Order, Dkt. 42-1................................................JA1049

Exhibit to Pls. Opposition to Defs. Motion for Stay Pending
    Appeal (May 23, 2025), Declaration of George E. Moose in
    Support of Pls. Oppositon to Defs. Stay Motion, Dkt. 45-1 ............JA1050

APPEAL,CLOSED,TYPE−D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00804−BAH

UNITED STATES INSTITUTE OF PEACE et al v. JACKSON et al
Assigned to: Judge Beryl A. Howell
Related Case: 1:25−cv−01090−BAH
Case in other court: USCA, 25−05185
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 03/18/2025
Date Terminated: 05/19/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**UNITED STATES INSTITUTE OF PEACE**

represented by **Alyssa Howard Card**
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
202−778−1800
Email: ahoward@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
202−778−1800
Email: bjernigan@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
(410) 949−1146
Fax: (410) 659−0436
Email: wmurphy@zuckerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1100
Washington, DC 20036
(202) 778−1822
Fax: (202) 822−8106
Email: agoldfarb@zuckerman.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN J. SULLIVAN**
*Ambassador, in his official capacity as Chair of the Board of Directors of the United States Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)

**JA1**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**JUDY ANSLEY**                    represented by   **Alyssa Howard Card**
*in her official capacity as a member of the*              (See above for address)
*Board of Directors of the United States*                 *LEAD ATTORNEY*
*Institute of Peace*                                      *ATTORNEY TO BE NOTICED*

                                                 **Ben Jernigan**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **William James Murphy**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Andrew Nathan Goldfarb**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**JOSEPH L. FALK**                 represented by   **Alyssa Howard Card**
*in his official capacity as a member of the*              (See above for address)
*Board of Directors of the United States*                 *LEAD ATTORNEY*
*Institute of Peace*                                      *ATTORNEY TO BE NOTICED*

                                                 **Ben Jernigan**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **William James Murphy**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Andrew Nathan Goldfarb**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**KERRY KENNEDY**                  represented by   **Alyssa Howard Card**
*in her official capacity as a member of the*              (See above for address)
*Board of Directors of the United States*                 *LEAD ATTORNEY*
*Institute of Peace*                                      *ATTORNEY TO BE NOTICED*

                                                 **Ben Jernigan**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**JA2**

William James Murphy
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Andrew Nathan Goldfarb
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**MARY SWIG**
*in her official capacity as a member of the*
*Board of Directors of the United States*
*Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**NANCY ZIRKIN**
*in her official capacity as a member of the*
*Board of Directors of the United States*
*Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**GEORGE E. MOOSE**
*Ambassador; in his official capacities as*
*Acting President of the United States*
*Institute of Peace and as an ex officio*
*member of the Board of Directors of the*
*United States Institute of Peace*

represented by **Alyssa Howard Card**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben Jernigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Murphy**
(See above for address)
*LEAD ATTORNEY*

**JA3**

*ATTORNEY TO BE NOTICED*

**Andrew Nathan Goldfarb**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KENNETH JACKSON**
*in his official capacity as Assistant to the Administrator for Management and Resources for USAID and in his purported capacity as acting president of the United States Institute of Peace*

represented by    **Brian P. Hudak**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
601 D Street, NW
Washington, DC 20530
(202) 252−2549
Fax: (202) 252−2599
Email: brian.hudak@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
UNITED STATES ATTORNEY'S OFFICE
601 D Street, NW
Washington, DC 20001
202−252−2525
Email: joseph.carilli@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sam Escher**
DOJ−USAO
601 D Street NW
# 7.1527
Washington, DC 20530
(202) 252−2531
Email: sam.escher@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE**

represented by    **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE TEMPORARY ORGANIZATION**

represented by    **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

Sam Escher
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY GLEASON**
*in her official capacity as the Acting*
*Administrator of U.S. DOGE Service and*
*U.S. DOGE Service Temporary*
*Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES M. BURNHAM**
*in his official capacity as an employee of*
*the U.S. DOGE Service or the U.S.*
*DOGE Service Temporary Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JACOB ALTIK**
*in his official capacity as an employee of*
*the U.S. DOGE Service or the U.S.*
*DOGE Service Temporary Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NATE CAVANAUGH**
*in his official capacity as an employee of*
*the U.S. DOGE Service or the U.S.*
*DOGE Service Temporary Organization*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

represented by

**JA5**

**MARCO A. RUBIO**
*in his official capacity as the U.S.*
*Secretary of State and in his official*
*capacity as an ex officio member of the*
*USIP Board of Directors*

**Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**
*in his official capacity as the U.S.*
*Secretary of Defense and in his official*
*capacity as an ex officio member of the*
*USIP Board of Directors*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER A. GARVIN**
*Vice Admiral, in his official capacity as*
*President of the National Defense*
*University and in his official capacity as*
*an ex officio member of the USIP Board*
*of Directors*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States of America*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TRENT MORSE**
*in his official capacity as Deputy Director*
*of Presidential Personnel in the White*
*House Presidential Personnel Office, the*
*White House Office, and the Executive*
*Office of the President of the United*

represented by **Brian P. Hudak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph F. Carilli , Jr.**

**JA6**

*States* (See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Escher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**113 FORMER SENIOR MILITARY AND FOREIGN POLICY OFFICIALS**       represented by    **Rebecca S. LeGrand**
LEGRAND LAW PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
202−587−5725
Email: rebecca@legrandpllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025**       represented by    **Michael L Shenkman**
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
202−857−1197
Email: mshenkman@baileyglasser.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2025 | 1 | COMPLAINT *For Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number ADCDC−11551408) filed by JOHN J. SULLIVAN, UNITED STATES INSTITUTE OF PEACE, MARY SWIG, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons)(Goldfarb, Andrew) (Entered: 03/18/2025) |
| 03/18/2025 | 2 | Emergency MOTION for Temporary Restraining Order *and for an Immediate Administrative Stay* by UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY, MARY SWIG. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Text of Proposed Order)(Goldfarb, Andrew) (Entered: 03/18/2025) |
| 03/18/2025 | 3 | NOTICE of Appearance by Andrew Nathan Goldfarb on behalf of All Plaintiffs (Goldfarb, Andrew) (Entered: 03/18/2025) |
| 03/19/2025 | 4 | NOTICE of Appearance by Alyssa Howard Card on behalf of All Plaintiffs (Card, Alyssa) (Entered: 03/19/2025) |
| 03/19/2025 |  | Case Assigned to Judge Beryl A. Howell. (zjd) (Entered: 03/19/2025) |
| 03/19/2025 | 5 | STANDING ORDER. Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah4) (Entered: 03/19/2025) |
| 03/19/2025 |  | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on plaintiffs' 2 Motion for a Temporary Restraining Order on March 19, 2025 at 2:00 PM, in Courtroom 26A− In Person before Judge Beryl A. Howell; DIRECTING defendants to file any written response to plaintiffs' motion by March 19, 2025 at 12:00 PM; and ORDERING plaintiffs to serve defendants with a copy of this Order immediately upon receipt to ensure that counsel for defendants has sufficient notice to appear at the |

| | | hearing. Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah4) (Entered: 03/19/2025) |
|---|---|---|
| 03/19/2025 | | Set/Reset Deadlines/Hearings: Defendants Response To Plaintiff's Motion due no later than 12:00PM on 3/19/2025. Motion Hearing set for 3/19/2025 at 2:00 PM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 03/19/2025) |
| 03/19/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for March 19, 2025 at 2:00PM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 03/19/2025)** |
| 03/19/2025 | 6 | SUMMONS (13) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/19/2025) |
| 03/19/2025 | 7 | NOTICE of Appearance by Ben Jernigan on behalf of All Plaintiffs (Jernigan, Ben) (Entered: 03/19/2025) |
| 03/19/2025 | 8 | NOTICE of Appearance by Joseph F. Carilli, Jr on behalf of All Defendants (Carilli, Joseph) (Entered: 03/19/2025) |
| 03/19/2025 | 9 | Memorandum in opposition to re 2 Motion for TRO, filed by AMY GLEASON, JAMES M. BURNHAM, JACOB ALTIK, NATE CAVANAUGH, MARCO RUBIO, PETE HEGSETH, PETER A GARVIN, DONALD J. TRUMP, KENNETH JACKSON, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Hudak, Brian) (Entered: 03/19/2025) |
| 03/19/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 3/19/2025 re 2 Emergency Motion for Temporary Restraining Order. The Court Heard Oral Arguments From The Parties. For Reasons Stated On The Record, The Court Denies 2 Emergency Motion for Temporary Restraining Order and for an Immediate Administrative Stay. The Court Directs The Parties To Meet And Confer and File Either Joint Or Individual Expedited Briefing Schedule due no later than 2:00PM On March 20, 2025. (Court Reporter LISA EDWARDS.) (mac) (Entered: 03/19/2025) |
| 03/19/2025 | | MINUTE ORDER (paperless) DENYING plaintiffs' 2 Motion for a Temporary Restraining Order ("Pls.' Mot."). Plaintiffs did not make the sufficient showings of likelihood of success on the merits and likelihood of suffering irreparable harm to warrant issuance of the extraordinary relief of a temporary restraining order ("TRO"). *See Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (describing the four factors necessary for granting a preliminary injunction or TRO). <br><br> Regarding likelihood of success on the merits, the unique position of the U.S. Institute of Peace, as a Congressionally established independent nonprofit corporation, makes it too difficult to determine on the present record whether the President's removal of the Board members and the remaining three *ex officio* members' appointment of a new Institute President was lawful and thus whether DOGE's intrusion on the property was permitted. On the one hand, the Institute is statutorily described as "an independent nonprofit corporation" and charitable organization, 22 U.S.C. § 4603(b), and its employees are expressly "not considered officers and employees of the Federal Government," except for certain purposes, *id.* § 4606(f)(1). On the other, the Institute's leadership is appointed by the President and confirmed by the Senate, *id.* § 4605(b)(4); the Board has two Cabinet members sitting *ex officio*, *id.* § 4605(b)(1)−(2); and the Institute itself admits it is subject to FOIA, *see* FOIA, UNITED STATES INSTITUTE FOR PEACE, https://www.usip.org/freedom−information−act−foia, which applies to executive branch entities. In addition, as defendants point out, the Institute has grant−making authority with public funds, *id.* §§ 4603(c), 4604(b)(1), (d), 4606(b); is tasked with making reports to Congress, *id.* § 4604(c)(3); and may obtain services |

**JA8**

from the General Services Administration, *id.* § 4604(o). Moreover, plaintiffs' counsel seemed to concede, by invoking *Humphrey's Executor*, 295 U.S. 602 (1935) (involving statutory removal protections for executive branch agencies with quasi−legislative and quasi−judicial functions), that the Institute is an executive branch entity. Notwithstanding that the Presidents' removal of the five plaintiff Board members violated the applicable statutory removal provisions, 22 U.S.C. § 4605(f), depending on the precise nature of the Institute, some of those removal provisions, namely *id.* § 4605(f)(3), may be constitutionally suspect under *Myers v. United States*, 272 U.S. 52 (1926), for reserving a role for Congress in the removal process. *See Morrison v. Olson*, 487 U.S. 654, 686 (1988) (describing that takeaway from *Myers*). Upon further consideration, the Institute may be deemed to sit outside of the executive branch, or the removal protections may be deemed appropriately enforceable within the Supreme Court's jurisprudence, but plaintiffs did not demonstrate as much in this expedited posture. *See generally*, Pls.' Mot. (not addressing *Myers* or *Humphrey's Executor*).

Plaintiffs also did not demonstrate irreparable harm because their alleged harm was dependent on their success on the merits. Plaintiffs cited as their irreparable harm their inability to carry out their statutory functions and the harm to the Institute based on defendants' intent to reduce it to the "statutory minimums" and defendants' alleged destruction of the Institute's property. Compl. 1 ¶¶ 59−65. Those harms, however, are dependent on plaintiffs' success on the merits. Plaintiffs' counsel can only represent the Institute⸺and thus properly assert the harms of the Institute⸺to the extent that plaintiff Board members and former President of the Institute, George Moose, were wrongfully removed. Plaintiffs likewise only suffer harm in their official capacities⸺the capacities in which they pled, Compl. ¶¶ 7−11⸺if they must lawfully remain members of the Board. While the allegations of records and property destruction, *see e.g.*, Pls.' Mot. at 3, and defendants' threatening and aggressive confrontation, involving the deployment of law enforcement officers from three different agencies, in interactions with employees at the U.S. Institute of Peace are deeply troubling, the extraordinary relief of the TRO is not warranted at this time.

The parties are DIRECTED to jointly propose a schedule for summary judgment briefing by March 20, 2025 at 2:00 PM.

Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah4) (Entered: 03/19/2025)

| | | |
|---|---|---|
| 03/20/2025 | 10 | NOTICE of Appearance by Sam Escher on behalf of All Defendants (Escher, Sam) (Entered: 03/20/2025) |
| 03/20/2025 | 11 | Joint MOTION for Briefing Schedule *Setting Expedited Briefing Schedule* by UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY, MARY SWIG. (Attachments: # 1 Text of Proposed Order Proposed Order)(Jernigan, Ben) Modified event on 3/21/2025 (znmw). (Entered: 03/20/2025) |
| 03/20/2025 | | MINUTE ORDER (paperless), upon consideration of the parties' 11 Joint Motion for Expedited Briefing ISSUING the following SCHEDULING ORDER:<br><br>(1) By March 24, 2025, plaintiffs will file any amended complaint (though defendants' obligation to respond is stayed pending further order of the Court);<br><br>(2) By April 4, 2025, plaintiffs will file their motion for summary judgment;<br><br>(3) By April 11, 2025, defendants will file any cross−dispositive motion and opposition to plaintiffs' motion;<br><br>(4) By April 18, 2025, plaintiffs will file their opposition to defendants' cross−motion and reply in support of their motion;<br><br>(5) By April 25, 2025, defendants will file any reply in support of their cross−motion.<br><br>Any hearing, if necessary, will be held the week of April 28, 2025.<br><br>Signed by Judge Beryl A. Howell on March 20, 2025. (lcbah4) (Entered: 03/20/2025) |

| | | |
|---|---|---|
| 03/21/2025 | | Set/Reset Deadlines: Amended Pleadings due by 3/24/2025. Summary Judgment Motion due by 4/4/2025. Defendants Cross Dispositive Motion And Opposition To Plaintiff's Motion due by 4/11/2025. Plaintiffs Opposition to Defendant's Cross−Motion And Reply In Support OF Their Motion due by 4/18/2025. Defendants Reply In Support Of Their Cross−Motion due by 4/25/2025. (mac) (Entered: 03/21/2025) |
| 03/21/2025 | | NOTICE OF ERROR re 11 Motion for Order; emailed to bjernigan@zuckerman.com, cc'd 17 associated attorneys — The PDF file you docketed contained errors: 1. **Please note the following for future filings; do not refile document**, 2. Signature on Filing Must Match PACER Account (mg, ) (Entered: 03/21/2025) |
| 03/24/2025 | 12 | AMENDED COMPLAINT against All Defendants filed by JOHN J. SULLIVAN, UNITED STATES INSTITUTE OF PEACE, MARY SWIG, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I − Redline of Amended Complaint, # 10 Summons)(Goldfarb, Andrew) (Entered: 03/24/2025) |
| 03/24/2025 | 13 | SEALED DOCUMENT re 12 Amended Complaint filed by UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L FALK, KERRY KENNEDY, MARY SWIG(This document is SEALED and only available to authorized persons.)(Goldfarb, Andrew) Modified to add link on 3/25/2025 (znmw). (Entered: 03/24/2025) |
| 03/31/2025 | 14 | MOTION for Order *Pursuant to the All Writs Act to Suspend Transfer of Property and for Status Conference* by NANCY ZIRKIN, GEORGE E. MOOSE, UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, MARY SWIG. (Attachments: # 1 Exhibit Exhibit A − Resolution, # 2 Exhibit Exhibit B − Email Correspondence, # 3 Text of Proposed Order Proposed Order)(Goldfarb, Andrew). Added MOTION for Status Conference on 4/1/2025 (mg). (Entered: 03/31/2025) |
| 03/31/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 14 Motion for Order Pursuant to All Writs Act and for Status Conference, DIRECTING defendants to file any position on that Motion by 3:00 pm today, March 31, 2025, and further DIRECTING the parties to appear in−person for a status conference on April 1, 2025 at 10:00 am in Courtroom 26A. Signed by Judge Beryl A. Howell on March 31, 2025. (lcbah4) (Entered: 03/31/2025) |
| 03/31/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for April 1, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: https://www.dcd.uscourts.gov/sites/dcd/files/Standing%20Order%20No.% 2024−31_001.pdf. Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court.(mac) (Entered: 03/31/2025) |
| 03/31/2025 | | Set/Reset Deadlines/Hearings: Defendant's Position On Motion due no later than 3:00PM on 3/31/2025. Status Conference set for 4/1/2025 at 10:00 AM in Courtroom 26A− In Person (Audio Line Available) before Judge Beryl A. Howell. (mac) (Entered: 03/31/2025) |
| 03/31/2025 | 15 | Memorandum in opposition to re 14 Motion for Order, filed by AMY GLEASON, TRENT MORSE, JAMES M. BURNHAM, JACOB ALTIK, NATE CAVANAUGH, MARCO A. RUBIO, PETER B. HEGSETH, PETER A. GARVIN, DONALD J. TRUMP, KENNETH JACKSON, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Exhibit 1 (Form 1334), # 2 Exhibit 2 (Bd. Resolution), # 3 Exhibit 3 (Letter), # 4 Exhibit 4 (OMB Waiver), # 5 Text of Proposed Order)(Hudak, Brian) (Entered: 03/31/2025) |

| 04/01/2025 | 16 | REPLY to opposition to motion re 14 Motion for Order, *Pursuant to the All Writs Act to Suspend Transfer of Property and for Status Conference* filed by NANCY ZIRKIN, GEORGE E. MOOSE, UNITED STATES INSTITUTE OF PEACE, JOHN J. SULLIVAN, JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, MARY SWIG. (Goldfarb, Andrew) (Entered: 04/01/2025) |
|---|---|---|
| 04/01/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Status Conference held on 4/1/2025. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 04/01/2025) |
| 04/01/2025 | 17 | NOTICE of Appearance by William James Murphy on behalf of All Plaintiffs (Murphy, William) (Entered: 04/01/2025) |
| 04/01/2025 | 18 | TRANSCRIPT OF MOTION HEARING before Judge Beryl A. Howell held on March 19, 2025; Page Numbers: 1−94. Date of Issuance: April 1, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354−3269. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/22/2025. Redacted Transcript Deadline set for 5/2/2025. Release of Transcript Restriction set for 6/30/2025.(Edwards, Lisa) (Entered: 04/01/2025) |
| 04/01/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 14 Motion for Order Pursuant to All Writs Act to Suspend Transfer of Property ("Pls.' Mot."), defendants' 15 Opposition ("Defs.' Opp'n"), plaintiffs' 16 Reply, and the arguments made at a motion hearing held on April 1, 2025, DENYING plaintiffs' 14 Motion in part as MOOT and in part on the merits.<br><br>On March 31, 2025, plaintiffs filed the pending motion requesting that the Court urgently enjoin defendants' "proposed transfer" of property from the U.S. Institute of Peace ("USIP") to the executive branch's General Services Administration ("GSA") under the All Writs Act, 28 U.S.C. § 1651(a), because such transfer "has the potential substantially to impair this Court's jurisdiction to grant relief to Plaintiffs," Pls.' Mot. at 1, "or, in the alternative,... that the Court schedule a status conference to address the issue as soon as practicable," *id.* Plaintiffs' request for a hearing on the motion was promptly granted and hearing scheduled for the following day&mdash;today&mdash;with an opportunity for defendants to file an opposition prior to the hearing.<br><br>Defendants clarified at the hearing that transfer to GSA of the USIP building and all of the personal property contained therein, was completed on Saturday, March 29, 2025. *See* Defs.' Opp'n [15−1], Ex. 1 (GSA form for intra−executive branch transfer signed on Mar. 27, 2025); *id.*, Ex. 3 (undated letter from new USIP President to GSA requesting the transfer without reimbursement); *id.*, Ex. 4 (letter from Director of OMB approving the transfer, dated Mar. 29, 2025). With respect to the USIP property already transferred, the deal is no longer merely "proposed" but done, rendering plaintiffs' requested relief moot as to that property.<br><br>With respect to any other USIP property that has not yet been transferred, including USIP's Endowment held, according to plaintiffs' counsel, in various bank accounts totaling over $20 million, plaintiffs must demonstrate their entitlement to relief under the All Writs Act. This statute empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). |

The first issue to address when invoking the All Writs Act is whether the requested relief is "necessary or appropriate in aid of [this Court's] jurisdiction." *Id.* While plaintiffs raise concern about real property and financial property being transferred to the U.S. government and this Court's inability to promptly transfer them back, *see* Pls.' Mot. ¶ 8 (citing the Quiet Title Act, which bars entry of a preliminary injunction to dispossess the United States of real property, 28 U.S.C. § 2409a(c)) and ¶ 9 (describing how the only recourse for restoring financial assets would be a Tucker Act suit before the Court of Federal Claims), plaintiffs conceded orally that this Court would still have jurisdiction over the merits of this suit if the property were transferred. The suit would not be moot because some relief would still be possible. An order halting transfer of the property thus is not necessary or appropriate to aid this Court's jurisdiction to resolve the ultimate dispute.

Second, plaintiffs cannot demonstrate a likelihood of success on the merits, which is required to obtain an injunction to preserve the status quo between the parties under the All Writs Act in this Circuit. *See Belbacha v. Bush*, 520 F.3d 452, 458−59 (D.C. Cir. 2008); *Kiyemba v. Obama*, 561 F.3d 509, 513 n.3 (D.C. Cir. 2009) (interpreting *Belbacha* as requiring that even if the court has the power to preserve the status quo pursuant to the All Writs Act, the party must still satisfy the four factors for issuing a preliminary injunction to obtain that relief); *see also Shoop v. Twyford*, 596 U.S. 811, 820 (2022) ("We have made clear that a petitioner cannot use that [All Writs] Act to circumvent statutory requirements or otherwise binding procedural rules."). Plaintiffs cite to *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004), which does not require satisfaction of the four−factor test for a preliminary injunction for an "All Writs Act injunction," Pls.' Mot. at 5, but the Eleventh Circuit's different approach is not applicable here. *See Samuel L. Ferenc, Note, Clear Rights and Worthy Claimants: Judicial Intervention in Administrative Action under the All Writs Act*, 118 COLUM. L. REV. 127, 150−55 (2018) (distinguishing between the D.C. Circuit's approach and the Eleventh Circuit's anomalous approach in *Klay*); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir. 2005) (holding that plaintiffs cannot "use the All Writs Act in order to circumvent the requirements for preliminary injunctive relief").

As explained in the prior order denying plaintiffs' request for a temporary restraining order, plaintiffs have not demonstrated on the current record before the Court that they are likely to succeed on the merits of their ultra vires claims about the removal of USIP's Board members and President. *See* Minute Order (Mar. 19, 2025). Despite further discussion of the issue during the status conference today, ambiguity persists given the paucity of apposite law regarding USIP's proper classification as an "independent establishment" or "Government corporation" that rests outside of or within the executive branch and whether it qualifies as an agency, *see* 5 U.S.C. §§ 103−105. Indeed, plaintiffs conceded at the hearing that their reply brief cites to authority on this issue not previously provided to the Court and, further, that this issue will be more fully addressed in the expedited summary judgment briefing being prepared by the parties that will be helpful in making a thorough assessment of the merits.

For these reasons, plaintiffs' motion is DENIED.

Signed by Judge Beryl A. Howell on April 1, 2025. (lcbah4) (Entered: 04/01/2025)

| 04/04/2025 | 19 | MOTION for Summary Judgment by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Statement of Facts)(Goldfarb, Andrew) (Entered: 04/04/2025) |
| 04/04/2025 | 20 | SUPPLEMENTAL MEMORANDUM re 19 *Exhibits to R.56.1 Statement* by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12 − Place Holder, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 |

| | | |
|---|---|---|
| | | Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Text of Proposed Order)(Goldfarb, Andrew) Modified event and added link on 4/9/2025 (mg). (Entered: 04/05/2025) |
| 04/05/2025 | <u>21</u> | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN (This document is SEALED and only available to authorized persons.) (Attachments: # <u>1</u> Exhibit Ex. 12 − UNDER SEAL, # <u>2</u> Exhibit Proposed Order)(Goldfarb, Andrew) (Entered: 04/05/2025) |
| 04/05/2025 | <u>22</u> | Amended MOTION for Summary Judgment Corrected re <u>19</u> Motion for Summary Judgment by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Goldfarb, Andrew) Modified on 4/8/2025 to add link (mg). (Entered: 04/05/2025) |
| 04/07/2025 | <u>23</u> | TRANSCRIPT OF PROCEEDINGS, before Judge Beryl A. Howell, held on 4−01−2025. Page Numbers: 1 − 87. Date of Issuance: 4−07−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/28/2025. Redacted Transcript Deadline set for 5/8/2025. Release of Transcript Restriction set for 7/6/2025.(Davila, Elizabeth) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER (paperless) GRANTING plaintiffs' <u>21</u> Motion to Seal Exhibit, DIRECTING the Clerk of Court to place under seal plaintiffs' Exhibit 12, and DIRECTING plaintiffs to post on the public docket a redacted copy of the same exhibit. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah4) (Entered: 04/07/2025) |
| 04/07/2025 | <u>28</u> | SEALED DOCUMENT (Exhibit 12) filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. re <u>20</u> Motion for Summary Judgment. (This document is SEALED and only available to authorized persons.)(mg) (Entered: 04/09/2025) |
| 04/08/2025 | <u>24</u> | NOTICE OF FILING REDACTED DOCUMENT to <u>20</u> MOTION for Summary Judgment *Exhibits to R.56.1 Statement* by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN (Attachments: # <u>1</u> Exhibit Ex. 12 − Redacted)(Goldfarb, Andrew) (Entered: 04/08/2025) |
| 04/08/2025 | <u>25</u> | NOTICE of Appearance by Rebecca S. LeGrand on behalf of 113 Former Senior Military and Foreign Policy Officials (LeGrand, Rebecca) (Entered: 04/08/2025) |
| 04/08/2025 | <u>26</u> | Unopposed MOTION for Leave to File Amicus Brief by 128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025. (Attachments: # <u>1</u> Exhibit Proposed Brief, # <u>2</u> Text of Proposed Order)(Shenkman, Michael) Modified relief on 4/9/2025 (mg). (Entered: 04/08/2025) |
| 04/08/2025 | <u>27</u> | MOTION for Leave to File Amicus Brief by 113 Former Senior Military and Foreign Policy Officials. (Attachments: # <u>1</u> Exhibit 1 (Proposed Amicus Brief), # <u>2</u> Text of Proposed Order)(LeGrand, Rebecca) (Entered: 04/08/2025) |

| 04/09/2025 | 29 | SUMMONS (1) Issued Electronically as to TRENT MORSE. (mg) (Entered: 04/09/2025) |
|---|---|---|
| 04/09/2025 | | MINUTE ORDER (paperless) GRANTING 128 Employees' 26 Unopposed Motion for Leave to File Amicus Brief and 113 Former Senior Military and Foreign Policy Officials' 27 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 9, 2025. (lcbah4) (Entered: 04/09/2025) |
| 04/09/2025 | 30 | AMICUS BRIEF by 128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025. (znmw) (Entered: 04/10/2025) |
| 04/09/2025 | 31 | AMICUS BRIEF by 113 FORMER SENIOR MILITARY AND FOREIGN POLICY OFFICIALS. (znmw) (Entered: 04/10/2025) |
| 04/11/2025 | 32 | MOTION for Summary Judgment by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Hudak, Brian) (Entered: 04/11/2025) |
| 04/11/2025 | 33 | Memorandum in opposition to re 22 Motion for Summary Judgment, 19 Motion for Summary Judgment filed by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Hudak, Brian) (Entered: 04/11/2025) |
| 04/18/2025 | 34 | REPLY to opposition to motion re 19 Motion for Summary Judgment, 32 Motion for Summary Judgment, *Consolidated Opposition to Cross−Motion for Summary Judgment* filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Statement of Facts, # 2 Declaration, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Text of Proposed Order)(Goldfarb, Andrew) (Entered: 04/18/2025) |
| 04/18/2025 | 35 | Consolidated Memorandum in opposition to re 32 MOTION for Summary Judgment filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (See docket entry 34 to view document). (mg) (Entered: 04/22/2025) |
| 04/23/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on the pending cross−motions for summary judgment on Thursday, May 1 at 11:00 AM, in Courtroom 26A, in person. Signed by Judge Beryl A. Howell on April 23, 2025. (lcbah4) (Entered: 04/23/2025) |
| 04/24/2025 | | Set/Reset Hearings: Motion Hearing set for 5/1/2025 at 11:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 04/24/2025) |
| 04/25/2025 | 36 | REPLY to opposition to motion re 32 Motion for Summary Judgment, filed by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Hudak, Brian) (Entered: 04/25/2025) |
| 04/28/2025 | | MINUTE ORDER (paperless) VACATING the scheduled hearing for Thursday, May 1, and DIRECTING the parties to appear for a hearing on the pending cross−motions for summary judgment on Wednesday, May 14 at 10:00 AM, in Courtroom 26A, in person. Signed by Judge Beryl A. Howell on April 28, 2025. (lcbah4) (Entered: 04/28/2025) |
| 04/30/2025 | | Set/Reset Hearings: Motion Hearing set for 5/14/2025 at 10:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 04/30/2025) |

| | | |
|---|---|---|
| 05/13/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for May 14, 2025 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB). **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 05/13/2025)** |
| 05/14/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 5/14/2025 re 22 Amended Motion for Summary Judgment 32 Motion for Summary Judgment and 19 Motion for Summary Judgment. The Court Heard Oral Arguments From The Parties And Will Reserve Decision. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 05/14/2025) |
| 05/14/2025 | | MINUTE ORDER (paperless) DIRECTING defendants to file by 2:00 PM on May 15, 2025, any supplemental briefing in response to the Court's question distinguishing USIP from the entities described as "private, non−profit corporations" in the D.C. Circuit emergency panel's opinion in *Widakuswara v. Lake*, No. 25−5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025). Signed by Judge Beryl A. Howell on May 14, 2025. (lcbah4) (Entered: 05/14/2025) |
| 05/15/2025 | | Set/Reset Deadlines: Defendants Supplemental Briefing due no later than 2:00PN On 5/15/2025. (mac) (Entered: 05/15/2025) |
| 05/15/2025 | 37 | SUPPLEMENTAL MEMORANDUM to re Order, filed by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO A. RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Hudak, Brian) (Entered: 05/15/2025) |
| 05/16/2025 | 38 | TRANSCRIPT OF PROCEEDINGS before Judge Beryl A. Howell, held on 5−14−2025; Page Numbers: 1 − 109. Date of Issuance: 5−16−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/6/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025.(Davila, Elizabeth) (Entered: 05/16/2025) |
| 05/19/2025 | 39 | ORDER GRANTING plaintiffs' 22 Motion for Summary Judgment and denying defendants' 32 Cross−Motion for Summary Judgment. See Order for further details. The Clerk of Court is directed to close this case. Signed by Judge Beryl A. Howell on May 19, 2025. (lcbah4) (Entered: 05/19/2025) |
| 05/19/2025 | 40 | MEMORANDUM OPINION regarding plaintiffs' 22 Motion for Summary Judgment and defendants' 32 Cross−Motion for Summary Judgment. Signed by Judge Beryl A. Howell on May 19, 2025. (lcbah4) (Entered: 05/19/2025) |
| 05/21/2025 | 41 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 40 Memorandum & Opinion, 39 Order on Motion for Summary Judgment, by JAMES M. BURNHAM, KENNETH JACKSON, DONALD J. TRUMP, NATE CAVANAUGH, PETER A. GARVIN, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, JACOB ALTIK, MARCO |

| | | |
|---|---|---|
| | | RUBIO, PETER B. HEGSETH, U.S. DOGE SERVICE, TRENT MORSE, AMY GLEASON. Fee Status: No Fee Paid. Parties have been notified. (Hudak, Brian) (Entered: 05/21/2025) |
| 05/21/2025 | 42 | MOTION to Stay *Pending Appeal* by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 05/21/2025) |
| 05/22/2025 | 43 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 41 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER (paperless) DIRECTING plaintiffs to file any response to defendants' 42 Motion for Stay Pending Appeal by Friday, May 23, 2025 at 12:00 PM. Signed by Judge Beryl A. Howell on May 22, 2025. (lcbah4) (Entered: 05/22/2025) |
| 05/22/2025 | | Set/Reset Deadlines: Plaintiffs Response To Defendants' 42 Motion For Stay Pending Appeal due no later than 12:00PM on 5/23/2025. (mac) (Entered: 05/22/2025) |
| 05/22/2025 | 44 | NOTICE OF SUPPLEMENTAL AUTHORITY by JACOB ALTIK, JAMES M. BURNHAM, NATE CAVANAUGH, PETER A. GARVIN, AMY GLEASON, PETER B. HEGSETH, KENNETH JACKSON, TRENT MORSE, MARCO RUBIO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION (Attachments: # 1 Supplement Trump v. Wilcox, 24A966)(Hudak, Brian) (Entered: 05/22/2025) |
| 05/22/2025 | | USCA Case Number 25−5185 for 41 Notice of Appeal to DC Circuit Court, filed by PETER A. GARVIN, PETER B. HEGSETH, DONALD J. TRUMP, AMY GLEASON, JAMES M. BURNHAM, KENNETH JACKSON, U.S. DOGE SERVICE, MARCO RUBIO, NATE CAVANAUGH, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, JACOB ALTIK, TRENT MORSE. (mg) (Entered: 05/23/2025) |
| 05/23/2025 | 45 | Memorandum in opposition to re 42 MOTION to Stay *Pending Appeal* filed by JUDY ANSLEY, JOSEPH L. FALK, KERRY KENNEDY, GEORGE E. MOOSE, JOHN J. SULLIVAN, MARY SWIG, UNITED STATES INSTITUTE OF PEACE, NANCY ZIRKIN. (Attachments: # 1 Exhibit Declaration of George E. Moose)(Goldfarb, Andrew) (Entered: 05/23/2025) |
| 05/23/2025 | 46 | ORDER DENYING defendants' 42 Motion for Stay. See Order for further details. Signed by Judge Beryl A. Howell on May 23, 2025. (lcbah4) (Entered: 05/23/2025) |

**JA16**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES INSTITUTE OF PEACE**, 2301 Constitution Avenue, NW, Washington, DC 20037,

**AMBASSADOR JOHN J. SULLIVAN**, in his official capacity as Chair of the Board of Directors of the United States Institute of Peace, 2301 Constitution Avenue, NW, Washington, DC 20037, and in his individual capacity,

**NANCY ZIRKIN**, in her official capacity as a member of the Board of Directors of the United States Institute of Peace, 2301 Constitution Avenue, NW, Washington, DC 20037, and in her individual capacity,

**JUDY ANSLEY**, in her official capacity as a member of the Board of Directors of the United States Institute of Peace, 2301 Constitution Avenue, NW, Washington, DC 20037, and in her individual capacity,

**JOSEPH L. FALK**, in his official capacity as a member of the Board of Directors of the United States Institute of Peace, 2301 Constitution Avenue, NW, Washington, DC 20037, and in his individual capacity,

**KERRY KENNEDY,** in her official capacity as a member of the Board of Directors of the United States Institute of Peace, 2301 Constitution Avenue, NW, Washington, DC 20037, and in her individual capacity,

**MARY SWIG**, in her official capacity as a member of the Board of Directors of the United States Institute of Peace, 2301 Constitution Avenue, NW, Washington, DC 20037, and in her individual capacity, and

**AMBASSADOR GEORGE E. MOOSE**, in his official capacities as Acting President of the United States Institute of Peace and as an *ex officio* member of the Board of Directors of the

Civil Case No. 25-00804

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

United States Institute of Peace, 2301
Constitution Avenue, NW, Washington, DC
20037, and in his individual capacity,

                 Plaintiffs,

        v.

**KENNETH JACKSON**, in his official capacity
as Assistant to the Administrator for
Management and Resources for USAID and in
his purported capacity as acting president of the
United States Institute of Peace, 1300
Pennsylvania Avenue, NW, Washington, DC
20004,

**U.S. DOGE SERVICE**, 736 Jackson Place,
NW, Washington, DC 20503,

**U.S. DOGE SERVICE TEMPORARY
ORGANIZATION**, 736 Jackson Place, NW,
Washington, DC 20503,

**AMY GLEASON**, in her official capacity as the
Acting Administrator of U.S. DOGE Service and
U.S. DOGE Service Temporary Organization,
736 Jackson Place, NW, Washington, DC 20503,

**JAMES BURNHAM**, in his official capacity as
an employee of the U.S. DOGE Service or the
U.S. DOGE Service Temporary Organization,
736 Jackson Place, NW, Washington, DC 20503,

**JACOB ALTIK**, in his official capacity as an
employee of the U.S. DOGE Service or the U.S.
DOGE Service Temporary Organization, 736
Jackson Place, NW, Washington, DC 20503,

**NATE CAVANAUGH**, in his official capacity
as an employee of the U.S. DOGE Service or the
U.S. DOGE Service Temporary Organization,
736 Jackson Place, NW, Washington, DC 20503,

**MARCO RUBIO**, in his official capacity as the
U.S. Secretary of State and in his official
capacity as an *ex officio* member of the USIP

Board of Directors, 2201 C Street, NW,
Washington, DC 20451,

**PETE HEGSETH**, in his official capacity as the
U.S. Secretary of Defense and in his official
capacity as an *ex officio* member of the USIP
Board of Directors, 1000 Defense Pentagon,
Washington, DC 20301

**VICE ADMIRAL PETER A. GARVIN**, in his
official capacity as President of the National
Defense University and in his official capacity as
an *ex officio* member of the USIP Board of
Directors, 300 5th Ave SW, Building 62, Fort
Lesley J. McNair, Washington, DC 20319,

**TRENT MORSE**, in his official capacity as
Deputy Director of Presidential Personnel in the
White House Presidential Personnel Office, the
White House Office, and the Executive Office of
the President of the United States, 1600
Pennsylvania Avenue, NW, Washington, DC
20500, 1650 17th Street, NW, Washington, DC
20006, and

**DONALD J. TRUMP**, in his official capacity
as President of the United States of America,
1600 Pennsylvania Avenue, NW Washington,
DC 20500,

Defendants.

## AMENDED COMPLAINT

1.    Defendants' lawless, forcible attempt to dismantle Plaintiff United States Institute

of Peace ("the Institute" or "USIP")—an independent nonprofit corporation established by

Congress in 1984 to work with the United States Government and other partners around the world

to help resolve and prevent violent conflicts— and the duly appointed members of its Board of

Directors began on February 19, 2025, with the issuance of an Executive Order titled

"Commencing the Reduction of the Federal Bureaucracy."[1] That Order incorrectly labeled the Institute a part of the "Federal bureaucracy." And contrary to Congress's finding that the Institute represents "the most efficient and immediate means" and "an appropriate investment by" the United States to promote peace and the peaceful resolution of conflicts, 22 U.S.C. § 4601(a), the President declared the Institute "unnecessary" and directed steps to curtail its vital work.

2.      Since then, the attacks on the Institute have escalated to include the unlawful purported firing of all of the Institute's Board members who were presidentially appointed and confirmed by the Senate, including Plaintiffs Ambassador John J. Sullivan, Judy Ansley, Joseph L. Falk, Kerry Kennedy, Mary Swig, and Nancy Zirkin (the "Board Member Plaintiffs" and together with the Institute, "Plaintiffs"); the unlawful purported firing of the Institute's Acting President, Plaintiff Ambassador George Moose, by *ex officio* board members Marco Rubio, Pete Hegseth, and Vice Admiral Peter A. Garvin; and the unlawful attempt to install Defendant Kenneth Jackson as the acting President.

3.      On March 17, 2025, the attacks culminated in the literal trespass and takeover by force by Defendants, including representatives of DOGE, of the Institute's headquarters building on Constitution Avenue. Once physically inside the Institute's headquarters, DOGE personnel and other representatives of Defendants caused physical destruction to the building—including tearing the USIP seal off of the wall—and moved aggressively to gain control of the Institute's infrastructure, including sensitive computer systems.

---

[1] Exec. Order No. 14,217, 90 Fed. Reg. 10,577 (Feb. 25, 2025).

4.    Plaintiffs seek the  intervention of this Court to stop Defendants from completing the unlawful dismantling of the Institute and irreparably impairing Plaintiffs' ability to perform their vital peace promotion and conflict resolution work as tasked by Congress.

5.    Specifically, Plaintiffs seek preliminary and permanent equitable relief (1) declaring Defendants' efforts purporting to remove the Institute's Board members duly appointed under 22 U.S.C. § 4605(b)(4) and the Institute's Acting President Ambassador George Moose, unlawful, null and void, and without legal effect; (2) ordering that the Institute's Board members duly appointed under 22 U.S.C. § 4605(b)(4) and the Institute's Acting President Ambassador George Moose may not be removed or in any way be treated as having been removed, or otherwise be obstructed from their ability to carry out their respective duties; (3) enjoining further trespass by Defendants against real and personal property belonging to the Institute and ejecting Defendants from such property, and (4) enjoining Defendants, or any other person acting in concert with Defendants, from maintaining, retaining, gaining, or exercising any access or control over the Institute's offices, facilities, computer systems, or any other records, files, or resources, and from acting or purporting to act in the name of Institute, and from using the Institute's name, emblem, badge, seal and any other mark of recognition of the Institute until the Court has an opportunity to fully consider and decide upon the issues raised in this Complaint.

## PARTIES

6.    Plaintiff United States Institute of Peace is an "independent nonprofit corporation" established by Congress in 1984. 22 U.S.C. § 4604(b).  The Institute works with partners around the world to help resolve and prevent violent conflicts.  The Institute is headquartered in Washington, D.C., at 2301 Constitution Avenue, NW, Washington, DC 20037. The building (the "USIP headquarters building") is owned by the Institute and sits on land over which the Institute

has administrative jurisdiction.   Ex. A, Amended Declaration of George Moose; Ex. B, Navy Transfer of Admin Jurisdiction; Ex. C, Potomac Annex Transfer of Jurisdiction.   The Institute also has presence in twenty-six countries around the world, including seven field offices.   The Institute employs 414 employees and personal services contractors to carry out its statutory mandate.   Under the USIP ACT, the Institute is authorized to institute civil actions in any court of competent jurisdiction. 22 U.S.C. § 4604(k).

7.    Plaintiff Ambassador John J. Sullivan is a duly appointed member of the Institute's Board of Directors under 22 U.S.C. § 4605(b)(4) and brings this action in his official capacity as Chair of the Institute's Board of Directors, as well as in his individual capacity.

8.    Plaintiff Nancy Zirkin is a duly appointed member of the Institute's Board of Directors under 22 U.S.C. § 4605(b)(4) and brings this action in her official capacity as a member of the Institute's Board, as well as in her individual capacity. Ms. Zirkin is the Vice Chair of the Board of Directors.

9.    Plaintiff Judy Ansley is a duly appointed member of the Institute's Board of Directors under 22 U.S.C. § 4605(b)(4) and brings this action in her official capacity as a member of the Institute's Board, as well as in her individual capacity.

10.    Plaintiff Joseph L. Falk is a duly appointed member of the Institute's Board of Directors under 22 U.S.C. § 4605(b)(4) and brings this action in his official capacity as a member of the Institute's Board, as well as in his individual capacity.

11.    Plaintiff Kerry Kennedy is a duly appointed member of the Institute's Board of Directors under 22 U.S.C. § 4605(b)(4) and brings this action in her official capacity as a member of the Institute's Board, as well as in her individual capacity.

12.    Plaintiff Mary Swig is a duly appointed member of the Institute's Board of Directors under 22 U.S.C. § 4605(b)(4) and brings this action in her official capacity as a member of the Institute's Board, as well as in her individual capacity.

13.    The Board Member Plaintiffs include both Republicans and Democrats.

14.    Plaintiff Ambassador George Moose is the duly appointed Acting President of the Institute under 22 U.S.C. § 4606(a) and brings this action in his official capacity as the Institute's President and in his capacity as an *ex officio* member of the Board of Directors, as well as in his individual capacity. Ambassador Moose began serving as duly appointed Acting President and Chief Executive Officer of the Institute on April 25, 2024.

15.    Defendant Kenneth Jackson is the Assistant to the Administrator for Management and Resources at USAID and, as explained in this Complaint, purports to be the acting president of the United States Institute of Peace.

16.    Defendant U.S. DOGE Service is an entity that was created within the Executive Office of the President by Executive Order 14158.

17.    Defendant U.S. DOGE Service Temporary Organization is an entity that was created within the Executive Office of the President by Executive Order 14158.

18.    Defendant Amy Gleason is the Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

19.    Defendant James Burnham is an employee of the U.S. DOGE Service or the U.S. DOGE Service Temporary Organization.

20.    Defendant Jacob Altik is an employee of the U.S. DOGE Service or the U.S. DOGE Service Temporary Organization.

21.     Defendant Nate Cavanaugh is an employee of the U.S. DOGE Service or the U.S. DOGE Service Temporary Organization.

22.     Defendant Marco Rubio is the U.S. Secretary of State and is an *ex officio* member of the USIP Board of Directors.

23.     Defendant Pete Hegseth is the U.S. Secretary of Defense and is an *ex officio* member of the USIP Board of Directors.

24.     Defendant Vice Admiral Peter A. Garvin is the President of the National Defense University and is an *ex officio* member of the USIP Board of Directors.

25.     Defendant Trent Morse is Deputy Director of Presidential Personnel in the White House Presidential Personnel Office, the White House Office, and the Executive Office of the President.

26.     Defendant Donald J. Trump is the President of the United States.

## JURISDICTION AND VENUE

27.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1361, 1651, 2201, and 2202, and because Plaintiffs allege violations of the United States Institute of Peace Act, 22 U.S.C. § 4601 *et seq.*

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

## LEGAL FRAMEWORK

29.     In 1984, under the leadership of two World War II veterans, Senators Mark Hatfield, a Republican, and Spark Matsunaga a Democrat, Congress enacted the United States

Institute of Peace Act (the "USIP Act"), which was signed into law by President Ronald Reagan.[2]

That Act of Congress established "an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." 22 U.S.C. § 4601(b).

30.    Congress confirmed the Institute's status as an independent nonprofit corporation outside of the Executive branch throughout the USIP Act. 22 U.S.C. § 4603(b). Consistent with that, Congress exempted the Institute from federal income tax. 22 U.S.C. § 4603(b). Congress granted the corporation all the powers of a nonprofit corporation under the District of Columbia Nonprofit Corporation Act except the power to dissolve itself, a power reserved to Congress. 22 U.S.C. § 4604(a).

31.    Congress vested "[t]he powers of the Institute" in a Board of Directors. All of the Board's fifteen members (including the Secretaries of State and Defense and the President of the National Defense University as *ex officio* members) must be "appointed by the President, by and with the advice and consent of the Senate." 22 U.S.C. § 4605(b). "Not more than eight voting members of the Board . . . may be members of the same political party." *Id.* at § 4605(c). The three *ex officio* members serve at the pleasure of the President, while the twelve remaining members may not be officers or employees of the United States Government. 22 U.S.C. § 4605(d)(2).

--------

[2] United States Institute of Peace Act, Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984), 22 U.S.C. § 4601-4611, as amended.

32. Critically for this action, the twelve board members appointed under 22 U.S.C. § 4605(b)(4) may only be removed by the President "(1) in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties; (2) upon the recommendation of eight voting members of the Board; or (3) upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate." *Id.* at §§ 4605(b), (d), (f). None of the three exclusive methods for removal of a Board member under § 4605(f) was followed here.

33. Third, Congress protected the independence of the Institute's officers and employees by providing that the president of the Institute is appointed by the Institute's Board, and that "[a]ll officers shall serve at the pleasure of the Board." 22 U.S.C. § 4606(a). In addition, Congress explicitly provided that officers and employees of the Institute are not officers or employees of the Federal Government except as related to liability and compensation levels. 22 U.S.C. § 4606(f).

34. Congress prohibited the use of political tests or political qualifications with respect to personnel actions and the selection of grantees, contractors, or other recipients of Institute funds. 22 U.S.C. § 4608(b).

35. Congress established various transparency requirements regarding the Institute's activities and use of Federal funds, including requiring the Institute to provide to the President of the United States and each House of Congress an audit report that examines "[a]ll books, accounts, financial records, files, and other papers, things, and property belonging to or in use by the Institute," 22 U.S.C. § 4607(h). The only Executive oversight authorized by Congress with respect

to the Institute's financial activities is "the authority of the Office of Management and Budget to review and submit comments on the Institute's budget request at the time it is transmitted to Congress." 22 U.S.C. § 4608(a).

## FACTUAL ALLEGATIONS

**A.    Executive Order 14217**

36.    On February 19, 2025, President Trump signed Executive Order 14217.

37.    The stated purpose of the Executive Order is to "reduce the size of the Federal Government," with "a reduction in the elements . . . that the President has determined are unnecessary."

38.    The Executive Order lists entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."

39.    The Executive Order names the Institute as one of the entities purportedly covered by the order.

40.    The Executive Order gave "the head of each unnecessary governmental entity" 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components thereof, are statutorily required and to what extent."

41.    The Executive Order further provided that, in response to those reports, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order."

42.    The Executive Order "shall be implemented consistent with applicable law and subject to the availability of appropriations."

**B.    DOGE Takes Action**

43.    On February 20, 2025, the day after the Executive Order was issued, Chris Young, a representative of the U.S. DOGE Service, contacted the Institute.

44.    The Institute agreed to hold a virtual meeting with DOGE representatives on February 24, 2025.  Ex. A, Amended Declaration of George Moose; Ex. D, Declaration of George Foote.

45.    In that February 24 meeting, the Institute Acting President, Ambassador Moose, and outside counsel for the Institute, George Foote, explained to DOGE representatives Cavanaugh, Burnham, and Altik that the Institute is an independent nonprofit corporation outside of the Executive branch.   Ex. A, Amended Declaration of George Moose; Ex. D, Declaration of George Foote.

46.    On March 5, 2025, the Institute submitted a courtesy letter to OMB responding to the requests made in the Executive Order.  The letter explained the Institute's establishment by Congress and its status as an independent nonprofit that is not an Executive branch entity and reiterated the Institute's willingness to maintain its longstanding cooperation with the Executive branch with regard to the foreign policy agenda of the President of the United States.  Ex. D, OMB Letter.

47.    On or about March 8, 2025, Mr. Moose received word that DOGE was making inquiries into the status of the Institute's security operations.  These inquiries were intended to facilitate DOGE's access to the Institute's headquarters, just as DOGE had done with respect to numerous executive agencies. Ex. A, Amended Declaration of George Moose.

48.    On or about March 9, 2025, USIP outside counsel George Foote emailed Defendants Burnham, Altik, and Cavanaugh with information about the private nature of the Institute's security and the Institute's ownership of its headquarters building.  Mr. Foote again confirmed that the Institute is an independent nonprofit corporation and stated that unauthorized personnel would only be admitted with a valid warrant issued by a court.  Ex. D., Declaration of George Foote.

**C.    The Administration's Unlawful Purported Removal of Board Members**

49.    On or about March 14, 2025, the Institute's Board of Directors had 13 members: the three *ex officio* members under 22 U.S.C. § 4605(b)(1)-(3), and 10 members (five Republicans and five Democrats) who had been duly appointed with the advice and consent of the Senate pursuant to 22 U.S.C. § 4605(b)(4).  The six Board Member Plaintiffs were among the 10 duly appointed Institute Board members.

50.    On or about March 14, 2025, Trent Morse of the White House Presidential Personnel Office emailed certain members of the Board, including the Board Member Plaintiffs, claiming to inform them of their termination from the Board by President Trump.  Those emails did not state any justification for the purported terminations. *See* Ex. D, Declaration of George Foote.

51.    Shortly thereafter, on March 14, 2025, representatives from DOGE and Defendant Jackson appeared at USIP headquarters building requesting access.  Because the Institute has administrative jurisdiction over the parcel of land on which its headquarters sits and the USIP building is owned by the Institute, those representatives were denied entry.

52.    Later that same evening, Defendants Altik and Cavanaugh returned to the Institute's headquarters accompanied by FBI Special Agents and presented Mr. Foote with a

"resolution" signed by the three *ex officio* members of the Board purporting to remove Mr. Moose from his position as Acting President of the Institute. Ex. F, *Ex Officio* Resolution.

53.    The resolution of the *ex officio* Board members also purported to install Defendant Jackson as the acting president of the Institute.

**D.    Trespass by DOGE Representatives on and against Institute Property**

54.    As noted, the Institute owns, occupies, possesses, and controls its headquarters building, which is located at 2301 Constitution Avenue, NW, Washington, DC 20037 ("USIP headquarters building"). Ex. A, Amended Declaration of George Moose. The USIP headquarters building was built by private contractors engaged by USIP and paid by a combination of special appropriations and private gifts, as authorized by 22 U.S.C. § 4604(h)(3)(A).The Institute owns, possesses, and controls personal property, including but not limited to records, files, computer equipment, other office equipment, furniture, and miscellaneous items, located within the USIP headquarters building and at other locations. Ex. A, Amended Declaration of George Moose.

55.    While the USIP headquarters building is situated on a parcel of land owned by the United States of America, the U.S. Department of the Navy transferred administrative jurisdiction of that parcel of real property to the Institute on November 21, 1996, following congressional enactment into law of, and consistent with, Section 2831 of the National Defense Authorization Act for Fiscal Year 1997 ("USIP parcel of land").

56.    On March 17, 2025, at approximately 2:30 p.m., four employees of Inter-Con Security Systems Inc. ("Inter-Con"), USIP's former security contractor, arrived at USIP headquarters.[3] Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien. They

_____

[3] In light of Inter-Con's efforts to coordinate with Defendants and facilitate access to the USIP headquarters building by the DOGE Defendants and Defendant Jackson, USIP suspended

were unable to enter the building because their badges had been deactivated upon suspension of USIP's contract with Inter-Con.  Ex. G, Declaration of Colin O'Brien.

57.    Upon their failed entry, another Inter-Con employee, Mr. Kevin Simpson, arrived with a physical key that USIP had not yet confiscated after the suspension of the Inter-Con contract.  Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien.  Mr. Simpson used his key to gain entrance into the USIP headquarters building and let the other Inter-Con employees in.  Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien.

58.    After entering the headquarters building, the Inter-Con employees were advised by Mr. Foote that they were trespassing.  Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien.  Mr. Simpson and the staffers ignored Mr. Foote and proceeded to walk toward the Institute's gun safe.  Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien. Mr. Foote subsequently called the Washington, D.C. Metropolitan Police Department ("the MPD") to report the unlawful intrusion.  Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien.  As the Inter-Con staff made their way to the gun safe, a building lockdown was initiated by Mr. O'Brien after consultation with Mr. Moose.  Ex. G, Declaration of Colin O'Brien.

59.    Inter-Con and DOGE personnel engaged in additional attempts to unlawfully access the USIP headquarters building, but were eventually able to enter the building, forcibly occupy it, and expel  the duly appointed USIP Acting President, other USIP personnel, and outside counsel.  *See* Ex. G, Declaration of Colin O'Brien.

---

its contract with Inter-Con on March 16 and terminated that contract on March 17. Ex. D, Declaration of George Foote; Ex. G, Declaration of Colin O'Brien.

60.    In the days after the March 17 takeover of the USIP headquarters building, Defendants' aggressive efforts to gain control of USIP property and systems and to paralyze the organization continued, including ordering a cut-off of USIP funds.

61.    On or about March 21, 2025, Defendant Jackson purported to fire at least six USIP employees based on their "at-will-employment status." Ex. A, Amended Declaration of George Moose.

**E. Defendants' Actions Are Causing Irreparable Harm to Plaintiffs**

62.    Unless Defendants are permanently enjoined from continuing their attacks on USIP, Plaintiffs will suffer irreparable harm.

63.    Defendants have made clear that their goal is to reduce the Institute to what is, in Defendants' view, the "statutory minimums."  Such reduction would entail permanently shutting down all functions and activities of the Institute except for the maintenance of its Board, the appointment of a president, the payment of incidental expenses for the Board, and the submission of certain reports to Congress and the Executive branch.

64.    Anticipated imminent activities by Defendants almost certainly include, *inter alia*, cancelling most, if not all, of the Institute's personal service contracts; cancelling contracts with vendors; cancelling agreements with the Institute's partners; freezing payments to vendors, grantees, and employees; placing Institute staff on administrative leave or terminating their employment; accessing computer systems; modifying and deleting electronic files, records, including studies, analyses, and underlying data, and deleting databases that contain information of USIP contacts and partners; destroying physical files; disposing of other Institute property.  Ex. H, Declaration of Shira Lowringer. As noted above, the firing of USIP staff has begun.

65.     Consistent with the Executive Order's stated goal and DOGE's prior practice, Defendants will likely cancel most, if not all, of the Institute's contracts with vendors and partners. The cancellation of all existing contracts threatens two irreparable injuries for the Institute. The first irreparable injury facing the Institute is potential liability for breach of contract. If the Defendants were to cancel the Institute's existing contracts with its vendors and partners, the Institute would be in breach of said contracts and, therefore, vulnerable to lawsuits from its vendors and partners.

66.     Typically, the threat of a breach of contract claim would not be considered an irreparable harm because the injured party could recover in a subsequent lawsuit. Here, however, the Institute would have no guarantee of recovering monetary damages from the Defendants because the Defendants are protected by sovereign immunity. *Wages and White Lion Investments, L.L.C., v. United States Food and Drug Administration*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citing *Alabama-Coushatta Tribe of Texas v. Unted States*, 757 F.3d 484, 488 (5th Cir. 2014)) (stating "Federal agencies generally enjoy sovereign immunity for any monetary damages."). Irreparable harm exists when a party has "no guarantee of eventual recovery." *Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758, 765 (2021).

67.     Moreover, cancelling the Institute's contracts threatens irreparable harm to the Institute's goodwill and reputation. This court has held that "[i]njury to reputation and goodwill is not easily measured in monetary terms," and is therefore "often viewed as irreparable." *Jones v. District of Columbia*, 177 F.Supp.3d 542, 547 (D.D.C. 2016) (citing 11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (3d ed. 2013 & 2015 Supp.). This court has been explicit that "harm to reputation has been recognized repeatedly as a type of irreparable injury."

*Brodie v. U.S. Dep't of Health and Human Services*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) (citing *Alf v. Donley*, 666 F.Supp.2d 60, 69 (D.D.C. 2009)).

68.     Further, all duly appointed USIP Board members are suffering irreparable harm as long as they are deprived of their statutory entitlement to serve as members of the Institute's Board.

69.     The duly appointed USIP Board members have fiduciary duties to act in the best interests of USIP. Consistent with these duties, they must take action to halt Defendants' unlawful, unauthorized attempts to dismantle the organization.

70.     This Court has recognized that even if the deprivation of a Senate-confirmed appointee's "statutory right to function" is temporary, the injury to them and their organization is both significant and irreparable. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (granting preliminary injunction against removal of plaintiffs as members of the U.S. Commission on Civil Rights), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam). Certainly, a damages remedy after a final judgment and all appeals have been exhausted is ordinarily inadequate. *See Mackie v. Bush*, 809 F. Supp. 144, 147 (D.D.C. 1993) (granting TRO against removal of plaintiff members of Postal Service Board of Governors), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993) (per curiam).

## CAUSES OF ACTION

**Count I**
***Ultra Vires* Action**
**28 U.S.C. § 1361**
**(All Defendants)**

71.     Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

72.     Plaintiffs have a right of action to enjoin and declare unlawful official action that is *ultra vires*.

73. The Constitution vests executive power in the President. U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

74. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. U.S. Const., art. I. The executive power vested in the President in art. II, § 1 to faithfully execute law does not include the authority to amend or disregard acts of Congress.

75. Under the USIP Act, Congress established the Institute as an independent nonprofit corporation. 22 U.S.C. § 4603(b).

76. "Insofar as Congress has made explicit statutory requirements, they must be observed." *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 296 (1945).

77. Defendants' actions to exert control over USIP exceed executive authority, usurp legislative authority conferred upon Congress by the Constitution, violate the separation of powers, are *ultra vires*, and should be enjoined.

**Count II**
**Violation of the USIP Act**
**22 U.S.C. § 4605(f)**
**28 U.S.C. § 1361**
**(All Defendants)**

78. Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

79. Under the USIP Act, Congress established the Institute as an independent nonprofit corporation. 22 U.S.C. § 4603(b). Per the statute, "[t]he Institute may exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act." 22 U.S.C. § 4604(a). The USIP Act further establishes the governance structure of the Institute,

mandating that "[t]he powers of the Institute shall be vested in a Board of Directors."  22 U.S.C. § 4605(a).

80.    The statute sets out the exclusive methods and circumstances under which a member of the Board appointed with the advice and consent of the Senate under 22 U.S.C. § 4605(b)(4) may be removed.  22 U.S.C. § 4605(f).

81.    The notices emailed to such Board members purporting to terminate them did not satisfy any of the methods or bases for removal in 22 U.S.C. § 4605(f).

82.    President Trump failed to comply with 22 U.S.C. § 4605(f)(1) by purporting to terminate members of the Board without "consult[ing] with the Board" and without identifying any "conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties."  22 U.S.C. § 4605(f)(1).

83.    President Trump failed to comply with 22 U.S.C. § 4605(f)(2) by purporting to remove the members of the Board without "the recommendation of eight voting members of the Board."

84.    President Trump failed to comply with 22 U.S.C. § 4605(f)(3) by purporting to remove the members of the Board without "the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate [now the HELP Committee]".

85.    Accordingly, President Trump's actions to remove the members of the Institute's Board are unlawful and without legal effect.

**Count III**
***Ultra Vires* Action**
**22 U.S.C. § 4605**
**28 U.S.C. § 1361**
**(Defendants Rubio, Hegseth, Garvin)**

86.     Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

87.     The purported Board resolution attempting to remove George Moose as Acting President of the Institute, which resolution was adopted by the three *ex officio* members of the Board, was *ultra vires* because the purported removal of the Institute's Board members duly appointed pursuant to 22 U.S.C. § 4605(b)(4) was in violation of the USIP Act and without legal effect, as discussed in Count II.

88.     Under the USIP Act, "the Board shall appoint the president of the Institute and such other officers as the Board determines to be necessary." 22 U.S.C. § 4606(a).  The Act requires Board meetings to be conducted "at any time pursuant to the call of the Chairman, or as required in writing to the Chairman by at least five members of the Board." 22. U.S.C. § 4605(h)(2). Further, "[a] majority of the members of the Board shall constitute a quorum for any Board meeting." *Id.*

89.     As discussed in Count II, President Trump's purported termination of the Board members, including the Chairman, John Sullivan, violated the USIP Act and thus has no legal effect.  Thus, the Institute's Board members, including Chairman Sullivan, continued to be duly appointed, lawful members of the Institutes' Board at the time of the purported meeting of the three *ex officio* Board members that resulted in the "resolution" to remove Mr. Moose.

90.     Accordingly, the purported meeting of the *ex officio* Board members was not conducted "pursuant to the call of the Chairman." 22 U.S.C. § 4605(h)(2). That purported meeting

was not "requested in writing to the Chairman by at least five members of the Board." *Id.* Nor did the meeting have the quorum required for official Board action. *Id.* Thus, any purported meeting of the *ex officio* members that occurred was not an authorized meeting of the Institute's Board.

91.    The purported termination of Plaintiff Ambassador Moose as Acting President was undertaken inconsistently with the Institute's bylaws and provisions of the USIP Act governing Board procedure.

92.    As a result, the purported termination of Mr. Moose as Acting President of the Institute was *ultra vires* and without legal effect.

**Count IV**
***Ultra Vires* Action**
**22 U.S.C. § 4605**
**28 U.S.C. § 1361**
**(Defendants Jackson, Rubio, Hegseth, Garvin)**

93.    Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

94.    The purported Board resolution attempting to designate Defendant Jackson as acting president of the Institute, which resolution was adopted by the three *ex officio* members of the Board, was *ultra vires* because the purported removal of the Institute's Board members duly appointed pursuant to 22 U.S.C. § 4605(b)(4) was in violation of the USIP Act and without legal effect, as discussed in Counts II and III.

95.    Under the USIP Act, "the Board shall appoint the president of the Institute and such other officers as the Board determines to be necessary." 22 U.S.C. § 4606(a). The Act requires Board meetings to be conducted "at any time pursuant to the call of the Chairman, or as required in writing to the Chairman by at least five members of the Board." 22. U.S.C. § 4605(h)(2).

Further, "[a] majority of the members of the Board shall constitute a quorum for any Board meeting." *Id.*

96.    As discussed in Counts I and II, President Trump's purported termination of the Board members, including Chairman John Sullivan, violated the USIP Act and thus has no legal effect. Thus, the Institute's Board members, including Chairman Sullivan, continued to be duly appointed, lawful members of the Institutes' Board at the time of the purported meeting of the three *ex officio* Board members that resulted in the "resolution" to install Mr. Jackson as acting president.

97.    Accordingly, the purported meeting of the *ex officio* Board members was not conducted "pursuant to the call of the Chairman." 22 U.S.C. § 4605(h)(2). That purported meeting was not "requested in writing to the Chairman by at least five members of the Board." *Id.* Nor did the meeting have the quorum required for official Board action. *Id.* Thus, any purported meeting of the *ex officio* members that occurred was not an authorized meeting of the Institute's Board.

98.    The purported designation of Mr. Jackson as acting president of the Institute was undertaken inconsistently with the Institute's bylaws and provisions of the USIP Act governing Board procedure.

99.    As a result, the purported designation of Mr. Jackson as acting president of the Institute was *ultra vires* and without legal effect.

**Count V**
**Administrative Procedure Act**
**5 U.S.C. § 701, et seq.**
**(Defendants Jackson, Rubio, Hegseth, Garvin)**

100.    Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

101.    To the extent Defendants Rubio, Hegseth, and Garvin were acting in their official capacities as Secretary of State, Secretary of Defense, and President of the National Defense University, respectively, their actions are reviewable under the Administrative Procedure Act. 5 U.S.C. § 702.

102.    The actions of Defendants Rubio, Hegseth, and Garvin set forth herein should be held unlawful and set aside because they were and are arbitrary; capricious; abuses of discretion; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; and otherwise not in accordance with law." 5 U.S.C. § 706.

### Count VI
### Ejectment for Trespass, Attempted Trespass, and Threatened Trespass to Real and Personal Property
### (Defendants Jackson, U.S. DOGE Service, U.S. DOGE Service Temporary Organization)

103.    Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

104.    Plaintiff USIP is, and at all times mentioned in this Complaint was, the owner, occupier, possessor, and controller of the USIP headquarters building.

105.    Plaintiff USIP is, and at all times mentioned in this Complaint was, the owner, possessor, and controller of personal property, including but not limited to records, files, computer equipment, other office equipment, furniture, and miscellaneous items, located within the USIP headquarters building and at other locations.

106.    At all times relevant to this Complaint, Plaintiff USIP is, and was, the occupier, possessor, controller, and steward of the USIP parcel of land located at 2301 Constitution Avenue, NW, Washington, DC 20037.

107.    At all times relevant to this Complaint, Plaintiff USIP has and had administrative jurisdiction over the USIP parcel of land.

108.    Defendants, including DOGE and its representatives, have willfully and repeatedly trespassed upon and obstructed Plaintiff USIP's use and enjoyment of its real property as described in this Complaint.    Defendants, including DOGE and its representatives, have willfully and repeatedly attempted to further trespass upon and obstruct Plaintiff USIP's use and enjoyment of its real property as described in this Complaint.    Defendants, including DOGE and its representatives, have willfully and repeatedly threatened to, in the future, trespass upon and obstruct Plaintiff USIP's use and enjoyment of its real property as described in this Complaint.

109.    Defendants who trespassed on USIP headquarters property did so in their official capacity as representatives of DOGE.

110.    Plaintiff USIP repeatedly advised Defendants in writing and otherwise that DOGE representatives, and other persons not authorized by the Institute, were not permitted to enter the USIP headquarters building and were not permitted to enter onto the USIP parcel of land.

111.    Accordingly, Defendants knew or should have known that such trespass was in violation of Plaintiff's USIP's right to free enjoyment and use of its property.

112.    Defendants have threatened future trespass to personal property of Plaintiff USIP, with the intention of, *inter alia*, accessing and modifying Institute computer systems and disposing of or destroying other personal property owned by the Institute.    The statements and actions by DOGE representatives evidence their intention to impair the operations of the Institute by, *inter alia*, freezing payments to vendors and grantees, terminating contracts, deleting or destroying electronic and physical files and records, and otherwise disposing of or destroying personal property belonging to the Institute.

113.    Unless Defendants are enjoined, Plaintiff USIP will suffer irreparable injury.

114.    Injunctions to remove unlawful occupants from real property have long been recognized in common law as ejectment.  *See* D.C. Code 16-1101.

**Count VII**
**Declaratory Judgment Act**
**28 U.S.C. §§ 2201 and 2202**
**(All Defendants)**

115.    Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as if fully set forth here.

116.    Plaintiffs are entitled to declaratory relief on the basis of all claims identified.  There is substantial and ongoing controversy between Plaintiffs and Defendants, which creates confusion among the Institute's staff, external partners, and the public regarding who has the authority to control and direct actions of the Institute.  A declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Institute's Board members, whom the President of the United States has illegally attempted to remove, lawfully remain members of the Institute's Board of Directors, and that Ambassador Moose lawfully remains the Acting President of the Institute.  Plaintiffs further request declaratory relief to make clear that Defendant Jackson has not been lawfully appointed to any position within the Institute.

<u>DEMAND FOR JUDGMENT AND RELIEF</u>

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this Court:

(1) Sustain Plaintiffs' Complaint herein;

(2) Enter a preliminary and permanent injunction[4] ordering that the Institute's Board members duly appointed under 22 U.S.C. § 4605(b)(4), including the Board Member Plaintiffs, may not be removed from the Board or in any way be treated as having been removed, denied, or otherwise be obstructed from their ability to carry out their duties as Board members;

(3) Enter a preliminary and permanent injunction ordering that George Moose may not be removed as USIP Acting President or in any way be treated as having been removed, denied, or obstructed in accessing any of the benefits or resources of his office or otherwise be obstructed from his ability to carry out his duties as Acting President;

(4) Enter a preliminary and permanent injunction compelling that the emails purporting to terminate the Institute's Board members duly appointed under 22 U.S.C. § 4605(b)(4) and the notice purporting to terminate Plaintiff Moose be withdrawn and rescinded as null and void,

---

[4] To the extent that the Government intends to seek a security under Rule 65(c), Plaintiffs request that the security be waived in this case. District courts enjoy broad discretion to determine the security amount or to waive the security requirement altogether. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) ("Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all.") (quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)); *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995). There is a longstanding exception to the security requirement in public-interest cases like these. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]ublic-interest litigation [constitutes] an area in which the courts have recognized an exception to the Rule 65 security requirement."); *Natural Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) ("The purpose of the security given under Rule 65(c) is to cover the costs and damages suffered by the party wrongfully enjoined. It would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party.").

(5) Enter a preliminary and permanent injunction ejecting Defendants from the USIP parcel of land and USIP headquarters building and prohibiting trespass by Defendants against real and personal property belonging to the Institute;

(6) Enter a preliminary and permanent injunction prohibiting Defendants, or any other person acting in concert with Defendants, from maintaining, retaining, gaining, or exercising any access or control over Plaintiffs' offices, facilities, computer systems, accounts, or any other records, files, or resources, and from acting or purporting to act in the name of Institute, and from using the Institute's name, emblem, badge, seal, and any other mark of recognition of the Institute;

(7) Declare that the Institute's Board members duly appointed under 22 U.S.C. § 4605(b)(4), including the Board Member Plaintiffs, lawfully remain members of the Institute's Board of Directors;

(8) Declare that Ambassador George Moose lawfully remains the Acting President of the Institute;

(9) Declare that Mr. Kenneth Jackson has not been lawfully appointed to any position within the Institute;

(10)    Provide any such further relief as this Court deems just and proper.


Respectfully submitted,

Dated: March 24, 2025

*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb (D.C. Bar 455751)
J. Benjamin Jernigan (D.C. Bar 9000865)
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800

Fax: (202) 822-8106
agoldfarb@zuckerman.com
bjernigan@zuckerman.com


*Counsel to Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 24th day of March, 2025, I caused the foregoing to be filed

electronically with the Clerk of the Court using CM/ECF, which will then send a notification of

such filing to all counsel of record.


*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb
*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES INSTITUTE OF PEACE**, *et al.*, | |
| Plaintiffs, | |
| v. | **Case No. 1:25-cv-00804-BAH** |
| **KENNETH JACKSON**, *et al.*, | |
| Defendants. | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), Plaintiffs hereby provide the following statement of material facts as to which there is no genuine issue.

## CREATION OF UNITED STATES INSTITUTE OF PEACE

1.      In 1984, Congress established the United States Institute of Peace ("USIP" or "the Institute") as an independent nonprofit corporation pursuant to the United States Institute of Peace Act (the "USIP Act").  Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984), 22 U.S.C. §§ 4601-4611, as amended.

2.      The Institute's creation followed the 1980 formation of the Commission on Proposals for the National Academy of Peace and Conflict Resolution ("the Commission").  Pub. L. No. 95-561, 92 Stat. 2143, 2376 (1980).  The Commission published its final report on the creation of a United States Peace Academy in 1981.  *See* Commission on Proposals for the National Academy of Peace & Conflict Resolution, *To Establish the United States Academy of Peace: Report to the President and Congress* (1981) ("Matsunaga Commission Report").

10133397.1

**JA47**

3.      Congress found that "there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information," and that the Institute represents "the most efficient and immediate means" and "an appropriate investment by" the United States to promote peace and the peaceful resolution of conflicts. 22 U.S.C. § 4601(a).

4.      Congress designed the Institute to "carry out its activities outside the day-to-day policymaking pressures and constraints which might impinge upon that freedom were [the Institute] to be part of an existing agency or department." S. REP. NO. 98-244, at 23 (1983) (favorably reporting S. 564 to establish the U.S. Academy of Peace) (Ex. 26).  *See also* 130 CONG. REC. 17,504 (1984) (proposing S. 564 as Hatfield Amendment No. 3270 to the Department of Defense Authorization Act, 1985, H.R. 5167, 98th Cong. (1984)).

5.      Congress stressed the Institute's role as a resource for both the legislative and executive branches. *Id.* (stating importance of an entity "whose only role is to explore alternatives to international violence and to bring those alternatives to the attention of those in a position of trust, within both the legislative and executive branches.").

## USIP ASSETS: THE HEADQUARTERS BUILDING, ENDOWMENT MONIES, AND STORED COMPUTER INFORMATION

6.      The Institute's headquarters building is located at 2301 Constitution Avenue, NW, Washington, DC 20037.

7.      The land on which the USIP headquarters sits is owned by the United States; however, Congress authorized the transfer of administrative jurisdiction over that land from the U.S. Department of the Navy to the Institute pursuant to Section 2831 of the National Defense

10133397.1

**JA48**

Authorization Act for Fiscal Year 1997.  The U.S. Navy completed that transfer on November 21, 1996.  Amended Compl. Ex. B (ECF No. 12-2).

8.      Congress authorized the transfer of administrative jurisdiction over an adjacent parcel of land pursuant to Section 2842 of the John Warner National Defense Authorization Act for Fiscal Year 2007.  The U.S. Navy completed that transfer on August 29, 2012.  Amended Compl. Ex. C (ECF No. 12-3).

9.      The Institute constructed its headquarters building beginning in 2008.  The building was initially funded with about $70 million of private contributions and $99 million of funds specially appropriated by Congress.  *See* Pub. L. No. 108-447, div. J, §§ 118, 122, 118 Stat. 2809, 3347-48 (Dec. 8, 2004).  After an additional appropriation of $15 million and completion of the building, *see* Pub. L. No. 111-117, div. F, tit. I, 123 Stat. 3034, 3319 (Dec. 16, 2009), Congress prohibited further use of appropriated funds for construction.  *See*, *e.g.*, Pub. L. No. 112-10, § 2103, 125 Stat. 38, 177 (Apr. 15, 2011); Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 736 (Mar. 23, 2024).  USIP has used private funds for building maintenance and renovation. Ex. 3, Decl. of Allison Blotzer ¶ 5.

10.      Pursuant to Congressional authority, § 4603(c), in 1986 the Institute created a separate nonprofit legal entity, the "Endowment of the United States Institute of Peace," under District of Columbia law.  Ex. 17, Endowment of the US Institute of Peace Form 990 (2022).

11.      The Endowment has held significant assets for the Institute, including bank accounts holding yet-unexpended appropriated funds pursuant to § 4609(b), as well as contributions from private sources for the limited purposes permitted by § 4604(h)(3). As of March 14, 2025, the Endowment's accounts held approximately $15 million in private contributions for the limited purposes permitted by § 4604(h)(3), and approximately $10 million

in unexpended appropriated funds pursuant to § 4609(b).  Exhibit 3, Decl. of Allison Blotzer ¶¶ 3-4 X.

12.    USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support Institutional Review Board standards for research using human subjects. Amended Compl. Ex. H Decl. of Shira Lowinger ¶ 10 (ECF No. 12-8).

13.    USIP's computer systems contain decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of control of intellectual property documentation renders USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out a core part of its mission, which is education and training. *Id.* ¶ 13.

14.    USIP electronically maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits, tax reporting obligations, and its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 16.

**USIP BOARD OF DIRECTORS AND ACTING PRESIDENT GEORGE MOOSE**

15.    As provided in the USIP Act, 22 U.S.C. § 4605(b), the Institute's Board of Directors (the "USIP Board"), consists of three *ex officio* members (the Secretary of State, the Secretary of Defense, and the president of the National Defense University) and twelve members

4

appointed by the President with the advice and consent of the Senate. *See also* Ex. 37, USIP Bylaws.

16.    As of March 13, 2014, the USIP Board had 14 members: the three *ex officio* members plus 11 individuals duly appointed pursuant to § 4605(b)(4). One of the (b)(4) Board members resigned on March 14, leaving 10 (b)(4) Board members.

17.    *Ex officio* member Secretary of State Marco Rubio was confirmed by the U.S. Senate as the Secretary of State on January 20, 2025.  171 CONG. REC. S259 (daily ed. Jan. 20, 2025) (confirmation).

18.    *Ex officio* member Secretary of State Pete Hegseth was confirmed by the U.S. Senate as the Secretary of Defense on January 24, 2025.  171 CONG. REC. S374 (daily ed. Jan. 24, 2025) (confirmation).

19.    *Ex officio* member Vice Admiral Garvin assumed command as the president of the National Defense University on October 11, 2024.  Ex. 18, National Defense University, "VADM Peter A. Garvin, USN," (*available at* https://www.ndu.edu/About/Leadership/Article-View/Article/2492624/vadm-peter-a-garvin-usn/).

20.    Ambassador John Sullivan was confirmed by the U.S. Senate as a member of the USIP Board on May 2, 2024.  170 CONG. REC. S3369 (daily ed. May 2, 2024) (confirmations). His term began on July 20, 2024.[1]  He fills one of the Republican slots. Ex. 19, Sullivan Appointment Affidavit (2024).

21.    Nancy Zirkin was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008. 154 CONG. REC. S5124 (daily ed. June 4, 2008) (confirmations).  Her term

---

[1] *See* 22 U.S.C. § 4605(e)(5).

10133397.1

began on October 16, 2008. She fills one of the Democratic slots.  Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace," (Oct. 16, 2008).

22.    Judy Ansley was simultaneously nominated to complete a prior USIP Board member's term and for reappointment as a member of the USIP Board.  157 CONG. REC. S293 (daily ed. Jan. 26, 2011).  She was confirmed by the U.S. Senate for both terms on May 26, 2011.  157 CONG. REC. S3468 (daily ed. May 26, 2011) (confirmations).  She was sworn in on June 6, 2011.  She fills one of the Republican slots.  Ex. 21, USIP, "New Members for USIP Board of Directors Sworn In," (June 7, 2011).

23.    Joseph Falk was confirmed by the U.S. Senate as a member of the USIP Board on February 2, 2023.  169 CONG. REC. S242 (daily ed. Feb. 2, 2023) (confirmations).  His term began on April 29, 2023. He fills one of the Democratic slots.  Ex. 6, Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025).

24.    Kerry Kennedy was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008.  154 CONG. REC. S5124 (daily ed. June 4, 2008) (confirmations).  Her term began on October 16, 2008. She fills one of the Democratic slots.  Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace," (Oct. 16, 2008).

25.    Mary Swig was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022.  168 CONG. REC. S4048 (daily ed. Aug. 4, 2022) (confirmations).  Her term began on October 19, 2022. She fills one of the Democratic slots.  Ex. 5, Decl. of Mary Swig, ¶ 3 (Apr. 3, 2025).

26.    Jonathan Burks was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022.  168 CONG. REC. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Republican slots.  Ex. 5, Decl. of Mary Swig, ¶ 3.

6

10133397.1

27.     Edward M. Gabriel was confirmed by the U.S. Senate as a member of the USIP

Board on August 4, 2022.  168 CONG. REC. S4048 (daily ed. Aug. 4, 2022) (confirmations). His

term began on October 19, 2022. He fills one of the Democratic slots.  Ex. 5, Decl. of Mary

Swig, ¶ 3.

28.     Michael Singh was confirmed by the U.S. Senate as a member of the USIP Board

on August 4, 2022.  168 CONG. REC. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term

began on October 19, 2022. He fills one of the Republican slots.  Ex. 5, Decl. of Mary Swig, ¶ 3.

29.     Roger Zakheim was confirmed by the U.S. Senate as a member of the USIP

Board on January 30, 2023.  169 CONG. REC. S152 (daily ed. Jan. 30, 2023) (confirmation). His

term began on April 29, 2023. He fills one of the Republican slots. Ex. 6, Decl. of Joseph Falk,

¶ 3 (Apr. 3, 2025).

30.     The remaining two appointed positions on the Board are vacant.

31.     The USIP Board appointed Ambassador George E. Moose as the Acting President

of the Institute in April 2024. Ambassador Moose served on the USIP Board from 2007 to 2023,

first as a member, then as Vice Chair and from October 2022 until a few months before his

appointment to Acting President, as Chair. Amended Compl. Ex. A, Amended Decl. of George

Moose ¶ 3 (ECF No. 12-1). Prior to joining the USIP Board, Ambassador Moose served in many

governmental roles, including as Ambassador to the Republics of Benin and Senegal in the

1980s and 1990s and Assistant Secretary of State for African Affairs from 1993 to 1997.

32.     Pursuant to its status as an independent nonprofit, USIP may sue and be sued in

its own name. *Id*. at § 4604(k). Accordingly, USIP is not represented in litigation by the

Department of Justice. Indeed, USIP must, and does, hire private counsel for legal

representation. For example, in 2022 USIP hired a private firm in in Omaha, Nebraska to pursue

10133397.1

payment recovery from a defaulting contractor. *See United States Institute of Peace v. Safiullah Rauf et. al.*, No. CI-1023 (Douglas County Ct. NEB); *see also* Amended Compl. Ex. D, Decl. of George Foote ¶ 3 (ECF No. 12-4) (declarant stating that he has served as USIP outside counsel since 1987).

33.    Pursuant to the USIP Act's requirement that USIP accounts be audited annually by an accredited, certified public accounting firm according to generally accepted auditing standards, § 4607(g), USIP has retained KPMG to conduct the annual audits.  Ex. 3, Decl. of Allison Blotzer ¶¶ 6-7.

**DEFENDANTS' ACTIONS PURSUANT TO EXECUTIVE ORDER 14217**

34.    On February 19, 2025, President Trump signed Executive Order 14217, entitled "Commencing the Reduction of the Federal Bureaucracy." Exec. Order No. 14217, 90 Fed. Reg. 10,577 (Feb. 25, 2025) ("EO 14217").  EO 14217 directs USIP to eliminate its "non-statutory components and functions . . . to the maximum extent consistent with applicable law" and to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law." *Id*.

35.    EO 14217 further directed any official review of budget requests be rejected "to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination." EO 14217 required that it be implemented "consistent with applicable law and subject to the availability of appropriations." *Id*.

36.    On February 20, the day after issuance of EO 14217, a representative of the DOGE Service contacted the Institute. On February 24, Ambassador Moose and USIP's outside counsel met virtually with DOGE representatives Defendants Nate Cavanaugh, James Burnham, and Jacob Altik. Ambassador Moose and USIP counsel explained the Institute's legal status as

10133397.1

an independent nonprofit corporation outside of the Executive branch of the Federal government.
The DOGE representatives asserted that the only statutory requirements of the Institute are the
existence of its Board, the appointment of a president, the payment of incidental expenses for the
Board, and the submission of certain reports to Congress and the Executive branch. Amended
Compl. Ex. D, Decl. of George Foote ¶ 5 (ECF No. 12-4).

37.    On March 9, 2025, after the Institute received word that DOGE staff was making
inquiries into the status of the Institute's security operations, George Foote emailed DOGE
representatives James Burnham, Jacob Altik, and Nate Cavanaugh with information about the
nature of the Institute's privately contracted security firm, and the Institute's ownership of its
headquarters building.  Mr. Foote reiterated the Institute's status as an independent nonprofit
organization and stated that uninvited persons would only be admitted to the property with a
valid warrant issued by a court.  Mr. Foote did not receive a response from Mr. Burnham. *Id.* ¶ 6.

38.    On March 14, 2025, Trent Morse of the White House Presidential Personnel
Office emailed certain members of the USIP Board "on behalf of" President Trump.  Ex. 12
(compilation of termination notices).  The email stated that the Board members' "position on the
United States Institute of Peace {*sic*} is hereby terminated, effective immediately." *Id.*

39.    By such emails President Trump purported to remove all 11 USIP Board members
duly appointed pursuant to 22 USC § 4605(b)(4).

40.    The email did not identify a conviction of a felony, malfeasance in office,
persistent neglect of duties, or inability to discharge duties on the part of any of the USIP Board
members.  Ex. 12 (compilation of termination notices).

10133397.1

41.     The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of eight voting members of the USIP Board. *Id.*

42.     The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the HELP Committee of the Senate.   *Id.*

43.     On March 14, 2025, USIP's outside counsel was presented with a document labeled "Resolution of the Board of Directors" stating that "as of March 14, 2025, Mr. George E. Moose is removed from his position as USIP's president and Mr. Kenneth Jackson is designated as USIP's acting president with all the powers delegated by the Board of Directors to that role." Amended Compl. Ex. F (ECF No. 12-6).  The document did not reflect the agreement or participation of any Board member other than the three *ex officio* members.

44.     On March 14, a majority of the Board members duly appointed under 22 U.S.C. § 4605(b)(4) plus Ambassador Moose as an *ex officio* Board member convened a call with the Institute's outside counsel to discuss the termination notices. Counsel communicated his view that the notices have no legal effect because they do not comply with the for-cause termination clause of the USIP Act.  Amended Compl. Ex. D, Decl. of George Foote ¶¶ 7-8 (ECF No. 12-4).

45.     On March 14, at two different points in time, Defendant Jackson and representatives from DOGE, including Defendants Altik and Cavanaugh, entered onto the USIP parcel of land accompanied by FBI agents and requested access to the USIP headquarters

10133397.1

building. They presented no warrant and were denied entry to the USIP headquarters building. *Id.* ¶¶ 8-9.

46.     On Sunday, March 16, two FBI agents visited a senior USIP security official at his home unannounced for the purposes of gaining information on how to gain entrance to the USIP building. *Id.* ¶ 10.

47.     That same Sunday, the Institute's outside counsel received multiple calls from Jonathan Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of Columbia. Hornok sought access to the USIP building for unnamed individuals and stated that he had suspicion that USIP may be engaging in criminal behavior. In one call, Hornok sought access to USIP records for *ex officio* Board member Hegseth as provided in 22 U.S.C. § 4607(f). Hornok demanded access to the building and USIP computer systems for an unnamed representative of Defendant Hegseth at 2:00 p.m. the following day. USIP counsel offered to arrange access as provided in the statute but refused Hornok's demand as outside the statutory requirements of reasonableness. Hornok told USIP counsel that he would criminally investigate USIP and anyone who "obstructed" access to USIP's computer systems. *Id.* ¶¶ 12-15.

48.     On March 16, the Institute suspended its contract with its security firm, Inter-Con Security Systems Inc. ("Inter-Con"), based on Inter-Con's efforts to coordinate with Defendants and facilitate access to the USIP headquarters building by the DOGE Defendants and Defendant Jackson. USIP cancelled the Inter-Con contract on March 17.  Amended Compl. Ex. G, Decl. of Colin O'Brien ¶¶ 4, 9 (ECF No. 12-7).

49.     The following day, March 17, four employees of Inter-Con arrived at USIP headquarters at approximately 2:30 p.m. After they were initially unable to enter the building because their badges had been deactivated upon the suspension of Inter-Con's contract, another

10133397.1

Inter-Con employee, Kevin Simpson, arrived with a physical key that USIP had not yet

recovered from Inter-Con. Simpson used the key to gain entrance into the USIP headquarters

building and let in the other Inter-Con employees.  *Id*. ¶¶ 5-6.

50.     In response, Institute counsel called the Washington, D.C. Metropolitan Police

Department ("MPD") to report Inter-Con's entry without consent to the Institute's land and

headquarters building.  *Id*. ¶ 7.

51.     When MPD officers arrived to receive the report, they assisted DOGE personnel,

who were present outside the building, to gain physical entry to the Institute's building. MPD

officers escorted Ambassador Moose, other USIP personnel, and outside counsel from the

building, leaving the DOGE Defendants and Defendant Jackson in physical possession and

control of USIP's headquarters.  *Id*. ¶¶ 14-17, 20, 24.

52.     As of March 14, 2025, the Institute employed over 400 employees and personal

services contractors to carry out its statutory mandate.  Ex. 4, Decl. of Terry Jones ¶ 3.

53.     On March 21, 2025, Defendant Jackson fired six USIP employees. The

termination letters referred to the employees' "at-will-employment-status."  *See, e.g.*, Ex. 13

("Termination of Colin O'Brien's At-Will Employment with USIP").

54.     On March 28, 2025, one or more Defendants caused termination notices to be sent

to virtually all of the Institute's employees.  Ex. 4, Decl. of Terry Jones ¶ 5; *See* Abigail

Hauslohner & Derek Hawkins, *DOGE Fires Nearly All Staff at U.S. Institute of Peace

Headquarters*, Washington Post (Mar. 29, 2025), https://www.washingtonpost.com/—national-

security/2025/03/29/doge-usip-peace-institute-fired/.

55.     On March 31, 2025, Plaintiffs learned of an undated document titled "Resolution

of the Board of Directors" signed by two of the *ex officio* directors (Defendants Hegseth and

10133397.1

Rubio). The document purports, as of March 25, 2025, to remove Defendant Jackson as Acting President of the Institute and appoint Defendant Cavanaugh in his stead. The resolution also purports to fire USIP's Chief Financial Officer and Chief Operating Officer. The document further directs Cavanaugh "to transfer USIP's assets, including USIP's real property and rights thereof, including all assets recently received from the Endowment, to the General Services Administration (GSA)." Ex. 2 to Defs' Opp. To Motion pursuant to the All Writs Act (ECF No. 15-2).

56.    On March 31, 2025, Plaintiffs learned of additional documents that purported to execute the transfer of USIP's headquarters building to GSA on Saturday, March 29, 2025. Exs. 1, 3, 4 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-1, 15-3, 15-4).

57.    On March 31, 2025, Plaintiffs learned of a purported board resolution by two ex officio board members (Secretaries Rubio and Hegseth) firing all officers of the USIP Endowment, appointing Adam Amar as new president of the Endowment, and directing Amar to transfer all of the Endowment's assets to USIP. Ex. 2 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-2).

58.    On April 1, 2025, Defendants' counsel informed this Court that GSA had leased, or was in the process of leasing, the USIP building to the Department of Labor.

**USIP ACTIVITIES**

59.    The Institute has field offices, staff, and/or contractors in 26 countries around the world, including seven field offices in Nigeria, Libya, Thailand, El Salvador, Pakistan, Tunisia, and Colombia.  Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 8 (ECF No. 12-8). These offices have maintained computer systems with sensitive information about USIP workers and operations. *Id.*

10133397.1

60.    USIP frequently serves as a resource to Congress. It regularly briefs Members and their staffs upon request and holds briefings on Capitol Hill. Such briefings have concerned transnational criminal networks with links to China, crime and mass migration in Central America, and critical minerals in Africa. The Institute has long facilitated congressionally mandated commissions and regularly convenes senior expert groups to analyze pressing issues. For example:

      a.   Iraq Study Group. In 2006, a bipartisan group of Members of Congress requested USIP to act as the facilitator for the Iraq Study Group (ISG), which was set up to provide a "'fresh eyes' assessment of the situation in Iraq." Ex. 2 (Iraq Study Group Fact Sheet).[2] The members of the ISG hailed from all parts of the federal government: former Secretary of State James A. Baker, III; Congressman Lee Hamilton; Lawrence S. Eagleburger, former Secretary of State; Vernon E. Jordan, Jr., Senior Managing Director, Lazard, Freres & Co. LLC; Edwin Meese, III, former U.S. Attorney General; Sandra Day O'Connor, former U.S. Supreme Court Associate Justice; Leon E. Panetta, former White House Chief of Staff; William J. Perry, former U.S. Secretary of Defense; Charles S. Robb, former U.S. Senator; and Alan K. Simpson, former U.S. Senator. Ex. 1, Decl. of Paul Hughes ¶¶ 5-7.

           The Institute, with support from the Center for the Study of the Presidency, the Center for Strategic and International Studies, and the James A. Baker III Institute for Public Policy at Rice University, served the ISG by convening expert working groups, writing briefing papers, providing analysis, and coordinating meetings. Ex. 1, Decl. of Paul Hughes ¶ 8.

      b.   Afghanistan Study Group.  The Afghan Study Group (ASG) was established by Congress in December 2019. S. Rept. No. 116-126, at 43 (2019).  Congress tasked the ASG to "consider the implications of a peace settlement or the failure to reach a settlement on U.S. policy, resources, and commitments in Afghanistan." Id.  The group was co-chaired by former Senator Kelly Ayotte, former Chairman of the Joint Chiefs of Staff, General Joe Dunford, USMC, as

---

[2]  USIP's role in the ISG was funded by specific Congressional appropriations to facilitate and support the ISG.  See Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, Pub. L. No. 109-234, 120 STAT. 418, 439 (2006); Conference Report on H.R. 4939, Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, 109 CONG. REC. H3614-15 (Oct. 8, 2004) (stating that $1 million dollars were provided for USIP for activities related to the ISG).

10133397.1

well as Nancy Lindborg, former Assistant Administrator for the Bureau for Democracy, Conflict, and Humanitarian Assistance at USAID. Ex. 14, Decl. of Michael Phelan ¶ 3.

USIP served the ASG by providing administrative and logistical support, convening working groups and stakeholder meetings, writing briefing papers, providing analysis, and coordinating ASG meetings.  Ex. 14, Decl. of Michael Phelan ¶ 4.

c. Gandhi-King Global Academy. In 2020, Congress directed the Institute to create the "Gandhi-King Global Academy," a professional development training initiative to develop and make publicly available a curriculum on conflict resolution tools based on the principles of nonviolence. Pub. L. No. 116-260, div. FF, § 334, 134 Stat. 1182, 3115 (Dec. 27, 2020). Congress directed the Institute to report every six months to four congressional committees (two House, two Senate) on its progress on the initiative. Id. § 336(a)(2). See Ex. 31, Decl. of Alli Aloudes Phillips (describing role in the Gandhi-King Global Academy's conflict resolution education and training programs); Ex. 32, Decl. of Maria Antonia Montes (describing work as Senior Program Officer for Gandhi-King Global Academy).

61.    Other nonprofit organizations and think tanks perform the same type of research, education, training, and dialogue facilitation activities as USIP in communities around the world. See, e.g., Ex. 27, Decl. of Andrew Wells-Dang (explaining the similarity between USIP and other international nonprofits he has worked with); Ex. 29, Decl. of Mary Glantz (describing other nonprofits and think tanks that broadly offer expert advice and analysis, including to Congress and government agencies); Ex. 30, Decl. of Nicole Cochran (describing research and training efforts, as well as work convening expert study groups similar to how the Stimson Center and Center for Strategic and International Studies function);

62.    USIP's research, training, and conflict resolution efforts often occurs "on the ground" in communities in conflict and involves a wide range of partners and stakeholders to which USIP is able to gain access and trust because of its independence from official U.S. Government institutions. The substance, approach, and type of work is very different from that undertaken by Executive branch agencies. Ex. 29, Decl. of Mary Glantz (contrasting USIP work

10133397.1

with her prior work as a Foreign Service Officer); Ex. 32, Decl. of Maria Antonia Montes

(describing ability to travel to areas where U.S. Government personnel were not authorized to go,

and to meet with grassroots civil society members to gather information, and describing her lack

of access to official files or discussions around State Department's Executive or Foreign Policy

Objectives); Ex. 36, Decl. of Frank Aum (explaining differences between nature and substance of

work at USIP compared to the Office of the Secretary of Defense at the Pentagon, where he

previously worked); Ex. 34, Decl. of Scott Worden (explaining how work for USIP is

"fundamentally different" from his work at a federal agency (USAID) and for the Special Inspector

General for Afghanistan Reconstruction); Ex. 28, Decl. of Christopher Bosley (former U.S. Navy

intelligence officer contrasting work on USIP's Countering Violent Extremism team, which

involved engaging "local, on-the-ground partners and communities dealing with violent extremism

issues and root causes," conducting "immediate-term piloting of programs to stop violent

extremism," and "longitudinal convening and scholarship to study and address these issues over

time" with "the workstreams in which agencies of the official U.S. government operate"); Ex. 33,

Decl. of Mary Speck (describing how her work in Guatemala on USIP's Latin America Program

is "unlike that of any Executive Branch entity" and how USIP's "status as an independent non-

profit entity was crucial to [its] work. Our goal is to build trust between authorities -- especially

police -- and local citizen groups, including businesspeople, indigenous authorities, activists, and

religious leaders. These partners trust us because we do not represent the U.S. government or any

ideological group that is advocating for specific policies. We can be honest interlocutors, able to

reach out to Evangelical leaders, human rights activists and business owners alike."

63.    USIP is able to perform conflict-resolution research and conduct trainings, convene

and facilitate communications and dialogue between groups in conflict because it assiduously

10133397.1

**JA62**

maintains its independence from official U.S. Government diplomatic and policymaking activities, and because its partners recognize (and rely upon) that independence. Indeed, USIP provides research briefing analysis, and conflict-resolution training services, training, and advisory services to a variety of different partners: educational institutions, foreign governments, other nonprofit think tanks, and agencies within the United States Executive Branch. The United States government has no say over what projects USIP undertakes for foreign and NGO groups. *See* Ex. 31, Decl. of Alli Aloudes Phillips (describing importance of USIP's independence from the Executive Branch to the nongovernmental peacebuilding organizations with which USIP works in Africa, Latin America, and Asia); Ex. 34, Decl. of Scott Worden ("USIP was able to convene a variety of Afghan and international stakeholders at USIP's [private office space in Kabul] because we were viewed as non-governmental and created a neutral space for peacebuilders to engage in open dialogue that would not have been possible at a U.S. government facility."); Ex. 35, Decl. of Tegan Blaine (former USAID official explaining work on USIP's "climate, environment, and conflict" project in Africa performing "deep research and analysis" of information derived from "on-the-ground" dialogue with communities inaccessible to US Government, and describing clear lines between USIP and involvement or awareness of decisionmaking or strategic priorities of U.S. Africa Command); Ex. 11, Decl. of Samantha Robinson (describing USIP's ability to perform humanitarian peacebuilding work in the Middle East and other places because it operates independently from U.S. government agencies and is not subject to work free of governmental restrictions and protocols).

64.    USIP does not engage or participate in "Track 1" diplomacy, which is reserved for official governmental representatives. *See* Ex. 16, Lisa Sokol, "Multi-Track Diplomacy Explained," Nuclear Threat Initiative, at https://www.nti.org/risky-business/multi-track-

10133397.1

diplomacy-explained/ ("Track 1 Diplomacy refers to official diplomacy, where communication is directly between or among governments. These formal discussions are conducted by diplomats, heads of state, and other official authorities.").

65.    USIP engages in "Track 1.5" diplomacy. *E.g.*, Ex. 30, Decl. of Nicole Cochran (USIP implemented and supported Track 1.5 dialogues as a "neutral and credible convener"). The distinctive feature of Track 1.5 diplomacy is that it involves the participation of "nongovernmental experts." Ex. 16. *See* Jeffrey Mapendere et al., *Track One and a Half Diplomacy and the Complementarity of Tracks*, 2 Culture of Peace Online J. 66, 69 (2006) (Ex. 15).  Independent nongovernmental entities similarly convene Track 1.5 meetings. One example is the Carter Center's involvement in mediating the conflict between Uganda and Sudan. "By operating at a Track One and a Half level, The Carter Center has the advantage of applying an eclectic approach to international and ethnic conflict, such as the use of high-level diplomacy, private problemsolving workshops, direct mediation, interactive conflict resolution, and other confidencebuilding interventions."  Ex. 15 at 70.  Another example was the China-U.S. Strategic Nuclear Dynamics Dialogue, which was convened and run by the nonprofit, private think tanks Center for Strategic and International Studies and Pacific Forum.  Ex 16.

66.    USIP also engages in "Track 2" diplomacy, which denotes "a purely unofficial channel for dialogue between *non-governmental experts*, without direct governmental involvement." *Id.* (emphasis added). Scholars have defined it as "unofficial, informal interaction between members of adversary groups or nations that aim to develop strategies, to influence public opinion, organize human and material resources in ways that might help resolve their conflict." Ex. 15 at 68.

10133397.1

67.    When USIP engages on these fronts, parties on all sides understand it to be an independent forum, and not to speak for the United States (just like the Center for Strategic and International Studies in the China-U.S. Strategic Nuclear Dynamics Dialogue or the Carter Center when mediating the conflict between Uganda and Sudan in the late 1990s). *See* Exs. 15, 16.   In the example of the Center for Strategic and International Studies, the dialogue "provided an avenue for what officials often describe as 'frank and candid' discussions with Chinese counterparts on nuclear issues. By bringing together think tank experts, retired officials, and active government and military officials, the dialogue led to a unique series of conversations where both sides could exchange views and build trust, even in the face of broader tensions."  Ex. 16; Ex. 36, Decl. of Frank Aum (describing research on the Korean Peninsula and efforts "convening and moderating dozens of Track 2 (nongovernmental) dialogues, seminars, and roundtables").

68.    When USIP participates in conflict resolution initiatives, it draws on developed regional expertise to give it credibility among the parties to the dialogue. At times, USIP's independence facilitates access to certain communities, networks, or stakeholders that federal officers with formal governmental or diplomatic status channels lack. USIP's experience, expertise and long-term relationships of trust with key stakeholders help it craft effective agendas, convene the right participants, and facilitate discussion that can generate new insights to inform congressional and Executive branch policy evaluation and development efforts. For example:

- In connection with a border dispute between Kyrgyzstan and Tajikistan, USIP sponsored a Track 2 dialogue between an influential group of former advisors and policy experts to discuss initiatives to reconcile the divided and hostile communities. The governments' representatives focused on difficult border demarcation and access issues. The USIP-related dialogue worked on initiatives that more broadly addressed how to reestablish normal interaction between communities on both sides of the border.  The dialogue thawed relations and paved the way for a historic official border demarcation deal. Ex. 10, Decl. of Gavin Helf ¶ 5.

10133397.1

- In 2003 and 2004, USIP members in Iraq worked outside the official U.S. security bubble, known as the Green Zone, to facilitate reconciliation between Iraqi tribes. USIP's independence allowed it to conduct objective research, which it shared with US officials to consider as part of their policy and programming activities, to engage parties in training and problem-solving dialogue, and to engage with diverse stakeholders necessary for preventing and resolving conflict. Ex. 1, Decl. of Paul Hughes ¶¶ 17-18, 23.

- In the Middle East, USIP has leveraged its independent status and its peacebuilding tools, including its Peace Game strategic exercise tool, and its deep networks of trusted local contacts, to bring together trusted Palestinian, Israeli, and regional interlocutors to work together on problem-solving related to post-conflict recovery and stabilization in Gaza. The work yielded valuable information, which USIP shared at the request of U.S. government representatives. Ex. 11, Decl. of Samantha Robinson ¶ 6.

- Ahead of local elections in the autonomous Bangsamoro region in the southern Philippines in October 2023, USIP was asked by both the Philippines government and the Moro Islamic Liberation Front—not by the US government—to discreetly facilitate ceasefire efforts between the two sides. USIP's independent status made it possible to engage both sides directly as a third party and create joint Quick Response Teams of Philippine Army, National Police, and Moro Islamic Liberation Front former combatants. The ceasefire did not break down and the peace process remained intact. Ex. 8, Decl. of Brian Harding ¶ 6.

- USIP facilitated informal conversations with the Azerbaijani and Armenian Embassies about what would be needed by both sides to reach a peace agreement ending their 30-plus year war. The talks created the opportunity for both parties to float ideas and talk about concerns they did not want to provide in official channels. These conversations helped narrow the gap between their war aims and concerns, leading to a peace agreement in mid-March 2025. Ex. 9, Decl. of Catherine Dale ¶ 6.

**The United States Government Manual**

69.     The United States Government Manual (the "Manual") is a publication of the

Office of the Federal Register of the National Archives and Records Administration ("NARA")

within the Executive branch. It is published by the Government Publishing Office, an office

within the Legislative branch. *See* Ex. 22, Manual*, "About Us" (available at

https://www.usgovernmentmanual.gov/About).  *See also* Ex. 23, U.S. Government Manual

(published Jan 13, 2025) (available at

20

**JA66**

https://www.govinfo.gov/app/collection/govman/2025/03executive_United%20States%20Government%20Manual) (excerpted).  The Manual is the "official handbook of the Federal Government." *See id.*

70.    The current organizational chart of the federal government in the Government Manual does not include USIP at all. *See* Ex. 23. Under the Executive Branch, the Manual identifies 15 agencies and 58 "independent establishments and government corporations." *Id.* USIP is not listed among them.  *See id.* The Manual also classifies entities within the Executive Branch (in addition to the White House) as "Executive Branch: Departments" and "Executive Branch: Independent Agencies and Government Corporations." Again, USIP is not listed. *Id.*

71.    The Manual lists USIP as a "Quasi-Official Agency," along with Legal Services Corporation ("LSC"), Smithsonian Institution, State Justice Institute, and the United States Holocaust Memorial Museum. *Id.*

72.    Since USIP first appeared in the Manual in 1988, the Manual has listed it as a "Quasi-Official Agency." Ex. Ex. 24, U.S. Office of the Federal Register, NARA, *United States Government Manual, 1988/89*, p. 767 (Rev. June 1, 1988) (excerpted). NARA defines "quasi-official agencies" as "***organizations that are not agencies under the definition of 5 U.S.C. 105*** but that are required by statute to publish certain information on their programs and activities in the Federal Register." *Id.* at 747 (emphasis added); *see also* Ex. 25, U.S. Office of the Federal Register, NARA, *United States Government Manual, 2009-2010*, p. 543 (Washington: GPO, 2010) (excerpted) (defining quasi-official agencies as ***organizations that are not executive agencies under the definition in 5 U.S.C. 105***…") (emphasis added).


**ADDITIONAL FACTS BEARING ON IRREPARABLE HARM TO THE INSTITUTE**

10133397.1

73.    Actions taken to date since March 14, 2025 that individually and collectively impair the Institute's ability to function and fulfill its mission as provided by Congress include:

    a.   Removal of eleven duly-appointed Board members;

    b.   Purported installation by the ex officio Board members of acting presidents (Ken Jackson and Nate Cavanaugh) who were committed not to the mission and activities of the Institute but to halting and eliminating all USIP staff and programs;

    c.   Firing all but a handful of the Institute's over 400 employees, many with extensive experience and expertise in all areas of the field of peaceful conflict resolution;

    d.   Shutting down the Institute's administrative and communication systems, leaving employees without adequate resources to understand their employment status, access to personnel records, or health insurance coverage status;

    e.   Undertaking to close USIP's field offices and cancel contracts concerning ongoing projects;

    f.   Instructing and taking actions to transfer of all of USIP's assets to GSA, including (i) the USIP-owned headquarters building, valued at $500 million, for zero dollars, and (ii) all USIP property in the building;

    g.   Undertaking to lease USIP's headquarters building to the Department of Labor;

    h.   Terminating all of the USIP Endowment's officers, appointing a new president of the Endowment, and instructing him to transfer all of the Endowment's assets, including bank accounts holding at least $25 million, to USIP.

Ex. 7, Moose Decl. ¶ 13.

74.    The eleven USIP Board members who were duly appointed under 22 U.S.C. § 4605(b)(4) and who were purportedly removed by President Trump via email on March 14, 2025 were not notified about and were not given the opportunity to participate in board actions or decisionmaking concerning: whether to terminate Ambassador Moose and replace him with Defendant Jackson as Acting President; whether to respond to Defendant Jackson's firing of employees on March 21; whether to participate in board action that concerned whether it was in USIP's best interests to terminate virtually all of USIP's employees on March 28, including the

10133397.1

Institute's CFO and COO; whether to replace Defendant Jackson with Defendant Cavanaugh as

Acting President; whether to transfer the USIP headquarters building and all property in it to

GSA for zero dollars; and whether to replace all officers of the USIP Endowment and transfer all

Endowment assets to USIP. *Id.* ¶ 14.

75.     USIP's employees, individually and collectively, have deep institutional

knowledge and expertise in a broad range of conflict resolution-related programs, activities,

curriculum development, research, and training in which they have been engaged, both in the

U.S. and around the world. *See Id.* ¶ 15; Exs. 8-11, 27-36 (declarations of former USIP Staff).

76.     Recent events have adversely impacted the commitment of USIP's donor base to

the Institute. Many donors who donated funds for the construction and/or maintenance of the

USIP headquarters building have contacted Ambassador Moose concerning the status of their

contributions. These donors include individuals who have pledged millions of dollars to support

the Institute. Ex. 7, Moose Decl. ¶ 16.

77.     The USIP building is unique—its design intended to reflect and functionally aid

the Institute's mission. *See* https://www.safdiearchitects.com/projects/united-states-institute-of-

peace; *At U.S. Institute of Peace, building's provocative design doesn't entirely succeed*,

Washington Post (Feb. 24, 2012) (available at https://www.washingtonpost.com/realestate/at-us-

institute-of-peace-buildings-provocative-design-doesnt-entirely-

succeed/2012/02/21/gIQADOxOYR_story.html).

78.     USIP's ability to fulfill its mission—including to engage in conflict resolution

training, to be a trusted information resource for congressional and governmental bodies, and to

convene and facilitate dialogue between groups in conflict—depends on its long-earned

reputation as a nonpartisan, expert organization. It further depends on it not being part of, and

10133397.1

being recognized as independent of the Executive Branch. Defendants' actions toward USIP since issuance of EO 14217 will adversely affect the Institute's standing and reputation as an "honest, good faith broker" in the field. Ex. 7, Moose Decl. ¶ 17.

79.     Actions to cancel contracts and grants, and deletion or alteration of information from USIP's computer system will cause severe and irreparable harm to USIP and its staff. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 5 (ECF No. 12-8).

80.     USIP has contracts domestically with a variety of vendors. These include a facilities and engineering contract for building maintenance, catering contracts, and building security contracts. USIP is legally bound by these contracts, and the sudden cancellation of such contracts without cause will result in USIP breaching the contracts. Outside of the potential legal repercussions, USIP's relationship with these vendors will be harmed, rendering it difficult to reestablish such contracts in the future in order to restart work. Further, canceling the facilities and engineering contract will result in the loss of key personnel with pertinent and specialized knowledge about the USIP headquarters building and systems, rendering it difficult to safely maintain the building and restart work in the future. *Id*. ¶¶ 6-7.

81.     USIP's offices contain USIP assets, federal assets, and computers with sensitive information about USIP workers and operations. If such leases are terminated without guidance for how to shut down an office, especially in insecure areas, all of this information is at risk of being taken and used to harm USIP and its staff. *Id*. ¶¶ 8-9.

82.     USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support

10133397.1

Institutional Review Board standards for research using human subjects. Any release of

employee information, which includes names, personal information, and banking information,

would harm and even endanger USIP's staff, especially those located abroad in insecure areas,

who may be targeted by terrorist groups or other bad actors. *Id.* ¶ 11.

83.     Further, the deletion of current and historical employee and vendor information

would render it extremely difficult to restart work in the future, as all records are kept

electronically. *Id.* ¶ 12.

84.     USIP's computer system contains decades of research and educational materials

which are USIP's intellectual property and documentation supporting this claim of intellectual

property, such as author agreements. This includes but is not limited to educational courses and

other materials used in USIP's online global academy, and student lists. The loss of this

intellectual property documentation would render USIP unable to use, distribute, or sell these

texts in the future, which would harm USIP's ability to carry out part of its core mission, which

is education and training. *Id.* ¶ 13.

85.     USIP maintains documentation regarding its operations and use of funds in its

computer systems, which are required for audits of the organization. Loss of access to these

materials, which are only kept electronically, would prevent USIP from fulfilling its tax reporting

obligations as well as its statutorily mandated requirement to report its annual audits to Congress

and the President of the United States. *Id.* ¶ 15.

86.     The sudden termination of USIP employees and contractor staff risks significant

harm to both USIP and these personnel. Many of these personnel work in insecure areas of the

world. Some are third-country nationals who were asked to leave their country of residence and

relocate to a new country to perform work for USIP. If their contracts are canceled without

10133397.1

proper notice or assistance, these staff could be stranded and trapped in that insecure country or

kicked out or prosecuted for lack of proper work documentation. *Id.* ¶ 16.

10133397.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES INSTITUTE FOR PEACE,
et al.,

   Plaintiffs,

  v.

KENNETH JACKSON,
Assistant to the Administrator for Management
and Resources for USAID, et al.,

   Defendants.

Civil Action No. 25-0804 (BAH)

---

## DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF FACTS NOT IN GENUINE DISPUTE AND STATEMENTS OF UNDISPUTED MATERIAL FACTS

  Defendants respectfully submit the following responses to Plaintiffs' statement of material facts not in genuine dispute under Federal Rule of Civil Procedure ("Rule") 56 and Local Civil Rule 7(h), and statements of undisputed material facts in support of its cross-motion for summary judgment.

### RESPONSES TO PLAINTIFFS' STATEMENTS

1. In 1984, Congress established the United States Institute of Peace ("USIP" or "the Institute") as an independent nonprofit corporation pursuant to the United States Institute of Peace Act (the "USIP Act"). Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984), 22 U.S.C. §§ 4601-4611, as amended.

  **Response:** Undisputed except the proper name of the full enactment that established the Institute was the Department of Defense Authorization Act of 1985.

2. The Institute's creation followed the 1980 formation of the Commission on Proposals for the National Academy of Peace and Conflict Resolution ("the Commission"). Pub. L. No. 95-561, 92 Stat. 2143, 2376 (1980). The Commission published its final report on the creation of a United States Peace Academy in 1981. *See* Commission on Proposals for the National Academy of Peace & Conflict Resolution, *To Establish the United States Academy*

*of Peace: Report to the President and Congress* (1981) ("Matsunaga Commission Report").

**Response:** Undisputed.

3.    Congress found that "there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information," and that the Institute represents "the most efficient and immediate means" and "an appropriate investment by" the United States to promote peace and the peaceful resolution of conflicts. 22 U.S.C. § 4601(a).

**Response:** Undisputed.

4.    Congress designed the Institute to "carry out its activities outside the day-to-day policymaking pressures and constraints which might impinge upon that freedom were [the Institute] to be part of an existing agency or department." S. Rep. No. 98-244, at 23 (1983) (favorably reporting S. 564 to establish the U.S. Academy of Peace) (Ex. 26). *See also* 130 Cong. Rec. 17,504 (1984) (proposing S. 564 as Hatfield Amendment No. 3270 to the Department of Defense Authorization Act, 1985, H.R. 5167, 98th Cong. (1984)).

**Response:** Disputed. Congress did not include this language in its enactment and the Institute's organic statute reveals different purposes. 22 U.S.C. § 4601.

5.    Congress stressed the Institute's role as a resource for both the legislative and executive branches. *Id.* (stating importance of an entity "whose only role is to explore alternatives to international violence and to bring those alternatives to the attention of those in a position of trust, within both the legislative and executive branches.").

**Response:** Disputed. Congress did not include this language in its enactment and the Institute's organic statute reveals different purposes. 22 U.S.C. § 4601.

6.    The Institute's headquarters building is located at 2301 Constitution Avenue, NW, Washington, DC 20037.

**Response:** Undisputed in part. The Institute's former headquarters was located at that address. That building has subsequently been transferred to the General Services Administration. *See* GSA Form 1334, ECF No. 15-1; Institute Request Letter, ECF No. 15-3; OMB Approval Letter, ECF No. 15-4. Moreover, this statement is immaterial to the cross-motions for summary judgment.

7.     The land on which the USIP headquarters sits is owned by the United States; however, Congress authorized the transfer of administrative jurisdiction over that land from the U.S. Department of the Navy to the Institute pursuant to Section 2831 of the National Defense Authorization Act for Fiscal Year 1997. The U.S. Navy completed that transfer on November 21, 1996. Amended Compl. Ex. B (ECF No. 12-2).

**Response:** Undisputed in part.  This statement is undisputed as to the Institute's former headquarters building.  Moreover, this statement is immaterial to the cross-motions for summary judgment.

8.     Congress authorized the transfer of administrative jurisdiction over an adjacent parcel of land pursuant to Section 2842 of the John Warner National Defense Authorization Act for Fiscal Year 2007. The U.S. Navy completed that transfer on August 29, 2012. Amended Compl. Ex. C (ECF No. 12-3).

**Response:** Undisputed in part.  This statement is undisputed as to the Institute's former headquarters building.   Moreover, this statement is immaterial to the cross-motions for summary judgment.

9.     The Institute constructed its headquarters building beginning in 2008. The building was initially funded with about $70 million of private contributions and $99 million of funds specially appropriated by Congress. *See* Pub. L. No. 108-447, div. J, §§ 118, 122, 118 Stat. 2809, 3347-48 (Dec. 8, 2004). After an additional appropriation of $15 million and completion of the building, *see* Pub. L. No. 111-117, div. F, tit. I, 123 Stat. 3034, 3319 (Dec. 16, 2009), Congress prohibited further use of appropriated funds for construction. *See, e.g.*, Pub. L. No. 112-10, § 2103, 125 Stat. 38, 177 (Apr. 15, 2011); Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 736 (Mar. 23, 2024). USIP has used private funds for building maintenance and renovation. Ex. 3, Decl. of Allison Blotzer ¶ 5.

**Response:** Undisputed in part for purposes of the pending cross-motions.  This statement is undisputed as to the Institute's former headquarters building.   Moreover, this statement is immaterial to the cross-motions for summary judgment.

10.    Pursuant to Congressional authority, § 4603(c), in 1986 the Institute created a separate nonprofit legal entity, the "Endowment of the United States Institute of Peace," under District of Columbia law. Ex. 17, Endowment of the US Institute of Peace Form 990 (2022).

**Response:** Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions.

11.  The Endowment has held significant assets for the Institute, including bank accounts holding yet-unexpended appropriated funds pursuant to § 4609(b), as well as contributions from private sources for the limited purposes permitted by § 4604(h)(3). As of March 14, 2025, the Endowment's accounts held approximately $15 million in private contributions for the limited purposes permitted by § 4604(h)(3), and approximately $10 million in unexpended appropriated funds pursuant to § 4609(b). Exhibit 3, Decl. of Allison Blotzer ¶¶ 3-4 X.

**Response:** Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions.

12.  USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support Institutional Review Board standards for research using human subjects. Amended Compl. Ex. H Decl. of Shira Lowinger ¶ 10 (ECF No. 12-8).

**Response:** Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions.

13.  USIP's computer systems contain decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of control of intellectual property documentation renders USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out a core part of its mission, which is education and training. *Id.* ¶ 13.

**Response:** The first two sentences are undisputed for purposes of the pending cross-motions, but those sentences are immaterial to those motions.  The third sentence is disputed, and the cited source does not support the notion that the Institute has lost control of or will lose control of these intellectual property rights, which appear to be speculative assertions from Plaintiffs.

14.  USIP electronically maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits, tax reporting obligations, and its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 16.

**Response:** Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions.

15.    As provided in the USIP Act, 22 U.S.C. § 4605(b), the Institute's Board of Directors (the "USIP Board"), consists of three *ex officio* members (the Secretary of State, the Secretary of Defense, and the president of the National Defense University) and twelve members appointed by the President with the advice and consent of the Senate. *See also* Ex. 37, USIP Bylaws.

    **Response:** Undisputed.

16.    As of March 13, 2014, the USIP Board had 14 members: the three *ex officio* members plus 11 individuals duly appointed pursuant to § 4605(b)(4). One of the (b)(4) Board members resigned on March 14, leaving 10 (b)(4) Board members.

    **Response:** Undisputed.

17.    *Ex officio* member Secretary of State Marco Rubio was confirmed by the U.S. Senate as the Secretary of State on January 20, 2025. 171 Cong. Rec. S259 (daily ed. Jan. 20, 2025) (confirmation).

    **Response:** Undisputed.

18.    *Ex officio* member Secretary of State Pete Hegseth was confirmed by the U.S. Senate as the Secretary of Defense on January 24, 2025. 171 Cong. Rec. S374 (daily ed. Jan. 24, 2025) (confirmation).

    **Response:** Undisputed.

19.    *Ex officio* member Vice Admiral Garvin assumed command as the president of the National Defense University on October 11, 2024. Ex. 18, National Defense University, "VADM Peter A. Garvin, USN," (*available at* https://www.ndu.edu/About/Leadership/Article-View/Article/2492624/vadm-peter-a-garvin-usn/).

    **Response:** Undisputed.

20.    Ambassador John Sullivan was confirmed by the U.S. Senate as a member of the USIP Board on May 2, 2024. 170 Cong. Rec. S3369 (daily ed. May 2, 2024) (confirmations). His term began on July 20, 2024. He fills one of the Republican slots. Ex. 19, Sullivan Appointment Affidavit (2024).

    **Response:** Undisputed except that Sullivan no longer "fills one of the Republican slots"

after the President of the United States exercised his Article II powers to remove Sullivan. *See*

Emails, ECF No. 21-1 at 4.

21.    Nancy Zirkin was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008. 154 Cong. Rec. S5124 (daily ed. June 4, 2008) (confirmations). Her term began

on October 16, 2008. She fills one of the Democratic slots. Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace," (Oct. 16, 2008).

**Response:** Undisputed except that Zirkin no longer "fills one of the Democratic slots" after

the President of the United States exercised his Article II powers to remove Zirkin.

22.    Judy Ansley was simultaneously nominated to complete a prior USIP Board member's term and for reappointment as a member of the USIP Board. 157 Cong. Rec. S293 (daily ed. Jan. 26, 2011). She was confirmed by the U.S. Senate for both terms on May 26, 2011. 157 Cong. Rec. S3468 (daily ed. May 26, 2011) (confirmations). She was sworn in on June 6, 2011. She fills one of the Republican slots. Ex. 21, USIP, "New Members for USIP Board of Directors Sworn In," (June 7, 2011).

**Response:** Undisputed except that Ansley no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Ansley. *See* Emails, ECF No. 21-1 at 2.

23.    Joseph Falk was confirmed by the U.S. Senate as a member of the USIP Board on February 2, 2023. 169 Cong. Rec. S242 (daily ed. Feb. 2, 2023) (confirmations). His term began on April 29, 2023. He fills one of the Democratic slots. Ex. 6, Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025).

**Response:** Undisputed except that Falk no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Falk. *See* Emails, ECF No. 21-1 at 3.

24.    Kerry Kennedy was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008. 154 Cong. Rec. S5124 (daily ed. June 4, 2008) (confirmations). Her term began on October 16, 2008. She fills one of the Democratic slots. Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace," (Oct. 16, 2008).

**Response:** Undisputed except that Kennedy no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Kennedy. *See* Emails, ECF No. 21-1 at 6.

25.    Mary Swig was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4048 (daily ed. Aug. 4, 2022) (confirmations). Her term began on October 19, 2022. She fills one of the Democratic slots. Ex. 5, Decl. of Mary Swig, ¶ 3 (Apr. 3, 2025).

**Response:** Undisputed except that Swig no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Swig. *See* Emails, ECF No. 21-1 at 5.

26.    Jonathan Burks was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Republican slots. Ex. 5, Decl. of Mary Swig, ¶ 3.

**Response:** Undisputed except that Burks no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Burks.

27.    Edward M. Gabriel was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4048 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Democratic slots. Ex. 5, Decl. of Mary Swig, ¶ 3.

**Response:** Undisputed except that Gabriel no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Gabriel.

28.    Michael Singh was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Republican slots. Ex. 5, Decl. of Mary Swig, ¶ 3.

**Response:** Undisputed except that Singh no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Singh.

29.    Roger Zakheim was confirmed by the U.S. Senate as a member of the USIP Board on January 30, 2023. 169 Cong. Rec. S152 (daily ed. Jan. 30, 2023) (confirmation). His term began on April 29, 2023. He fills one of the Republican slots. Ex. 6, Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025).

**Response:** Undisputed except that Zakheim no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Zakheim.

30.    The remaining two appointed positions on the Board are vacant.

**Response:** Disputed. The Board has twelve vacancies after the President of the United States exercised his Article II powers to remove the prior members.

31.    The USIP Board appointed Ambassador George E. Moose as the Acting President of the Institute in April 2024. Ambassador Moose served on the USIP Board from 2007 to 2023, first as a member, then as Vice Chair and from October 2022 until a few months before his appointment to Acting President, as Chair. Amended Compl. Ex. A, Amended Decl. of George Moose ¶ 3 (ECF No. 12-1). Prior to joining the USIP Board, Ambassador Moose served in many governmental roles, including as Ambassador to the Republics of Benin and Senegal in the 1980s and 1990s and Assistant Secretary of State for African Affairs from 1993 to 1997.

   **Response:** Undisputed for purposes of the pending cross-motions, but this statement is

immaterial to those motions.

32.    Pursuant to its status as an independent nonprofit, USIP may sue and be sued in its own name. *Id.* § 4604(k). Accordingly, USIP is not represented in litigation by the Department of Justice. Indeed, USIP must, and does, hire private counsel for legal representation. For example, in 2022 USIP hired a private firm in in Omaha, Nebraska to pursue payment recovery from a defaulting contractor. *See United States Institute of Peace v. Safiullah Rauf et. al.*, No. CI-1023 (Douglas County Ct. NEB); *see also* Amended Compl. Ex. D, Decl. of George Foote ¶ 3 (ECF No. 12-4) (declarant stating that he has served as USIP outside counsel since 1987).

   **Response:** Defendants do not dispute that the Institute may sue and be sued in its own

name. 22 U.S.C. § 4604(k). That said, Defendants dispute any suggestion that the Institute is not

a part of the Executive Branch, as elaborated in Defendants' brief.

   Defendants further dispute the assertion that the Institute is not represented in litigation by

the Department of Justice and that it "must . . . hire private counsel for legal representation." For

example, the Department of Justice has represented the Institute in Freedom of Information Act

cases in the past. *See, e.g.*, *Schwarz v. Dep't of Health & Hum. Servs.*, Civ. A. No. 00-1610

(D.D.C.); *Schwarz v. Dep't of Energy*, No. 01-5413 (D.C. Cir.); *see also* 22 U.S.C. § 4607(i) ("The

Institute and its directors, officers, employees, and agents shall be subject to the provisions of

section 552 of Title 5 (relating to freedom of information).").

   Officers and employees of the Institute are also subject to the Federal Tort Claims Act. *See*

22 U.S.C. § 4606(f)(1). "The Attorney General shall defend any civil action or proceeding brought

in any court against any employee of the Government or his estate for any such damage or injury"

under the Federal Tort Claims Act. 28 U.S.C. § 2679(c).

33.    Pursuant to the USIP Act's requirement that USIP accounts be audited annually by an accredited, certified public accounting firm according to generally accepted auditing standards, § 4607(g), USIP has retained KPMG to conduct the annual audits. Ex. 3, Decl. of Allison Blotzer ¶¶ 6-7.

**Response:** Undisputed but Defendants add that the "Institute shall provide a report of the

audit to the President and to each House of Congress no later than six months following the close

of the fiscal year for which the audit is made." 22 U.S.C. § 4607(h).

34.    On February 19, 2025, President Trump signed Executive Order 14217, entitled "Commencing the Reduction of the Federal Bureaucracy." Exec. Order No. 14217, 90 Fed. Reg. 10,577 (Feb. 25, 2025) ("EO 14217"). EO 14217 directs USIP to eliminate its "non-statutory components and functions . . . to the maximum extent consistent with applicable law" and to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law." *Id.*

**Response:** Undisputed.

35.    EO 14217 further directed any official review of budget requests be rejected "to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination." EO 14217 required that it be implemented "consistent with applicable law and subject to the availability of appropriations." *Id.*

**Response:** Undisputed.

36.    On February 20, the day after issuance of EO 14217, a representative of the DOGE Service contacted the Institute. On February 24, Ambassador Moose and USIP's outside counsel met virtually with DOGE representatives Defendants Nate Cavanaugh, James Burnham, and Jacob Altik. Ambassador Moose and USIP counsel explained the Institute's legal status as an independent nonprofit corporation outside of the Executive branch of the Federal government. The DOGE representatives asserted that the only statutory requirements of the Institute are the existence of its Board, the appointment of a president, the payment of incidental expenses for the Board, and the submission of certain reports to Congress and the Executive branch. Amended Compl. Ex. D, Decl. of George Foote ¶ 5 (ECF No. 12-4).

**Response:** Defendants dispute that the identified officials are "DOGE representatives," a

vague and inaccurate term.  For example, Cavanaugh is an employee of the General Services

Administration ("GSA") who works on various government efficiency projects in the

administration. Defendants also dispute that the Institute is "an independent nonprofit corporation outside of the Executive branch of the Federal government" for the reasons stated in their brief. The remainder of the statement is undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions.

37.     On March 9, 2025, after the Institute received word that DOGE staff was making inquiries into the status of the Institute's security operations, George Foote emailed DOGE representatives James Burnham, Jacob Altik, and Nate Cavanaugh with information about the nature of the Institute's privately contracted security firm, and the Institute's ownership of its headquarters building. Mr. Foote reiterated the Institute's status as an independent nonprofit organization and stated that uninvited persons would only be admitted to the property with a valid warrant issued by a court. Mr. Foote did not receive a response from Mr. Burnham. *Id.* ¶ 6.

**Response:** Defendants dispute that the identified officials are "DOGE representatives," a vague and inaccurate term. For example, Cavanaugh is an employee of GSA who works on various government efficiency projects in the administration. Defendants also dispute that the Institute is an independent nonprofit corporation outside of the Executive Branch of the federal government for the reasons stated in their brief. The remainder of the statement is undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions.

38.     On March 14, 2025, Trent Morse of the White House Presidential Personnel Office emailed certain members of the USIP Board "on behalf of" President Trump. Ex. 12 (compilation of termination notices). The email stated that the Board members' "position on the United States Institute of Peace {sic} is hereby terminated, effective immediately." *Id.*

**Response:** Undisputed.

39.     By such emails President Trump purported to remove all 11 USIP Board members duly appointed pursuant to 22 U.S.C. § 4605(b)(4).

**Response:** Defendants do not dispute that the President of the United States removed the Board members pursuant to his authority under Article II of the United States Constitution. Defendants dispute the characterization that the President "purported" to remove the Board members.

40.    The email did not identify a conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties on the part of any of the USIP Board members. Ex. 12 (compilation of termination notices).

    **Response:** Undisputed, but this statement is immaterial to the parties' cross-motions.

41.    The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of eight voting members of the USIP Board. *Id.*

    **Response:** Undisputed, but this statement is immaterial to the parties' cross-motions.

42.    The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the HELP Committee of the Senate. *Id.*

    **Response:** Undisputed, but this statement is immaterial to the parties' cross-motions.

43.    On March 14, 2025, USIP's outside counsel was presented with a document labeled "Resolution of the Board of Directors" stating that "as of March 14, 2025, Mr. George E. Moose is removed from his position as USIP's president and Mr. Kenneth Jackson is designated as USIP's acting president with all the powers delegated by the Board of Directors to that role." Amended Compl. Ex. F (ECF No. 12-6). The document did not reflect the agreement or participation of any Board member other than the three *ex officio* members.

    **Response:** Undisputed except that when this document was presented, the President of the United States had removed the former board members pursuant to his Article II removal powers; thus, there were no other Board members to agree or participate in the decision to designate Mr. Kenneth Jackson as the Acting President of the Institute. *See* Am. Compl. (ECF No. 12) ¶¶ 50, 52-53.

44.    On March 14, a majority of the Board members duly appointed under 22 U.S.C. § 4605(b)(4) plus Ambassador Moose as an *ex officio* Board member convened a call with the Institute's outside counsel to discuss the termination notices. Counsel communicated his view that the notices have no legal effect because they do not comply with the for-cause termination clause of the USIP Act. Amended Compl. Ex. D, Decl. of George Foote ¶¶ 7-8 (ECF No. 12-4).

    **Response:** Defendants dispute that the board members on the call were duly appointed members of the board as they had been removed by the President under his Article II powers. *See*

Emails, ECF No. 21-1. The remainder of the statement is undisputed for purposes of the pending

cross-motions, but this statement is immaterial to those motions.

45.     On March 14, at two different points in time, Defendant Jackson and representatives from
        DOGE, including Defendants Altik and Cavanaugh, entered onto the USIP parcel of land
        accompanied by FBI agents and requested access to the USIP headquarters building. They
        presented no warrant and were denied entry to the USIP headquarters building. *Id.* ¶¶ 8-9.

        **Response:** Defendants dispute that the identified officials are "DOGE representatives," a

vague and inaccurate term.  For example, Cavanaugh is an employee of GSA who works on various

government efficiency projects in the administration.  Defendants do not dispute that Jackson, in

his capacity as Acting President of the Institute, and others permitted by him, attempted to gain

entry to the Institute's headquarters on March 14, 2025, but were denied entry, without authority,

by Moose and others acting at his best.

46.     On Sunday, March 16, two FBI agents visited a senior USIP security official at his home
        unannounced for the purposes of gaining information on how to gain entrance to the USIP
        building. *Id.* ¶ 10.

        **Response:** This statement is immaterial to the pending cross-motions.

47.     That same Sunday, the Institute's outside counsel received multiple calls from Jonathan
        Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of
        Columbia. Hornok sought access to the USIP building for unnamed individuals and stated
        that he had suspicion that USIP may be engaging in criminal behavior. In one call, Hornok
        sought access to USIP records for *ex officio* Board member Hegseth as provided in
        22 U.S.C. § 4607(f). Hornok demanded access to the building and USIP computer systems
        for an unnamed representative of Defendant Hegseth at 2:00 p.m. the following day. USIP
        counsel offered to arrange access as provided in the statute but refused Hornok's demand
        as outside the statutory requirements of reasonableness. Hornok told USIP counsel that he
        would criminally investigate USIP and anyone who "obstructed" access to USIP's
        computer systems. *Id.* ¶¶ 12-15.

        **Response:** This statement is immaterial to the pending cross-motions.

48.     On March 16, the Institute suspended its contract with its security firm, Inter-Con Security
        Systems Inc. ("Inter-Con"), based on Inter-Con's efforts to coordinate with Defendants and
        facilitate access to the USIP headquarters building by the DOGE Defendants and
        Defendant Jackson. USIP cancelled the Inter-Con contract on March 17. Amended Compl.
        Ex. G, Decl. of Colin O'Brien ¶¶ 4, 9 (ECF No. 12-7).

**Response:** This statement is immaterial to the pending cross-motions.

49.    The following day, March 17, four employees of Inter-Con arrived at USIP headquarters at approximately 2:30 p.m. After they were initially unable to enter the building because their badges had been deactivated upon the suspension of Inter-Con's contract, another Inter-Con employee, Kevin Simpson, arrived with a physical key that USIP had not yet recovered from Inter-Con. Simpson used the key to gain entrance into the USIP headquarters building and let in the other Inter-Con employees. *Id.* ¶¶ 5-6.

**Response:** This statement is immaterial to the pending cross-motions.

50.    In response, Institute counsel called the Washington, D.C. Metropolitan Police Department ("MPD") to report Inter-Con's entry without consent to the Institute's land and headquarters building. *Id.* ¶ 7.

**Response:** This statement is immaterial to the pending cross-motions.

51.    When MPD officers arrived to receive the report, they assisted DOGE personnel, who were present outside the building, to gain physical entry to the Institute's building. MPD officers escorted Ambassador Moose, other USIP personnel, and outside counsel from the building, leaving the DOGE Defendants and Defendant Jackson in physical possession and control of USIP's headquarters. *Id.* ¶¶ 14-17, 20, 24.

**Response:** This statement is immaterial to the pending cross-motions.

52.    As of March 14, 2025, the Institute employed over 400 employees and personal services contractors to carry out its statutory mandate. Ex. 4, Decl. of Terry Jones ¶ 3.

**Response:** This statement is immaterial to the pending cross-motions.

53.    On March 21, 2025, Defendant Jackson fired six USIP employees. The termination letters referred to the employees' "at-will-employment-status." *See, e.g.*, Ex. 13 ("Termination of Colin O'Brien's At-Will Employment with USIP").

**Response:** This statement is immaterial to the pending cross-motions.

54.    On March 28, 2025, one or more Defendants caused termination notices to be sent to virtually all of the Institute's employees. Ex. 4, Decl. of Terry Jones ¶ 5; *See* Abigail Hauslohner & Derek Hawkins, *DOGE Fires Nearly All Staff at U.S. Institute of Peace Headquarters*, Washington Post (Mar. 29, 2025), https://www.washingtonpost.com/—national-security/2025/03/29/doge-usip-peace-institute-fired/.

**Response:** This statement is immaterial to the pending cross-motions.

55.    On March 31, 2025, Plaintiffs learned of an undated document titled "Resolution of the Board of Directors" signed by two of the *ex officio* directors (Defendants Hegseth and Rubio). The document purports, as of March 25, 2025, to remove Defendant Jackson as

Acting President of the Institute and appoint Defendant Cavanaugh in his stead. The resolution also purports to fire USIP's Chief Financial Officer and Chief Operating Officer. The document further directs Cavanaugh "to transfer USIP's assets, including USIP's real property and rights thereof, including all assets recently received from the Endowment, to the General Services Administration (GSA)." Ex. 2 to Defs' Opp. To Motion pursuant to the All Writs Act (ECF No. 15-2).

**Response:** Undisputed except that Defendants dispute Plaintiffs' characterizations that the ex officio board members "purported" to do the actions above. As explained throughout these filings, Defendants had actual authority to perform the actions in this paragraph and took the indicated actions under that authority. *See* Bd. Resolution, ECF No. 15-2.

56.    On March 31, 2025, Plaintiffs learned of additional documents that purported to execute the transfer of USIP's headquarters building to GSA on Saturday, March 29, 2025. Exs. 1, 3, 4 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-1, 15-3, 15-4).

**Response:** Undisputed except that Defendants dispute Plaintiffs' characterizations that the ex officio board members "purported" to do the actions above. As explained throughout these filings, Defendants had actual authority to perform the actions in this paragraph and took the indicated actions under that authority.

57.    On March 31, 2025, Plaintiffs learned of a purported board resolution by two *ex officio* board members (Secretaries Rubio and Hegseth) firing all officers of the USIP Endowment, appointing Adam Amar as new president of the Endowment, and directing Amar to transfer all of the Endowment's assets to USIP. Ex. 2 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-2).

**Response:** Undisputed except that Defendants dispute Plaintiffs' characterizations that the ex officio board members "purported" to do the actions above. As explained throughout these filings, Defendants had actual authority to perform the actions in this paragraph and took the indicated actions under that authority.

58.    On April 1, 2025, Defendants' counsel informed this Court that GSA had leased, or was in the process of leasing, the USIP building to the Department of Labor.

**Response:** This statement is immaterial to the pending cross-motions.

59.    The Institute has field offices, staff, and/or contractors in 26 countries around the world, including seven field offices in Nigeria, Libya, Thailand, El Salvador, Pakistan, Tunisia, and Colombia. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 8 (ECF No. 12-8). These offices have maintained computer systems with sensitive information about USIP workers and operations. *Id.*

   **Response:** This statement is immaterial to the pending cross-motions.

60.    USIP frequently serves as a resource to Congress. It regularly briefs Members and their staffs upon request and holds briefings on Capitol Hill. Such briefings have concerned transnational criminal networks with links to China, crime and mass migration in Central America, and critical minerals in Africa. The Institute has long facilitated congressionally mandated commissions and regularly convenes senior expert groups to analyze pressing issues. For example:

   a.    Iraq Study Group. In 2006, a bipartisan group of Members of Congress requested USIP to act as the facilitator for the Iraq Study Group (ISG), which was set up to provide a "'fresh eyes' assessment of the situation in Iraq." Ex. 2 (Iraq Study Group Fact Sheet). The members of the ISG hailed from all parts of the federal government: former Secretary of State James A. Baker, III; Congressman Lee Hamilton; Lawrence S. Eagleburger, former Secretary of State; Vernon E. Jordan, Jr., Senior Managing Director, Lazard, Freres & Co. LLC; Edwin Meese, III, former U.S. Attorney General; Sandra Day O'Connor, former U.S. Supreme Court Associate Justice; Leon E. Panetta, former White House Chief of Staff; William J. Perry, former U.S. Secretary of Defense; Charles S. Robb, former U.S. Senator; and Alan K. Simpson, former U.S. Senator. Ex. 1, Decl. of Paul Hughes ¶¶ 5-7.

   The Institute, with support from the Center for the Study of the Presidency, the Center for Strategic and International Studies, and the James A. Baker III Institute for Public Policy at Rice University, served the ISG by convening expert working groups, writing briefing papers, providing analysis, and coordinating meetings. Ex. 1, Decl. of Paul Hughes ¶ 8.

   b.    Afghanistan Study Group. The Afghan Study Group (ASG) was established by Congress in December 2019. S. Rept. No. 116-126, at 43 (2019). Congress tasked the ASG to "consider the implications of a peace settlement or the failure to reach a settlement on U.S. policy, resources, and commitments in Afghanistan." *Id.* The group was co-chaired by former Senator Kelly Ayotte, former Chairman of the Joint Chiefs of Staff, General Joe Dunford, USMC, as well as Nancy Lindborg, former Assistant Administrator for the Bureau for Democracy, Conflict, and Humanitarian Assistance at USAID. Ex. 14, Decl. of Michael Phelan ¶ 3.

   USIP served the ASG by providing administrative and logistical support, convening working groups and stakeholder meetings, writing briefing

papers, providing analysis, and coordinating ASG meetings. Ex. 14, Decl. of Michael Phelan ¶ 4.

c. <u>Gandhi-King Global Academy</u>. In 2020, Congress directed the Institute to create the "Gandhi-King Global Academy," a professional development training initiative to develop and make publicly available a curriculum on conflict resolution tools based on the principles of nonviolence. Pub. L. No. 116-260, div. FF, § 334, 134 Stat. 1182, 3115 (Dec. 27, 2020). Congress directed the Institute to report every six months to four congressional committees (two House, two Senate) on its progress on the initiative. *Id.* § 336(a)(2). *See* Ex. 31, Decl. of Alli Aloudes Phillips (describing role in the Gandhi-King Global Academy's conflict resolution education and training programs); Ex. 32, Decl. of Maria Antonia Montes (describing work as Senior Program Officer for Gandhi-King Global Academy).

**Response:** Undisputed, but the Institute's response to congressional inquiries does nothing to take it out of the Executive Branch of the federal government and the Institute's congressional interactions are ancillary to its statutory purposes, which are plainly executive functions. 22 U.S.C. § 4601.

61. Other nonprofit organizations and think tanks perform the same type of research, education, training, and dialogue facilitation activities as USIP in communities around the world. *See, e.g.*, Ex. 27, Decl. of Andrew Wells-Dang (explaining the similarity between USIP and other international nonprofits he has worked with); Ex. 29, Decl. of Mary Glantz (describing other nonprofits and think tanks that broadly offer expert advice and analysis, including to Congress and government agencies); Ex. 30, Decl. of Nicole Cochran (describing research and training efforts, as well as work convening expert study groups similar to how the Stimson Center and Center for Strategic and International Studies function);

**Response:** This statement is immaterial to the pending cross-motions.

62. USIP's research, training, and conflict resolution efforts often occurs "on the ground" in communities in conflict and involves a wide range of partners and stakeholders to which USIP is able to gain access and trust because of its independence from official U.S. Government institutions. The substance, approach, and type of work is very different from that undertaken by Executive branch agencies. Ex. 29, Decl. of Mary Glantz (contrasting USIP work with her prior work as a Foreign Service Officer); Ex. 32, Decl. of Maria Antonia Montes (describing ability to travel to areas where U.S. Government personnel were not authorized to go, and to meet with grassroots civil society members to gather information, and describing her lack of access to official files or discussions around State Department's Executive or Foreign Policy Objectives); Ex. 36, Decl. of Frank Aum (explaining differences between nature and substance of work at USIP compared to the Office of the Secretary of Defense at the Pentagon, where he previously worked); Ex. 34,

Decl. of Scott Worden (explaining how work for USIP is "fundamentally different" from his work at a federal agency (USAID) and for the Special Inspector General for Afghanistan Reconstruction); Ex. 28, Decl. of Christopher Bosley (former U.S. Navy intelligence officer contrasting work on USIP's Countering Violent Extremism team, which involved engaging "local, on-the-ground partners and communities dealing with violent extremism issues and root causes," conducting "immediate-term piloting of programs to stop violent extremism," and "longitudinal convening and scholarship to study and address these issues over time" with "the workstreams in which agencies of the official U.S. government operate"); Ex. 33, Decl. of Mary Speck (describing how her work in Guatemala on USIP's Latin America Program is "unlike that of any Executive Branch entity" and how USIP's "status as an independent non-profit entity was crucial to [its] work. Our goal is to build trust between authorities -- especially police -- and local citizen groups, including businesspeople, indigenous authorities, activists, and religious leaders. These partners trust us because we do not represent the U.S. government or any ideological group that is advocating for specific policies. We can be honest interlocutors, able to reach out to Evangelical leaders, human rights activists and business owners alike."

**Response:** Defendants dispute the assertions in this statement about the Institute being "able to gain access and trust because of its independence from official U.S. Government institutions," and the Institute's work being "very different from that undertaken by Executive branch agencies." These assertions are not factual but are, instead, opinions. Ultimately, whether the Institute sits outside the Executive Branch is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government.

63.    USIP is able to perform conflict-resolution research and conduct trainings, convene and facilitate communications and dialogue between groups in conflict because it assiduously maintains its independence from official U.S. Government diplomatic and policymaking activities, and because its partners recognize (and rely upon) that independence. Indeed, USIP provides research briefing analysis, and conflict-resolution training services, training, and advisory services to a variety of different partners: educational institutions, foreign governments, other nonprofit think tanks, and agencies within the United States Executive Branch. The United States government has no say over what projects USIP undertakes for foreign and NGO groups. *See* Ex. 31, Decl. of Alli Aloudes Phillips (describing importance of USIP's independence from the Executive Branch to the nongovernmental peacebuilding organizations with which USIP works in Africa, Latin America, and Asia); Ex. 34, Decl. of Scott Worden ("USIP was able to convene a variety of Afghan and international stakeholders at USIP's [private office space in Kabul] because we were viewed as non-governmental and created a neutral space for peacebuilders to engage in open dialogue that would not have been possible at a U.S. government facility."); Ex. 35, Decl. of Tegan Blaine (former USAID official explaining work on USIP's "climate,

environment, and conflict" project in Africa performing "deep research and analysis" of information derived from "on-the-ground" dialogue with communities inaccessible to US Government, and describing clear lines between USIP and involvement or awareness of decisionmaking or strategic priorities of U.S. Africa Command); Ex. 11, Decl. of Samantha Robinson (describing USIP's ability to perform humanitarian peacebuilding work in the Middle East and other places because it operates independently from U.S. government agencies and is not subject to work free of governmental restrictions and protocols).

**Response:** Defendants dispute the assertions in the paragraph above about the Institute's "independence from official U.S. Government diplomatic and policymaking activities," and the assertion that "its partners recognize (and rely upon) that independence." These assertions are not factual but are, instead, opinions. Ultimately, whether the Institute sits outside the Executive Branch is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government.

64.    USIP does not engage or participate in "Track 1" diplomacy, which is reserved for official governmental representatives. *See* Ex. 16, Lisa Sokol, "Multi-Track Diplomacy Explained," Nuclear Threat Initiative, at https://www.nti.org/risky-business/multi-track-diplomacy-explained/ ("Track 1 Diplomacy refers to official diplomacy, where communication is directly between or among governments. These formal discussions are conducted by diplomats, heads of state, and other official authorities.").

**Response:** Disputed, and the cited materials fail to support the statement.

65.    USIP engages in "Track 1.5" diplomacy. E.g., Ex. 30, Decl. of Nicole Cochran (USIP implemented and supported Track 1.5 dialogues as a "neutral and credible convener"). The distinctive feature of Track 1.5 diplomacy is that it involves the participation of "nongovernmental experts." Ex. 16. *See* Jeffrey Mapendere et al., *Track One and a Half Diplomacy and the Complementarity of Tracks*, 2 Culture of Peace Online J. 66, 69 (2006) (Ex. 15). Independent nongovernmental entities similarly convene Track 1.5 meetings. One example is the Carter Center's involvement in mediating the conflict between Uganda and Sudan. "By operating at a Track One and a Half level, The Carter Center has the advantage of applying an eclectic approach to international and ethnic conflict, such as the use of high-level diplomacy, private problemsolving workshops, direct mediation, interactive conflict resolution, and other confidencebuilding interventions." Ex. 15 at 70. Another example was the China-U.S. Strategic Nuclear Dynamics Dialogue, which was convened and run by the nonprofit, private think tanks Center for Strategic and International Studies and Pacific Forum. Ex 16.

**Response:** Defendants dispute the first sentence, and the cited materials fail to support the statement. The remainder of the statement is immaterial to the pending cross-motions.

66. USIP also engages in "Track 2" diplomacy, which denotes "a purely unofficial channel for dialogue between *non-governmental experts*, without direct governmental involvement." *Id.* (emphasis added). Scholars have defined it as "unofficial, informal interaction between members of adversary groups or nations that aim to develop strategies, to influence public opinion, organize human and material resources in ways that might help resolve their conflict." Ex. 15 at 68.

**Response:** Disputed, and the cited materials fail to support the statement.

67. When USIP engages on these fronts, parties on all sides understand it to be an independent forum, and not to speak for the United States (just like the Center for Strategic and International Studies in the China-U.S. Strategic Nuclear Dynamics Dialogue or the Carter Center when mediating the conflict between Uganda and Sudan in the late 1990s). *See* Exs. 15, 16. In the example of the Center for Strategic and International Studies, the dialogue "provided an avenue for what officials often describe as 'frank and candid' discussions with Chinese counterparts on nuclear issues. By bringing together think tank experts, retired officials, and active government and military officials, the dialogue led to a unique series of conversations where both sides could exchange views and build trust, even in the face of broader tensions." Ex. 16; Ex. 36, Decl. of Frank Aum (describing research on the Korean Peninsula and efforts "convening and moderating dozens of Track 2 (nongovernmental) dialogues, seminars, and roundtables").

**Response:** Defendants dispute the assertions in the paragraph above about "parties on all sides understand it to be an independent forum, and not to speak for the United States[.]" These assertions are not factual but are, instead, opinions, as well as speculative as to what "parties on all sides understand[.]" The Institute, for example, "may use 'United States' or 'U.S.' or any other reference to the United States Government or Nation" in the course of its work, 22 U.S.C. § 4603(e)(2), and was created "to serve the people and the Government[,]" 22 U.S.C. § 4601(b). Thus, it could just as easily be that "parties on all sides understand [the Institute not] to be an independent forum," but one that serves the United States' interests. Ultimately, whether the Institute is independent from the federal government is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government.

68. When USIP participates in conflict resolution initiatives, it draws on developed regional expertise to give it credibility among the parties to the dialogue. At times, USIP's independence facilitates access to certain communities, networks, or stakeholders that

federal officers with formal governmental or diplomatic status channels lack. USIP's experience, expertise and long-term relationships of trust with key stakeholders help it craft effective agendas, convene the right participants, and facilitate discussion that can generate new insights to inform congressional and Executive branch policy evaluation and development efforts. For example:

- In connection with a border dispute between Kyrgyzstan and Tajikistan, USIP sponsored a Track 2 dialogue between an influential group of former advisors and policy experts to discuss initiatives to reconcile the divided and hostile communities. The governments' representatives focused on difficult border demarcation and access issues. The USIP-related dialogue worked on initiatives that more broadly addressed how to reestablish normal interaction between communities on both sides of the border. The dialogue thawed relations and paved the way for a historic official border demarcation deal. Ex. 10, Decl. of Gavin Helf ¶ 5.

- In 2003 and 2004, USIP members in Iraq worked outside the official U.S. security bubble, known as the Green Zone, to facilitate reconciliation between Iraqi tribes. USIP's independence allowed it to conduct objective research, which it shared with US officials to consider as part of their policy and programming activities, to engage parties in training and problem-solving dialogue, and to engage with diverse stakeholders necessary for preventing and resolving conflict. Ex. 1, Decl. of Paul Hughes ¶¶ 17-18, 23.

- In the Middle East, USIP has leveraged its independent status and its peacebuilding tools, including its Peace Game strategic exercise tool, and its deep networks of trusted local contacts, to bring together trusted Palestinian, Israeli, and regional interlocutors to work together on problem-solving related to post-conflict recovery and stabilization in Gaza. The work yielded valuable information, which USIP shared at the request of U.S. government representatives. Ex. 11, Decl. of Samantha Robinson ¶ 6.

- Ahead of local elections in the autonomous Bangsamoro region in the southern Philippines in October 2023, USIP was asked by both the Philippines government and the Moro Islamic Liberation Front—not by the US government—to discreetly facilitate ceasefire efforts between the two sides. USIP's independent status made it possible to engage both sides directly as a third party and create joint Quick Response Teams of Philippine Army, National Police, and Moro Islamic Liberation Front former combatants. The ceasefire did not break down and the peace process remained intact. Ex. 8, Decl. of Brian Harding ¶ 6.

- USIP facilitated informal conversations with the Azerbaijani and Armenian Embassies about what would be needed by both sides to reach a peace agreement ending their 30-plus year war. The talks created the opportunity for both parties to float ideas and talk about concerns they did not want to provide in official channels. These conversations helped narrow the gap

between their war aims and concerns, leading to a peace agreement in mid-March 2025. Ex. 9, Decl. of Catherine Dale ¶ 6.

**Response:** Defendants dispute the repeated assertions in the paragraphs above about the Institute's "independence" and "independent status." These assertions are not factual but are, instead, opinions and speculation. The Institute, for example, "may use 'United States' or 'U.S.' or any other reference to the United States Government or Nation" in the course of its work, 22 U.S.C. § 4603(e)(2), and it was created "to serve the people and the Government[,]" 22 U.S.C. § 4601(b). It could just as easily be that the Institute's status as a United States agency influenced the description of events in the paragraphs above, despite the assertions about the Institute's "independence." Whether the Institute sits outside the Executive Branch is a matter of law for the Court to decide.  For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government.

69.    The United States Government Manual (the "Manual") is a publication of the Office of the Federal Register of the National Archives and Records Administration ("NARA") within the Executive branch. It is published by the Government Publishing Office, an office within the Legislative branch. *See* Ex. 22, Manual, "About Us" (*available at* https://www.usgovernmentmanual.gov/About). *See also* Ex. 23, U.S. Government Manual (published        Jan        13,        2025)        (*available        at* https://www.govinfo.gov/app/collection/govman/2025/03executive_United%20States%20Government%20Manual) (excerpted). The Manual is the "official handbook of the Federal Government." *See id.*

**Response:** Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President).  U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About.  Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law. *Id.* As the Manual makes clear, its contents reflect

information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.* The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The remainder of this statement is undisputed.

70.    The current organizational chart of the federal government in the Government Manual does not include USIP at all. *See* Ex. 23. Under the Executive Branch, the Manual identifies 15 agencies and 58 "independent establishments and government corporations." *Id.* USIP is not listed among them. *See id.* The Manual also classifies entities within the Executive Branch (in addition to the White House) as "Executive Branch: Departments" and "Executive Branch: Independent Agencies and Government Corporations." Again, USIP is not listed. *Id.*

**Response:** Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President). U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law. *Id.* As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.* The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The remainder of this statement is undisputed.

71.    The Manual lists USIP as a "Quasi-Official Agency," along with Legal Services Corporation ("LSC"), Smithsonian Institution, State Justice Institute, and the United States Holocaust Memorial Museum. *Id.*

**Response:** Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President).  U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About.  Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law.  *Id.*  As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.*  The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders.  U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH.  The remainder of this statement is undisputed.

72.    Since USIP first appeared in the Manual in 1988, the Manual has listed it as a "Quasi-Official Agency." Ex. Ex. 24, U.S. Office of the Federal Register, NARA, *United States Government Manual*, 1988/89, p. 767 (Rev. June 1, 1988) (excerpted). NARA defines "quasi-official agencies" as "***organizations that are not agencies under the definition of 5 U.S.C. 105*** but that are required by statute to publish certain information on their programs and activities in the Federal Register." *Id.* at 747 (emphasis added); *see also* Ex. 25, U.S. Office of the Federal Register, NARA, *United States Government Manual*, 2009-2010, p. 543 (Washington: GPO, 2010) (excerpted) (defining quasi-official agencies as ***organizations that are not executive agencies under the definition in 5 U.S.C. 105***…") (emphasis added).

**Response:** Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President).  U.S. Government

Manual, About Us, available at: https://usgovernmentmanual.gov/About.  Those publishers merely

"review and edit the submissions to produce organized and concise descriptions of Federal agency

programs and activities" and nothing in the Manual describes it as a legal document or a definitive

expression of the Executive's view on the law.  *Id*.  As the Manual makes clear, its contents reflect

information "submitted to [the Office of the Federal Register] by Federal agencies and

organizations[.]"  *Id.*  The information in the Manual about the Institute was presumably submitted

by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting

Moose as the board's chairperson and Lisa Grande as its president, among other prior office

holders.  U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-

4XNH.  The remainder of this statement is undisputed.

73.    Actions taken to date since March 14, 2025 that individually and collectively impair the
       Institute's ability to function and fulfill its mission as provided by Congress include:

   a.    Removal of eleven duly-appointed Board members;

   b.    Purported installation by the *ex officio* Board members of acting presidents
         (Ken Jackson and Nate Cavanaugh) who were committed not to the mission
         and activities of the Institute but to halting and eliminating all USIP staff
         and programs;

   c.    Firing all but a handful of the Institute's over 400 employees, many with
         extensive experience and expertise in all areas of the field of peaceful
         conflict resolution;

   d.    Shutting down the Institute's administrative and communication systems,
         leaving employees without adequate resources to understand their
         employment status, access to personnel records, or health insurance
         coverage status;

   e.    Undertaking to close USIP's field offices and cancel contracts concerning
         ongoing projects;

   f.    Instructing and taking actions to transfer of all of USIP's assets to GSA,
         including (i) the USIP-owned headquarters building, valued at $500
         million, for zero dollars, and (ii) all USIP property in the building;

g.   Undertaking to lease USIP's headquarters building to the Department of Labor;

h.   Terminating all of the USIP Endowment's officers, appointing a new president of the Endowment, and instructing him to transfer all of the Endowment's assets, including bank accounts holding at least $25 million, to USIP.

Ex. 7, Moose Decl. ¶ 13.

**Response:** While Defendants do not dispute that, factually, some of the events above occurred, as explained throughout these filings, Defendants dispute that Plaintiffs have authority to speak to the Institute's alleged harms rather than their own individual harms. Assuming without conceding that Plaintiffs do have such authority, whether the Institute would be irreparably harmed by the events above is not a fact but, instead, is Plaintiffs' legal conclusion. To the contrary, the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217.

74.   The eleven USIP Board members who were duly appointed under 22 U.S.C. § 4605(b)(4) and who were purportedly removed by President Trump via email on March 14, 2025 were not notified about and were not given the opportunity to participate in board actions or decisionmaking concerning: whether to terminate Ambassador Moose and replace him with Defendant Jackson as Acting President; whether to respond to Defendant Jackson's firing of employees on March 21; whether to participate in board action that concerned whether it was in USIP's best interests to terminate virtually all of USIP's employees on March 28, including the Institute's CFO and COO; whether to replace Defendant Jackson with Defendant Cavanaugh as Acting President; whether to transfer the USIP headquarters building and all property in it to GSA for zero dollars; and whether to replace all officers of the USIP Endowment and transfer all Endowment assets to USIP. *Id.* ¶ 14.

**Response:** Defendants do not dispute that the former Board members did not participate in the actions above; however, as explained throughout these filings, Defendants dispute that they would have had any authority to do so. The President of the United States removed the former Board members pursuant to his Article II removal powers. *See* Am. Compl. (ECF No. 12) ¶¶ 50, 52, ECF No. 12; Letters, ECF No. 21-1.

75.    USIP's employees, individually and collectively, have deep institutional knowledge and expertise in a broad range of conflict resolution-related programs, activities, curriculum development, research, and training in which they have been engaged, both in the U.S. and around the world. *See id.* ¶ 15; Exs. 8-11, 27-36 (declarations of former USIP Staff).

    **Response:** This statement is immaterial to the pending cross-motions.

76.    Recent events have adversely impacted the commitment of USIP's donor base to the Institute. Many donors who donated funds for the construction and/or maintenance of the USIP headquarters building have contacted Ambassador Moose concerning the status of their contributions. These donors include individuals who have pledged millions of dollars to support the Institute. Ex. 7, Moose Decl. ¶ 16.

    **Response:** This statement is immaterial to the pending cross-motions.

77.    The USIP building is unique—its design intended to reflect and functionally aid the Institute's mission. *See* https://www.safdiearchitects.com/projects/united-states-institute-of-peace; *At U.S. Institute of Peace, building's provocative design doesn't entirely succeed*, Washington Post (Feb. 24, 2012) (*available at* https://www.washingtonpost.com/realestate/at-us-institute-of-peace-buildings-provocative-design-doesnt-entirely-succeed/2012/02/21/gIQADOxOYR_story.html).

    **Response:** This statement is immaterial to the pending cross-motions.

78.    USIP's ability to fulfill its mission—including to engage in conflict resolution training, to be a trusted information resource for congressional and governmental bodies, and to convene and facilitate dialogue between groups in conflict—depends on its long-earned reputation as a nonpartisan, expert organization. It further depends on it not being part of, and being recognized as independent of the Executive Branch. Defendants' actions toward USIP since issuance of EO 14217 will adversely affect the Institute's standing and reputation as an "honest, good faith broker" in the field. Ex. 7, Moose Decl. ¶ 17.

    **Response:** Disputed: as explained throughout these filings, Defendants dispute that the

Institute is independent of the Executive Branch, and contrary to Plaintiffs' position, the United

States government is harmed by not being able to promote the President's policy of dramatically

reducing the size of the Federal Government, while increasing its accountability to the American

people, among other purposes outlined in Executive Order 14,217.

79.    Actions to cancel contracts and grants, and deletion or alteration of information from USIP's computer system will cause severe and irreparable harm to USIP and its staff. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 5 (ECF No. 12-8).

**Response:** Disputed: the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217.

80.    USIP has contracts domestically with a variety of vendors. These include a facilities and engineering contract for building maintenance, catering contracts, and building security contracts. USIP is legally bound by these contracts, and the sudden cancellation of such contracts without cause will result in USIP breaching the contracts. Outside of the potential legal repercussions, USIP's relationship with these vendors will be harmed, rendering it difficult to reestablish such contracts in the future in order to restart work. Further, canceling the facilities and engineering contract will result in the loss of key personnel with pertinent and specialized knowledge about the USIP headquarters building and systems, rendering it difficult to safely maintain the building and restart work in the future. *Id.* ¶¶ 6-7.

   **Response:** Disputed: the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217.

81.    USIP's offices contain USIP assets, federal assets, and computers with sensitive information about USIP workers and operations. If such leases are terminated without guidance for how to shut down an office, especially in insecure areas, all of this information is at risk of being taken and used to harm USIP and its staff. *Id.* ¶¶ 8-9.

   **Response:** Disputed.  This statement is purely speculative, and the cited materials fail to support the statement.

82.    USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support Institutional Review Board standards for research using human subjects. Any release of employee information, which includes names, personal information, and banking information, would harm and even endanger USIP's staff, especially those located abroad in insecure areas, who may be targeted by terrorist groups or other bad actors. *Id.* ¶ 11.

**Response:** This first sentence in this statement is immaterial to the pending cross-motions.

The second sentence is disputed because it is purely speculative, and the cited materials fail to

support the statement.

83.    Further, the deletion of current and historical employee and vendor information would render it extremely difficult to restart work in the future, as all records are kept electronically. *Id.* ¶ 12.

    **Response:** Disputed.  This statement is purely speculative, and the cited materials fail to

support the statement.

84.    USIP's computer system contains decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of this intellectual property documentation would render USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out part of its core mission, which is education and training. *Id.* ¶ 13.

    **Response:** This first two sentences in this statement are immaterial to the pending cross-

motions.  The third sentence is disputed because it is purely speculative, and the cited materials

fail to support the statement.

85.    USIP maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits of the organization. Loss of access to these materials, which are only kept electronically, would prevent USIP from fulfilling its tax reporting obligations as well as its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 15.

    **Response:** This first sentence in this statement is immaterial to the pending cross-motions.

The second sentence is disputed because it is purely speculative, and the cited materials fail to

support the statement.

86.    The sudden termination of USIP employees and contractor staff risks significant harm to both USIP and these personnel. Many of these personnel work in insecure areas of the world. Some are third-country nationals who were asked to leave their country of residence and relocate to a new country to perform work for USIP. If their contracts are canceled without proper notice or assistance, these staff could be stranded and trapped in that insecure country or kicked out or prosecuted for lack of proper work documentation. *Id.* ¶ 16.

**Response:** This first two sentences in this statement are immaterial to the pending cross-motions. The third sentence is disputed because it is purely speculative, and the cited materials fail to support the statement.

## DEFENDANTS' STATEMENTS

1.    In 1984, Congress established the Institute through the Department of Defense Authorization Act of 1985, Act. Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984). See 22 U.S.C. §§ 4601–4611.

2.    In the Institute's organic statute, Congress made several findings that prompted the Institute's creation, including the following:

(1)    a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict; . . .

(4)    there is a national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities with regard to the history, nature, elements, and future of peace processes, and to bring together and develop new and tested techniques to promote peaceful economic, political, social, and cultural relations in the world; . . .

(6)    there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information;

(7)    the Commission on Proposals for the National Academy of Peace and Conflict Resolution, created by the Education Amendments of 1978, recommended establishing an academy as a highly desirable investment to further the Nation's interest in promoting international peace;

(8)    an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs, would be the most efficient and immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts; and

(9)    the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of

- 29 -

international peace and the resolution of conflicts among nations without the use of violence.

22 U.S.C. § 4601(a).

3.    Congress created the Institute as an establishment of the United States.  22 U.S.C. § 4603(a).

4.    As to its form, the Institute is organized as a nonprofit corporation organized prohibited from having any owner other than its incorporator, the United States.  *Id.* § 4603(b) ("The Institute is an independent nonprofit corporation . . . The Institute does not have the power to issue any shares of stock[.]").

5.    Authority to run the Institute is vested in its board of directors.  *Id.* § 4605(a).

6.    The Institute's board consists of three voting ex officio members—the Secretary of State, the Secretary of Defense, and the president of the National Defense University—and twelve appointed members.  *Id.* § 4605(b).

7.    The appointed members are "appointed by the President, by and with the advice and consent of the Senate."  *Id.* § 4605(b)(4).

8.    No more than eight total members can be from one political party, but by virtue of the ex officio members, the Institute's board is designed to be dominated by the political party of the President.  *Id.* § 4605(c).

9.    The Institute's board has the power to select a president of the Institute.  *Id.* § 4606(a).

10.    The president and other officers of the Institute "serve at the pleasure of the Board[,]" meaning they can be removed by the board at any time for any reason.  *Id.*

11.    The Institute receives congressional appropriations and is prohibited from receiving non-governmental funds except for two highly specific activities—the construction and maintenance of a suitable headquarters and program-related hospitality. *Id.* § 4605(h)(3).

12.    The Institute, including through its president, is authorized to "receive and disburse public moneys, obtain and make grants, enter into contracts, [and] establish and collect fees," among other authorities. *Id.* § 4606(b).

13.    The Institute's organic statute includes various other provisions, including:

a.    it is authorized to use the name and seal of the United States, *id.* § 4603;

b.    it is subject to the Freedom of Information Act, *id.* § 4607(i);

c.    it is required to publish notices of board meetings in the Federal Register, *id.* § 4605(h)(3);

d.    it can obtain services and support from GSA, *id.* § 4604(o);

e.    the compensation of its board members, president, and employees are set by federal statute, *id.* §§ 4605(i), 4606(a), 4606(c);

f.    reimbursement of its board's travel expenses is controlled by federal statute, *id.* § 4605(j);

g.    the Federal Tort Claims Act applies to it and its officers and employees, *id.* § 4606(f)(1);

h.    its employees receive federal government benefits (e.g., workers compensation, civil service retirement, federal life insurance, and federal health insurance), *id.* § 4606(f)(1); and

i.    upon liquidation, its asserts revert to the United States Treasury, *id.* § 4610.

14.    On February 19, 2025, President Trump signed Executive Order 14,217. Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025).

15.    That Order described the policy of President Trump's administration "to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people." *Id.* § 1.

16.    To fulfill that objective, the President directed that "[t]he non-statutory components and functions of [certain identified] governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]"  *Id.* § 2(a).  Among the identified entities was the Institute.  *Id.* § 2(a)(iv).

17.    To carry out that Executive Order, on or about March 14, 2025, the White House Presidential Personnel Office notified the Institute's board members, including the former board members who are Plaintiffs in this suit, informing them that they had been terminated from their positions with the Institute.  Am. Compl. (ECF No. 12) ¶ 50; Pls. Stmt. of Undisp. Facts (ECF No. 19-1, "Pls. Stmt.") ¶ 38; Termination Notices, ECF No. 24-1.

18.    Thereafter, the remaining Institute board members (i.e., the ex officio members) issued a resolution of the board removing the then-acting Institute president, George E. Moose, and designating a new president, Kenneth Jackson.  Am. Compl. (ECF No. 12) ¶¶ 52–53; Pls. Stmt. (ECF No. 19-1) ¶ 43; Bd. Resolution, ECF No. 12-6.

19.    By resolution effective March 25, 2025, the Institute's board issued another resolution, removing Jackson as the Institute's president and appointing Nate Cavanaugh as the Institute's acting president.  Bd. Resolution, ECF No. 15-2.

20.    The Institute is listed in the U.S. Government Manual as a federal government entity.  U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH.

21.    The Manual makes no attempt to identify which of the three branches houses the Institute.  *Id.*

22.    The U.S. Government Manual does not purport to be a legal document or a definitive expression of the Executive's view on the law.  *See* U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About.

23.    The publishers of the Manual—the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President)—merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities." *Id.*

24.    As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.*

25.    The information in the Manual about the Institute was submitted by the Institute's former leadership given the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders.  U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH.

26.    USA.gov is a General Services Administration website that serves as "the official guide to government information and services."  USA.gov, https://www.usa.gov/.

27.    The Institute is listed on USA.gov under its index of "government departments and agencies."  USA.gov, USIP, https://www.usa.gov/agencies/united-states-institute-of-peace.

28.    When President Reagan signed the Institute's organic statute, he issued a signing statement noting that the act "neither intended to, nor has the effect of, restricting the President's constitutional power to remove" the Institute's board members.  Statement on Signing the Department of Defense Authorization Act, 1985 (Oct. 19, 1984), available at:

https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-

authorization-act-1985.

Dated: April 10, 2025                    Respectfully submitted,
        Washington, DC

                                         EDWARD R. MARTIN, JR., D.C. Bar #481866
                                         United States Attorney


                                         By:  _____/s/ Brian P. Hudak_____
                                              BRIAN P. HUDAK
                                              Chief, Civil Division
                                              601 D Street, NW
                                              Washington, DC 20530
                                              (202) 252-2549

                                         JOSEPH F. CARILLI, JR.
                                         SAM ESCHER, D.C. Bar #1655538
                                         Assistant United States Attorneys

                                         *Attorneys for the United States of America*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE OF PEACE, *et al.*,

       Plaintiffs,

   v.

KENNETH JACKSON, *et al.*,

       Defendants.

Case No. 1:25-cv-00804-BAH

## PLAINTIFFS' (I) REPLY IN SUPPORT OF STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE, (II) RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS, AND (III) ADDITIONAL UNDISPUTED MATERIAL FACTS IN REPONSE TO THE CROSS-MOTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), Plaintiffs respectfully submit the following reply in support of its statement of undisputed material facts in support of its motion for summary judgment, Plaintiffs' response to Defendants' statement of facts for the cross-motion/opposition, and Plaintiffs' additional undisputed facts in response to the cross-motion.

For the Court's convenience, Plaintiffs have also included their original undisputed material facts (from ECF 20) and Defendants' responses thereto (from ECF 32-1).

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 1 | In 1984, Congress established the United States Institute of Peace ("USIP" or "the Institute") as an independent nonprofit corporation pursuant to the United States Institute of Peace Act (the "USIP Act"). Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984), 22 U.S.C. §§ 4601-4611, as amended. | Undisputed except the proper name of the full enactment that established the Institute was the Department of Defense Authorization Act of 1985. | |
| 2 | The Institute's creation followed the 1980 formation of the Commission on Proposals for the National Academy of Peace and Conflict Resolution ("the Commission"). Pub. L. No. 95-561, 92 Stat. 2143, 2376 (1980). The Commission published its final report on the creation of a United States Peace Academy in 1981. *See* Commission on Proposals for the National Academy of Peace & Conflict Resolution, *To Establish the United States Academy of Peace: Report to the President and Congress* (1981) ("Matsunaga Commission Report"). | Undisputed | |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 3 | Congress found that "there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information," and that the Institute represents "the most efficient and immediate means" and "an appropriate investment by" the United States to promote peace and the peaceful resolution of conflicts. 22 U.S.C. § 4601(a). | Undisputed | |
| 4 | Congress designed the Institute to "carry out its activities outside the day-to-day policymaking pressures and constraints which might impinge upon that freedom were [the Institute] to be part of an existing agency or department." S. Rep. No. 98-244, at 23 (1983) (favorably reporting S. 564 to establish the U.S. Academy of Peace) (Ex. 26). *See also* 130 Cong. Rec. 17,504 (1984) (proposing S. 564 as Hatfield Amendment No. 3270 to the | Disputed. Congress did not include this language in its enactment and the Institute's organic statute reveals different purposes. 22 U.S.C. § 4601. | Defendants do not dispute that the Senate report contains the quoted statement. *See also* Resp. to Defs. SOF ¶ 8. Nor do Defendants present any facts showing that Congress intended the Institute to be subject to policymaking pressures or constraints, or to carry out its activities as part of an existing agency or department. |

3

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Department of Defense Authorization Act, 1985, H.R. 5167, 98th Cong. (1984)). | | |
| 5 | Congress stressed the Institute's role as a resource for both the legislative and executive branches. *Id.* (stating importance of an entity "whose only role is to explore alternatives to international violence and to bring those alternatives to the attention of those in a position of trust, within both the legislative and executive branches."). | Disputed. Congress did not include this language in its enactment and the Institute's organic statute reveals different purposes. 22 U.S.C. § 4601. | Defendants do not dispute the fact or that the Senate report contains the quoted statement. The statement in 22 USC § 4601(a)(5) that the Institute, as an institution "devoted to international peace research, education and training, and information services," could strengthen "the peacemaking activities of people in such institutions, *government*, private enterprise, and voluntary associations" (emphasis added) reflects the same legislative intent. |
| 6 | The Institute's headquarters building is located at 2301 Constitution Avenue, NW, Washington, DC 20037. | Undisputed in part. The Institute's former headquarters was located at that address. That building has subsequently been transferred to the General Services Administration. *See* GSA Form 1334, ECF No. 15-1; Institute Request Letter, ECF No. 15-3; OMB Approval Letter, ECF No. 15-4. Moreover, this statement is immaterial to the cross-motions for summary judgment. | Defendants do not dispute that USIP owned its headquarters building at least until March 29, 2025, when Defendants purported to transfer it to GSA for no consideration. Plaintiffs contend the purported transfer was ultra vires and unlawful and thus dispute Defendants' use of the term "former." Defendants' statement about materiality is legal argument. |
| 7 | The land on which the USIP headquarters sits is owned by the United States; however, Congress | Undisputed in part. This statement is undisputed as to the Institute's former headquarters building. Moreover, this | Defendants do not dispute that USIP owned its headquarters building at least until March 29, 2025, when Defendants |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | authorized the transfer of administrative jurisdiction over that land from the U.S. Department of the Navy to the Institute pursuant to Section 2831 of the National Defense Authorization Act for Fiscal Year 1997. The U.S. Navy completed that transfer on November 21, 1996. Amended Compl. Ex. B (ECF No. 12-2). | statement is immaterial to the cross-motions for summary judgment. | purported to transfer it to GSA for no consideration, or that USIP has administrative jurisdiction over the land on which it sits, which gives USIP the right to control entry onto the land. Plaintiffs contend the purported transfer was ultra vires and unlawful and thus dispute Defendants' use of the term "former." Defendants' statement about materiality is legal argument. |
| 8 | Congress authorized the transfer of administrative jurisdiction over an adjacent parcel of land pursuant to Section 2842 of the John Warner National Defense Authorization Act for Fiscal Year 2007. The U.S. Navy completed that transfer on August 29, 2012. Amended Compl. Ex. C (ECF No. 12-3). | Undisputed in part. This statement is undisputed as to the Institute's former headquarters building. Moreover, this statement is immaterial to the cross-motions for summary judgment. | Defendants do not dispute that USIP has administrative jurisdiction over the adjacent parcel of land. Plaintiffs contend the purported transfer was ultra vires and unlawful and thus dispute Defendants' use of the term "former." Defendants' statement about materiality is legal argument. |
| 9 | The Institute constructed its headquarters building beginning in 2008. The building was initially funded with about $70 million of private contributions and $99 million of funds specially appropriated by Congress. See Pub. L. No. 108-447, div. J, §§ 118, 122, 118 Stat. 2809, 3347-48 (Dec. 8, | Undisputed in part for purposes of the pending cross-motions. This statement is undisputed as to the Institute's former headquarters building. Moreover, this statement is immaterial to the cross-motions for summary judgment. | Plaintiffs contend the purported transfer was ultra vires and unlawful and thus dispute Defendants' use of the term "former." Defendants' statement about materiality is legal argument. |

5

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | 2004). After an additional appropriation of $15 million and completion of the building, see Pub. L. No. 111-117, div. F, tit. I, 123 Stat. 3034, 3319 (Dec. 16, 2009), Congress prohibited further use of appropriated funds for construction. See, e.g., Pub. L. No. 112-10, § 2103, 125 Stat. 38, 177 (Apr. 15, 2011); Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 736 (Mar. 23, 2024). USIP has used private funds for building maintenance and renovation. Ex. 3, Decl. of Allison Blotzer ¶ 5 | | |
| 10 | Pursuant to Congressional authority, § 4603(c), in 1986 the Institute created a separate nonprofit legal entity, the "Endowment of the United States Institute of Peace," under District of Columbia law. Ex. 17, Endowment of the US Institute of Peace Form 990 (2022). | Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | Defendants' statement about materiality is legal argument. |
| 11 | The Endowment has held significant assets for the Institute, including bank accounts holding yet-unexpended appropriated funds pursuant to § 4609(b), as well as | Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | Defendants' statement about materiality is legal argument. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | contributions from private sources for the limited purposes permitted by § 4604(h)(3). As of March 14, 2025, the Endowment's accounts held approximately $15 million in private contributions for the limited purposes permitted by § 4604(h)(3), and approximately $10 million in unexpended appropriated funds pursuant to § 4609(b). Exhibit 3, Decl. of Allison Blotzer, ¶¶ 3-4. | | |
| 12 | USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support Institutional Review Board standards for research using human subjects. Amended Compl. Ex. H Decl. of Shira Lowinger ¶ 10 (ECF No. 12-8). | Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | Defendants' statement about materiality is legal argument. |

7

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 13 | USIP's computer systems contain decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of control of intellectual property documentation renders USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out a core part of its mission, which is education and training. *Id.* ¶ 13. | The first two sentences are undisputed for purposes of the pending cross-motions, but those sentences are immaterial to those motions. The third sentence is disputed, and the cited source does not support the notion that the Institute has lost control of or will lose control of these intellectual property rights, which appear to be speculative assertions from Plaintiffs. | Defendants' statement about materiality is legal argument. |
| 14 | USIP electronically maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits, tax reporting obligations, and its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 16. | Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions | Defendants' statement about materiality is legal argument. |

8

JA114

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 15 | As provided in the USIP Act, 22 U.S.C. § 4605(b), the Institute's Board of Directors (the "USIP Board"), consists of three *ex officio* members (the Secretary of State, the Secretary of Defense, and the president of the National Defense University) and twelve members appointed by the President with the advice and consent of the Senate. *See also* Ex. 37, USIP Bylaws. | Undisputed | |
| 16 | As of March 13, 2014, the USIP Board had 14 members: the three *ex officio* members plus 11 individuals duly appointed pursuant to § 4605(b)(4). One of the (b)(4) Board members resigned on March 14, leaving 10 (b)(4) Board members. | Undisputed | |
| 17 | *Ex officio* member Secretary of State Marco Rubio was confirmed by the U.S. Senate as the Secretary of State on January 20, 2025. 171 Cong. Rec. S259 (daily ed. Jan. 20, 2025) (confirmation). | Undisputed | |
| 18 | *Ex officio* member Secretary of State Pete Hegseth was confirmed by the U.S. Senate as the Secretary of | Undisputed | |

9

**JA115**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Defense on January 24, 2025. 171 Cong. Rec. S374 (daily ed. Jan. 24, 2025) (confirmation). | | |
| 19 | *Ex officio* member Vice Admiral Garvin assumed command as the president of the National Defense University on October 11, 2024. Ex. 18, National Defense University, "VADM Peter A. Garvin, USN," (*available at* https://www.ndu.edu/About/Leadership/Article-View/Article/2492624/vadm-peter-a-garvin-usn/). | Undisputed | |
| 20 | Ambassador John Sullivan was confirmed by the U.S. Senate as a member of the USIP Board on May 2, 2024. 170 Cong. Rec. S3369 (daily ed. May 2, 2024) (confirmations). His term began on July 20, 2024. He fills one of the Republican slots. Ex. 19, Sullivan Appointment Affidavit (2024). | Undisputed except that Sullivan no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Sullivan. *See* Emails, ECF No. 21-1 at 4. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |
| 21 | Nancy Zirkin was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008. 154 CONG. REC. S5124 (daily ed. June | Undisputed except that Zirkin no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Zirkin. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |

10

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | 4, 2008) (confirmations). Her term began on October 16, 2008. She fills one of the Democratic slots. Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace" (Oct. 16, 2008). | | |
| 22 | Judy Ansley was simultaneously nominated to complete a prior USIP Board member's term and for reappointment as a member of the USIP Board. 157 Cong. Rec. S293 (daily ed. Jan. 26, 2011). She was confirmed by the U.S. Senate for both terms on May 26, 2011. 157 Cong. Rec. S3468 (daily ed. May 26, 2011) (confirmations). She was sworn in on June 6, 2011. She fills one of the Republican slots. Ex. 21, USIP, "New Members for USIP Board of Directors Sworn In" (June 7, 2011). | Undisputed except that Ansley no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Ansley. *See* Emails, ECF No. 21-1 at 2. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |
| 23 | Joseph Falk was confirmed by the U.S. Senate as a member of the USIP Board on February 2, 2023. 169 Cong. Rec. S242 (daily ed. Feb. 2, 2023) (confirmations). His term began on April 29, 2023. He fills one | Undisputed except that Falk no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Falk. *See* Emails, ECF No. 21-1 at 3. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |

11

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | of the Democratic slots. Ex. 6, Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025). | | |
| 24 | Kerry Kennedy was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008. 154 Cong. Rec. S5124 (daily ed. June 4, 2008) (confirmations). Her term began on October 16, 2008. She fills one of the Democratic slots. Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace" (Oct. 16, 2008). | Undisputed except that Kennedy no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Kennedy. *See* Emails, ECF No. 21-1 at 6. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |
| 25 | Mary Swig was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4048 (daily ed. Aug. 4, 2022) (confirmations). Her term began on October 19, 2022. She fills one of the Democratic slots. Ex. 5, Decl. of Mary Swig, ¶ 3 (Apr. 3, 2025). | Undisputed except that Swig no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Swig. *See* Emails, ECF No. 21-1 at 5 | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |
| 26 | Jonathan Burks was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills | Undisputed except that Burks no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Burks | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | one of the Republican slots. Ex. 5, Decl. of Mary Swig, ¶ 3. | | |
| 27 | Edward M. Gabriel was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4048 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Democratic slots. Ex. 5, Decl. of Mary Swig, ¶ 3. | Undisputed except that Gabriel no longer "fills one of the Democratic slots" after the President of the United States exercised his Article II powers to remove Gabriel. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |
| 28 | Michael Singh was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022. 168 Cong. Rec. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Republican slots. Ex. 5, Decl. of Mary Swig, ¶ 3 | Undisputed except that Singh no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Singh. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |
| 29 | Roger Zakheim was confirmed by the U.S. Senate as a member of the USIP Board on January 30, 2023. 169 Cong. Rec. S152 (daily ed. Jan. 30, 2023) (confirmation). His term began on April 29, 2023. He fills one of the Republican slots. Ex. 6, | Undisputed except that Zakheim no longer "fills one of the Republican slots" after the President of the United States exercised his Article II powers to remove Zakheim. | Defendants' statement that the purportedly removed Board member "no longer" fills a board slot is legal argument. |

13

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025) | | |
| 30 | The remaining two appointed positions on the Board are vacant. | Disputed. The Board has twelve vacancies after the President of the United States exercised his Article II powers to remove the prior members | Defendants' statement about the number of vacancies on the Institute's Board is legal argument. |
| 31 | The USIP Board appointed Ambassador George E. Moose as the Acting President of the Institute in April 2024. Ambassador Moose served on the USIP Board from 2007 to 2023, first as a member, then as Vice Chair and from October 2022 until a few months before his appointment to Acting President, as Chair. Amended Compl. Ex. A, Amended Decl. of George Moose ¶ 3 (ECF No. 12-1). Prior to joining the USIP Board, Ambassador Moose served in many governmental roles, including as Ambassador to the Republics of Benin and Senegal in the 1980s and 1990s and Assistant Secretary of State for African Affairs from 1993 to 1997. | Undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | Defendants' statement about materiality is legal argument. |

14

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 32 | Pursuant to its status as an independent nonprofit, USIP may sue and be sued in its own name. *Id.* § 4604(k). Accordingly, USIP is not represented in litigation by the Department of Justice. Indeed, USIP must, and does, hire private counsel for legal representation. For example, in 2022 USIP hired a private firm in Omaha, Nebraska to pursue payment recovery from a defaulting contractor. *See United States Institute of Peace v. Safiullah Rauf et. al.,* No. CI-1023 (Douglas County Ct. NEB); *see also* Amended Compl. Ex. D, Decl. of George Foote ¶ 3 (ECF No. 12-4) (declarant stating that he has served as USIP outside counsel since 1987). | Defendants do not dispute that the Institute may sue and be sued in its own name. 22 U.S.C. § 4604(k). That said, Defendants dispute any suggestion that the Institute is not a part of the Executive Branch, as elaborated in Defendants' brief.<br><br>Defendants further dispute the assertion that the Institute is not represented in litigation by the Department of Justice and that it "must . . . hire private counsel for legal representation." For example, the Department of Justice has represented the Institute in Freedom of Information Act cases in the past. *See, e.g., Schwarz v. Dep't of Health & Hum. Servs.,* Civ. A. No. 00-1610 (D.D.C.); *Schwarz v. Dep't of Energy,* No. 01-5413 (D.C. Cir.); *see also* 22 U.S.C. § 4607(i) ("The Institute and its directors, officers, employees, and agents shall be subject to the provisions of section 552 of Title 5 (relating to freedom of information)").<br><br>Officers and employees of the Institute are also subject to the Federal Tort Claims Act. See 22 U.S.C. § 4606(f)(1). "The Attorney General shall defend any civil | Defendants' quotation of a provision of the USIP Act is not a fact. Fed. R. Civ. P. 56(c); LCR 7(h).<br><br>Defendants' dispute about whether the Institute is part of the Executive Branch is legal argument. |

15

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | | action or proceeding brought in any court against any employee of the Government or his estate for any such damage or injury" under the Federal Tort Claims Act. 28 U.S.C. § 2679(c). | |
| 33 | Pursuant to the USIP Act's requirement that USIP accounts be audited annually by an accredited, certified public accounting firm according to generally accepted auditing standards, § 4607(g), USIP has retained KPMG to conduct the annual audits. Ex. 3, Decl. of Allison Blotzer ¶¶ 6-7. | Undisputed but Defendants add that the "Institute shall provide a report of the audit to the President and to each House of Congress no later than six months following the close of the fiscal year for which the audit is made." 22 U.S.C. § 4607(h). | Defendants' added quotation of a statutory provision is irrelevant to SUMF 33 and is not a fact. Fed. R. Civ. P. 56(c); LCR 7(h). |
| 34 | On February 19, 2025, President Trump signed Executive Order 14217, entitled "Commencing the Reduction of the Federal Bureaucracy." Exec. Order No. 14217, 90 Fed. Reg. 10,577 (Feb. 25, 2025) ("EO 14217"). EO 14217 directs USIP to eliminate its "non-statutory components and functions . . . to the maximum extent consistent with applicable law" and to "reduce the performance of [its] statutory functions and associated | Undisputed | |

16

**JA122**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | personnel to the minimum presence and function required by law." *Id.* | | |
| 35 | EO 14217 further directed any official review of budget requests be rejected "to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination." EO 14217 required that it be implemented "consistent with applicable law and subject to the availability of appropriations." *Id.* | Undisputed | |
| 36 | On February 20, the day after issuance of EO 14217, a representative of the DOGE Service contacted the Institute. On February 24, Ambassador Moose and USIP's outside counsel met virtually with DOGE representatives Defendants Nate Cavanaugh, James Burnham, and Jacob Altik. Ambassador Moose and USIP counsel explained the Institute's legal status as an independent nonprofit corporation outside of the Executive branch of the Federal government. The DOGE representatives asserted that the only statutory requirements of the | Defendants dispute that the identified officials are "DOGE representatives," a vague and inaccurate term. For example, Cavanaugh is an employee of the General Services Administration ("GSA") who works on various government efficiency projects in the administration. Defendants also dispute that the Institute is "an independent nonprofit corporation outside of the Executive branch of the Federal government" for the reasons stated in their brief. The remainder of the statement is undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | Defendants do not provide evidence for their statement that Cavanaugh, Burnham, and Altik were not acting as representatives of DOGE, or that Cavanaugh is a GSA employee. On April 12, Cavanaugh stated in an email that he was "a member of the DOGE team working at the General Services Administration." Pl. Opp. Ex. 6 (Apr. 12, 2025 Cavanaugh email).<br><br>Defendants do not dispute the fact that USIP's outside counsel explained to Cavanaugh, Burnham, and Altik the Institute's legal status as an independent nonprofit corporation outside of the |

17

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Institute are the existence of its Board, the appointment of a president, the payment of incidental expenses for the Board, and the submission of certain reports to Congress and the Executive branch. Amended Compl. Ex. D, Decl. of George Foote ¶ 5 (ECF No. 12-4). | | Executive branch of the Federal government.<br><br>Defendants' statement about materiality is legal argument. |
| 37 | On March 9, 2025, after the Institute received word that DOGE staff was making inquiries into the status of the Institute's security operations, George Foote emailed DOGE representatives James Burnham, Jacob Altik, and Nate Cavanaugh with information about the nature of the Institute's privately contracted security firm, and the Institute's ownership of its headquarters building. Mr. Foote reiterated the Institute's status as an independent nonprofit organization and stated that uninvited persons would only be admitted to the property with a valid warrant issued by a court. Mr. Foote did not receive a response from Mr. Burnham. *Id.* ¶ 6. | Defendants dispute that the identified officials are "DOGE representatives," a vague and inaccurate term. For example, Cavanaugh is an employee of GSA who works on various government efficiency projects in the administration. Defendants also dispute that the Institute is an independent nonprofit corporation outside of the Executive Branch of the federal government for the reasons stated in their brief. The remainder of the statement is undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | Defendants do not provide evidence for their statement that Cavanaugh, Burnham, and Altik were not acting as representatives of DOGE, or that Cavanaugh is a GSA employee. On April 12, Cavanaugh stated in an email that he was "a member of the DOGE team working at the General Services Administration." Pl. Opp. Ex. 6 (Apr. 12, 2025 Cavanaugh email).<br><br>Defendants do not dispute the fact that USIP's outside counsel (again) told Cavanaugh, Burnham, and Altik that USIP is an independent nonprofit corporation outside of the Executive branch of the Federal government and told them that uninvited persons would not be admitted to the USIP-controlled property without a warrant. |

18

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | | | Defendants' statement about materiality is legal argument. |
| 38 | On March 14, 2025, Trent Morse of the White House Presidential Personnel Office emailed certain members of the USIP Board "on behalf of" President Trump. Ex. 12 (compilation of termination notices). The email stated that the Board members' "position on the United States Institute of Peace {sic} is hereby terminated, effective immediately." *Id.* | Undisputed | |
| 39 | By such emails President Trump purported to remove all 11 USIP Board members duly appointed pursuant to 22 U.S.C. § 4605(b)(4). | Defendants do not dispute that the President of the United States removed the Board members pursuant to his authority under Article II of the United States Constitution. Defendants dispute the characterization that the President "purported" to remove the Board members. | |
| 40 | The email did not identify a conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties on the part of any of the USIP Board members. Ex. 12 (compilation of termination notices). | Undisputed, but this statement is immaterial to the parties' cross-motions. | Defendants' statement about materiality is legal argument. |

19

**JA125**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 41 | The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of eight voting members of the USIP Board. *Id.* | Undisputed, but this statement is immaterial to the parties' cross-motions. | Defendants' statement about materiality is legal argument. |
| 42 | The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the HELP Committee of the Senate. *Id.* | Undisputed, but this statement is immaterial to the parties' cross-motions. | Defendants' statement about materiality is legal argument. |
| 43 | On March 14, 2025, USIP's outside counsel was presented with a document labeled "Resolution of the Board of Directors" stating that "as of March 14, 2025, Mr. George E. Moose is removed from his position as USIP's president and Mr. Kenneth Jackson is designated as USIP's acting president with all the powers delegated by the Board of | Undisputed except that when this document was presented, the President of the United States had removed the former board members pursuant to his Article II removal powers; thus, there were no other Board members to agree or participate in the decision to designate Mr. Kenneth Jackson as the Acting President of the Institute. *See* Am. Compl. (ECF No. 12) ¶¶ 50, 52-53. | Defendants' response after "[u]ndisputed" is legal argument. |

20

**JA126**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Directors to that role." Amended Compl. Ex. F (ECF No. 12-6). The document did not reflect the agreement or participation of any Board member other than the three *ex officio* members. | | |
| 44 | On March 14, a majority of the Board members duly appointed under 22 U.S.C. § 4605(b)(4) plus Ambassador Moose as an ex officio Board member convened a call with the Institute's outside counsel to discuss the termination notices. Counsel communicated his view that the notices have no legal effect because they do not comply with the for-cause termination clause of the USIP Act. Amended Compl. Ex. D, Decl. of George Foote ¶¶ 7-8 (ECF No. 12-4). | Defendants dispute that the board members on the call were duly appointed members of the board as they had been removed by the President under his Article II powers. *See* Emails, ECF No. 21-1. The remainder of the statement is undisputed for purposes of the pending cross-motions, but this statement is immaterial to those motions. | The first sentence of Defendants' response and Defendants' statement about materiality are legal argument. |
| 45 | On March 14, at two different points in time, Defendant Jackson and representatives from DOGE, including Defendants Altik and Cavanaugh, entered onto the USIP parcel of land accompanied by FBI agents and requested access to the USIP headquarters building. They | Defendants dispute that the identified officials are "DOGE representatives," a vague and inaccurate term. For example, Cavanaugh is an employee of GSA who works on various government efficiency projects in the administration. Defendants do not dispute that Jackson, in his capacity as Acting President of the Institute, and | Defendants do not provide evidence for their statement that Cavanaugh, Burnham, and Altik were not acting as representatives of DOGE, or that Cavanaugh is a GSA employee. On April 12, Cavanaugh stated in an email that he was "a member of the DOGE team working at the General Services |

21

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | presented no warrant and were denied entry to the USIP headquarters building. *Id.* ¶¶ 8-9. | others permitted by him, attempted to gain entry to the Institute's headquarters on March 14, 2025, but were denied entry, without authority, by Moose and others acting at his best [sic]. | Administration." Pl. Opp. Ex. 6 (Apr. 12, 2025 Cavanaugh email).<br><br>The third sentence of Defendants' response is legal argument. |
| 46 | On Sunday, March 16, two FBI agents visited a senior USIP security official at his home unannounced for the purposes of gaining information on how to gain entrance to the USIP building. *Id.* ¶ 10. | This statement is immaterial to the pending cross-motions | Defendants do not dispute, and therefore concede, SUMF 46. Defendants' statement about materiality is legal argument. |
| 47 | That same Sunday, the Institute's outside counsel received multiple calls from Jonathan Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of Columbia. Hornok sought access to the USIP building for unnamed individuals and stated that he had suspicion that USIP may be engaging in criminal behavior. In one call, Hornok sought access to USIP records for *ex officio* Board member Hegseth as provided in 22 U.S.C. § 4607(f). Hornok demanded access to the building and USIP computer systems for an unnamed representative of Defendant Hegseth | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 47. Defendants' statement about materiality is legal argument. |

22

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | at 2:00 p.m. the following day. USIP counsel offered to arrange access as provided in the statute but refused Hornok's demand as outside the statutory requirements of reasonableness. Hornok told USIP counsel that he would criminally investigate USIP and anyone who "obstructed" access to USIP's computer systems. *Id.* ¶¶ 12-15. | | |
| 48 | On March 16, the Institute suspended its contract with its security firm, Inter-Con Security Systems Inc. ("Inter-Con"), based on Inter-Con's efforts to coordinate with Defendants and facilitate access to the USIP headquarters building by the DOGE Defendants and Defendant Jackson. USIP cancelled the Inter-Con contract on March 17. Amended Compl. Ex. G, Decl. of Colin O'Brien ¶¶ 4, 9 (ECF No. 12-7). | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 48. Defendants' statement about materiality is legal argument. |
| 49 | The following day, March 17, four employees of Inter-Con arrived at USIP headquarters at approximately 2:30 p.m. After they were initially unable to enter the building because | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 49. Defendants' statement about materiality is legal argument. |

23

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | their badges had been deactivated upon the suspension of Inter-Con's contract, another Inter- Con employee, Kevin Simpson, arrived with a physical key that USIP had not yet recovered from Inter-Con. Simpson used the key to gain entrance into the USIP headquarters building and let in the other Inter-Con employees. *Id.* ¶¶ 5-6. | | |
| 50 | In response, Institute counsel called the Washington, D.C. Metropolitan Police Department ("MPD") to report Inter-Con's entry without consent to the Institute's land and headquarters building. *Id.* ¶ 7. | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 50. Defendants' statement about materiality is legal argument. |
| 51 | When MPD officers arrived to receive the report, they assisted DOGE personnel, who were present outside the building, to gain physical entry to the Institute's building. MPD officers escorted Ambassador Moose, other USIP personnel, and outside counsel from the building, leaving the DOGE Defendants and Defendant Jackson in physical | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 51. Defendants' statement about materiality is legal argument. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | possession and control of USIP's headquarters. *Id.* ¶¶ 14-17, 20, 24 | | |
| 52 | As of March 14, 2025, the Institute employed over 400 employees and personal services contractors to carry out its statutory mandate. Ex. 4, Decl. of Terry Jones ¶ 3. | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 52. Defendants' statement about materiality is legal argument. |
| 53 | On March 21, 2025, Defendant Jackson fired six USIP employees. The termination letters referred to the employees' "at-will-employment-status." *See, e.g.,* Ex. 13 ("Termination of Colin O'Brien's At-Will Employment with USIP"). | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 53. Defendants' statement about materiality is legal argument. |
| 54 | On March 28, 2025, one or more Defendants caused termination notices to be sent to virtually all of the Institute's employees. Ex. 4, Decl. of Terry Jones ¶ 5; *See* Abigail Hauslohner & Derek Hawkins, *DOGE Fires Nearly All Staff at U.S. Institute of Peace Headquarters,* Washington Post (Mar. 29, 2025), https://www.washingtonpost.com/ national- | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 54. Defendants' statement about materiality is legal argument. |

25

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | security/2025/03/29/doge-usip-peace-institute-fired/. | | |
| 55 | On March 31, 2025, Plaintiffs learned of an undated document titled "Resolution of the Board of Directors" signed by two of the ex officio directors (Defendants Hegseth and Rubio). The document purports, as of March 25, 2025, to remove Defendant Jackson as Acting President of the Institute and appoint Defendant Cavanaugh in his stead. The resolution also purports to fire USIP's Chief Financial Officer and Chief Operating Officer. The document further directs Cavanaugh "to transfer USIP's assets, including USIP's real property and rights thereof, including all assets recently received from the Endowment, to the General Services Administration (GSA)." Ex. 2 to Defs' Opp. To Motion pursuant to the All Writs Act (ECF No. 15-2). | Undisputed except that Defendants dispute Plaintiffs' characterizations that the ex officio board members "purported" to do the actions above. As explained throughout these filings, Defendants had actual authority to perform the actions in this paragraph and took the indicated actions under that authority. *See* Bd. Resolution, ECF No. 15-2. | Defendants' response after "[u]ndisputed" is legal argument. |
| 56 | On March 31, 2025, Plaintiffs learned of additional documents that purported to execute the transfer of USIP's headquarters building to | Undisputed except that Defendants dispute Plaintiffs' characterizations that the ex officio board members "purported" to do the actions above. As explained | The second sentence of Defendants' response is legal argument. |

26

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | GSA on Saturday, March 29, 2025. Exs. 1, 3, 4 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-1, 15-3, 15-4). | throughout these filings, Defendants had actual authority to perform the actions in this paragraph and took the indicated actions under that authority | |
| 57 | On March 31, 2025, Plaintiffs learned of a purported board resolution by two *ex officio* board members (Secretaries Rubio and Hegseth) firing all officers of the USIP Endowment, appointing Adam Amar as new president of the Endowment, and directing Amar to transfer all of the Endowment's assets to USIP. Ex. 2 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-2). | Undisputed except that Defendants dispute Plaintiffs' characterizations that the ex officio board members "purported" to do the actions above. As explained throughout these filings, Defendants had actual authority to perform the actions in this paragraph and took the indicated actions under that authority | The second sentence of Defendants' response is legal argument. |
| 58 | On April 1, 2025, Defendants' counsel informed this Court that GSA had leased, or was in the process of leasing, the USIP building to the Department of Labor. | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 58. Defendants' statement about materiality is legal argument. |
| 59 | The Institute has field offices, staff, and/or contractors in 26 countries around the world, including seven field offices in Nigeria, Libya, Thailand, El Salvador, Pakistan, | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 59. Defendants' statement about materiality is legal argument. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Tunisia, and Colombia. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 8 (ECF No. 12-8). These offices have maintained computer systems with sensitive information about USIP workers and operations. *Id.* | | |
| 60 | USIP frequently serves as a resource to Congress. It regularly briefs Members and their staffs upon request and holds briefings on Capitol Hill. Such briefings have concerned transnational criminal networks with links to China, crime and mass migration in Central America, and critical minerals in Africa. The Institute has long facilitated congressionally mandated commissions and regularly convenes senior expert groups to analyze pressing issues. For example:<br><br>a.   Iraq Study Group. In 2006, a bipartisan group of Members of Congress requested USIP to act as the facilitator for the Iraq Study Group (ISG), which was set up to provide a "'fresh eyes' assessment | Undisputed, but the Institute's response to congressional inquiries does nothing to take it out of the Executive Branch of the federal government and the Institute's congressional interactions are ancillary to its statutory purposes, which are plainly executive functions. 22 U.S.C. § 4601. | Defendants' response after "[u]ndisputed" is legal argument. |

28

Case 1:25-cv-00804-BAH    Document 34-1    Filed 04/18/25    Page 29 of 78

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | of the situation in Iraq." Ex. 2 (Iraq Study Group Fact Sheet). The members of the ISG hailed from all parts of the federal government: former Secretary of State James | | |
| | A. Baker, III; Congressman Lee Hamilton; Lawrence S. Eagleburger, former Secretary of State; Vernon E. Jordan, Jr., Senior Managing Director, Lazard, Freres & Co. LLC; Edwin Meese, III, former U.S. Attorney General; Sandra Day O'Connor, former U.S. Supreme Court Associate Justice; Leon E. Panetta, former White House Chief of Staff; William J. Perry, former U.S. Secretary of Defense; Charles S. Robb, former U.S. Senator; and Alan K. Simpson, former U.S. Senator. Ex. 1, Decl. of Paul Hughes ¶¶ 5-7. | | |
| | The Institute, with support from the Center for the Study of the Presidency, the Center for Strategic and International Studies, and the James A. Baker III Institute for Public Policy at Rice University, served the ISG by convening expert | | |

29

JA135

| # | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | working groups, writing briefing papers, providing analysis, and coordinating meetings. Ex. 1, Decl. of Paul Hughes ¶ 8. | | |
| | b.    Afghanistan Study Group. The Afghan Study Group (ASG) was established by Congress in December 2019. S. Rept. No. 116-126, at 43 (2019). Congress tasked the ASG to "consider the implications of a peace settlement or the failure to reach a settlement on U.S. policy, resources, and commitments in Afghanistan." Id. The group was co-chaired by former Senator Kelly Ayotte, former Chairman of the Joint Chiefs of Staff, General Joe Dunford, USMC, as well as Nancy Lindborg, former Assistant Administrator for the Bureau for Democracy, Conflict, and Humanitarian Assistance at USAID. Ex. 14, Decl. of Michael Phelan ¶ 3.

USIP served the ASG by providing administrative and logistical support, convening working groups and stakeholder meetings, writing | | |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | briefing papers, providing analysis, and coordinating ASG meetings. Ex. 14, Decl. of Michael Phelan ¶ 4. | | |
| | c. Gandhi-King Global Academy. In 2020, Congress directed the Institute to create the "Gandhi-King Global Academy," a professional development training initiative to develop and make publicly available a curriculum on conflict resolution tools based on the principles of nonviolence. Pub. L. No. 116-260, div. FF, § 334, 134 Stat. 1182, 3115 (Dec. 27, 2020). Congress | | |
| | directed the Institute to report every six months to four congressional committees (two House, two Senate) on its progress on the initiative. Id. § 336(a)(2). See Ex. 31, Decl. of Alli Aloudes Phillips (describing role in the Gandhi-King Global Academy's conflict resolution education and training programs); Ex. 32, Decl. of Maria Antonia Montes (describing work as | | |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Senior Program Officer for Gandhi-King Global Academy). | | |
| 61 | Other nonprofit organizations and think tanks perform the same type of research, education, training, and dialogue facilitation activities as USIP in communities around the world. *See, e.g.*, Ex. 27, Decl. of Andrew Wells-Dang (explaining the similarity between USIP and other international nonprofits he has worked with); Ex. 29, Decl. of Mary Glantz (describing other nonprofits and think tanks that broadly offer expert advice and analysis, including to Congress and government agencies); Ex. 30, Decl. of Nicole Cochran (describing research and training efforts, as well as work convening expert study groups similar to how the Stimson Center and Center for Strategic and International Studies function). | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 61. Defendants' statement about materiality is legal argument. |
| 62 | USIP's research, training, and conflict resolution efforts often occurs "on the ground" in communities in conflict and involves a wide range of partners | Defendants dispute the assertions in this statement about the Institute being "able to gain access and trust because of its independence from official U.S. Government institutions," and the | Defendants' rhetorical characterization of the sworn declarations of USIP employees who at other times in their careers have served as federal employees, describing factual |

| Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|
| ¶ | | |
| and stakeholders to which USIP is able to gain access and trust because of its independence from official U.S. Government institutions. The substance, approach, and type of work is very different from that undertaken by Executive branch agencies. Ex. 29, Decl. of Mary Glantz (contrasting USIP work with her prior work as a Foreign Service Officer); Ex. 32, Decl. of Maria Antonia Montes (describing ability to travel to areas where U.S. Government personnel were not authorized to go, and to meet with grassroots civil society members to gather information, and describing her lack of access to official files or discussions around State Department's Executive or Foreign Policy Objectives); Ex. 36, Decl. of Frank Aum (explaining differences between nature and substance of work at USIP compared to the Office of the Secretary of Defense at the Pentagon, where he previously worked); Ex. 34, Decl. of Scott Worden (explaining how work for USIP is "fundamentally different" | Institute's work being "very different from that undertaken by Executive branch agencies." These assertions are not factual but are, instead, opinions. Ultimately, whether the Institute sits outside the Executive Branch is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government. | differences between their work for USIP and their work as federal employees, as "opinions" does not create a genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(o); LCR 7.1(h). *See also* ECF 30 (brief of 113 USIP employees) and ECF 31 (brief of 128 former executive branch officials). Defendants do not dispute any of the statements in any of the factual declarations. |

| # | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| ¶ | from his work at a federal agency (USAID) and for the Special Inspector General for Afghanistan Reconstruction); Ex. 28, Decl. of Christopher Bosley (former U.S. Navy intelligence officer contrasting work on USIP's Countering Violent Extremism team, which involved engaging "local, on-the-ground partners and communities dealing with violent extremism issues and root causes," conducting "immediate-term piloting of programs to stop violent extremism," and "longitudinal convening and scholarship to study and address these issues over time" with "the workstreams in which agencies of the official U.S. government operate"); Ex. 33, Decl. of Mary Speck (describing how her work in Guatemala on USIP's Latin America Program is "unlike that of any Executive Branch entity" and how USIP's "status as an independent non-profit entity was crucial to [its] work. Our goal is to build trust between authorities -- especially police -- and local citizen | | |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | groups, including businesspeople, indigenous authorities, activists, and religious leaders. These partners trust us because we do not represent the U.S. government or any ideological group that is advocating for specific policies. We can be honest interlocutors, able to reach out to Evangelical leaders, human rights activists and business owners alike." | | |
| 63 | USIP is able to perform conflict-resolution research and conduct trainings, convene and facilitate communications and dialogue between groups in conflict because it assiduously maintains its independence from official U.S. Government diplomatic and policymaking activities, and because its partners recognize (and rely upon) that independence. Indeed, USIP provides research briefing analysis, and conflict-resolution training services, training, and advisory services to a variety of different partners: educational institutions, foreign governments, other nonprofit think | Defendants dispute the assertions in the paragraph above about the Institute's "independence from official U.S. Government diplomatic and policymaking activities," and the assertion that "its partners recognize (and rely upon) that independence." These assertions are not factual but are, instead, opinions. Ultimately, whether the Institute sits outside the Executive Branch is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government. | Defendants do not dispute that the Institute "assiduously maintains its independence from official U.S. Government diplomatic and policymaking activities" or that "USIP provides research briefing analysis, and conflict-resolution training services, training, and advisory services to a variety of different partners: educational institutions, foreign governments, other nonprofit think tanks, and agencies within the United States Executive Branch. The United States government has no say over what projects USIP undertakes for foreign and NGO groups." Moreover, Defendants do not dispute any of the statements in any of the factual declarations. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | tanks, and agencies within the United States Executive Branch. The United States government has no say over what projects USIP undertakes for foreign and NGO groups. *See* Ex. 31, Decl. of Alli Aloudes Phillips (describing importance of USIP's independence from the Executive Branch to the nongovernmental peacebuilding organizations with which USIP works in Africa, Latin America, and Asia); Ex. 34, Decl. of Scott Worden ("USIP was able to convene a variety of Afghan and international stakeholders at USIP's [private office space in Kabul] because we were viewed as non-governmental and created a neutral space for peacebuilders to engage in open dialogue that would not have been possible at a U.S. government facility."); Ex. 35, Decl. of Tegan Blaine (former USAID official explaining work on USIP's "climate, environment, and conflict" project in Africa performing "deep research and analysis" of information derived from "on-the-ground" dialogue with | | Defendants' rhetorical characterization of the sworn declarations of USIP employees describing the factual independence of USIP from Executive Branch entities and the importance of that independence to USIP's work as "opinions," does not create a genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(c); LCR 7.1(h). *See also* ECF 30 (brief of 113 USIP employees) and 31 (brief of 128 former executive branch officials). |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | communities inaccessible to US Government, and describing clear lines between USIP and involvement or awareness of decisionmaking or strategic priorities of U.S. Africa Command); Ex. 11, Decl. of Samantha Robinson (describing USIP's ability to perform humanitarian peacebuilding work in the Middle East and other places because it operates independently from U.S. government agencies and is not subject to work free of governmental restrictions and protocols). | | |
| 64 | USIP does not engage or participate in "Track 1" diplomacy, which is reserved for official governmental representatives. *See* Ex. 16, Lisa Sokol, "Multi-Track Diplomacy Explained," Nuclear Threat Initiative, at https://www.nti.org/risky-business/multi-track-diplomacy-explained/ ("Track 1 Diplomacy refers to official diplomacy, where communication is directly between or among governments. These | Disputed, and the cited materials fail to support the statement. | Defendants provide no evidence to support its response, which does not create a genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(c); LCR 7.1(h). Defendants ignore the substance of the sworn declarations establishing that USIP employees who engage in "track" dialogues never represent that they are "part of the U.S. Government" or "implementing U.S. government policy." *See* Ex. 36 (declaration of USIP employee who has convened and moderated "dozens" of |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | formal discussions are conducted by diplomats, heads of state, and other official authorities."). | | Track 2 (i.e., nongovernmental) dialogues); Ex. 30 (declaration of USIP employee who has participated multiple times in USIP's support of Track 1.5 dialogues where USIP has served as a "nongovernmental" host). |
| 65 | USIP engages in "Track 1.5" diplomacy. E.g., Ex. 30, Decl. of Nicole Cochran (USIP implemented and supported Track 1.5 dialogues as a "neutral and credible convener"). The distinctive feature of Track 1.5 diplomacy is that it involves the participation of "nongovernmental experts." Ex. 16. *See* Jeffrey Mapendere et al., *Track One and a Half Diplomacy and the Complementarity of Tracks*, 2 Culture of Peace Online J. 66, 69 (2006) (Ex. 15). Independent nongovernmental entities similarly convene Track 1.5 meetings. One example is the Carter Center's involvement in mediating the conflict between Uganda and Sudan. "By operating at a Track One and a Half level, The Carter Center has the advantage of applying an eclectic approach to international and ethnic | Defendants dispute the first sentence, and the cited materials fail to support the statement. The remainder of the statement is immaterial to the pending cross-motions. | Defendants' response as to the first sentence ignores the cited declaration of a USIP employee describing the Institute's participation in Track 1.5 dialogues as a "neutral and credible convener." *See* Ex. 30. Defendants do not dispute, and therefore concede, the remainder of SUMF 65. Defendants' response as to the first sentence does not create a genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(c); LCR 7.1(h). |

38

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | conflict, such as the use of high-level diplomacy, private problemsolving workshops, direct mediation, interactive conflict resolution, and other confidencebuilding interventions." Ex. 15 at 70. Another example was the China-U.S. Strategic Nuclear Dynamics Dialogue, which was convened and run by the nonprofit, private think tanks Center for Strategic and International Studies and Pacific Forum. Ex 16 | | |
| 66 | USIP also engages in "Track 2" diplomacy, which denotes "a purely unofficial channel for dialogue between *non-governmental experts*, without direct governmental involvement." *Id.* (emphasis added). Scholars have defined it as "unofficial, informal interaction between members of adversary groups or nations that aim to develop strategies, to influence public opinion, organize human and material resources in ways that might help resolve their conflict." Ex. 15 at 68. | Disputed, and the cited materials fail to support the statement. | Defendants' response simply ignores the cited declaration of a USIP employee in SUMF 67 describing the Institute's participation in Track 2 dialogues. *See* SUMF 67 (citing Ex. 36). Defendants' response as to the first sentence does not create a genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(c); LCR 7.1(h). |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 67 | When USIP engages on these fronts, parties on all sides understand it to be an independent forum, and not to speak for the United States (just like the Center for Strategic and International Studies in the China–U.S. Strategic Nuclear Dynamics Dialogue or the Carter Center when mediating the conflict between Uganda and Sudan in the late 1990s). *See* Exs. 15, 16. In the example of the Center for Strategic and International Studies, the dialogue "provided an avenue for what officials often describe as 'frank and candid' discussions with Chinese counterparts on nuclear issues. By bringing together think tank experts, retired officials, and active government and military officials, the dialogue led to a unique series of conversations where both sides could exchange views and build trust, even in the face of broader tensions." Ex. 16; Ex. 36, Decl. of Frank Aum (describing research on the Korean Peninsula and efforts "convening and moderating dozens of Track 2 | Defendants dispute the assertions in the paragraph above about "parties on all sides understand it to be an independent forum, and not to speak for the United States[.]" These assertions are not factual but are, instead, opinions, as well as speculative as to what "parties on all sides understand[.]" The Institute, for example, "may use 'United States' or 'U.S.' or any other reference to the United States Government or Nation" in the course of its work, 22 U.S.C. § 4603(e)(2), and was created "to serve the people and the Government[,]" 22 U.S.C. § 4601(b). Thus, it could just as easily be that "parties on all sides understand [the Institute not] to be an independent forum," but one that serves the United States' interests. Ultimately, whether the Institute is independent from the federal government is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government | Defendants' rhetorical characterization in the first two sentences of the sworn declaration of a USIP employee describing his participation in Track 2 dialogues as "opinions" and "speculative," does not create a genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(c); LCR 7.1(h). Defendants do not dispute any of the statements in the factual declaration. |

40

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | (nongovernmental) dialogues, seminars, and roundtables"). | | |
| 68 | When USIP participates in conflict resolution initiatives, it draws on developed regional expertise to give it credibility among the parties to the dialogue. At times, USIP's independence facilitates access to certain communities, networks, or stakeholders that federal officers with formal governmental or diplomatic status channels lack. USIP's experience, expertise and long-term relationships of trust with key stakeholders help it craft effective agendas, convene the right participants, and facilitate discussion that can generate new insights to inform congressional and Executive branch policy evaluation and development efforts. For example:<br><br>• In connection with a border dispute between Kyrgyzstan and Tajikistan, USIP sponsored a Track 2 dialogue between an influential group of former advisors and policy experts to discuss initiatives to | Defendants dispute the repeated assertions in the paragraphs above about the Institute's "independence" and "independent status." These assertions are not factual but are, instead, opinions and speculation. The Institute, for example, "may use 'United States' or 'U.S.' or any other reference to the United States Government or Nation" in the course of its work, 22 U.S.C. § 4603(e)(2), and it was created "to serve the people and the Government[,]" 22 U.S.C. § 4601(b). It could just as easily be that the Institute's status as a United States agency influenced the description of events in the paragraphs above, despite the assertions about the Institute's "independence." Whether the Institute sits outside the Executive Branch is a matter of law for the Court to decide. For the reasons explained in Defendants' brief, the Institute is properly under the Executive Branch of the United States government | Defendants do not actually dispute any of the first three sentences of SUMF 68, let alone cite to record evidence sufficient to create a genuine disputed issue of material fact. With respect to the first two sentences of their Response, Defendants' rhetorical characterization of the sworn declarations of USIP employees describing specialized training, expertise, and access to communities and conflicting groups that formal executive branch officials lack, as "opinions" and "speculation" does not create a "genuine" issue of material fact under Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. 56(c); LCR 7.1(h). Moreover, Defendants do not dispute any of the statements in any of the factual declarations.<br><br>Defendants' response after the first two sentences is unsupported speculation and legal argument. |

41

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | reconcile the divided and hostile communities. The governments' representatives focused on difficult border demarcation and access issues. The USIP-related dialogue worked on initiatives that more broadly addressed how to reestablish normal interaction between communities on both sides of the border. The dialogue thawed relations and paved the way for a historic official border demarcation deal. Ex. 10, Decl. of Gavin Helf ¶ 5. | | |
| | • In 2003 and 2004, USIP members in Iraq worked outside the official U.S. security bubble, known as the Green Zone, to facilitate reconciliation between Iraqi tribes. USIP's independence allowed it to conduct objective research, which it shared with US officials to consider as part of their policy and programming activities, to engage parties in training and problem-solving dialogue, and to engage with diverse stakeholders necessary for preventing and resolving conflict. | | |

42

**JA148**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Ex. 1, Decl. of Paul Hughes ¶¶ 17-18, 23. | | |
| | • In the Middle East, USIP has leveraged its independent status and its peacebuilding tools, including its Peace Game strategic exercise tool, and its deep networks of trusted local contacts, to bring together trusted Palestinian, Israeli, and regional interlocutors to work together on problem-solving related to post-conflict recovery and stabilization in Gaza. The work yielded valuable information, which USIP shared at the request of U.S. government representatives. Ex. 11, Decl. of Samantha Robinson ¶ 6. | | |
| | • Ahead of local elections in the autonomous Bangsamoro region in the southern Philippines in October 2023, USIP was asked by both the Philippines government and the Moro Islamic Liberation Front—not by the US government—to discreetly facilitate ceasefire efforts between the two sides. USIP's independent status made it possible to engage both | | |

43

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | sides directly as a third party and create joint Quick Response Teams of Philippine Army, National Police, and Moro Islamic Liberation Front former combatants. The ceasefire did not break down and the peace process remained intact. Ex. 8, Decl. of Brian Harding ¶ 6.<br><br>• USIP facilitated informal conversations with the Azerbaijani and Armenian Embassies about what would be needed by both sides to reach a peace agreement ending their 30-plus year war. The talks created the opportunity for both parties to float ideas and talk about concerns they did not want to provide in official channels. These conversations helped narrow the gap between their war aims and concerns, leading to a peace agreement in mid- March 2025. Ex. 9, Decl. of Catherine Dale ¶ 6. | | |
| 69 | The United States Government Manual (the "Manual") is a publication of the Office of the Federal Register of the National Archives and Records | Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the | Defendants do not actually dispute, and therefore concede, the substance of SUMF 69, including that the Manual is |

44

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | Administration ("NARA") within the Executive branch. It is published by the Government Publishing Office, an office within the Legislative branch. *See* Ex. 22, Manual, "About Us" (*available at* https://www.usgovernmentmanual. gov/About). *See also* Ex. 23, U.S. Government Manual (published Jan 13, 2025) (*available at* https://www.govinfo.gov/app/collect ion/govman/2025/03executive_Unit ed%20States%2 0Government%20Manual) (excerpted). The Manual is the "official handbook of the Federal Government." *See id.* | Office of Legal Counsel, the Attorney General, or the President). U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law. *Id.* As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" Id. The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The remainder of this statement is undisputed. | the "official handbook of the Federal Government." |
| 70 | The current organizational chart of the federal government in the Government Manual does not | Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and | Defendants do not actually dispute, and therefore concede, the substance of SUMF 70, including that the Manual is |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | include USIP at all. *See* Ex. 23. Under the Executive Branch, the Manual identifies 15 agencies and 58 "independent establishments and government corporations." *Id.* USIP is not listed among them. *See id.* The Manual also classifies entities within the Executive Branch (in addition to the White House) as "Executive Branch: Departments" and "Executive Branch: Independent Agencies and Government Corporations." Again, USIP is not listed. *Id.* | Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President). U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law. Id. As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" Id. The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The remainder of this statement is undisputed. | responsible for identifying and classifying whether an entity is part of the federal government and whether it is part of a particular branch of the federal government, and that the Manual does not list USIP among any of the "agencies" or "independent establishments and government corporations" within the Executive Branch, or that that the Manual does not classify USIP within the Executive Branch. |

46

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 71 | The Manual lists USIP as a "Quasi-Official Agency," along with Legal Services Corporation ("LSC"), Smithsonian Institution, State Justice Institute, and the United States Holocaust Memorial Museum. *Id.* | Disputed in part: The publishers of the Federal Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President). U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law. Id. As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" Id. The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. | Defendants do not actually dispute, and therefore concede, the substance of SUMF 71. |

47

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | | Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The remainder of this statement is undisputed. | |
| 72 | Since USIP first appeared in the Manual in 1988, the Manual has listed it as a "Quasi-Official Agency." Ex. 24, U.S. Office of the Federal Register, NARA, *United States Government Manual, 1988/89*, p. 767 (Rev. June 1, 1988) (excerpted). NARA defines "quasi-official agencies" as "*organizations that are not agencies under the definition of 5 U.S.C. 105* but that are required by statute to publish certain information on their programs and activities in the Federal Register." *Id.* at 747 (emphasis added); *see also* Ex. 25, U.S. Office of the Federal Register, NARA, *United States Government Manual*, 2009- 2010, p. 543 (Washington: GPO, 2010) (excerpted) (defining quasi-official agencies as *organizations that are not executive agencies under the definition in 5 U.S.C. 105…*") (emphasis added). | Disputed in part: The publishers of the Manual are the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Attorney Office of Legal Counsel, the Attorney General, or the President). U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. Those publishers merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities" and nothing in the Manual describes it as a legal document or a definitive expression of the Executive's view on the law. Id. As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" Id. The information in the Manual about the Institute was presumably submitted by the Institute's former leadership as the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its | Defendants do not actually dispute, and therefore concede, the substance of SUMF 72, including that the Manual classifies USIP as *not* an "agency" or an "executive agency" under the definition of 5 U.S.C. 105. *See also* Pl. Opp. Ex. 4 (1987 letter from OPM counsel stating that "the Institute is not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51."). |

48

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | | president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The remainder of this statement is undisputed | |
| 73 | Actions taken to date since March 14, 2025 that individually and collectively impair the Institute's ability to function and fulfill its mission as provided by Congress include:<br><br>a.    Removal of eleven duly-appointed Board members;<br><br>b.    Purported installation by the ex officio Board members of acting presidents (Ken Jackson and Nate Cavanaugh) who were committed not to the mission and activities of the Institute but to halting and eliminating all USIP staff and programs;<br><br>c.    Firing all but a handful of the Institute's over 400 employees, many with extensive experience and expertise in all areas of the field of peaceful conflict resolution; | While Defendants do not dispute that, factually, some of the events above occurred, as explained throughout these filings, Defendants dispute that Plaintiffs have authority to speak to the Institute's alleged harms rather than their own individual harms. Assuming without conceding that Plaintiffs do have such authority, whether the Institute would be irreparably harmed by the events above is not a fact but, instead, is Plaintiffs' legal conclusion. To the contrary, the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217. | Defendants do not dispute, and therefore concede, SUMF 73, including that Defendants purported to remove the eleven (b)(4) Board members and undertook to transfer all of USIP's assets to GSA, including "the USIP-owned headquarters building," and that the actions "individually and collectively impair the Institute's ability to function and fulfill its mission as provided by Congress." Defendants' response is legal argument. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | d.    Shutting down the Institute's administrative and communication systems, leaving employees without adequate resources to understand their employment status, access to personnel records, or health insurance coverage status; | | |
| | e.    Undertaking to close USIP's field offices and cancel contracts concerning ongoing projects; | | |
| | f.    Instructing and taking actions to transfer of all of USIP's assets to GSA, including (i) the USIP-owned headquarters building, valued at $500 million, for zero dollars, and (ii) all USIP property in the building; | | |
| | g.    Undertaking to lease USIP's headquarters building to the Department of Labor; | | |
| | h.    Terminating all of the USIP Endowment's officers, appointing a new president of the Endowment, and instructing him to transfer all of the Endowment's assets, including | | |

50

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | bank accounts holding at least $25 million, to USIP.<br><br>Ex. 7, Moose Decl. ¶ 13. | | |
| 74 | The eleven USIP Board members who were duly appointed under 22 U.S.C. § 4605(b)(4) and who were purportedly removed by President Trump via email on March 14, 2025 were not notified about and were not given the opportunity to participate in board actions or decisionmaking concerning: whether to terminate Ambassador Moose and replace him with Defendant Jackson as Acting President; whether to respond to Defendant Jackson's firing of employees on March 21; whether to participate in board action that concerned whether it was in USIP's best interests to terminate virtually all of USIP's employees on March 28, including the Institute's CFO and COO; whether to replace Defendant Jackson with Defendant Cavanaugh as Acting President; whether to transfer the USIP headquarters building and all property in it to GSA for zero | Defendants do not dispute that the former Board members did not participate in the actions above; however, as explained throughout these filings, Defendants dispute that they would have had any authority to do so. The President of the United States removed the former Board members pursuant to his Article II removal powers. See Am. Compl. (ECF No. 12) ¶¶ 50, 52, ECF No. 12; Letters, ECF No. 21-1. | Defendants do not dispute, and therefore concede, SUMF 74. Defendants' response is legal argument. |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | dollars; and whether to replace all officers of the USIP Endowment and transfer all Endowment assets to USIP. *Id.* ¶ 14. | | |
| 75 | USIP's employees, individually and collectively, have deep institutional knowledge and expertise in a broad range of conflict resolution-related programs, activities, curriculum development, research, and training in which they have been engaged, both in the U.S. and around the world. *See id.* ¶ 15; Exs. 8-11, 27-36 (declarations of former USIP Staff). | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 75. Defendants' statement about materiality is legal argument. |
| 76 | Recent events have adversely impacted the commitment of USIP's donor base to the Institute. Many donors who donated funds for the construction and/or maintenance of the USIP headquarters building have contacted Ambassador Moose concerning the status of their contributions. These donors include individuals who have pledged millions of dollars to support the Institute. Ex. 7, Moose Decl. ¶ 16. | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 76. Defendants' statement about materiality is legal argument. |

52

Case 1:25-cv-00804-BAH    Document 34-1    Filed 04/18/25    Page 53 of 78

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| 77 | The USIP building is unique—its design intended to reflect and functionally aid the Institute's mission. *See* https://www.safdiearchitects.com/projects/united-states-institute- of-peace; *At U.S. Institute of Peace, building's provocative design doesn't entirely succeed,* Washington Post (Feb. 24, 2012) *(available at* https://www.washingtonpost.com/realestate/at-us-institute-of-peace-buildings- provocative-design-doesnt-entirely-succeed/2012/02/21/gIQADOxOYR_story.html). | This statement is immaterial to the pending cross-motions. | Defendants do not dispute, and therefore concede, SUMF 77. Defendants' statement about materiality is legal argument. |
| 78 | USIP's ability to fulfill its mission—including to engage in conflict resolution training, to be a trusted information resource for congressional and governmental bodies, and to convene and facilitate dialogue between groups in conflict—depends on its long-earned reputation as a nonpartisan, expert organization. It further depends on it not being part of, and being recognized as independent of | Disputed: as explained throughout these filings, Defendants dispute that the Institute is independent of the Executive Branch, and contrary to Plaintiffs' position, the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217. | Defendants do not dispute, and therefore concede, the first sentence of SUMF 78: that "USIP's ability to fulfill its mission—including to engage in conflict resolution training, to be a trusted information resource for congressional and governmental bodies, and to convene and facilitate dialogue between groups in conflict—depends on its long-earned reputation as a nonpartisan, expert organization." Nor do Defendants' dispute, and therefore concede, that their |

53

**JA159**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | the Executive Branch. Defendants' actions toward USIP since issuance of EO 14217 will adversely affect the Institute's standing and reputation as an "honest, good faith broker" in the field. Ex. 7, Moose Decl. ¶ 17. | | actions toward USIP since issuance of EO 14217 "will adversely affect the Institute's standing and reputation as an 'honest, good faith broker' in the field." Defendants' response is legal argument. |
| 79 | Actions to cancel contracts and grants, and deletion or alteration of information from USIP's computer system will cause severe and irreparable harm to USIP and its staff. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 5 (ECF No. 12-8). | Disputed: the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217. | Defendants do not dispute, and therefore concede, SUMF 79. Defendants' response is legal argument. |
| 80 | USIP has contracts domestically with a variety of vendors. These include a facilities and engineering contract for building maintenance, catering contracts, and building security contracts. USIP is legally bound by these contracts, and the sudden cancellation of such contracts without cause will result in USIP breaching the contracts. Outside of the potential legal repercussions, USIP's relationship with these vendors will be harmed, | Disputed: the United States government is harmed by not being able to promote the President's policy of dramatically reducing the size of the Federal Government, while increasing its accountability to the American people, among other purposes outlined in Executive Order 14,217. | Defendants do not dispute, and therefore concede, SUMF 80. Defendants' response is legal argument. |

54

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | rendering it difficult to reestablish such contracts in the future in order to restart work. Further, canceling the facilities and engineering contract will result in the loss of key personnel with pertinent and specialized knowledge about the USIP headquarters building and systems, rendering it difficult to safely maintain the building and restart work in the future. *Id.* ¶¶ 6-7. | | |
| 81 | USIP's offices contain USIP assets, federal assets, and computers with sensitive information about USIP workers and operations. If such leases are terminated without guidance for how to shut down an office, especially in insecure areas, all of this information is at risk of being taken and used to harm USIP and its staff. *Id.* ¶¶ 8-9. | Disputed. This statement is purely speculative, and the cited materials fail to support the statement. | Defendants do not dispute, and therefore concede, SUMF 81. Defendants' response is legal argument. |
| 82 | USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used | This first sentence in this statement is immaterial to the pending cross-motions. The second sentence is disputed because it is purely speculative, and the cited materials fail to support the statement. | Defendants do not dispute, and therefore concede, the facts set out in the first two sentences of this SUMF 82. While Defendants appear to characterize the third sentence (not the second sentence) as "speculative," the statement is within a sworn declaration by a USIP employee |

55

**JA161**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | in USIP's online global academy, documentation for intellectual property purposes, and documentation to support Institutional Review Board standards for research using human subjects. Any release of employee information, which includes names, personal information, and banking information, would harm and even endanger USIP's staff, especially those located abroad in insecure areas, who may be targeted by terrorist groups or other bad actors. *Id.* ¶ 11. | | with personal knowledge of the information maintained in USIP's computer systems.<br><br>Defendants' statement about materiality is legal argument. |
| 83 | Further, the deletion of current and historical employee and vendor information would render it extremely difficult to restart work in the future, as all records are kept electronically. *Id.* ¶ 12. | Disputed. This statement is purely speculative, and the cited materials fail to support the statement. | Defendants' characterization of SUMF 83 does not create a genuine issue of material fact. The statement is within a sworn declaration by a USIP employee with personal knowledge of the information maintained in USIP's computer systems. |
| 84 | USIP's computer system contains decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as | This first two sentences in this statement are immaterial to the pending cross-motions. The third sentence is disputed because it is purely speculative, and the cited materials fail to support the statement. | Defendants do not dispute, and therefore concede, the facts set out in the first two sentences of SUMF 84. While Defendants appear to characterize the third sentence (not the second sentence) as "speculative," the statement is within |

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of this intellectual property documentation would render USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out part of its core mission, which is education and training. *Id.* ¶ 13. | | the sworn declaration of a USIP employee with personal knowledge of the information maintained in USIP's computer systems. |
| 85 | USIP maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits of these materials, which are only kept electronically, would prevent USIP from fulfilling its tax reporting obligations as well as its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 15. | This first sentence in this statement is immaterial to the pending cross-motions. The second sentence is disputed because it is purely speculative, and the cited materials fail to support the statement. | Defendants do not dispute, and therefore concede, the facts set out in the first two sentences of SUMF 85. While Defendants characterize the second sentence as "speculative," the statement is in a sworn declaration of a USIP employee with personal knowledge of the information maintained electronically by USIP. |
| 86 | The sudden termination of USIP employees and contractor staff risks significant harm to both USIP and | This first two sentences in this statement are immaterial to the pending cross-motions. The third sentence is disputed | Defendants do not dispute, and therefore concede, the facts set out in the first three sentences of SUMF 86. While |

57

**JA163**

| ¶ | Plaintiff's Statement of Undisputed Material Facts ("SUMF") | Defendants' Responses to SUMF | Plaintiff's Reply to Defendants' Responses to SUMF |
|---|---|---|---|
| | these personnel. Many of these personnel work in insecure areas of the world. Some are third-country nationals who were asked to leave their country of residence and relocate to a new country to perform work for USIP. If their contracts are canceled without proper notice or assistance, these staff could be stranded and trapped in that insecure country or kicked out or prosecuted for lack of proper work documentation. Id. ¶ 16. | because it is purely speculative, and the cited materials fail to support the statement. | Defendants appear to characterize the fourth sentence (not the third sentence) as "speculative," the statement is within a sworn declaration by a USIP employee with personal knowledge of the circumstances faced by USIP employees and contractors around the world. |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL FACTS

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| 1 | In 1984, Congress established the Institute through the Department of Defense Authorization Act of 1985, Act. Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984). See 22 U.S.C. §§ 4601–4611. | Undisputed |

58

**JA164**

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| 2 | In the Institute's organic statute, Congress made several findings that prompted the Institute's creation, including the following:<br><br>(1)    a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict;<br><br>. . .<br><br>(4)  there is a national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities with regard to the history, nature, elements, and future of peace processes, and to bring together and develop new and tested techniques to promote peaceful economic, political, social, and cultural relations in the world; . . . .<br><br>(6)    there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information;<br><br>(7)   the Commission on Proposals for the National Academy of Peace and Conflict Resolution, created by the | Disputed in part. Undisputed as to the quotations of some of the statements in § 4601 of the USIP Act. Disputed as to Defendants' characterization of those statements as the only or exclusive findings "that prompted the Institute's creation." *See* Pl. SUMF ¶¶ 4-5. Moreover, DSOF 2 omits the following subsections of § 4601(a):<br><br>• (2) people throughout the world are fearful of nuclear war, are divided by war and threats of war, are experiencing social and cultural hostilities from rapid international change and real and perceived conflicts over interests, and are diverted from peace by the lack of problem-solving skills for dealing with such conflicts;<br><br>• (3) many potentially destructive conflicts among nations and peoples have been resolved constructively and with cost efficiency at the international, national, and community levels through proper use of such techniques as negotiation, conciliation, mediation, and arbitration;<br><br>• (5) existing institutions providing programs in international affairs, diplomacy, conflict resolution, and peace studies are essential to further development of techniques to promote peaceful resolution of international conflict, and the peacemaking activities of people in such institutions, government, private enterprise, and voluntary associations can be strengthened by a national institution devoted to international peace research, education and training, and information services; |

59

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | Education Amendments of 1978, recommended establishing an academy as a highly desirable investment to further the Nation's interest in promoting international peace; <br><br> (8) an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs, would be the most efficient and immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts; and <br><br> (9) the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence. <br><br> 22 U.S.C. § 4601(a). | |
| 3 | Congress created the Institute as an establishment of the United States. 22 U.S.C. § 4603(a). | Disputed in part. Undisputed that "Congress created the Institute." Disputed that the Institute is an "establishment of the United States," which is legal argument. |
| 4 | As to its form, the Institute is organized as a nonprofit corporation organized prohibited [sic] from having any owner other than its incorporator, the United States. *Id.* § 4603(b) ("The Institute is an independent nonprofit | Disputed. The statutory citation does not support the text of the statement, which is legal argument. The statute does not state or support the conclusion that the "United States" is the "owner" of USIP. |

60

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | corporation . . . The Institute does not have the power to issue any shares of stock[.]". | |
| 5 | Authority to run the Institute is vested in its board of directors. *Id.* § 4605(a). | Undisputed that the statute states: "The powers of the Institute shall be vested in a Board of Directors unless otherwise specified in this chapter." § 4605(a)(1). |
| 6 | The Institute's board consists of three voting ex officio members—the Secretary of State, the Secretary of Defense, and the president of the National Defense University—and twelve appointed members. *Id.* § 4605(b). | Disputed in part. Undisputed that there are 15 voting members of the Board as provided in § 4605(b). The president of the Institute is also a nonvoting ex officio member of the Board. § 4606(a). |
| 7 | The appointed members are "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 4605(b)(4). | Undisputed |
| 8 | No more than eight total members can be from one political party, but by virtue of the ex officio members, the Institute's board is designed to be dominated by the political party of the President. *Id.* § 4605(c). | Disputed in part. Undisputed as to the first clause ("No more than eight total members can be from one political party"). Disputed as to the rest of the sentence. Defendants' statement of partisan "domination" is argument that is not supported by the cited provision, § 4605(c), or by other provisions governing the terms of Board service (§ 4605(e)) and the removal of (b)(4) Board members (§ 4605(f)). Nor is it supported by the legislative history of the statute, which shows that Congress expressly stated that the partisan-balance requirement was intended to *prevent* partisanship from influencing the work of the Institute, *see* Pl. SUMF ¶¶ 4-5. <br><br> The USIP biennial reports submitted to Congress and the President in the years after the Institute's creation underscore |

61

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | Congress's purposeful efforts to avoid partisan influence and ensure the Institute's independence. In the 1987 report, the Institute noted: |
| | | Congress created the Institute as "an independent nonprofit corporation." Making that independence a reality has been one of the most important accomplishments of the Institute's first year of activity. It is a central legacy of the Institute's first Board of Directors. |
| | | Congress vested the Institute with a measure of intellectual freedom comparable in many respects to that enjoyed by institutions of higher education and, having protected the Institute as an educational entity divorced from the political pressures of the day, *wisely provided that the Institute should refrain from policymaking and dispute intervention.* |
| | | Pl. Opp. Ex. 1, USIP 1987 Biennial Report at 1 (emphasis added). The Institute noted the risk to its independence from "the politically ascendant forces of the day," and noted the structural features in the USIP Act designed to prevent that, including "*[b]eing an independent establishment of the federal government and not an agency of the Congress or the Executive Branch.*" *Id.* at 2 (emphasis added). The Institute stressed that "Congress insisted that the Institute be independent of control by any particular discipline, methodology, belief, cause, region or group." *Id. See also* Pl. Opp. Ex. 2, USIP 1989 |

62

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | Biennial Report at ix (noting that the independence provided in by Congress in the USIP Act "is an important element in building public confidence in the work of the Institute and has been stressed from the first meeting of the Board of Directors"); Pl. Opp. Ex. 3, USIP 1991 Biennial Report at 1 ("The Congress insulated the Institute from political pressures by granting it independent status as a federal institute and nonprofit corporate form with a bipartisan governing Board…"). |
| 9 | The Institute's board has the power to select a president of the Institute. *Id.* § 4606(a). | Undisputed |
| 10 | The president and other officers of the Institute "serve at the pleasure of the Board[,]" meaning they can be removed by the board at any time for any reason. *Id.* | Undisputed as to the first phrase. Disputed as to the phrase: "…meaning they can be removed by the board at any time for any reason," which characterization is legal argument. |
| 11 | The Institute receives congressional appropriations and is prohibited from receiving non-governmental funds except for two highly specific activities—the construction and maintenance of a suitable headquarters and program-related hospitality. *Id.* § 4605(h)(3). | Disputed. The text of DSOF 11 characterizes the statute as concerning two "highly specific activities," and incorrectly refers to § 4605(h)(3). Defendants presumably intended to cite to § 4604(h)(3), which states in full:<br><br>Notwithstanding any other provision of this chapter, the Institute and the legal entity described in section 4603(c) of this title may not obtain any grant or contract or receive any gift or contribution from any private agency, organization, corporation or other legal entity, institution, or individual, except such Institute or legal entity may accept such a gift or contribution to- |

63

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | (A) purchase, lease for purchase, or otherwise acquire, construct, improve, furnish, or maintain a suitable permanent headquarters, any related facility, or any site or sites for such facilities for the Institute and the legal entity described in section 4603(c) of this title; or |
| | | (B) provide program-related hospitality, including such hospitality connected with the presentation of the Spark M. Matsunaga Medal of Peace. |
| | | In addition, USIP can charge fees from its products, § 4605(i), and charge fees for participation in its directly authorized activities, § 4605(j). |
| 12 | The Institute, including through its president, is authorized to "receive and disburse public moneys, obtain and make grants, enter into contracts, [and] establish and collect fees," among other authorities. *Id.* § 4606(b). | Undisputed that the quoted portion appears in § 4606(b), which states in full: "Subject to the provisions of section 4604(h)(3) of this title, the Board shall authorize the president and any other officials or employees it designates to receive and disburse public moneys, obtain and make grants, enter into contracts, establish and collect fees, and undertake all other activities necessary for the efficient and proper functioning of the Institute." |
| 13 | The Institute's organic statute includes various other provisions, including:<br>a.    it is authorized to use the name and seal of the United States, id. § 4603;<br>b.    it is subject to the Freedom of Information Act, id. § 4607(i); | Disputed in part. Undisputed that the statutory cites are from the USIP Act. Except for DSOF 13(b), the text purporting to describe every one of the cited provisions is incorrect in whole or part, and/or incomplete.<br><br>• DSOF 13(a) is incorrect that the Institute can use the seal of the United States. Rather it can only use the terms "United |

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | c.    it is required to publish notices of board meetings in the Federal Register, id. § 4605(h)(3); <br><br> d.    it can obtain services and support from GSA, id. § 4604(o); <br><br> e.    the compensation of its board members, president, and employees are set by federal statute, id. §§ 4605(i), 4606(a), 4606(c); <br><br> f.    reimbursement of its board's travel expenses is controlled by federal statute, id. § 4605(j); <br><br> g.    the Federal Tort Claims Act applies to it and its officers and employees, id. § 4606(f)(1); <br><br> h.    its employees receive federal government benefits (e.g., workers compensation, civil service retirement, federal life insurance, and federal health insurance), id. § 4606(f)(1); and <br><br> i.    upon liquidation, its assets revert to the United States Treasury, id. § 4610. | States," "U.S.," or "any other reference to the United States Government or Nation" in the *Institute's* title or "corporate seal, emblem, badge, or other mark of recognition," and "in any fiscal year *only* if there is an authorization of appropriations for the Institute for such fiscal year provided by law." § 4603(e)(2) (emphasis added). <br><br> • Contrary to DSOF 13(c), under the USIP Act the Institute is not required to publish notices of board meetings in the Federal Register. Rather, Federal Register notice is sufficient but not necessary. Board meetings "shall be preceded by reasonable public notice. Notice in the Federal Register shall be deemed to be reasonable public notice for purposes of the preceding sentence." § 4605(h)(3). <br><br> • DSOF 13(d) omits that the Institute may obtain services from the GSA but only "on a reimbursable basis." § 4604(o). <br><br> • Contrary to DSOF 13(e), compensation of the USIP president is set "at rates determined by the Board," and the USIP president sets compensation for employees. A 1987 letter to the Director of Personnel in the Executive Office of the President from counsel for OPM confirms this, stating: *"the Institute is not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51.* This is further apparent from certain provision within the enabling legislation indicating that the Institute was not to be considered an agency. . . . *Section 4606(c) gives the* |

Case 1:25-cv-00804-BAH    Document 34-1    Filed 04/18/25    Page 66 of 78

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | *president of the Institute specific authority to appoint, fix the compensation of, and remove employees without regard to Civil Service rules, and subject instead to the Institute's bylaws and the general policy established by its Board.*…We interpret [4606(c)] as indicating that federal classification and pay rates serve as a guide and that the president should compensate the employees at an equivalent pay rate.… When read in conjunction with subsection (c), subsection (f) merely reiterates the premise that when fixing the rate of compensation, the president is to be guided by the provisions of Title 5 which relate to pay rates and classification.… Accordingly, *we conclude from our review that the Institute is not under the purview of OPM because it would not be directly subject to the classification and pay rules under the General Schedule but rather would be merely guided by these provisions*…[t]here would be no requirement to get OPM approval for compensation a step above the minimum. *The Institute therefore is free to designate its supergrade position under its separate authority.*"
*See* Pl. Opp. Ex. 4, Letter from OPM Assoc. Gen. Counsel to Dir. of Personnel, Executive Office of the President (Oct. 2, 1987) (emphasis added).

• Contrary to DSOF 13(f), the federal expense allowance is a guide as to travel expenses. *See* Pl. Opp. Ex. 4 (1987 letter from OPM counsel quoted above). |

66

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | • DSOF 13(g) incorrectly states that the Institute is itself covered by the Federal Tort Claims Act. By its plain terms, the cited provision applies only to USIP officers and employees. |
| | | Both DSOF 13(g) and (h) selectively characterize § 4606(f)(1), which states in full: |
| | | Federal employment status only for stated purposes: (1) *Officers and employees of the Institute shall not be considered officers and employees of the Federal Government except* for purposes of the provisions of title 28, which relate to Federal tort claims liability, and the provisions of title 5, which relate to compensation and benefits, including the following provisions: chapter 51 (relating to classification); subchapters I and III of chapter 53 (relating to pay rates); subchapter I of chapter 81 (relating to compensation for work injuries); chapter 83 (relating to civil service retirement); chapter 87 (relating to life insurance); and chapter 89 (relating to health insurance). The Institute shall make contributions at the same rates applicable to agencies of the Federal Government under the provisions of title 5 referred to in this section. (emphasis added). |
| | | *See also* Pl. Opp. Ex. 4 (1987 letter from OPM counsel) (section 4606(f) "enumerates the only circumstances under |

67

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | which the employees of the Institute will be considered to be federal employees"). |
| | | In addition, in a 1988 memo to the USIP General Counsel, the Executive Office of the President confirmed that Section 108 of P.L. 100-238, which concerned "benefits coverage for employees of a non-Government entity," barred "retirement, health benefits, and life insurance coverage" for all new USIP staff appointed on or after October 1, 1988. Pl. Opp. Ex. 5, Memo from Dir. of Personnel, Exec. Office of the President to USIP Gen. Counsel (Mar. 11, 1988). *See also* PAUF 13 and Pl. Opp. Ex. 9 ("USIP provides private, commercially sourced retirement plans and health and life insurance to its eligible employees."). |
| | | • DSOF 13(i) is incomplete: § 4610 refers to "dissolution or final liquidation of the Institute." And Federal law requires a tax-exempt nonprofit corporation that is dissolving to distribute its remaining assets only to another tax-exempt organization as described in section 501(c)(3), or to the federal government, or to a state or local government. 26 C.F.R. § 1.501(c)(3)-1(4). |
| | | Plaintiffs contend that by firing virtually all USIP employees working in its Washington DC office, giving away all of its property and assets, and canceling its contracts, Defendants have and are attempting an effective dissolution of USIP pursuant to EO 14217's directive for a "termination" of USIP. *See* SUMF 35, 55-58, 73, 79-80. |

68

**JA174**

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | Defendants have presented no facts that they have complied with their contractual and other obligations under D.C. Nonprofit Corporations Law. |
| 14 | On February 19, 2025, President Trump signed Executive Order 14,217. Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025). | Undisputed |
| 15 | That Order described the policy of President Trump's administration "to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people." *Id.* § 1. | Undisputed that the quoted phrase appears in Exec. Order 14,217. The Order requires that any actions taken pursuant to the Order be done "consistent with applicable law." E.O. 14,217 § 3(b). |
| 16 | To fulfill that objective, the President directed that "[t]he non-statutory components and functions of [certain identified] governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]" *Id.* § 2(a). Among the identified entities was the Institute. *Id.* § 2(a)(iv). | Undisputed that the quoted phrase appears in Exec. Order 14,217. The Order requires that any actions taken pursuant to the Order be done "consistent with applicable law." E.O. 14,217 § 3(b). |
| 17 | To carry out that Executive Order, on or about March 14, 2025, the White House Presidential Personnel Office notified the Institute's board members, including the former board members who are Plaintiffs in this suit, informing them that they had been terminated from their positions with the Institute. Am. Compl. (ECF No. 12) ¶ 50; Pls. Stmt. of Undisp. Facts (ECF No. 19-1, "Pls. Stmt.") ¶ 38; Termination Notices, ECF No. 24-1. | Disputed in part. Undisputed that on March 14, 2025, Defendant Trent Morse emailed USIP's (b)(4) Board members and purported to remove them from their positions by email without reference to or compliance with the provision for removal of (b)(4) Board members in § 4605(f). Plaintiffs dispute that this was done "consistent with applicable law" as required by E.O. |

69

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | | 14,217 and dispute the characterization of Plaintiff Board members as "former board members." |
| 18 | Thereafter, the remaining Institute board members (i.e., the ex officio members) issued a resolution of the board removing the then-acting Institute president, George E. Moose, and designating a new president, Kenneth Jackson. Am. Compl. (ECF No. 12) ¶¶ 52–53; Pls. Stmt. (ECF No. 19-1) ¶ 43; Bd. Resolution, ECF No. 12-6. | Disputed in part. Undisputed that on March 14, 2025, the three ex officio Board members purported to issue a resolution removing Ambassador Moose as acting president and appointing Defendant Jackson. Plaintiffs dispute the characterization of the ex officio members as the "remaining" Board members and of Defendant Jackson as the "new President" because the purported removal of the (b)(4) Board members was ultra vires and void ab initio, and thus the purported removal of Ambassador Moose and purported appointment of Defendant Jackson were likewise invalid. |
| 19 | By resolution effective March 25, 2025, the Institute's board issued another resolution, removing Jackson as the Institute's president and appointing Nate Cavanaugh as the Institute's acting president. Bd. Resolution, ECF No. 15-2. | Disputed in part. Undisputed that on or about March 25, 2025, two of the ex officio Board members purported to issue a resolution replacing Defendant Jackson with Defendant Cavanaugh as acting president of USIP. Plaintiffs dispute the characterization of two ex officio members as the "Institute's board," the characterization of Defendant Jackson as the "Institute's president" because the purported removal of the (b)(4) Board members was ultra vires and void ab initio, and thus the purported removal of Ambassador Moose, purported appointment of Defendant Jackson, and purported replacement of Jackson with Cavanaugh were likewise invalid. |
| 20 | The Institute is listed in the U.S. Government Manual as a federal government entity. U.S. Government Manual, U.S. | Disputed. The Institute is categorized in the U.S. Government Manual as a "Quasi-Official Agency," which is defined by the Manual as **not** an "agency" or an "executive agency" under the |

70

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
|  | Institute of Peace, available at: https://perma.cc/DX7M-4XNH. | definition of 5 U.S.C. 105. *See* Pl. SUMF ¶ 72. *See also* Pl. Opp. Ex. 4 (1987 letter from OPM counsel stating that "the Institute is not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51."). |
| 21 | The Manual makes no attempt to identify which of the three branches houses the Institute. *Id.* | Disputed. The Manual describes itself as "the official handbook of the Federal Government." It classifies and categorizes entities within each of the three branches, and it has concluded that USIP does not fall within "agency activities and programs of the executive, judicial, and legislative branches of Government," but rather fits separately within "*activities and programs of quasi-official agencies…*" *See also* https://www.usgovernmentmanual.gov/. https://www.usgovernmentmanual.gov/About ("This current edition of the Government Manual provides **comprehensive** information on the legislative, judicial, and executive branches. **It also includes information on quasi-official agencies.**") (emphasis added). |
| 22 | The U.S. Government Manual does not purport to be a legal document or a definitive expression of the Executive's view on the law. *See* U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. | Disputed. Defendants' characterization of the Manual and what it "purports" to be is not supported by the citation. The Manual website states that "For over eight decades, *The United States Government Manual* has been the 'official handbook' of the Federal Government" and that the Manual "is a special edition of the *Federal Register*, issued under the authority of the Administrative Committee of the Federal Register (See 1 CFR part 9.)." *See* https://www.usgovernmentmanual.gov/; https://www.usgovernmentmanual.gov/About |

71

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| 23 | The publishers of the Manual—the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President)—merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities." *Id.* | Disputed because the selective quotation and characterization are incomplete. The quoted phrase omits: "Agency liaison officers are consulted to verify the currency of the *Government Manual*'s content at least once a year. The OFR exercises final editorial control over all editions of the *Government Manual*. To keep pace with changes in Government programs and leadership, OFR editors may amend the current edition throughout the year, using information verified by them or by the liaison officers." *See also* Pl. Opp. Ex. 4 (1987 letter from OPM counsel stating that "the Institute is not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51."). |
| 24 | As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.* | *See* Response to Fact No. 23. |
| 25 | The information in the Manual about the Institute was submitted by the Institute's former leadership given the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. | Undisputed that the cited information about USIP's leadership does not correctly identify USIP's current duly appointed, lawful leadership as it existed prior to the actions challenged as ultra vires and unlawful in this case. The statement is immaterial to the pending cross-motions. |
| 26 | USA.gov is a General Services Administration website that serves as "the official guide to government information and services." USA.gov, https://www.usa.gov/. | Undisputed that the quoted phrase appears at the bottom of the cited webpage. |
| 27 | The Institute is listed on USA.gov under its index of "government departments and agencies." USA.gov, USIP, | Undisputed that USIP is listed on USA.gov's directory of "U.S. federal government agencies, departments, corporations, instrumentalities, and government-sponsored enterprises." |

| ¶ | Defendants' Statement of Facts (DSOF) | Plaintiff's Responses to DSOF |
|---|---|---|
| | https://www.usa.gov/agencies/united-states-institute-of-peace. | |
| 28 | When President Reagan signed the Institute's organic statute, he issued a signing statement noting that the act "neither intended to, nor has the effect of, restricting the President's constitutional power to remove" the Institute's board members. Statement on Signing the Department of Defense Authorization Act, 1985 (Oct. 19, 1984), available at: https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-authorization-act-1985. | Disputed in part. Undisputed that the quoted language was part of President Reagan's signing statement. Plaintiffs dispute that the statement is material because the USIP Act that Congress passed and President Reagan signed into law, by its explicit statutory text, restricted the President's authority to remove (b)(4) Board members. *See* 22 U.S.C. § 4605(f). |

**PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS IN RESPONSE TO DEFENDANTS' CROSS-MOTION**

| ¶ | Plaintiffs' Additional Undisputed Material Facts (PAUF) |
|---|---|
| PAUF 1 | In August 1987, the Institute issued its first Biennial Report to the Congress and the President. Pl. Opp. Ex. 1. The Report stated: |
| | Congress created the Institute as "an independent nonprofit corporation." Making that independence a reality has been one of the most important accomplishments of the Institute's first year of activity. It is a central legacy of the Institute's first Board of Directors. |
| | Congress vested the Institute with a measure of intellectual freedom comparable in many respects to that enjoyed by institutions of higher education and, having protected the Institute as an educational entity divorced from the |

73

| ¶ | Plaintiffs' Additional Undisputed Material Facts (PAUF) |
|---|---|
| | political pressures of the day, wisely provided that the Institute should refrain from policymaking and dispute intervention. |
| | *Id.* at 1. The Report noted the risk to USIP's independence from "the politically ascendant forces of the day," and noted the structural features in the USIP Act designed to prevent that, including "[*b*]*eing an independent establishment of the federal government and not an agency of the Congress or the Executive Branch.*" *Id.* at 2 (emphasis added). The Institute stated that "Congress insisted that the Institute be independent of control by any particular discipline, methodology, belief, cause, region or group." *Id.* |
| PAUF 2 | In December 1989, the Institute issued its second Biennial Report to the Congress and the President. Pl. Opp. Ex. 2. The Report stated that the independence provided by Congress in the USIP Act "is an important element in building public confidence in the work of the Institute and has been stressed from the first meeting of the Board of Directors." *Id.* at ix. It further stated that the Institute "must not interfere with the conduct of foreign relations, which is the responsibility of Government agencies such as the Department of State," and that "the Institute can decide to undertake projects at the request or with the support of Governmental agencies, *if the projects are in accord with Institute priorities.*" *Id.* (emphasis added). |
| PAUF 3 | In January 1992, the Institute issued its 1991 Biennial Report to the Congress and the President. Pl. Opp. Ex. 3. The Report stated: "The Congress insulated the Institute from political pressures by granting it independent status as a federal institute and nonprofit corporate form with a bipartisan governing Board…" *Id.* at 1. It also stated: "As intended by its enabling legislation, the institute functions as a nonideological educational resource for policymakers and officials and *does not intervene directly in formulation or conduct of US foreign policy.*" *Id.* (emphasis added). |
| PAUF 4 | In 1987, the Associate General Counsel of OPM wrote a letter to the Director of Personnel in the Executive Office of the President concluding that federal compensation schedules did not apply to USIP. Among the statements in the letter were:<br><br>• "[T]he Institute is not an executive agency either under the definition in 5 U.S.C. 105 or 5 U.S.C. Chapter 51. This is further apparent from certain provisions within the enabling legislation indicating that the Institute was not to be considered an agency." |

74

| ¶ | Plaintiffs' Additional Undisputed Material Facts (PAUF) |
|---|---|
| | • "Section 4606(c) gives the president of the Institute specific authority to appoint, fix the compensation of, and remove employees without regard to Civil Service rules, and subject instead to the Institute's bylaws and the general policy established by its Board." |
| | • "We interpret [4606(c)] as indicating that federal classification and pay rates serve as a guide and that the president should compensate the employees at an equivalent pay rate.... When read in conjunction with subsection (c), subsection (f) merely reiterates the premise that when fixing the rate of compensation, the president is to be guided by the provisions of Title 5 which relate to pay rates and classification." |
| | • "Employees of the Institute are not covered under the definition of "employee" in chapter 51 as chapter 51 coverage is limited to employees of an 'agency.'"** |
| | • "Accordingly, we conclude from our review that the Institute is not under the purview of OPM because it would not be directly subject to the classification and pay rules under the General Schedule but rather would be merely guided by these provisions...[t]here would be no requirement to get OPM approval for compensation a step above the minimum. The Institute therefore is free to designate its supergrade position under its separate authority." |
| | *See* Pl. Opp. Ex. 4, Letter from OPM Assoc. Gen. Counsel to Dir. of Personnel, Executive Office of the President (Oct. 2, 1987). |
| | **Chapter 51 of Title 5 defines "agency," for purposes of that chapter, to mean "mean an Executive agency, the Library of Congress, the Botanic Garden, the Government Printing Office, the Office of the Architect of the Capitol, and the government of the District of Columbia. *See* 5 U.S.C. § 5102(a)(1). This definition is intended to include "corporations wholly owned by the United States." *See* Historical and Revision Notes to § 5102, available at https://uscode.house.gov/view.xhtml?path=/prelim@title5/part3/subpartD/chapter51&edition=prelim. |
| PAUF 5 | In a 1988 memo to the USIP General Counsel, the Executive Office of the President confirmed that all new USIP staff appointed on or after October 1, 1988 were barred from obtaining "retirement, health benefits, and life insurance coverage" because of Section 108 of P.L. 100-238, which prohibited "benefits coverage *for employees of a non-* |

75

| ¶ | Plaintiffs' Additional Undisputed Material Facts (PAUF) |
|---|---|
| | *Government entity*." Pl. Opp. Ex. 5, Memo from Dir. of Personnel, Exec. Office of the President to USIP Gen. Counsel (Mar. 11, 1988) (emphasis added). |
| PAUF 6 | In furtherance of Defendants' goal of shutting down all USIP programmatic activity, one of the DOGE representatives told USIP staff to assume that beginning in early April 2025, all USIP overseas programs would wind down. Pl. Opp. Ex. 8, Supplemental Decl. of George E. Moose ¶ 4 (Apr. 18, 2025). |
| PAUF 7 | The vast majority of the staff based in USIP's headquarters in Washington, DC were terminated on March 28, 2025, including all employees working on the Gandhi-King Global Academy program mandated by Congress. Three Vice Presidents whose programs included overseas operations received termination notices on April 12, 2025, with April 18, 2025 being their last employment date. As of Friday, April 18, 2025, only four headquarters employees (not counting DOGE representatives) have not received a termination notice – two of these individuals work in the IT department, one in human resources, and one in finance. All four individuals expect their last day at USIP to be no later than May 31, 2025. *Id.* ¶ 5. |
| PAUF 8 | As of April 18, 2025, all but four USIP employees and personal services contractors (PSCs) working overseas have received termination notices. None of the termination dates is later than May 31, 2025. The four individuals who have not received termination notices are not performing any work other than closing down USIP's operations and understand that they will be terminated in the near future. *Id.* ¶ 6. |
| PAUF 9 | The purported Acting President of USIP, Defendant Cavanaugh, does not appear to carry out any tasks for USIP. *Id.* ¶ 7. |
| PAUF 10 | On April 12, 2025, Defendant Cavanaugh, the purported USIP Acting President, stated in an email to the Vera Institute, a private nonprofit organization that works on incarceration issues (https://www.vera.org/), that he was "a member of the DOGE team working at the General Services Administration." Cavanaugh wrote that he wanted to discuss "getting a DOGE team assigned to the organization." Pl. Opp. Ex. 6, Cavanaugh email to Vera Inst. (Apr. 12, 2025). |
| PAUF 11 | On an April 15, 2025 call between Defendant Cavanaugh, another DOGE representative, and representatives of the Vera Institute, Defendant Cavanaugh was asked to explain "the basis for having a DOGE team assigned to an independent non-profit like Vera?" Cavanaugh replied: "There are other independent non-profits like USIP where we have a DOGE team |

76

| ¶ | Plaintiffs' Additional Undisputed Material Facts (PAUF) |
|---|---|
| | assigned. Our basis for asking to the Institute is because we want to assign a DOGE team to every institute or agency that has congressional monies appropriated to it." Pl. Opp. Ex. 7, Vera Institute/DOGE Teams Call Notes (Apr. 15, 2025); *see also* Washington Post, *DOGE sought to assign a team to an independent nonprofit group* (Apr. 16, 2025), available at https://www.washingtonpost.com/national-security/2025/04/15/doge-musk-nonprofit-vera-institute/. |
| PAUF 12 | USIP uses a commercial payroll broker to disburse its biweekly payroll to employees. The funds are disbursed from a commercial bank account held by USIP. Pl. Opp. Ex. 9, Decl. of USIP CFO Allison Blotzer ¶ 3 (Apr. 16, 2025). |
| PAUF 13 | USIP provides private, commercially sourced retirement plans and health and life insurance to its eligible employees. *Id.* ¶ 4. |

Dated: April 18, 2025

Respectfully submitted,

/s/ *Andrew N. Goldfarb*
Andrew N. Goldfarb (D.C. Bar No. 455751)
J. Benjamin Jernigan (D.C. Bar No. 9000865)
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, D.C. 20037
Tel: (202) 778-1800

William J. Murphy (D.C. Bar No. 350371)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 332-0444

77

*Counsel for Plaintiffs*

78

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *

| | |
|---|---|
| UNITED STATES INSTITUTE OF | ) Civil Action |
| PEACE, et al., | ) No. 25-804 |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| KENNETH JACKSON, et al., | ) May 14, 2025 |
| | ) 10:05 a.m. |
| Defendants. | ) Washington, D.C. |
| | ) |

* * * * * * * * * * * * * * *

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

**APPEARANCES:**

FOR THE PLAINTIFFS:
WILLIAM MURPHY, ESQ.
ANDREW N. GOLDFARB, ESQ.
BEN JERNIGAN, ESQ.
Zuckerman Spaeder, LLP
1800 M Street, NW
Washington, D.C.  20036
(202) 822-8106
wmurphy@zuckerman.com

FOR THE DEFENDANTS:
BRIAN P. HUDAK, ESQ.
SAM ESCHER, ESQ.
United States Attorney's Office
for the District of Columbia
601 D Street, NW
Washington, D.C.  20001
(202) 252-2549
brian.hudak@usdoj.gov

***This transcript is <u>work product</u>.  This transcript shall be***
***considered null and void if the transcript is edited,***
***disassembled, cut/pasted, screenshot, and/or photocopied in any***
***manner by any party without authorization of the signatory.***

Court Reporter: Elizabeth Davila, RPR, FCRR
Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

1       **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Your Honor, this is Civil

3       Action 25-804, United States Institute of Peace, et al.,

4       versus Kenneth Jackson, et al.

5              Would the parties please come forward to the

6       lectern and identify yourselves for the record this morning.

7       We'll start with plaintiffs' counsel first.

8              MR. MURPHY:  Good morning, Your Honor.

9       William Murphy --

10             THE COURT:  If you could stand at the podium.

11       Please stand at the podium and use the microphone.

12             MR. MURPHY:  Sure.  Thank you, Your Honor.

13             Good morning.  I am William Murphy from Zuckerman

14       Spaeder.  With me this morning are Andrew Goldfarb and Ben

15       Jernigan.

16             THE COURT:  Good morning.

17             MR. MURPHY:  Good morning.

18             MR. HUDAK:  Good morning, Your Honor.

19             Brian Hudak from the U.S. Attorney's Office on

20       behalf of the United States.  With me at counsel table is

21       Sam Escher, also with the United States Attorney's Office.

22             THE COURT:  Okay.  Good morning.

23             All right.  So this is the fourth hearing I am

24       actually having regarding the Trump administration's actions

25       towards the U.S. Institute for Peace.

1          In this case, we originally had a hearing on a

2     motion for a temporary restraining order which this Court

3     denied in March, in light of the complicated questions about

4     the nature of the Institute -- which I will call "USIP"

5     because it's short; I know some people call it "the

6     Institute," but, frankly, in chambers we have been calling

7     it "USIP," so I know I am going to slip into that -- and

8     both what the nature of the entity is and what its role

9     under our constitutional scheme is.

10          Plaintiffs had challenged the removal by the

11     president of USIP's ten appointed board members and the

12     subsequent removal of USIP's president, Ambassador Moose.

13          Plaintiffs at that point consisted of five of the

14     removed board members and the Institute itself suing a

15     variety of defendants, including the President; DOGE --

16     various DOGE or DOGE-affiliated officials; and the ex

17     officio members of the board, who are Secretaries Hegseth,

18     Rubio, and National Defense University President Garvin.

19          The parties, then and now, took completely

20     divergent positions on the nature of USIP, with plaintiffs

21     asserting that USIP is a congressionally established yet

22     freestanding nonprofit organization organized under District

23     of Columbia law, suggesting that the Institute is not part

24     of the federal government at all; which, as the plaintiffs

25     presented it, was, in fact, pretty critical to its ability

4

1    to function as it was set up to function, independent of the

2    federal government.

3            As such, the plaintiffs argued the President was

4    required to follow the statute in removing board members but

5    did not and, therefore, the removal of the plaintiff board

6    members and, in fact, all of the board members -- whether

7    they were plaintiffs or not before the Court -- was in

8    violation of the statute, illegal, *ultra vires*; and

9    everything that happened afterwards, without the involvement

10   of the wrongfully -- allegedly wrongfully removed board

11   members, was also *ultra vires* and illegal.

12           Defendants, on the other hand, as I said, took the

13   divergent position that -- and still do -- that USIP is an

14   executive branch component of the nation's federal

15   government, exercising executive power through executive

16   functions.  And as such, the President has absolute removal

17   power over the board members who were presidentially

18   appointed so that what happened here was totally illegal.

19           So let me just say then, as now, despite the

20   couple months that have passed, still no court has ever

21   considered the nature of USIP.  There wasn't much guidance

22   from prior cases about how to navigate determining whether

23   USIP is a part of the federal government; and if it is,

24   whether it's part of the executive branch of the government;

25   and if it is, whether it exercised sufficient executive

1  power to be subject to the President's unilateral removal

2  power notwithstanding any statutory for-cause removal

3  requirements.

4       So these are all very basic threshold issues to

5  work through before determining the ultimate issue of the

6  legality of the President's removal of the board members.

7       Based on the limited arguments presented by the

8  parties necessarily, on an emergency TRO basis, without the

9  benefit of full briefing of all of these very serious

10  threshold constitutional issues, the Court concluded the

11  plaintiffs had not yet shown that they were likely to

12  succeed on the merits.

13       We, of course, next had a hearing on plaintiffs'

14  motion to suspend the transfer of property on April 1, when

15  the plaintiffs had learned that the defendants were going to

16  transfer USIP's headquarters, belonging to the Institute, to

17  the General Services Administration, which was -- GSA is

18  unquestionably part of the executive branch.  And that

19  emergency motion under the All Writs Act was also denied, in

20  part, because it was moot because USIP headquarters had

21  already been transferred the weekend before; and, in part,

22  because plaintiffs couldn't satisfy -- although a creative

23  use of the All Writs Act, couldn't satisfy the All Writs

24  standard of it being necessary or appropriate in aid of this

25  Court's jurisdiction, and ability to show a likelihood of

6

1    success on the merits on an All Writs Act claim.

2         Now, in a separate case, I had a third hearing;

3    and that case was *Pippenger v. DOGE*, which is brought by

4    terminated employees, contractors, program partners, and a

5    USIP donor against various defendants as well as the

6    Institute itself.

7         So between these two cases, I have the somewhat

8    awkward situation where I have, in this case, the Institute

9    as a plaintiff; but in the *Pippenger* case the Institute is

10   on the other side of the "V" as a defendant, which is an

11   issue that the defendants have raised here as an issue.

12        The *Pippenger* case challenges what it purports to

13   be an effective shutdown of the Institute, with a number of

14   discrete actions and the removal of plaintiffs in this case

15   as part of their claim.

16        That *Pippenger* case is also on an expedited

17   summary judgment briefing schedule.  I did give the parties

18   in this case an opportunity, with the plaintiff and parties

19   in the *Pippenger* case, to join together in the briefing; but

20   they have chosen to proceed separately.  So the *Pippenger*

21   case remains separate.  Those claims, plaintiffs, and issues

22   will not be addressed here today.

23        So in this case I have pending before me two

24   motions for summary judgment, one for each side.  And that

25   means both sides believe they're entitled to final judgment

1    in their favor based on the factual record presented to the

2    Court in declarations and the applicable law as applied to

3    the now seven pending claims in the plaintiffs' amended

4    complaint, which is slightly different from the original

5    complaint presented to the Court at the TRO when it was in

6    the TRO posture.

7         But the main divergence of opinion about the

8    nature of USIP that was presented to me at the beginning of

9    this case remains, with both sides taking quite different

10   views of what USIP is within our constitutional order.  And

11   what flows from that is a whole series -- a whole lot of

12   jurisprudence depending on what USIP is.

13        I am going to proceed here -- even though I have

14   cross-motions for summary judgment from each side,

15   plaintiffs filed their summary judgment first.  I will start

16   with plaintiffs' counsel first, in terms of further

17   elucidating the positions of the parties.

18        MR. MURPHY:  Thank you, Your Honor.

19        Again, William Murphy for the plaintiffs.

20        May it please the Court.

21        We are here on cross-motions for summary judgment.

22   I would point out that the plaintiffs have presented

23   approximately 40 exhibits in support of our motion for

24   summary judgment, including over 20 declarations.

25        The government has really produced no evidence.

1    Their statement of undisputed material facts consists,

2    basically, of references to various statutory previsions.

3         What I think is very important about that is the

4    fundamental question that Your Honor has been struggling

5    with and that you posed this morning:  What is USIP?

6         Our position is that it is not a part of the

7    federal government as the defendants say we have conceded,

8    which we have not.  In fact, in 1988, Congress passed a bill

9    that modified the retirement, life, and health benefits that

10   were available to federal employees.  And when it did so, in

11   Public Law 100-238, Section 108, it said that:  Any

12   individuals who were covered in the past but otherwise not

13   eligible because they were employed by an entity other than

14   the government will no longer be eligible for health

15   benefits, retirement benefits, life insurance, and other

16   aspects of the Federal Retirement System.

17        Those words are important.  It's in the statute.

18        These folks were determined by the Executive

19   Office of the President, in 1988, not to be entitled to any

20   of those benefits going forward because they were employed

21   by an entity other than the government.  They were employed

22   by USIP.  So that is Exhibit 5 to our reply brief.

23        The interpretation is there from the Executive

24   Office of the President at the time, and the government has

25   no response to that.  They don't mention it.  They don't

1    refer to it.  They can't deal with it.

2           Now, it's not only that.  But our Exhibit 4 is an

3    opinion from the associate general counsel of OPM in 1987

4    having to do with the pay scales for people employed by the

5    USIP.  What the associate general counsel of OPM said was

6    that:  As an independent nonprofit corporation, USIP is not

7    an executive agency under 5 U.S.C. 105 or Chapter 51 of

8    Title 5.

9           It is not an executive agency.

10           We have two opinions from the '80s that say it's

11    not an element or entity of the government.

12           THE COURT:  Mr. Murphy, this is --

13           MR. MURPHY:  And it's not an executive branch

14    entity.

15           THE COURT:  -- this is one of the problems I have

16    with that; and that is that the political branches can use

17    whatever words they want to describe an "entity."

18           We live in a complicated world.  We have a diverse

19    country.  And the political branches figure out what they

20    think needs to be done to govern us the best they can.

21           Congress certainly has the power to say whether an

22    entity created by Congress is subject to certain statutes,

23    or not; certain benefits, or not.  But the issue of where an

24    entity -- whether an entity is or is not as a constitutional

25    matter -- and a government entity is something that the

1    Supreme Court has emphatically said is not up to the

2    political branches, it's up to the third branch; that

3    happens to be me right now.

4          The Supreme Court in *Lebron* and in other cases

5    involving Amtrak where the -- you know, in cases where the

6    D.C. Circuit said:  Amtrak is clearly a private entity.  I

7    mean, it's not subject -- we can't treat it like a federal

8    agency.  It's not subject to all of those laws that apply to

9    the federal agency.  It's not subject to the Fifth Amendment

10   or First Amendment.

11         The Supreme Court said:  Hmm, the D.C. Circuit

12   relied too heavily on how Congress decided to call Amtrak.

13   And that is not binding on the courts.

14         So the Supreme Court -- I am waiting for you to

15   cite an Article III court, hopefully binding precedent on

16   me; and then, that will relieve me of being the first court

17   to have to make the decision about what USIP is.

18         But a political branch determination of what USIP

19   is for purposes of government benefits, application of a

20   particular statute to USIP is something that the Supreme

21   Court has made clear is an Article III decision.

22         Not that we ignore what the statute says or what

23   the political branches say -- we have to be respectful of

24   that, but not defer to it.

25         The Supreme Court has been pretty clear that when

11

1    we make -- we, Article III judges, address the

2    constitutional issue of:  What is an entity?  Is it a

3    government entity subject to -- is it under the federal

4    government?

5            No matter what the political branches have said

6    it's entitled to, how it should be treated, whether it's

7    entitled to sovereign immunity, whether it's entitled to the

8    pay scale for federal government workers, or anything else,

9    the Supreme Court has said you look at a number of

10   different -- three, basically -- three different factors.

11   They were clear about that in *Lebron*.

12           So in *Lebron* -- from my reading of *Lebron* and

13   subsequent cases, they wanted to look at factors like:  Who

14   created it?  Who funds it?  Is it a creation of the federal

15   government?  Those are the factors that I feel that guide my

16   analysis here of -- one could say is the first threshold

17   question:  Is it a government entity? -- or is it, as you

18   say, not a government entity at all?  So... yes.

19           MR. MURPHY:  Okay.  I hear you.

20           Let me just point out:  I don't think we can

21   disregard the statutes that Congress enacted -- not just the

22   USIP statute, but the basic statutes that govern what are

23   and what are not federal entities.

24           5 U.S.C. Section 105 is the comprehensive statute

25   that the government says covers USIP.  And yet, the Office

1   of Management and Budget determined, in 1987, that USIP is

2   not an entity under Section 105.  In 5 U.S.C. Section 5103,

3   Congress has stated that the Office of Management and Budget

4   gets the final word on those classifications.  So I think

5   that's important.

6          The OMB gets the final word on what is or is not a

7   105 entity; and they said that USIP is not.  That's, to me,

8   important.

9          THE COURT:  I get that.

10          Frankly, at the TRO -- in the TRO posture, when I

11  was trying to figure out:  Well, how much deference should I

12  give to that? -- the Supreme Court's analysis is, basically,

13  not much at all.  The constitutional analysis has to be

14  somewhat different.

15          I just want to get some basic facts down first.

16          MR. MURPHY:  Okay.

17          THE COURT:  If you know.  And they may be

18  questions that only Mr. Hudak can answer.

19          But since our last hearing in this case, on

20  April 1, are you aware of any further assets being

21  transferred out of USIP beyond its building?

22          For example, the endowment or the endowment funds,

23  have they been transferred out of USIP?

24          MR. MURPHY:  Our understanding is that the

25  endowment funds have been transferred.

1    THE COURT:  And do you know where they have been

2    transferred to?

3    MR. MURPHY:  I do not.

4    THE COURT:  Okay.  And how many employees does

5    USIP have now in total?

6    MR. MURPHY:  My understanding is that there are

7    approximately four.  There are precisely four at the

8    headquarters building; I think two IT persons and a couple

9    of other staff-type folks who are helping to wind down

10   whatever operations remain.  And that -- overseas, everyone

11   has been notified that their -- they will be terminated by

12   the end of May, and that their only function that they can

13   perform is to help wind down all of the operations of the

14   entity.

15   THE COURT:  Okay.

16   MR. MURPHY:  That's my understanding.

17   THE COURT:  And for the overseas employees, are

18   the overseas employees contractors or --

19   MR. MURPHY:  Both.

20   THE COURT:  -- employees?  Okay.

21   MR. MURPHY:  Both.  Both.

22   THE COURT:  And how many -- so if there are four

23   employees still working at the headquarters here in D.C.,

24   how many are now overseas?

25   MR. MURPHY:  I think just a handful.  I mean,

**JA197**

14

```
 1    literally, a handful.

 2              THE COURT:  All right.  And that includes both

 3    employees and contractors, just to be clear?

 4              MR. MURPHY:  That's right.  That's right.

 5              THE COURT:  Okay.  Do you know what activities,

 6    programs, if any, still remain in tact and functioning?

 7              MR. MURPHY:  So the supplemental declaration from

 8    Ambassador Moose, which we submitted with our reply brief,

 9    basically states what we knew as of that time, and it hasn't

10    changed.  There are no programmatic activities being

11    undertaken by USIP.

12              THE COURT:  Okay.

13              MR MURPHY:  Zero.

14              THE COURT:  Okay.  And that includes both the

15    statutory tasks that shall be done and those that may be

16    done?

17              MR. MURPHY:  That is correct.

18              THE COURT:  Both the "shall" and the "may"?

19              MR. MURPHY:  That is correct, Your Honor.

20              And the example of the "shall," I think, is the

21    most recent -- the Gandhi-King Global Academy, which

22    Congress in 2020, as part of the appropriations bill,

23    created and -- actually directed USIP to create this academy

24    of research folks on nonviolence, and said that they would

25    have to report to Congress periodically on accomplishing
```

1    that goal.  It was a five-year program.  The program has

2    been completely shut down.  We have an affidavit or

3    declaration from the person in charge of the program who

4    says that she's gone, everybody else involved with the

5    program is gone.  And Congress's direction that there shall

6    be such a program has been nullified.

7            THE COURT:  Okay.

8            MR. MURPHY:  Can I continue and try to answer your

9    questions?

10           THE COURT:  Yes.  Yes.

11           MR. MURPHY:  So I think it's important to say --

12   to focus on what Congress's purpose was and what it

13   described when it created USIP.  It is -- in the purpose

14   statute, it described as an:  Independent, nonprofit

15   national institute.

16           "Institute" is an unusual word.  It's not an

17   "entity."  It's not an "executive branch agency."  It's not

18   a nongovernmental corporation owned by the United States.

19   It's an institute.

20           It was designed to be something akin to an

21   academic institution, as legislative history makes that

22   clear.

23           Howard University is an institute in that sense,

24   it's created by Congress.  It's not part of the executive

25   branch.

1      THE COURT:  Just so the record is absolutely

2  clear, in your briefing -- at the beginning of this case,

3  the plaintiffs took the position that USIP was not part of

4  the federal government.

5      MR. MURPHY:  Right.

6      THE COURT:  I understood from the briefing that

7  you were sort of backing away from that a little bit and not

8  taking a position as to whether USIP was part of the federal

9  government.  That's what the government seized on -- or the

10  defendant seized on, to say:  Ah, see, they're conceding

11  they're part of the federal government.

12      But now -- just to be totally clear, you have gone

13  back to the original position, from where I sit, USIP is not

14  part of the federal government; is that clear?

15      MR. MURPHY:  That is correct, Your Honor.

16      Our position is twofold, that:  A, USIP is not

17  part of the federal government; but B, if the Court

18  determines that it is, it's not part of the executive branch

19  of the federal government.  As a subcategory of that, it

20  does not perform substantial executive functions; which,

21  when we get into the *Humphrey's Executor* issues, is what is

22  most significant.

23      But I think we can avoid those issues -- as Your

24  Honor knows, that's been our position:  You don't have to go

25  there.  There is no Article II issue if all we have is a

1    nongovernmental entity that Congress certainly has

2    established.  But when Congress set it up, it said that:

3    The President shall appoint board members subject to the

4    advice and consent of the Senate, and they may not be

5    removed absent cause.

6         And so there is no Article II issue if there is no

7    executive function being performed by that entity.  That's

8    our position.

9         THE COURT:  Okay.  And with respect to the

10   defendants' challenge to the plaintiffs, counsel's ability,

11   basically, to represent the Institute here -- from the

12   government's perspective, because the plaintiff board

13   members and Plaintiff Moose are no longer leading the

14   Institute -- what is your response to that?

15        MR. MURPHY:  So our response is that the action of

16   the President in terminating the positions of the board, the

17   11 board members, other than the three who are ex officio,

18   was *ultra vires* and had no effect.  They are still the

19   board.

20        The plaintiffs include six board members, which is

21   a majority of the board.  And my understanding is that there

22   are two others who are willing to serve, if the Court rules

23   our way.  I don't know about the other two.  So there were

24   four that did not join in the lawsuit, but two of them are

25   sort of on the sidelines waiting to see what happens.

1      So the majority of the board is still in place, in

2   our view, because they were never properly removed.

3          THE COURT:  All right.  So let me just be blunt.

4   Do you need the Institute as a plaintiff in this case, or is

5   that sort of beside the point?

6          MR. MURPHY:  I think that the Institute is a

7   proper plaintiff in that part of our complaint alleges --

8   contrary to what the government has argued in their most

9   recent brief, part of our complaint alleges that the things

10  that have been done since the improper removal of the board

11  and the improper removal of the president, Ambassador

12  Moose -- those things should be corrected by the Court.

13  There should be both declaratory and injunctive relief to

14  stop the ongoing -- and it is ongoing -- dissolution of the

15  USIP and the termination of all of its functions, including

16  those functions that Congress mandated it to perform.

17         THE COURT:  So it's your position that you do need

18  the Institute as a plaintiff in this action in order to

19  obtain all of the relief you seek as spelled out in your

20  proposed order?

21         MR. MURPHY:  I don't think I would go there

22  necessarily, Your Honor.  I am not saying we necessarily

23  need the USIP as an entity.  I think it is proper.

24         I wouldn't say that if only the board members who

25  have been improperly removed were plaintiffs that we

1    couldn't get that relief because, after all, they have

2    fiduciary duties under D.C. corporation law to the entity.

3    And they would like to perform those fiduciary obligations

4    but they are being prevented from doing so.

5            I don't think the entity is a necessary plaintiff,

6    but I think it is a proper plaintiff.

7            And let me just comment, you mentioned the

8    *Pippenger* case.  In that case, the relief that is being

9    sought against USIP is in the alternative.  They have taken

10   the very clear position that:  If the Court reinstates the

11   board and the president, that there would be no need for

12   them to be suing the USIP.  It's only if we do not prevail

13   in this matter that they would seek to then say:  Well, the

14   USIP at -- whatever remains of it is violating the

15   Administrative Procedure Act.

16           THE COURT:  Okay.  So let's go back to the subject

17   you opened on, as to whether USIP is part of the federal

18   government or not.

19           In the cases where this has become an issue -- and

20   *Amtrak* is sort of the leading case on this because the

21   D.C. Circuit had found Amtrak to be a private entity.  And

22   the Supreme Court was pretty emphatic they were wrong on

23   that, and set out these three factors that I alluded to to

24   analyze that issue, making clear that it didn't matter what

25   the political branches called Amtrak.

1          So I would just like to look at those factors --

2          MR. MURPHY:  Sure.

3          THE COURT:  -- as just an outline; the *Lebron* look

4     at whether the government created the corporation by special

5     law.  And I don't think there is any dispute here that that

6     factor is met here, because USIP was created by Congress in

7     a special statute; would you agree?

8          MR. MURPHY:  I agree that they established it as

9     an institute.  A nonprofit, independent institute.

10          THE COURT:  Well --

11          MR. MURPHY:  Yes.

12          THE COURT:  -- I view it a separate -- unlike the

13     government, which says if it is a government entity, it has

14     to be an executive branch agency --

15          MR. MURPHY:  No.

16          THE COURT:  -- I view this as separate questions;

17     and that's how the Supreme Court has analyzed this.

18          MR. MURPHY:  Okay.

19          THE COURT:  Is it a government entity?  And then,

20     once look at that, you go to the next issue:  Where does it

21     land under our constitutional scheme?  Is it one of the

22     three branches or not?

23          The government thinks you can't have something

24     outside the three branches.  But we will get to that in a

25     second.

1     I just want to start with the first question where

2     the parties have a dispute, because I want to be clear about

3     the parties' position and their reasoning for my benefit.

4          Three factors set out by the Supreme Court for

5     whether something is a government entity.  I mean, the

6     Supreme Court never made clear whether Amtrak was in any one

7     particular branch of government.  They just said:  Is it or

8     is it not a government entity? -- without saying whether it

9     was in the executive branch or not.

10         Okay.  One, the government created the corporation

11    by special law.

12         Is there a dispute that that factor is or is not

13    met here?

14         MR. MURPHY:  USIP was created by Congress, agreed.

15         THE COURT:  Second factor, for the furtherance of

16    government objectives?

17         MR. MURPHY:  I think that's a mixed question --

18    the answer to it is mixed in this setting.  Because

19    certainly, Congress, in its statement of purposes, said that

20    there were certain governmental purposes, public purposes

21    that would be served.  But at the same time they recognized

22    that in order to most effectively fulfill those purposes, it

23    ought to be separated from the government; it ought to be

24    independent so that it could perform its role as a neutral,

25    honest broker who could both teach and do research on

1    nonviolent resolution of conflict and actually go into the

2    field from time to time and help to do that -- not just with

3    the government, but with foreign governments, NGOs, civic

4    societies, and foreign countries where the USIP is viewed --

5    and I think this is important -- I think it's very important

6    to include in your factors:  What does it do?  What

7    functions does it actually serve?

8            I think we tried to give the Court ample

9    material -- and there are 16 declarations from people who

10    know what they did in the field and how different it was

11    from what government entities do in the field.

12            THE COURT:  Okay.  Well, for furtherance of

13    government objectives, so you think it has some?

14            MR. MURPHY:  It does have some --

15            THE COURT:  Because clearly, I think -- if you

16    look at the purpose, part of the organic statute of USIP,

17    they thought it was significant enough.  I mean, USIP was

18    created after a whole commission said the government needed

19    this; this would be useful to the government, the research,

20    the congressional reliance on some studies, and the

21    expertise of USIP.  They created USIP with a number of

22    government objectives to serve the government, different

23    branches of the government, and in order to ensure its

24    independence -- which I also appreciate Congress thought was

25    important for USIP to have.  Congress used other tools at

1    its disposal to help protect its independence, for-cause

2    removal being one of those aspects of independence.

3            MR. MURPHY:  Your Honor, may I just say --

4            THE COURT:  Yes.

5            MR. MURPHY:  Congress has created dozens, scores

6    of entities that form -- that serve public purposes.

7    Title 36 includes a score of them, many scores of them.  I

8    was surprised, when I looked at Title 36, to see how many of

9    them there are.

10            But just because Congress created them to serve a

11    public purpose doesn't mean that the Daughters of the

12    American Revolution is a part of the government or a part of

13    the executive branch, just to give one example out of so

14    many that are --

15            THE COURT:  Yes.  But those are charters versus

16    original-created organizations.

17            MR. MURPHY:  Well, some of them were originally

18    created, like the U.S. Olympic Committee; it didn't really

19    exist in that form until Congress created it.  But it's been

20    held by the Supreme Court not to be part of the federal

21    government.  So there is that.

22            I think that the fact of creation is not, you

23    know, really -- and that that creation served a public

24    purpose is really not an answer to the question.  I think

25    you --

1          THE COURT:  Okay.  Well, there is a third factor

2     under *Lebron*.

3          MR. MURPHY:  Yeah.

4          THE COURT:  First factor:  Government created it

5     for the furtherance of government objectives, and retained

6     for itself permanent authority to appoint a majority of the

7     directors.

8          The Supreme Court laid out those factors, analyzed

9     Amtrak under those factors.  They said it is clearly a

10    government entity under the Supreme Court -- which is

11    binding on me for -- purposes -- and, therefore, the Supreme

12    Court said Amtrak was subject to the First Amendment.

13          MR. MURPHY:  It is.

14          THE COURT:  And that is what they have confirmed

15    in *Department of Transportation v. Association of American

16    Railroads,* decided 20 years later, in 2015.

17          In that case, the Supreme Court looked at Amtrak

18    to decide whether it was subject to the Constitution for

19    purposes of not just the First Amendment but for purposes of

20    separation of powers.

21          MR. MURPHY:  Correct.

22          THE COURT:  And they applied the same analysis.

23          MR. MURPHY:  But I think central to both of those

24    cases was an analysis of:  What was at issue?

25          In the *Amtrak* case it was whether the First

1    Amendment prevented a director of Amtrak to decide that a

2    particular poster was too political to be displayed at the

3    old Penn Station; and that was the issue.  That was an

4    important issue, and the context of that decision I think is

5    important.

6          In the subsequent case, it was an effort to place

7    folks who are not part of the government in a position to

8    make rules and regulations about the extent to which Amtrak

9    trains would get priority over the Conrail lines.  So it was

10   a -- you know, it was a delegation of executive power to

11   people that weren't part of the government, unless they were

12   part of the government.  So then they said:  Okay.  Well,

13   for this purpose, then, Amtrak is part of the government.

14         I think that's very important.  They were not

15   removal clause cases.  They did not really have to do with

16   the President's Article II powers to execute the laws, which

17   is what our case is about.  So I think that's a big

18   difference.

19         Look, there are a number of other entities; we

20   have not talked about all of these entities.  But, you

21   know -- and if you think about it, the legal --

22         THE COURT:  Well, let me just say -- and you can

23   tell me where I am wrong.

24         The plaintiffs rely on the *U.S. Olympic Committee*

25   case to say -- there, the Supreme Court looked at the U.S.

1    Olympic Committee and said:  This is a private entity.  This

2    isn't a government entity because the government doesn't

3    really have an interest.  And as a function, the government

4    is not involved in doing sports events.

5         But the *Olympic Committee* case was in 1987.  Both

6    *Lebron* and *Association of American Railroads* came after

7    that.  And it seemed like the Supreme Court sort of changed

8    its test to the three-factor test, not this functional test

9    that they seem to allude to in the *U.S. Olympic Committee*.

10        Am I wrong on that?

11        MR. MURPHY:  They certainly did not -- I don't

12   think they addressed the *U.S. Olympic Committee* decision.

13   They certainly didn't overrule it.

14        THE COURT:  Well, they sort of ignored it, and

15   said:  This is the three-factor test we're using.

16        And then they adopted it in *Lebron* and then

17   reiterated it, almost 20 years later --

18        MR. MURPHY:  For the purposes --

19        THE COURT:  -- in 2015.

20        MR. MURPHY:  I'm sorry.

21        For the purposes of the issues before them at the

22   time, the question whether the First Amendment applied to

23   Amtrak when it was an organization that clearly had a lot of

24   federal contacts and federal control over it, and so could

25   the government avoid its First Amendment obligations by

1    saying:  Oh, no, this is a private company -- that's a much

2    different context.

3              THE COURT:  Let me go to your alternative

4    argument.

5              I understand why you are going back to your

6    original argument that USIP is not a government entity at

7    all because:  If it's not a government entity at all, not

8    only is it not within Article II, it's not subject to the

9    President's unilateral removal authority under the

10    jurisprudence starting from *Myers* -- by former President,

11    then-Chief Justice Taft -- all the way to the present; with

12    that line of jurisprudence it just would be inapplicable if

13    it's not a government entity.  And you went across the

14    board, I get that.

15              MR. MURPHY:  It would make the Court's decision

16    easier in that respect.

17              THE COURT:  It certainly would.  It certainly

18    would.

19              But I just cannot take the easy way out here when

20    I have got Supreme Court precedence that I think dictates

21    something different.

22              Let's go to the second question, which is your

23    alternative argument, that -- whether USIP is part of the

24    executive branch for purposes of the separation of powers

25    constitutional question that is raised by what the President

1    did here in using unilateral removal power of the -- you

2    know, for the directors.

3            The defendants argue quite forcefully that:  The

4    Institute is predominantly tasked with enhancing U.S.

5    diplomacy and foreign policy efforts in an attempt to

6    obviate the need for military action, and these clearly fall

7    within the ambit of Article II executive powers.

8            I want to start with where there is an area of

9    agreement.

10           Do the plaintiffs agree that foreign diplomacy and

11   foreign affairs are areas traditionally relegated to the

12   executive branch where the executive has, as part of its

13   core, constitutional authorities?

14           MR. MURPHY:  When they are performed by government

15   officials, diplomacy; the war power clearly are executive

16   decisions.

17           THE COURT:  So you are basically saying:  If it's

18   a government entity engaging in those activities, then it

19   must be an Article II.  Is that what you are saying?

20           MR. MURPHY:  And I would say -- if it's an

21   executive branch agency.  If we're going to go to the second

22   level of the question here:  Is USIP within the executive

23   branch?

24           THE COURT:  The question is:  Is USIP within the

25   executive branch?

```
 1              MR. MURPHY:  Right.

 2              THE COURT:  The government's view on that has two

 3    different tags --

 4              Mr. Hudak, you will be free to correct me if I am

 5    misunderstanding your able presentation in your briefing,

 6    and before.

 7              But as I understand it, the defendants' position

 8    is two-pronged:  USIP plays in the playground of foreign

 9    diplomacy, stopping military action, and gaining peace; and

10    that those are core executive branch powers of the

11    President, to deal with international relations; foreign

12    relations.

13              And the second reasoning that the defendants have

14    presented is:  If it doesn't exercise legislative powers and

15    it doesn't exercise judicial powers, it's not an

16    adjudicatory body; it's not a legislative body.  The only

17    thing left is the executive branch, so it must sit there.

18    Which is an assumption, that it has got to sit in the

19    executive branch if it doesn't sit in the other two -- which

20    is an assumption that is an interesting one.

21              What is your position on that?

22              MR. MURPHY:  My position on that is that they rely

23    heavily, for the first time in their reply brief, on the

24    Springer decision from 1928.  I mean, that's the -- they

25    cite Buckley v. Valeo.  But they miscite it because Buckley
```

1      *v. Valeo* does not say that there are only three branches.

2      It says there are three branches.  And they -- to the

3      extent -- you know, it deals to the extent that they

4      interact with each other, and that there should be some

5      separation between the three.  It doesn't say there's

6      nothing else.  *Springer* sort of says that.

7            But in the context of the Organic Act of the

8      Philippines, which is not really relevant to today's

9      world -- but the Organic Act of the Philippines said that

10     the governor of the Philippines has all of the executive

11     power to direct everything that was done.  The legislature

12     of the Philippines created a role for itself in placing

13     members on various boards -- the national bank of the

14     Philippines, the national gas company of the Philippines --

15     whatever companies they had, the legislative branch in the

16     Philippines put their own people in positions of authority

17     there.

18            In analogizing it to our system, the Court said:

19     Well, it's not legislative and it's not judicial, so it must

20     be executive.

21            And I thought -- and the government says that

22     there is no exception recognized to that principle.  Well,

23     actually, in *Springer* -- and I think this is really

24     significant because it predates a lot of these agencies that

25     have been created since.

1      But in *Springer* what the Supreme Court majority

2 said was that:  It is argued that Congress, in creating

3 corporations for governmental purposes, has sometimes

4 devolved the voting power in such corporations upon

5 persons --

6      (Court reporter clarification.)

7      MR. MURPHY:  I'm sorry.

8      -- voting powers upon persons other than executive

9 officers.

10      In the case of the Smithsonian Institution, cited

11 as an example Congress provided for a governing board of

12 regents composed, in part, of members of the Senate and of

13 the house.

14      There are two or three other instances in respect

15 of nonstock organizations of like character.

16      But the court majority goes on to say:  But we

17 think that those are too few to really deviate from what we

18 want to hold with respect to the Organic Act of the

19 Philippines.

20      And then Justice Holmes and Brandeis, I think, are

21 entitled to some respect even when they dissent.

22      Holmes said that this whole analysis by the

23 majority was wrong because:  We cannot and do not make

24 distinctions between the legislative and executive actions

25 with mathematical precision and divide the branches into

1    watertight compartments, were it ever so desirable to do so,

2    which I am far from believing it is or that the Constitution

3    requires.

4         And he says further that:  Congress long ago

5    established the Smithsonian Institution, to question which

6    would be to lay hands on the Ark of the Covenant, not to

7    speak of later similar exercises of power hitherto

8    unquestioned, as far as I know.  I think it would be

9    lamentable even to hint a doubt as to the legitimacy of the

10   action of Congress in establishing the Smithsonian as it

11   did.

12        There are many other institutions like the

13   Smithsonian today, some of which may have existed in 1928;

14   but the Court majority just settled them [sic] and

15   disregarded them.

16        But there is no law -- there is no law that says

17   there are only three things that Congress can create, and

18   they either have to be executive, legislative, or judicial.

19   That's not the law.  And --

20        THE COURT:  Yes.  Well, I am very curious about

21   where Mr. Hudak will say the Smithsonian rests within our

22   constitutional framework.

23        I searched your papers to find out:  Where do you

24   think the Smithsonian sits then, if you think that you have

25   to be in one of the three branches?

 1              Okay.  So let me --

 2              MR. MURPHY:  Can I continue, Your Honor, just with

 3    some other examples?

 4              THE COURT:  Sure, sure.

 5              MR. MURPHY:  I mean, the Legal Services

 6    Corporation, where does that belong?

 7              You mentioned, I think, at the last hearing the

 8    grand jury, which has been recognized to be not part of

 9    any -- of the three branches.

10              But how about the public defender's organizations?

11    Are they executive?  Are they judicial?  What are they?

12              THE COURT:  Well, public -- well, the Federal

13    Public Defender is actually -- come within -- we have a

14    whole judicial conference committee on public defenders.

15              MR. MURPHY:  You do.  You do.

16              THE COURT:  They're funded through the

17    judiciary --

18              MR. MURPHY:  But are they part of the judiciary?

19    I mean, I think a typical federal public defender probably

20    thinks, when he appears in court defending a defendant, that

21    he is not part of the judiciary; he is a representative of

22    the defendant.

23              So the Red Cross; the Library of Congress, which I

24    guess may be tested sometime soon.  I always thought it was

25    part of Congress, but maybe it's not.

34

1          THE COURT:  Well, I have thought that perhaps the

2     reasoning that happens in this case might be probative of

3     other --

4          MR. MURPHY:  Right.

5          THE COURT:  -- exercises of the President's

6     removal power beyond pure executive -- beyond those entities

7     we think of as purely Article II entities.

8          MR. MURPHY:  Holmes was right.  You cannot draw

9     with mathematical certainty dividing lines between the three

10    branches, and USIP is an example of that.

11         THE COURT:  Okay.  So let's say the government --

12    the defendants lose on the second prong of their argument,

13    which is:  Everything created by Congress has got to sit in

14    one of the three branches, which is an assumption -- as I

15    said at one of our last hearings, I have a question about

16    whether that is actually an assumption that plays out in

17    operation.

18         But there is a second prong.  The second prong

19    which, at first blush, has a lot of persuasive power, which

20    is:  Core presidential duties are foreign relations.  And

21    USIP -- and diplomacy on behalf of the country -- pure, you

22    know, core presidential powers -- and so that's the second

23    prong.

24         Facilitating peace agreements among foreign groups

25    or discussing potential solutions to global conflict, that

1    sure sounds a lot like core presidential powers.  That's the

2    second -- that's the second prong of the defendants'

3    position why USIP properly sits within the executive branch

4    and functions and exercises powers that are executive in

5    nature.

6         USIP's work, in many of its tasks under its

7    organic statute -- the training, the education, and so on --

8    you know, in the foreign relations sphere, may not be this

9    foreign diplomacy, dealing with global conflicts abroad,

10   kind of core presidential power.  But the on-the-ground

11   projects that USIP works with sound to me like more falling

12   within some of these core presidential exercise of power.

13        USIP's conversations, for example, that

14   Christopher Bosley talked about; conversations with

15   representatives from multiple different countries to

16   understand dynamics in the U.S. government's efforts to

17   repatriate foreign terrorist fighters -- how is that not a

18   project in aid of the executive branch's foreign affairs and

19   war powers?

20        MR. MURPHY:  Your Honor, what I would say is --

21   and there are a lot of examples in the declarations.

22        THE COURT:  Well, I mean, talking to the North

23   Korean representatives --

24        MR. MURPHY:  Right.

25        THE COURT:  -- to improve U.S.-North Korea

1    relations, how is that -- how are the defendants not

2    correct?

3           MR. MURPHY:  Our government historically has not

4    had relations with North Korea, okay?

5           So the fact that USIP can go and meet with someone

6    from North Korea, they are not doing it as a representative

7    of the United States; they're doing it in furtherance of

8    their mission to engage with people overseas about

9    resolution of disputes through nonviolence.

10          When Azerbaijan and Armenia had a border dispute,

11   USIP was involved in bringing those parties together; and

12   the result was a treaty.  It wasn't a treaty to which the

13   United States was a party.  The United States was not part

14   of that.  USIP did that as an independent, third party

15   engaged as an honest broker in trying to bring people

16   together.

17          The same is true with respect to many other of the

18   projects that are described.  Kyrgyzstan and Tajikistan had

19   another similar matter; there is a reference in the Robinson

20   Declaration to the resolution of that -- I'm sorry, the

21   Health Declaration.

22          So a lot of what they do at USIP is in response to

23   things that Congress asks them to do.  There are these study

24   groups that were convened -- the Afghan study group, the

25   Iraq study group, the Gaza study group -- where USIP takes

1   part and brings people together from those regions, but not

2   as a government of the United States.

3           If they were part of the government of the

4   United States, the people probably wouldn't come and meet

5   with them because they would be viewed as taking one side or

6   the other.  USIP has the ability, as a private

7   nongovernmental entity, to facilitate resolutions of

8   disputes overseas, which is -- you know, is it in the

9   interest of the United States?  Yeah.  It's in the interest

10  of the whole world to stop wars from breaking out over

11  border disputes or ethnic disputes.

12          When USIP works in this role -- and then there is

13  this discussion of Track 1.5 and Track 2.0 diplomacy.  The

14  key to both of those kinds of diplomacy is the entity that's

15  bringing people together is not part of the United States

16  government.  Because if it were, it won't work.  That's the

17  belief.  That's what's happened in fact.  That's the results

18  that have been achieved because it is not an executive

19  branch agency.

20          They do not answer to the State Department.  They

21  do not answer to the Defense Department.

22          When they go overseas on a mission, they don't

23  report to the ambassador.  These folks do not swear an oath

24  to uphold the Constitution of the United States, like

25  everybody in the Foreign Service does.

1    They are private folks who are engaged in

2    nonviolent teaching, research, and in the field bringing

3    those principles to bear to resolve conflict.  That's what

4    they do.

5    THE COURT:  So I appreciate that USIP having

6    functional independence from the federal government and

7    specifically from the executive branch official tools of

8    diplomacy is critical to its ability to do what it does.

9    But from the perspective of a constitutional

10    analysis of:  What is it in service of?  What is it in

11    furtherance of?

12    It is ultimately in service of dealing with the

13    foreign relations of the U.S. government, though, isn't

14    it --

15    MR. MURPHY:  I wouldn't say --

16    THE COURT:  -- in furthering those interests?

17    MR. MURPHY:  I would not say it's the foreign

18    relations of the U.S. government.  I would not -- I think

19    that's a leap too far because sometimes it may not be.

20    And as Ambassador Moose --

21    THE COURT:  But how can it -- excuse me.

22    But how can it not be?

23    The Secretary of Defense and the Secretary of

24    State sit as voting ex officio members on the board, it can

25    use executive branch detailees from other agencies.  There

1    are lots of protections that the Congress built into the

2    USIP organic statute to ensure it wasn't -- in any of its

3    independent activities it was not acting against U.S.

4    government interests.

5           MR. MURPHY:  I wouldn't say that it's acting

6    against U.S. government interests.  But I would say that

7    it's not beholden to the U.S. government.  It doesn't take

8    direction from the U.S. government.

9           It might act on a suggestion of the U.S.

10   government, which it may or may not agree to do, as

11   Ambassador Moose says in his declaration.

12          Your Honor, think about the Carnegie Institute for

13   International Peace, they do the same sorts of things.

14   There are other organizations that do the same sorts of

15   things.

16          THE COURT:  Is the Carnegie Institute for Peace

17   run by a board that is presidentially appointed?

18          MR. MURPHY:  It is not.  But the fact that it does

19   what it does --

20          THE COURT:  Was it created by Congress, by

21   statute?

22          MR. MURPHY:  I don't believe it was.  But the fact

23   that it does what it does doesn't make it beholden to the

24   President of the United States or part of the executive

25   branch, or that doesn't mean that it is engaging in an

1    executive function just because they're trying to bring

2    about a peaceful resolution of a conflict.

3            Which is really -- the argument that's being made

4    is:  Well, if you're bringing about a peaceful resolution of

5    a conflict, then you must be part of the President's foreign

6    affairs power.

7            THE COURT:  Well, let me just look to one other --

8    I mean, the precedent for this, the guidance for this, and

9    the law is scarce.

10           Let me just get your reaction to *Bowsher v. Synar*,

11   a 1986 Supreme Court case, where the Supreme Court looked to

12   the fact that the Comptroller General was subject to

13   statutory for-cause removal authority by Congress, not the

14   President.  The Supreme Court seized on the congressional

15   for-cause removal power to say, Ha, aha, Comptroller General

16   must be in the legislative branch because Congress said:  We

17   have removal power for cause.

18           The Supreme Court seized on that to say -- so the

19   Comptroller General may not exercise any executive power and

20   said whatever the Comptroller General had done that

21   encroached on executive power had to be null and void, in

22   terms of a deficit reduction which was at issue in that

23   case.

24           But by that reasoning -- that the Supreme Court

25   looked at who could exercise the removal power, even if it

1    was for cause.  There, it was Congress.  So they said it

2    must be -- the Comptroller General is in the legislative

3    branch.

4         Why can't that reasoning, by analogy, apply

5    here? -- where the President -- Congress gave the President

6    removal power -- for-cause removal power, to say that USIP

7    must be in the executive branch?

8         MR. MURPHY:  I don't think that analogy works,

9    Your Honor.

10        THE COURT:  Why?

11        MR. MURPHY:  Here is why:  In *Bowsher,* the issue

12   was:  The comptroller was given the ability to undo budget

13   proposals that the comptroller and the GAO felt were not

14   consistent with the overall goal of balancing the budget.

15        So the comptroller was performing an executive

16   function, clearly an executive function.  He was kind of the

17   head of the budget process.  So --

18        THE COURT:  Not the President.

19        MR. MURPHY:  Right.  And he didn't report to the

20   President.  He reported to the Congress.  And that was an

21   aggrandizement of congressional power over an executive

22   function, which the court, in a whole line of decisions, has

23   said Congress can't do.

24        But that doesn't really apply here.  Here, the

25   question is:  Has the President lawfully ended the tenure of

1    these board members under the statute which gave them the

2    power to appoint them?

3              It also said:  You are limited in your ability to

4    remove them.

5              And the government relies on this notion that,

6    well, you know, the power of appointment implies the power

7    of removal.  But in all the cases that say that --

8              THE COURT:  Well, I am not sure -- I'm not sure

9    that the defendants have gone that far.  But it's one of the

10   things I want to explore with Mr. Hudak, how far are they

11   going?  Are they going as far to say:  Presidential

12   appointment means presidential removal power?

13             But I am not sure they have gone that far here.

14             MR. MURPHY:  Well, they say it at various points

15   in the papers that they have filed.  I don't know to what

16   extent they think that applies to everything.

17             But the key caveat to that always has been:

18   Unless Congress says otherwise, unless Congress makes it

19   clear that the President's removal power does not extend to

20   his unlimited ability to force a removal.

21             THE COURT:  I think the law has been pretty clear

22   that -- even with the Supreme Court's most current

23   jurisprudence on the president's removal power, that it's

24   limited to executive branch entities exercising executive

25   branch power that is more than *de minimis*.

1              MR. MURPHY:  Right.

2              THE COURT:  It's got to be substantial executive

3    branch power.

4              MR. MURPHY:  Right.

5              THE COURT:  So I think that that's what --

6              MR. MURPHY:  And we hope that remains the case.

7              THE COURT:  Well, we'll soon see.

8              MR. MURPHY:  We hope that remains the case.

9              THE COURT:  Let me go back to the second prong of

10   the defendants' argument here, that the playground that USIP

11   plays in is core presidential power.

12             Putting aside the teaching, the research, the

13   publishing of papers, the sort of educational roles that

14   USIP plays, in terms of its on-the-ground work, could you

15   explain to me why that isn't diplomacy, foreign relations

16   within the core powers of the President as an exercise of

17   executive power.

18             MR. MURPHY:  Well, I have tried to do that.  And I

19   think the answer remains that:  If they were, in fact,

20   employees of the State Department, the Foreign Service, or

21   part of the Defense Department and did those things, that

22   would be part of the President's core responsibility, but

23   they are not.

24             The whole reason for their being is that they are

25   not, because they can perform a role that our government

1    can't always perform.  And they do it in places where our

2    government is not always welcome.  They deal with folks

3    overseas who would absolutely reject any efforts by the

4    United States government to intercede in whatever what their

5    issues were.  But the USIP has the ability to do that

6    because they are recognized to be a nongovernmental, neutral

7    party who is trying to just bring people together and

8    resolve conflicts through peaceful means.

9              THE COURT:  Okay.

10             MR. MURPHY:  That's not what the State Department

11   does.  It's not what the Defense Department does.

12             Now, the government is aware what we're doing.

13   But I think -- you know, we have an amicus brief from 118

14   former government officials, military officers who say

15   exactly that:  These are things that we couldn't do, don't

16   do, but USIP does do and does it well.  And it's effective.

17   And so -- not only our own declarations, but from our actual

18   folks who were in the field up until March.

19             But it's buttressed by this affidavit -- or, I'm

20   sorry -- amicus brief from the people who know.

21             THE COURT:  All right.  The answer that you have

22   given me about why USIP doesn't exercise any executive power

23   would, to your mind, take it out of the *Myers* line of

24   absolute presidential removal power --

25             MR. MURPHY:  Yes.

1          THE COURT:  -- and put it sort of within the

2    *Humphrey's Executor* exemption?

3          MR. MURPHY:  You know, Your Honor, I think that

4    when you look at the extent to which USIP exercises

5    executive authority, if at all, it is *de minimis* in

6    comparison to -- to take an example -- the NLRB.  I mean, it

7    is really *de minimis* in the sense that:  Executive power is

8    usually thought of as interpreting a law and enforcing it.

9          THE COURT:  I am somewhat familiar with the NLRB,

10   and I might disagree with you on that.

11         MR. MURPHY:  I know you are.  I know you are.

12         I think we are easily on the other side of the

13   *Myers*/*Humphrey's* line.  We are on the *Humphrey's* side for

14   sure.  Because --

15         THE COURT:  Because it's your view that USIP

16   doesn't exercise adjudicatory power, legislative power, or

17   executive power.  So if *Humphrey's Executor* applies

18   anywhere, it applies to an entity that doesn't exercise any

19   government power at all?

20         Is that basically your argument?

21         MR. MURPHY:  That is, basically, my argument in a

22   nutshell.

23         THE COURT:  All right.  So let me turn to some of

24   the things you are asking for in your proposed order.

25         One of the things you ask for is:  A declaration

1   that the Institute's board members shall continue to serve

2   and may be removed only in conformity with 22 U.S.C. Section

3   4605(f).

4          That's one of the things you are asking me to do.

5   And that raises a question about (f)(3), which provides

6   that:  The President can remove a member upon a

7   recommendation of a majority of the members of certain House

8   committees and certain Senate committees.

9          Now, *Myers* -- and I think I may have raised this,

10  at least briefly, at the TRO hearing.  But *Myers* held

11  unconstitutional a statutory removal provision that required

12  the President to receive advice and consent of the Senate

13  before removing the Postmaster General.

14         *Myers,* in its most limited reading -- not the

15  expansive reading that it's been given subsequently, but in

16  its most limited reading that *Humphrey's Executor* actually

17  gave it -- that holding was that Congress can't retain

18  removal authority --

19         MR. MURPHY:  Right.

20         THE COURT:  -- over executive branch officials.

21         Here we have (f)(3), which gives congressional

22  committees a role in removal.

23         Do I have to analyze whether (f)(3) is

24  constitutional or not before I can issue a declaration that

25  you are asking me to do, that the board members may only be

```
 1    removed in conformity with 22 U.S.C. 4605(f)?

 2              MR. MURPHY:  Well, (f)(3) is part of (f).

 3              THE COURT:  So you are saying, yes, I have to

 4    analyze the constitutionality of (f)(3)?

 5              MR. MURPHY:  No.  No.  Your Honor --

 6              THE COURT:  Don't I have enough constitutional

 7    issues to deal with in this case already?

 8              MR. MURPHY:  You have plenty to deal with.

 9              So Myers' holding is that Congress, or the Senate,

10    doesn't have the ability to veto a decision by the President

11    to remove someone who is within his Article II authority;

12    okay?  That was a veto by Congress of the ability of the

13    President to fire a postmaster.

14              This is not a veto provision.

15              This is a provision that:  If the President would

16    like to remove someone but he doesn't have cause, the person

17    hasn't been -- he hasn't consulted with the board and

18    determined that the person is engaged in malfeasance or, you

19    know, some bad act -- action; he could also say:  If these

20    congressional committees recommend it, I can fire this

21    person.

22              It gives him additional authority.  It doesn't

23    take any authority away.  So --

24              THE COURT:  So it would be constitutional under

25    Myers.
```

```
 1              MR. MURPHY:  It is constitutional, yes.

 2              THE COURT:  I see.  Okay.

 3              Now, in terms of other things that you want

 4      declared and enjoined, you want declared that:  The

 5      resolution purportedly adopted by two directors directing

 6      Nate Cavanaugh to transfer USIP's building and assets to GSA

 7      was unlawful, null and void, and without legal effect.

 8              Is that something I can declare?

 9              But in terms of injunctive relief, how -- without

10      GSA in front of me -- am I able to do an injunctive relief

11      to order defendants from further trespass against the real

12      and personal property belonging to the Institute and its

13      employees, contractors, agents, and other representatives?

14              MR. MURPHY:  So we're asking for the declaratory

15      relief because what they did they didn't have the authority

16      to do.

17              I would think that the injunction would just say

18      that you can't do anything further with respect to efforts

19      to do something with the property, other than restore it to

20      USIP.

21              We don't know what the status of the building is,

22      really.  I mean, I think at the last -- not the last hearing

23      with the employees, but the last hearing that you had on the

24      mandamus effort, the government announced that the building

25      is going to go to the Labor Department.  I was a little
```

1    surprised by that.  My wife worked for the Labor Department

2    for 40 years, it's a very large building.

3            THE COURT:  I think I mentioned something like

4    that, because we can see it right across the street.

5            MR. MURPHY:  You know, it's across the --

6            THE COURT:  I thought it was, like, really big.  I

7    didn't know they would need more space.

8            MR. MURPHY:  It's across the street.  It's a huge

9    building.  I said to my wife -- she's been retired for a

10   while.  I said:  Were you cramped for space over there?

11           She said:  Oh, no.  There's plenty of empty space.

12   So it was a little surprising.

13           But I don't know what's happened with that.

14           THE COURT:  We'll find out.

15           MR. MURPHY:  Yeah.  And I think there should be an

16   order that says:  Whatever you have done with the building

17   so far, stop doing it.

18           Because it should be restored to USIP, that's what

19   we're asking for.

20           THE COURT:  Okay.  So let me go back to this

21   building issue.

22           As I understand plaintiffs' theory, Nate Cavanaugh

23   was not properly appointed as president of USIP; he had no

24   authority to transfer the property.

25           But when I look at the plaintiffs' claims in the

1      amended complaint, I don't see a separate claim for relief

2      regarding the illegality of Cavanaugh's appointment.

3              Count 4 challenges the appointment of Jackson in

4      the amended complaint, but I didn't see a challenge to

5      Cavanaugh's.

6              MR. MURPHY:  Well, I may be wrong.

7              THE COURT:  Maybe it's on the same theory.

8              MR. MURPHY:  I think --

9              THE COURT:  Cavanaugh is certainly a defendant.

10             MR. MURPHY:  Yeah.  At the time he was not the

11     president, when the amended complaint was filed.  I think

12     Jackson was still the putative purported president.  So that

13     transfer from Jackson to Cavanaugh occurred after the

14     amended complaint was filed.

15             Under normal substitution rules, under Rule 25,

16     Cavanaugh would sort of take the place of Jackson because he

17     is now the president -- or acting president, whatever his

18     title is.

19             Mr. Cavanaugh seems to wear a lot of hats.  I

20     think there is a discovery motion that is in the *Pippenger*

21     case that has just been filed that says he's done like -- he

22     is now, like, the head of six different agencies, maybe.

23             THE COURT:  Well, for a young man, he has gotten

24     around.  But certainly --

25             You can just make an oral motion to amend the

1    complaint to add Cavanaugh to Count 4 to make this totally

2    clear.

3            MR. MURPHY:  Done.  We make that motion.

4            THE COURT:  All right.

5            Mr. Hudak, I will wait until I get to you.  But

6    have in mind what your response is going to be to the oral

7    motion to amend, under Rule 15(a) of the Rules of Civil

8    Procedure, knowing that it should be freely given.

9            Okay.  That's just one little housekeeping matter.

10           In terms of procedures, does the president or the

11   board normally have, or both, have authority to decide who

12   has access to the headquarters' building, in terms of the

13   trespass --

14           MR. MURPHY:  Sure.

15           THE COURT:  -- claim and proposed order on that?

16           MR. MURPHY:  Normally -- I mean, normally, the

17   president of the entity would be able to determine who can

18   come in.

19           THE COURT:  All right.  In terms of the sale of

20   property under USIP's bylaws or statute, who -- is it the

21   president or the board or both that can decide on transfer

22   of assets of USIP?

23           MR. MURPHY:  I would think that, under normal

24   corporate principles, it would be the board of directors

25   that would need to make that kind of a decision.

1          I think, Your Honor, too, always being cognizant

2     of the fact that Congress determined that the one power that

3     the board does not have is to cease its corporate activities

4     or surrender its charter.  And what has happened here,

5     contrary to that provision of the law, is that the corporate

6     activities of USIP have ceased; and to claim otherwise, I

7     think, is fallacious.

8          THE COURT:  All right.  So let me turn to one of

9     the new claims added in the amended complaint, which is the

10     APA claim in Count 5.

11          If the plaintiffs prevail on Counts 1 through 4,

12     what additional relief would be available in Count 5, your

13     APA claim?

14          MR. MURPHY:  I mean, I view it as an alternative

15     claim for relief.

16          THE COURT:  Okay.  The proposed order also

17     requests a declaration that:  The resolution adopted by the

18     two directors purportedly appointing Adam Ahmar [sic] as

19     president of the endowment of USIP and authorizing and

20     instructing him to transfer all of the endowment's assets to

21     USIP was unlawful, null and void, and without legal effect.

22          Could you just explain to me which claim or count

23     in the complaint is associated with that specific requested

24     relief?

25          MR. MURPHY:  I think it would be in Count 1, Your

 1   Honor.

 2          Count 1, paragraph 77, says that:  Defendants'

 3   actions to exert control over USIP exceed executive

 4   authority, usurp legislative authority conferred upon

 5   Congress by the Constitution, violate the separation of

 6   powers, are *ultra vires*, and should be enjoined.

 7          And part of that *ultra vires* claim is the

 8   determination made to tell the endowment to give up its

 9   funds and give them to USIP so they can be given to DOGE.

10   And who knows where they went from there.

11          THE COURT:  Okay.  And then the proposed order

12   also asked for an injunction ordering that:  Defendants or

13   any other person acting in concert with defendants are

14   enjoined from maintain, retaining, gaining, or exercising

15   any access or control over the Institute's office,

16   facilities, computer systems, or any other records, files,

17   or resources; and from acting or purporting to act in the

18   name of the Institute; and from using the Institute's name,

19   emblem, badge, seal, any other mark of recognition of the

20   Institute.

21          So that relief as to all defendants would include

22   ex officio voting members of the board.

23          MR. MURPHY:  Yeah.  We do not --

24          THE COURT:  So how would you expect me to deal

25   with the fact that you're barring all detailees from the

1    defendants, Department of State, Department of Defense, and

2    whatever the university is?

3              MR. MURPHY:  I think we would amend that request

4    to exclude the ex officio members of the board from that

5    relief.

6              THE COURT:  And their home agencies?

7              MR. MURPHY:  Yes.

8              But I am talking there, Your Honor, about, like,

9    access to information, materials, and so forth.  We would

10   expect that an injunction that would prevent them from

11   continuing to dissipate the assets of the entity would apply

12   to the ex officio members.

13             THE COURT:  Let me just look through my questions

14   to see if there is anything else I need to find out.

15             I just wanted to be clear about the nature of the

16   challenge to the appointment of Jackson and, presumably,

17   Nate Cavanaugh as well, as president of USIP.

18             I appreciate the plaintiffs are challenging the

19   exercise of the removal power without satisfying any of the

20   statutory prerequisites for the exercise of the removal

21   power.  But beyond that fact, I got the sense -- but I

22   wasn't clear about this -- are the plaintiffs also

23   challenging the procedures that the defendants used for the

24   appointment of Jackson and Cavanaugh?

25             If so, could you just explain what procedures, in

1    the plaintiffs' view, should have been followed?

2         Putting aside the improper -- allegedly improper

3    removal of the board members.

4         MR. MURPHY:  Okay.  Normally -- normally, the

5    board acts at meetings.  There are public notice of the

6    meetings, and then there is a meeting.  And at the meeting

7    the board makes determinations, like the appointment or

8    removal of the president --

9         THE COURT:  And the meetings, and the public

10   notice of the meetings in the *Federal Register*, is that a

11   statutory requirement or just a bylaw requirement, or both?

12        MR. MURPHY:  It's not a requirement that it be

13   posted in the *Federal Register*; but if it is posted in the

14   *Register*, that's deemed to be adequate notice.  So it's not

15   a requirement at all.

16        I think that that may be in the statute.  But I

17   should check that.  Yeah, I am pretty sure it's in the

18   statute.

19        There was no notice of this meeting.  The

20   defendants' argument --

21        THE COURT:  Well, can I just -- the statute, at

22   4605(h)(2), requires board meetings to be conducted at any

23   time pursuant to the call of the chair or as required in

24   writing to the chairman by at least five members of the

25   board, and a majority of the members of the board constitute

1    a quorum.

2            But I don't see that a meeting is required

3    necessarily, let alone a noticed meeting is required

4    necessarily for appointment of the president or any of the

5    other officers of USIP.

6            That's why I just wanted to pin down what the

7    nature of -- you know, if there were procedural

8    irregularities, other than the removal and uninvolvement of

9    what plaintiffs' claims were the unlawfully removed board

10   members -- other procedures that were expected or required

11   to be followed to a point --

12           MR. MURPHY:  So the bylaws do contain a provision

13   that -- in an exceptional circumstance of an emergency, the

14   board could act without a meeting, if everybody signs off on

15   it and agrees to do it that way.  That wasn't done here.

16           I mean, I guess the government's -- or the

17   defendants' argument would be:  Well, the three ex officio

18   members got together and decided that this was an

19   exceptional circumstance and they all agreed to do whatever

20   they did agree to do.

21           There is no evidence that they actually went

22   through that process or -- you know, of those procedures.

23   But our fundamental --

24           THE COURT:  Well, is there a part of the statute

25   or bylaws that requires that all resolutions be adopted at a

1    formal meeting?

2         MR. MURPHY:  No.  But the board must decide to

3    remove the president and to appoint a new president.  So

4    that is something that the board has to do.  And our

5    position is that:  Because of the unlawful removal of the

6    11 board members, there was no quorum.  The three do not

7    constitute a quorum, and there is no majority of the quorum

8    members who were in attendance because there is no quorum at

9    all.

10        Three board members can't do anything if the other

11   11 were improperly removed.

12        THE COURT:  Okay.

13        All right.  Anything further, before I turn to

14   Mr. Hudak?

15        MR. MURPHY:  Your Honor, I am tempted to present

16   this argument to you, which is not a serious argument --

17        THE COURT:  You're giving into your temptations,

18   so proceed.

19        MR. MURPHY:  I am.  I am giving in.

20        This entity is not clearly any part of the federal

21   government that you can really identify.  You know, the

22   government -- the defendants talk about, you know, if it

23   acts like a duck, quacks like a duck, says it's a duck.

24        Eric Carle wrote a wonderful series of poems about

25   animals.  I am reminded of the duckbilled platypus, which is

 1    not easy to imagine.  It lays eggs like a bird, suckles like

 2    a mammal, and dives like a fish to the bottom of the sea.

 3            The USIP is that sort of an entity.  It's not

 4    clearly part of the executive branch -- it's certainly not

 5    part of the executive branch.  It has some legislative

 6    functions as well.  It's not part of the judiciary.  But

 7    it's not something that -- our basic position is -- is

 8    really part of the federal government at all.  It's unique.

 9            The Court should recognize its unique nature and

10    determine that the President did not have an Article II

11    power to order the removal or termination of the board that

12    had been appointed and confirmed by the Senate.

13            Thank you, Your Honor.

14            THE COURT:  Thank you.

15            Mr. Hudak, you can collect your papers.  My court

16    reporter would like a ten-minute break.

17            MR. HUDAK:  That's would be great.  Thank you,

18    Your Honor.

19            (Whereupon, a recess was taken.)

20            THE COURT:  So good morning, Mr. Hudak.

21            MR. HUDAK:  Good morning, Your Honor.

22            I guess I would start with the position on the

23    amendment.  I believe the -- I think -- as my friend on the

24    other side noted, I don't believe a formal amendment is

25    necessary because Mr. Cavanaugh is --

1          THE COURT:  Already a defendant.

2          MR. HUDAK:  And he succeeded -- Mr. Jackson was

3     named in his official capacity as the acting president of

4     the U.S. Institute of Peace.

5          Under Federal Rule of Civil Procedure 25(d), as my

6     friend referenced, the successor to that office -- because

7     it is a public office in our mind -- he is automatically

8     substituted in as the defendant.

9          THE COURT:  Good.  If there is no objection to

10    that, that works for me.  All right.  Good.

11         Then can we start just with some basic facts,

12    Mr. Hudak.

13         MR. HUDAK:  Sure.

14         THE COURT:  Because I want to know:  Is the

15    plaintiffs' impression about what is going on at USIP now

16    correct, that there are only about four employees at

17    headquarters' building, with two IT and a couple other

18    staff, to wind down operations; and a handful of people

19    overseas also winding down?  Is that accurate?

20         MR. HUDAK:  So I asked -- in the middle of the

21    hearing -- great modern technology with the Court's Wi-Fi, I

22    appreciate it.  I asked those very questions.

23         So my understanding is that the U.S. Institute of

24    Peace has five employees, not including contractors; that

25    the Institute is currently in the operational posture of

**JA243**

1    being at or reducing to its statutory minimum, not wind

2    down.  It is being reduced to its statutory minimum.

3              THE COURT:  Which means what?

4              MR. HUDAK:  The "shall" clauses in its statute

5    is -- my understanding -- is what the statutory minimum of

6    the Institute is; like it has been with other organizations

7    that the administration has taken this effort to preserve

8    government resources by reducing certain other government

9    components to their statutory minimum.  I believe that the

10   position --

11             THE COURT:  My impression was that it was just the

12   "shall" clauses.

13             MR. HUDAK:  That is my understanding as well, Your

14   Honor.  I have not engaged with folks to get a list of

15   exactly what the statutory minimum means in this case

16   because we don't believe that there are any claims in this

17   case for that.  You know, *Pippenger* may be a little bit

18   different.

19             But in this case, at least, this -- we view this

20   as a focus on the board removal and Mr. Moose's removal, as

21   opposed to challenges to the continuing operations.

22             THE COURT:  Oh, I think they're calling everything

23   that happened after the improper removal to be null and

24   void, all of the actions taken afterward; which is why I was

25   focusing on their proposed order for both the declaratory

1    relief and the injunctive relief.

2         From my reading of both what is going on and

3    what's asked for in the *Pippenger* case as well as this one,

4    it's a lot -- very overlapping.

5         MR. HUDAK:  I understand.  And --

6         THE COURT:  Which is why I was trying to encourage

7    them to do this jointly, to no avail.

8         MR. HUDAK:  Yeah.  Yeah.  I hear Your Honor; and I

9    certainly understand that that is their position as well.

10        But I think it's kind of -- their theory is it is

11   all fruit of a poisonous tree because we removed,

12   improperly -- Mr. Moose's termination was improper, and

13   everything that the Institute has done since that date is

14   improper, as opposed to --

15        THE COURT:  I might use that phrase, Mr. Hudak.

16        MR. HUDAK:  Hopefully not, Your Honor.  Hopefully

17   not, Your Honor, that that doesn't appear in your opinion.

18   But --

19        THE COURT:  I like it.

20        MR. HUDAK:  But it's as opposed to -- that the

21   continued operations of the Institute independently violates

22   some sort of statutory provision, or something like that.

23        I think, as we argued in our brief, if they were

24   properly removed they don't have standing to challenge the

25   continued operations of the Institute for being -- violating

1    the APA and being arbitrary and capricious, or something

2    like that.  They're suffering no continuing harm because

3    they have nothing but, really, taxpayer standing and an

4    emotional bond to their former employer --

5            THE COURT:  Right.  Everything flows from the

6    fundamental issue, constitutional issues --

7            MR. HUDAK:  Yes, Your Honor.

8            THE COURT:  -- that I view as three separate

9    issues, which is:  Is it a government entity under the

10    Constitution?

11            No matter what the political branches have called

12    it, that's a decision I have to make.

13            And if it is a government entity, is it within the

14    executive branch?

15            And even if it's within the executive branch, does

16    it exercise any executive powers to trigger, under current

17    jurisprudence, the President's absolute removal power.

18            All three are significant constitutional

19    questions.

20            Let me just sort of jump to one of the issues that

21    came up when talking to Mr. Murphy, which is:  The

22    government's current working theory of the extent of the

23    President's removal power.  Because Mr. Murphy said his

24    understanding of the defendants' position is that:  If the

25    President has appointment power, the President has removal

 1    power.

 2            Am I right that that is not the scope of the

 3    position the defendants and the current administration is

 4    taking as to the scope of the President's absolute removal

 5    power?

 6            MR. HUDAK:  Your Honor --

 7            THE COURT:  Or is that correct?

 8            MR. HUDAK:  Your Honor, that is correct.

 9            So, again, this Court is bound by *Humphrey's*

10    *Executor*, whatever it means.  And so at least for these --

11            THE COURT:  I think I know what it means.

12            MR. HUDAK:  We can have that discussion, Your

13    Honor.  Maybe my view might be a little bit different,

14    unfortunately, than the Court's.

15            But I think, yes.  So, obviously, *Humphrey's*

16    *Executor,* it creates an exception to that rule for the

17    entities and officials that fall into the *Humphrey's*

18    *Executor* exception.

19            So I don't believe the government has --

20            THE COURT:  So the government -- just to be

21    absolutely clear, the government does not here, or anywhere,

22    assert that the President's removal power is coextensive

23    with his appointment power?

24            MR. HUDAK:  Correct.  I mean, I would --

25            THE COURT:  And that the President's -- "correct,"

 1    that's all I need.

 2              And that the President's removal power only

 3    extends to executive branch entities?

 4              MR. HUDAK:  That might be a tougher question, Your

 5    Honor.

 6              So, certainly, it doesn't apply to judges such as

 7    yourself.  So you were appointed by the President of the

 8    United States and confirmed by the Senate and, obviously,

 9    the Constitution --

10              THE COURT:  I know.  I am relieved by your correct

11    answer to the first question.

12              But in terms of the limits to what other limits

13    apply to the President's appointment power, I also want to

14    be clear about that.

15              I think the jurisprudence is pretty clear that the

16    President's removal power, without limits -- I am just going

17    to call it "absolute removal power," only applies to

18    executive branch entities or agencies exercising more than

19    *de minimis* executive power.

20              Would you agree that that is at least what the

21    jurisprudence holds?

22              Then you can tell me whether the President is

23    still agreeing that those are the limits on his power.

24              MR. HUDAK:  Your Honor, I would say that that is

25    the heartland of his authority.

1          I'm -- the reason for my hesitation is --

2          THE COURT:  Is because the Library of Congress and

3     Register of Copyrights?

4          MR. HUDAK:  That.  There are also certain -- you

5     know, there are certain commemorative organizations that the

6     President might have appointed that we may argue that aren't

7     actually part of the U.S. government, but the President has

8     some role in appointing.

9          I have not done a full canvassing of every charter

10    organization under Title 36, and whether and to what extent

11    the President has some role in the appointment or

12    recommendation of appointments.

13         THE COURT:  Okay.  So, Mr. Hudak, let me go back

14    to my first question.

15         Would you agree that the jurisprudence, the

16    Supreme Court law binding on this Court, has -- to date --

17    only set that the President's absolute removal power is as

18    to executive branch agencies exercising more than *de minimis*

19    executive power?

20         MR. HUDAK:  I believe that is where the Supreme

21    Court's jurisprudence has been.  But one caveat:  I don't

22    think they've considered a case of an entity where the

23    President has appointment power that falls outside of the

24    executive branch.

25         I think all of the cases -- *Seila Law*, *Lebron* --

1   that's not a removal case; but going back to *Myers* and

2   *Humphrey's Executor*, I think that line of cases stands for

3   the proposition that Your Honor just stated.  But I don't

4   think that --

5           THE COURT:  So if this -- if USIP is found not to

6   be an executive branch agency, this might be its first

7   opportunity -- the Supreme Court's first opportunity to

8   decide that?

9           MR. HUDAK:  Perhaps.  But I think that, you know,

10  in our mind -- yes.  I mean, if the Court does not believe

11  this is an executive branch entity -- and our papers -- and

12  I hope my argument here today convinces you otherwise --

13  then I think the fallback argument is that the President

14  appoints the board.  Even under the statute, the President

15  is the one to remove the board.

16          I mean, I don't -- it's really hard for me to

17  envision, with those two characteristics, that this is not

18  the executive branch agency, especially when it is dealing

19  with foreign affairs issues.

20          THE COURT:  Well, it's certainly not an agency.

21  You can call it an "entity," but it's certainly not an

22  agency.

23          MR. HUDAK:  So our best understanding of how to

24  classify it under Title 5 -- and that's why I used the word

25  "executive agency."

1         Title 5 says if it's an executive branch

2    department -- and it provides a list of departments -- or if

3    it's a government-controlled or owned corporation, or is an

4    independent establishment of the executive branch -- that

5    all of those, in those definitions, 5 U.S.C. 101 to 104 --

6    5 U.S.C. 105, I believe says all of those are executive

7    agencies, as that term is used in Title 5.

8         So I am happy to use "entity" --

9         THE COURT:  As used in Title 5.

10         MR. HUDAK:  Yes.

11         THE COURT:  Title 5; our favorite statute, FOIA;

12    another favorite statute, the APA.

13         But those are congressional descriptions not

14    binding on this Court as to -- as a constitutional matter,

15    whether it's a government entity.

16         Would you agree with that?

17         MR. HUDAK:  I agree with that, Your Honor.

18         THE COURT:  So looking at those definitions --

19    they aren't particularly helpful to me in doing a

20    constitutional separation of powers analysis here.

21         Would you agree?

22         MR. HUDAK:  I think that they demonstrate, maybe,

23    the congressional interpretation, and that it might be

24    persuasive to the Court.

25         But certainly, the Court is the one that needs to

1     decide, under the Constitution, whether this entity is part

2     of the federal government; and if so, what branch of the

3     federal government, or if it sits outside of the branches of

4     the federal government.

5              Yes.  Those are questions for the Court to

6     resolve.

7              THE COURT:  Okay.  Good.

8              I just wanted to clarify one niggling thing that's

9     come up in other cases.

10             22 U.S.C. 4604(a) of the USIP's organic statute

11    grants the Institute the powers conferred upon a nonprofit

12    corporation by the District of Columbia Nonprofit

13    Corporation Act consistent with this chapter, except for

14    Section 5(o) of the District of Columbia Nonprofit

15    Corporation Act.

16             The 5(o) is the dissolution, I believe.

17             Do the defendants agree that the only portion of

18    the D.C. Nonprofit Corporation Act applicable to USIP is

19    precisely what this says, Section 5 of that Act?

20             And the reason I ask is because there is another

21    provision in the Nonprofit Corporation Act that suggests

22    that for organizations organized under this Act, people

23    who -- you know, directors appointed by person other than

24    the members may be removed with or without cause by those

25    persons, which is D.C. Code 29-406.08(e).

**JA252**

69

1          But it's not clear to me that any other part of

2     the D.C. Nonprofit Corporation Act applies to USIP, other

3     than what the statute says, which is Section 5.

4          Do defendants agree?

5          MR. HUDAK:  I mean, I thoroughly went through the

6     D.C. Nonprofit Corporation Act to try to find some meaning

7     to this phrase when we were briefing it.  There are a lot of

8     discussions about --

9          THE COURT:  Well, the government -- the

10     defendants, in some actions, are relying on this particular

11     provision.  It hasn't really come up here.  But I just want

12     to make the record absolutely clear that USIP's organic

13     statute doesn't incorporate and force USIP to comply with

14     all parts of the D.C. Nonprofit Corporation Act, other than

15     say:  You have the same powers under Section 5 of that Act.

16     No other part of that Act applies to USIP.

17          Do the defendants agree?

18          MR. HUDAK:  I mean, without a specific example in

19     mind, I think that is generally correct.  There may be an

20     exception that I am not aware of, Your Honor, that I haven't

21     looked into for preparing for this hearing.

22          THE COURT:  Okay.  I just wanted to get the record

23     straight on that.

24          Okay.  What else do you want to tell me?

25          MR. HUDAK:  So I think, analytically, we view this

 1   case similar to what the Court has outlined.  Is it part of

 2   the federal government?  Is it part of the executive branch?

 3   Does the *Humphrey's Executor* exception apply?

 4          So as far as part of the federal government:  We

 5   think that *Lebron* and the various aspects of the Institute

 6   as a matter of law make it part of the federal government.

 7          THE COURT:  Because you think all three factors

 8   set out in *Lebron* and subsequent cases, even dealing with

 9   Amtrak, apply?  And the answer is "affirmative" to each of

10   those factors as to USIP?

11          MR. HUDAK:  Yeah.  So in *Lebron*, they said that:

12   We hold that where, as here, the government creates a

13   corporation by special law.

14          Factor one, it did so here.

15          For the furtherance of governmental objectives; it

16   did so here in its organic statute, spelling out those

17   government objectives.

18          And that it retains itself permanent authority to

19   appoint a majority of the board of directors of that

20   corporation -- which, clearly, it continues to have that

21   authority.

22          So it meets all three of the factors of *Lebron* for

23   it to be part of the government.

24          And, again, we didn't --

25          THE COURT:  Except Mr. Murphy raised questions

1    about the second factor, in furtherance of government

2    interests.  You know, that is a more problematic factor here

3    in some ways because that factor was considered in *Lebron*.

4         Amtrak is a very different kind of entity than

5    USIP.  I mean, Amtrak is subject to very stringent statutory

6    requirements in how it conducts its affairs.  It has a list

7    of priorities set by statute as to how it can select and

8    schedule projects, requirements on how it has to maintain

9    specific rails, procurement requirements.

10        Whereas, USIP is sort of given general guidance; a

11   lot of "may" clauses as opposed to "shall" clauses, which

12   is, now, to its detriment, in what the Trump administration

13   is considering is necessary to maintain its statutory

14   minima.

15        But because of those discretionary clauses and the

16   USIP organic statute, it seems quite different from the

17   tight strictures by statute imposed on Amtrak.

18        So given the much broader discretion that USIP

19   seems to have to carry out its overall mission, doesn't that

20   distinguish *Lebron* here in terms of the analysis of that

21   factor?

22        MR. HUDAK:  I don't think so, Your Honor.  I think

23   the words of its organic statute in 22 U.S.C. 4601 answer

24   this.

25        And 4601(b) -- and we'll get to (a), with the list

1   of the purposes.

2           But (b) begins:  It is the purpose of this chapter

3   to establish an independent, nonprofit national institute to

4   serve the people and the government.

5           I don't know how you can read that as saying that

6   this is created not to fulfill, like, governmental

7   objective; that's what, you know, the statute says it's

8   being set up to do.

9           And then if you go through the findings and

10  declarations of Congress in 4601(a), we listed the salient

11  ones in our brief.  But it goes through the objectives to

12  promote alternatives to war, that that is in the national

13  interest of the United States; to have alternatives to

14  foreign diplomacy.

15          I mean, again, my friend on the other side is

16  right, that these aren't foreign -- you know, formal

17  diplomats that are engaging in this work at the

18  United States Institute of Peace; but it is still the

19  United States Institute of Peace that is going forth and

20  carrying out the objectives of the statute that Congress set

21  forth and that Congress created, and that is led by

22  officials that the President has appointed and that the

23  President can remove; and that the organization's budget

24  is -- and it can't receive money except for two very small

25  items, that -- it's entirely dependent and wholly controlled

1    by the federal government in allocating its budget.

2              THE COURT:  And in terms of its budget, haven't

3    funds been appropriated to USIP through at least 2024?

4              MR. HUDAK:  I believe it was part of -- I believe

5    funding is part of the Continuing Resolution for the

6    Institute.

7              THE COURT:  Through 2025?

8              MR. HUDAK:  Whenever the CR ends.  I'm sorry, I

9    don't have that date.

10             THE COURT:  I don't either.  Yes.

11             MR. HUDAK:  I think it's sometime in the fall.

12             THE COURT:  Okay.  And just to make sure I haven't

13   missed something in reading *Lebron* and some of the

14   subsequent litigation that went to the Supreme Court and the

15   D.C. Circuit over Amtrak, the Supreme Court and the

16   D.C. Circuit have never held that Amtrak, though a

17   government entity -- after the D.C. Circuit had its views

18   corrected by the Supreme Court in *Lebron* -- never said it is

19   part of the executive branch, has it?

20             MR. HUDAK:  I don't believe it has, Your Honor.

21             THE COURT:  So that's like one huge entity that

22   many of us use on a regular basis that, wow, not clear

23   whether it fits into legislative branch -- certainly not the

24   judiciary -- or the executive branch, right?

25             MR. HUDAK:  I mean, I think it's pretty clear it's

1    not part of the legislative branch.  I don't think running

2    trains does -- is it a part of the legislature?

3            But, I mean, I think we would make the argument

4    that it is part of the executive branch under --

5            THE COURT:  But no court has ever seen that it is

6    necessary to make that decision?

7            MR. HUDAK:  Correct.  Because I think the context

8    in which, you know, those questions arose didn't matter.

9            So in Lebron it was a First Amendment issue.  And,

10   you know, we -- no matter which branch of the federal

11   government you are an employee of -- you know, if you are a

12   government official, you have obligations not to infringe on

13   people's First Amendment activities and rights.

14           So I don't believe that -- I think Your Honor is

15   correct.  I don't think there has been a judicial finding

16   that Amtrak is part of the executive branch.

17           But I think it does answer the question -- the

18   first analytical question, which is:  Is it part of the

19   government?

20           And so we think it is for those reasons.  So we

21   now get --

22           THE COURT:  And before I leave the:  Is it part of

23   the federal government constitutional question, I was

24   interested in *Widakuswara v. Lake*, which is a very --

25   recently, a D.C. Circuit emergency panel granted a stay of a

```
1    preliminary injunction by Judge Lamberth on this court.

2    Granted the stay, saying that:  Radio Free Asia and Middle

3    East Broadcasting Networks were private, nonprofit

4    corporations.

5              Basically saying those were not government

6    entities.

7              Do you know what makes those entities private,

8    nonprofit corporations but USIP a government -- how they

9    differ from USIP here?

10             MR. HUDAK:  I don't, Your Honor.  I --

11             THE COURT:  Are you familiar with that case; do

12   you know?

13             MR. HUDAK:  I am aware of that case and the U.S.

14   Agency for Global Media cases.

15             It's my understanding that the D.C. Circuit -- I

16   might be wrong about this.  The D.C. Circuit stayed Judge

17   Lamberth's PI but, then, the en banc D.C. Circuit stayed

18   that stay order; I think that's the way it works.  So --

19             THE COURT:  Or maybe -- I haven't been following

20   that, I have been pretty deep in this.

21             But it caught my eye that they called these Radio

22   Free Asia and Middle East Broadcasting as private, nonprofit

23   corporations.  What was it about them that made them

24   private, nonprofit corporations as opposed to government

25   entities?
```

1          MR. HUDAK:  Your Honor, I don't have the answer

2     for you here today.

3          THE COURT:  Okay.

4          MR. HUDAK:  But I am happy to submit a

5     supplemental -- you know, a two-pager to explain why we

6     think those are different.

7          THE COURT:  Okay.  If you could do that, like, by

8     tomorrow, that would be great.

9          MR. HUDAK:  Yeah.

10          THE COURT:  Perfect.

11          Okay.  So would you agree that, ultimately, one of

12     the key questions here is whether USIP is part of the

13     executive branch for purposes of the separation of powers

14     constitutional question?

15          MR. HUDAK:  Yes.

16          THE COURT:  And I think, based on your briefing --

17     although you seem to go back and forth, so I wanted to pin

18     this down -- that this is an inquiry that turns on USIP's

19     functions both as tasked in its statute and also as it

20     operates in practice.

21          Because your briefing seemed to go along with that

22     at one part, because you say:  Whether the Institute serves

23     an executive function or its vested executive power turns

24     not just on how it operates but also on its congressional

25     design, which seems -- you look at both.

1          But then -- later, in your reply, you suggest

2     that:  Only USIP's functions and authorities assigned

3     Congress, not its practical work, are relevant.

4          So do you think it's both?

5          MR. HUDAK:  I think it's both, Your Honor.  And my

6     apologies for that confusion in our brief.

7          I think that if an entity is bestowed upon it

8     executive powers and set up such that the President both

9     appoints and removes the officials, then I think those

10    factors -- I think:  Even without looking at what it

11    actually does, carry the day.

12          But if it's vague in the statute as to what are

13    the operations of the entity, and the Court is assessing for

14    constitutional purposes, where does it fit?

15          I think it can look at its operations if that is

16    not clear from the organic statute about what powers have

17    been bestowed upon it by the political branches.  So --

18          THE COURT:  And you think it's important for me to

19    figure out where USIP fits because of the current applicable

20    jurisprudence that the President's absolute removal power

21    only applies to executive branch entities?

22          MR. HUDAK:  Correct.

23          THE COURT:  Exercising more the *de minimus*

24    executive power?

25          MR. HUDAK:  We think the easiest path forward for

1     the Court is to recognize this is an executive branch agency

2     because we don't think there can be much dispute on that

3     point.

4              In fact, you know, what I heard from the argument

5     in the morning is that it's -- what I understand the

6     argument on the other side to be is that:  This is not an

7     executive branch agency because we are not governmental

8     actors going and doing foreign affairs stuff.

9              But that begs the first question.

10             So if they already -- if the Court believes under

11    *Lebron* they are governmental actors, I don't hear much and I

12    don't see much in the papers to suggest that what they are

13    doing somehow is judicial or legislative, aside from, you

14    know, a couple of paragraphs in their briefing where they

15    say that they provide reports to Congress.  But so does

16    every agency.  And I think we pointed out the week before

17    that --

18             THE COURT:  But this argument goes to your

19    assumption that every congressional-created entity -- no

20    matter what Congress calls it and no matter what Congress

21    denominates where it sits, like the Library of Congress in

22    Congress, or the Register of Copyrights in Congress, is --

23    if it's not designated, it has to be in one branch or the

24    other, despite the fact that Amtrak has never been

25    classified within a branch by any Article III court.

1          Leading me to one question that I highlighted for

2     you to be prepared for, the Smithsonian.  I mean, do you

3     think because it's not judicial -- even though it's across

4     the street from us, it doesn't make it judicial, clearly?

5     It sits down the Mall from the Capitol.  Location doesn't

6     make it legislative.

7          So is it executive?  What is the Smithsonian then?

8          If every entity created by Congress has to be in

9     one branch of government, where, in the defendants' view,

10    does the Smithsonian sit?

11          MR. HUDAK:  So, obviously, I think there are

12    exceptions to that.  We pointed out one, grand juries.

13          THE COURT:  Yes.  I pointed out the grand jury to

14    you.

15          MR. HUDAK:  If the other side pointed it out, and

16    I respond --

17          THE COURT:  If my recollection serves me

18    correctly, Mr. Hudak.

19          MR. HUDAK:  I did not mean to take credit.

20          THE COURT:  You are in the civil division; so it

21    might not have come promptly to your mind, as it did to

22    mine.  But -- yes.

23          MR. HUDAK:  And so the Supreme Court has

24    recognized that sits outside the three branches.

25          THE COURT:  So some things created by Congress can

80

```
1    sit out one of the three branches.
2              MR. HUDAK:  But that's only where it's -- I think
3    if you look at how they reached that analytical decision was
4    that -- it goes all the way back to England before the
5    founding; and this has always been viewed as something that
6    sits outside of the power of the king and the powers of the
7    courts.  It's mentioned in the Bill of Rights expressly, but
8    not in the constitutional structure in the articles.  So it
9    obviously exists, it's a constitutional entity --
10             THE COURT:  I'm sorry.  The Bill of Rights doesn't
11   mention the Smithsonian Institute.
12             MR. HUDAK:  Oh, I'm sorry.  I was talking about
13   the grand jury.
14             THE COURT:  Oh.
15             MR. HUDAK:  You are right.  You are right.  The
16   Smithsonian does not go back to Merry Old England.  No, my
17   apologies.
18             THE COURT:  I was like:  Where are you going with
19   this argument, Mr. Hudak?
20             MR. HUDAK:  I'm sorry, Your Honor.
21             THE COURT:  Okay.  So the grand jury is one thing.
22             MR. HUDAK:  It's one thing.
23             THE COURT:  But the Smithsonian is yet another
24   exception of an example of an institution that sits outside
25   one of the three branches.
```

1          So your process of elimination reasoning that you

2     got from *Springer* was something that the court in *Springer*

3     may have used up until a point, and it wasn't the entire

4     part of their reasoning in *Springer* at all.  But this

5     process of elimination -- if it's not legislative, and it's

6     not adjudicatory, it must be executive -- I just don't

7     think -- I think it's flawed because it doesn't explain the

8     Smithsonian; it doesn't explain the grand jury -- putting

9     history aside.  I mean, it doesn't explain other things as

10    well.

11         So don't you just have to look more at the

12    statute, function, and operation of an entity to decide

13    where it sits?

14         MR. HUDAK:  So, Your Honor, I would push back on

15    that a little bit.

16         THE COURT:  Okay.

17         MR. HUDAK:  I think there are exceptions to the

18    *Springer* analysis.  But I think those exceptions are

19    exceedingly rare and are clearly kind of -- either from

20    history or from the statutory context, that Congress created

21    something that it intended to be outside of the three

22    branches.

23         And if it did, that's going to be, obviously, a

24    big constitutional question about whether or not that is,

25    indeed, compatible with the organization of the federal

1    government as set forth in the Constitution.  So --

2    THE COURT:  But if you are setting up an entity

3    that you want to engage in diplomacy, 1.5 or 2.0, or

4    whatever -- I am not a diplomate, so I don't -- you know,

5    which is working outside official channels and, in order to

6    do its work, is necessarily not representing the U.S.

7    government in order to perform its congressional tasks --

8    wouldn't that be the kind of entity that would meet such an

9    exception?

10    MR. HUDAK:  I don't think, because there is

11    nothing in the statute that suggests that -- it uses the

12    word "independent," I will give them that.

13    But in *Collins* the Supreme Court said the term

14    "independent" does not necessarily connote independence from

15    presidential control.

16    So where in the statute where it receives its

17    funding, like any other agency through appropriations; where

18    its board is appointed by the President, with advice and

19    consent of the Senate; where the President can remove the

20    members, albeit in the statute it has some protections on

21    that; where it has a defined purpose set forth in an organic

22    statute; where it furthers governmental interests -- I just

23    don't see anything, from the face of the statute, that

24    Congress chose to depart from what is the typical

25    organization of the federal government here.

1          The Smithsonian is a good example of one that is

2    really hard.  I mean, that might be the duckbilled platypus.

3          But the D.C. Circuit has ruled already it's not

4    part of the executive branch.  So we're already into a land

5    where, you know, the Institute is not.  And there, there

6    were good reasons for that ruling.

7          The Smithsonian's board is not entirely appointed

8    by the President.  It's not, you know, some -- the board is

9    not in the presidential control.  Here, the Institute -- the

10   entire board is in presidential control because he --

11         THE COURT:  Doesn't the President appoint some

12   members of the Smithsonian board?

13         MR. HUDAK:  I believe the only executive branch

14   member -- there might be some private ones.  But I believe

15   the only executive branch member is ex officio, the Vice

16   President of the United States.

17         I believe the majority of the board are actually

18   congressional members, which makes it this kind of weird

19   thing.  You know, the D.C. Circuit's opinion in that case,

20   in *Dong* -- you know, it goes through the history.  And the

21   Smithsonian traces its roots back to the 19th century.  You

22   know, the Institute doesn't.

23         THE COURT:  I mean, wasn't *Dong* just dealing with

24   the question of whether the Smithsonian was an agency for

25   purposes of FOIA?

84

1          MR. HUDAK:  Yes.  But one of the provisions is an

2     independent establishment of the executive branch.  So it

3     begged the question of:  Is this an independent

4     establishment of the executive branch?

5          And the D.C. Circuit held it was not.

6          Indeed, the D.C. Circuit -- it is plain -- it

7     ruled:  It is plain that the Smithsonian is not an

8     establishment in the executive branch.

9          And it starts:  To begin with, 9 of the 17 members

10    of its governing board of regents are appointed by joint

11    resolution of Congress, and 6 of the remaining 8 are

12    themselves members of Congress.  The other two are the Vice

13    President of the United States and the Chief Justice of the

14    United States.

15          So it does not bear hallmarks of an executive

16    branch agency.  And that was the first thing that the

17    D.C. Circuit turned to, was:  Who appoints its members?

18    There, it's not the President.  Here, it plainly is.

19          THE COURT:  So let's turn to *Humphrey's Executor*

20    and whether any executive power exercised by USIP is -- if

21    it exercises any government power?

22          And if it does, is it executive?

23          And if so, is it more than *de minimus*?

24          MR. HUDAK:  So I think --

25          THE COURT:  So defendants describe plaintiffs'

1    educational research and scholarly work as:  Largely

2    incidental to its core mission to extend the United States

3    soft power to enhance its diplomacy, foreign relations in

4    attempt to obviate the need for military action.

5          And this, to me, seems like a pretty broad reading

6    of the statute because the statute itself describes USIP's

7    function as:  Examining the disciplines and social

8    behavioral and physical sciences; developing new and tested

9    techniques; promoting programs and peace studies;

10    establishing an academy; advancing the history, science, art

11    and practice of international peace -- in the purposes

12    section.

13          It doesn't talk about enhancing diplomacy.

14          I am just wondering whether you are overreading

15    the purposes language.

16          MR. HUDAK:  I don't think I am, Your Honor,

17    because I think that in 4601(a), for example, in (a)(1) it

18    says that:  The Institute will be a living institution

19    embodying the heritage, ideals, and concerns of the American

20    people for peace.  And that:  There is a deep public need

21    for the nation to develop fully a range of effective

22    options, in addition to armed capacity, that can leash

23    international violence and manage international conflict.

24          That's its first stated purpose.

25          It seems to me to be very much foreign relation

1    powers having -- creating an entity that is controlled by

2    the President, funded by the United States, has the

3    United States' name in its title -- to engage in soft

4    diplomacy, soft international relations outside formal

5    diplomatic channels.  It is independent in that way.

6          It is independent from the State Department and

7    the Department of Defense, which are more of the -- are the

8    formal ways that the government exercises international --

9    it's control over international affairs.

10          And merely because the Institute may --

11          THE COURT:  But when the Institute is operating on

12    the ground -- because as I read a lot of its work, from

13    research, doing a study, disseminating publications,

14    figuring out options in sort of a theoretical way,

15    establishing an academy, giving prizes -- this is not even

16    foreign relations.  This is not even diplomacy.

17          The only time it gets to be involved in dealing

18    with people on the ground, its operational activities -- you

19    know, it has to do it as not representatives of the U.S.

20    government.  So it's not representing the U.S. government,

21    and it doesn't have to get approval from the State

22    Department, for example, before it engages in those

23    on-the-ground activities.

24          It doesn't seem to take direction from the U.S.

25    government in that way, which may be one of the reasons that

1   the Trump administration wants to get rid of it.

2           But, you know, whatever its reasons, doesn't that

3   independence make it not a tool of the executive branch and

4   the exercise of executive branch power even if it is

5   carrying out a federal government-tasked mission.

6           MR. HUDAK:  So I think my response would be -- two

7   points:  One, it's under the control of the President.  So

8   even with the for-cause removal protections, the political

9   party of the President is guaranteed to dominate the board

10  and direct its activities.

11          So if the President was adverse -- I think we

12  heard from my friend in the morning that one of the

13  activities was negotiating a treaty between two third-party

14  countries that didn't involve the United States.  Well, if

15  the President didn't want them to do that, I am pretty

16  confident he would -- through the power exercised by the

17  board, that that wouldn't have occurred.  Moreover, that

18  type of activity --

19          THE COURT:  It would not have occurred because an

20  ex officio member, Department of State secretary, or DoD

21  secretary would have said something to the President to stop

22  it?

23          MR. HUDAK:  Or said something to his fellow board

24  members that share their political persuasion and say, you

25  know:  Don't do this because the President wants to do this.

1              You know, for instance -- in the morning they

2       talked about that third-party country negotiation; but we do

3       that formally through diplomatic channels all the time.

4       Just this past weekend the President was involved in -- as

5       the media reports, I have no personal firsthand knowledge --

6       attempting and facilitating the resolution of a conflict

7       between India and Pakistan over Kashmir.  I think that

8       happens all the time.

9              The United States has interests in promoting peace

10      around the world.  And the fact that it does so through

11      formal diplomacy or peace-keeping forces or military might

12      or through an organization like the United States Institute

13      of Peace -- that goes in and doesn't have that formal

14      diplomacy and has, perhaps, a little bit more flexibility

15      and operational capacity because of that.  But that doesn't

16      mean it's anything but what the statute defines it to be,

17      which is part of the full range of effective options that

18      can leash international violence and manage international

19      conflict.  That's exactly why it's set up.

20             They compare themselves to NGOs that are purely

21      private that don't have presidential control.  But those

22      NGOs -- if they wanted to go in and negotiate the conflict

23      this past weekend, the President couldn't say:  No, no.

24      Don't do that.  Like, you are the U.S. Institute of Peace;

25      like, don't go and do that.  We're doing that through other

1    formal diplomatic channels.

2        Like, if the Carnegie Institute wants to go and do

3    something, yeah, the President can call up the board, the

4    president of that organization, but he doesn't control it.

5    And they don't get their funding exclusively from the

6    United States.

7        Yes, there are arrangements that the United States

8    has, I am assuming, with some of these entities -- that they

9    get grant funding or historically have received grant

10   funding from the United States to carry forth their

11   missions; but that doesn't mean the United States is

12   exercising the same level of control that they are over the

13   United States Institute of Peace.  They are a grantee.

14       Grantees do stuff for the United States all the

15   time, they further public objectives.  But they aren't part

16   of the government, like the Institute is; and they aren't

17   exerting that in the name of the United States.  Again, our

18   country's name is right in the title of the organization.

19       THE COURT:  Okay.  What else do you have to add?

20       MR. HUDAK:  I think just one point about the OPM

21   memos.  The OPM memos are in furtherance of the OPM's

22   determination about who is covered by various federal labor

23   and employment laws; they don't apply to whether the entity

24   is part of the federal government.

25       The citation that my friend gave, 5 U.S.C. 5103,

1   says that:  OPM shall determine the final applicability of

2   5102 of this title to specific positions and employees, not

3   to determination of whether the entity is part of the

4   federal government.

5           Certainly, we pointed out, in our brief, that

6   Congress creates executive branch agencies, executive branch

7   components that have exceptions to certain general

8   applicable governmental rules and programs; but that doesn't

9   really bear on whether or not the functions, the powers

10  they're exercising, and the control exercised by the

11  President puts them in the executive branch or not.

12          THE COURT:  Thank you.

13          MR. HUDAK:  Thank you, Your Honor.

14          THE COURT:  Mr. Murphy, do you want to respond?

15          MR. MURPHY:  I will say a few words, Your Honor.

16  I will try to keep it a "few," just in response to a couple

17  of the questions that you asked.

18          You asked whether the removal power of the

19  President has to be tied to an executive branch agency.  I

20  think that's clearly correct, because the whole premise is

21  that the President's ability to perform his executive

22  function through the vesting power implies the ability to

23  remove in certain circumstances.

24          The executive power is part and parcel of the

25  removal power.  I mean, it --

```
 1                THE COURT:  Well, I think, as Mr. Hudak said --

 2                MR. MURPHY:  To take care of the --

 3                THE COURT:  -- he agrees that the jurisprudence is

 4     there.

 5                MR. MURPHY:  Right.

 6                THE COURT:  But he is -- that's what the Supreme

 7     Court has clearly stated, and the D.C. Circuit.

 8                MR. MURPHY:  Right.

 9                THE COURT:  But it's not clear that that is where

10     this President thinks it stops.

11                MR. MURPHY:  Well, that could be.  But there is no

12     Article II issue if it's not an executive branch agency.

13                The argument made by the defendants' counsel

14     that -- you know, the fact that the USIP -- it's the

15     United States Institute for Peace, therefore that means

16     something.  I don't know how U.S. Steel would feel about

17     that.  But there are a lot of entities that have the name

18     "United States" in them.

19                THE COURT:  Yes.  But, I mean, the fact is that --

20     I think the Institute is only allowed to use "U.S." in its

21     title so as long as it gets appropriations from Congress.

22                MR. MURPHY:  That is correct.

23                THE COURT:  And it's getting appropriations from

24     Congress, which is why it's able to use "U.S." in its title.

25     But that doesn't help you in terms of -- you know, the fact
```

1    that it has "U.S." in the title is -- it's more probative

2    that they also get a lot -- most of its funding from

3    Congress.  That is quite probative of whether or not it is a

4    government entity.

5           MR. MURPHY:  Right.

6           I wanted to talk mostly about the Amtrak situation

7    because the Court seems to be concerned about application of

8    the Supreme Court's two opinions involving Amtrak and how

9    they affect this case.

10           I am just rereading *Department of Transportation*

11    *v. The Association of American Railroads*, which is the more

12    recent case.  And --

13           THE COURT:  Yeah.  That's 2015.

14           MR. MURPHY:  Yes.  You know, one of the things the

15    court said about Amtrak and its unique features and

16    significant ties to the government -- it made it clear that

17    it was not an autonomous, private enterprise.  And the Court

18    said:  Among other important considerations, its priorities,

19    its operations, its decisions are extensively supervised and

20    substantially funded by the political branches.

21           Now, USIP is substantially funded by the political

22    branches, but it is not actively and extensively supervised

23    in its operations and priorities.  There is not that level

24    of control over USIP.

25           In the final analysis of Justice Kennedy's

1    opinion, he said:  Treating Amtrak as governmental for these

2    purposes -- "governmental," as Your Honor pointed out -- is

3    not an unbridled grant of authority to an unaccountable

4    actor.

5        "The political branches created Amtrak" -- and one

6    of the things he pointed out was that the stock of Amtrak

7    was largely held by the government; there is no stock in

8    USIP, it's a nonmember corporation -- "the control of its

9    board, the political branches define its mission specify

10    many of its day-to-day operations have imposed substantial

11    transparency and accountability mechanisms, and for all

12    practicable purposes, set and supervise the annual budget."

13        A lot of those factors do not apply to USIP.

14        OMB does -- USIP doesn't submit its budget

15    proposal to OMB.  It makes its own budget proposal.  It goes

16    to the political branches, but -- there is no specification

17    of our day-to-day operations.  They don't really define the

18    mission.

19        There is a broad grant of authority to USIP as

20    sort of a necessary and proper clause, that USIP is able to

21    do other things that are consistent with its basic purposes

22    without any specification -- further specification by

23    Congress.  That is Section 4604(m):  The Institute may do

24    any and all lawful acts and things necessary or desirable to

25    carry out the objectives and purposes of this chapter.

94

1          It's given a broad grant of authority.

2          There is not a micromanagement of USIP the way

3     there was of Amtrak.  Amtrak -- almost every aspect of it

4     is, really, subject to federal government control.

5          So I think that that's -- those are all

6     distinctions that are important, and I don't think that the

7     Amtrak decisions control the outcome in this case.

8          Unless you have further questions Your Honor, I am

9     finished.

10          THE COURT:  No.

11          MR. MURPHY:  Thank you.

12          THE COURT:  I am good.  I am going to reserve

13     decision.  Thank you.

14          (Whereupon, the proceeding concludes.)

15

16                    **CERTIFICATE**

17          I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify
       that the foregoing constitutes a true and accurate
18     transcript of my stenographic notes, and is a full, true,
       and complete transcript of the proceedings to the best of my
19     ability.

20          This certificate shall be considered null and void
       if the transcript is disassembled, edited, screenshot,
21     and/or photocopied in any manner by any party without
       authorization of the signatory below.

22

23     Dated this 15th day of May, 2025.

24     /s/ Elizabeth Davila, RPR, FCRR
       Official Court Reporter

25

**'**

**'80s** [1] - 9:10

**/**

**/s** [1] - 94:24

**1**

**1** [5] - 5:14, 12:20, 52:11, 52:25, 53:2
**1.5** [2] - 37:13, 82:3
**100-238** [1] - 8:11
**101** [1] - 67:5
**104** [1] - 67:5
**105** [5] - 9:7, 11:24, 12:2, 12:7, 67:6
**108** [1] - 8:11
**10:05** [1] - 1:6
**11** [3] - 17:17, 57:6, 57:11
**118** [1] - 44:13
**14** [1] - 1:6
**15(a** [1] - 51:7
**15th** [1] - 94:23
**16** [1] - 22:9
**17** [1] - 84:9
**1800** [1] - 1:13
**1928** [2] - 29:24, 32:13
**1986** [1] - 40:11
**1987** [3] - 9:3, 12:1, 26:5
**1988** [2] - 8:8, 8:19
**19th** [1] - 83:21

**2**

**2.0** [2] - 37:13, 82:3
**20** [3] - 7:24, 24:16, 26:17
**20001** [1] - 1:19
**20036** [1] - 1:14
**2015** [3] - 24:16, 26:19, 92:13
**202** [2] - 1:14, 1:19
**2020** [1] - 14:22
**2024** [1] - 73:3
**2025** [3] - 1:6, 73:7, 94:23
**22** [4] - 46:2, 47:1, 68:10, 71:23
**25** [1] - 50:15
**25(d** [1] - 59:5
**25-804** [2] - 1:3, 2:3
**252-2549** [1] - 1:19
**29-406.08(e)** [1] - 68:25

**3**

**36** [3] - 23:7, 23:8, 65:10

**4**

**4** [4] - 9:2, 50:3, 51:1, 52:11
**40** [2] - 7:23, 49:2
**4601** [1] - 71:23
**4601(a** [2] - 72:10, 85:17
**4601(b** [1] - 71:25
**4604(a** [1] - 68:10
**4604(m** [1] - 93:23
**4605(f** [1] - 47:1
**4605(f)** [1] - 46:3
**4605(h)(2** [1] - 55:22

**5**

**5** [18] - 8:22, 9:7, 9:8, 11:24, 12:2, 52:10, 52:12, 66:24, 67:1, 67:5, 67:6, 67:7, 67:9, 67:11, 68:19, 69:3, 69:15, 89:25
**5(o** [2] - 68:14, 68:16
**51** [1] - 9:7
**5102** [1] - 90:2
**5103** [2] - 12:2, 89:25

**6**

**6** [1] - 84:11
**601** [1] - 1:18

**7**

**77** [1] - 53:2

**8**

**8** [1] - 84:11
**822-8106** [1] - 1:14

**9**

**9** [1] - 84:9

**A**

**a)(1** [1] - 85:17
**a.m** [1] - 1:6
**ability** [14] - 3:25, 5:25, 17:10, 37:6, 38:8, 41:12, 42:3, 42:20, 44:5, 47:10, 47:12, 90:21, 90:22, 94:19

**able** [5] - 29:5, 48:10, 51:17, 91:24, 93:20
**abroad** [1] - 35:9
**absent** [1] - 17:5
**absolute** [7] - 4:16, 44:24, 62:17, 63:4, 64:17, 65:17, 77:20
**absolutely** [4] - 16:1, 44:3, 63:21, 69:12
**academic** [1] - 15:21
**Academy** [1] - 14:21
**academy** [3] - 14:23, 85:10, 86:15
**access** [3] - 51:12, 53:15, 54:9
**accomplishing** [1] - 14:25
**accountability** [1] - 93:11
**accurate** [2] - 59:19, 94:17
**achieved** [1] - 37:18
**Act** [18] - 5:19, 5:23, 6:1, 19:15, 30:7, 30:9, 31:18, 68:13, 68:15, 68:18, 68:19, 68:21, 68:22, 69:2, 69:6, 69:14, 69:15, 69:16
**act** [4] - 39:9, 47:19, 53:17, 56:14
**Action** [2] - 1:3, 2:3
**action** [7] - 17:15, 18:18, 28:6, 29:9, 32:10, 47:19, 85:4
**actions** [6] - 2:24, 6:14, 31:24, 53:3, 60:24, 69:10
**actively** [1] - 92:22
**activities** [11] - 14:5, 14:10, 28:18, 39:3, 52:3, 52:6, 74:13, 86:18, 86:23, 87:10, 87:13
**activity** [1] - 87:18
**actor** [1] - 93:4
**actors** [2] - 78:8, 78:11
**acts** [3] - 55:5, 57:23, 93:24
**actual** [1] - 44:17
**Adam** [1] - 52:18
**add** [2] - 51:1, 89:19
**added** [1] - 52:9
**addition** [1] - 85:22
**additional** [2] - 47:22, 52:12

**address** [1] - 11:1
**addressed** [2] - 6:22, 26:12
**adequate** [1] - 55:14
**adjudicatory** [3] - 29:16, 45:16, 81:6
**administration** [4] - 60:7, 63:3, 71:12, 87:1
**Administration** [1] - 5:17
**administration's** [1] - 2:24
**Administrative** [1] - 19:15
**adopted** [4] - 26:16, 48:5, 52:17, 56:25
**advancing** [1] - 85:10
**adverse** [1] - 87:11
**advice** [3] - 17:4, 46:12, 82:18
**affairs** [7] - 28:11, 35:18, 40:6, 66:19, 71:6, 78:8, 86:9
**affect** [1] - 92:9
**affidavit** [2] - 15:2, 44:19
**affiliated** [1] - 3:16
**Afghan** [1] - 36:24
**afterwards** [1] - 4:9
**agencies** [8] - 30:24, 38:25, 50:22, 54:6, 64:18, 65:18, 67:7, 90:6
**Agency** [1] - 75:14
**agency** [21] - 9:7, 9:9, 10:8, 10:9, 15:17, 20:14, 28:21, 37:19, 66:6, 66:18, 66:20, 66:22, 66:25, 78:1, 78:7, 78:16, 82:17, 83:24, 84:16, 90:19, 91:12
**agents** [1] - 48:13
**aggrandizement** [1] - 41:21
**ago** [1] - 32:4
**agree** [14] - 20:7, 20:8, 28:10, 39:10, 56:20, 64:20, 65:15, 67:16, 67:17, 67:21, 68:17, 69:4, 69:17, 76:11
**agreed** [2] - 21:14, 56:19
**agreeing** [1] - 64:23
**agreement** [1] - 28:9
**agreements** [1] - 34:24
**agrees** [2] - 56:15, 91:3

**aha** [1] - 40:15
**Ahmar** [1] - 52:18
**aid** [2] - 5:24, 35:18
**aided** [1] - 1:25
**akin** [1] - 15:20
**al** [4] - 1:3, 1:6, 2:3, 2:4
**albeit** [1] - 82:20
**allegedly** [2] - 4:10, 55:2
**alleges** [2] - 18:7, 18:9
**allocating** [1] - 73:1
**allowed** [1] - 91:20
**allude** [1] - 26:9
**alluded** [1] - 19:23
**almost** [2] - 26:17, 94:3
**alone** [1] - 56:3
**alternative** [4] - 19:9, 27:3, 27:23, 52:14
**alternatives** [2] - 72:12, 72:13
**ambassador** [1] - 37:23
**Ambassador** [5] - 3:12, 14:8, 18:11, 38:20, 39:11
**ambit** [1] - 28:7
**amend** [3] - 50:25, 51:7, 54:3
**amended** [6] - 7:3, 50:1, 50:4, 50:11, 50:14, 52:9
**Amendment** [9] - 10:9, 10:10, 24:12, 24:19, 25:1, 26:22, 26:25, 74:9, 74:13
**amendment** [2] - 58:23, 58:24
**American** [5] - 23:12, 24:15, 26:6, 85:19, 92:11
**amicus** [2] - 44:13, 44:20
**ample** [1] - 22:8
**Amtrak** [32] - 10:5, 10:6, 10:12, 19:20, 19:21, 19:25, 21:6, 24:9, 24:12, 24:17, 24:25, 25:1, 25:8, 25:13, 26:23, 70:9, 71:4, 71:5, 71:17, 73:15, 73:16, 74:16, 78:24, 92:6, 92:8, 92:15, 93:1, 93:5, 93:6, 94:3, 94:7
**analogizing** [1] - 30:18
**analogy** [2] - 41:4, 41:8

**analysis** [11] - 11:16, 12:12, 12:13, 24:22, 24:24, 31:22, 38:10, 67:20, 71:20, 81:18, 92:25
**analytical** [2] - 74:18, 80:3
**analytically** [1] - 69:25
**analyze** [3] - 19:24, 46:23, 47:4
**analyzed** [2] - 20:17, 24:8
**Andrew** [1] - 2:14
**ANDREW** [1] - 1:12
**animals** [1] - 57:25
**announced** [1] - 48:24
**annual** [1] - 93:12
**answer** [13] - 12:18, 15:8, 21:18, 23:24, 37:20, 37:21, 43:19, 44:21, 64:11, 70:9, 71:23, 74:17, 76:1
**APA** [4] - 52:10, 52:13, 62:1, 67:12
**apologies** [2] - 77:6, 80:17
**appear** [1] - 61:17
**APPEARANCES** [1] - 1:10
**applicability** [1] - 90:1
**applicable** [4] - 7:2, 68:18, 77:19, 90:8
**application** [2] - 10:19, 92:7
**applied** [3] - 7:2, 24:22, 26:22
**applies** [7] - 42:16, 45:17, 45:18, 64:17, 69:2, 69:16, 77:21
**apply** [10] - 10:8, 41:4, 41:24, 54:11, 64:6, 64:13, 70:3, 70:9, 89:23, 93:13
**appoint** [6] - 17:3, 24:6, 42:2, 57:3, 70:19, 83:11
**appointed** [12] - 3:11, 4:18, 39:17, 49:23, 58:12, 64:7, 65:6, 68:23, 72:22, 82:18, 83:7, 84:10
**appointing** [2] - 52:18, 65:8
**appointment** [13] - 42:6, 42:12, 50:2, 50:3, 54:16, 54:24, 55:7, 56:4, 62:25, 63:23, 64:13, 65:11, 65:23
**appointments** [1] -

65:12
**appoints** [3] - 66:14, 77:9, 84:17
**appreciate** [4] - 22:24, 38:5, 54:18, 59:22
**appropriate** [1] - 5:24
**appropriated** [1] - 73:3
**appropriations** [4] - 14:22, 82:17, 91:21, 91:23
**approval** [1] - 86:21
**April** [2] - 5:14, 12:20
**arbitrary** [1] - 62:1
**area** [1] - 28:8
**areas** [1] - 28:11
**argue** [2] - 28:3, 65:6
**argued** [4] - 4:3, 18:8, 31:2, 61:23
**argument** [20] - 27:4, 27:6, 27:23, 34:12, 40:3, 43:10, 45:20, 45:21, 55:20, 56:17, 57:16, 66:12, 66:13, 74:3, 78:4, 78:6, 78:18, 80:19, 91:13
**arguments** [1] - 5:7
**Ark** [1] - 32:6
**armed** [1] - 85:22
**Armenia** [1] - 36:10
**arose** [1] - 74:8
**arrangements** [1] - 89:7
**art** [1] - 85:10
**Article** [14] - 10:15, 10:21, 11:1, 16:25, 17:6, 25:16, 27:8, 28:7, 28:19, 34:7, 47:11, 58:10, 78:25, 91:12
**articles** [1] - 80:8
**Asia** [2] - 75:2, 75:22
**aside** [4] - 43:12, 55:2, 78:13, 81:9
**aspect** [1] - 94:3
**aspects** [3] - 8:16, 23:2, 70:5
**assert** [1] - 63:22
**asserting** [1] - 3:21
**assessing** [1] - 77:13
**assets** [5] - 12:20, 48:6, 51:22, 52:20, 54:11
**assigned** [1] - 77:2
**associate** [2] - 9:3, 9:5
**associated** [1] - 52:23
**Association** [3] - 24:15, 26:6, 92:11
**assuming** [1] - 89:8
**assumption** [5] -

29:18, 29:20, 34:14, 34:16, 78:19
**attempt** [2] - 28:5, 85:4
**attempting** [1] - 88:6
**attendance** [1] - 57:8
**Attorney's** [3] - 1:17, 2:19, 2:21
**authorities** [2] - 28:13, 77:2
**authority** [20] - 24:6, 27:9, 30:16, 40:13, 45:5, 46:18, 47:11, 47:22, 47:23, 48:15, 49:24, 51:11, 53:4, 64:25, 70:18, 70:21, 93:3, 93:19, 94:1
**authorization** [2] - 1:22, 94:21
**authorizing** [1] - 52:19
**automatically** [1] - 59:7
**autonomous** [1] - 92:17
**avail** [1] - 61:7
**available** [2] - 8:10, 52:12
**avoid** [2] - 16:23, 26:25
**aware** [4] - 12:20, 44:12, 69:20, 75:13
**awkward** [1] - 6:8
**Azerbaijan** [1] - 36:10

## B

**backing** [1] - 16:7
**bad** [1] - 47:19
**badge** [1] - 53:19
**balancing** [1] - 41:14
**banc** [1] - 75:17
**bank** [1] - 30:13
**barring** [1] - 53:25
**based** [3] - 5:7, 7:1, 76:16
**basic** [6] - 5:4, 11:22, 12:15, 58:7, 59:11, 93:21
**basis** [2] - 5:8, 73:22
**bear** [3] - 38:3, 84:15, 90:9
**become** [1] - 19:19
**BEFORE** [1] - 1:9
**begged** [1] - 84:3
**begin** [1] - 84:9
**beginning** [2] - 7:8, 16:2
**begins** [1] - 72:2
**begs** [1] - 78:9
**behalf** [2] - 2:20,

34:21
**behavioral** [1] - 85:8
**beholden** [2] - 39:7, 39:23
**belief** [1] - 37:17
**believes** [1] - 78:10
**belong** [1] - 33:6
**belonging** [2] - 5:16, 48:12
**below** [1] - 94:21
**BEN** [1] - 1:12
**Ben** [1] - 2:14
**benefit** [2] - 5:9, 21:3
**benefits** [6] - 8:9, 8:15, 8:20, 9:23, 10:19
**BERYL** [1] - 1:9
**beside** [1] - 18:5
**best** [3] - 9:20, 66:23, 94:18
**bestowed** [2] - 77:7, 77:17
**between** [6] - 6:7, 30:5, 31:24, 34:9, 87:13, 88:7
**beyond** [4] - 12:21, 34:6, 54:21
**big** [3] - 25:17, 49:6, 81:24
**Bill** [2] - 80:7, 80:10
**bill** [2] - 8:18, 14:22
**binding** [5] - 10:13, 10:15, 24:11, 65:16, 67:14
**bird** [1] - 58:1
**bit** [5] - 16:7, 60:17, 63:13, 81:15, 88:14
**blunt** [1] - 18:3
**blush** [1] - 34:19
**board** [63] - 3:11, 3:14, 3:17, 4:4, 4:5, 4:6, 4:10, 4:17, 5:6, 17:3, 17:12, 17:16, 17:17, 17:19, 17:20, 17:21, 18:1, 18:10, 18:24, 19:11, 27:14, 31:11, 38:24, 39:17, 42:1, 46:1, 46:25, 47:17, 51:11, 51:21, 51:24, 52:3, 53:22, 54:4, 55:3, 55:5, 55:7, 55:22, 55:25, 56:9, 56:14, 57:2, 57:4, 57:6, 57:10, 58:11, 60:20, 66:14, 66:15, 70:19, 82:18, 83:7, 83:8, 83:10, 83:12, 83:17, 84:10, 87:9, 87:17, 87:23, 89:3, 93:9

**boards** [1] - 30:13
**body** [2] - 29:16
**bond** [1] - 62:4
**border** [2] - 36:10, 37:11
**Bosley** [1] - 35:14
**bottom** [1] - 58:2
**bound** [1] - 63:9
**Bowsher** [2] - 40:10, 41:11
**branch** [77] - 4:14, 4:24, 5:18, 9:13, 10:2, 10:18, 15:17, 15:25, 16:18, 20:14, 21:7, 21:9, 23:13, 27:24, 28:12, 28:21, 28:23, 28:25, 29:10, 29:17, 29:19, 30:15, 35:3, 37:19, 38:7, 38:25, 39:25, 40:16, 41:3, 41:7, 42:24, 42:25, 43:3, 46:20, 58:4, 58:5, 62:14, 62:15, 64:3, 64:18, 65:18, 65:24, 66:6, 66:11, 66:18, 67:1, 67:4, 68:2, 70:2, 73:19, 73:23, 73:24, 74:1, 74:4, 74:10, 74:16, 76:13, 77:21, 78:1, 78:7, 78:23, 78:25, 79:9, 83:4, 83:13, 83:15, 84:2, 84:4, 84:8, 84:16, 87:3, 87:4, 90:6, 90:11, 90:19, 91:12
**branch's** [1] - 35:18
**branches** [28] - 9:16, 9:19, 10:2, 10:23, 11:5, 19:25, 20:22, 20:24, 22:23, 30:1, 30:2, 31:25, 32:25, 33:9, 34:10, 34:14, 62:11, 68:3, 77:17, 79:24, 80:1, 80:25, 81:22, 92:20, 92:22, 93:5, 93:9, 93:16
**Brandeis** [1] - 31:20
**break** [1] - 58:16
**breaking** [1] - 37:10
**BRIAN** [1] - 1:16
**Brian** [1] - 2:19
**brian.hudak@usdoj. gov** [1] - 1:20
**brief** [10] - 8:22, 14:8, 18:9, 29:23, 44:13, 44:20, 61:23, 72:11, 77:6, 90:5
**briefing** [10] - 5:9, 6:17, 6:19, 16:2,

16:6, 29:5, 69:7, 76:16, 76:21, 78:14
**briefly** [1] - 46:10
**bring** [3] - 36:15, 40:1, 44:7
**bringing** [4] - 36:11, 37:15, 38:2, 40:4
**brings** [1] - 37:1
**broad** [3] - 85:5, 93:19, 94:1
**Broadcasting** [2] - 75:3, 75:22
**broader** [1] - 71:18
**broker** [2] - 21:25, 36:15
**brought** [1] - 6:3
**Buckley** [2] - 29:25
**Budget** [2] - 12:1, 12:3
**budget** [9] - 41:12, 41:14, 41:17, 72:23, 73:1, 73:2, 93:12, 93:14, 93:15
**building** [11] - 12:21, 13:8, 48:6, 48:21, 48:24, 49:2, 49:9, 49:16, 49:21, 51:12, 59:17
**built** [1] - 39:1
**buttressed** [1] - 44:19
**bylaw** [1] - 55:11
**bylaws** [3] - 51:20, 56:12, 56:25

## C

**cannot** [3] - 27:19, 31:23, 34:8
**canvassing** [1] - 65:9
**capacity** [3] - 59:3, 85:22, 88:15
**Capitol** [1] - 79:5
**capricious** [1] - 62:1
**care** [1] - 91:2
**Carle** [1] - 57:24
**Carnegie** [3] - 39:12, 39:16, 89:2
**carry** [4] - 71:19, 77:11, 89:10, 93:25
**carrying** [2] - 72:20, 87:5
**case** [46] - 3:1, 6:2, 6:3, 6:8, 6:9, 6:12, 6:14, 6:16, 6:18, 6:19, 6:21, 6:23, 7:9, 12:19, 16:2, 18:4, 19:8, 19:20, 24:17, 24:25, 25:6, 25:17, 25:25, 26:5, 31:10, 34:2, 40:11, 40:23, 43:6, 43:8, 47:7,

50:21, 60:15, 60:17, 60:19, 61:3, 65:22, 66:1, 70:1, 75:11, 75:13, 83:19, 92:9, 92:12, 94:7
**cases** [14] - 4:22, 6:7, 10:4, 10:5, 11:13, 19:19, 24:24, 25:15, 42:7, 65:25, 66:2, 68:9, 70:8, 75:14
**caught** [1] - 75:21
**Cavanaugh** [10] - 48:6, 49:22, 50:9, 50:13, 50:16, 50:19, 51:1, 54:17, 54:24, 58:25
**Cavanaugh's** [2] - 50:2, 50:5
**caveat** [2] - 42:17, 65:21
**cease** [1] - 52:3
**ceased** [1] - 52:6
**central** [1] - 24:23
**century** [1] - 83:21
**certain** [10] - 9:22, 9:23, 21:20, 46:7, 46:8, 60:8, 65:4, 65:5, 90:7, 90:23
**certainly** [17] - 9:21, 17:1, 21:19, 26:11, 26:13, 27:17, 50:9, 50:24, 58:4, 61:9, 64:6, 66:20, 66:21, 67:25, 73:23, 90:5
**certainty** [1] - 34:9
**CERTIFICATE** [1] - 94:16
**certificate** [1] - 94:20
**certify** [1] - 94:17
**chair** [1] - 55:23
**chairman** [1] - 55:24
**challenge** [4] - 17:10, 50:4, 54:16, 61:24
**challenged** [1] - 3:10
**challenges** [3] - 6:12, 50:3, 60:21
**challenging** [2] - 54:18, 54:23
**chambers** [1] - 3:6
**changed** [2] - 14:10, 26:7
**channels** [4] - 82:5, 86:5, 88:3, 89:1
**Chapter** [1] - 9:7
**chapter** [3] - 68:13, 72:2, 93:25
**character** [1] - 31:15
**characteristics** [1] - 66:17
**charge** [1] - 15:3

**charter** [2] - 52:4, 65:9
**charters** [1] - 23:15
**check** [1] - 55:17
**Chief** [2] - 27:11, 84:13
**chose** [1] - 82:24
**chosen** [1] - 6:20
**Christopher** [1] - 35:14
**Circuit** [15] - 10:6, 10:11, 19:21, 73:15, 73:16, 73:17, 74:25, 75:15, 75:16, 75:17, 83:3, 84:5, 84:6, 84:17, 91:7
**Circuit's** [1] - 83:19
**circumstance** [2] - 56:13, 56:19
**circumstances** [1] - 90:23
**citation** [1] - 89:25
**cite** [2] - 10:15, 29:25
**cited** [1] - 31:10
**civic** [1] - 22:3
**Civil** [4] - 1:3, 2:2, 51:7, 59:5
**civil** [1] - 79:20
**claim** [10] - 6:1, 6:15, 50:1, 51:15, 52:6, 52:10, 52:13, 52:15, 52:22, 53:7
**claims** [6] - 6:21, 7:3, 49:25, 52:9, 56:9, 60:16
**clarification** [1] - 31:6
**clarify** [1] - 68:8
**classifications** [1] - 12:4
**classified** [1] - 78:25
**classify** [1] - 66:24
**clause** [2] - 25:15, 93:20
**clauses** [5] - 60:4, 60:12, 71:11, 71:15
**clear** [27] - 10:21, 10:25, 11:11, 14:3, 15:22, 16:2, 16:12, 16:14, 19:10, 19:24, 21:2, 21:6, 42:19, 42:21, 51:2, 54:15, 54:22, 63:21, 64:14, 64:15, 69:1, 69:12, 73:22, 73:25, 77:16, 91:9, 92:16
**clearly** [14] - 10:6, 22:15, 24:9, 26:23, 28:6, 28:15, 41:16, 57:20, 58:4, 70:20, 79:4, 81:19, 90:20, 91:7

**Code** [1] - 68:25
**coextensive** [1] - 63:22
**cognizant** [1] - 52:1
**collect** [1] - 58:15
**Collins** [1] - 82:13
**COLUMBIA** [1] - 1:1
**Columbia** [4] - 1:18, 3:23, 68:12, 68:14
**commemorative** [1] - 65:5
**comment** [1] - 19:7
**commission** [1] - 22:18
**committee** [1] - 33:14
**Committee** [6] - 23:18, 25:24, 26:1, 26:5, 26:9, 26:12
**committees** [4] - 46:8, 46:22, 47:20
**companies** [1] - 30:15
**company** [2] - 27:1, 30:14
**compare** [1] - 88:20
**comparison** [1] - 45:6
**compartments** [1] - 32:1
**compatible** [1] - 81:25
**complaint** [11] - 7:4, 7:5, 18:7, 18:9, 50:1, 50:4, 50:11, 50:14, 51:1, 52:9, 52:23
**complete** [1] - 94:18
**completely** [2] - 3:19, 15:2
**complicated** [2] - 3:3, 9:18
**comply** [1] - 69:13
**component** [1] - 4:14
**components** [2] - 60:9, 90:7
**composed** [1] - 31:12
**comprehensive** [1] - 11:24
**Comptroller** [5] - 40:12, 40:15, 40:19, 40:20, 41:2
**comptroller** [3] - 41:12, 41:13, 41:15
**computer** [2] - 1:25, 53:16
**computer-aided** [1] - 1:25
**conceded** [1] - 8:7
**conceding** [1] - 16:10
**concerned** [1] - 92:7
**concerns** [1] - 85:19
**concert** [1] - 53:13
**concluded** [1] - 5:10
**concludes** [1] - 94:14

**conducted** [1] - 55:22
**conducts** [1] - 71:6
**conference** [1] - 33:14
**conferred** [2] - 53:4, 68:11
**confident** [1] - 87:16
**confirmed** [3] - 24:14, 58:12, 64:8
**conflict** [9] - 22:1, 34:25, 38:3, 40:2, 40:5, 85:23, 88:6, 88:19, 88:22
**conflicts** [2] - 35:9, 44:8
**conformity** [2] - 46:2, 47:1
**confusion** [1] - 77:6
**Congress** [66] - 8:8, 9:21, 9:22, 10:12, 11:21, 12:3, 14:22, 14:25, 15:24, 17:1, 17:2, 18:16, 20:6, 21:14, 21:19, 22:24, 22:25, 23:5, 23:10, 23:19, 31:2, 31:11, 32:4, 32:10, 32:17, 33:23, 33:25, 34:13, 36:23, 39:1, 39:20, 40:13, 40:16, 41:1, 41:5, 41:20, 41:23, 42:18, 46:17, 47:9, 47:12, 52:2, 53:5, 65:2, 72:10, 72:20, 72:21, 77:3, 78:15, 78:20, 78:21, 78:22, 79:8, 79:25, 81:20, 82:24, 84:11, 84:12, 90:6, 91:21, 91:24, 92:3, 93:23
**Congress's** [2] - 15:5, 15:12
**congressional** [11] - 22:20, 40:14, 41:21, 46:21, 47:20, 67:13, 67:23, 76:24, 78:19, 82:7, 83:18
**congressional-created** [1] - 78:19
**congressionally** [1] - 3:21
**connote** [1] - 82:14
**Conrail** [1] - 25:9
**consent** [3] - 17:4, 46:12, 82:19
**considerations** [1] - 92:18
**considered** [5] - 1:21, 4:21, 65:22, 71:3, 94:20
**considering** [1] -

71:13
**consisted** [1] - 3:13
**consistent** [3] - 41:14, 68:13, 93:21
**consists** [1] - 8:1
**constitute** [2] - 55:25, 57:7
**constitutes** [1] - 94:17
**Constitution** [8] - 24:18, 32:2, 37:24, 53:5, 62:10, 64:9, 68:1, 82:1
**constitutional** [25] - 3:9, 5:10, 7:10, 9:24, 11:2, 12:13, 20:21, 27:25, 28:13, 32:22, 38:9, 46:24, 47:6, 47:24, 48:1, 62:6, 62:18, 67:14, 67:20, 74:23, 76:14, 77:14, 80:8, 80:9, 81:24
**constitutionality** [1] - 47:4
**consulted** [1] - 47:17
**contacts** [1] - 26:24
**contain** [1] - 56:12
**context** [5] - 25:4, 27:2, 30:7, 74:7, 81:20
**continue** [3] - 15:8, 33:2, 46:1
**continued** [2] - 61:21, 61:25
**continues** [1] - 70:20
**continuing** [3] - 54:11, 60:21, 62:2
**Continuing** [1] - 73:5
**contractors** [5] - 6:4, 13:18, 14:3, 48:13, 59:24
**contrary** [2] - 18:8, 52:5
**control** [16] - 26:24, 53:3, 53:15, 82:15, 83:9, 83:10, 86:9, 87:7, 88:21, 89:4, 89:12, 90:10, 92:24, 93:8, 94:4, 94:7
**controlled** [3] - 67:3, 72:25, 86:1
**convened** [1] - 36:24
**conversations** [2] - 35:13, 35:14
**convinces** [1] - 66:12
**Copyrights** [2] - 65:3, 78:22
**core** [11] - 28:13, 29:10, 34:20, 34:22, 35:1, 35:10, 35:12, 43:11, 43:16, 43:22,

85:2
**corporate** [3] - 51:24, 52:3, 52:5
**Corporation** [8] - 33:6, 68:13, 68:15, 68:18, 68:21, 69:2, 69:6, 69:14
**corporation** [10] - 9:6, 15:18, 19:2, 20:4, 21:10, 67:3, 68:12, 70:13, 70:20, 93:8
**corporations** [6] - 31:3, 31:4, 75:4, 75:8, 75:23, 75:24
**correct** [18] - 14:17, 14:19, 16:15, 24:21, 29:4, 36:2, 59:16, 63:7, 63:8, 63:24, 63:25, 64:10, 69:19, 74:7, 74:15, 77:22, 90:2, 91:22
**corrected** [2] - 18:12, 73:18
**correctly** [1] - 79:18
**counsel** [6] - 2:7, 2:20, 7:16, 9:3, 9:5, 91:13
**counsel's** [1] - 17:10
**Count** [6] - 50:3, 51:1, 52:10, 52:12, 52:25, 53:2
**count** [1] - 52:22
**countries** [3] - 22:4, 35:15, 87:14
**country** [3] - 9:19, 34:21, 88:2
**country's** [1] - 89:18
**Counts** [1] - 52:11
**couple** [5] - 4:20, 13:8, 59:17, 78:14, 90:16
**course** [1] - 5:13
**COURT** [180] - 1:1, 1:9, 2:10, 2:16, 2:22, 9:12, 9:15, 12:9, 12:17, 13:1, 13:4, 13:15, 13:17, 13:20, 13:22, 14:2, 14:5, 14:12, 14:14, 14:18, 15:7, 15:10, 16:1, 16:6, 17:9, 18:3, 18:17, 19:16, 20:3, 20:10, 20:12, 20:16, 20:19, 21:15, 22:12, 22:15, 23:4, 23:15, 24:1, 24:4, 24:14, 24:22, 25:22, 26:14, 26:19, 27:3, 27:17, 28:17, 28:24, 29:2, 32:20, 33:4, 33:12,

33:16, 34:1, 34:5, 34:11, 35:22, 35:25, 38:5, 38:16, 38:21, 39:16, 39:20, 40:7, 41:10, 41:18, 42:8, 42:21, 43:2, 43:5, 43:7, 43:9, 44:9, 44:21, 45:1, 45:9, 45:15, 45:23, 46:20, 47:3, 47:6, 47:24, 48:2, 49:3, 49:6, 49:14, 49:20, 50:7, 50:9, 50:23, 51:4, 51:15, 51:19, 52:8, 52:16, 53:11, 53:24, 54:6, 54:13, 55:9, 55:21, 56:24, 57:12, 57:17, 58:14, 58:20, 59:1, 59:9, 59:14, 60:3, 60:11, 60:22, 61:6, 61:15, 61:19, 62:5, 62:8, 63:7, 63:11, 63:20, 63:25, 64:10, 65:2, 65:13, 66:5, 66:20, 67:9, 67:11, 67:18, 68:7, 69:9, 69:22, 70:7, 70:25, 73:2, 73:7, 73:10, 73:12, 73:21, 74:5, 74:22, 75:11, 75:19, 76:3, 76:7, 76:10, 76:16, 77:18, 77:23, 78:18, 79:13, 79:17, 79:20, 79:25, 80:10, 80:14, 80:18, 80:21, 80:23, 81:16, 82:2, 83:11, 83:23, 84:19, 84:25, 86:11, 87:19, 89:19, 90:12, 90:14, 91:1, 91:3, 91:6, 91:9, 91:19, 91:23, 92:13, 94:10, 94:12
**Court** [62] - 1:23, 1:24, 3:2, 4:7, 5:10, 7:2, 7:5, 7:20, 10:1, 10:4, 10:11, 10:14, 10:21, 10:25, 11:9, 16:17, 17:22, 18:12, 19:10, 19:22, 20:17, 21:4, 21:6, 22:8, 23:20, 24:8, 24:10, 24:12, 24:17, 25:25, 26:7, 27:20, 30:18, 31:1, 32:14, 40:11, 40:14, 40:18, 40:24, 58:9, 63:9, 65:16, 66:10, 67:14, 67:24, 67:25, 68:5, 70:1, 73:14, 73:15, 73:18, 77:13, 78:1, 78:10, 79:23,

82:13, 91:7, 92:7, 92:17, 94:24
**court** [13] - 4:20, 10:15, 10:16, 31:6, 31:16, 33:20, 41:22, 58:15, 74:5, 75:1, 78:25, 81:2, 92:15
**Court's** [9] - 5:25, 12:12, 27:15, 42:22, 59:21, 63:14, 65:21, 66:7, 92:8
**COURTROOM** [1] - 2:2
**courts** [2] - 10:13, 80:7
**Covenant** [1] - 32:6
**covered** [2] - 8:12, 89:22
**covers** [1] - 11:25
**CR** [1] - 73:8
**cramped** [1] - 49:10
**create** [2] - 14:23, 32:17
**created** [28] - 9:22, 11:14, 14:23, 15:13, 15:24, 20:4, 20:6, 21:10, 21:14, 22:18, 22:21, 23:5, 23:10, 23:16, 23:18, 23:19, 24:4, 30:12, 30:25, 34:13, 39:20, 72:6, 72:21, 78:19, 79:8, 79:25, 81:20, 93:5
**creates** [3] - 63:16, 70:12, 90:6
**creating** [3] - 31:2, 86:1
**creation** [3] - 11:14, 23:22, 23:23
**creative** [1] - 5:22
**credit** [1] - 79:19
**critical** [2] - 3:25, 38:8
**cross** [2] - 7:14, 7:21
**Cross** [1] - 33:23
**cross-motions** [2] - 7:14, 7:21
**curious** [1] - 32:20
**current** [5] - 42:22, 62:16, 62:22, 63:3, 77:19
**cut/pasted** [1] - 1:22

---
**D**
---

**D.C** [26] - 1:7, 1:14, 1:19, 10:6, 10:11, 13:23, 19:2, 19:21, 68:18, 68:25, 69:2, 69:6, 69:14, 73:15, 73:16, 73:17, 74:25,

75:15, 75:16, 75:17, 83:3, 83:19, 84:5, 84:6, 84:17, 91:7
**date** [3] - 61:13, 65:16, 73:9
**Dated** [1] - 94:23
**Daughters** [1] - 23:11
**Davila** [2] - 1:23, 94:24
**DAVILA** [1] - 94:17
**day-to-day** [2] - 93:10, 93:17
**de** [7] - 42:25, 45:5, 45:7, 64:19, 65:18, 77:23, 84:23
**deal** [6] - 9:1, 29:11, 44:2, 47:7, 47:8, 53:24
**dealing** [6] - 35:9, 38:12, 66:18, 70:8, 83:23, 86:17
**deals** [1] - 30:3
**decide** [8] - 24:18, 25:1, 51:11, 51:21, 57:2, 66:8, 68:1, 81:12
**decided** [3] - 10:12, 24:16, 56:18
**decision** [12] - 10:17, 10:21, 25:4, 26:12, 27:15, 29:24, 47:10, 51:25, 62:12, 74:6, 80:3, 94:13
**decisions** [4] - 28:16, 41:22, 92:19, 94:7
**Declaration** [2] - 36:20, 36:21
**declaration** [6] - 14:7, 15:3, 39:11, 45:25, 46:24, 52:17
**declarations** [6] - 7:2, 7:24, 22:9, 35:21, 44:17, 72:10
**declaratory** [3] - 18:13, 48:14, 60:25
**declare** [1] - 48:8
**declared** [2] - 48:4
**deemed** [1] - 55:14
**deep** [2] - 75:20, 85:20
**defendant** [7] - 6:10, 16:10, 33:20, 33:22, 50:9, 59:1, 59:8
**defendants** [24] - 3:15, 4:12, 5:15, 6:5, 6:11, 8:7, 28:3, 29:13, 34:12, 36:1, 42:9, 48:11, 53:12, 53:13, 53:21, 54:1, 54:23, 57:22, 63:3, 68:17, 69:4, 69:10, 69:17, 84:25

Defendants [1] - 1:7
DEFENDANTS [1] - 1:16
defendants' [10] - 17:10, 29:7, 35:2, 43:10, 53:2, 55:20, 56:17, 62:24, 79:9, 91:13
Defender [1] - 33:13
defender [1] - 33:19
defender's [1] - 33:10
defenders [1] - 33:14
defending [1] - 33:20
Defense [7] - 3:18, 37:21, 38:23, 43:21, 44:11, 54:1, 86:7
defer [1] - 10:24
deference [1] - 12:11
deficit [1] - 40:22
define [2] - 93:9, 93:17
defined [1] - 82:21
defines [1] - 88:16
definitions [2] - 67:5, 67:18
delegation [1] - 25:10
demonstrate [1] - 67:22
denied [2] - 3:3, 5:19
denominates [1] - 78:21
depart [1] - 82:24
Department [16] - 24:15, 37:20, 37:21, 43:20, 43:21, 44:10, 44:11, 48:25, 49:1, 54:1, 86:6, 86:7, 86:22, 87:20, 92:10
department [1] - 67:2
departments [1] - 67:2
dependent [1] - 72:25
DEPUTY [1] - 2:2
describe [2] - 9:17, 84:25
described [3] - 15:13, 15:14, 36:18
describes [1] - 85:6
descriptions [1] - 67:13
design [1] - 76:25
designated [1] - 78:23
designed [1] - 15:20
desirable [2] - 32:1, 93:24
despite [2] - 4:19, 78:24
detainees [2] - 38:25, 53:25
determination [4] - 10:18, 53:8, 89:22,

90:3
determinations [1] - 55:7
determine [3] - 51:17, 58:10, 90:1
determined [4] - 8:18, 12:1, 47:18, 52:2
determines [1] - 16:18
determining [2] - 4:22, 5:5
detriment [1] - 71:12
develop [1] - 85:21
developing [1] - 85:8
deviate [1] - 31:17
devolved [1] - 31:4
dictates [1] - 27:20
differ [1] - 75:9
difference [1] - 25:18
different [17] - 7:4, 7:9, 11:10, 12:14, 22:10, 22:22, 27:2, 27:21, 29:3, 35:15, 50:22, 60:18, 63:13, 71:4, 71:16, 76:6
diplomacy [18] - 28:5, 28:10, 28:15, 29:9, 34:21, 35:9, 37:13, 37:14, 38:8, 43:15, 72:14, 82:3, 85:3, 85:13, 86:4, 86:16, 88:11, 88:14
diplomate [1] - 82:4
diplomatic [3] - 86:5, 88:3, 89:1
diplomats [1] - 72:17
direct [2] - 30:11, 87:10
directed [1] - 14:23
directing [1] - 48:5
direction [3] - 15:5, 39:8, 86:24
director [1] - 25:1
directors [7] - 24:7, 28:2, 48:5, 51:24, 52:18, 68:23, 70:19
disagree [1] - 45:10
disassembled [2] - 1:22, 94:20
disciplines [1] - 85:7
discovery [1] - 50:20
discrete [1] - 6:14
discretion [1] - 71:18
discretionary [1] - 71:15
discussing [1] - 34:25
discussion [2] - 37:13, 63:12
discussions [1] - 69:8
displayed [1] - 25:2
disposal [1] - 23:1

dispute [5] - 20:5, 21:2, 21:12, 36:10, 78:2
disputes [4] - 36:9, 37:8, 37:11
disregard [1] - 11:21
disregarded [1] - 32:15
disseminating [1] - 86:13
dissent [1] - 31:21
dissipate [1] - 54:11
dissolution [2] - 18:14, 68:16
distinctions [2] - 31:24, 94:6
distinguish [1] - 71:20
DISTRICT [3] - 1:1, 1:1, 1:9
District [4] - 1:18, 3:22, 68:12, 68:14
divergence [1] - 7:7
divergent [2] - 3:20, 4:13
diverse [1] - 9:18
dives [1] - 58:2
divide [1] - 31:25
dividing [1] - 34:9
division [1] - 79:20
DoD [1] - 87:20
DOGE [5] - 3:15, 3:16, 6:3, 53:9
DOGE-affiliated [1] - 3:16
dominate [1] - 87:9
done [12] - 9:20, 14:15, 14:16, 18:10, 30:11, 40:20, 49:16, 50:21, 51:3, 56:15, 61:13, 65:9
Dong [2] - 83:20, 83:23
donor [1] - 6:5
doubt [1] - 32:9
down [10] - 12:15, 13:9, 13:13, 15:2, 56:6, 59:18, 59:19, 60:2, 76:18, 79:5
dozens [1] - 23:5
draw [1] - 34:8
duck [3] - 57:23
duckbilled [2] - 57:25, 83:2
duties [2] - 19:2, 34:20
dynamics [1] - 35:16

E

easier [1] - 27:16

easiest [1] - 77:25
easily [1] - 45:12
East [2] - 75:3, 75:22
easy [2] - 27:19, 58:1
edited [2] - 1:21, 94:20
education [1] - 35:7
educational [2] - 43:13, 85:1
effect [3] - 17:18, 48:7, 52:21
effective [4] - 6:13, 44:16, 85:21, 88:17
effectively [1] - 21:22
effort [3] - 25:6, 48:24, 60:7
efforts [4] - 28:5, 35:16, 44:3, 48:18
eggs [1] - 58:1
either [3] - 32:18, 73:10, 81:19
element [1] - 9:11
eligible [2] - 8:13, 8:14
elimination [2] - 81:1, 81:5
ELIZABETH [1] - 94:17
Elizabeth [2] - 1:23, 94:24
elucidating [1] - 7:17
emblem [1] - 53:19
embodying [1] - 85:19
emergency [4] - 5:8, 5:19, 56:13, 74:25
emotional [1] - 62:4
emphatic [1] - 19:22
emphatically [1] - 10:1
employed [4] - 8:13, 8:20, 8:21, 9:4
employee [1] - 74:11
employees [14] - 6:4, 8:10, 13:4, 13:17, 13:18, 13:20, 13:23, 14:3, 43:20, 48:13, 48:23, 59:16, 59:24, 90:2
employer [1] - 62:4
employment [1] - 89:23
empty [1] - 49:11
en [1] - 75:17
enacted [1] - 11:21
encourage [1] - 61:6
encroached [1] - 40:21
end [1] - 13:12
ended [1] - 41:25
endowment [5] - 12:22, 12:25, 52:19,

53:8
endowment's [1] - 52:20
ends [1] - 73:8
enforcing [1] - 45:8
engage [2] - 36:8, 82:3, 86:3
engaged [4] - 36:15, 38:1, 47:18, 60:14
engages [1] - 86:22
engaging [3] - 28:18, 39:25, 72:17
England [2] - 80:4, 80:16
enhance [1] - 85:3
enhancing [2] - 28:4, 85:13
enjoined [3] - 48:4, 53:6, 53:14
ensure [2] - 22:23, 39:2
enterprise [1] - 92:17
entire [2] - 81:3, 83:10
entirely [2] - 72:25, 83:7
entities [17] - 11:23, 22:11, 23:6, 25:19, 25:20, 34:6, 34:7, 42:24, 63:17, 64:3, 64:18, 75:6, 75:7, 75:25, 77:21, 89:8, 91:17
entitled [6] - 6:25, 8:19, 11:6, 11:7, 31:21
entity [66] - 3:8, 8:13, 8:21, 9:11, 9:14, 9:17, 9:22, 9:24, 9:25, 10:6, 11:2, 11:3, 11:17, 11:18, 15:17, 17:1, 17:7, 18:23, 19:2, 19:5, 19:21, 20:13, 20:19, 21:5, 21:8, 24:10, 26:1, 26:2, 27:6, 27:7, 27:13, 28:18, 37:7, 37:14, 45:18, 51:17, 54:11, 57:20, 58:3, 62:9, 62:13, 65:22, 66:11, 66:21, 67:8, 67:15, 68:1, 71:4, 73:17, 73:21, 77:7, 77:13, 78:19, 79:8, 80:9, 81:12, 82:2, 82:8, 86:1, 89:23, 90:3, 92:4
envision [1] - 66:17
Eric [1] - 57:24
ESCHER [1] - 1:17

**Escher** [1] - 2:21
**especially** [1] - 66:18
**ESQ** [5] - 1:11, 1:12, 1:12, 1:16, 1:17
**establish** [1] - 72:3
**established** [4] - 3:21, 17:2, 20:8, 32:5
**establishing** [3] - 32:10, 85:10, 86:15
**establishment** [4] - 67:4, 84:2, 84:4, 84:8
**et** [4] - 1:3, 1:6, 2:3, 2:4
**ethnic** [1] - 37:11
**events** [1] - 26:4
**evidence** [2] - 7:25, 56:21
**ex** [9] - 3:16, 17:17, 38:24, 53:22, 54:4, 54:12, 56:17, 83:15, 87:20
**exactly** [3] - 44:15, 60:15, 88:19
**examining** [1] - 85:7
**example** [12] - 12:22, 14:20, 23:13, 31:11, 34:10, 35:13, 45:6, 69:18, 80:24, 83:1, 85:17, 86:22
**examples** [2] - 33:3, 35:21
**exceed** [1] - 53:3
**exceedingly** [1] - 81:19
**except** [3] - 68:13, 70:25, 72:24
**exception** [7] - 30:22, 63:16, 63:18, 69:20, 70:3, 80:24, 82:9
**exceptional** [2] - 56:13, 56:19
**exceptions** [4] - 79:12, 81:17, 81:18, 90:7
**exclude** [1] - 54:4
**exclusively** [1] - 89:5
**excuse** [1] - 38:21
**execute** [1] - 25:16
**Executive** [2] - 8:18, 8:23
**executive** [111] - 4:14, 4:15, 4:24, 4:25, 5:18, 9:7, 9:9, 9:13, 15:17, 15:24, 16:18, 16:20, 17:7, 20:14, 21:9, 23:13, 25:10, 27:24, 28:7, 28:12, 28:15, 28:21, 28:22, 28:25, 29:10, 29:17,

29:19, 30:10, 30:20, 31:8, 31:24, 32:18, 33:11, 34:6, 35:3, 35:4, 35:18, 37:18, 38:7, 38:25, 39:24, 40:1, 40:19, 40:21, 41:7, 41:15, 41:16, 41:21, 42:24, 43:2, 43:17, 44:22, 45:5, 45:7, 45:17, 46:20, 53:3, 58:4, 58:5, 62:14, 62:15, 62:16, 64:3, 64:18, 64:19, 65:18, 65:19, 65:24, 66:6, 66:11, 66:18, 66:25, 67:1, 67:4, 67:6, 70:2, 73:19, 73:24, 74:4, 74:16, 76:13, 76:23, 77:8, 77:21, 77:24, 78:1, 78:7, 79:7, 81:6, 83:4, 83:13, 83:15, 84:2, 84:4, 84:8, 84:15, 84:20, 84:22, 87:3, 87:4, 90:6, 90:11, 90:19, 90:21, 90:24, 91:12
**Executor** [10] - 16:21, 45:2, 45:17, 46:16, 63:10, 63:16, 63:18, 66:2, 70:3, 84:19
**exemption** [1] - 45:2
**exercise** [13] - 29:14, 29:15, 35:12, 40:19, 40:25, 43:16, 44:22, 45:16, 45:18, 54:19, 54:20, 62:16, 87:4
**exercised** [4] - 4:25, 84:20, 87:16, 90:10
**exercises** [6] - 32:7, 34:5, 35:4, 45:4, 84:21, 86:8
**exercising** [8] - 4:15, 42:24, 53:14, 64:18, 65:18, 77:23, 89:12, 90:10
**exert** [1] - 53:3
**exerting** [1] - 89:17
**Exhibit** [2] - 8:22, 9:2
**exhibits** [1] - 7:23
**exist** [1] - 23:19
**existed** [1] - 32:13
**exists** [1] - 80:9
**expansive** [1] - 46:15
**expect** [2] - 53:24, 54:10
**expected** [1] - 56:10
**expedited** [1] - 6:16
**expertise** [1] - 22:21
**explain** [7] - 43:15,

52:22, 54:25, 76:5, 81:7, 81:8, 81:9
**explore** [1] - 42:10
**expressly** [1] - 80:7
**extend** [2] - 42:19, 85:2
**extends** [1] - 64:3
**extensively** [1] - 92:19, 92:22
**extent** [7] - 25:8, 30:3, 42:16, 45:4, 62:22, 65:10
**eye** [1] - 75:21

**F**

**f)** [1] - 47:2
**f)(3** [5] - 46:5, 46:21, 46:23, 47:2, 47:4
**face** [1] - 82:23
**facilitate** [1] - 37:7
**facilitating** [2] - 34:24, 88:6
**facilities** [1] - 53:16
**fact** [19] - 3:25, 4:6, 8:8, 23:22, 36:5, 37:17, 39:18, 39:22, 40:12, 43:19, 52:2, 53:25, 54:21, 78:4, 78:24, 88:10, 91:14, 91:19, 91:25
**factor** [12] - 20:6, 21:12, 21:15, 24:1, 24:4, 26:8, 26:15, 70:14, 71:1, 71:2, 71:3, 71:21
**factors** [14] - 11:10, 11:13, 11:15, 19:23, 20:1, 21:4, 22:6, 24:8, 24:9, 70:7, 70:10, 70:22, 77:10, 93:13
**facts** [3] - 8:1, 12:15, 59:11
**factual** [1] - 7:1
**fall** [3] - 28:6, 63:17, 73:11
**fallacious** [1] - 52:7
**fallback** [1] - 66:13
**falling** [1] - 35:11
**falls** [1] - 65:23
**familiar** [2] - 45:9, 75:11
**far** [9] - 32:2, 32:8, 38:19, 42:9, 42:10, 42:11, 42:13, 49:17, 70:4
**favor** [1] - 7:1
**favorite** [2] - 67:11, 67:12

**FCRR** [3] - 1:23, 94:17, 94:24
**features** [1] - 92:15
**federal** [42] - 3:24, 4:2, 4:14, 4:23, 8:7, 8:10, 10:7, 10:9, 11:3, 11:8, 11:14, 11:23, 16:4, 16:8, 16:11, 16:14, 16:17, 16:19, 19:17, 23:20, 26:24, 33:19, 38:6, 57:20, 58:8, 68:2, 68:3, 68:4, 70:2, 70:4, 70:6, 73:1, 74:10, 74:23, 81:25, 82:25, 87:5, 89:22, 89:24, 90:4, 94:4
**Federal** [5] - 8:16, 33:12, 55:10, 55:13, 59:5
**fellow** [1] - 87:23
**felt** [1] - 41:13
**few** [3] - 31:17, 90:15, 90:16
**Fi** [1] - 59:21
**fiduciary** [2] - 19:2, 19:3
**field** [5] - 22:2, 22:10, 22:11, 38:2, 44:18
**Fifth** [1] - 10:9
**fighters** [1] - 35:17
**figure** [3] - 9:19, 12:11, 77:19
**figuring** [1] - 86:14
**filed** [7] - 7:15, 42:15, 50:11, 50:14, 50:21
**files** [1] - 53:16
**final** [5] - 6:25, 12:4, 12:6, 90:1, 92:25
**findings** [1] - 72:9
**finished** [1] - 94:9
**fire** [2] - 47:13, 47:20
**First** [8] - 10:10, 24:12, 24:19, 24:25, 26:22, 26:25, 74:9, 74:13
**first** [18] - 2:7, 7:15, 7:16, 10:16, 11:16, 12:15, 21:1, 24:4, 29:23, 34:19, 64:11, 65:14, 66:6, 66:7, 74:18, 78:9, 84:16, 85:24
**firsthand** [1] - 88:5
**fish** [1] - 58:2
**fit** [1] - 77:14
**fits** [2] - 73:23, 77:19
**five** [4] - 3:13, 15:1, 55:24, 59:24
**five-year** [1] - 15:1

**flawed** [1] - 81:7
**flexibility** [1] - 88:14
**flows** [2] - 7:11, 62:5
**focus** [2] - 15:12, 60:20
**focusing** [1] - 60:25
**FOIA** [2] - 67:11, 83:25
**folks** [9] - 8:18, 13:9, 14:24, 25:7, 37:23, 38:1, 44:2, 44:18, 60:14
**follow** [1] - 4:4
**followed** [2] - 55:1, 56:11
**following** [1] - 75:19
**FOR** [3] - 1:1, 1:11, 1:16
**for-cause** [5] - 5:2, 23:1, 40:13, 40:15, 41:6, 87:8
**force** [2] - 42:20, 69:13
**forcefully** [1] - 28:3
**forces** [1] - 88:11
**foregoing** [1] - 94:17
**Foreign** [2] - 37:25, 43:20
**foreign** [24] - 22:3, 22:4, 28:5, 28:10, 28:11, 29:8, 29:11, 34:20, 34:24, 35:8, 35:9, 35:17, 35:18, 38:13, 38:17, 40:5, 43:15, 66:19, 72:14, 72:16, 78:8, 85:3, 85:25, 86:16
**form** [2] - 23:6, 23:19
**formal** [6] - 57:1, 58:24, 72:16, 86:4, 86:8, 88:11, 88:13, 89:1
**formally** [1] - 88:3
**former** [3] - 27:10, 44:14, 62:4
**forth** [7] - 54:9, 72:19, 72:21, 76:17, 82:1, 82:21, 89:10
**forward** [3] - 2:5, 8:20, 77:25
**founding** [1] - 80:5
**four** [5] - 13:7, 13:22, 17:24, 59:16
**fourth** [1] - 2:23
**framework** [1] - 32:22
**frankly** [2] - 3:6, 12:10
**Free** [2] - 75:2, 75:22
**free** [1] - 29:4
**freely** [1] - 51:8
**freestanding** [1] - 3:22

**friend** [5] - 58:23, 59:6, 72:15, 87:12, 89:25
**front** [1] - 48:10
**fruit** [1] - 61:11
**fulfill** [2] - 21:22, 72:6
**full** [4] - 5:9, 65:9, 88:17, 94:18
**fully** [1] - 85:21
**function** [13] - 4:1, 13:12, 17:7, 26:3, 40:1, 41:16, 41:22, 76:23, 81:12, 85:7, 90:22
**functional** [2] - 26:8, 38:6
**functioning** [1] - 14:6
**functions** [10] - 4:16, 16:20, 18:15, 18:16, 22:7, 35:4, 58:6, 76:19, 77:2, 90:9
**fundamental** [3] - 8:4, 56:23, 62:6
**funded** [4] - 33:16, 86:2, 92:20, 92:21
**funding** [6] - 73:5, 82:17, 89:5, 89:9, 89:10, 92:2
**funds** [5] - 11:14, 12:22, 12:25, 53:9, 73:3
**furtherance** [8] - 21:15, 22:12, 24:5, 36:7, 38:11, 70:15, 71:1, 89:21
**furthering** [1] - 38:16
**furthers** [1] - 82:22

## G

**gaining** [2] - 29:9, 53:14
**Gandhi** [1] - 14:21
**Gandhi-King** [1] - 14:21
**GAO** [1] - 41:13
**Garvin** [1] - 3:18
**gas** [1] - 30:14
**Gaza** [1] - 36:25
**general** [4] - 9:3, 9:5, 71:10, 90:7
**General** [7] - 5:17, 40:12, 40:15, 40:19, 40:20, 41:2, 46:13
**generally** [1] - 69:19
**given** [8] - 41:12, 44:22, 46:15, 51:8, 53:9, 71:10, 71:18, 94:1
**Global** [2] - 14:21,

75:14
**global** [2] - 34:25, 35:9
**goal** [2] - 15:1, 41:14
**Goldfarb** [1] - 2:14
**GOLDFARB** [1] - 1:12
**govern** [2] - 9:20, 11:22
**governing** [2] - 31:11, 84:10
**government** [139] - 3:24, 4:2, 4:15, 4:23, 4:24, 7:25, 8:7, 8:14, 8:21, 8:24, 9:11, 9:25, 10:19, 11:3, 11:4, 11:8, 11:15, 11:17, 11:18, 11:25, 16:4, 16:9, 16:11, 16:14, 16:17, 16:19, 18:8, 19:18, 20:4, 20:13, 20:19, 20:23, 21:5, 21:7, 21:8, 21:10, 21:16, 21:23, 22:3, 22:11, 22:13, 22:18, 22:19, 22:22, 22:23, 23:12, 23:21, 24:4, 24:5, 24:10, 25:7, 25:11, 25:12, 25:13, 26:2, 26:3, 26:25, 27:6, 27:7, 27:13, 28:14, 28:18, 30:21, 34:11, 36:3, 37:2, 37:3, 37:16, 38:6, 38:13, 38:18, 39:4, 39:6, 39:7, 39:8, 39:10, 42:5, 43:25, 44:2, 44:4, 44:12, 44:14, 45:19, 48:24, 57:21, 57:22, 58:8, 60:8, 62:9, 62:13, 63:19, 63:20, 63:21, 65:7, 67:3, 67:15, 68:2, 68:3, 68:4, 69:9, 70:2, 70:4, 70:6, 70:12, 70:17, 70:23, 71:1, 72:4, 73:1, 73:4, 74:11, 74:12, 74:19, 74:23, 75:5, 75:8, 75:24, 79:9, 82:1, 82:7, 82:25, 84:21, 86:8, 86:20, 86:25, 87:5, 89:16, 89:24, 90:4, 92:4, 92:16, 93:7, 94:4
**government's** [5] - 17:12, 29:2, 35:16, 56:16, 62:22
**government-controlled** [1] - 67:3

**government-tasked** [1] - 87:5
**governmental** [10] - 21:20, 31:3, 70:15, 72:6, 78:7, 78:11, 82:22, 90:8, 93:1, 93:2
**governments** [1] - 22:3
**governor** [1] - 30:10
**grand** [6] - 33:8, 79:12, 79:13, 80:13, 80:21, 81:8
**grant** [5] - 89:9, 93:3, 93:19, 94:1
**granted** [2] - 74:25, 75:2
**grantee** [1] - 89:13
**grantees** [1] - 89:14
**grants** [1] - 68:11
**great** [3] - 58:17, 59:21, 76:8
**ground** [5] - 35:10, 43:14, 86:12, 86:18, 86:23
**group** [3] - 36:24, 36:25
**groups** [2] - 34:24, 36:24
**GSA** [3] - 5:17, 48:6, 48:10
**guaranteed** [1] - 87:9
**guess** [3] - 33:24, 56:16, 58:22
**guidance** [3] - 4:21, 40:8, 71:10
**guide** [1] - 11:15

## H

**hallmarks** [1] - 84:15
**hand** [1] - 4:12
**handful** [3] - 13:25, 14:1, 59:18
**hands** [1] - 32:6
**happy** [2] - 67:8, 76:4
**hard** [2] - 66:16, 83:2
**harm** [1] - 62:2
**hats** [1] - 50:19
**head** [2] - 41:17, 50:22
**headquarters** [4] - 5:16, 5:20, 13:8, 13:23
**headquarters'** [2] - 51:12, 59:17
**health** [2] - 8:9, 8:14
**Health** [1] - 36:21
**hear** [3] - 11:19, 61:8, 78:11
**heard** [2] - 78:4, 87:12

**hearing** [11] - 2:23, 3:1, 5:13, 6:2, 12:19, 33:7, 46:10, 48:22, 48:23, 59:21, 69:21
**hearings** [1] - 34:15
**heartland** [1] - 64:25
**heavily** [2] - 10:12, 29:23
**Hegseth** [1] - 3:17
**held** [5] - 23:20, 46:10, 73:16, 84:5, 93:7
**help** [4] - 13:13, 22:2, 23:1, 91:25
**helpful** [1] - 67:19
**helping** [1] - 13:9
**hereby** [1] - 94:17
**heritage** [1] - 85:19
**hesitation** [1] - 65:1
**highlighted** [1] - 79:1
**hint** [1] - 32:9
**historically** [2] - 36:3, 89:9
**history** [5] - 15:21, 81:9, 81:20, 83:20, 85:10
**hitherto** [1] - 32:7
**Hmm** [1] - 10:11
**hold** [2] - 31:18, 70:12
**holding** [2] - 46:17, 47:9
**holds** [1] - 64:21
**Holmes** [3] - 31:20, 31:22, 34:8
**home** [1] - 54:6
**honest** [2] - 21:25, 36:15
**Honor** [50] - 2:2, 2:8, 2:12, 2:18, 7:18, 8:4, 14:19, 16:15, 16:24, 18:22, 23:3, 33:2, 35:20, 39:12, 41:9, 45:3, 47:5, 52:1, 53:1, 54:8, 57:15, 58:13, 58:18, 58:21, 60:14, 61:8, 61:16, 61:17, 62:7, 63:6, 63:8, 63:13, 64:5, 64:24, 66:3, 67:17, 69:20, 71:22, 73:20, 74:14, 75:10, 76:1, 77:5, 80:20, 81:14, 85:16, 90:13, 90:15, 93:2, 94:8
**HONORABLE** [1] - 1:9
**hope** [3] - 43:6, 43:8, 66:12
**hopefully** [2] - 10:15, 61:16
**house** [1] - 31:13
**House** [1] - 46:7

**housekeeping** [1] - 51:9
**Howard** [1] - 15:23
**HOWELL** [1] - 1:9
**Hudak** [15] - 2:19, 12:18, 29:4, 32:21, 42:10, 51:5, 57:14, 58:15, 58:20, 59:12, 61:15, 65:13, 79:18, 80:19, 91:1
**HUDAK** [67] - 1:16, 2:18, 58:17, 58:21, 59:2, 59:13, 59:20, 60:4, 60:13, 61:5, 61:8, 61:16, 61:20, 62:7, 63:6, 63:8, 63:12, 63:24, 64:4, 64:24, 65:4, 65:20, 66:9, 66:23, 67:10, 67:17, 67:22, 69:5, 69:18, 69:25, 70:11, 71:22, 73:4, 73:8, 73:11, 73:20, 73:25, 74:7, 75:10, 75:13, 76:1, 76:4, 76:9, 76:15, 77:5, 77:22, 77:25, 79:11, 79:15, 79:19, 79:23, 80:2, 80:12, 80:15, 80:20, 80:22, 81:14, 81:17, 82:10, 83:13, 84:1, 84:24, 85:16, 87:6, 87:23, 89:20, 90:13
**huge** [2] - 49:8, 73:21
**Humphrey's** [11] - 16:21, 45:2, 45:13, 45:17, 46:16, 63:9, 63:15, 63:17, 66:2, 70:3, 84:19

## I

**ideals** [1] - 85:19
**identify** [2] - 2:6, 57:21
**ignore** [1] - 10:22
**ignored** [1] - 26:14
**II** [10] - 16:25, 17:6, 25:16, 27:8, 28:7, 28:19, 34:7, 47:11, 58:10, 91:12
**III** [4] - 10:15, 10:21, 11:1, 78:25
**illegal** [3] - 4:8, 4:11, 4:18
**illegality** [1] - 50:2
**imagine** [1] - 58:1
**immunity** [1] - 11:7
**implies** [2] - 42:6, 90:22

**important** [14] - 8:3, 8:17, 12:5, 12:8, 15:11, 22:5, 22:25, 25:4, 25:5, 25:14, 77:18, 92:18, 94:6
**imposed** [2] - 71:17, 93:10
**impression** [2] - 59:15, 60:11
**improper** [7] - 18:10, 18:11, 55:2, 60:23, 61:12, 61:14
**improperly** [3] - 18:25, 57:11, 61:12
**improve** [1] - 35:25
**inapplicable** [1] - 27:12
**incidental** [1] - 85:2
**include** [3] - 17:20, 22:6, 53:21
**includes** [3] - 14:2, 14:14, 23:7
**including** [4] - 3:15, 7:24, 18:15, 59:24
**incorporate** [1] - 69:13
**indeed** [2] - 81:25, 84:6
**independence** [6] - 22:24, 23:1, 23:2, 38:6, 82:14, 87:3
**independent** [15] - 4:1, 9:6, 15:14, 20:9, 21:24, 36:14, 39:3, 67:4, 72:3, 82:12, 82:14, 84:2, 84:3, 86:5, 86:6
**independently** [1] - 61:21
**India** [1] - 88:7
**individuals** [1] - 8:12
**information** [1] - 54:9
**infringe** [1] - 74:12
**injunction** [4] - 48:17, 53:12, 54:10, 75:1
**injunctive** [4] - 18:13, 48:9, 48:10, 61:1
**inquiry** [1] - 76:18
**instance** [1] - 88:1
**instances** [1] - 31:14
**INSTITUTE** [1] - 1:3
**institute** [7] - 15:15, 15:16, 15:19, 15:23, 20:9, 72:3
**Institute** [50] - 2:3, 2:25, 3:4, 3:6, 3:14, 3:23, 5:16, 6:6, 6:8, 6:9, 6:13, 17:11, 17:14, 18:4, 18:6, 18:18, 28:4, 39:12,

39:16, 48:12, 53:18, 53:20, 59:4, 59:23, 59:25, 60:6, 61:13, 61:21, 61:25, 68:11, 70:5, 72:18, 72:19, 73:6, 76:22, 80:11, 83:5, 83:9, 83:22, 85:18, 86:10, 86:11, 88:12, 88:24, 89:2, 89:13, 89:16, 91:15, 91:20, 93:23
**Institute's** [3] - 46:1, 53:15, 53:18
**institution** [3] - 15:21, 80:24, 85:18
**Institution** [2] - 31:10, 32:5
**institutions** [1] - 32:12
**instructing** [1] - 52:20
**insurance** [1] - 8:15
**intended** [1] - 81:21
**interact** [1] - 30:4
**intercede** [1] - 44:4
**interest** [4] - 26:3, 37:9, 72:13
**interested** [1] - 74:24
**interesting** [1] - 29:20
**interests** [8] - 38:16, 39:4, 39:6, 71:2, 82:22, 88:9
**international** [9] - 29:11, 85:11, 85:23, 86:4, 86:8, 86:9, 88:18
**International** [1] - 39:13
**interpretation** [2] - 8:23, 67:23
**interpreting** [1] - 45:8
**involve** [1] - 87:14
**involved** [5] - 15:4, 26:4, 36:11, 86:17, 88:4
**involvement** [1] - 4:9
**involving** [2] - 10:5, 92:8
**Iraq** [1] - 36:25
**irregularities** [1] - 56:8
**issue** [20] - 5:5, 6:11, 9:23, 11:2, 16:25, 17:6, 19:19, 19:24, 20:20, 24:24, 25:3, 25:4, 40:22, 41:11, 46:24, 49:21, 62:6, 74:9, 91:12
**issues** [12] - 5:4, 5:10, 6:21, 16:21, 16:23, 26:21, 44:5, 47:7, 62:6, 62:9, 62:20,

66:19
**IT** [2] - 13:8, 59:17
**items** [1] - 72:25
**itself** [6] - 3:14, 6:6, 24:6, 30:12, 70:18, 85:6

**J**

**Jackson** [8] - 2:4, 50:3, 50:12, 50:13, 50:16, 54:16, 54:24, 59:2
**JACKSON** [1] - 1:6
**Jernigan** [1] - 2:15
**JERNIGAN** [1] - 1:12
**join** [2] - 6:19, 17:24
**joint** [1] - 84:10
**jointly** [1] - 61:7
**Judge** [2] - 75:1, 75:16
**JUDGE** [1] - 1:9
**judges** [1] - 11:1, 64:6
**judgment** [7] - 6:17, 6:24, 6:25, 7:14, 7:15, 7:21, 7:24
**judicial** [9] - 29:15, 30:19, 32:18, 33:11, 33:14, 74:15, 78:13, 79:3, 79:4
**judiciary** [5] - 33:17, 33:18, 33:21, 58:6, 73:24
**jump** [1] - 62:20
**juries** [1] - 79:12
**jurisdiction** [1] - 5:25
**jurisprudence** [11] - 7:12, 27:10, 27:12, 42:23, 62:17, 64:15, 64:21, 65:15, 65:21, 77:20, 91:3
**jury** [5] - 33:8, 79:13, 80:13, 80:21, 81:8
**Justice** [4] - 27:11, 31:20, 84:13, 92:25

**K**

**Kashmir** [1] - 88:7
**keep** [1] - 90:16
**keeping** [1] - 88:11
**Kennedy's** [1] - 92:25
**Kenneth** [1] - 2:4
**KENNETH** [1] - 1:6
**key** [3] - 37:14, 42:17, 76:12
**kind** [8] - 35:10, 41:16, 51:25, 61:10, 71:4, 81:19, 82:8, 83:18
**kinds** [1] - 37:14

**King** [1] - 14:21
**king** [1] - 80:6
**knowing** [1] - 51:8
**knowledge** [1] - 88:5
**knows** [2] - 16:24, 53:10
**Korea** [3] - 35:25, 36:4, 36:6
**Korean** [1] - 35:23
**Kyrgyzstan** [1] - 36:18

**L**

**labor** [1] - 89:22
**Labor** [2] - 48:25, 49:1
**laid** [1] - 24:8
**Lake** [1] - 74:24
**Lamberth** [1] - 75:1
**Lamberth's** [1] - 75:17
**lamentable** [1] - 32:9
**land** [2] - 20:21, 83:4
**language** [1] - 85:15
**large** [1] - 49:2
**largely** [2] - 85:1, 93:7
**last** [6] - 12:19, 33:7, 34:15, 48:22, 48:23
**Law** [2] - 8:11, 65:25
**law** [15] - 3:23, 7:2, 19:2, 20:5, 21:11, 32:16, 32:19, 40:9, 42:21, 45:8, 52:5, 65:16, 70:6, 70:13
**lawful** [1] - 93:24
**lawfully** [1] - 41:25
**laws** [3] - 10:8, 25:16, 89:23
**lawsuit** [1] - 17:24
**lay** [1] - 32:6
**lays** [1] - 58:1
**leading** [3] - 17:13, 19:20, 79:1
**leap** [1] - 38:19
**learned** [1] - 5:15
**leash** [2] - 85:22, 88:18
**least** [6] - 46:10, 55:24, 60:19, 63:10, 64:20, 73:3
**leave** [1] - 74:22
**Lebron** [19] - 10:4, 11:11, 11:12, 20:3, 24:2, 26:6, 26:16, 65:25, 70:5, 70:8, 70:11, 70:22, 71:3, 71:20, 73:13, 73:18, 74:9, 78:11
**lectern** [1] - 2:6
**led** [1] - 72:21
**left** [1] - 29:17
**Legal** [1] - 33:5

**legal** [3] - 25:21, 48:7, 52:21
**legality** [1] - 5:6
**legislative** [17] - 15:21, 29:14, 29:16, 30:15, 30:19, 31:24, 32:18, 40:16, 41:2, 45:16, 53:4, 58:5, 73:23, 74:1, 78:13, 79:6, 81:5
**legislature** [2] - 30:11, 74:2
**legitimacy** [1] - 32:9
**level** [3] - 28:22, 89:12, 92:23
**Library** [3] - 33:23, 65:2, 78:21
**life** [2] - 8:9, 8:15
**light** [1] - 3:3
**likelihood** [1] - 5:25
**likely** [1] - 5:11
**limited** [5] - 5:7, 42:3, 42:24, 46:14, 46:16
**limits** [4] - 64:12, 64:16, 64:23
**line** [5] - 27:12, 41:22, 44:23, 45:13, 66:2
**lines** [2] - 25:9, 34:9
**list** [4] - 60:14, 67:2, 71:6, 71:25
**listed** [1] - 72:10
**literally** [1] - 14:1
**litigation** [1] - 73:14
**live** [1] - 9:18
**living** [1] - 85:18
**LLP** [1] - 1:13
**location** [1] - 79:5
**look** [15] - 11:9, 11:13, 20:1, 20:3, 20:20, 22:16, 25:19, 40:7, 45:4, 49:25, 54:13, 76:25, 77:15, 80:3, 81:11
**looked** [6] - 23:8, 24:17, 25:25, 40:11, 40:25, 69:21
**looking** [2] - 67:18, 77:10
**lose** [1] - 34:12

**M**

**machine** [1] - 1:25
**main** [1] - 7:7
**maintain** [3] - 53:14, 71:8, 71:13
**majority** [12] - 17:21, 18:1, 24:6, 31:1, 31:16, 31:23, 32:14, 46:7, 55:25, 57:7,

70:19, 83:17
**malfeasance** [1] - 47:18
**Mall** [1] - 79:5
**mammal** [1] - 58:2
**man** [1] - 50:23
**manage** [2] - 85:23, 88:18
**Management** [2] - 12:1, 12:3
**mandamus** [1] - 48:24
**mandated** [1] - 18:16
**manner** [2] - 1:22, 94:21
**March** [2] - 3:3, 44:18
**mark** [1] - 53:19
**material** [2] - 8:1, 22:9
**materials** [1] - 54:9
**mathematical** [2] - 31:25, 34:9
**matter** [13] - 9:25, 11:5, 11:9, 19:13, 19:24, 36:19, 51:9, 62:11, 67:14, 70:6, 74:8, 74:10, 78:20
**mean** [34] - 10:7, 13:25, 21:5, 22:17, 23:11, 29:24, 33:5, 33:19, 35:22, 39:25, 40:8, 45:6, 48:22, 51:16, 52:14, 56:16, 63:24, 66:10, 66:16, 69:5, 69:18, 71:5, 72:15, 73:25, 74:3, 79:2, 79:19, 81:9, 83:2, 83:23, 88:16, 89:11, 90:25, 91:19
**meaning** [1] - 69:6
**means** [8] - 6:25, 42:12, 44:8, 60:3, 60:15, 63:10, 63:11, 91:15
**mechanisms** [1] - 93:11
**Media** [1] - 75:14
**media** [1] - 88:5
**meet** [3] - 36:5, 37:4, 82:8
**meeting** [7] - 55:6, 55:19, 56:2, 56:3, 56:14, 57:1
**meetings** [5] - 55:5, 55:6, 55:9, 55:10, 55:22
**meets** [1] - 70:22
**member** [4] - 46:6, 83:14, 83:15, 87:20
**members** [40] - 3:11, 3:14, 3:17, 4:4, 4:6, 4:11, 4:17, 5:6, 17:3,

17:13, 17:17, 17:20, 18:24, 30:13, 31:12, 38:24, 42:1, 46:1, 46:7, 46:25, 53:22, 54:4, 54:12, 55:3, 55:24, 55:25, 56:10, 56:18, 57:6, 57:8, 57:10, 68:24, 82:20, 83:12, 83:18, 84:9, 84:12, 84:17, 87:24
**memos** [1] - 89:21
**mention** [2] - 8:25, 80:11
**mentioned** [4] - 19:7, 33:7, 49:3, 80:7
**merely** [1] - 86:10
**merits** [2] - 5:12, 6:1
**Merry** [1] - 80:16
**met** [2] - 20:6, 21:13
**micromanagement** [1] - 94:2
**microphone** [1] - 2:11
**Middle** [2] - 75:2, 75:22
**middle** [1] - 59:20
**might** [14] - 34:2, 39:9, 45:10, 61:15, 63:13, 64:4, 65:6, 66:6, 67:23, 75:16, 79:21, 83:2, 83:14, 88:11
**military** [3] - 28:6, 29:9, 44:14, 85:4, 88:11
**mind** [6] - 44:23, 51:6, 59:7, 66:10, 69:19, 79:21
**mine** [1] - 79:22
**minima** [1] - 71:14
**minimis** [5] - 42:25, 45:5, 45:7, 64:19, 65:18
**minimum** [5] - 60:1, 60:2, 60:5, 60:9, 60:15
**minimus** [2] - 77:23, 84:23
**minute** [1] - 58:16
**miscite** [1] - 29:25
**missed** [1] - 73:13
**mission** [7] - 36:8, 37:22, 71:19, 85:2, 87:5, 93:9, 93:18
**missions** [1] - 89:11
**misunderstanding** [1] - 29:5
**mixed** [2] - 21:17, 21:18
**modern** [1] - 59:21
**modified** [1] - 8:9
**money** [1] - 72:24

**months** [1] - 4:20
**Moose** [6] - 3:12, 14:8, 17:13, 18:12, 38:20, 39:11
**moose's** [2] - 60:20, 61:12
**moot** [1] - 5:20
**moreover** [1] - 87:17
**morning** [14] - 2:6, 2:8, 2:13, 2:14, 2:16, 2:17, 2:18, 2:22, 8:5, 58:20, 58:21, 78:5, 87:12, 88:1
**most** [8] - 14:21, 16:22, 18:8, 21:22, 42:22, 46:14, 46:16, 92:2
**mostly** [1] - 92:6
**motion** [8] - 3:2, 5:14, 5:19, 7:23, 50:20, 50:25, 51:3, 51:7
**motions** [3] - 6:24, 7:14, 7:21
**MR** [180] - 2:8, 2:12, 2:17, 2:18, 7:18, 9:13, 11:19, 12:16, 12:24, 13:3, 13:6, 13:16, 13:19, 13:21, 13:25, 14:4, 14:7, 14:13, 14:17, 14:19, 15:8, 15:11, 16:5, 16:15, 17:15, 18:6, 18:21, 20:2, 20:8, 20:11, 20:15, 20:18, 21:14, 21:17, 22:14, 23:3, 23:5, 23:17, 24:3, 24:13, 24:21, 24:23, 26:11, 26:18, 26:20, 27:15, 28:14, 28:20, 29:1, 29:22, 31:7, 33:2, 33:5, 33:15, 33:18, 34:4, 34:8, 35:20, 35:24, 36:3, 38:15, 38:17, 39:5, 39:18, 39:22, 41:8, 41:11, 41:19, 42:14, 43:1, 43:4, 43:6, 43:8, 43:18, 44:10, 44:25, 45:3, 45:11, 45:21, 46:19, 47:2, 47:5, 47:8, 48:1, 48:14, 49:5, 49:8, 49:15, 50:6, 50:8, 50:10, 51:3, 51:14, 51:16, 51:23, 52:14, 52:25, 53:23, 54:3, 54:7, 55:4, 55:12, 56:12, 57:2, 57:15, 57:19, 58:17, 58:21, 59:2, 59:13,

59:20, 60:4, 60:13, 61:5, 61:8, 61:16, 61:20, 62:7, 63:6, 63:8, 63:12, 63:24, 64:4, 64:24, 65:4, 65:20, 66:9, 66:23, 67:10, 67:17, 67:22, 69:5, 69:18, 69:25, 70:11, 71:22, 73:4, 73:8, 73:11, 73:20, 73:25, 74:7, 75:10, 75:13, 76:1, 76:4, 76:9, 76:15, 77:5, 77:22, 77:25, 79:11, 79:15, 79:19, 79:23, 80:2, 80:12, 80:15, 80:20, 80:22, 81:14, 81:17, 82:10, 83:13, 84:1, 84:24, 85:16, 87:6, 87:23, 89:20, 90:13, 90:15, 91:2, 91:5, 91:8, 91:11, 91:22, 92:5, 92:14, 94:11
**multiple** [1] - 35:15
**MURPHY** [115] - 1:11, 2:8, 2:12, 2:17, 7:18, 9:13, 11:19, 12:16, 12:24, 13:3, 13:6, 13:16, 13:19, 13:21, 13:25, 14:4, 14:7, 14:13, 14:17, 14:19, 15:8, 15:11, 16:5, 16:15, 17:15, 18:6, 18:21, 20:2, 20:8, 20:11, 20:15, 20:18, 21:14, 21:17, 22:14, 23:3, 23:5, 23:17, 24:3, 24:13, 24:21, 24:23, 26:11, 26:18, 26:20, 27:15, 28:14, 28:20, 29:1, 29:22, 31:7, 33:2, 33:5, 33:15, 33:18, 34:4, 34:8, 35:20, 35:24, 36:3, 38:15, 38:17, 39:5, 39:18, 39:22, 41:8, 41:11, 41:19, 42:14, 43:1, 43:4, 43:6, 43:8, 43:18, 44:10, 44:25, 45:3, 45:11, 45:21, 46:19, 47:2, 47:5, 47:8, 48:1, 48:14, 49:5, 49:8, 49:15, 50:6, 50:8, 50:10, 51:3, 51:14, 51:16, 51:23, 52:14, 52:25, 53:23, 54:3, 54:7, 55:4, 55:12, 56:12, 57:2, 57:15, 57:19, 90:15,

91:2, 91:5, 91:8, 91:11, 91:22, 92:5, 92:14, 94:11
**Murphy** [8] - 2:9, 2:13, 7:19, 9:12, 62:21, 62:23, 70:25, 90:14
**must** [9] - 28:19, 29:17, 30:19, 40:5, 40:16, 41:2, 41:7, 57:2, 81:6
**Myers** [7] - 27:10, 44:23, 46:9, 46:10, 46:14, 47:25, 66:1
**Myers'** [1] - 47:9
**Myers/Humphrey's** [1] - 45:13

---

### N

**name** [6] - 53:18, 86:3, 89:17, 89:18, 91:17
**named** [1] - 59:3
**Nate** [3] - 48:6, 49:22, 54:17
**nation** [1] - 85:21
**nation's** [1] - 4:14
**national** [5] - 15:15, 30:13, 30:14, 72:3, 72:12
**National** [1] - 3:18
**nature** [9] - 3:4, 3:8, 3:20, 4:21, 7:8, 35:5, 54:15, 56:7, 58:9
**navigate** [1] - 4:22
**necessarily** [7] - 5:8, 18:22, 56:3, 56:4, 82:6, 82:14
**necessary** [7] - 5:24, 19:5, 58:25, 71:13, 74:6, 93:20, 93:24
**need** [11] - 18:4, 18:17, 18:23, 19:11, 28:6, 49:7, 51:25, 54:14, 64:1, 85:4, 85:20
**needed** [1] - 22:18
**needs** [2] - 9:20, 67:25
**negotiate** [1] - 88:22
**negotiating** [1] - 87:13
**negotiation** [1] - 88:2
**Networks** [1] - 75:3
**neutral** [2] - 21:24, 44:6
**never** [5] - 18:2, 21:6, 73:16, 73:18, 78:24
**new** [3] - 52:9, 57:3, 85:8
**next** [2] - 5:13, 20:20
**NGOs** [3] - 22:3, 88:20, 88:22

**niggling** [1] - 68:8
**NLRB** [2] - 45:6, 45:9
**nongovernmental** [4] - 15:18, 17:1, 37:7, 44:6
**nonmember** [1] - 93:8
**nonprofit** [10] - 3:22, 9:6, 15:14, 20:9, 68:11, 72:3, 75:3, 75:8, 75:22, 75:24
**Nonprofit** [7] - 68:12, 68:14, 68:18, 68:21, 69:2, 69:6, 69:14
**nonstock** [1] - 31:15
**nonviolence** [2] - 14:24, 36:9
**nonviolent** [2] - 22:1, 38:2
**normal** [2] - 50:15, 51:23
**normally** [5] - 51:11, 51:16, 55:4
**North** [3] - 35:22, 36:4, 36:6
**noted** [1] - 58:24
**notes** [1] - 94:18
**nothing** [3] - 30:6, 62:3, 82:11
**notice** [4] - 55:5, 55:10, 55:14, 55:19
**noticed** [1] - 56:3
**notified** [1] - 13:11
**notion** [1] - 42:5
**notwithstanding** [1] - 5:2
**null** [6] - 1:21, 40:21, 48:7, 52:21, 60:23, 94:20
**nullified** [1] - 15:6
**number** [4] - 6:13, 11:9, 22:21, 25:19
**nutshell** [1] - 45:22
**NW** [2] - 1:13, 1:18

**O**

**oath** [1] - 37:23
**objection** [1] - 59:9
**objective** [1] - 72:7
**objectives** [10] - 21:16, 22:13, 22:22, 24:5, 70:15, 70:17, 72:11, 72:20, 89:15, 93:25
**obligations** [3] - 19:3, 26:25, 74:12
**obtain** [1] - 18:19
**obviate** [2] - 28:6, 85:4
**obviously** [5] - 63:15,

64:8, 79:11, 80:9, 81:23
**occurred** [3] - 50:13, 87:17, 87:19
**OF** [3] - 1:1, 1:3, 1:8
**office** [3] - 53:15, 59:6, 59:7
**Office** [7] - 1:17, 2:19, 2:21, 8:19, 8:24, 11:25, 12:3
**officers** [3] - 31:9, 44:14, 56:5
**Official** [1] - 1:24
**official** [5] - 38:7, 59:3, 74:12, 82:5, 94:24
**officials** [7] - 3:16, 28:15, 44:14, 46:20, 63:17, 72:22, 77:9
**officio** [9] - 3:17, 17:17, 38:24, 53:22, 54:4, 54:12, 56:17, 83:15, 87:20
**Old** [1] - 80:16
**old** [1] - 25:3
**Olympic** [6] - 23:18, 25:24, 26:1, 26:5, 26:9, 26:12
**OMB** [3] - 12:6, 93:14, 93:15
**on-the-ground** [3] - 35:10, 43:14, 86:23
**once** [1] - 20:20
**one** [46] - 6:24, 9:15, 11:16, 20:21, 21:6, 21:10, 23:2, 23:13, 29:20, 32:25, 34:14, 34:15, 37:5, 40:7, 42:9, 45:25, 46:4, 51:9, 52:2, 52:8, 61:3, 62:20, 65:21, 66:15, 67:25, 68:8, 70:14, 73:21, 76:11, 76:22, 78:23, 79:1, 79:9, 79:12, 80:1, 80:21, 80:22, 80:25, 83:1, 84:1, 86:25, 87:7, 87:12, 89:20, 92:14, 93:5
**ones** [2] - 72:11, 83:14
**ongoing** [2] - 18:14
**opened** [1] - 19:17
**operates** [2] - 76:20, 76:24
**operating** [1] - 86:11
**operation** [2] - 34:17, 81:12
**operational** [3] - 59:25, 86:18, 88:15
**operations** [12] -

13:10, 13:13, 59:18, 60:21, 61:21, 61:25, 77:13, 77:15, 92:19, 92:23, 93:10, 93:17
**opinion** [5] - 7:7, 9:3, 61:17, 83:19, 93:1
**opinions** [2] - 9:10, 92:8
**OPM** [5] - 9:3, 9:5, 89:20, 89:21, 90:1
**OPM's** [1] - 89:21
**opportunity** [2] - 6:18, 66:7
**opposed** [5] - 60:21, 61:14, 61:20, 71:11, 75:24
**options** [3] - 85:22, 86:14, 88:17
**oral** [2] - 50:25, 51:6
**order** [17] - 3:2, 7:10, 18:18, 18:20, 21:22, 22:23, 45:24, 48:11, 49:16, 51:15, 52:16, 53:11, 58:11, 60:25, 75:18, 82:5, 82:7
**ordering** [1] - 53:12
**Organic** [3] - 30:7, 30:9, 31:18
**organic** [10] - 22:16, 35:7, 39:2, 68:10, 69:12, 70:16, 71:16, 71:23, 77:16, 82:21
**organization** [8] - 3:22, 26:23, 65:10, 81:25, 82:25, 88:12, 89:4, 89:18
**organization's** [1] - 72:23
**organizations** [7] - 23:16, 31:15, 33:10, 39:14, 60:6, 65:5, 68:22
**organized** [2] - 3:22, 68:22
**original** [4] - 7:4, 16:13, 23:16, 27:6
**original-created** [1] - 23:16
**originally** [2] - 3:1, 23:17
**otherwise** [4] - 8:12, 42:18, 52:6, 66:12
**ought** [1] - 21:23
**outcome** [1] - 94:7
**outline** [1] - 20:3
**outlined** [1] - 70:1
**outside** [9] - 20:24, 65:23, 68:3, 79:24, 80:6, 80:24, 81:21, 82:5, 86:4

**overall** [2] - 41:14, 71:19
**overlapping** [1] - 61:4
**overreading** [1] - 85:14
**overrule** [1] - 26:13
**overseas** [9] - 13:10, 13:17, 13:18, 13:24, 36:8, 37:8, 37:22, 44:3, 59:19
**own** [3] - 30:16, 44:17, 93:15
**owned** [2] - 15:18, 67:3

**P**

**pager** [1] - 76:5
**Pakistan** [1] - 88:7
**panel** [1] - 74:25
**papers** [6] - 32:23, 42:15, 43:13, 58:15, 66:11, 78:12
**paragraph** [1] - 53:2
**paragraphs** [1] - 78:14
**parcel** [1] - 90:24
**part** [77] - 3:23, 4:23, 4:24, 5:18, 5:20, 5:21, 6:15, 8:6, 14:22, 15:24, 16:3, 16:8, 16:11, 16:14, 16:17, 16:18, 18:7, 18:9, 19:17, 22:16, 23:12, 23:20, 25:7, 25:11, 25:12, 25:13, 27:23, 28:12, 31:12, 33:8, 33:18, 33:21, 33:25, 36:13, 37:1, 37:3, 37:15, 39:24, 40:5, 43:21, 43:22, 47:2, 53:7, 56:24, 57:20, 58:4, 58:5, 58:6, 58:8, 65:7, 68:1, 69:1, 69:16, 70:1, 70:2, 70:4, 70:6, 70:23, 73:4, 73:5, 73:19, 74:1, 74:2, 74:4, 74:16, 74:18, 74:22, 76:12, 76:22, 81:4, 83:4, 88:17, 89:15, 89:24, 90:3, 90:24
**particular** [4] - 10:20, 21:7, 25:2, 69:10
**particularly** [1] - 67:19
**parties** [8] - 2:5, 3:19, 5:8, 6:17, 6:18, 7:17, 21:2, 36:11
**parties'** [1] - 21:3
**partners** [1] - 6:4

**parts** [1] - 69:14
**party** [8] - 1:22, 36:13, 36:14, 44:7, 87:9, 87:13, 88:2, 94:21
**passed** [2] - 4:20, 8:8
**past** [3] - 8:12, 88:4, 88:23
**path** [1] - 77:25
**pay** [2] - 9:4, 11:8
**Peace** [12] - 2:3, 2:25, 39:13, 39:16, 59:4, 59:24, 72:18, 72:19, 88:13, 88:24, 89:13, 91:15
**peace** [7] - 29:9, 34:24, 85:9, 85:11, 85:20, 88:9, 88:11
**PEACE** [1] - 1:3
**peace-keeping** [1] - 88:11
**peaceful** [3] - 40:2, 40:4, 44:8
**pending** [2] - 6:23, 7:3
**Penn** [1] - 25:3
**people** [17] - 3:5, 9:4, 22:9, 25:11, 30:16, 36:8, 36:15, 37:1, 37:4, 37:15, 44:7, 44:20, 59:18, 68:22, 72:4, 85:20, 86:18
**people's** [1] - 74:13
**perfect** [1] - 76:10
**perform** [9] - 13:13, 16:20, 18:16, 19:3, 21:24, 43:25, 44:1, 82:7, 90:21
**performed** [2] - 17:7, 28:14
**performing** [1] - 41:15
**perhaps** [3] - 34:1, 66:9, 88:14
**periodically** [1] - 14:25
**permanent** [2] - 24:6, 70:18
**person** [6] - 15:3, 47:16, 47:18, 47:21, 53:13, 68:23
**personal** [2] - 48:12, 88:5
**persons** [4] - 13:8, 31:5, 31:8, 68:25
**perspective** [2] - 17:12, 38:9
**persuasion** [1] - 87:24
**persuasive** [2] - 34:19, 67:24
**Philippines** [8] - 30:8, 30:9, 30:10, 30:12, 30:14, 30:16, 31:19

**photocopied** [2] - 1:22, 94:21
**phrase** [2] - 61:15, 69:7
**physical** [1] - 85:8
**PI** [1] - 75:17
**pin** [2] - 56:6, 76:17
**Pippenger** [10] - 6:3, 6:9, 6:12, 6:16, 6:19, 6:20, 19:8, 50:20, 60:17, 61:3
**place** [3] - 18:1, 25:6, 50:16
**places** [1] - 44:1
**placing** [1] - 30:12
**plain** [2] - 84:6, 84:7
**plainly** [1] - 84:18
**plaintiff** [9] - 4:5, 6:9, 6:18, 17:12, 18:4, 18:7, 18:18, 19:5, 19:6
**Plaintiff** [1] - 17:13
**plaintiffs** [23] - 3:10, 3:13, 3:20, 3:24, 4:3, 4:7, 5:11, 5:15, 5:22, 6:14, 6:21, 7:15, 7:19, 7:22, 16:3, 17:10, 17:20, 18:25, 25:24, 28:10, 52:11, 54:18, 54:22
**Plaintiffs** [1] - 1:4
**PLAINTIFFS** [1] - 1:11
**plaintiffs'** [10] - 2:7, 5:13, 7:3, 7:16, 49:22, 49:25, 55:1, 56:9, 59:15, 84:25
**platypus** [2] - 57:25, 83:2
**playground** [2] - 29:8, 43:10
**plays** [4] - 29:8, 34:16, 43:11, 43:14
**plenty** [2] - 47:8, 49:11
**podium** [2] - 2:10, 2:11
**poems** [1] - 57:24
**point** [8] - 3:13, 7:22, 11:20, 18:5, 56:11, 78:3, 81:3, 89:20
**pointed** [7] - 78:16, 79:12, 79:13, 79:15, 90:5, 93:2, 93:6
**points** [2] - 42:14, 87:7
**poisonous** [1] - 61:11
**policy** [1] - 28:5
**political** [17] - 9:16, 9:19, 10:2, 10:18, 10:23, 11:5, 19:25, 25:2, 62:11, 77:17,

87:8, 87:24, 92:20, 92:21, 93:5, 93:9, 93:16
**portion** [1] - 68:17
**posed** [1] - 8:5
**position** [23] - 4:13, 8:6, 16:3, 16:8, 16:13, 16:16, 16:24, 17:8, 18:17, 19:10, 21:3, 25:7, 29:7, 29:21, 29:22, 35:3, 57:5, 58:7, 58:22, 60:10, 61:9, 62:24, 63:3
**positions** [5] - 3:20, 7:17, 17:16, 30:16, 90:2
**posted** [2] - 55:13
**poster** [1] - 25:2
**Postmaster** [1] - 46:13
**postmaster** [1] - 47:13
**posture** [3] - 7:6, 12:10, 59:25
**potential** [1] - 34:25
**power** [74] - 4:15, 4:17, 5:1, 5:2, 9:21, 25:10, 28:1, 28:15, 30:11, 31:4, 32:7, 34:6, 34:19, 35:10, 35:12, 40:6, 40:15, 40:17, 40:19, 40:21, 40:25, 41:6, 41:21, 42:2, 42:6, 42:12, 42:19, 42:23, 42:25, 43:3, 43:11, 43:17, 44:22, 44:24, 45:7, 45:16, 45:17, 45:19, 52:2, 54:19, 54:21, 58:11, 62:17, 62:23, 62:25, 63:1, 63:5, 63:22, 63:23, 64:2, 64:13, 64:16, 64:17, 64:19, 64:23, 65:17, 65:19, 65:23, 76:23, 77:20, 77:24, 80:6, 84:20, 84:21, 85:3, 87:4, 87:16, 90:18, 90:22, 90:24, 90:25
**powers** [24] - 24:20, 25:16, 27:24, 28:7, 29:10, 29:14, 29:15, 31:8, 34:22, 35:1, 35:4, 35:19, 43:16, 53:6, 62:16, 67:20, 68:11, 69:15, 76:13, 77:8, 77:16, 80:6, 86:1, 90:9
**practicable** [1] - 93:12
**practical** [1] - 77:3
**practice** [2] - 76:20,

85:11
**precedence** [1] - 27:20
**precedent** [2] - 10:15, 40:8
**precisely** [1] - 13:7, 68:19
**precision** [1] - 31:25
**predates** [1] - 30:24
**predominantly** [1] - 28:4
**preliminary** [1] - 75:1
**premise** [1] - 90:20
**prepared** [1] - 79:2
**preparing** [1] - 69:21
**prerequisites** [1] - 54:20
**present** [2] - 27:11, 57:15
**presentation** [1] - 29:5
**presented** [7] - 3:25, 5:7, 7:1, 7:5, 7:8, 7:22, 29:14
**preserve** [1] - 60:7
**president** [20] - 3:11, 3:12, 18:11, 19:11, 49:23, 50:11, 50:12, 50:17, 51:10, 51:17, 51:21, 52:19, 54:17, 55:8, 56:4, 57:3, 59:3, 89:4
**President** [58] - 3:15, 3:18, 4:3, 4:16, 8:19, 8:24, 17:3, 17:16, 27:10, 27:25, 29:11, 39:24, 40:14, 41:5, 41:18, 41:20, 41:25, 43:16, 46:6, 46:12, 47:10, 47:13, 47:15, 58:10, 62:25, 64:7, 64:22, 65:6, 65:7, 65:11, 65:23, 66:13, 66:14, 72:22, 72:23, 77:8, 82:18, 82:19, 83:8, 83:11, 83:16, 84:13, 84:18, 86:2, 87:7, 87:9, 87:11, 87:15, 87:21, 87:25, 88:4, 88:23, 89:3, 90:11, 90:19, 91:10
**President's** [19] - 5:1, 5:6, 25:16, 27:9, 34:5, 40:5, 42:19, 43:22, 62:17, 62:23, 63:4, 63:22, 63:25, 64:2, 64:13, 64:16, 65:17, 77:20, 90:21
**president's** [1] - 42:23
**presidential** [13] -

34:20, 34:22, 35:1, 35:10, 35:12, 42:11, 42:12, 43:11, 44:24, 82:15, 83:9, 83:10, 88:21
**presidentially** [2] - 4:17, 39:17
**presumably** [1] - 54:16
**pretty** [10] - 3:25, 10:25, 19:22, 42:21, 55:17, 64:15, 73:25, 75:20, 85:5, 87:15
**prevail** [2] - 19:12, 52:11
**prevent** [1] - 54:10
**prevented** [2] - 19:4, 25:1
**previsions** [1] - 8:2
**principle** [1] - 30:22
**principles** [2] - 38:3, 51:24
**priorities** [1] - 71:7, 92:18, 92:23
**priority** [1] - 25:9
**private** [13] - 10:6, 19:21, 26:1, 27:1, 37:6, 38:1, 75:3, 75:7, 75:22, 75:24, 83:14, 88:21, 92:17
**prizes** [1] - 86:15
**probative** [3] - 34:2, 92:1, 92:3
**problematic** [1] - 71:2
**problems** [1] - 9:15
**procedural** [1] - 56:7
**Procedure** [3] - 19:15, 51:8, 59:5
**procedures** [5] - 51:10, 54:23, 54:25, 56:10, 56:22
**proceed** [3] - 6:20, 7:13, 57:18
**proceeding** [1] - 94:14
**PROCEEDINGS** [1] - 1:8
**Proceedings** [1] - 1:25
**proceedings** [1] - 94:18
**process** [4] - 41:17, 56:22, 81:1, 81:5
**procurement** [1] - 71:9
**produced** [2] - 1:25, 7:25
**product** [1] - 1:21
**program** [6] - 6:4, 15:1, 15:3, 15:5, 15:6

**programmatic** [1] - 14:10
**programs** [3] - 14:6, 85:9, 90:8
**project** [1] - 35:18
**projects** [3] - 35:11, 36:18, 71:8
**promote** [1] - 72:12
**promoting** [2] - 85:9, 88:9
**promptly** [1] - 79:21
**prong** [6] - 34:12, 34:18, 34:23, 35:2, 43:9
**pronged** [1] - 29:8
**proper** [4] - 18:7, 18:23, 19:6, 93:20
**properly** [4] - 18:2, 35:3, 49:23, 61:24
**property** [5] - 5:14, 48:12, 48:19, 49:24, 51:20
**proposal** [2] - 93:15
**proposals** [1] - 41:13
**proposed** [6] - 18:20, 45:24, 51:15, 52:16, 53:11, 60:25
**proposition** [1] - 66:3
**protect** [1] - 23:1
**protections** [3] - 39:1, 82:20, 87:8
**provide** [1] - 78:15
**provided** [1] - 31:11
**provides** [2] - 46:5, 67:2
**provision** [8] - 46:11, 47:14, 47:15, 52:5, 56:12, 61:22, 68:21, 69:11
**provisions** [1] - 84:1
**Public** [2] - 8:11, 33:13
**public** [13] - 21:20, 23:6, 23:11, 23:23, 33:10, 33:12, 33:14, 33:19, 55:5, 55:9, 59:7, 85:20, 89:15
**publications** [1] - 86:13
**publishing** [1] - 43:13
**pure** [2] - 34:6, 34:21
**purely** [2] - 34:7, 88:20
**purported** [1] - 50:12
**purportedly** [2] - 48:5, 52:18
**purporting** [1] - 53:17
**purports** [1] - 6:12
**purpose** [9] - 15:12, 15:13, 22:16, 23:11,

23:24, 25:13, 72:2, 82:21, 85:24
**purposes** [23] - 10:19, 21:19, 21:20, 21:22, 23:6, 24:11, 24:19, 26:18, 26:21, 27:24, 31:3, 72:1, 76:13, 77:14, 83:25, 85:11, 85:15, 93:2, 93:12, 93:21, 93:25
**pursuant** [1] - 55:23
**push** [1] - 81:14
**put** [2] - 30:16, 45:1
**putative** [1] - 50:12
**puts** [1] - 90:11
**putting** [2] - 43:12, 55:2, 81:8

## Q

**quacks** [1] - 57:23
**questions** [13] - 3:3, 12:18, 15:9, 20:16, 54:13, 59:22, 62:19, 68:5, 70:25, 74:8, 76:12, 90:17, 94:8
**quite** [4] - 7:9, 28:3, 71:16, 92:3
**quorum** [5] - 56:1, 57:6, 57:7, 57:8

## R

**Radio** [2] - 75:2, 75:21
**Railroads** [3] - 24:16, 26:6, 92:11
**rails** [1] - 71:9
**raised** [4] - 6:11, 27:25, 46:9, 70:25
**raises** [1] - 46:5
**range** [2] - 85:21, 88:17
**rare** [1] - 81:19
**reached** [1] - 80:3
**reaction** [1] - 40:10
**read** [2] - 72:5, 86:12
**reading** [7] - 11:12, 46:14, 46:15, 46:16, 61:2, 73:13, 85:5
**real** [1] - 48:11
**really** [23] - 7:25, 23:18, 23:23, 23:24, 25:15, 26:3, 30:8, 30:23, 31:17, 40:3, 41:24, 45:7, 48:22, 49:6, 57:21, 58:8, 62:3, 66:16, 69:11, 83:2, 90:9, 93:17, 94:4
**reason** [3] - 43:24,

65:1, 68:20
**reasoning** [7] - 21:3, 29:13, 34:2, 40:24, 41:4, 81:1, 81:4
**reasons** [4] - 74:20, 83:6, 86:25, 87:2
**receive** [2] - 46:12, 72:24
**received** [1] - 89:9
**receives** [1] - 82:16
**recent** [3] - 14:21, 18:9, 92:12
**recently** [1] - 74:25
**recess** [1] - 58:19
**recognition** [1] - 53:19
**recognize** [2] - 58:9, 78:1
**recognized** [5] - 21:21, 30:22, 33:8, 44:6, 79:24
**recollection** [1] - 79:17
**recommend** [1] - 47:20
**recommendation** [2] - 46:7, 65:12
**record** [5] - 2:6, 7:1, 16:1, 69:12, 69:22
**records** [1] - 53:16
**Red** [1] - 33:23
**reduced** [1] - 60:2
**reducing** [2] - 60:1, 60:8
**reduction** [1] - 40:22
**refer** [1] - 9:1
**reference** [1] - 36:19
**referenced** [1] - 59:6
**references** [1] - 8:2
**regarding** [2] - 2:24, 50:2
**regents** [2] - 31:12, 84:10
**regions** [1] - 37:1
**Register** [5] - 55:10, 55:13, 55:14, 65:3, 78:22
**regular** [1] - 73:22
**regulations** [1] - 25:8
**reinstates** [1] - 19:10
**reiterated** [1] - 26:17
**reject** [1] - 44:3
**relation** [1] - 85:25
**relations** [12] - 29:11, 29:12, 34:20, 35:8, 36:1, 36:4, 38:13, 38:18, 43:15, 85:3, 86:4, 86:16
**relegated** [1] - 28:11
**relevant** [2] - 30:8,

77:3
**reliance** [1] - 22:20
**relied** [1] - 10:12
**relief** [15] - 18:13, 18:19, 19:1, 19:8, 48:9, 48:10, 48:15, 50:1, 52:12, 52:15, 52:24, 53:21, 54:5, 61:1
**relies** [1] - 42:5
**relieve** [1] - 10:16
**relieved** [1] - 64:10
**rely** [2] - 25:24, 29:22
**relying** [1] - 69:10
**remain** [2] - 13:10, 14:6
**remaining** [1] - 84:11
**remains** [6] - 6:21, 7:9, 19:14, 43:6, 43:8, 43:19
**reminded** [1] - 57:25
**removal** [54] - 3:10, 3:12, 4:5, 4:16, 5:1, 5:2, 5:6, 6:14, 18:10, 18:11, 23:2, 25:15, 27:9, 28:1, 34:6, 40:13, 40:15, 40:17, 40:25, 41:6, 42:7, 42:12, 42:19, 42:20, 42:23, 44:24, 46:11, 46:18, 46:22, 54:19, 54:20, 55:3, 55:8, 56:8, 57:5, 58:11, 60:20, 60:23, 62:17, 62:23, 62:25, 63:4, 63:22, 64:2, 64:16, 64:17, 65:17, 66:1, 77:20, 87:8, 90:18, 90:25
**remove** [9] - 42:4, 46:6, 47:11, 47:16, 57:3, 66:15, 72:23, 82:19, 90:23
**removed** [12] - 3:14, 4:10, 17:5, 18:2, 18:25, 46:2, 47:1, 56:9, 57:11, 61:11, 61:24, 68:24
**removes** [1] - 77:9
**removing** [2] - 4:4, 46:13
**repatriate** [1] - 35:17
**reply** [4] - 8:22, 14:8, 29:23, 77:1
**report** [3] - 14:25, 37:23, 41:19
**reported** [2] - 1:25, 41:20
**reporter** [2] - 31:6, 58:16

**Reporter** [3] - 1:23, 1:24, 94:24
**reports** [2] - 78:15, 88:5
**represent** [1] - 17:11
**representative** [2] - 33:21, 36:6
**representatives** [4] - 35:15, 35:23, 48:13, 86:19
**representing** [2] - 82:6, 86:20
**request** [1] - 54:3
**requested** [1] - 52:23
**requests** [1] - 52:17
**required** [6] - 4:4, 46:11, 55:23, 56:2, 56:3, 56:10
**requirement** [4] - 55:11, 55:12, 55:15
**requirements** [4] - 5:3, 71:6, 71:8, 71:9
**requires** [2] - 32:3, 55:22, 56:25
**rereading** [1] - 92:10
**research** [7] - 14:24, 21:25, 22:19, 38:2, 43:12, 85:1, 86:13
**reserve** [1] - 94:12
**resolution** [9] - 22:1, 36:9, 36:20, 40:2, 40:4, 48:5, 52:17, 84:11, 88:6
**Resolution** [1] - 73:5
**resolutions** [2] - 37:7, 56:25
**resolve** [3] - 38:3, 44:8, 68:6
**resources** [2] - 53:17, 60:8
**respect** [7] - 17:9, 27:16, 31:14, 31:18, 31:21, 36:17, 48:18
**respectful** [1] - 10:23
**respond** [2] - 79:16, 90:14
**response** [7] - 8:25, 17:14, 17:15, 36:22, 51:6, 87:6, 90:16
**responsibility** [1] - 43:22
**restore** [1] - 48:19
**restored** [1] - 49:18
**restraining** [1] - 3:2
**rests** [1] - 32:21
**result** [1] - 36:12
**results** [1] - 37:17
**retain** [1] - 46:17
**retained** [1] - 24:5
**retaining** [1] - 53:14

**retains** [1] - 70:18
**retired** [1] - 49:9
**retirement** [2] - 8:9, 8:15
**Retirement** [1] - 8:16
**Revolution** [1] - 23:12
**rid** [1] - 87:1
**Rights** [2] - 80:7, 80:10
**rights** [1] - 74:13
**Robinson** [1] - 36:19
**role** [8] - 3:8, 21:24, 30:12, 37:12, 43:25, 46:22, 65:8, 65:11
**roles** [1] - 43:13
**roots** [1] - 83:21
**RPR** [3] - 1:23, 94:17, 94:24
**Rubio** [1] - 3:18
**rule** [1] - 63:16
**Rule** [5] - 50:15, 51:7, 59:5
**ruled** [2] - 83:3, 84:7
**Rules** [1] - 51:7
**rules** [4] - 17:22, 25:8, 50:15, 90:8
**ruling** [1] - 83:6
**run** [1] - 39:17
**running** [1] - 74:1

## S

**sale** [1] - 51:19
**salient** [1] - 72:10
**Sam** [1] - 2:21
**SAM** [1] - 1:17
**satisfy** [2] - 5:22, 5:23
**satisfying** [1] - 54:19
**scale** [1] - 11:8
**scales** [1] - 9:4
**scarce** [1] - 40:9
**schedule** [2] - 6:17, 71:8
**scheme** [2] - 3:9, 20:21
**scholarly** [1] - 85:1
**science** [1] - 85:10
**sciences** [1] - 85:8
**scope** [2] - 63:2, 63:4
**score** [1] - 23:7
**scores** [2] - 23:5, 23:7
**screenshot** [2] - 1:22, 94:20
**sea** [1] - 58:2
**seal** [1] - 53:19
**searched** [1] - 32:23
**second** [13] - 20:25, 21:15, 27:22, 28:21, 29:13, 34:12, 34:18,

34:22, 35:2, 43:9, 71:1
**Secretaries** [1] - 3:17
**secretary** [2] - 87:20, 87:21
**Secretary** [2] - 38:23
**Section** [10] - 8:11, 11:24, 12:2, 46:2, 68:14, 68:19, 69:3, 69:15, 93:23
**section** [1] - 85:12
**see** [12] - 16:10, 17:25, 23:8, 43:7, 48:2, 49:4, 50:1, 50:4, 54:14, 56:2, 78:12, 82:23
**seek** [2] - 18:19, 19:13
**seem** [3] - 26:9, 76:17, 86:24
**Seila** [1] - 65:25
**seized** [4] - 16:9, 16:10, 40:14, 40:18
**select** [1] - 71:7
**Senate** [8] - 17:4, 31:12, 46:8, 46:12, 47:9, 58:12, 64:8, 82:19
**SENIOR** [1] - 1:9
**sense** [3] - 15:23, 45:7, 54:21
**separate** [6] - 6:2, 6:21, 20:12, 20:16, 50:1, 62:8
**separated** [1] - 21:23
**separately** [1] - 6:20
**separation** [6] - 24:20, 27:24, 30:5, 53:5, 67:20, 76:13
**series** [2] - 7:11, 57:24
**serious** [2] - 5:9, 57:16
**serve** [7] - 17:22, 22:7, 22:22, 23:6, 23:10, 46:1, 72:4
**served** [2] - 21:21, 23:23
**serves** [2] - 76:22, 79:17
**service** [2] - 38:10, 38:12
**Service** [2] - 37:25, 43:20
**Services** [2] - 5:17, 33:5
**set** [14] - 4:1, 17:2, 19:23, 21:4, 65:17, 70:8, 71:7, 72:8, 72:20, 77:8, 82:1, 82:21, 88:19, 93:12
**setting** [2] - 21:18,

82:2
**settled** [1] - 32:14
**seven** [1] - 7:3
**shall** [12] - 1:21, 14:15, 14:18, 14:20, 15:5, 17:3, 46:1, 60:4, 60:12, 71:11, 90:1, 94:20
**share** [1] - 87:24
**short** [1] - 3:5
**shorthand** [1] - 1:25
**show** [1] - 5:25
**shown** [1] - 5:11
**shut** [1] - 15:2
**shutdown** [1] - 6:13
**sic** [2] - 32:14, 52:18
**side** [10] - 6:10, 6:24, 7:14, 37:5, 45:12, 45:13, 58:24, 72:15, 78:6, 79:15
**sidelines** [1] - 17:25
**sides** [2] - 6:25, 7:9
**signatory** [2] - 1:22, 94:21
**significant** [5] - 16:22, 22:17, 30:24, 62:18, 92:16
**signs** [1] - 56:14
**similar** [3] - 32:7, 36:19, 70:1
**sit** [8] - 16:13, 29:17, 29:18, 29:19, 34:13, 38:24, 79:10, 80:1
**sits** [9] - 32:24, 35:3, 68:3, 78:21, 79:5, 79:24, 80:6, 80:24, 81:13
**situation** [2] - 6:8, 92:6
**six** [2] - 17:20, 50:22
**slightly** [1] - 7:4
**slip** [1] - 3:7
**small** [1] - 72:24
**Smithsonian** [18] - 31:10, 32:5, 32:10, 32:13, 32:21, 32:24, 79:2, 79:7, 79:10, 80:11, 80:16, 80:23, 81:8, 83:1, 83:12, 83:21, 83:24, 84:7
**Smithsonian's** [1] - 83:7
**so..** [1] - 11:18
**social** [1] - 85:7
**societies** [1] - 22:4
**soft** [3] - 85:3, 86:3, 86:4
**solutions** [1] - 34:25
**someone** [3] - 36:5, 47:11, 47:16

**sometime** [2] - 33:24, 73:11
**sometimes** [2] - 31:3, 38:19
**somewhat** [3] - 6:7, 12:14, 45:9
**soon** [2] - 33:24, 43:7
**sorry** [8] - 26:20, 31:7, 36:20, 44:20, 73:8, 80:10, 80:12, 80:20
**sort** [16] - 16:7, 17:25, 18:5, 19:20, 26:7, 26:14, 30:6, 43:13, 45:1, 50:16, 58:3, 61:22, 62:20, 71:10, 86:14, 93:20
**sorts** [2] - 39:13, 39:14
**sought** [1] - 19:9
**sound** [1] - 35:11
**sounds** [1] - 35:1
**sovereign** [1] - 11:7
**space** [3] - 49:7, 49:10, 49:11
**Spaeder** [2] - 1:13, 2:14
**special** [4] - 20:4, 20:7, 21:11, 70:13
**specific** [4] - 52:23, 69:18, 71:9, 90:2
**specifically** [1] - 38:7
**specification** [3] - 93:16, 93:22
**specify** [1] - 93:9
**spelled** [1] - 18:19
**spelling** [1] - 70:16
**sphere** [1] - 35:8
**sports** [1] - 26:4
**Springer** [8] - 29:24, 30:6, 30:23, 31:1, 81:2, 81:4, 81:18
**staff** [2] - 13:9, 59:18
**staff-type** [1] - 13:9
**stand** [2] - 2:10, 2:11
**standard** [1] - 5:24
**standing** [2] - 61:24, 62:3
**stands** [1] - 66:2
**start** [6] - 2:7, 7:15, 21:1, 28:8, 58:22, 59:11
**starting** [1] - 27:10
**starts** [1] - 84:9
**State** [8] - 37:20, 38:24, 43:20, 44:10, 54:1, 86:6, 86:21, 87:20
**statement** [2] - 8:1, 21:19
**states** [1] - 14:9

**STATES** [3] - 1:1, 1:3, 1:9
**States** [36] - 1:17, 2:3, 2:20, 2:21, 15:18, 36:7, 36:13, 37:2, 37:4, 37:9, 37:15, 37:24, 39:24, 44:4, 64:8, 72:13, 72:18, 72:19, 83:16, 84:13, 84:14, 85:2, 86:2, 87:14, 88:9, 88:12, 89:6, 89:7, 89:10, 89:11, 89:13, 89:14, 89:17, 91:15, 91:18
**States'** [1] - 86:3
**Station** [1] - 25:3
**status** [1] - 48:21
**statute** [45] - 4:4, 4:8, 8:17, 10:20, 10:22, 11:22, 11:24, 15:14, 20:7, 22:16, 35:7, 39:2, 39:21, 42:1, 51:20, 55:16, 55:18, 55:21, 56:24, 60:4, 66:14, 67:11, 67:12, 68:10, 69:3, 69:13, 70:16, 71:7, 71:16, 71:17, 71:23, 72:7, 72:20, 76:19, 77:12, 77:16, 81:12, 82:11, 82:16, 82:20, 82:22, 82:23, 85:6, 88:16
**statutes** [3] - 9:22, 11:21, 11:22
**statutory** [16] - 5:2, 8:2, 14:15, 40:13, 46:11, 54:20, 55:11, 60:1, 60:2, 60:5, 60:9, 60:15, 61:22, 71:5, 71:13, 81:20
**stay** [3] - 74:25, 75:2, 75:18
**stayed** [2] - 75:16, 75:17
**Steel** [1] - 91:16
**stenographic** [1] - 94:18
**still** [9] - 4:13, 4:20, 13:23, 14:6, 17:18, 18:1, 50:12, 64:23, 72:18
**stock** [2] - 93:6, 93:7
**stop** [4] - 18:14, 37:10, 49:17, 87:21
**stopping** [1] - 29:9
**stops** [1] - 91:10
**straight** [1] - 69:23
**Street** [2] - 1:13, 1:18
**street** [3] - 49:4, 49:8, 79:4

**strictures** [1] - 71:17
**stringent** [1] - 71:5
**structure** [1] - 80:8
**struggling** [1] - 8:4
**studies** [2] - 22:20, 85:9
**study** [5] - 36:23, 36:24, 36:25, 86:13
**stuff** [2] - 78:8, 89:14
**subcategory** [1] - 16:19
**subject** [14] - 5:1, 9:22, 10:7, 10:8, 10:9, 11:3, 17:3, 19:16, 24:12, 24:18, 27:8, 40:12, 71:5, 94:4
**submit** [2] - 76:4, 93:14
**submitted** [1] - 14:8
**subsequent** [5] - 3:12, 11:13, 25:6, 70:8, 73:14
**subsequently** [1] - 46:15
**substantial** [3] - 16:20, 43:2, 93:10
**substantially** [2] - 92:20, 92:21
**substituted** [1] - 59:8
**substitution** [1] - 50:15
**succeed** [1] - 5:12
**succeeded** [1] - 59:2
**success** [1] - 6:1
**successor** [1] - 59:6
**suckles** [1] - 58:1
**suffering** [1] - 62:2
**sufficient** [1] - 4:25
**suggest** [2] - 77:1, 78:12
**suggesting** [1] - 3:23
**suggestion** [1] - 39:9
**suggests** [2] - 68:21, 82:11
**suing** [2] - 3:14, 19:12
**summary** [6] - 6:17, 6:24, 7:14, 7:15, 7:21, 7:24
**supervise** [1] - 93:12
**supervised** [2] - 92:19, 92:22
**supplemental** [2] - 14:7, 76:5
**support** [1] - 7:23
**Supreme** [37] - 10:1, 10:4, 10:11, 10:14, 10:20, 10:25, 11:9, 12:12, 19:22, 20:17, 21:4, 21:6, 23:20,

24:8, 24:10, 24:11,
24:17, 25:25, 26:7,
27:20, 31:1, 40:11,
40:14, 40:18, 40:24,
42:22, 65:16, 65:20,
66:7, 73:14, 73:15,
73:18, 79:23, 82:13,
91:6, 92:8
**surprised** [2] - 23:8,
49:1
**surprising** [1] - 49:12
**surrender** [1] - 52:4
**suspend** [1] - 5:14
**swear** [1] - 37:23
**Synar** [1] - 40:10
**system** [1] - 30:18
**System** [1] - 8:16
**systems** [1] - 53:16

## T

**table** [1] - 2:20
**tact** [1] - 14:6
**Taft** [1] - 27:11
**tags** [1] - 29:3
**Tajikistan** [1] - 36:18
**tasked** [3] - 28:4,
76:19, 87:5
**tasks** [3] - 14:15, 35:6,
82:7
**taxpayer** [1] - 62:3
**teach** [1] - 21:25
**teaching** [2] - 38:2,
43:12
**techniques** [1] - 85:9
**technology** [1] - 59:21
**temporary** [1] - 3:2
**temptations** [1] -
57:17
**tempted** [1] - 57:15
**ten** [2] - 3:11, 58:16
**ten-minute** [1] - 58:16
**tenure** [1] - 41:25
**term** [2] - 67:7, 82:13
**terminated** [2] - 6:4,
13:11
**terminating** [1] -
17:16
**termination** [3] -
18:15, 58:11, 61:12
**terms** [7] - 7:16,
40:22, 43:14, 48:3,
48:9, 51:10, 51:12,
51:19, 64:12, 71:20,
73:2, 91:25
**terrorist** [1] - 35:17
**test** [4] - 26:8, 26:15
**tested** [2] - 33:24,
85:8
**THE** [183] - 1:1, 1:9,

1:11, 1:16, 2:2, 2:10,
2:16, 2:22, 9:12,
9:15, 12:9, 12:17,
13:1, 13:4, 13:15,
13:17, 13:20, 13:22,
14:2, 14:5, 14:12,
14:14, 14:18, 15:7,
15:10, 16:1, 16:6,
17:9, 18:3, 18:17,
19:16, 20:3, 20:10,
20:12, 20:16, 20:19,
21:15, 22:12, 22:15,
23:4, 23:15, 24:1,
24:4, 24:14, 24:22,
25:22, 26:14, 26:19,
27:3, 27:17, 28:17,
28:24, 29:2, 32:20,
33:4, 33:12, 33:16,
34:1, 34:5, 34:11,
35:22, 35:25, 38:5,
38:16, 38:21, 39:16,
39:20, 40:7, 41:10,
41:18, 42:8, 42:21,
43:2, 43:5, 43:7,
43:9, 44:9, 44:21,
45:1, 45:9, 45:15,
45:23, 46:20, 47:3,
47:6, 47:24, 48:2,
49:3, 49:6, 49:14,
49:20, 50:7, 50:9,
50:23, 51:4, 51:15,
51:19, 52:8, 52:16,
53:11, 53:24, 54:6,
54:13, 55:9, 55:21,
56:24, 57:12, 57:17,
58:14, 58:20, 59:1,
59:9, 59:14, 60:3,
60:11, 60:22, 61:6,
61:15, 61:19, 62:5,
62:8, 63:7, 63:11,
63:20, 63:25, 64:10,
65:2, 65:13, 66:5,
66:20, 67:9, 67:11,
67:18, 68:7, 69:9,
69:22, 70:7, 70:25,
73:2, 73:7, 73:10,
73:12, 73:21, 74:5,
74:22, 75:11, 75:19,
76:3, 76:7, 76:10,
76:16, 77:18, 77:23,
78:18, 79:13, 79:17,
79:20, 79:25, 80:10,
80:14, 80:18, 80:21,
80:23, 81:16, 82:2,
83:11, 83:23, 84:19,
84:25, 86:11, 87:19,
89:19, 90:12, 90:14,
91:1, 91:3, 91:6,
91:9, 91:19, 91:23,
92:13, 94:10, 94:12
**themselves** [2] -

84:12, 88:20
**then-Chief** [1] - 27:11
**theoretical** [1] - 86:14
**theory** [4] - 49:22,
50:7, 61:10, 62:22
**therefore** [3] - 4:5,
24:11, 91:15
**they've** [1] - 65:22
**thinks** [3] - 20:23,
33:20, 91:10
**third** [6] - 6:2, 10:2,
24:1, 36:14, 87:13,
88:2
**third-party** [2] - 87:13,
88:2
**thoroughly** [1] - 69:5
**three** [29] - 11:10,
17:17, 19:23, 20:22,
20:24, 21:4, 26:8,
26:15, 30:1, 30:2,
30:5, 31:14, 32:17,
32:25, 33:9, 34:9,
34:14, 56:17, 57:6,
57:10, 62:8, 62:18,
70:7, 70:22, 79:24,
80:1, 80:25, 81:21
**three-factor** [2] - 26:8,
26:15
**threshold** [3] - 5:4,
5:10, 11:16
**tied** [1] - 90:19
**ties** [1] - 92:16
**tight** [1] - 71:17
**title** [8] - 50:18, 67:11,
86:3, 89:18, 90:2,
91:21, 91:24, 92:1
**Title** [8] - 9:8, 23:7,
23:8, 65:10, 66:24,
67:1, 67:7, 67:9
**today** [4] - 6:22, 32:13,
66:12, 76:2
**today's** [1] - 30:8
**together** [7] - 6:19,
36:11, 36:16, 37:1,
37:15, 44:7, 56:18
**tomorrow** [1] - 76:8
**took** [3] - 3:19, 4:12,
16:3
**tool** [1] - 87:3
**tools** [2] - 22:25, 38:7
**total** [1] - 13:5
**totally** [3] - 4:18,
16:12, 51:1
**tougher** [1] - 64:4
**towards** [1] - 2:25
**traces** [1] - 83:21
**Track** [2] - 37:13
**traditionally** [1] -
28:11
**training** [1] - 35:7

**trains** [2] - 25:9, 74:2
**transcript** [6] - 1:21,
1:21, 94:18, 94:18,
94:20
**TRANSCRIPT** [1] - 1:8
**Transcript** [1] - 1:25
**transcription** [1] -
1:25
**transfer** [7] - 5:14,
5:16, 48:6, 49:24,
50:13, 51:21, 52:20
**transferred** [5] - 5:21,
12:21, 12:23, 12:25,
13:2
**transparency** [1] -
93:11
**Transportation** [2] -
24:15, 92:10
**treat** [1] - 10:7
**treated** [1] - 11:6
**treating** [1] - 93:1
**treaty** [3] - 36:12,
87:13
**tree** [1] - 61:11
**trespass** [2] - 48:11,
51:13
**tried** [2] - 22:8, 43:18
**trigger** [1] - 62:16
**TRO** [6] - 5:8, 7:5, 7:6,
12:10, 46:10
**true** [3] - 36:17, 94:17,
94:18
**Trump** [3] - 2:24,
71:12, 87:1
**try** [3] - 15:8, 69:6,
90:16
**trying** [5] - 12:11,
36:15, 40:1, 44:7,
61:6
**turn** [4] - 45:23, 52:8,
57:13, 84:19
**turned** [1] - 84:17
**turns** [2] - 76:18,
76:23
**two** [21] - 6:7, 6:23,
9:10, 13:8, 17:22,
17:23, 17:24, 29:2,
29:8, 29:19, 31:14,
48:5, 52:18, 59:17,
66:17, 72:24, 76:5,
84:12, 87:6, 87:13,
92:8
**two-pager** [1] - 76:5
**two-pronged** [1] -
29:8
**twofold** [1] - 16:16
**type** [2] - 13:9, 87:18
**typical** [2] - 33:19,
82:24

## U

**U.S** [29] - 2:19, 2:25,
23:18, 25:24, 25:25,
26:9, 26:12, 28:4,
35:16, 38:13, 38:18,
39:3, 39:6, 39:7,
39:8, 39:9, 59:4,
59:23, 65:7, 75:13,
82:6, 86:19, 86:20,
86:24, 88:24, 91:16,
91:20, 91:24, 92:1
**U.S.-North** [1] - 35:25
**U.S.C** [10] - 9:7, 11:24,
12:2, 46:2, 47:1,
67:5, 67:6, 68:10,
71:23, 89:25
**ultimate** [1] - 5:5
**ultimately** [2] - 38:12,
76:11
**ultra** [5] - 4:8, 4:11,
17:18, 53:6, 53:7
**unaccountable** [1] -
93:3
**unbridled** [1] - 93:3
**unconstitutional** [1] -
46:11
**under** [32] - 3:9, 3:22,
5:19, 9:7, 11:3, 12:2,
19:2, 20:21, 24:2,
24:9, 24:10, 27:9,
35:6, 42:1, 47:24,
50:15, 51:7, 51:20,
51:23, 59:5, 62:9,
62:16, 65:10, 66:14,
66:24, 68:1, 68:22,
69:15, 74:4, 78:10,
87:7
**understood** [1] - 16:6
**undertaken** [1] - 14:11
**undisputed** [1] - 8:1
**undo** [1] - 41:12
**unfortunately** [1] -
63:14
**unilateral** [3] - 5:1,
27:9, 28:1
**uninvolvement** [1] -
56:8
**unique** [3] - 58:8,
58:9, 92:15
**UNITED** [3] - 1:1, 1:3,
1:9
**United** [36] - 2:3, 2:20,
2:21, 15:18, 36:7,
36:13, 37:2, 37:4,
37:9, 37:15, 37:24,
39:24, 44:4, 64:8,
72:13, 72:18, 72:19,
83:16, 84:13, 84:14,
85:2, 86:2, 86:3,

87:14, 88:9, 88:12, 89:6, 89:7, 89:10, 89:11, 89:13, 89:14, 89:17, 91:15, 91:18
**united** [1] - 1:17
**University** [2] - 3:18, 15:23
**university** [1] - 54:2
**unlawful** [3] - 48:7, 52:21, 57:5
**unlawfully** [1] - 56:9
**unless** [4] - 25:11, 42:18, 94:8
**unlike** [1] - 20:12
**unlimited** [1] - 42:20
**unquestionably** [1] - 5:18
**unquestioned** [1] - 32:8
**unusual** [1] - 15:16
**up** [15] - 4:1, 10:1, 10:2, 17:2, 44:18, 53:8, 62:21, 68:9, 69:11, 72:8, 77:8, 81:3, 82:2, 88:19, 89:3
**uphold** [1] - 37:24
**useful** [1] - 22:19
**uses** [1] - 82:11
**USIP** [111] - 3:4, 3:7, 3:20, 3:21, 4:13, 4:21, 4:23, 5:20, 6:5, 7:8, 7:10, 7:12, 8:5, 8:22, 9:5, 9:6, 10:17, 10:18, 10:20, 11:22, 11:25, 12:1, 12:7, 12:21, 12:23, 13:5, 14:11, 14:23, 15:13, 16:3, 16:8, 16:13, 16:16, 18:15, 18:23, 19:9, 19:12, 19:14, 19:17, 20:6, 21:14, 22:4, 22:16, 22:17, 22:21, 22:25, 27:6, 27:23, 28:22, 28:24, 29:8, 34:10, 34:21, 35:3, 35:11, 36:5, 36:11, 36:14, 36:22, 36:25, 37:6, 37:12, 38:5, 39:2, 41:6, 43:10, 43:14, 44:5, 44:16, 44:22, 45:4, 45:15, 48:20, 49:18, 49:23, 51:22, 52:6, 52:19, 52:21, 53:3, 53:9, 54:17, 56:5, 58:3, 59:15, 66:5, 68:18, 69:2, 69:13, 69:16, 70:10, 71:5, 71:10, 71:16, 71:18,

73:3, 75:8, 75:9, 76:12, 77:19, 84:20, 91:14, 92:21, 92:24, 93:8, 93:13, 93:14, 93:19, 93:20, 94:2
**USIP's** [12] - 3:11, 3:12, 5:16, 35:6, 35:13, 48:6, 51:20, 68:10, 69:12, 76:18, 77:2, 85:6
**usurp** [1] - 53:4

**V**

**vague** [1] - 77:12
**Valeo** [2] - 29:25, 30:1
**variety** [1] - 3:15
**various** [7] - 3:16, 6:5, 8:2, 30:13, 42:14, 70:5, 89:22
**versus** [2] - 2:4, 23:15
**vested** [1] - 76:23
**vesting** [1] - 90:22
**veto** [3] - 47:10, 47:12, 47:14
**Vice** [2] - 83:15, 84:12
**view** [12] - 18:2, 20:12, 20:16, 29:2, 45:15, 52:14, 55:1, 60:19, 62:8, 63:13, 69:25, 79:9
**viewed** [3] - 22:4, 37:5, 80:5
**views** [2] - 7:10, 73:17
**violate** [1] - 53:5
**violates** [1] - 61:21
**violating** [2] - 19:14, 61:25
**violation** [1] - 4:8
**violence** [2] - 85:23, 88:18
**vires** [5] - 4:8, 4:11, 17:18, 53:6, 53:7
**void** [6] - 1:21, 40:21, 48:7, 52:21, 60:24, 94:20
**voting** [4] - 31:4, 31:8, 38:24, 53:22
**vs** [1] - 1:5

**W**

**wait** [1] - 51:5
**waiting** [2] - 10:14, 17:25
**wants** [3] - 87:1, 87:25, 89:2
**war** [3] - 28:15, 35:19, 72:12
**wars** [1] - 37:10

**washington** [1] - 1:19
**Washington** [2] - 1:7, 1:14
**watertight** [1] - 32:1
**ways** [2] - 71:3, 86:8
**wear** [1] - 50:19
**week** [1] - 78:16
**weekend** [3] - 5:21, 88:4, 88:23
**weird** [1] - 83:18
**welcome** [1] - 44:2
**whereas** [1] - 71:10
**whole** [9] - 7:11, 22:18, 31:22, 33:14, 37:10, 41:22, 43:24, 90:20
**wholly** [1] - 72:25
**Wi** [1] - 59:21
**Wi-Fi** [1] - 59:21
**Widakuswara** [1] - 74:24
**wife** [2] - 49:1, 49:9
**WILLIAM** [1] - 1:11
**William** [3] - 2:9, 2:13, 7:19
**willing** [1] - 17:22
**wind** [4] - 13:9, 13:13, 59:18, 60:1
**winding** [1] - 59:19
**wmurphy@ zuckerman.com** [1] - 1:15
**wonderful** [1] - 57:24
**wondering** [1] - 85:14
**word** [5] - 12:4, 12:6, 15:16, 66:24, 82:12
**words** [4] - 8:17, 9:17, 71:23, 90:15
**workers** [1] - 11:8
**works** [5] - 35:11, 37:12, 41:8, 59:10, 75:18
**world** [4] - 9:18, 30:9, 37:10, 88:10
**wow** [1] - 73:22
**writing** [1] - 55:24
**Writs** [4] - 5:19, 5:23, 6:1
**wrongfully** [2] - 4:10
**wrote** [1] - 57:24

**Y**

**year** [1] - 15:1
**years** [3] - 24:16, 26:17, 49:2
**young** [1] - 50:23
**yourself** [1] - 64:7
**yourselves** [1] - 2:6

**Z**

**zero** [1] - 14:13
**Zuckerman** [2] - 1:13, 2:13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-cv-804 (BAH) |
| v. | **Judge Beryl A. Howell** |
| KENNETH JACKSON, *in his official capacity*, *et al.*, | |
| Defendants. | |

## ORDER

Upon consideration of plaintiffs' motion for summary judgment, ECF No. 22, defendants' cross motion for summary judgment, ECF No. 32, the legal memoranda, exhibits and declarations submitted in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby—

**ORDERED** that plaintiffs' motion for summary judgment, ECF No. 22, is **GRANTED**; it is further

**ORDERED** that defendants' cross-motion for summary judgment, ECF No. 32, is **DENIED**; it is further

**ORDERED** that plaintiffs are granted judgment in their favor on Counts One, Two, Three, Four, and Six of the Amended Complaint, ECF No. 12; it is further

**DECLARED** that the purported removal of members of the Board of Directors of the United States Institute of Peace ("USIP") duly appointed under 22 U.S.C. § 4605(b)(4), was unlawful, in violation of 22 U.S.C. § 4605(f), *ultra vires*, and therefore null, void, and without legal effect; it is further

1

**JA294**

**DECLARED** that plaintiff Board members who were purportedly terminated remain members of the USIP Board and may be removed by the United States President only pursuant to the terms of 22 U.S.C. § 4605(f); it is further

**DECLARED** that the purported removal of Ambassador George Moose as acting president of the Institute by a resolution adopted by less than a majority of the duly appointed Board of Directors of USIP was invalid, and therefore null, void, and without legal effect; it is further

**DECLARED** that the purported appointments of Kenneth Jackson and Nate Cavanaugh to the positions of president of USIP pursuant to resolutions adopted by less than a majority of the duly appointed Board of Directors of USIP were invalid and therefore null, void, and without legal effect; it is further

**DECLARED** that Amb. Moose therefore remains president of USIP and may be removed only by a duly constituted Board of Directors, under 22 U.S.C. § 4606; it is further

**DECLARED** that all actions taken or authorized by Kenneth Jackson or Nate Cavanaugh as acting presidents of USIP were invalid and therefore null, void, and without legal effect; it is further

**DECLARED** that, given the illegitimate appointment of Nate Cavanaugh to the position as USIP president, the actions and documents by which he purportedly transferred USIP's headquarters, located at 2301 Constitution Avenue, NW, Washington, DC 20037, to the General Services Administration were invalid and therefore null, void, and without legal effect; it is further

**DECLARED** that the transfer of USIP's other financial or physical assets to the General Services Administration was likewise invalid, null void, and without legal effect; it is further

**DECLARED** that the resolution adopted by two *ex officio* Directors of USIP's Board purportedly appointing Adam Amar as president of the Endowment of the USIP Fund and authorizing and instructing him to transfer any and all of the Endowment's assets to USIP was invalid, null, void, and without any legal effect; it is further

**ORDERED** that plaintiff Board members duly appointed under 22 U.S.C. § 2605(b)(4) shall continue to serve in accordance with § 4605(e) and may not be removed or treated in any way as having been removed, or otherwise obstructed from carrying out their duties, except in accordance with § 4605(f); it is further

**ORDERED** that USIP Acting President Amb. Moose shall continue to serve in accordance with § 4606(a) and may not be removed or treated in any way as having been removed, or otherwise obstructed from carrying out his duties, except in accordance with §§ 4601-11; it is further

**ORDERED** that defendants, except for the *ex officio* members of USIP's Board of Directors to the extent their official positions allow, are **ENJOINED** from further trespass against the real and personal property belonging to the Institute and its employees, contractors, agents, and other representatives; it is further

**ORDERED** that defendants, except for the *ex officio* members of USIP's Board of Directors to the extent their official positions allow, are **ENJOINED** from maintaining, retaining, gaining, or exercising any access or control over the Institute's offices, facilities, computer systems, or any other records, files, or resources, and from acting or purporting to act in the name of Institute, and from using the Institute's name, emblem, badge, seal and any other mark of recognition of the Institute; it is further

**JA296**

**ORDERED** that the defendants who are *ex officio* members of USIP's Board of Directors may not act unilaterally or in any combination of the three of them together, without additional consent constituting a majority of members of the duly constituted USIP Board of Directors, to transfer any of USIP's assets; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Date:  May 19, 2025

*This is a final and appealable order.*

_____
**BERYL A. HOWELL**
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-cv-804 (BAH) |
| v. | **Judge Beryl A. Howell** |
| KENNETH JACKSON, *in his official capacity*, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

The U.S. Institute of Peace ("USIP" or "the Institute") was created by Congress 40 years ago in a statute signed by President Ronald Reagan. By design, USIP was established by the two political branches to advance a safer, more peaceful world with the specific tasks of conducting research, providing training on peacemaking techniques, and promoting peaceful conflict resolution abroad—without formally involving the U.S. government in foreign disputes. To ensure the independence of the Institute, Congress stated this intent explicitly in the organic statute, which declares USIP's status as an "independent nonprofit corporation," 22 U.S.C. § 4603(b), and imposed certain prerequisites for the exercise of presidential power to remove USIP's board members, *id.* § 4605(f). Since then, Congress has endorsed USIP's important work by continuing to fund the Institute through appropriations bills signed by seven different Presidents from both major political parties, including the current President during his first term in office.

In a drastic and abrupt change of course, within the first month of his second term, President Trump unilaterally decided that USIP is "unnecessary," issuing Executive Order 14217 ("EO 14217") § 1, 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025), to this effect, and then his

1

Administration rushed through actions, including removal of Board members, to reach the professed goal of reducing all of USIP's operations and personnel to the bare minimum to perform only mandated statutory tasks, while ignoring the broader statutory goals set out for this organization to fulfill.  These unilateral actions were taken without asking Congress to cease or reprogram appropriations or by recommending that Congress enact a new law to dissolve or reduce the Institute or transfer its tasks to another entity, despite the President's constitutional duties either to "take care" of "faithfully execut[ing]" the laws, U.S. Const. art. II, § 3, cl. 4, or to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient," *id.*, cl. 1.

Instead, the current Administration decided to effectuate the President's Executive Order 14217 through blunt force, backed up by law enforcement officers from three separate local and federal agencies.  The Administration removed the Institute's leadership, including plaintiff Board members and its president in contravention of statutory limitations, and had personnel from a newly created federal office, called the Department of Government Efficiency ("DOGE"), forcibly take over the Institute's headquarters on March 17, 2025.  With a newly installed USIP president, the Administration then handed off USIP's property for no consideration and abruptly terminated nearly all of its staff and activities around the world.  *See* Hearing on Cross-Mots. for Summ. J. Tr. ("XMSJ Hr'g"). at 13:4-15:6 (5/14/25), ECF No. 38 (plaintiffs' counsel representing that only four employees are left at USIP's headquarters and only "a handful" overseas, and that "zero" programmatic activities are occurring at USIP); *id.* at 59:14-60:17 (defendants' counsel representing that only five employees are left and that "the Institute is currently in the operational posture of being at or reducing to its statutory minimum").

2

**JA299**

The question before this Court is whether these unilateral actions by the President and his Administration are legal under duly enacted statutes and the U.S. Constitution. Since the outset of this lawsuit challenging the President's removal of all but the *ex officio* members of the Institute's Board—after which all other challenged actions were effectuated—the parties have taken opposite views of the legality of these actions based on their divergent characterizations of the Institute's relationship to the U.S. government: plaintiffs assert that USIP is a "congressionally established" yet "free-standing nonprofit," Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at 1, ECF No. 22, not part of the federal government at all, XMSJ Tr. Hr'g at 8:6-8, while defendants assert that USIP is an "Executive Branch component of the Nation's federal government exercising executive power through executive functions," Defs.' Cross. Mot. for Summ. J., Mem. in Supp. & Opp'n to Pls.' MSJ ("Defs.' Opp'n") at 1, ECF No. 32. No court before has addressed this novel question of where precisely the Institute falls within our constitutional structure, though the answer to this question has implications for the legality under the U.S. Constitution of the President's exercise of removal power in a manner that violates the applicable statute.

The Institute is unique in its structure and function—neither a traditional Executive branch agency nor an entirely private nonprofit corporation. A close evaluation of USIP's organic statute and its practical operations indicates that the arguments ably presented on both sides have some merit, but both end up taking leaps to reach conclusions that are unsupported by the factual record and current jurisprudence. This Court concludes that, despite exhibiting qualities of nongovernmental organizations ("NGOs"), USIP has strong governmental ties and must be considered a part of the federal government, at least for purposes of resolving the constitutional separation-of-powers questions posed here. At the same time, USIP does not

3

exercise governmental, let alone executive, power under the Constitution and is not part of the

Executive branch.  Instead, USIP supports both the Executive and Legislative branches as an

independent think tank that carries out its own international peace research, education and

training, and information services.

As an independent entity exercising inconsequential government power and *de minimis*,

if any, executive power, Congress's ability to restrict the President's removal power is even

greater than that outlined in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), *Seila

Law v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), and the Supreme Court's

other seminal presidential removal power cases.  Applying those cases, Congress's restrictions

on the President's removal power of USIP Board members are squarely constitutional, and the

President and his Administration's acts to the contrary are unlawful and *ultra vires*.  The actions

that have occurred since then—at the direction of the President to reduce USIP to its "statutory

minimums"—including the removal of USIP's president, his replacement by officials affiliated

with DOGE, the termination of nearly all of USIP's staff, and the transfer of USIP property to

the General Services Administration ("GSA"), were thus effectuated by illegitimately-installed

leaders who lacked legal authority to take these actions, which must therefore be declared null

and void.

\*     \*     \*

To aid in review of this Memorandum Opinion, given its length required to address the

novel constitutional and other issues raised in the parties' pending dispositive motions, an

overview is provided.  **Part I** reviews the relevant factual and procedural background in this case

regarding the Institute (**section A**), the Administration's actions that instigated this litigation

(**section B**), and the prior motions and rulings in this case leading to the expedited dispositive motions resolved here (**section C**).

**Part II** provides the legal standards governing the parties' cross-motions for summary judgment, under Federal Rule of Civil Procedure 56.

**Part III** addresses the merits and disposition of the pending motions.  **Section A** considers whether USIP is part of the Executive branch under our Constitution and thus subject to the President's Article II removal authority.  **Subsection 1** holds that USIP is part of the federal government such that constitutional separation-of-powers principles apply, but **subsection 2** holds that USIP does not exercise executive powers and is not part of the Executive branch, and so the President had no constitutional authority under Article II to remove the Institute's Board members.  Consequently, the USIP Act's for-cause and other removal protections were valid, and the President acted *ultra vires*, violating those provisions.  **Section B** goes on to consider whether that conclusion would change if USIP *were* part of the Executive branch and concludes that it would not.  USIP is led by a multi-member board of experts and exercises *de minimis*, if any, executive power, so under binding precedent, including *Humphrey's Executor* and *Seila Law*, the statutory for-cause and other removal protections are constitutional.  **Section C** explains how these conclusions mean that plaintiffs prevail on Counts One, Two, Three, Four, and Six in their Amended Complaint.  **Section D** describes the requirements for injunctive relief and determines both the declaratory relief to which plaintiffs are entitled and the specific injunctive relief plaintiffs shall be afforded.

**Part IV** provides a brief conclusion summarizing the disposition of the pending cross-motions for summary judgment.

5

**JA302**

## I.    BACKGROUND

The background and procedural history relevant to the pending cross-motions are described below.

### A.    Organizational Background

USIP was established in 1984 under the Department of Defense Authorization Act of 1985, Pub. L. No. 98-525, tit. XVII sec. 1701-1712, 98 Stat. 2492, 2649, (1984), *codified at* 22 U.S.C. §§ 4601-4611.  Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶ 1, ECF No. 20;[1] 22 U.S.C. § 4603(a) ("There is hereby established the United States Institute of Peace.").  The effort to create USIP was bipartisan in nature, led by two former World War II veterans, Senators Mark Hatfield and Spark Matsunaga, who had long envisioned a national "peace academy."  Amicus Br. of 113 Former Sr. Military & Foreign Policy Gov't Officials ("Sr. Officials Amicus Br.") at 10, ECF No. 31; *The Origins of USIP*, U.S. INSTITUTE OF PEACE, https://web.archive.org/web/20241127185853/https://www.usip.org/about/origins-usip (last visited May 14, 2025).  As the statute mentions, a "Commission on Proposals for the National Academy of Peace and Conflict resolution, created by the Education Amendments of 1978, recommended establishing an academy as a highly desirable investment for further the Nation's interest in promoting peace."  22 U.S.C. § 4601(a)(7); REPORT OF THE COMMISSION ON PROPOSALS FOR THE NATIONAL ACADEMY OF PEACE AND CONFLICT RESOLUTION, *To Establish the United States Academy of Peace* ("Comm'n Rep.") (1981).  Specifically, the Commission spent about a year hearing from people in the field, assessing peace-promoting organizations, and evaluating "the current state of peace learning and its use."  Comm'n Rep. at 2.  The Commission saw a "federal role" for "international peace research, education and training, and

---

[1]        Unless otherwise noted, cited facts submitted by plaintiffs are undisputed.  *See* Pls.' SUMF; Defs.' Responses to Pls.' SUMF ("Defs.' Resp."), ECF No. 32-1.

information services," *id.* at xiii, and proposed "an interdisciplinary institution devoted to international peace" to further that interest, *id.* at 1.  The Institute's organic statute, implementing this vision, was signed into law by President Reagan.

Described below are various aspects of how the Institute operates, including its statutory framework, statutory purposes, funding sources, activities, interactions with other government entities, and internal governance structure.

## 1. *Statutory Framework*

Congress defined USIP as an "independent nonprofit corporation and an organization described in section 170(c)(2)(B) of Title 26," 22 U.S.C. § 4603(b), which provides for corporations or foundations "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes," 26 U.S.C. § 170(c)(2)(B).  USIP has the powers of a D.C. nonprofit corporation, except for the ability to dissolve itself.  *See* 22 U.S.C. § 4604(a) (referencing section 5(o) of the District of Columbia Nonprofit Corporation Act, D.C. Code 29-412.01 *et seq.*); District of Columbia Nonprofit Corporation Act, Pub. L. No. 87-569, sec. 5(o), 76 Stat. 265, 268 (1962) (regarding a corporation's authority to "cease its corporate activities and surrender its corporate franchise").[2]  USIP likewise may not issue stock to transfer its ownership. *See* 22 U.S.C. § 4603(b).

## 2. *Purposes*

The Institute's organic statute describes its purpose as "establish[ing] an independent, nonprofit, national institute to serve the people and the Government through the widest possible

---

[2]       Defendants agree that other provisions of the D.C. Code—aside from those outlining a nonprofit corporation's powers (section 5 of Pub. L. 87-569, or D.C. Code Title 29, Ch. 4, Subchapter III, § 29-403, "purposes and powers")—do not apply.  *See* XMSJ Hr'g Tr. at 68:8-69:23.  Therefore, USIP's organic statute, *see infra* Part I.A.7, not any provision of the D.C. Code, controls removal of USIP Board members and officers.  *Cf.* D.C. Code § 29-406.08(e) ("Except as otherwise provided in the articles of incorporation or bylaws, a director who is appointed by persons other than the members may be removed with or without cause by those persons.").

range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." *Id.* § 4601(b).  That section—the "Congressional declaration of findings and purposes"—discusses the need for stronger research, training, and information dissemination in peaceful conflict resolution techniques.  *See id.* § 4601.  Specifically, Congress identified a "national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities . . . to bring together and develop new and tested techniques to promote peaceful . . . relations in the world." *Id.* § 4601(a)(4).  In addition, Congress described "a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information." *Id.* § 4601(a)(6).

To meet these identified needs, the political branches envisioned a "national institution devoted to international peace research, education and training and information services," *id.* § 4601(a)(5), using words such as an "academy," *id.* § 4601(a)(7), or "institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs," *id.* § 4601(a)(8).  To carry out this goal of establishing such an "academy" or "institute," Congress provided funding and guidance on tasking, with protections to ensure the Institute's independence.

### 3.   *Funding*

USIP receives annual appropriations from Congress to carry out its mission and may also obtain funds through private donations and governmental grants, as well as by charging fees and subscriptions for its publications and educational activities.  *Id.* §§ 4609(a), 4604(h)(1), 4604(h)(3), 4604(i)-(j).  Unlike Executive branch agencies, USIP may seek appropriations

directly from Congress, relegating the Office of Management and Budget ("OMB") to submitting comments on the budget request at the time of transmittal.  *Id.* § 4608(a).  Private gifts and contributions may only be used for the development and maintenance of its headquarters or other facilities and for hospitality purposes.  *Id.* § 4604(h)(3)(A)-(B).

USIP's distinctive headquarters (prior to the challenged acts in this case) on Washington, D.C.'s Constitution Avenue were funded through $70 million of private contributions and $99 million of funds appropriated specially by Congress.  Pls.' SUMF ¶¶ 6, 9.  The headquarters were owned by USIP and maintained by USIP with private funds.  *Id.* ¶ 9.  While the United States owns the land on which USIP's headquarters are located, USIP had administrative jurisdiction of that property, pursuant to a transfer effected in 1996.  *Id.* ¶¶ 7-8; Am. Compl., Ex. B, Letter from Sec'y of Navy to President of USIP (Nov. 21, 1996), ECF No. 12-2 (transferring administrative jurisdiction over the real property to USIP); *id.*, Ex. C, Notice of Transfer of Jurisdiction (Nov. 8, 2013), ECF No. 12-3 (transferring an adjacent parcel of land).

USIP is congressionally authorized both to retain appropriated funds not used in a given year, *see* 22 U.S.C. § 4609(b), and to collect private funds, in a separate private endowment, *see id.* § 4603(c) (describing the "Endowment of the United States Institute for Peace").  Prior to the events leading to the instant dispute, the Institute's Endowment held $15 million of private donations and $10 million of rolled-over appropriations.  *See* Pls.' SUMF ¶ 11.

Upon liquidation or dissolution of the Institute, all assets must revert to the U.S. Treasury.  22 U.S.C. § 4610.

### 4.    *Activities*

USIP's activities, as set out in the organic statute, focus on research, training, and the promotion of peaceful conflict resolution techniques.  Congress instructed the Institute to establish various fellowship, scholarship, and award programs, *id.* §§ 4604(b)(1), (b)(10), (c), as

well as a research program on peace to investigate "the causes of war," "peace theories," and the

"experiences of the United States and other nations in resolving conflicts," *id.* § 4604(b)(3).

Congress further provided that the Institute should "develop programs to make international

peace and conflict resolution research, education, and training more available and useful." *Id.*

§ 4604(b)(4). In this regard, Congress mentioned the creation of handbooks and practical

materials, the publication and dissemination of the Institute's work product, and offering

trainings and symposia. *Id.* §§ 4604(b)(4), (b)(6)-(8). Apart from providing its own education,

the Institute is instructed to promote and support peace education and research at the graduate

and postgraduate levels and authorized to make grants to educational institutions for such

purposes. *Id.* §§ 4604(b)(5), (d). All of this work may be facilitated by forming relationships

with public and private institutions. *Id.* § 4604(b)(2).

USIP is also statutorily authorized to respond to requests for conducting investigations,

examinations, studies, and reports "on any issue within the Institute's competence." *Id.*

§ 4604(e). Such requests may, for instance, come from Congress. In fact, USIP regularly briefs

members of Congress and their staff. Pls.' SUMF ¶ 60. USIP also engages in specific ad-hoc

projects, one example being the Iraq Study Group. A bipartisan group of members of Congress

asked USIP in 2006 to facilitate a study group comprised of various federal government officials

with support from independent nonprofit institutions to provide a fresh perspective on the

situation in Iraq. *Id*. ¶ 60(a). USIP organized expert working groups, developed briefing papers,

provided analysis, and coordinated meetings. *Id.* In 2020, Congress specifically directed, as

codified in law, USIP to develop the "Gandhi-King Global Academy," a professional training

institute to develop and disseminate nonviolent conflict resolution curricula. *Id.*; *see also*

10

**JA307**

Consolidated Appropriations Act of 2021, Pub. L. 116-260, sec. 333-34, 134 Stat. 1182, 3115-16

(2020) (describing the Academy and the "Gandhi-King Scholarly Exchange Initiative").

In addition to its headquarters in Washington, D.C., USIP has global applied research

offices abroad, where staff members carry out specific projects, facilitate conflict resolution

discussions, and teach and share nonviolent conflict management techniques.  *See* Pls.' Mem. at

7; Pls.' SUMF ¶ 59.

To facilitate these statutory tasks, USIP may request information from various

government entities—just like any other private person—pursuant to the Freedom of Information

Act ("FOIA").  22 U.S.C. § 4604(b)(9).  USIP also serves as a clearinghouse for the

dissemination of information "from the field of peace learning" to the public and to government

personnel, *id.* § 4604(b)(8), and is subject itself to FOIA, *id.* § 4607(i).  Congress made clear,

however, that USIP is not to advance its mission independently via petition to political bodies—

prohibiting its "influenc[ing] the passage or defeat of any legislation by the Congress" or state,

local, or global legislative bodies, unless asked to testify.  *Id.* § 4604(n).

### 5.    *Interactions with Other Government Entities*

Aside from the ways in which USIP interacts with Congress and Executive branch

agencies to further directly its peace-promoting goals, *i.e.*, by responding to congressional and

agency inquiries, filing FOIA requests for information, or publishing work product, its organic

statute also provides for various administrative touchpoints with other government entities.  For

instance, USIP may obtain support from the GSA on a reimbursable basis, despite retaining

ownership of its headquarters building (prior to the Administration's actions leading to this

dispute).  *Id.* § 4604(o).[3]

---

[3]    GSA owns and leases 8,397 buildings for the federal government, including post offices, courthouses and
office buildings that house government offices, like the Department of Justice and Department of Labor.  *See*

Further, despite maintaining substantial independence over its finances—as evidenced by USIP having a private firm do its annual audits and USIP being authorized to make its own budgetary request to Congress—USIP must report its annual audit to Congress and allow OMB to comment on its budget requests. *Id.* §§ 4607(g)-(h), 4608(a).[4]  USIP must also make biennial reports to Congress and the President, *id.* § 4611, and report notice of its board meetings, which may be provided in the Federal Register, *id.* § 4605(h)(3).

More consequentially, USIP may only continue to use "United States" "U.S." or any other reference to the U.S. government in its name or seal if Congress continues to appropriate funds to the organization.  *Id.* § 4603(e)(2).  Thus, the Institute's titular affiliation with the U.S. government is contingent on Congress's annual approval of appropriations.

### 6.    *Leadership and Staff*

USIP is led by a Board of Directors consisting of fifteen voting members: three *ex officio* members (the Secretary of State, the Secretary of Defense, and the National Defense University President) and twelve members, who are appointed by the President of the United States and confirmed by the Senate ("appointed members").  *Id.* § 4605(b).  By statute, "not more than eight voting members of the Board . . . may be members of the same political party."  *Id.* § 4605(c).  The twelve appointed members may serve up to two four-year terms.  *Id.* § 4605(e)(1), (e)(4).  Congress required that the appointed members have "appropriate practical or academic experience in peace and conflict resolution efforts of the United States," *id.* § 4605(d)(1), and be independent of the federal government since they may not be "[o]fficers" or "employees of the

---

*Inventory of GSA Owned and Leased Properties*, GSA, https://www.gsa.gov/tools-overview/buildings-and-real-estate-tools/inventory-of-gsa-owned-and-leased-properties (last visited Apr. 21, 2025); *id.*, *GSA Properties*, https://www.gsa.gov/real-estate/gsa-properties (last visited Apr. 21, 2025).

[4]        KPMG, a private accounting firm, does audits for USIP.  Pls.' SUMF ¶ 33; *see also* 22 U.S.C. § 4607(g) (stating that audits should be conducted "by independent certified public accountants or independent licensed public accountants").

**JA309**

United States Government," *id.* § 4605(d)(2).  Every three years, the Board elects a Chairman

from among the appointed members.  *Id.* § 4605(h)(1).  The Board meets at least semiannually,

at any time a meeting is called by the chairman or at the request of five members of the Board.

*Id.* § 4605(h)(2).  The quorum for such meetings is a majority of members of the Board.  *Id.*

The Board members appoint a president and other officers of USIP as necessary.  *Id.*

§ 4606(a).  The president of USIP is a nonvoting, *ex officio* member of the Board and serves for

a defined term of years.  *Id.*  The president may hire and terminate employees as he sees fit to

carry out the purposes of the Institute.  *Id.* § 4606(c).

USIP officers and employees are considered federal employees only for limited, express

purposes.  They are subject to the Federal Torts Claims Act ("FTCA") as federal employees are,

and they are treated as federal employees for some compensation and benefits-related purposes,

*see id.* § 4606(f)(1), although they are paid via a private payroll and receive benefits through

private plans, *see* Pls.' SUMF, Ex. 7, Decl. of Former USIP Pres. Amb. Moose ("Third Moose

Decl.") ¶ 4, ECF No. 20-7; Pls.' Opp'n Exhibits, Ex. 9, Decl. of Former USIP CFO Allison

Blotzer ¶ 3, ECF No. 34-11.  Their compensation is set by the president of USIP, "governed by

the provisions of Title 5 relating to classification and General Schedule pay rates."  22 U.S.C.

§ 4606(c).

Despite USIP having its own independent staff, other federal employees may join USIP

for a particular assignment.  The president of USIP may request that a federal officer be assigned

"by an appropriate department, agency, or congressional official or member of Congress."  22

U.S.C. § 4606(d)(1).  The Secretary of State, Secretary of Defense, and Director of the CIA may

also assign employees and officers from their own agencies to the Institute "on a rotating basis to

be determined by the Board."  *Id.* § 4606(d)(2).

USIP is "liable for the acts of its directors, officers, employees, and agents when acting within the scope of their authority" and thus does not have sovereign immunity. *Id.* § 4603(d). The Institute may defend itself, as well as affirmatively sue, in any court of competent jurisdiction, and is generally represented by private counsel. *Id.* § 4604(k); Pls.' SUMF ¶ 32; Defs.' Resp. ¶ 32 (noting that USIP on occasion has been represented by DOJ).

### 7.    *The President's Statutory Removal Authority*

Appointed board members are subject to statutory removal protections and "may be removed by the President" of the United States under three circumstances. First, the President may remove a Board member under a classic for-cause provision. *See* 22 U.S.C. § 4605(f)(1). "[I]n consultation with the Board," the President may remove a Board member "for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties." *Id.* Second, the President may remove a Board member "upon the recommendation of eight voting members of the Board." *Id.* § 4605(f)(2). No cause is required if the eight voting members agree, *see id.* § 4605(c), and given that the President may have up to eight members on the Board of his own political party, the President could presumably remove a Board member for political reasons. Third, the President may remove a Board member without cause if certain congressional committees agree. *Id.* § 4605(f)(3). He needs "a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate." *Id.* In short, the President may remove a Board member for cause, upon recommendation of a majority of the Board, or upon recommendations of two House and two Senate committees.

14

**JA311**

### B.    Factual Background

Prior to any of the events giving rise to this litigation, USIP's president was Ambassador George Moose, who previously served as Chair of the USIP Board and, for many years prior, as Ambassador to the Republics of Benin and Senegal and Asisstant Secretary of State for African Affairs.  Pls.' SUMF ¶ 31.  The Board consisted of 10 appointed members: five Republicans (Amb. John Sullivan, Judy Ansley, Jonathan Burks, Michael Singh, and Roger Zakheim), and five Democrats (Nancy Zirkin, Joseph Falk, Kerry Kennedy, Mary Swig, and Edward Gabriel).  *Id*. ¶¶ 20-30.[5]  Two seats were vacant.  *Id*. ¶ 30.  The other voting members of the Board were, *ex officio*, Secretary of State Marco Rubio, Secretary of Defense Pete Hegseth, and Vice Admiral Peter Garvin.  *Id*. ¶¶ 17-19.  The Institute employed over 400 employees.  *Id*. ¶ 52.

On February 19, 2025, President Trump issued EO 14217, Commencing the Reduction of the Federal Bureaucracy, which ordered the downsizing of "elements . . . that the President has determined are unnecessary."  § 1, 90 Fed. Reg. at 10577.  "The non-statutory components and functions" of certain "governmental entities" are to be "eliminated to the maximum extent consistent with applicable law," and the entities are to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."  *Id.* § 2(a).  The President, in other words, ordered a virtual elimination of four congressionally created entities—USIP being one.  *Id.*

Moving swiftly, President Moose and USIP outside counsel met the day after issuance of EO 14217, on February 20, with several Trump administration officials tasked to efficiency-promoting projects (like EO 14217).  Pls.' SUMF ¶ 36.  Those officials asserted that the only statutory requirements of USIP are the existence of a Board, the appointment of a president, the

---

[5]    The Board had 11 appointed members until March 14, 2025, when one appointed Board member resigned. Pls.' SUMF ¶ 16; Defs.' SUMF ¶ 16.

payment of incidental expenses, and the submission of certain reports to Congress and the

Executive branch.  *Id*. ¶ 36.  Amb. Moose and USIP's counsel explained that USIP is an

"independent nonprofit organization outside of the executive branch of the federal government."

*See id*. ¶ 36; Defs.' Resp. ¶ 36 (disputing that USIP is outside of the Executive branch but not

that USIP's counsel so asserted); *see also* Am. Compl., Ex. D, Decl. of George Foote, USIP

Outside Counsel ("Foote Decl.") ¶ 5, ECF No. 12-4.  Amb. Moose soon after became aware that

DOGE was trying to determine the identity of USIP's private security contractor.  Compl., Ex.

A, Decl. of Amb. Moose ¶ 9 ("First Moose Decl."), ECF No. 1-2.

Notwithstanding being informed of USIP's view of its independence, as confirmed by its

outside legal counsel, and the apparent controversy surrounding this issue, the Administration

began disassembling USIP.  On Friday, March 14, 2025, Trent Morse of the White House

Presidential Personnel Office emailed all appointed Board members "[o]n behalf of President

Donald J. Trump," that their positions were "hereby terminated, effective immediately."  *See*

Pls.' SUMF ¶¶ 38-39; *id*., Ex. 12, ECF No. 20-12.  The emails provided no legal or factual

justification for the terminations and did not purport to meet any statutory requirement under 22

U.S.C. § 4605(f).  Pls.' SUMF ¶¶ 40-42.  That same day, a resolution was signed by the

remaining three *ex officio* voting Board members removing President Moose and replacing him

with an individual named Kenneth Jackson.  *Id*. ¶ 43.  When alerted by Board members about

these purported termination emails, outside counsel for USIP continued to impress upon DOGE

officials that USIP is outside of the control of the Executive branch and that he had informed the

Board members that these emails had no legal effect.  *See* Foote Decl. ¶¶ 7-8.

Rather than engaging with outside counsel or seeking recourse for clarification in a court

of law, representatives from DOGE attempted to enter USIP headquarters, but were denied entry.

Pls.' SUMF ¶ 45. USIP's outside counsel sent an email to DOGE's general counsel reiterating the view of USIP's status as "an independent nonprofit organization outside of the control of the Executive branch," and further advising that DOGE representatives required the USIP president's approval or a warrant to enter USIP headquarters and offering to discuss the matter. Foote Decl. ¶¶ 6-8. No DOGE or other Administration official sent any response to this email. *Id*. The DOGE officials tried again later, accompanied by agents of the Federal Bureau of Investigation ("FBI"), to enter USIP headquarters, but were denied entry. Pls.' SUMF ¶ 45; First Moose Decl. ¶ 11-12; Foote Decl. ¶ 9.

Undeterred, DOGE officials, in conjunction with the FBI and the Administration's newly installed Chief of the Criminal Division of the D.C. U.S. Attorney's Office ("DC-USAO") continued their efforts over the weekend to take control of the USIP premises. On Sunday, two FBI agents visited a "senior USIP security official at his home" to determine how to gain access to the building. Pls.' SUMF ¶ 46; Foote Decl. ¶ 10. That manager was on medical leave and was taken off guard by the visit. Foote Decl. ¶ 10. USIP outside counsel contacted one of the FBI agents and requested that all inquiries be directed toward him, given the underlying legal issues with the President's removal of the Board. *See id*. The FBI agent expressed that he was "hyper aware" of the issues. *Id*.

Nonetheless, the FBI on Sunday also contacted USIP's Chief Security Officer, Colin O'Brien, seeking information about USIP security procedures. *See* Am. Compl., Ex. G, Decl. of Colin O'Brien, Chief Security Officer of USIP ("O'Brien Decl.") ¶ 3, ECF No. 12-7. The FBI agent, the same one who had communicated with outside counsel and was thus apprised of the legal advice about USIP's independence, threatened that O'Brien was "the subject of an investigation by the Department of Justice into the incident that took place at USIP on Friday,

**JA314**

March 14, 2025, when USIP denied building entry to DOGE staff and FBI agents," despite, as the agent well knew, that O'Brien and others were acting in response to advice by outside legal counsel. *Id.* ¶ 3; Foote Decl. ¶ 10. O'Brien received the FBI's call while at work and feared that the FBI would be awaiting him for questioning when he returned home. O'Brien Decl. ¶ 3.

The DC-USAO Criminal Division Chief became involved the same Sunday, calling outside counsel to seek access to the USIP building and resources for unnamed individuals and stating "a suspicion that USIP may be engaging in criminal behavior." Foote Decl. ¶ 12 ("I later received a call from Jonath[a]n Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of Columbia."). This same DC-USAO official called again later on Sunday to say he was requesting that representatives for Secretaries Rubio and Hegseth be able to inspect books and records. *Id.* Outside counsel informed the DC-USAO official that he would be happy to facilitate such access upon a formal written request. *Id.* ¶ 13. Then, the DC-USAO official stated that "unnamed representatives of Secretary Hegseth would be at the USIP headquarters building the next day and would expect access to the USIP information systems." *Id.* ¶ 15. He threatened to investigate criminally anyone who obstructed their access. *Id.* ("He said that as Chief of the Criminal Division, he would criminally investigate USIP and anyone who 'obstructed' their access to USIP's computer systems."); Pls.' SUMF ¶ 47.

Upon O'Brien's recommendation, Amb. Moose and outside counsel decided to suspend USIP's contract with Inter-Con, its private security firm, out of concern that DOGE or the FBI would coerce Inter-Con employees into facilitating access. O'Brien Decl. ¶ 4; Pls.' SUMF ¶ 48. This concern turned out to be prescient.

On Monday, March 17, 2025, a tense sequence of events unfolded at USIP Headquarters in downtown Washington, D.C. Under the duress of threats relayed by DOGE officials of loss of

all of its government contracts, four employees of Inter-Con arrived at USIP Headquarters. TRO
Hr'g Tr. at 36:3-16 (3/19/25), ECF No. 18; Pls.' SUMF ¶ 49; Foote Decl. ¶ 16; O'Brien Decl.
¶ 8. Their badges had been deactivated, due to the suspension of the Inter-Con contract, but
these formerly contracted security personnel gained access to USIP's headquarters when a fifth
employee arrived with a physical key that had not yet been restored to USIP's custody. Pls.'
SUMF ¶ 49; *see also* O'Brien Decl. ¶¶ 5-6; Foote Decl. ¶¶ 16-17. Outside counsel informed
them that they were trespassing. O'Brien Decl. ¶ 7; Foote Decl. ¶ 18. USIP officers
immediately formally terminated the entire Inter-Con contract. Pls.' SUMF ¶ 48; O'Brien Decl.
¶ 9.

     The Inter-Con staff proceeded to USIP's arms room, where USIP's firearms are stored.
O'Brien Decl. ¶ 10; Foote Decl. ¶ 18. Fearing a violent standoff, Amb. Moose and O'Brien
initiated a building lockdown and called the D.C. Metropolitan Police Department ("MPD") to
report the trespass. *See* Pls.' SUMF ¶ 50; O'Brien Decl. ¶¶ 11, 14; Foote Decl. ¶¶ 18-19. DOGE
officials attempted to gain access through various doors but were unable to do so. O'Brien Decl.
¶ 12.

     In the meantime, Jackson, who had been designated as USIP's president by the three *ex
officio* Board members the prior Friday, contacted outside counsel and asked to speak. Foote
Decl. ¶ 21. Jackson was outside of the headquarters, but the "circus" outside—people from the
media and photographers who had gathered on scene—prevented them from speaking there. *Id.*
¶¶ 21-23. They agreed to meet on Zoom, but Jackson never showed up for the video conference
conversation. *Id.* ¶ 23.

     MPD arrived at USIP's headquarters and allowed DOGE officials, including Jackson, to
enter the building behind them. Pls.' SUMF ¶ 51; Foote Decl. ¶ 25; O'Brien Decl. ¶¶ 16-17.

**JA316**

O'Brien initiated a higher-level, full building lockdown. O'Brien Decl. ¶ 18. DOGE officials

asked him to escort them throughout the building, but O'Brien refused; he would not have been

able to do so because of the building shutdown. *Id.* ¶ 19. MPD instead escorted outside counsel,

Amb. Moose, and O'Brien (and later, all USIP personnel) out of the building without allowing

them to retrieve their belongings. Pls.' SUMF ¶ 51; Foote Decl. ¶ 26. At that point, about

fifteen police officers and multiple vehicles were outside of the building. Foote Decl. ¶ 27.

While waiting outside, O'Brien was informed that the FBI was en route, and he observed

two diplomatic security officers from the Department of State arrive and enter the building.

O'Brien Decl. ¶¶ 22-23; First Moose Decl. ¶ 12 (representing that DOGE officials returned to the

building with FBI agents after they were initially denied access by USIP staff). He then

observed MPD retrieve lock-picking equipment from a vehicle and gain entrance through a

building door on Constitution Avenue. O'Brien Decl. ¶ 25. O'Brien and other USIP personnel

received requests from DOGE personnel or others working with them to gain further access to

the USIP building and USIP computer systems. *Id.* ¶¶ 27-28.

In short, over that weekend and Monday, FBI officials visited a USIP employee on

medical leave in his home, an FBI agent called and threatened investigation of another USIP

employee, the DC-USAO Chief of the Criminal Division called outside counsel twice and

threatened criminal investigation of outside counsel and anyone who interfered with DOGE

accessing USIP physical premises and systems, and law enforcement officers from three separate

agencies converged at the headquarters where they escorted Amb. Moose and other USIP

officers off the premises.

Two days later, DOGE officials were able to access USIP computer systems through

USIP IT personnel, Am. Compl., Ex. A, Decl. of Amb. Moose ("Second Moose Decl.") ¶¶ 5-11,

**JA317**

ECF No. 12-1 (describing one employee who drove from Georgia to aid DOGE access), and then attempted to cut off personnel access to funds and were suspected of dumping financial records into shred bins.  *Id.* ¶ 12-14; *see also* Pls.' Mot. for TRO, Ex. B, ECF No. 2-3 (photograph purportedly taken on March 18, 2025, of paper records in trash can marked "SHRED").  DOGE officials proceeded to strip USIP logos and monikers from the walls inside of the building. Second Moose Decl. ¶ 15.

On March 21, 2025, newly installed USIP president Jackson fired six USIP employees, referencing their at-will employment status.  *See* Pls.' SUMF ¶ 53; *id.*, Ex. 13, ECF No. 20-13. Just one week later, nearly all of the Institute's employees were fired, presumably also by Jackson.  *See* Pls.' SUMF ¶ 54; *id.*, Decl. of Terry Jones, Former VP of Human Resources ("Jones Decl.") ¶ 5, Ex. 4, ECF No. 20-4.

Around this time in late March, a resolution signed by two of the three *ex officio* Board members, Secretaries Rubio and Hegseth, removed USIP President Jackson and replaced him with Nate Cavanaugh, one of the DOGE-affiliated officials who had been working on disassembling USIP.  *Id.* ¶ 55; Defs.' Opp'n to Pls.' Mot. Pursuant to All Writs Act ("Defs.' Opp'n to Pls.' All Writs Mot."), Ex. 2 ("Resolutions") at 1-4, ECF No. 15-2.  That same resolution set the groundwork for disposing of USIP's assets.  The resolution removed USIP's Chief Financial Officer and Chief Operating Officer and terminated all officers of the Endowment.  *See* Resolutions at 1, 3; Pls.' SUMF ¶ 57.  A newly appointed president of the Endowment was instructed by Secretaries Hegseth and Rubio to transfer all of the Endowment's assets to USIP, and Cavanaugh was instructed, also by Hegseth and Rubio, to transfer all of USIP's assets, including assets received from the Endowment, to GSA.  *See* Resolutions at 1, 3; Pls.' SUMF ¶¶ 55, 57.

**JA318**

Cavanaugh executed documents to transfer the USIP headquarters building to GSA, without compensation, via a series of undated documents sometime around the end of March. *See* Defs.' Opp'n to Pls.' All Writs Mot., Request for Transfer of Excess Real and Related Personal Property ("Request for Transfer"), Ex. 1, ECF No. 15-1; *id.*, Letter from Cavanaugh to GSA Adm'r Ehikian Ex. 3, ECF No. 15-3; *id.*, Letter from OMB Director Vought to Ehikian, Ex. 4, ECF No. 15-4; Pls.' SUMF ¶ 56.  Included in that transfer appears to be the various assets within USIP's headquarters.  *See* Request for Transfer.  The headquarters have been, or are in the process of being, leased to the Department of Labor.  *See* Pls.' SUMF ¶ 58.  Plaintiffs represent that the funds in USIP's Endowment have also been transferred, but they do not know their destination.  *See* XMSJ Hr'g Tr. at 12:22-13:3.

USIP now has only four or five employees and is conducting no programmatic activities. *See* XMSJ Hr'g Tr. at 13:4-15:6.  Defendants take the position that USIP is only required to undertake statutory functions using mandatory language, such as "shall."  *Id.* at 59:23-60:14. Thus, in the Administration's view, the detailed statutory tasks laid out in 22 U.S.C. §§ 4604(b)(1)-(10), 4604(c)-(g), which are all introduced by the phrase "the Institute *may*," can be ignored.  *See* XMSJ Hr'g Tr. at 59:23-60:14.  Even the mandatory programs, however, appear to have been halted.  *See id.* at 14:14-15:6; Pls.' SUMF, Decl. of Alli Alourdes Phillips ("Phillips Decl.") ¶¶ 2, 5, Ex. 31, ECF No. 20-31 (describing the Gandhi-King Global Academy and how it was shut down).

### C.    Procedural History

On March 18, 2025, the Institute and five of its purportedly terminated appointed Board members sued then-USIP president Jackson, U.S. DOGE Service, U.S. DOGE Service Temporary Organization, several DOGE officials including Cavanaugh, Secretaries Rubio and Hegseth, Vice Admiral Garvin, and President Trump, alleging *ultra vires* actions, separation-of-

powers violations, and violations of the USIP organic statute, as well as trespass to real and

personal property. *See* Compl., ECF No. 1. Those plaintiffs immediately sought a temporary

restraining order ("TRO") and an administrative stay, given that, at the time, the named

defendants were entering USIP's headquarters and allegedly engaging in immediate seizing of

property and property damage, including the alleged destruction of financial records. *See* Pls.'

Mot. for TRO at 3, ECF No. 2-1; *id.*, Pls.' Mem. in Supp. Mot. for TRO, ECF No. 2-1; *id.*, Ex. B

(photograph of paper records in "SHRED"-marked trash can). They sought to restore all

removed Board members to their positions, as well as Amb. Moose, though not all those fired

were plaintiffs in the litigation. *See id.*, Proposed TRO, ECF No. 2-4; TRO Hr'g Tr. at 7:1-8:6,

11:11-21. Plaintiffs also sought to eject defendants from USIP's headquarters and revoke their

access to electronic property. *See* TRO Hr'g Tr. at 7:1-8:6. The Court held a hearing on the

request for a TRO the following day, on March 19, 2025.

Plaintiffs provided no argument, at the hearing or in their papers, on the Court's authority

to issue an administrative stay, so the parties and Court focused on the propriety of a TRO,

which demands a showing of a likelihood of success on the merits, *Ramirez v. Collier*, 595 U.S.

411, 421 (2022). *See* TRO Hr'g Tr. at 21:10-22:17. On that front, the parties took completely

divergent views about the nature of the Institute. Plaintiffs insisted that USIP was entirely

independent from the federal government, *see id.* at 15:10-25, while defendants insisted that

USIP was an Executive branch agency subject to presidential control. *See* Defs.' Opp'n to Pls.'

TRO at 1-2, ECF No. 9 (contending dispute was non-justiciable as an intra-executive branch

conflict). On this expedited timeline, neither side provided a fulsome analysis of the powers

actually exercised by USIP to allow for a determination of where the Institute falls within the

federal government, if at all, nor did either provide a nuanced analysis of how such an entity

**JA320**

could be governmental without its presidentially appointed Board being subject to absolute

presidential control.  For instance, plaintiffs provided little to no analysis of how to analyze the

President's removal authority if the Court concluded that defendants were correct that USIP was

a governmental entity and were, additionally, correct that USIP, in fact, did fall within the

Executive branch.  *See* TRO Hr'g Tr. at 67:10-21 (plaintiffs' counsel mentioning *Humphrey's*

*Executor* only briefly on rebuttal); Pls.' Mem. in Supp. TRO; Defs.' Opp'n to Pls.' TRO.

Without full briefing on the complex constitutional and novel question about the nature

of this unique Institute, this Court determined that the Institute and its five terminated Board

members had not yet demonstrated a likelihood of success on the merits or irreparable harm

entitling them to the requested temporary injunctive relief.  *See* Min. Order (Mar. 19, 2025)

(denying the TRO).  In accord with the parties' request, the Court set a schedule for expedited

briefing of dispositive motions.  *See* Min. Order (Mar. 20, 2025).

A few days later, the existing plaintiffs filed an amended complaint, adding to the

previously listed plaintiffs both Ambassador Moose and Nancy Zirkin (a former Democratic

appointed Board member), collectively "plaintiffs."  *See* Am. Compl., ECF No. 12.  These

plaintiffs reasserted their claims in both their official and individual capacities.  *See id.*  Plaintiffs

also added Trent Morse to the existing defendants, collectively "defendants," and added an

additional claim under the Administrative Procedure Act ("APA").  *See id.* ¶¶ 100-102.  The

operative amended complaint now contains the following seven claims: defendants acted *ultra*

*vires* in attempting to exert control over USIP (Count One), *id.* ¶¶ 71-77; defendants violated 22

U.S.C. § 4605(f) in removing the USIP Board members without satisfying the statutory

provisions (Count Two), *id.* ¶¶ 78-85; defendants Rubio, Hegseth, and Garvin acted *ultra vires*

and in violation of 22 U.S.C. § 4605 in removing Amb. Moose as president of USIP (Count

**JA321**

Three), *id.* ¶¶ 86-92; defendants Jackson, Rubio, Hegseth, and Garvin acted *ultra vires* and in

violation of 22 U.S.C. § 4605 in appointing Jackson as the new president of USIP (Count Four),

*id.* ¶¶ 93-99; defendants Jackson, Rubio, Hegseth, and Garvin, the latter three acting in their

official capacities as Secretary of State, Secretary of Defense, and President of the National

Defense University, respectively, violated the APA by taking actions that were unlawful,

arbitrary and capricious, abuses of discretion, in excess of authority, without observance of

required procedure, and not otherwise in accordance with law (Count Five), *id.* ¶¶ 100-02; and

defendants Jackson, U.S. DOGE Service, and U.S. DOGE Service Temporary Organization

committed trespass in entering USIP headquarters without permission and future trespass in

intending to seize personal property, records, and computer systems (Count Six), *id.* ¶¶ 103-14.

Plaintiffs additionally request declaratory relief on all of those claims.  *Id.* ¶¶ 115-16 (Count

Seven).

After the Amended Complaint was filed, and as described *infra* in Part I.B., defendants

proceeded to terminate the Institute's employees and appoint yet another new president, who was

then instructed to transfer all of USIP's assets to GSA.  In response, plaintiffs moved, on March

31, 2025, pursuant to the All Writs Act, 28 U.S.C. § 1651, to suspend what they believed was the

imminent transfer of property.  *See* Pls.' All Writs Act ("AWA") Mot., ECF No. 14.  After a

hearing held the next day, this Court denied the relief, in part, because the headquarters had

already been transferred to GSA the prior weekend and also the requested relief was not

"necessary or appropriate in aid of" the Court's "jurisdiction" to qualify under the AWA.  *See*

Min. Order (Apr. 1, 2025).  Plaintiffs further had not demonstrated a likelihood of success on the

merits.  *See id.*

Plaintiffs then moved for expedited summary judgment. *See* Pls.' Mem.  Former terminated employees of USIP and former senior military and foreign affairs officials filed amicus briefs. *See* Amicus Br. of 128 Emps. of USIP Purportedly Terminated ("Terminated Emps. Amicus Br."); ECF No. 30; Sr. Officials Amicus Br.  Defendants opposed and cross-moved for summary judgment. *See* Defs.' Opp'n.  Plaintiffs filed a combined opposition to defendants' motion and a reply in support of plaintiffs' motion. Pls.' Opp'n & Pls.' Reply ("Pls.' Opp'n"), ECF No. 34.  Defendants lastly filed a reply in support of their summary judgment motion. Defs.' Reply in Supp. Summ. J. ("Defs.' Reply"), ECF No. 36.  The Court heard oral argument on these motions on May 14, 2025. *See* XMSJ Hr'g Tr.  These expedited cross-motions for summary judgment are now ripe for resolution.

## II.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under the governing law," meaning that "factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (citation omitted).  Thus, "[i]n considering a motion for summary judgment, judges must ask themselves not whether they think 'the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented,'" because that evidence is such that "the jury could reasonably find for the

**JA323**

plaintiff." *Stoe v. Barr*, 960 F.3d 627, 638-39 (D.C. Cir. 2020) (quoting *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.    DISCUSSION

Plaintiffs argue that they should prevail on their claims because USIP's Board members
were wrongfully terminated, rendering invalid all subsequent actions taken on behalf of USIP
under defendants' leadership, because the President's removal power is subject to statutory
requirements, which were ignored.  *See* Pls.' Mem. at 36-37.  This argument is predicated on
plaintiffs' view that USIP is not a governmental entity and, regardless, is neither an Executive
branch entity nor exercises executive powers.  *See id.* at 15-29; XMSJ Hr'g Tr. at 8:6-8.  In
addition, plaintiffs contend that defendants' actions in effectively ceasing the Institute's
activities, terminating its staff, and otherwise seemingly dissolving the Institute (by transferring
its assets, terminating its contracts, etc.) are separately unlawful because these actions violate
USIP's organic statute and are arbitrary and capricious under the APA.  *See* Pls.' Mem. at 37-38.

Defendants counter that the statutory removal protections for USIP's Board members are
unconstitutional under the Constitution's Article II because USIP is an Executive branch entity
wielding executive power that does not fit within the narrow exception to the President's broad
removal authority as outlined in *Humphrey's Executor*.  *See* Defs.' Opp'n at 6-26.  According to
defendants, all of their actions were therefore lawful, and plaintiffs' additional claims all fail.
*See id.* at 27-30.  Defendants further argue that injunctive relief is unavailable and would be
improper here and that plaintiff Board members cannot sue on behalf of the Institute.  *See id.* at
7-8, 30-33.

The instant claims present novel and complicated questions, starting with whether USIP,
congressionally created to be an independent nonprofit corporation, is a governmental entity.  If

**JA324**

so, the next question is whether USIP is independent of the Executive branch, such that the

President may not exercise inherent Article II removal authority over USIP Board members in

contravention of Congress's statutory boundaries.  Finally, even if USIP is a governmental entity

properly placed in the Executive branch for purposes of constitutional analysis, as defendants

urge, the next crucial question is whether the President's Article II removal authority is

improperly infringed by the statutory removal protections for USIP's Board members.  No

caselaw provides binding answers to these questions involving USIP or any similar entity, and

the Constitution—necessarily short, to last the test of time—provides only the scarcest of

instruction.

  As a backdrop to the discussion that follows, however, certain legal guideposts are clear.

First, the President's exercise of any unilateral removal authority is limited to Executive branch

officers, a principle confirmed in every removal power case decided by the Supreme Court.  *See,*

*e.g.*, *Myers v. United States*, 272 U.S. 52, 126 (1926) ("In the absence of any specific provision

to the contrary, the power of appointment to *executive office* carries with it, as a necessary

incident, the power of removal." (emphasis added)); *Humphrey's Ex'r*, 295 U.S. at 627-28

("[T]he necessary reach of the [*Myers*] decision goes far enough to include all purely executive

officers.  It goes no farther; much less does it include an officer who occupies no place in the

executive department and who exercises no part of the executive power vested by the

Constitution in the President."); *Wiener v. United States*, 357 U.S. 349, 353 (1958)

("[*Humphrey's*] drew a sharp line of cleavage between officials who were part of the Executive

establishment and were thus removable by virtue of the President's constitutional powers, and

those who are members of a body 'to exercise its judgment without the leave or hindrance of any

other official or any department of the government,' as to whom a power of removal exists only

if Congress may fairly be said to have conferred it." (internal citations omitted) (quoting

*Humphrey's Ex'r*, 295 U.S. at 625-26)); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988) ("The

analysis contained in our removal cases is designed not to define rigid categories of those

officials who may or may not be removed at will by the President, but to ensure that Congress

does not interfere with the President's exercise of the 'executive power' and his constitutionally

appointed duty to 'take care that the laws be faithfully executed' under Article II."); *Free Enter.*

*Fund v. Pub. Co. Acct. Oversight Bd.* ("*PCAOB*"), 561 U.S. 477, 483 (2010) (explaining that

because all executive power is vested in the President, who must "take Care that the Laws be

faithfully executed" and "perform all the great business of the State" (quoting 30 WRITINGS ON

GEORGE WASHINGTON 334 (J. Fitzpatrick ed. 1939)), he must have the power of appointment

and the power of removal "to keep these officers accountable" (citing Art. II, § 1, cl. 1; *id.* § 3));

*Seila L.*, 591 U.S. at 214 ("The view that prevailed, as most consonant to the text of the

Constitution and to the requisite responsibility and harmony in the Executive Department, was

that the executive power included a power to oversee *executive* officers through removal."

(emphasis added) (citation and internal quotations omitted)); *Collins v. Yellen*, 594 U.S. 220, 252

(2021) ("The removal power helps the President maintain a degree of control over the

subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to

ensure that these subordinates serve the people effectively and in accordance with the policies

that the people presumably elected the President to promote.").

Second, and an inexorable result of the first point, is that the President's constitutional

removal authority does not extend as far as his power to appoint.  Put another way, just because

the President has appointment power does not mean he has absolute removal power when the

Constitution or Congress provides otherwise for governmental entities not located within the

Executive branch nor exercising executive power.  Defendants acknowledge that the Supreme

Court's current jurisprudence extends only this far.  XMSJ Hr'g Tr. at 62:20-66:15 (In response

to the Court's query, "Would you agree that the jurisprudence, the Supreme Court law binding

on this Court, has to date only s[aid] that the President's absolute removal power is as to

executive branch agencies exercising more than *de minimis* executive power?," defendants'

counsel confirmed, "I believe that is where the Supreme Court's jurisprudence has been.").[6]

A careful examination of relevant judicial authorities, as applied to USIP's statutory

purposes and tasking, and its operations, make clear that although USIP may be considered a

governmental entity for the constitutional questions raised in the instant lawsuit about the scope

of the President's removal authority, USIP does not exercise executive power so as to invoke

concern about the President's Article II removal power.  Even if USIP were an Executive branch

agency, however, the Supreme Court's reasoning in *Humphrey's Executor* would apply *a fortiori*

here.  The Board members' removal without cause was therefore unlawful, and plaintiffs prevail

on Counts One and Two (removal of the Board members was *ultra vires* and violated 22 U.S.C.

§ 4605(f)).  Defendants' subsequent actions that flowed from the improper removal of USIP's

leadership in March 2025 are thus also unlawful, such that summary judgment for plaintiff is

also appropriate for Counts Three (removal of USIP president Amb. Moose was unlawful), Four

---

[6]      Defendants' counsel, however, suggested that the Supreme Court could go further and recognize
presidential removal power under the Constitution beyond the bounds of Article II—essentially, removal power
coextensive with appointment power, except presumably for those presidential appointments subject to
constitutional protection under Article III—despite the stark departure from separation-of-powers principles that
would represent.  *See* XMSJ Hr'g Tr. at 65:21-24 (defendants' counsel stating, "But one caveat, I don't think [the
Supreme Court has] considered a case of an entity where the President has appointment power that falls outside of
the executive branch," prompting the Court's follow-up question, "So . . . if USIP is found not to be an executive
branch agency, this might be its first opportunity . . . to decide that?",  to which defendants' counsel responded,
"Perhaps").

(appointment of the new USIP presidents was unlawful), and Six (trespass of defendants on

USIP property).[7]

In sum, for the reasons explained below, plaintiffs' summary judgment motion is granted,

and defendants' cross-summary judgment motion is denied.[8]

### A.    USIP Does Not Exercise Article II Executive Power Such that USIP is Subject to the President's Constitutional Removal Authority.

Plaintiffs argue that USIP is a "non-executive nonprofit corporation," not part of the

Executive branch, and therefore "Article II has nothing to say about the removal of [its] Board."

Pls.' Mem. at 2, 14-15.  Defendants, on the other hand, insist that USIP is an "establishment of

the United States," citing 22 U.S.C. § 4603(a) ("There is hereby established the United States

Institute of Peace."), and as such, it must "fall into one of three branches."  Defs.' Opp'n at 3, 9-

10, 13.  Defendants then reach the swift conclusion that because USIP does not exercise judicial

or legislative power and, further, operates in the area of foreign policy, USIP must be "part of the

executive branch."  *Id.* at 13-14.  With these predicates in place, defendants reason that the

---

[7]      Given that no additional relief is available to plaintiffs if they were to succeed on the merits of Count Five, *see* XMSJ Hr'g Tr. at 52:8-15, the APA claim asserted in that count need not be considered.

[8]      Defendants make several threshold arguments that plaintiffs' claims are improper, but none are persuasive. First, defendants contend that plaintiffs' counsel does not represent the Institute, which is named a plaintiff, because only the present leadership of the Institute (Cavanaugh, Secretaries Hegseth and Rubio, and Garvin) have the power to authorize suit.  *See* Defs' Opp'n at 7-8 (citing 22 U.S.C. § 4604(k)); Defs.' Reply at 19-20.  Yet, if the removal of plaintiff Board members and former USIP president, Amb. Moose, are found to be unlawful, Amb. Moose remains in charge of USIP and thus can authorize suit, and has done so.  *See* Pls.' SUMF, USIP Bylaws § 5, ECF No. 20-37 (giving the president responsibility for "day-to-day administration of the affairs of the Institute").  Second, defendants argue that plaintiffs cannot file suit in their former official capacities because they lack the power of those offices.  Defs.' Opp'n at 9.  This, too, assumes the removal of the plaintiff appointed members was lawful, when that is the very legal question to be resolved here.  Regardless, plaintiffs, in the Amended Complaint, also sued in their individual capacities, so defendants' point has no practical effect on plaintiffs' claims.  Finally, defendants argue that plaintiffs improperly sued Jackson in his official capacity at USAID, where Jackson was the Assistant to the Administrator for Management and Resources, *see id.*, but Jackson did not take any of the actions at issue in this case in that capacity—he took the actions alleged in this lawsuit as the president of USIP, as plaintiffs clearly allege, *see* Am. Compl. at 2 (suing Jackson in his "purported capacity as acting president of [USIP]").  In any case, no claim turns on the proper inclusion of Jackson as a defendant, given that the current president of USIP (Cavanaugh) was also named, so any necessary relief may run against him.  *See id.*

## JA328

President has removal authority over USIP's leadership under Article II of the Constitution.  *See id.* at 18, 23.

The classification of USIP as a government entity that sits within the Executive branch, as defendants insist it does, bears on the President's constitutional removal authority.  As explained, the President's Article II removal authority only extends as far as the Executive branch.  The Supreme Court explained in *Seila Law* that the President has the constitutional "ability to remove executive officials" because they "must remain accountable to the President, whose authority they wield" under Article II of the Constitution.  591 U.S. at 213; *see also id.* at 214 (quoting *Myers*, 272 U.S. at 163-64, for the principle that "Article II 'grants to the President' the 'general administrative control of those executing the laws, including the power of appointment *and removal* of executive officers'" (emphasis in original)).  Even under the broadest vision of the unitary executive theory—where all the power of the Executive branch is "*unified*" in the President to "ensure both vigor and accountability," *Harris v. Bessent* ("*Harris III*"), No. 25-5057, 2025 WL 980278, at *3-4 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring) (emphasis in original) (second passage quoting *Seila L.*, 591 U.S. at 240 (Thomas, J., concurring in part and dissenting in part)), *vacated en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025)—presidential removal authority only extends as far as officials in that branch.  *See id.* at *4 ("[T]he president of the United States [is] '. . . personally responsible for *his* branch.'" (emphasis added) (quoting Akhil Reed Amar, AMERICA'S CONSTITUTION: A BIOGRAPHY 197 (2005))).  The Constitution does not grant the President removal authority over other government or nongovernment officials writ large.  While the President appoints Article III judges, for instance, he has no power to remove them.

USIP has qualities of both a government entity and an NGO. While USIP may be considered part of the government for constitutional purposes—meaning regardless of any statutory classification, the Institute is subject to at least some provisions of the Constitution— USIP nevertheless does not exercise executive power and thus does not sit under Article II as an Executive branch entity.

### 1.    *USIP is Part of the Federal Government for Purposes of a Constitutional Separation-of-Powers Analysis.*

Defendants conclude that USIP is part of the federal government because USIP was created by federal statute, indeed "established" by Congress, 22 U.S.C. § 4603(a), is led by a Board of presidential appointees, including Cabinet officials, and has "various other hallmarks of being part of the federal government." Defs.' Opp'n at 10. They further highlight multiple statutory provisions governing USIP, including that USIP is **(1)** authorized to use the name and seal of the United States, 22 U.S.C. § 4603(e), **(2)** subject to FOIA, *id.* § 4607(i), **(3)** required to publish notices of board meetings (and may do so in the Federal Register), *id.* § 4605(h)(3), **(4)** funded almost exclusively by appropriations, *id.* § 4604(h)(3), **(5)** prohibited from issuing stock and thus having private ownership, *id.* § 4603(b), and **(6)** able to obtain services and support from GSA, *id.* § 4604(o). Defs.' Opp'n at 10. Moreover, **(7)** USIP's assets revert to the Treasury upon liquidation, 22 U.S.C. § 4610, and USIP's employees are subject to **(8)** the FTCA, *id.* § 4606(f)(1), **(9)** federal statutes establishing employee benefits, *id.*, **(10)** federal statutes determining compensation, *id.* §§ 4605(i), 4606(a), 4606(c), and **(11)** federal statutory requirements for reimbursement of travel expenses, *id.* § 4605(j). Defs.' Opp'n at 10-11.

In addition to these federal statutes treating USIP as a federal entity, OMB annually lists USIP as a "federal entity," pursuant to the Inspector General Act of 1978, which requires OMB to identify "federal entities," and government manuals and websites list USIP as part of the

33

**JA330**

federal government.  *Id.* at 11-13 (citing 5 U.S.C. § 415(a)(2)); GSA, *United States Institute of*

*Peace*, USA.GOV: A-Z INDEX OF U.S. GOVERNMENT DEPARTMENTS AND AGENCIES,

https://www.usa.gov/agencies/united-states-institute-of-peace (last visited May 18, 2025) (the

GSA website with a list of "government departments and agencies," including USIP); Pls.'

SUMF, Ex. 23, The United States Government Manual current edition ("USG Manual"), ECF

No. 20-23 (including USIP).  *But cf.* Pls.' Mem. at 22-23 (noting that USIP is classified outside

of the Executive branch, as a quasi-official agency, in that manual).  Finally, defendants rely on

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 399 (1995), where the Supreme

Court held that Amtrak—despite being a for-profit corporation and expressly identified in its

organic statute as "not an agency or establishment of the United States government"—is part of

the government for purposes of the First Amendment, to argue that USIP should be treated the

same here.  Defs.' Opp'n at 12-13.

Plaintiffs, on the other hand, avoid answering in their briefing whether "USIP might for

certain purposes properly be considered part of the government writ large," Pls.' Mem. at 16,

though acknowledging the complexity of that question, given the vast array of corporations

formed by the federal government yet operating independently, *see id.* at 15-16.[9]  At the hearing,

however, plaintiffs took the emphatic position that USIP is not part of the federal government.

*See* XMSJ Hr'g Tr. at 8:6-8.  Regardless, both in their briefing and at the hearing, plaintiffs insist

that USIP is not part of the Executive branch and not subject to the President's Article II power.

*Id.* at 16.

---

[9]        A non-answer on the issue of whether USIP is part of the federal government does not constitute a
concession, contrary to defendants' insistence.  *See* Defs.' Reply at 12; *see also* Pls.' Opp'n at 9 ("Defendants are
simply wrong when they suggest that . . . Plaintiffs 'concede' that USIP is 'part of the federal government.' . . .
Instead, Plaintiffs submit that Defendants' attempt to categorize USIP as part of the federal government in a general
sense is both overly simplistic and beside the point.").

Plaintiffs are correct that even if USIP is part of the government for constitutional purposes, as relevant here, that will not resolve the key question—whether USIP exercises executive power and is part of the Executive branch. If USIP is *not* part of the government for such purposes, however, USIP *cannot* be part of the Executive branch. *See Kim v. FINRA, Inc.*, 698 F. Supp. 3d 147, 163 (D.D.C. 2023) ("Because FINRA is likely not a state actor, Plaintiff's Article II [appointments and removal] challenges are unlikely to succeed."). Courts, thus, often begin with the threshold inquiry whether an entity should properly be considered part of the federal government before determining its placement in the federal constitutional scheme. *See, e.g.*, *id.* at 162-63. In *Free Enterprise Fund*, 561 U.S. 477, the Supreme Court considered a challenge to the double for-cause removal protections provided to members of the PCAOB, a non-profit corporation whose members and employees are not considered government officers or employees for statutory purposes. *Id.* at 484. The Court first established that "the parties agree[d] that the Board is 'part of the Government' for constitutional purposes, and that its members are 'Officers of the United States' who 'exercise significant authority pursuant to the laws of the United States'" before explaining that PCAOB operates as a subordinate to the Securities and Exchange Commission ("SEC"), *id.* at 485-86 (internal citation omitted) (first quoting *Lebron*, 513 U.S. at 397; and then quoting *Buckley v. Valeo*, 424 U.S. 1, 125-26 (1976)), which would make the Board part of the Executive branch, and then continuing to the merits of the claims challenging the statutory for-cause removal restrictions on presidential power. Turning first, therefore, to this threshold question, for the reasons explained below, the Court concludes that USIP acts as part of the federal government for constitutional, separation-of-powers purposes.

    a.    ***Diversity of Congressionally Created Entities***

As a general matter, USIP, like many other congressionally created corporations, has both governmental and nongovernmental qualities—appropriately termed a "hybrid" or "boundary" organization. Kevin R. Kosar, Cong. Rsch. Serv., RL30533, The Quasi Government: Hybrid Organizations with Both Government and Private Sector Legal Characteristics (2011), https://sgp.fas.org/crs/misc/RL30533.pdf; Anne Joseph O'Connell, *Bureaucracy at the Boundary*, 162 U. Pa. L. Rev. 841 (2014). Such organizations exist on a spectrum, ranging from some entities created to be more privately operated, separate and independent of the federal government, and others more closely operationally linked so as in fact to be part of the federal government.

At the more private end of the spectrum, Congress has chartered both for-profit and nonprofit entities that exist nearly entirely independently of the government. Congress established Howard University, for instance, in the 1800s. An Act to Incorporate Howard University in the District of Columbia, 14 Stat. 438 (1867); *see also* Pls.' Mem. at 15. Howard received federal appropriations at the time, and still receives grants today, but has always been privately managed by trustees not selected by the government.

Congress has also chartered (largely in the twentieth century) nearly one hundred nonprofit corporations under Title 36—housing "patriotic and national organizations"—that are similarly independent. *See* 36 U.S.C. § 20101 *et seq*.; Pls.' Opp'n at 2, 6 (referencing Title 36 organizations); Defs.' Reply at 15. These include well-known entities such as the Boy Scouts of America, *see id.* § 30901 ("Boy Scouts of America . . . is a body corporate and politic of the District of Columbia."); the United States Olympic and Paralympic Committee, 36 U.S.C. § 220502 ("The corporation is a federally chartered corporation."); and the American National Red Cross, *id.* § 300101(a) ("The American National Red Cross . . . is a Federally chartered

**JA333**

instrumentality of the United States and a body corporate and politic in the District of

Columbia.").  The "federal designation" is largely "honorific" as they "do not receive direct

appropriations, they exercise no federal powers, their debts are not covered by the full faith and

credit of the United States, and they do not enjoy original jurisdiction in the federal courts."

O'Connell, *supra*, at 860 (quoting Kosar, *supra*, at 23).  They are generally managed by boards

of directors or governors without government interference and are merely required to make

annual reports to Congress on their activities and share their accounting audits.  *See, e.g.*, 36

U.S.C. § 300104 (establishing a private Board of Governors for the American Red Cross); *id.*

§ 220504 (establishing a private board of directors for the U.S. Olympic Committee); *id.* § 10101

(audits); *id.* § 30908 (annual report on activities).[10]

Other largely independent but still hybrid organizations are not created by Congress at

all.  FINRA, for instance, is a self-regulatory organization that performs a "supervisory role over

the securities industry, subject to oversight from the SEC," per 15 U.S.C. § 78s.  *Scottsdale*

*Capital Advisors Corp. v. FINRA, Inc.*, 678 F. Supp. 3d 88, 94 (D.D.C. 2023), *reversed in part*

*sub nom. Alpine Sec. Corp. v. FINRA, Inc.*, 121 F.4th 1314 (D.C. Cir. 2024).  Structurally,

FINRA is a Delaware not-for-profit corporation governed by a board of 22 people selected by

FINRA's members and not appointed by any governmental official.  *Id.* at 95.  FINRA is also

funded privately—via membership fees, fines, penalties, and sanctions.  *Id.*

---

[10]    Congress has also chartered independent for-profit corporations. Comsat is a classic example.  In 1962,
Congress chartered the Communications Satellite Corporation as a private corporation under the District of
Columbia Business Corporation Act.  Communications Satellite Act of 1962, Pub. L. No. 87-624, sec. 102(c), 76
Stat. 419 (describing it as a "private corporation"); *Lebron*, 513 U.S. at 390-91.  Comsat was "capitalized entirely
with private funds," and "controlled by its private shareholders." *Lebron*, 513 U.S. at 390-91.  Despite clearly
operating in the private sector, being explicitly designated as "not . . . an agency or establishment of the United
States Government," and having private shareholders, Comsat's leadership was influenced by the federal
government: The President appointed incorporators to serve as the initial board of directors and thereafter appointed
a small minority (three) of the fifteen directors on the board.  *See id.*; 76 Stat. at 423-24, sec. 301-304.

**JA334**

Moving along the spectrum toward organizations with closer ties to the federal government, Congress has chartered corporations that exist mostly in the private sector— "unhindered by the restraints of bureaucracy and politics"—but are subject to greater governmental control via presidential appointment of their leadership. *Lebron*, 513 U.S. at 391. For instance, the Corporation for Public Broadcasting was chartered in 1967 as a "nonprofit corporation," "not . . . an agency or establishment of the United States Government," but managed by a board of directors appointed by the President, with advice and consent of the Senate. 47 U.S.C. § 396(b)-(c)(1); *Lebron*, 513 U.S. at 391. Likewise, the Legal Services Corporation, which "provid[es] financial support for legal assistance in noncriminal proceedings" to the indigent, was established as a "private nonmembership nonprofit corporation" but whose eleven board of directors are "appointed by the President, by and with advice and consent of the Senate." 42 U.S.C. §§ 2996b(a)-2996c(a); *Lebron*, 513 U.S. at 391. Similarly, Amtrak is a for-profit Congressionally created corporation, "not a department, agency, or instrumentality of the United States Government," 49 U.S.C. §§ 24301(a)(2)-(3), but its leadership consists of a board of directors, the majority of whom are appointed by the President, *id.* § 24302(a)(1).

The early banks of the United States were also of this hybrid character. The Second Bank of the United States, the subject of *McCulloch v. Maryland*, 4 Wheat. 316 (1819), incorporated in 1816, was owned in part by the United States, which held 20% of its stock, and led in part by Presidential appointees—5 of the 25 directors were selected by the President, with the rest to be elected by shareholders other than the United States. *Lebron*, 513 U.S. at 386-87. Congress continued to create countless for-profit corporations—some controlled by the U.S. Government (either via total stock ownership or the President's appointment of the majority of

38

**JA335**

board members) and some not.  *See id.* at 387-89.  Such corporations proliferated throughout the Great Depression and World War II eras, eventually leading to legislation providing for federal audits of these corporations and dissolution of many.  *See id.* at 388-90.[11]

Closer to the interdependent-with-government end of the spectrum, some nonprofit organizations exist within or as an adjunct to federal agencies.  For instance, PCAOB is a nonprofit corporation created by Congress to oversee public company auditing, expressly "not an agency or establishment of the United States Government."  15 U.S.C. § 7211(a)-(b).  The members of the Board are not "officer[s] or employee[s] of or agent[s] for the Federal Government by reason of such service."  *Id.* § 7211(b).  Yet, the Board is directly appointed and overseen by the SEC, and the rules promulgated by the Board are subject to the SEC's approval.  *Free Enter. Fund*, 561 U.S. at 484-85.  The Supreme Court treated PCAOB as a part of the Executive branch in analyzing the President's constitutional removal authority over its Board members.  *See id.* at 484-85, 495, 508-09.

In short, the political branches have been creative in establishing or supporting entities embodying varying degrees of independence from the federal government, as reflected in statutory terms codifying express statements of independence, the extent of federal government funding through appropriations or grants, government control through ownership or leadership appointment, government oversight through auditing and reporting, and otherwise.  This makes distinguishing government entities from nongovernmental organizations a matter requiring a case-by-case assessment.

**b.    *Legal Framework***

---

[11]    Fannie Mae, which provides mortgage-backed securities, was one such Depression-era corporation.  As an investor-owned publicly traded corporation, Fannie Mae operated largely independently until the economic collapse in 2008, when Fannie Mae was placed into government conservatorship.  *See* Kosar, *supra*, at 8-10.

**JA336**

An organization may be deemed a government entity for some purposes and not for others.  Sometimes Congress is explicit about an entity's status for a particular statutory purpose.  For instance, Congress specified that PCAOB's employees are not considered employees of the federal government.  *See* 15 U.S.C. § 7211 ("No member or person employed by . . . the Board shall be deemed to be an officer or employee of . . . the Federal Government by reason of such service.").  That provision makes clear that PCAOB employees are not subject to federal pay scales.  *See Free Enter. Fund*, 561 U.S. at 484-85 ("The Board can thus recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale.").  Take, also, for example, the Legal Services Corporation, which is explicitly made subject to FOIA and thus considered part of the government for purposes of responding to record requests from the public.  *See* 42 U.S.C. § 2996d(g).

Other times, however, Congress does not specify an entity's status for a particular purpose, and its general label—whether a "nonprofit corporation," "federally chartered instrumentality," or "not an establishment of the federal government"—is not dispositive for all purposes.[12]  A case-by-case analysis based on the particular purpose is then required.  Illustrative of such an analysis is the D.C. Circuit's consideration, in *Dong v. Smithsonian Institute*, 125 F.3d 877, 878-83 (D.C. Cir. 1997), of whether the Smithsonian Institution is an "agency" under the Privacy Act based on that statute's particular definition of "agency" and the features of the Institution in its organic statute, leading to the conclusion that the Privacy Act did not apply.  *See infra* Part III.A.2.

---

[12]    The Congressional Research Service ("CRS"), in line with various academics, has sorted these entities into categories based on their interaction and affiliation with the federal government and given them various labels—*e.g.*, "government-sponsored enterprises" and "agency-related nonprofits."  Kosar, *supra*, at 7, 12. Those categories, however, have limited legal significance and likewise do not shed light on whether an entity is considered governmental for a particular purpose, let alone situated within the Executive branch.

Importantly, Congress's label alone cannot dictate whether an entity is governmental for *constitutional* purposes, which falls outside of Congress's purview. In *Lebron*, the Supreme Court explained that a statutory disavowal of a federal government status indeed "deprives Amtrak of sovereign immunity from suit," but a statute could not resolve "Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." 513 U.S. at 392. As the Court later put it, "[c]ongressional pronouncements, though instructive as to matters within Congress' authority to address, are not dispositive of [a corporation's] status as a governmental entity for purposes of separation of powers analysis under the Constitution." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 51 (2015) (internal citations omitted).

Rather, for such constitutional questions, a corporation is part of the government when the corporation satisfies three factors: "[(1)] the Government creates [the] corporation by special law, [(2)] for furtherance of governmental objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors for that corporation." *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (alterations in original) (quoting *Lebron*, 513 U.S. at 400). In *Lebron*, the Supreme Court used that framework to hold that the First Amendment applied to Amtrak. Amtrak was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal government appointees." 513 U.S. at 398. Six of the corporation's "eight externally named directors (the ninth is named by a majority of the board itself) are appointed directly by the President of the United States." *Id.* at 397. Consequently, the Supreme Court concluded that Amtrak is a state actor and "part of the Government" for the purposes of "individual rights guaranteed against the Government by the Constitution." *Id.* at 394, 398.

**JA338**

That same three-factor inquiry applies to constitutional separation-of-powers questions. *See Ass'n of Am. R.R.*, 575 U.S. at 55 ("[T]he structural principles secured by the separation of powers protect the individual as well." (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011))).[13]  The Supreme Court in *Department of Transportation v. Association of American Railroads* considered a challenge to Amtrak's authority to issue "metrics and standards" addressing the "performance and scheduling of passenger railroad services" based on the ground that Amtrak is a private entity and such authority was an unconstitutional private delegation of power.  *Id.* at 45.  Without reaching the separation of powers or Appointments Clause questions raised, the Supreme Court reversed the D.C. Circuit's determination that Amtrak was a private entity.  Upon considering Amtrak's creation, purpose, and control, the Court concluded that "Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions," explaining that "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit."  *Id.* at 53-54.[14]

Specifically, regarding Amtrak's creation and control, the Court examined its "ownership and corporate structure," noting as pertinent that the "Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock" and that Amtrak's Board consists of eight presidential appointees (of nine total members), for whom Congress carefully outlined requirements for the President to consider, including experience in the transportation industry, partisan balance, and consultation with leaders of both parties of Congress, and whose salaries

---

[13]    Neither side in this case cited in their briefing to *Association of American Railroads*, despite both parties discussing *Lebron*.  Given that *Association of American Railroads* builds upon *Lebron* in a context more relevant here (separation of powers), its framework is instructive.

[14]    While the Supreme Court in neither *Lebron*, *see* 531 U.S. at 398, nor *Association of American Railroads*, *see* 575 U.S. at 51-55, delineated its analysis into three discrete factors, though considering the same type of qualities, the D.C. Circuit has distilled the analysis into such parts, *see Herron*, 861 F.3d at 167, and thus that framework is adopted here.

are subject to congressional limits. *Id.* at 51-52. Regarding Amtrak's objectives and

accountability, the Court noted the government's "substantial, statutorily mandated supervision"

of Amtrak and observed that "rather than advancing its own private economic interests, Amtrak

is required to pursue numerous, additional goals defined by statute" in the government interest, is

required to make regular reports to Congress and the President, and is the subject of regular

congressional hearings. *Id.* at 52-53 (citing, *e.g.*, the obligation to "provide efficient and

effective intercity passenger rail mobility," 49 U.S.C. § 24101(b), and "provide reduced fares to

the disabled and elderly," *id.* § 24307(a)). Importantly, Congress "has mandated certain aspects

of Amtrak's day-to-day operations," requiring consideration of specific factors when making

decisions, for instance, and Amtrak is "dependent on federal financial support." *Id.* at 53. The

Court also noted that Amtrak is subject to "substantial transparency and accountability

mechanisms," *id.* at 55, including being subject to FOIA and budget oversight and

"supervis[ion]" by the political branches and being required to maintain an inspector general as a

"designated Federal entity" "under the Inspector General Act." *Id.* at 52-55. The Court

concluded because of Amtrak's "significant ties to the Government" and the political branches'

"extensive[] supervis[ion] and substantial[] fund[ing]" of "its priorities, operations, and

decisions," Amtrak acted "as a governmental entity" rather than "an autonomous private

enterprise." *Id.* at 53.

### c.    *Application to USIP*

Applying this three-factor inquiry here, USIP is part of the federal government for

constitutional separation-of-powers purposes. Although USIP is statutorily defined as an

"independent nonprofit corporation," 22 U.S.C. § 4603(b), "the practical reality of federal

control and supervision prevails over Congress' disclaimer of" USIP's status, *Ass'n of Am. R.R.*,

575 U.S. at 55.[15]  First, USIP was created by special statute, outlining the goals, structure, and

obligations of the organization.  *See Herron*, 861 F.3d at 167; *Lebron*, 513 U.S. at 397.  Neither

plaintiffs nor defendants seem to dispute that basic premise.

Second, that statute makes clear USIP's purpose to achieve governmental objectives

through articulated activities that are monitored by Congress.  *See Lebron*, 513 U.S. at 397;

*Ass'n of Am. R.R.*, 575 U.S. at 52-53.  In the section of USIP's organic statute entitled

"Congressional declaration of findings and purposes," Congress described "a national need to

examine" various "disciplines" "to bring together and develop new and tested techniques to

promote peaceful economic, political, social, and cultural relations in the world" and recognized

"a need for Federal leadership to expand and support the existing international peace and conflict

resolution efforts of the Nation and to develop new comprehensive peace education and training

programs, basic and applied research projects, and programs providing peace information."  22

U.S.C. § 4601(a)(4), (6).  Congress explained that the statute aimed to establish a "national

institute to serve the people and the government through the widest possible range of education

and training, basic and applied research opportunities, and peace information services."  *Id.*

§ 4601(b).  In the section entitled "powers and duties," Congress offered ten specific activities

for the Institute to carry out, ranging from broad ("enter into formal and informal relationships

with other institutions") to highly specific ("establish a Jennings Randolph Program for

International Peace and appoint, for periods up to two years, scholars and leaders in peace").  *Id.*

§ 4604(b)(1), (4).  That same section also instructs a specific award that USIP should make every

---

[15]    For the same reason, USIP's own definition cannot be dispositive of its status.  *See* Sr. Officials' Amicus Br. at 5 (citing USIP's 2020-2022 Strategic Plan: "USIP's distinct status—as *formally independent but with a special link to the U.S. government*—enables [it] to serve as a trusted *connector* among foreign governments, civil societies, and U.S. government officials"); *see also* Pls.' Opp'n at 13 (citing USIP's biennial reports that emphasize the Institute's independence).

year and describes the kind of "extension and outreach activities" the Institute should engage in. *Id.* § 4604(c), (d).

USIP certainly has broad discretion in carrying out these activities, since much of the language used by Congress is permissive, *e.g.*, *id.* § 4604(b) ("The Institute, acting through the Board, may—"), and Congress does not set specific deadlines, metrics, or mechanisms to monitor success or dictate day-to-day operations. USIP's Board, as plaintiffs point out, chooses its own projects and initiatives, independent of the government, based on the Institute's priorities. *See* Pls.' Opp'n at 22-23; Third Moose Decl. ¶¶ 9-12 ("When foreign governments or other organizations contact USIP to work together on projects, we do not obtain U.S. government approval when agreeing to undertake these activities. Again, if they align with USIP's mission and we have the capacity to engage with these groups, we may do so."). By contrast, Amtrak's statute is more specific, setting out a list of "priorities in selecting and scheduling projects," mandating maintenance of specific rails, and dictating certain procurement requirements, as the Supreme Court noted in *Association of American Railroads*. 575 U.S. at 53; 49 U.S.C. § 24902(b).

Congress nevertheless makes clear USIP's objectives and ensures that USIP's activities are furthering governmental aims. In addition to suggesting certain award and fellowship programs, in § 4604(b)-(c), Congress has specifically instructed USIP to develop the Gandhi-King Global Academy, Pub. L. 116-260, 134 Stat. 3115, sec. 334 (2020). Further, Congress maintains oversight over USIP through the annual appropriations process, which much like Amtrak, *see* 575 U.S. at 53, the Institute relies on substantially for its funding, *see* 22 U.S.C. §§ 4609(a), 4604(h)(3) (private funds may only be used for the development and maintenance of its headquarters or other facilities and for hospitality purposes). USIP's ongoing use of "United

States," "U.S.," or any other reference to the United States government in its name, seal, or emblem is also contingent on these annual appropriations, demonstrating that USIP was designed to, at least in significant part, further the country's interests and is subject to ongoing review of that goal. *See id.* § 4603(b). Finally, USIP is subject to the similar "transparency and accountability mechanisms" as Amtrak, 575 U.S. at 55: FOIA, 22 U.S.C. § 4607(i), including congressional determination of its budget with input from OMB, *id.* § 4609; *id.* § 4608(a), and regular reports to Congress and the President, *id.* § 4611.[16] USIP is also required to publish notice of its Board meetings and invited to do so in the Federal Register. *Id.* § 4605(h)(3).

Plaintiffs argue that USIP was intended to "stand apart from the policymaking branches and act as a resource to strengthen the work not just of the U.S. government, but also of 'existing institutions providing programs in international affairs, diplomacy, conflict resolution, and peace studies,' as well as 'government, private enterprise, and voluntary associations,'" Pls.' Opp'n at 12 (quoting 22 U.S.C. § 4601(a)(5)), suggesting that USIP's creation was not "in furtherance of governmental objectives," *Herron*, 861 F.3d at 167. The existence of additional aims does not undercut the coexistent *governmental* purpose of USIP, made apparent in the same section of the statute. 22 U.S.C. § 4601(b) (describing the purpose of USIP to "serve the people and the Government"). Moreover, plaintiffs' point that USIP's Board has fiduciary duties to the Institute and not any political branch does not conflict with USIP's overall governmental purpose. Pls.' Opp'n at 14; Pls.' Mem. at 17-18. Amtrak's board members likewise have fiduciary duties to the corporation but both entities exercise those duties in ways consistent with the statutory

---

[16]    Like Amtrak, USIP is also designated as a "federal entity" under the Inspector General Act, *see* 5 U.S.C. § 415(a)(2), *e.g.*, List of Designated Federal Entities & Federal Entities, 59 Fed. Reg. 43598, 43599 (Aug. 24, 1994); Defs.' Opp'n at 11. This fact is not probative, however, considering that USIP is audited by a private accounting firm, not an Inspector General, and USIP was included from 1994 to 2014 but seemingly not before or after. *See* Pls.' Opp'n at 17; Pls.' SUMF ¶ 33.

governmental mandates. *See Lebron*, 513 U.S. at 397 (noting that the corporate form does not allow the corporation to evade its governmental obligations).

Third, USIP is subject to government ownership and control in the relevant sense. *See Ass'n for Am. R.R.*, 575 U.S. at 51-52. The government "retains for itself permanent authority to appoint a majority of the directors" of USIP. *Herron*, 861 F.3d at 167. In fact, the President appoints *all* of USIP's voting Board members with advice and consent of the Senate (the three *ex officio* members who are appointed for other positions and the twelve specifically for USIP's Board); the only other Board member, the president of USIP, who does not vote, is selected by the fifteen appointed Board members. *See* 22 U.S.C. §§ 4605(b), 4606(a). Much like the Amtrak board members, the USIP Board members are to be selected, in part, based on their expertise and experience in the area and to create a partisan balance. 22 U.S.C. § 4605(c)-(d); *Ass'n of Am. R.R.*, 575 U.S. at 51-52 (noting those factors as consistent with governmental control). USIP also, while functionally independent, is owned by the government in the sense that the organization cannot issue stock to be owned by anyone else, 22 U.S.C. § 4603(b), and cannot dissolve itself, *id.* § 4604(a), and, if dissolved, its assets would go to the U.S. Treasury, *id.* § 4610.[17] In short, USIP "was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Ass'n of Am. R.R.*, 575 U.S. at 53.

Plaintiffs point to an older Supreme Court case, *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee* ("*USOC*"), 483 U.S. 522 (1987), presumably to bolster the argument that USIP falls outside of the federal government entirely. Pls.' Opp'n at 6-7, 9-10. The Court

---

[17]     Plaintiffs contest the relevance of the reversion of funds to the Treasury upon dissolution, noting that "any tax-exempt nonprofit organization that is dissolving" must "distribute its remaining assets only to another tax-exempt organization . . ., or to the federal government, or to a state or local government." Pls.' Opp'n at 20. By this measure of ownership, then, plaintiffs contend "the government (federal or state) would 'own' every single extant tax-exempt nonprofit." *Id.* Plaintiffs may be correct that this fact could not be dispositive, but the explicit notation that USIP's funds must revert to the Treasury—and not a state government or other nonprofit—weighs in favor of viewing the Institute as a governmental entity.

**JA344**

there considered whether the Olympic Committee was subject to the Fifth Amendment when the

Committee took steps to protect its intellectual property.  After noting that the Committee had a

corporate charter and received some governmental funding, neither of which were dispositive

characteristics of a governmental entity, the Court focused on whether the Committee performed

"functions that have been 'traditionally the *exclusive* prerogative' of the Federal Government."

*Id.* at 544 (emphasis in original) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)).

The conduct and coordination of amateur sports were not "traditional government function[s],"

*id.* at 545, nor was the "choice of how to enforce its exclusive right to use the word 'Olympic,'"

so the Committee was not considered a governmental actor, *id.* at 547.  Indeed, as plaintiffs

emphasize, "USIP's NGO functions in conflict resolution" are ones also performed by private

entities.  Pls.' Opp'n at 6-7.  The functional test proposed in *USOC*, however, was not employed

in the later cases involving Amtrak, as plaintiffs readily admit.  Pls.' Opp'n at 10 ("A few years

later, the Supreme Court employed a different analysis, and barely cited *U.S. Olympic

Committee*, in determining that Amtrak was subject to the First Amendment when deciding what

advertisements could be displayed in New York's Penn Station.").  For purposes of

constitutional separation-of-powers questions, *Association of American Railroads* is most on

point—and there, the "traditional[ly]" private or public nature of the corporation's functions

were not dispositive.

Plaintiffs point to various other characteristics of USIP as relevant in discerning its

character and function, but none carry much weight for purposes of constitutional separation-of-

powers questions.  Plaintiffs point out, for example, that Congress described USIP as a charitable

organization under the tax code, citing 26 U.S.C. § 170(c)(2)(B), which applies to 501(c)(3)

organizations, not public entities or political subdivisions.  *See* Pls.' Opp'n at 20-21.  "If

**JA345**

Congress intended for the Institute to be owned by the 'United States,'" plaintiffs argue, USIP would not have been so classified. *Id.* at 21. Again, however, Congress's classifications are not controlling. *Lebron* and *Association of American Railroads* instruct courts to look to the organization's creation, structure, objectives, and degree of governmental control—a practical inquiry—rather than statutory labels and categorizations. For that same reason, classifications by other bodies, such as USIP's classification by the U.S. Government Manual, a publication by the Office of the Federal Register within the National Archives and Records Administration, and by the Congressional Research Service, as "quasi-official," are likewise unavailing for this purpose. Pls.' Mem. at 22-23; Pls.' SUMF, Ex. 25, The United States Government Manual 2009/2010, ECF No. 20-25 (noting that the Manual defines "quasi-official agency" as "not executive agencies under the definition of 5 U.S.C. § 105 but are required by statute to publish certain information on their programs and activities in the Federal Register"); *see also* USG Manual, ECF No. 20-23; Kosar, *supra*, at 6 (noting that USIP is classified as a "quasi-official agency" under the Government Manual and noting that Amtrak likewise used to have that same descriptor).[18]

Plaintiffs also note that USIP lacks sovereign immunity and is a distinct legal entity. Pls.' Mem. at 3; Pls.' Opp'n at 11-12; 22 U.S.C. §§ 4603(d), 4604(k). Again, those are statutory determinations that do not resolve the entity's constitutional status, as the Court in *Lebron* explained. *See* 513 U.S. at 392 (Congress' "statutory disavowal of Amtrak's agency status deprive[d] Amtrak of sovereign immunity from suit" but did not resolve Amtrak's status for constitutional purposes).

---

[18]    Even less probative, then, is the fact that USIP's former website—which now appears defunct—used a ".org" instead of a ".gov" domain name. *See* Terminated Emps. Amicus Br. at 5.

Finally, plaintiffs emphasize that USIP's Board members and employees are not employees or officers of the U.S. government, except for purposes of the FTCA and certain compensation and benefits purposes.  22 U.S.C. § 4606(f)(1); Pls.' Mem. at 17; Pls.' Opp'n at 12, 15-16.  The statute, in fact, says this twice, also separately emphasizing that "officers and employees of the United States Government may not be appointed to the Board."  22 U.S.C. § 4605(d)(2).  Further, USIP employees are paid on a private payroll, Pls.' Add'l SUMF ¶ 12, ECF No. 34-1, receive privately administered benefits, Pls.' Opp'n Exhibits, Ex. 5, Exec. Office of the President Memo re: Employee Benefits Coverage (Mar. 11, 1988), ECF No. 34-7; Pls.' Opp'n at 12 & n.6 (explaining that 5 U.S.C. § 8914 precluded nongovernmental employees from receiving federal benefits); Pls.' Add'l SUMF ¶ 13, and their salaries are guided—not mandated—by statute, at least per a 1987 OPM memo, Pls.' Opp'n, Ex. 4, OPM Memo (Oct. 2, 1987), ECF No. 34-6.  USIP employees do not take an oath of office or receive government personnel forms.  *See* Terminated Emps. Amicus Br. at 8.

Again, Congress's disavowal of governmental employee status has important statutory implications but cannot dictate whether USIP operates as a governmental entity under the Constitution.  *See Lebron*, 513 U.S. at 592.  PCAOB's Board members and other employees are not "officer[s] or employee[s] or agent[s] for the Federal Government" either.  15 U.S.C. § 7211(b).  Though the Court in *Free Enterprise* did not have to consider that fact because the parties agreed that "the Board is 'part of the government' for constitutional purposes, . . . and that its members are 'Officers of the United States'" for such purposes, 561 U.S. at 485-86, the Court interpreted § 7211(b) as describing employees' status only "for statutory purposes" *id.* at 485-86 ("[d]espite the provisions specifying that Board members are not Government officials

for *statutory* purposes" (emphasis added)), seemingly recognizing that section's limited relevance to the constitutional separation-of-powers inquiry.

Plaintiffs' statutory arguments thus cannot avoid the key characteristics that make USIP part of the federal government for constitutional separation-of-powers purposes.

### 2.    *USIP is Not Part of the Executive Branch.*

As stated earlier, a threshold finding that USIP is a government entity does not resolve the case. Given that defendants have offered no theory of why the President would have constitutional authority unilaterally to remove USIP Board members if they are not part of the Executive branch and do not exercise executive power, the determination that USIP may be a governmental entity is insufficient. The ultimate question remains—whether USIP is subject to the President's Article II removal authority.[19]

This question is not resolved easily by analogous precedent. Despite concluding that Amtrak was a government entity, the Supreme Court did not make any finding as to whether Amtrak was in the Executive branch in either *Lebron*, 513 U.S. 374, or *Association of American Railroads*, 575 U.S. 43, nor did the D.C. Circuit on remand of *American Railroads*, despite resolving the Due Process and Appointments Clause issues at hand. *See generally Ass'n of Am. R.R. v. Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016) (holding that Amtrak's power to regulate

---

[19]    As plaintiffs point out, *Collins*, 594 U.S. 220, supports the point that for questions about the President's removal powers, a determination that an entity is merely part of the federal government is insufficient and what matters is whether that entity is part of the Executive branch. *See* Pls.' Opp'n at 11. In *Collins*, the Supreme Court considered whether a for-cause removal restriction on a single leader of an agency (the Federal Housing Finance Agency ("FHFA")) was constitutional. An amicus raised the argument that the director of the FHFA acted as a private party when conducting its role as a conservator or receiver and on this basis, Congress could limit the President's removal authority. *See id.* at 254. Without suggesting that the President could exercise removal authority over entities acting in a private capacity or even within the government but outside of Article II, the Court instead reasoned that the particular way in which the director acts as a receiver is through "implementation of a legislative mandate," which is the "very essence of 'execution' of the law," so "the FHFA clearly exercises executive power" and the President's constitutional removal authority applied. *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 733 (1986)).

**JA348**

its competitors violated the Due Process Clause and that the arbitrator appointed to resolve

rulemaking disagreements between Amtrak and the Federal Railroad Administration was an

"Officer" under the Constitution); *see also Ass'n of Am. R.R. v. Dep't of Transp.*, 896 F.3d 539

(D.C. Cir. 2018) (reviewing, on a second appeal, the propriety of the remedy for the

constitutional violations).[20]   In *Dong*, the D.C. Circuit implicitly assumed the Smithsonian

Institute was a government entity to conclude it was not an Executive branch agency for the

narrow purpose of the statutory definition in the Privacy Act, without further consideration of

whether the Smithsonian is subject to Article II for other purposes. *See* 125 F.3d at 883.

For defendants, the answer to whether USIP is part of the Executive branch flows easily

from the answer to the threshold issue: USIP is part of the federal government and does not

exercise legislative or judicial power. Defs.' Opp'n 13-14. Based on the assumption that "[a]

component of the federal government must fall into one of three branches," defendants use

process-of-elimination reasoning to conclude that USIP must be part of the Executive branch.

*Id.* Defendants argue as an additional point that USIP, in fact, exercises core executive powers.

---

[20]    To be more specific, the D.C. Circuit on remand held that the Passenger Rail Investment and Improvement Act ("PRIIA") "violates the Fifth Amendment's Due Process Clause by authorizing an economically self-interested actor to regulate its competitors." 821 F.3d at 23. The PRIIA provision at issue "task[ed] Amtrak and the Federal Railroad Administration (FRA) with jointly developing performance metrics and standards," problematically providing "a means of enforcing Amtrak's statutory priority over other trains"—*i.e.*, over its competitors. *Id.* This discussion did not opine on whether Amtrak is part of the Executive branch, explaining only that just because Amtrak is not an autonomous private enterprise does not mean it is not economically self-interested. *See id.* at 31-32. The court made a single passing comment that the FRA and Amtrak are "subdivisions in the same branch," 821 F.3d at 35, which might be read to suggest they both belong to the Executive branch, but the court did not engage in further analysis. The D.C. Circuit further held that the PRIIA violates the Appointments Clause for delegating regulatory power to an improperly appointed arbitrator, who, as a principal officer could not be appointed by the Surface Transportation Board, but rather had to be appointed by the President. *See id.* at 39. While describing Amtrak and the FRA's joint rulemaking as "agency action" might suggest Amtrak is part of Article II, the court never went so far as to say that. *Id.* The court merely held that the *arbitrator* role described in the statute was a principal "Officer" under the Constitution and thus could not be appointed by a mere head of a department. *See id.*

         The D.C. Circuit's second post-remand opinion likewise did not opine on whether Amtrak is part of the Executive branch. *See* 896 F.3d 539. A sole comment may imply that the opinion so assumed: "Finally, the dissenting opinion notes that the Administration is housed 'in the same branch' of an Executive agency as Amtrak. Dissent Op. at 557." 896 F.3d at 548. Again, the court engaged in no further discussion on that point.

*See id.* at 14-16.  At first blush, this reasoning has attraction, but closer scrutiny reveals that both defendants' assumption and their analysis of USIP's powers are flawed.

        **a.**       ***Exclusivity of Three Branches of the Federal Government***

Defendants' assumption that every federal entity falls neatly within one branch is not correct.  Federal entities may be classified as legislative for one purpose but treated as executive for others.  For instance, the Government Accountability Office ("GAO"), led by the Comptroller General, is generally part of the Legislative branch.  GAO is explicitly described as "an instrumentality of the United States Government independent of the executive departments," 31 U.S.C. § 702(a), "part of the legislative branch," Reorganization Act of 1949, Pub. L. No. 81-109, sec. 7, 63 Stat. 203, 205, and "an agent of Congress," Accounting and Auditing Act of 1950, Pub. L. No. 81-784, ch. 946, sec. 111(d), 64 Stat. 832, 835.  Consequently, in *Bowsher v. Synar*, 478 U.S. 714 (1986), the Supreme Court held that as part of the Legislative branch for constitutional purposes, the Comptroller General could not exercise executive powers under the Constitution, so his apparent authority to implement a statute determining certain budget calculations and to dictate budgetary cuts in the presidential budget request was invalid.  *See id.* at 733-736.  Nonetheless, the definition of "executive agency," under 5 U.S.C. § 105, which applies to the APA and other statutes governing executive agencies, explicitly includes GAO. *See id.* § 104(2) (including GAO as an "independent establishment," which is one type of executive agency).

As with the first threshold question of whether USIP is part of the federal government, all that matters here is how USIP is classified for *constitutional* separation-of-powers purposes (not any statutory purposes), but that too can be a complicated inquiry, given that a single entity may exercise multiple different types of authority and "governmental power cannot always be readily characterized with only one . . . labe[l]." *Mistretta v. United States*, 488 U.S. 361, 393 (1989)

**JA350**

(alterations in original) (quoting *Bowsher*, 478 U.S. at 749 (Stevens, J., concurring in the

judgment)).  Executive branch entities, for instance, may carry out adjudicative, rulemaking, and

enforcement functions, which courts have labeled in various ways.  *See, e.g.*, *Seila L.*, 591 U.S.

at 216-17 (describing how *Humphrey's Executor* upheld removal restrictions for multimember

Executive branch entities, like the Federal Trade Commission ("FTC"), with "'quasi-judicial' or

'quasi-legislative' functions"); *id.* at 216 n.2 (describing those functions as fundamentally

"executive" under the Constitution); *Wilcox v. Trump*, -- F. Supp. 3d --, 2025 WL 720914, at *7

(D.D.C. Mar. 6, 2025) (describing such quasi-judicial and quasi-legislative powers of the

National Labor Relations Board ("NLRB")).  A Judicial branch entity may also carry out

rulemaking functions, in lieu of any "judicial power" at all.  *See Mistretta*, 488 U.S. at 384-97

(describing the U.S. Sentencing Commission and holding that it is part of the Judicial branch for

a constitutional separation-of-powers analysis); 28 U.S.C. § 991(a) ("There is established as an

independent commission in the judicial branch of the United States a United States Sentencing

Commission.").  The Vice President, too, though not an entity *per se*, explicitly carries out cross-

branch duties, acting as both an aide to the President and the President of the Senate.  *See* U.S.

CONST. art. I, § 3, cl. 4; *see generally* Roy E. Brownell II, *A Constitutional Chameleon: The Vice

President's Place Within the American System of Separation of Powers*, 24 KAN. J.L. & PUB.

POL'Y 1 (2014).  Despite the importance of separation of powers into separate branches, the

Supreme Court has recognized "that our constitutional system imposes upon the Branches a

degree of overlapping responsibility, a duty of interdependence as well as independence the

absence of which 'would preclude the establishment of a Nation capable of governing itself

effectively.'" *Mistretta*, 488 U.S. at 381 (quoting *Buckley*, 424 U.S. at 121).

Further, not every federal government entity sits within a particular branch at all.  The

grand jury, for example, is an independent entity "not . . . textually assigned . . . to any of the

branches described in the first three Articles."  *United States v. Williams*, 504 U.S. 36, 47 (1992).

Though the grand jury operates "under judicial auspices," the Supreme Court has described its

"institutional relationship with the Judicial Branch" as one "at arm's length," characterized by

only very limited "power . . . to fashion . . . rules of grand jury procedure" and call the jurors

together and administer their oaths.  *Id.* at 47, 50.  The Supreme Court has also stated that

Congress can create "'offices' in the generic sense and provide such method of appointment to

those 'offices' as it chooses" without the leaders being "Officers of the United States" under

Article II of the Constitution (providing for presidential appointment of such officers, *see* U.S.

CONST. art. II, § 2, cl. 2), if they operate in an area "removed from the administration and

enforcement of the public law" or "perform duties only in aid of those functions that Congress

may carry out by itself."  *Buckley*, 424 U.S. at 138-39; *see also id.* at 139-41 (holding that the

Federal Election Commission, whose members were not appointed by the President, could not

administer the statute through rulemaking, determinations of eligibility for funds, advisory

opinions, enforcement actions, etc.).

Plaintiffs point to the Smithsonian Institution as an example of a government

establishment that cannot easily reside within any of the three branches.  *See* Pls.' Opp'n at 7-8.

Indeed, both parties seem to agree that the Smithsonian Institution does not exercise executive

power, *see id.*; Defs.' Opp'n at 23, but also does not engage in adjudications or rulemaking, *see*

Pls.' Opp'n at 7.  Its leadership also comes from all three branches—its Board of Regents

includes members of Congress, the Chief Justice, and the Vice President.  *See* 20 U.S.C. § 42(a).

While no case has held that the Smithsonian Institution does or does not fall into one of the

tripartite branches under the Constitution, that example counsels caution in understanding all congressionally created or chartered entities that may be considered part of the federal government to fall necessarily within one of the first three Articles.

Put simply, entities that perform nongovernmental functions or functions distinct from the three branches (like the grand jury), do not necessarily reside within a particular branch of the federal government.

Defendants' arguments to the contrary are unpersuasive. To begin, defendants stick to the assumption that all government entities must fall within one of the three branches, painting the grand jury as an anomaly and the Smithsonian Institution as an "exceedingly rare" "exception[]," and citing cases that emphasize the separation of the three branches. XMSJ Hr'g Tr. at 80:23-81:22 (suggesting the Smithsonian was one of the rare entities "intended to be outside of the three branches"); Defs.' Reply at 2-6. Defendants are correct that the three branches are separate, such that legislative power is not generally exercised by the Executive branch and vice versa. *See* Defs.' Reply at 3-6. Yet, defendants' cases emphasizing such differentiation among the branches say nothing about entities that exercise nongovernmental—non-legislative, non-judicial, and non-executive—powers. *See id.* at 4-5 (citing *Buckley*, 424 U.S. at 138-139, which, in defendants' own terms, reinforces the uncontroversial "need for government components exercising executive authorities to be located in the Executive Branch"); *id.* at 5-6 (citing *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991), which merely reiterated that the Legislative branch cannot exercise executive powers); *id.* at 6 (citing *INS v. Chadha*, 462 U.S. 919, 951 (1983), which simply emphasized that the government was divided into three categories and each branch must remain confined to its category).

**JA353**

Defendants point to *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 202-03 (1928), as suggesting that all government entities fall within one of three branches, because there, the Supreme Court applied process-by-elimination reasoning to determine that a committee created by the Philippine Legislature to control or manage a government-owned corporation was part of the Executive branch. *See* Defs.' Reply at 5-6. The Court had explained that the Philippines government followed separation-of-powers principles akin to the U.S. Constitution, and reasoned that the powers of the committee "are not legislative in character, and . . . not judicial[, so t]he fact that they do not fall within the authority of either of these two constitutes logical ground for concluding that they do fall within that of the remaining one of the three among which the powers of government are divided." *Springer*, 277 U.S. at 201-03. The Court did not rely on that deduction alone, however, and instead went on to explain why the committee's powers were executive in nature: "The appointment of managers (in this instance corporate directors) of property or a business, is essentially an executive act which the Legislature is without capacity to perform directly or through any of its members." *Id.* at 203. As the Court later summarized the holding in *Springer*: "Because the Organic Act of the Philippine Islands incorporated the separation-of-powers principle, and because the challenged statute authorized two legislators to perform the *executive function of controlling the management of the government-owned corporations*, the Court held the statutes invalid." *Metro. Wash. Airports Auth.*, 501 U.S. at 275 (emphasis added). That the Court mentioned the lack of any legislative or judicial powers as part of its determination that a Filipino committee is part of their Executive branch does not reflect a firm holding that no entity of the U.S. government can exist outside of the three branches.[21]

---

[21]    Notably, the great legal minds Justices Holmes and Brandeis both dissented from *Springer*, and Justice Holmes noted that "we do not and cannot carry out the distinction between legislative and executive action with

**JA354**

In sum, complex government entities are not always easily classified within the three branches, and further, an entity may be part of the government, in a broad sense—created by Congress for governmental purposes and controlled by the government, *see supra* section III.A.1.b—without exercising governmental powers, executive, judicial or legislative, at all.[22] Defendants' process-of-elimination approach therefore holds little water.  The relevant inquiry is whether USIP sits specifically within the Executive branch.

### b.    *Determination of an Entity's Constitutional Status*

When considering a separation-of-powers question requiring the determination of whether an entity sits within a particular branch, existing case law provides some guide but no clear test or discrete list of factors to consider, in contrast to the question of whether an organization is a governmental entity, as discussed *supra* in Part III.A.1.b.  An entity's organic statute is a good place to start.  In *Kuretski v. Commissioner of Internal Revenue Service* ("*C.I.R.*"), 755 F.3d 929 (D.C. Cir. 2014), the D.C. Circuit considered whether presidential removal of Tax Court judges violated separation of powers, evaluating first to which branch the Tax Court belonged.  *See id.* at 932, 939-42.  To start, the Court observed that the Tax Court was explicitly established by Congress "as an Executive Branch agency rather than an Article III

---

mathematical precision and divide the branches into watertight compartments, were it ever desirable to do so, which I am far from believing that it is, or that the Constitution requires."  277 U.S. at 211 (Holmes, J., dissenting).  Justices Holmes and Brandeis recognized as early on as the 1920s that the complexities of governance required a more nuanced understanding of the federal constitutional structure.

[22]    Defendants' citation to *National Horseman's Benevolent and Protective Association v. Black*, 53 F.4th 869, 872-73 (5th Cir. 2022), is not to the contrary.  Defs.' Reply at 3.  The court there sustained a private nondelegation doctrine challenge to a congressionally created private entity that regulates horseracing through "formulat[ion] [of] detailed rules on an array of topics" without approval or review by any executive agency.  *Nat'l Horseman's*, 53 F.4th at 872.  The court explained the problem with "vesting government power in a private entity not accountable to the people," when "the Constitution vests federal power only in the three branches of the government."  *Id.* at 872-73.  That case did not opine on the meaning of "federal power," however, or whether entities that do not exercise federal power can be part of the government, let alone within or outside a particular branch.  The Fifth Circuit merely held that entities with rulemaking or regulatory authority must be part of the federal government or closely overseen (with "pervasive surveillance and authority") by a component of it.  *Id.* at 881-82.

tribunal." *Id.* at 940. In *Mistretta*, the Supreme Court evaluated a similar question—whether presidential for-cause removal authority and the Sentencing Commission's rulemaking power violated separation of powers. *See* 488 U.S. at 383-84. The Court took as a given that Congress had assigned the Sentencing Commission explicitly to the Judicial branch and thus began with the presumption that it was appropriate there. *Id.* at 385.

In both cases, the statutory denominations served merely as a launching point. The decisions ultimately turned on the function of the entities in question—what powers they exercised in *constitutional* terms. In *Kuretski*, the plaintiff argued the Tax Court was part of Article III, and indeed, the Supreme Court had previously explicitly stated that the Tax Court exercised "judicial power." *See* 755 F.3d at 938-42 (citing *Freytag v. C.I.R.*, 501 U.S. 868, 891 (1991), which held that the Tax Court "exercises a portion of the judicial power of the United States" and thus qualified as a "Court of Law" for purposes of the Appointments Clause). The D.C. Circuit nonetheless rejected that argument, reasoning that although as an adjudicatory body, the Tax Court exercised judicial power in some *generic* or "enlarged sense," the Tax Court did not occupy a judicial role under Article III. *See id.* at 941-43 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 592 U.S. 272, 280 (1856)). As an adjudicator of "public rights," the Tax Court did not decide cases or controversies under Article III, and its role "interpreting and applying the revenue laws" was consistent with Executive branch responsibilities. *Id.* at 939-40, 943-44. The court thus concluded that the Tax Court exercised Article II, rather than Article III judicial, power and sat in the Executive branch. *Id.* at 943. That holding was not undermined by statutory recognition (also reiterated in *Freytag*) of the Tax Court's independence from the Executive branch, *see* 26 U.S.C. § 7441 ("The Tax Court is not an agency of, and shall be independent of, the Executive branch of the Government."), which the

court considered to be about "functional" rather than "constitutional independence," nor of the

Tax Court's creation by Article I, *see id.* ("established under article I of the Constitution of the

United States"), which is true of all Executive branch agencies. *Kuretski*, 755 F.3d at 943.[23]

Similarly, in *Mistretta*, the Court evaluated the Sentencing Commission's rulemaking and

administrative functions to conclude these functions were not "more appropriately performed by

the other Branches" and did not "undermine the integrity of the Judiciary." 488 U.S. at 385.

Despite the "peculiar[ity]" of locating the Commission in the Judicial branch, given that "it is

not a court and does not exercise *judicial* power," placement there did not cause any

constitutional problem given that the necessary administrative or rulemaking duties carried out

by such an "auxiliar[y] bod[y]," "[b]ecause of their close relation to the central mission of the

Judicial Branch," are "not more appropriate for another Branch." *Id.* at 384-85, 389-90

(emphasis added). In short, its function, in aid of the judiciary, made "appropriate" the

Sentencing Commission's placement in the Judicial branch.

In addition to an entity's powers, its supervision and control may be indicative of where

the entity sits. For instance, in *Free Enterprise Fund*, the Court implicitly held that PCAOB

belonged to the Executive branch, given that the SEC—an Executive branch agency—oversaw

its duties and appointed its board members. *See* 561 U.S. at 486-87, 492. Neither appointment

nor removal authority, however, is dispositive. Regarding appointment, several entities outside

---

[23]    *Kuretski*, like *Springer*, includes language emphasizing the three discrete branches of government and suggesting that if an entity does not belong to two branches, it likely belongs to the third. *See* 755 F.3d at 943 ("We have explained that Tax Court judges do not exercise the 'judicial power of the United States' pursuant to Article III. We have also explained that Congress's establishment of the Tax Court as an Article I legislative court did not transfer the Tax Court to the Legislative Branch. It follows that the Tax Court exercises its authority as part of the Executive Branch."). That does not undercut, however, indications previously described that *some* entities, particularly those more removed from core governmental responsibilities, *see, e.g.*, *Buckley*, 424 U.S. at 138-39, may not belong in any branch at all. *See supra* Part III.A.2.a. In fact, *Kuretski*, like *Springer*, did not rely merely on process of elimination but rather noted explicitly that the Tax Court "is in the business of interpreting and applying the internal revenue laws" and that Congress had formed the Court as an Executive branch agency. 755 F.3d at 939-40, 943.

of the Executive branch are led by presidential appointees: The Comptroller General is appointed by the President yet considered to be part of the Legislative branch. *See* 31 U.S.C. § 703(a)(1); *Bowsher*, 478 U.S. at 731-33. The Sentencing Commissioners are, too, appointed by the President, despite being part of the Judicial branch, as of course, are judges themselves. *See Mistretta*, 488 U.S. at 368, 396-97.

Regarding removal, entities outside of the Executive branch may also be subject to presidential removal pursuant to statute. Sentencing Commissioners, for example, are removable by the President for cause, but *Mistretta* held that this did not diminish the independence of the judiciary or of the Commission itself. *See id.* at 409-10. Such removal authority is not constitutional in origin, considering that the Commission is not part of Article II, but Congress in creating an entity could confer such limited authority to the President without sacrificing its non-executive nature. *See id.* While the Court in *Bowsher* strongly relied on Congress's removal authority over the Comptroller General to hold that the General's exercise of certain executive powers was impermissible as an encroachment on the Executive branch, the Court did not go so far as to hold that removal power always dictates an entity's constitutional location. *See id.* at 732. It rather relied on long-standing concerns, as articulated in Supreme Court precedent, about Congress reserving power unto itself over removal of executive officers. *See id.* at 724-32; *see also Humphrey's Executor*, 295 U.S. at 626-27 (holding that *Myers* held that Congress could not require advice and consent of the Senate as a prerequisite to presidential removal of an Executive branch official).

### c.    *Application to USIP*

Applying these lessons to determine whether USIP belongs to the Executive branch, both parties seem to agree that USIP's powers—as outlined in its organic statute and exercised in practice—ultimately define its constitutional character. *See* Pls.' Mem. at 24-29; Defs.' Opp'n at

21 n.4; Defs.' Reply at 8 ("[W]hether the institute serves an executive function or is vested

executive power turns not just on how it operates, but also on its congressional design."); Defs.'

Supp'l Mem. at 4, ECF No. 37 (explaining that the power exercised by an officer determine the

officer's constitutional classification for purposes of a removal question).[24]  Starting briefly with

its organic statute, USIP stands apart from both *Kuretski* and *Mistretta*.  Notably, Congress did

not assign USIP to any branch at all, though by labeling it an "independent nonprofit

corporation," suggested that USIP was *not* an Executive branch entity.  22 U.S.C. § 4603(b); *see*

*also* Comm'n Rep. at 179 (noting, in its recommendation to create what became USIP, that

despite presidential appointments of Board members, "the Academy is not an Executive Branch

institution").  This stands in contrast to other government entities for which Congress has been

clear when assigning entities to the Executive branch.  *Compare* 22 U.S.C. § 4603(b), *with* 20

U.S.C. § 3411 ("There is established an executive department to be known as the Department of

Education."), *and* 29 U.S.C. § 153 ("The National Labor Relations Board . . . is continued as an

agency of the United States."); *see also* Pls.' Mem. at 19 nn.14-16 (citing numerous statutes

where Congress has clearly labeled entities as part of the Executive branch, including where they

are also simultaneously described as corporations); Pls.' Opp'n at 17-18.[25]

---

[24]    Defendants later in their briefing seem to question whether the "practical work" of USIP is relevant, as
compared to its statutory "functions and authorities assigned by Congress."  Defs.' Reply at 18.  This focus on
the statute does not appear to help defendants, however.  The statute, by its terms, focuses solely on educational,
research, and scholarly projects, *see infra*, and thus appears even less "executive" than the work of USIP in
operation.  At the hearing, defendants agreed that both statutory instruction and practical operation are relevant.  *See*
XMSJ Hr'g Tr. at 76:11-77:17.

[25]    In its initial years, USIP clearly understood Congress to have made the Institute separate from the
Executive branch.  *See Oversight of the U.S. Institute of Peace: Hearing Before the S. Comm. on Labor & Human
Resources and the S. Comm. on Foreign Rels.*, 100th Cong. 6 (1987) (statement of Hon. John Norton Moore,
Chairman of Board of Dirs. of USIP) ("The legislative history of our enabling statute, and indeed the statutory text
itself, makes clear that the United States Institute of Peace was not designed to become part of the Executive Branch.
We believe that one of the greatest accomplishments of our early months in existence was the establishment of this
independence."); Terminated Emps. Amicus Br. at 5; Pls.' Add'l SUMF ¶ 1 (citing an early USIP report to Congress
and the President stating that the Institute refrains from "policy making and dispute intervention" because USIP is
"not an agency of Congress or the Executive Branch"); Pls.' Opp'n at 21.  Perhaps for this reason, the National

**JA359**

Other provisions of the USIP Act, or lack thereof, also suggest that Congress did not envision USIP as part of Article II, even if USIP may be properly considered part of the government for constitutional purposes. In particular, the statute's explicit statements that USIP's Board members and employees are not officers or employees of the federal government seem to remove USIP from Article II, 22 U.S.C. §§ 4605(d)(2), 4606(f)(1), as does the requirement that USIP receive annual appropriations to continue using the "United States" as a prefix in its name, *id.* § 4603(e)(2). Congress's choice to apply affirmatively to USIP certain statutes and services ordinarily applied automatically to Executive branch agencies, such as FOIA, the FTCA, and GSA support, also suggests Congress did not envision USIP as part of Article II. *See* 22 U.S.C. §§ 4607(i), 4606(f)(1), 4604(o); 5 U.S.C. § 552 (applying FOIA to "agenc[ies]"); 28 U.S.C. § 1346 (applying the FTCA to cases where the United States is a defendant); *supra* n.3; Pls.' Mem. at 21-22; Pls.' Opp'n at 16.

Defendants point to different statutory provisions as support for finding that USIP is an Executive branch entity. Defendants contend that USIP's organic statute, which states "[t]here is hereby established the United States Institute of Peace," 22 U.S.C. § 4603(a), as a "nonprofit corporation," *id.* § 4603(b), makes the Institute a wholly owned corporation of the United States, under 5 U.S.C. § 103(1), which, in turn, makes it an Executive branch agency, under *id.* § 105.

---

Archives and Records Administration ("NARA") has long classified USIP as a "quasi-official agency" in the U.S. Government Manual; quasi-official agencies are not listed as part of the Executive branch. *See* USG Manual; Pls.' Mem. at 22-23; Pls.' SUMF ¶ 72; Defs.' Resp. ¶ 72 (discounting the Manual as simply reflecting information given from the entities themselves and not reflecting anyone else's view); Defs.' Opp'n at 18. Practical independence is not constitutional independence, however, *see Kuretski*, 755 F.3d at 943, and President Reagan, who issued a signing statement along with the USIP Act asserting his constitutional at-will removal authority of its Board members, did not see USIP as having the latter, Defs.' Opp'n at 8; Presidential Statement on Signing the Department of Defense Authorization Act, 1985 (Oct. 19, 1984), https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-authorization-act-1985.

The longstanding recognition of USIP's independence is probative and certainly favors a finding that USIP sits outside of the Executive branch for constitutional purposes, but these observations are ultimately not dispositive, given that the entity's powers and functions are most crucial. *See supra* Part III.A.2.b.

**JA360**

Defs.' Opp'n at 20-21.  Indeed, the United States created and controls the Institute, which is

barred from issuing stock to anyone else, and retains its funds upon dissolution—making it the

only conceivable owner.  *See id.* (citing 22 U.S.C. §§ 4603(a)-(b), 4605, 4610).  Alternatively,

defendants argue that USIP is an "independent establishment," under 5 U.S.C. § 104(1), given

that it is "established" by the United States and "independent," *see* 22 U.S.C. § 4603(a)-(b),

which also makes it an "executive agency," under 5 U.S.C. § 105.  *See* Defs.' Opp'n at

21.  These points, highlighted during hearings for the TRO and Motion to Suspend Transfer of

Property, *see* TRO Hr'g at 49:4-9; Hr'g for Mot. to Suspend Prop. Transfer at 66:2-70:3 (4/1/25),

ECF No. 23, demonstrate the extent that Congress intended for USIP to be treated as an agency

for additional statutory purposes—Title 5, in particular, includes the Administrative Procedure

Act and the Inspector General Act.  Yet, the fact that Congress did not suggest more concretely

in USIP's organic statute that USIP was in a particular branch suggests Congress did not

envision USIP exercising Article II power.  In any event, as already explained *supra* in Parts

III.A.1.b and III.A.2.a-b (noting, for instance, the inclusion of GAO as an "executive agency"

under this Title), the powers exercised by an entity, not Congress's statutory classifications, are

dispositive of an entity's constitutional character.[26]

 Most crucially, USIP does not exercise executive power in the constitutional sense.  The

Executive branch, per the Constitution, "execute[s]," or administers, the laws.  *See* U.S. CONST.

art II.  Put plainly, that means "interpreting a law enacted by Congress to implement the

---

[26] As defendants explain in their supplemental memorandum, for the purposes of a constitutional removal
question, what matters is "whether the officer exercises executive power, not the label attached."  Defs.' Supp'l
Mem. at 4.  Defendants point to the helpful example of *Intercollegiate Broadcasting System, Inc. v. Copyright
Royalty Bd.*, 684 F.3d 1332, 1341-42 (D.C. Cir. 2012), which holds that, despite the Library of Congress's title and
classification as a "congressional agency" for some purposes, the Librarian is considered a "component of the
Executive Branch" for purposes of an Appointments Clause question under the Constitution because "the powers in
the Library," such as promulgating regulations, applying statutes to affected parties, and setting certain rates and
terms case-by-case, are executive in nature.  *See* Defs.' Supp'l Mem. at 4.

legislative mandate," *Bowsher*, 478 U.S. at 732-33, and enforcing it, by judicial lawsuit or

otherwise, *see Buckley*, 424 U.S. at 138.  Implementing the law through adjudications or

rulemaking may also be considered Executive branch activities.  *See Kuretski*, 755 F.3d at 938-

41 (discussing adjudication); *Buckley*, 424 U.S. at 140-41 (recognizing rulemaking as commonly

performed by Executive branch entities); *Dong*, 125 F.3d at 879 (describing as "typical[]

executive activity" "administer[ing] federal statues, prosecut[ing] offenses, [and] promulgat[ing]

rules and regulations").  By contrast, purely "investigative and informative activities" are not

executive and rather "fall[] into the same general category as those powers which Congress

might delegate to one of its own committees."  *Buckley*, 424 U.S. at 137.

Apart from those core duties, the Executive branch also wields significant power over

foreign affairs, appointing ambassadors, making treaties, recognizing foreign nations, and

"engaging in direct diplomacy with foreign heads of states and their ministers."  *Zivotofsky ex*

*rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13-14 (2015).  The President's leadership of the military also

confers certain powers over war and peace, though formal declarations of course require acts of

Congress.  *See* U.S. CONST. art. II, § 2, cl. 1; *id.* art. I, § 8, cl. 11.

USIP's activities, by contrast, are solely focused on research, education, and scholarship.

USIP does not execute, enforce, administer, interpret, or implement any law.  "It does not make

binding rules of general application or determine rights and duties through adjudication.  It issues

no orders and performs no regulatory functions."  *Dong*, 125 F.3d at 882.  USIP's purpose,

rather, is to provide "the widest possible range of *education and training, basic and applied*

*research opportunities, and peace information services* on the means to promote international

peace and the resolution of conflicts among the nations and peoples of the world without

recourse to violence."  22 U.S.C. § 4601(b) (emphasis added).  Section 4604, which provides

65

**JA362**

USIP's "powers and duties," lists 10 "specific activities"—all of which are related to the development and dissemination of information.  *Id.* § 4604(b) ((1) "establish a Jennings Randolph Program for International Peace and appoint . . . scholars and leaders . . . to pursue scholarly inquiry," (2) "enter into formal and informal relationships with other institutions," (3) "establish a Jeannette Rankin Research Program on Peace to conduct research and make studies," (4) "develop programs to make international peace and conflict resolution research, education, and training more available," (5) "provide, promote, and support peace education and research programs," (6) "conduct training, symposia, and continuing education programs," (7) "develop, for publication or other public communication, and disseminate, the carefully selected products of the Institute," (8) "establish a clearinghouse and other means for disseminating information," (9) "secure directly" from federal entities under FOIA "information necessary to enable the Institute to carry out the purposes of this chapter," (10) "establish the Spark M. Matsunaga Scholars Program").  USIP may also make grants and conduct outreach activities— but only for the purposes of supporting research, promoting the study of international peace, educating individuals, assisting the Institute in its information services programs, and assisting the Institute in the study of conflict resolution, and promoting the other purposes outlined.  *Id.* § 4604(d).  USIP can serve federal entities as well, but again, only in these capacities: "investigat[ing], examin[ing], study[ing], and report[ing] on any issue within the Institute's competence."  *Id.* § 4604(e).  USIP has no residual statutory authority to engage generally in foreign diplomacy or foreign peacemaking expeditions.

Research, educational, and scholarly tasks are not "executive" under our constitutional scheme, nor are they legislative, judicial, or governmental at all.  USIP's powers and duties are akin to those carried out by private organizations—universities, NGOs, etc.—as evident by the

partnerships the USIP Act contemplates.  *See, e.g.*, 22 U.S.C. §§ 4604(b)(5), (10), 4604(d)

(describing collaborations with educational institutions).  To the extent they are considered

governmental, *Buckley* made clear that such "investigative and informative activities" are of the

kind that Congress might delegate to one of its own committees—thus not executive in nature.

424 U.S. at 137.

    While international peace and conflict resolution are, as subject areas, associated with

foreign affairs, which falls primarily under the President's purview, the Executive branch does

not control everything touching that subject area, contrary to defendants' suggestion.  *See* Defs.'

Opp'n at 16-17; *Zivotofsky*, 576 U.S. at 19-21 (2015) (declining "to acknowledge" an

"unbounded power" of the President "over foreign affairs" and emphasizing that "[i]t is not for

the President alone to determine the whole content of the Nation's foreign policy").  An entity's

powers, not its subject matter, dictate its constitutional role.  *See Kuretski*, 755 F.3d at 941-42

(rejecting that just because something involves a suit in court, it falls within Article III).

    Importantly, USIP's powers are not serving the Executive branch's foreign affairs

function: USIP does not wage war, conclude peace agreements, recognize foreign nations,

establish foreign policy, make treaties, negotiate with foreign sovereigns for agreements binding

on the United States, or transact with other states or maintain diplomatic relations on behalf of

the government.  *See* Defs.' Opp'n at 15-16 (describing the President's foreign affairs authority

as encompassing these powers); Defs.' Reply at 9; Pls.' SUMF, Ex. 36, Decl. of Frank Aum,

Senior Expert on Northeast Asia ("Aum Decl.") ¶ 4, ECF No. 20-36 ("At USIP, I never engaged

in any work that entailed executive branch authorities or obligations, such as implementing U.S.

government policy, executing or enforcing U.S. laws, negotiating or signing treaties or

agreements, conducting diplomacy, representing official U.S. government policies and interests,

or swearing an oath as a federal employee."). Congress has elsewhere been explicit when

entities are expected to be involved in foreign affairs to implement foreign policy on behalf of

the President. *See, e.g.*, 22 U.S.C. § 3305(a)-(b) (establishing the American Institute in Taiwan

as a "nonprofit corporation incorporated under the laws of the District of Columbia" to "enter[]

into, perform[], and enforce[], in the manner and to the extent directed by the President" any

"agreement or transaction relative to Taiwan"); Pls.' Mem. at 26. Nothing in the USIP Act

suggests USIP should even implement foreign policy, agreements, or transactions otherwise

created by the Executive branch.

Nor does USIP serve as some kind of auxiliary body, directly facilitating the Executive

branch's foreign affairs work. *Cf. Mistretta*, 488 U.S. at 389-90 (describing the Sentencing

Commission as an auxiliary body supporting the judiciary and thus part of the Judicial branch

despite not exercising traditional judicial powers); *Free Enter. Fund*, 561 U.S. at 486-87, 492

(impliedly determining that the PCAOB is part of the Executive branch because it acts "under

the SEC's oversight, particularly with respect to the issuance of rules or the imposition of

sanctions (both of which are subject to Commission approval and alteration)"). In a broad sense,

USIP furthers governmental aims pursuant to its statutory mandate, aiding foreign policy by

advancing the country's knowledge of foreign conflicts and peaceful paths to resolution. *See

supra* Part III.A.1.c (explaining that USIP has a governmental purpose). Yet, USIP does not act

at the direction of the President or any other executive officer. *Cf.* 22 U.S.C. § 3305(b) (statutory

directions to the American Institute in Taiwan). USIP selects its own projects, initiatives, and

efforts, without Executive branch consultation (aside from consultation with the *ex officio* Board

members who have other Executive branch roles), in furtherance of its own priorities. *See* Third

Moose Decl. ¶¶ 5-12; *see also, e.g.*, Pls.' SUMF, Ex. 34, Decl. of Scott Worden, Director of

Afghanistan and Central Asia Programs ("Worden Decl.") ¶ 6, ECF No. 20-34 (explaining that he wrote and published pieces on national security issues never reviewed or cleared by U.S. government officials); Pls.' Opp'n at 22-23.  USIP can do studies and projects requested by government officials—but they are not mandated to do so—and many of these derive from congressional committees rather than Executive branch officials.  *See* Third Moose Decl. ¶¶ 5-7; 22 U.S.C. § 4604(e) ("The Institute *may respond* to the request of a department or agency of the United States Government to investigate, examine, study, and report on any issue within the Institute's competence." (emphasis added)); Pls.' Opp'n at 25-26; Pls.' SUMF ¶ 60; *see also id*. ¶ 63 (asserting that USIP also takes on projects for foreign and NGO groups); Defs.' Resp. ¶ 63 (disputing only that this makes USIP independent from the Executive branch).  USIP, for instance, "regularly briefs Members and their staffs upon request," and facilitates study groups formed by Congress, such as the Iraq Study Group, convening officials from all parts of government and with support from NGOs like an institute for public policy at Rice University.  Pls.' SUMF ¶ 60; *id.*, Ex. 1, Decl. of Paul Hughes, leader of the Iraq Study Group ¶¶ 5-15, ECF No. 20-1; *id.*, Ex. 2, Iraq Study Group Fact Sheet ¶ 2, ECF No. 20-2 ("The Bush administration was not involved in creating the ISG."); Pls.' Mem. at 26.[27]

Defendants point to USIP's on-the-ground operations to depict USIP as an active foreign diplomacy agent of the Executive branch whose educational and scholarly efforts are merely incidental to its diplomatic missions.  *See* Defs.' Opp'n at 14-17.  To be sure, USIP conducts activities abroad to facilitate peace and avoid conflict that may look, at first glance, like foreign

---

[27]    Defendants concede that "members of Congress can engage internationally," but posit that "they do so in furtherance of their legislative powers and duties—not executive ones."  Defs.' Reply at 9.  Defendants fail to explain how this helps illustrate USIP's exercise of *executive* powers.  USIP generally "engage[s] internationally" "in furtherance of its" *nongovernmental*, educational and research powers and duties—not executive ones.  Even when conducting a project to aid the legislature, USIP is doing so in service of its educational, information-gathering, and peace-disseminating mission.

**JA366**

diplomacy. USIP's on-the-ground efforts nevertheless do not constitute exercises of Article II power for several reasons.

First, these programs are, at their core, research and educational rather than diplomatic or policymaking in nature. Research, at times, requires information gathering in the field, and teaching sometimes occurs as-applied. The Institute's programs that foster dialogues to gather information, explore potential paths to ending conflicts, and promote nonviolent resolution techniques are thus all derivative of and in furtherance of its educational and research missions. For instance, when serving as a third-party neutral in a peace mediation, USIP is not furthering an Executive branch foreign policy but rather teaching others how to resolve conflict peacefully by facilitating conversation. *See* Pls.' Opp'n at 1-2 (describing USIP as a "non-governmental neutral facilitator of conflict resolution dialogues and trainings around the world"); *see, e.g.*, Pls.' SUMF, Ex. 27, Decl. of Andrew Wells-Dang, Senior Expert on Southeast Asia ¶ 3, ECF No. 20-27 (describing facilitating online youth dialogues to foster healing from past wars and displacement, using "community development and adult education practices"); *id.*, Ex. 30, Decl. of Nichole Cochran, Program Officer ("Cochran Decl.") ¶ 3, ECF No. 20-30 (describing training programs for grade school teachers in peaceful interpersonal conflict resolution to foster nonviolent behaviors among youth in Myanmar, in partnership with pro-democracy groups there). Other interactions with foreign groups are likewise in service of information-gathering, research, and study. *See, e.g.*, *id.*, Ex. 35, Decl. of Tegan Blaine, Director of Program on Climate, Environment, and Conflict ("Blaine Decl.") ¶¶ 4-5, ECF No. 20-35 (describing partnering with communities in Somalia to learn about "the intersection of climate, security, and other conflict drivers" and conducting meetings and trainings for U.S. security partners in Africa related to climate security). USIP does not establish policy, form strategy, or make agreements,

**JA367**

as the Executive branch does. *See* Blaine Decl. ¶¶ 3-4 (explaining that USIP's learnings from such projects are shared with government stakeholders but USIP plays no role and has no insight into how such information is "used in practice" to inform "strategic terrain decisions" or even budget priorities of its partners).[28]

Defendants contend that the educational and information-gathering aspects of such activities are inconsequential because—much like DOJ attorneys' research, training, and conflict resolution work, which is educational and scholarly in nature but in service of enforcement of the law, a core executive function—USIP's activities are all in furtherance of the United States' foreign affairs executive function. *See* Defs.' Opp'n at 16-17. By focusing on individual activities, defendants argue, plaintiffs overlook their fundamental *purpose*—missing the forest for the trees. *See id*. As plaintiffs retort, however, USIP's educational activities *are* the forest. Pls.' Opp'n at 25 n.16. Contrary to defendants' suggestion, USIP's sole statutory mandate is the development and dissemination of information related to peace and conflict resolution techniques; everything else is merely incidental to that. *See* 22 U.S.C. § 4601 *et seq.*; *contra* Defs.' Opp'n at 14-17; Defs.' Reply at 10 (framing USIP's purpose overly broadly as promoting peace and resolving conflicts). USIP has no broader foreign affairs mission itself, and defendants do not connect USIP's activities to any particular Executive branch program or entity to explain how USIP is directly facilitating the exercise of such powers. All of USIP's goals and activities, *see* 22 U.S.C. §§ 4601, 4604, are research, educational, or scholarly in nature.

---

[28]    The Commission that originally proposed USIP made clear that the envisioned Academy was focused on education and research, not making policy. *See* Comm'n Rep. at xiii ("The Commission specifically recommends that the Academy itself not engage in policymaking or dispute intervention."); *id.* at 170 ("Other than establishing its own policies, the Academy should not participate in policy decisions of any federal or non-federal body. The Academy may undertake studies on policy-relevant peace issues of concern to federal agencies, but its distance from operations along with the American tradition of academic freedom will shield its inquiries from result-directed influence.").

71

**JA368**

Second, because USIP never represents the U.S. government in its interactions abroad, by definition, USIP cannot be considered to conduct foreign diplomacy—or wield any executive power as understood in Article II, or even governmental power, at all. While defendants are correct that *official* diplomacy is "quintessential[ly] executive," Defs.' Opp'n at 15, they ignore that USIP acts as a completely independent, nongovernmental organization when engaging with foreign groups. *See* Pls.' Mem. at 7 & nn.6-7 (describing how USIP engages in "Track 1.5 and Track 2 diplomacy," which refers to "talks" where "non-governmental experts drive informal dialogue" and, in Track 2 diplomacy, no official governmental representatives participate); *id.* (describing "diplomacy" as a misnomer for such actions); Terminated Emps. Amicus Br. at 4 (describing Track 2 diplomacy); Worden Decl.¶ 5 (describing how USIP hosted meetings with stakeholders in Afghanistan "because we were viewed as non-governmental and created a neutral space for peacebuilders to engage in open dialogue"); Aum Decl. ¶ 4 ("At no point during my USIP tenure, whether in my research or in my public and private engagements, did I represent that I was a part of the U.S. government or was implementing U.S. government policy."). USIP employees travel not as government officials but as private citizens, allowing them to go to places where U.S. government officials are not permitted. *See* Pls.' Opp'n at 23 n.12; Pls.' SUMF, Ex. 8, Decl. of Brian Harding, Senior Expert for Southeast Asia and the Pacific Islands ("Harding Decl.") ¶ 4, ECF No. 20-8 (describing how USIP is outside of the Chief of Mission authority which controls governmental travel, 22 U.S.C. § 3927(b)); Worden Decl. ¶ 4 ("For my overseas travel, I did not have to receive any Embassy clearance or notification.").

In fact, the value in having USIP organize and conduct trainings and promote peaceful resolution abroad is that USIP can do so without burdensome bureaucracy and without carrying the sometimes-controversial clout of the U.S. government. *See, e.g.*, Pls.' SUMF, Ex. 10, Decl.

of Dr. Gavin Helf, Senior Expert on Central Asia at USIP ¶¶ 5-6 (describing how USIP

facilitated discussions between policy experts and former advisors about how to address the

border dispute between Kyrgyzstan and Tajikistan, its non-governmental status being crucial to

hosting participants "otherwise not . . . able to meet in an official setting"); Phillips Decl. ¶ 3

(explaining how the State Department requested a particular project because "we are not a

federal agency and are able to travel to places quickly where federal employees are often not

allowed"); Sr. Officials Amicus Br. at 3, 7 (noting "Congress's considered and intentional

decision to create an institution that would operate independently precisely so that it could

perform work that Congress deemed most appropriately performed outside the Executive

Branch, none of which is executive in nature."); *id.* at 8-9 (describing USIP's work convening

tribal sheikhs to limit violence in south Baghdad to aid U.S. military efforts there after hundreds

of servicemembers were inexplicably injured and killed).[29]  If USIP is not acting on behalf of the

United States in such interactions, it cannot be wielding the government's executive power.[30]

     USIP's work could perhaps be described as "soft diplomacy," but there is nothing strange

about soft diplomacy, as opposed to official diplomacy, occurring outside of the Executive

---

[29]     *See also id.*, Ex. 28, Decl. of Christopher Bosley, Acting Director of the Countering Violent Extremism team ¶ 3, ECF No. 20-28 (describing, after the fall of ISIS, conversing with representatives from Albania, Iraq, Kazakhstan, etc. to understand more candidly the sensitivities and social dynamics involved in the U.S. government's efforts to repatriate foreign terrorist fighters); Aum Decl. ¶ 3 (describing meeting with North Korean representatives to informally "discuss ways to improve U.S.-North Korea relations," which was only possible as a nongovernment official); Harding Decl. ¶ 6 (describing USIP's discreet facilitation of ceasefire efforts in the Philippines, made possible by USIP's independent status); Cochran Decl. ¶ 3 (explaining that some of the pro-democracy groups in Myanmar distrust the United States); Pls.' SUMF, Ex. 33, Decl. of Mary Speck, Senior Advisor to the Latin America Program ("Speck Decl.") ¶ 3, ECF No. 20-33 (explaining that local leaders in Guatemala, where they foster dialogues between local officials and citizens to reduce violence, do not trust the U.S. government); Blaine Decl. ¶ 4 (describing how they were able to provide analysis on climate security in Somalia by going to places where U.S. government officials are unable to travel).

[30]     Defendants alluded at the hearing to a potential tension between the conclusion that USIP is a government entity, *see supra* Part III.A.1, and an understanding of USIP employees acting as non-governmental officials when engaging in field work abroad.  *See* XMSJ Hr'g Tr. at 78:4-16.  That tension, though, is merely superficial.  As previously stated, an entity may be governmental for purposes of a constitutional analysis without exercising governmental power, *see supra* Part III.A.2.a; here, USIP is formally subject to separation-of-powers principles in the Constitution, but its officers are not wielding executive power.

branch. NGOs are extensively involved in similar democracy-promoting efforts abroad. *See*

Pls.' Opp'n at 27 (referencing the work of the National Endowment for Democracy and the

Carter Center and describing soft power as usually originating outside of government); Pls.'

SUMF ¶ 61. Private congressionally chartered organizations may, too, be involved in diplomacy

or decisions that affect foreign diplomacy. *See* Pls.' Opp'n at 6-7; 36 U.S.C. § 300102(1)-(2)

(establishing that the Red Cross will carry out certain treaty obligations on behalf of the United

States); *USOC*, 483 U.S. at 545 n.27 (describing the Olympic Committee's decision not to send

U.S. athletes to Moscow for the 1980 Olympics in light of tension between the U.S. and Soviet

Union); *id.* at 547 ("[T]he USOC is not a governmental actor."). The Judicial and Legislative

branches also interact with foreign officials to promote peace and American interests. *See, e.g.*,

Terminated Emps. Amicus Br. at 2-3 & n.5 (describing how in the 1960s, "Presidents and

Secretaries of State routinely asked Chief Justice Earl Warren to foster friendships with other

countries that Cold War politics precluded the Executive Branch from so engaging directly," and

still today, "the Judicial Conference of the United States" maintains an "International Relations

Committee").

Again, although the act of meeting and conversing with foreign groups may *seem*

executive in nature, without any indication that USIP is doing so on behalf of President (or the

United States at all), this activity alone lacks any Article II provenance and thus does not place

USIP within the Executive branch. Just as in *Kuretski*, where the Tax Court seemed, on the

surface, to be judicial in nature, but closer analysis revealed that the Tax Court did not exercise

judicial power in the Article III sense, the fact that USIP's activities somewhat resemble certain

foreign affairs functions has no purchase since USIP is not exercising any executive power as

understood in Article II.

Aside from involvement in foreign policy, defendants also argue that USIP's authority to issue grants from federal appropriations is a "clear example[] of [an] executive function." Defs.' Opp'n at 17. Plaintiffs counter that private nonprofit entities regularly receive federal funds and then reissue them as grants to other entities, *see* Pls.' Mem. at 28, and emphasize that USIP does not administer any detailed statutory regime when administering grants, in contrast, for example, to the Federal Election Commission's administration of public campaign funds as discussed in *Buckley*, 424 U.S. at 140-41. Indeed, the D.C. Circuit has explained that the ability to "make[] decisions" about "how federal grant money was spent" "does not always mean that [an entity] is a government agency." *Dong*, 125 F.3d at 881-82 (quoting *Pub. Citizen Health Rsch. Grp. v. Dep't of Health, Educ. & Welfare*, 668 F.2d 537, 543 (D.C. Cir. 1981)). "To the extent that [USIP] devotes part of its own budget to funding grants and fellowships, it appears to be no different from any private research university which receives federal funds and enjoys some control over their use." *Id.* at 882. Defendants offer no response to this point, which seems to set USIP apart from executive agencies that determine how the government should distribute funds. *See generally* Defs.' Opp'n; Defs.' Reply at 10 n.1 (contending defendants did not waive an argument about grantmaking but offering no substantive response on the distinction made by plaintiffs); Pls.' Opp'n at 28 n.19.

Regarding supervision and control of USIP, USIP's Board members, of course, are appointed and removable for-cause and via other enumerated mechanisms by the President, and three Executive branch officials sit on USIP's Board *ex officio*. USIP thus has a strong link to the Executive branch. As stated, however, that authority is not dispositive where USIP does not exercise Executive branch power—executing and enforcing the laws. *Cf. Mistretta*, 488 F.3d at 409-11 (Sentencing Commission is part of the Judicial branch despite presidential appointment

and removal authority); *see also* Defs.' Opp'n at 19-20 (admitting that appointment by the

President and confirmation of the Senate is not dispositive of an agency's classification as part of

the Executive branch). USIP instead, as an entity focused on collection and dissemination of

information, through research and teaching, exercises largely nongovernmental power.

    In sum, despite the President's statutory appointment and for-cause removal authority

over USIP Board members and USIP's overlapping area of expertise with the Executive branch,

USIP does not exercise executive powers in the Article II sense. *Kuretski* made clear that

*looking* executive, or judicial, on the surface, is not enough. *See* 755 F.3d at 939-43. USIP's

educational, scholarly, and research activities are *not* executive in nature, *see Buckley*, 424 U.S.

at 137, 139, nor in exclusive furtherance of Executive branch priorities, given that USIP

independently selects all projects undertaken based on its own priorities—with no obligation to

accept requests from either congressional or executive groups. Importantly, when USIP engages

with foreign entities abroad, USIP does so as an independent body, *not* on behalf of the U.S.

government. At most, USIP is an external partner to, rather than an arm of, the Executive

branch. USIP thus does not wield the President's Article II power and cannot be considered part

of the Executive branch for removal purposes.

    USIP's existence outside of the Executive branch is the end of the inquiry. As explained

earlier, the President has no constitutional removal authority outside of the Executive branch.

President Trump's removal of the ten board members here was thus unlawful, violating 22

U.S.C. § 4605(f). The Court's analysis need not go further.

    **B.**    **Even if USIP is Subject to the President's Constitutional Removal Authority under Article II, USIP Board Members' Statutory For-Cause Removal Protections Are Constitutional.**

    Plaintiffs argue, alternatively, that even assuming USIP is part of Article II, the statutory

removal protections for its appointed Board members are constitutional under *Humphrey's*

*Executor*.  *See* Pls.' Mem. at 29.  For completeness, this alternative argument is considered, and

the outcome is the same because USIP does not exercise executive power.

Applying principles from *Humphrey's Executor* and its progeny, the same reasons why

USIP is not part of the Executive branch are why statutory restrictions on Board members'

removal would not be problematic even if USIP were an Article II entity.  In *Myers v. United*

*States*, the Supreme Court recognized that the President has a general power of removal over

"purely executive officers," *Humphrey's Executor*, 295 U.S. at 632 (describing *Myers*'s holding),

and held that Congress could not reserve for itself a role in that removal decision.  *See Myers*,

272 U.S. at 107, 175-76 (holding that a statute requiring advice and consent of the Senate to

remove postmaster general was unconstitutional).  Less than a decade later, in *Humphrey's*

*Executor*, with six of the same justices as in the *Myers* opinion, the Court made clear that neither

the Constitution nor *Myers* enshrined "illimitable" presidential removal authority over the

officers of independent agencies.  295 U.S. at 629; *Morrison*, 487 U.S. at 687 (recognizing this

holding in *Humphrey's Executor*).  Rather, the Court there upheld for-cause removal restrictions

(*i.e.*, removal only for "inefficiency, neglect of duty, or malfeasance in office") on the FTC as a

multi-member, nonpartisan board of experts with staggered terms that exercises quasi-legislative

and quasi-judicial authority.  *Humphrey's Ex'r*, 295 U.S. at 623-24, 629.  The Court recognized

the President's Article II removal authority was diminished in that context.  *Id.* at 628.

Since then, the Supreme Court has affirmed and preserved this precedent.  In *Wiener v.*

*United States*, 357 U.S. 349 (1958), the Court upheld for-cause removal protections for the three

members of the War Claims Commission, an adjudicatory body tasked with resolving claims for

compensation against foreign adversaries arising from World War II.  *Id.* at 349-50, 356.  Thirty

years later in *Morrison*, the Supreme Court again recognized that the President does not have

absolute removal authority for officers with adjudicatory functions and further explained that the

permissibility of removal restrictions did not turn on whether the officers' functions were

"'quasi-legislative' or 'quasi-judicial,'" 487 U.S. at 691, as opposed to executive in nature,

instead looking to the degree to which they impeded the President's ability to execute the laws.

*See id.* at 691-93 (upholding removal protections for independent counsel contained in the Ethics

in Government Act).  In *Free Enterprise Fund*, the Supreme Court struck down the

permissibility of double for-cause removal protections for the PCAOB members but

affirmatively declined to reexamine *Humphrey's* and instead reiterated that "Congress can, under

certain circumstances, create independent agencies run by principal officers appointed by the

President, whom the President may not remove at will but only for good cause."  561 U.S. at

483.

        More recently, in *Seila Law*, while considering removal protections for a single-headed

agency, the Consumer Financial Protection Bureau, the Supreme Court reaffirmed that Congress

could provide for-cause removal protections to officers like those in *Humphrey's Executor*: "a

multimember body of experts, balanced along partisan lines," with "staggered" terms "enabl[ing]

the agency to accumulate technical expertise," that "performed legislative and judicial

functions," duties "neither political nor executive" in the constitutional sense.  591 U.S. at 216;

*see also id.* at 215-17.  In other words, "multimember expert agencies that do not wield

substantial executive power" are not subject to at-will presidential removal under the

Constitution.  *Id.* at 218.  Numerous cases in the lower courts have applied *Humphrey's Executor*

to uphold removal protections for similarly constituted multimember boards, including the

NLRB, the Consumer Product Safety Commission ("CPSC"), and the FTC itself.[31]  Though the

---

[31]        For the NLRB, *see Wilcox v. Trump*, 2025 WL 720914; *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356,
2024 WL 5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL 5004534, at *6

precedent has recently come under attack, defendants agree that *Humphrey's Executor* remains

binding. *See* Defs.' Opp'n at 25; *Wilcox*, 2025 WL 720914, at *10 (describing defendants'

position that *Humphrey's Executor* has been repudiated); *id.* at *10-14 (explaining why

*Humphrey's Executor* remains binding); *Harris v. Bessent* ("*Harris IV*"), Nos. 25-5037, 25-5057,

2025 WL 1021435, at *1-2 (D.C. Cir. Apr. 7, 2025) (en banc) (explaining that the Supreme

Court has reaffirmed and not overturned *Humphrey's Executor* and *Wiener*).

USIP's leadership consists of a multimember board with all of the characteristics that

warranted upholding removal protections in *Humphrey's Executor*. Regarding the makeup of

that Board, like the FTC, USIP's Board is partisan balanced by statute (with no more than eight

of the fifteen voting members of the same political party). *See* 22 U.S.C. § 4605(c); *Humphrey's

Ex'r*, 295 U.S. at 624; *Seila L.*, 591 U.S. at 216. Its members must be experts in their field. *See*

22 U.S.C. § 4605(d) ("Each individual appointed to the Board under subsection (b)(4) shall have

appropriate practical or academic experience in peace and conflict resolution efforts of the

United States."); *Humphrey's Ex'r*, 295 U.S. at 624; *Seila L.*, 591 U.S. at 216. Their terms are

multiple years (up to two terms of four years each) and staggered to preserve the accumulation of

technical expertise and knowledge. *See* 22 U.S.C. § 4605(e); *Seila L.*, 591 U.S. at 216.

---

(W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-cv-445, 2024 WL 4594709, at *7
(W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*, No. 24-cv-2717, 2024 WL 4188068, at *9 (N.D. Ill. Sep.
13, 2024); *YAPP USA Automotive Sys., Inc v. NLRB* , 748 F. Supp. 3d 497, 505-11 (E.D. Mich. 2024).
    For the FTC, *see Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v.
FTC*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024).
    For the CPSC, *see Leachco Inc. v. CPSC*, 103 F.4th 748, 761-62 (10th Cir. 2024), *cert. denied*, 145 S. Ct.
1047 (2025); *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 351-52 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024);
*United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL 1116062, at *4 (D. Mass. Mar. 14, 2024).

**JA376**

USIP also exercises *de minimis*, if any, executive power under the Constitution.[32]  As previously explained, USIP's activities are largely nongovernmental in nature, "removed from the administration and enforcement of the public law."  *Buckley*, 424 U.S. at 139; *see supra* Part III.A.2.c.  USIP offers trainings, facilitates study groups, and conducts research—both traditional and on-the-ground.  *See supra* Part III.A.2.c.  USIP interacts with foreign groups to promote peaceful conflict resolution techniques, but USIP does not develop or implement American foreign policy, meet with official foreign representatives, or make foreign agreements.  *See id.*; *cf.* 22 U.S.C. § 3305(a) (describing the American Institute of Taiwan, which is explicitly directed to implement the President's foreign policy and any applicable agreements).  USIP's work may, at times, inform Executive branch decisions, but USIP does not act at the behest of the U.S. government, neither Congress nor the Executive branch.  *See supra* Part III.A.2.c.  Importantly, USIP does not do any of its work abroad *as* the U.S. government or representing any official part of it.  *See id.*  USIP therefore does not carry out any of the President's foreign affairs power.

USIP also does not engage in any execution of the law—either in the most traditional enforcement sense, or through adjudications, rulemaking, or interpretation of the law.  *See id.*  USIP does not determine private citizens' rights to public benefits, issue orders, investigate violations of the law, or impose sanctions, unlike the entities in *Humphrey's Executor* and *Wiener*.  *Cf. Humphrey's Ex'r*, 295 U.S. at 628 (describing the FTC's responsibility to "administer[] the provisions of the statute in respect of 'unfair methods of competition'"); *Wiener*, 357 U.S. at 350 (describing the War Claims Commission as adjudicating claims for compensating those with injuries from enemies during World War II); *see also Wilcox*, 2025 WL

---

[32]    The parties appear to agree that whether USIP exercises something more than *de minimis* executive power is the proper inquiry under *Seila Law*.  Pls.' Mem. at 29 (arguing that even under such a narrow interpretation, they should prevail); Defs.' Reply at 17-18.

**JA377**

720914, at *8 (describing the NLRB's authority to issue cease-and-desist orders and adjudicate

unfair labor practices); *Dong*, 125 F.3d at 879 (describing such activities as "typically

executive").

Even if USIP *were* exercising some degree of the Executive branch's foreign affairs

power, that would not take USIP outside the scope of *Humphrey's Executor*.  The War Claims

Commission in *Wiener* assessed "claims for compensating internees, prisoners of war, and

religious organizations, . . . who suffered personal injury or property damage at the hands of the

enemy in connection with World War II" and distributed funds from foreign sources accordingly.

357 U.S. at 350; *see also id.* at 355.  That function was a product of President's foreign affairs

power to "settle claims of American nationals against foreign governments"—an issue of

"international diplomacy."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415-16 (2003) (noting

generally that settling claims of American nationals against foreign governments is an issue of

international diplomacy).  Yet, the War Claims Commission was not considered "purely

executive" so as to differentiate it from the FTC and take it outside of *Humphrey's Executor*.

*See Wiener*, 357 U.S. at 356.  As defendants note, the Court in *Wiener* "did not examine the

subject matter of that body or use it in rendering its decision."  Defs.' Opp'n at 27.  That lack of

discussion on the subject area does not, as defendants suggest, *see id.*, imply that the Court was

ignorant of it, but rather indicates that the subject simply did not matter.  *See* Pls.' Mem. at 33.

The bottom line is that an entity conducting some activity relating to foreign affairs is not

necessarily exercising executive power under the Constitution.

Defendants argue that *Humphrey's Executor* and *Wiener* do not apply to USIP because

USIP does not exercise quasi-judicial or quasi-legislative authority like the FTC and War Claims

Commission and does not operate as an adjudicatory body or in a legislative capacity.  *See* Defs.'

Opp'n at 26.  The exercise of quasi-judicial or quasi-legislative authority, however, was not dispositive to those decisions; rather, those decisions used those terms to describe how the agencies were exercising something *other than core executive* authority.  *See Seila L.*, 591 U.S. at 218 (describing *Humphrey's* holding as allowing for-cause removal protections for "multimember expert agencies that do not wield substantial executive power").  The fact that USIP is exercising neither purely executive, nor quasi-judicial or quasi-legislative authority here—rather exercising minimal to no governmental authority at all—means the reasoning of those decisions applies *a fortiori*.[33]  An entity does not become *more* subject to presidential control because it exercises far less overall governmental power of any kind.  In contrast to agencies like the FTC and NLRB that exercise quasi-judicial and quasi-legislative authority, USIP has no decision-making authority, authority to direct the activities of citizens through rulemaking, or authority to impact their rights or distribute their property.  USIP, in short, as an institution of research and teaching, has far less authority and is in far less need of executive control to promote political accountability and prevent unchecked exercise of government power.  *See Seila L.*, 591 U.S. at 213-15 (describing the President's removal authority as furthering the need for such accountability).

---

[33]    In fact, *Seila Law* characterizes quasi-judicial and quasi-legislative powers as fundamentally executive under our constitutional scheme.  *See* 591 U.S. at 216 n.2 ("As we observed in *Morrison* . . ., '[I]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered "executive," at least to some degree.' *Id.*, at 690, n. 28.  *See also Arlington v. FCC*, 569 U.S. 290, 305, n. 4, (2013) (even though the activities of administrative agencies 'take "legislative" and "judicial" forms,' 'they are exercises of—indeed, under our constitutional structure they must be exercises of—the "executive Power"' (quoting Art. II, § 1, cl. 1))."). The fact that USIP does not exercise such powers at all cannot make it *more* executive and thus more subject to the President's removal authority.

    In any case, to the extent that an exercise of quasi-legislative or quasi-judicial powers matters, USIP exhibits some quasi-legislative power, as described *supra* Part III.A.2.c (discussing USIP's powers and activities), by making reports to Congress, conducting investigations, performing research, and facilitating congressional study groups.  *See* Pls.' Opp'n at 31-32; *see also Humphrey's Ex'r*, 295 U.S. at 628; *Seila L.*, 591 U.S. at 215; *Buckley*, 424 U.S. at 137.  That USIP cannot "influence congressional action," per 22 U.S.C. § 4604(n), does not mean USIP cannot engage in legislative support functions to provide reliable information for use by policy-makers, as defendants suggest.  Defs.' Reply at 18.

In any event, to the extent that the exercise of quasi-judicial or quasi-legislative authority is relevant in demonstrating the need for an agency's independence from the President and thus justifying removal protections, that rationale also applies here.  In *Humphrey's Executor*, the Court recognized the importance of adjudication conducted "with entire impartiality" based not on politics but "trained judgment" and expertise.  295 U.S. at 624 ("The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality."); *see also Seila L.*, 591 U.S. at 216.  That same virtue of political independence is central to USIP's work.  USIP's information-gathering and promotion of peaceful conflict resolution through conversations with unofficial foreign groups and factions can only occur, as previously explained, because USIP is independent from the Executive branch.  *See supra* Part III.A.2, n.29 and accompanying text.  USIP can meet with local stakeholders who are skeptical of the U.S. government to resolve conflict and reduce violence that could otherwise cause harm to American interests.  *See id.*  Just as with adjudicatory bodies like the FTC and NLRB, Congress struck a careful balance in creating USIP—providing opportunities for Executive branch input (*e.g.*, with Cabinet members serving on the Board), while protecting Board members from at-will removal to ensure the Institute has sufficient independence to achieve the statutory tasks Congress set out.

Further, in response to plaintiffs' argument that USIP does not wield "substantial executive authority," as *Seila Law* narrowly defined the inquiry under *Humphrey's Executor*, Pls.' Mem. at 31 (quoting *Seila L.*, 591 U.S. at 218); Pls.' Opp'n at 29 n.20, defendants contend that the degree of agency authority is not relevant under *Collins*, 594 U.S. at 252.  Defs.' Opp'n at 26-27.[34]  The Court in *Collins* rejected the argument that because the Federal Housing Finance

---

[34]    Ironically, as plaintiffs point out, the Solicitor General has adopted this language as the test under *Humphrey's Executor*.  *See* Pls.' Opp'n at 29 (quoting the Solicitor General explaining that the *Humphrey's* "exception . . . extends only to 'multimember expert agencies *that do not wield substantial executive power*,'" App. to Stay the Judgments of the U.S. Dist. Ct. for the Dist. of Columbia & Request for Admin. Stay at 3, *Trump v.*

**JA380**

Authority has more limited enforcement and regulatory authority compared to the CFPB, for

which the Court struck down removal protections in *Seila Law*, Congress should have "greater

leeway to restrict the President's" removal authority. 594 U.S. at 251. The Court explained that

"the nature and breadth of an agency's authority is not dispositive in determining whether

Congress may limit the President's power to remove its head." *Id.* at 251-52. The concerns

about electoral accountability for "the subordinates" "carry[ing] out [the President's] duties as

the head of the Executive Branch" apply "whenever an agency does important work." *Id.* at 252.

How this observation helps defendants is unclear. Plaintiffs do not try to distinguish between

USIP's regulatory authority and that of some other agency: USIP simply does not exercise any

executive power that the President needs to control at all. *See* Pls.' Opp'n at 30; *see also Harris*

*III*, 2025 WL 980278, at *22 (Henderson, J., concurring) (explaining that because *Collins*

involved a single head of any agency rather than a multimember board, "it is not clear that

*Collins*' instruction not to weigh up the nature and breadth of an agency's authority extends to

multimember boards"); *Morrison*, 487 U.S. at 691-93 (evaluating the permissibility of removal

restrictions based on the degree to which they impeded the President's ability to execute the

laws).

     Defendants additionally cite to a signing statement drafted by President Reagan when he

signed the USIP Act in 1984. *See* Defs.' Opp'n at 8 (citing Presidential Statement on Signing

the Department of Defense Authorization Act, 1985 ("Presidential Signing Statement") (Oct. 19,

1984), https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-

---

*Wilcox*, No. 24A, 2025 WL 1101716 (S. Ct. Apr. 2025) (emphasis in original) (quoting *Seila Law*, 591 U.S. at
218)). On reply, defendants appear to change course and embrace the "substantial executive power" inquiry. *See*
Defs.' Reply at 16-17 ("[T]he *Humphrey's Executor* exception only applies when an agency exercises no substantial
executive power. *Seila L.*, 591 U.S. at 216. That is, while insubstantial or incidental exercises of executive
authority will not, under *Humphrey's Executor*, force a court to invalidate for-cause removal protections of an
otherwise quasi-judicial or quasi-legislative agency, an agency that predominately exercises executive functions
plainly exercises substantial executive power.").

authorization-act-1985).  Reagan stated that the Act was "neither intended to, nor has the effect

of, restricting the President's constitutional power to remove" USIP Board members.

Presidential Signing Statement.  A signing statement expressing disagreement with part of a

statute is reflective of nothing more than the President's failure to convince Congress to make

the changes he desired.  In any case, the President's view that a statutory provision is

unconstitutional is simply not authoritative.  *See In re Aiken Cnty.*, 725 F.3d 255, 261 (D.C. Cir.

2013) (explaining that "the President . . . may decline to follow [a] statutory mandate or

prohibition if the President concludes that it is unconstitutional," such as through a signing

statement, but only "unless and until a final Court decision in a justiciable case says that a

statutory mandate or prohibition on the Executive Branch is constitutional").

Finally, the Court in *Seila Law* made several observations about why removal protections

for multimember boards are less of a threat to the President's ability to execute the laws and

political accountability than removal protections for single-head agencies that illustrate why

USIP's removal protections are constitutionally permissible here.  At bottom, the Court

expressed concern about a single leader of an agency, a "holdover Director from a competing

political party who is dead set *against*" the President's agenda.  591 U.S. at 225 (emphasis in

original).  A multimember structure with staggered terms, however, allows the President to exert

control as vacancies arise through his appointment power, and the new appointees can constrain

the remaining leaders.  *See id.* at 225.  Moreover, the multimember structure prevents unilateral

decision-making by an unelected official who could be subject to capture by private interests; a

multimember board "avoids concentrating power in the hands of any single individual."  *Id.* at

222-23.

**JA382**

All of these virtuous features are especially present in USIP.  The President has ample

control of the Board.  Board members have four-year terms that are staggered, allowing every

President to exercise his appointment power.  *See* 22 U.S.C. § 4605(e).  Moreover, three of the

Board's members—the Secretary of Defense, Secretary of State, and President of the National

Defense University—are subject to at-will removal, *id.*, and given the partisan balance

requirements, *id.* § 4605(c), the "constituency is guaranteed to always track the political party of

the President." Defs.' Opp'n at 1; *see also id.* at 19.[35]  The President's Cabinet members may

also supplement USIP's staff on certain projects, as the Secretary of State, Secretary of Defense,

and CIA can "assign officers and employees of his respective department or agency, on a

rotating basis to be determined by the Board, to the Institute." 22 U.S.C. § 4606(d)(2).  Those

factors protect political accountability through the President.  Additionally, the Board also

consists of fifteen voting members, *id.* § 4605(b)—a large body that avoids the risk of unilateral

decision-making and is thus more insulated from private capture or personal whims that could

impede democratic ideals.

The President also has broader for-cause removal power for USIP than he does for other

multimember agencies, such as the FTC ("inefficiency, neglect of duty, or malfeasance in

office," *Humphrey's Executor*, 295 U.S. at 619) or the NLRB ("upon notice and hearing, for

neglect of duty or malfeasance in office," 29 U.S.C. § 153(a)), diminishing any constitutional

concerns.  Similar to those agencies, the President can remove an appointed Board member "in

consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect

---

[35]    Given that only eight members can be of the same political party, an outgoing President will leave behind
no more than five of his party (given that the three *ex officio* members will follow him out and leave three
vacancies).  *See* 22 U.S.C. § 4605(c).  The incoming President can therefore guarantee, through appointments,
majority control by his party.

of duties, or inability to discharge duties." 22 U.S.C. § 4605(f)(1).  That is a classic for-cause

removal clause with a minor procedural requirement (to consult with the Board) even less

burdensome than the notice and hearing requirement for the NLRB.  With USIP, however, the

President may also remove a Board member without cause if eight members of the Board so

recommend—an option that seems readily available should there be a political disagreement,

given that the President will likely always have a majority of members of his party.  *Id.*

§ 4605(f)(2).  Further, the President can remove a Board member without cause upon a

recommendation of a majority of the members of the Committee on Foreign Affairs and the

Committee on Education and Labor of the House, or majority of the members of the Committee

on Foreign Relations and the Committee on Labor and Human Resources of the Senate.  *Id.*

§ 4605(f)(3).[36]

The ability for the President to monitor and guide USIP in these ways does not, as

defendants suggest, mean that USIP is actually a political entity and thus part of Article II.  That

question, as discussed, turns on what powers USIP exercises and the functions it serves.  *See*

*supra* Part III.A.2.  Rather, such presidential influence reflects a careful balance struck by

---

[36]    Section 4605(f)(3) does not reflect an impermissible reservation of removal authority by Congress, as
admonished in *Myers*, 272 U.S. 52.  The Court there held unconstitutional a statutory removal restriction that
required the President to receive advice and consent from the Senate before removing a postmaster general, which
was an unconstitutional exertion of legislative authority over the Executive branch.  *See generally id.*; *see also
Wilcox*, 2025 WL 720914, at *13 (explaining the takeaway from *Myers* as "[w]hile Congress may structure
executive branch offices via statute and legislate about the roles of executive branch officers, including standards for
their removal, Congress cannot reserve for itself an active role in the removal decision"); Defs.' Reply at 19 (hinting
at such a problem).  Section 4605(f)(3) does not pose the same concern for two reasons.  First, USIP is not part of
the Executive branch and does not exercise executive power in constitutional terms, so the problem in *Myers* and
*Bowsher*, 478 U.S. at 732, where officers exercising executive powers were subject to legislative removal—allowing
the legislature to exert undue control over the Executive branch—is not applicable.  Even if USIP were part of the
Executive branch, the fact that Congress may not act unilaterally to remove USIP Board members (instead requiring
presidential assent) also protects USIP from undue legislative oversight.

Second, the role envisioned for Congress here, unlike the restriction in *Myers*, does not exert a check on the
President's removal authority in any way because congressional consent is not needed at all for presidential removal.
Section 2605(f)(3) is an option for presidential removal *in addition* to the classic for-cause clause in (f)(1), thus
representing an expansion, not a constriction, of Presidential removal authority.  The President can remove a Board
member for-cause, § 4605(f)(1) without Congress playing any role at all; if the President would like to remove a
Board member at-will, he can also do so if certain members of Congress agree, *id.* § 4605(f)(3).

Congress: Congress created an entity that is subject to a certain amount of political control to ensure that the entity fulfills its statutory mandate and does not act in ways inconsistent with government interests but that operates independently and nonpolitically to exhibit stability, consistency, and neutrality concomitant with its existence as a peace-promoting and conflict-reducing organization. *See* Pls.' Opp'n at 14; Comm'n Rep. at 179 (describing the need for the Institute to be "insulat[ed] from diverting and perhaps damaging policy demands while ensuring responsiveness to policy interests, particularly at the federal level"). Regardless, even if these factors of political control by the President do make USIP a part of Article II, they resolve any presidential removal power concerns. The Constitution does not confer an absolute removal authority even over executive entities, as the discussion of *Humphrey's*, *Wiener*, and *Seila* have illustrated here.

*      *      *

The Court in *Humphrey's* closed the opinion by stating that "between the decision in the *Myers* case, which sustains the unrestrictable power of the President to remove purely executive officers, and our present decision that such power does not extend to an office such as that here involved, there shall remain a field of doubt." 295 U.S. at 632. On that spectrum, from *Myers*-like pure executive officers on one end, to multimember boards with quasi-judicial and quasi-legislative responsibilities like the FTC on the other, USIP is on the far side of the FTC—even further afield from *Myers*. USIP exercises no meaningful executive power—whether construed as "pure executive" or quasi-judicial or quasi-legislative in nature. Though USIP's governmental qualities allow for the Constitution to apply and for the Court to engage in this separation-of-powers inquiry, USIP does not fit within the Executive branch and, even if it does,

due to its lack of exercise of executive power, is not subject to at-will presidential removal

authority in contravention of statutory limits.

### C.    Plaintiffs Prevail on Counts One, Two, Three, Four, and Six.

Given that 22 U.S.C. § 4605(f), providing USIP Board members with removal

protections, is not unconstitutional, the President's removal of all appointed Board members was

unlawful, *ultra vires*, and a violation of that provision of the USIP Act.  Plaintiffs therefore

prevail on Count One (*ultra vires* action) and Count Two (violation of § 4605(f)).  *See* Am.

Compl. ¶¶ 71-85.[37]  The unlawfulness of the President's removal decisions also renders unlawful

all of the actions that flowed from that.  The three *ex officio* members, acting just the three of

them, did not have the authority to remove Amb. Moose as president of USIP.  That decision

required an act of the legitimately constituted Board, which given the unlawfulness of the

removals, consisted of ten other members.  *See* 22 U.S.C. § 4606(a) ("The Board shall appoint

the president of the Institute.").  Plaintiffs therefore also prevail on Count Three.  *See* Am.

Compl. ¶¶ 86-92.  Likewise, the appointments of defendants Jackson and Cavanaugh as

President of the Institute by a subset of the Board, consisting solely of the three *ex officio*

members, was not a valid action taken by USIP's Board and is likewise void, so plaintiffs prevail

on Count Four.  *See id.* ¶¶ 93-99; XMSJ Hr'g Tr. at 50:10-51:4, 58:22-59:10 (both parties

agreeing that Cavanaugh is included under Count Four because he is automatically substituted

for Jackson as the new USIP president in his official capacity).

Plaintiffs are additionally entitled to summary judgment on their trespass and ejectment

claim in Count Six against defendants Jackson, U.S. DOGE Service, and U.S. DOGE Service

---

[37]    Plaintiffs alternatively argue that that they should "prevail on Count[] I . . . for the independent reason that Defendants have unlawfully ceased the Institute's corporate activities, in contravention of the USIP Act," Pls.' Mem. at 38, but, given that plaintiffs prevail on Count One on the basis of defendants' unlawful removal of USIP's Board members, this alternative argument need not be considered.

Temporary Organization.  Am. Compl. ¶¶ 103-14.  At the time when defendants entered USIP's

headquarters building (mid-March 2025), that building lawfully belonged to USIP, and because

removal of plaintiffs was unlawful, plaintiff Board members, Amb. Moose, and non-plaintiff

Board members were still lawfully in control of the property.  Plaintiffs have demonstrated that

USIP, not the U.S. government, privately owned the building and in fact had paid significant

private funds to build it, and USIP maintained jurisdiction over the real property on which the

building sat.  *See* Letter from Sec'y of Navy to President of USIP (Nov. 21, 1996) (transferring

administrative jurisdiction over the real property to USIP); Notice of Transfer of Jurisdiction;

Pls.' SUMF ¶¶ 7-9 ("The building was initially funded with about $70 million of private

contributions and $99 million of funds specially appropriated by Congress.").  Defendants

therefore did not have lawful authority to enter USIP's headquarters when its president so

forbade.  *See* XMSJ Hr'g Tr. at 51:10-18 (plaintiffs' counsel stating that "normally, the president

of the entity would be able to determine who can come in" to the building).

Further, because USIP's Board members and president Moose were wrongfully removed,

defendant Cavanaugh was also not legally appointed and had no authority to transfer the property

from USIP to GSA.  *See* Defs.' Opp'n to Pls.' All Writs Act Motion, Exs. 1, 3, and 4, ECF No.

15-1, 15-3, 15-4 (documents effectuating transfer of property from USIP to GSA).  That transfer

is thus null and void, and plaintiffs maintain rightful ownership of property.  *See Est. of Ellis by

Clark v. Hoes*, 677 A.2d 50, 51 (D.C. 1996) ("[A] common law action in ejectment . . . asserts a

claim to real property wrongfully in the possession of another.").[38]

---

[38]    Defendants argue merely that "there can be no trespass" because the "ex officio members did in fact
appoint Jackson to be the Institute's president."  Defs.' Opp'n at 29.  Defendants' sole objection to the trespass
claim, therefore, presumes the other claims' success on the merits—that the *ex officio* members' appointment of
Jackson was valid, when it was not.

### D.    Relief

Plaintiffs are entitled to relief on Counts One, Two, Three, Four, and Six.[39]  Plaintiffs

request both declaratory and injunctive relief.  *See* Pls.' Proposed Order, ECF No. 20-38.

#### 1.    *Declaratory Relief*

Defendants do not contest that plaintiffs are entitled to declaratory relief if they prevail on

the merits.  In addition to the straightforward declarations stemming from prevailing on the legal

claims as already articulated and to which plaintiffs are entitled, *see supra* Part III.C, plaintiffs

request a number of more detailed declarations.

First, plaintiffs request that all actions taken or authorized by Jackson or Cavanaugh at

the time they were acting as presidents of USIP be declared null and void.  *See* Pls.' Proposed

Order at 2.  Indeed, because of their improper appointment, all actions taken by defendants

Jackson and Cavanaugh for USIP were *ultra vires* and lacked legal effect.  In defendants' words,

it is "all fruit of a poisonous tree."  XMSJ Hr'g Tr. at 61:10-11.  Notably, defendants make no

effort to defend any actions by Jackson or Cavanaugh in the event their appointments are found

to be invalid.  For example, defendants do not even suggest here that such actions were ratified

by a lawful president or a lawful constituency of USIP's Board or that they are immunized by

some remnant of the *de facto* officer doctrine.  *See Ryder v. United States*, 515 U.S. 177, 180-85

(1995) (noting that the Court applied that doctrine, which confers "validity upon acts performed

by a person acting under the color of official title even though it is later discovered that the

legality of that person's appointment or election to office is deficient," in cases like *Buckley*, 424

U.S. at 142, but limiting those cases to their facts and declining to apply it there); *Guedes v.*

---

[39]    Plaintiffs also pled a "freestanding Declaratory Judgment Act Claim," Count Seven.  Defs.' Opp'n at 30;
Am. Compl. ¶¶ 115-16.  Indeed, as defendants point out, that Act does not provide an independent cause of action.
Defs.' Opp'n at 30; *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2021) (holding the Act does not "provide a cause
of action").  Plaintiffs are nonetheless entitled to declaratory relief as a remedy on their other claims.

**JA388**

*Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 12 (D.C. Cir. 2019) (describing how ratification can make valid an action previously undertaken by an unlawfully appointed officer); *see generally* Defs.' Opp'n.  Plaintiffs are therefore entitled to a declaration on this point as requested.

Second, plaintiffs request that "the transfer of USIP's financial assets to GSA be declared unlawful, null and void, and without legal effect."  Pls.' Proposed Order at 2.  Given that transfers of any USIP assets effectuated by Jackson or Cavanaugh were indeed invalid for the same reason as just explained, the transfers must be considered void.

Third, plaintiffs request a declaration that the "resolution adopted by two Directors purportedly appointing Adam Amar as president of the Endowment of the United States Institute of Peace Fund and authorizing and instructing him to transfer all of the Endowment's assets to USIP was unlawful, null and void, and without legal effect." *Id.*  While plaintiffs did not separately challenge Amar's appointment and the removal of the former Endowment president, this appointment was improper for the same reasons as were Jackson and Cavanaugh's appointments under Count Four.  *See supra* Part III.C.  An act of two *ex officio* members did not constitute a valid decision by the Board.  Likewise, any actions subsequently taken by Amar, such as transferring assets out of the Endowment, were invalid because Amar lacked authority to take such actions.

### 2.    *Injunctive Relief*

In addition to declarations, to be entitled to injunctive relief, plaintiffs must demonstrate (1) they have suffered an irreparable injury, (2) remedies available at law are inadequate to compensate for this injury, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *Monsanto Co v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S.

**JA389**

388, 391 (2006)).  Defendants contest the availability of injunctive relief, notwithstanding

plaintiffs' success on the merits.  Defs.' Opp'n at 30-32.

**a.**    ***Irreparable Harm and Inadequate Remedies at Law***

Plaintiffs have demonstrated that they, as officials of the Institute and the Institute, are

suffering irreparable harm that cannot be remedied in the absence of an injunction.[40]  Given that

the removals of plaintiffs as Board members and president of USIP were void, they remain in

their positions so as to be able to assert injuries on behalf of the Institute.  *See supra* n.8.

First, plaintiff Board members suffer a recognized irreparable harm from the "unlawful

removal from office by the President" and "the obviously disruptive effect" that such removal

has on the organization's leadership.  *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5

(D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983); *Wilcox*, 2025 WL

720914, at *15.  Plaintiffs have been "deprived of a presidentially appointed and congressionally

confirmed position of high importance," eliminating their ability to carry out their congressional

mandate in furthering the development of peace studies—which cannot be retroactively cured by

money damages.  *Wilcox*, 2025 WL 720914, at *15.  Plaintiff Moose has likewise been deprived

of a unique, irreplicable position to carry out USIP's important mission.[41]

---

[40]    These two factors are often considered together.  *See, e.g.*, *Wilcox*, 2025 WL 720914, at *15 n.20.

[41]    Some cases have suggested that plaintiffs do not suffer irreparable harm from deprivation of operating in a
congressionally created position where the entity continues to operate.  *See, e.g.*, *English v. Trump*, 279 F. Supp. 3d
307, 335-36 (D.D.C. 2018) (considering challenge brought by Deputy Director of the CFPB in the absence of any
concern that the CFPB was shutting down).  In *Berry* and *Wilcox*, by contrast, the challenged removals resulted in a
complete shut-down of the agency's work.  Here, technically USIP still exists with its three *ex officio* board
members and Cavanaugh as president, but defendants' actions here call into question whether USIP will continue to
operate in the future and have foreclosed the possibility that, without injunctive relief, USIP will operate in a fashion
similar to how it did previously.  "[B]ecause [plaintiffs] can likely establish that [they are] the lawful president [and
directors] of the organization, [their] right to serve in that role is inextricably intertwined with the organization's
survival."  *See Aviel v. Gor*, -- F. Supp. 3d --, 2025 WL 1009035, at *11 (D.D.C. Apr. 4, 2025).  That harm is thus
not similar to *English* and not remediable by monetary damages.  Regardless, plaintiffs have demonstrated multiple
other forms of harm experienced here.

93

**JA390**

Second, plaintiffs and the Institute suffer from a loss of USIP's independence and a harm to its reputation.  *See* Pls.' Mem. at 41-42; *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (citing cases for the principle that reputational harm is irreparable absent an injunction).  As explained, much of USIP's work is contingent upon relationships of trust and community partnerships around the world that allow USIP to develop insights and promote principles of peaceful conflict resolution.  *See supra* Part III.A.2.c.  The ability of USIP—and plaintiffs—to carry out that work is harmed if the Institute and its leaders are seen as political agents of the U.S. government.  *See Harris v. Bessent* ("*Harris I*"), -- F. Supp.3d --, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18, 2025) ("By vindicating their rights to occupy those offices, these plaintiffs act as much in their own interests as those of their [Institute]. . . .  Striking at the independence of these officials accrues harm to their offices, as well."); *Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence [of the removal power] threatens the independence of a commission.").[42]

Third, the actions taken by defendants Jackson and Cavanaugh after the removal of plaintiffs, including termination of staff and the transfer of property, Pls.' SUMF ¶¶ 52-54, 56; Pls.' Add'l SUMF ¶ 6, have resulted in USIP's loss of significant human capital and expertise (both that of leaders and staff members) developed over years of experience and a unique building that is symbolic of USIP's mission.  *See* Pls.' Mem. at 40.  Regarding the loss of talent and expertise, courts have recognized "the difficulty, if not impossibility, of quantifying in monetary terms the injury from losing highly skilled and experienced employees." *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024); *see also Beacon*

---

[42]     Plaintiffs also express concern about loss of donor confidence and the resultant financial harm this would impose.  Pls.' Mem. at 41.  Such potential loss of donations is both difficult to quantify and too speculative on the record in this case to warrant equitable relief.

*Assocs.*, 308 F. Supp. 3d at 288-89 (recognizing that without employees' "institutional

knowledge and reputation" an organization may be at a "strategic disadvantage").  Regarding

USIP's distinctive headquarters building, which was transferred to GSA, that asset and its

location in downtown Washington, D.C., cannot be simply replaced by money and the purchase

of an alternative property.  "The USIP building is unique—its design intended to reflect and

functionally aid the Institute's mission."  Pls.' SUMF ¶ 77.  Moreover, "the Institute's

headquarters building . . . at last sight maintained a display of five carved doves in the foyer,

each bearing the name of a staff member who was lost in a conflict zone."  Terminated Emps.

Amicus Br. at 9.  All of those losses will greatly hamper the Institute's ability to carry out its

statutory functions and make it more difficult for plaintiffs, upon return to their roles, to fulfill

their responsibilities.

### b.    *Balance of the Equities and Public Interest*

The balance of the equities and public interest favor injunctive relief here.  *See Nken v.

Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese two

factors merge"); *see also Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal

Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (applying the merged factors in permanent

injunction context).  Defendants have no cognizable interest in unlawfully exercising removal

power over USIP Board members or in retaining control of an Institute that is premised on such

unlawful actions.  Should the President wish to exercise more control over the Institute, he could

seek to satisfy the 22 U.S.C. § 4605(f) requirements—either removing plaintiffs for cause or

removing plaintiffs upon recommendation of other Board members or with consent of certain

congressional committees.  Should the President wish to reduce USIP's activities, he could have

his Secretaries of State or Defense encourage the Board members to make changes or encourage

Congress to reduce the Institute's funding.  He has no cognizable interest, either, in eliminating a

congressionally established entity. "[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Harris I*, 2025 WL 521027, at *9 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

Putting aside USIP's important work and any benefits such work may accrue to American citizens, the public surely has an interest in government officials following the law. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The public also has an interest in independent entities retaining their operational status consistent with the political branches' joint judgments embodied in statute, notwithstanding the political whims of a given president, who has constitutional duties to fulfill in faithfully taking care to execute laws and who has multiple legally permissible mechanisms to alter prior political branch judgments. *See Harris I*, 2025 WL 521027, at *9.

Defendants suggest that the equities instead weigh in their favor because "if Plaintiffs are reinstated and the government prevails after appellate review, any actions the Institute takes with Plaintiffs as directors will need to be reconsidered by the future directors, which may interfere with the Institute's ability to address future actions and interfere with the GSA's ability to utilize the building." Defs.' Opp'n at 32. "The possibility of future changes in the law is not enough, however, to permit . . . unlawful termination[s]." *Wilcox*, 2025 WL 720914, at *17. Defendants' unlawful actions have already so severely interfered with the Institute's functioning that they cannot now claim that undoing such unlawful actions will be against the public interest. Plaintiffs are therefore entitled to injunctive relief.

        **c.**     ***Plaintiffs' Entitlement to Requested Remedies***

**JA393**

Considering the specific form that injunctive relief should take, plaintiffs' Proposed

Order requests directions in four areas, each of which is discussed below. *See* Pls.' Proposed

Order.

### (i)    *Resuming Plaintiff Board Members' Positions on the Board*

Plaintiffs first request an order "that the Institute's Board members duly appointed under

22 U.S.C. § 4605(b)(4) shall continue to serve in accordance with 22 U.S.C. § 4605(e) and may

be removed only in conformity with 22 U.S.C. § 4605(f)." *Id.* at 2. Defendants argue that this

relief would be improper for three reasons. First, defendants posit that "*de jure* reinstatement of

a principal officer is beyond the equitable authority of the court to impose" because it

"impinges" on the President's power to control the executive branch." Defs.' Opp'n at 30-31

(quoting *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025)).

As an initial matter, plaintiffs are not part of the Executive branch, so this concern about

infringing on the President's "conclusive and preclusive" authority to control his subordinates,

*id.* at 30, is easily dismissed. More significantly, plaintiff Board members need not formally

reinstated to positions they never lost. Plaintiffs thus can achieve all the practical relief they

need by an order declaring the initial removal void *ab initio* and enjoining defendants from

interfering with plaintiffs' resumption of responsibilities as Board members. *See, e.g.*, *Wilcox*,

2025 WL 720914, at *16; *Harris v. Bessent* ("*Harris II*"), -- F. Supp. 3d --, No. 25-412 (RC),

2025 WL 679303, at *10-12 (D.D.C. Mar. 4, 2025); *Severino v. Biden*, 71 F.4th 1038, 1042-43

(D.C. Cir. 2023) (holding that a plaintiff's injury was redressable because the court could

"reinstate a wrongly terminated official '*de facto*,' even without a formal presidential

reappointment").

**JA394**

Second, defendants assert that this Court cannot enjoin the President in his official duties, suggesting reinstating plaintiffs would constitute an injunctive order against the President. Defs.' Opp'n at 31.  Defendants are mistaken: In *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), the D.C. Circuit made clear that injunctive relief could run against inferior officials who could *de facto* reinstate a plaintiff by allowing him to exercise the privileges of office, which would just as well remedy the plaintiff's harm.  *See id.* at 980; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" (second alteration in original) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment))).

Third, defendants argue that reinstatement of a public official was not a remedy historically available at equity, so this Court cannot "restrain by injunction the removal of a [public] officer."  Defs.' Opp'n at 31-32 (alteration in original) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).  This argument ignores the fact, however, that plaintiffs are not asking for a formal injunction against removal or ordering reinstatement—rather, only a declaration making their terminations void *ab initio* and an injunction allowing plaintiffs to carry on their positions as they did before.  *See Grundmann v. Trump*, -- F. Supp.3d --, 2025 WL 782665, at *16 (D.D.C. Mar. 12, 2025) (explaining that the lack of any remedy for formal reinstatement at equity "does not clearly extend to *de facto* reinstatement; nor does the Government offer a theory for how it could").[43]

---

[43]    In any case, as plaintiffs point out, Pls.' Opp'n at 42, reinstatement was previously available as a legal remedy through a writ of mandamus.  *See White v. Berry*, 171 U.S. 366, 377 (1898).  So, if the fact that unlawful removal of public officials was historically addressed through legal writs (such as mandamus) instead of equitable injunctions means equitable relief is unavailable here, "a writ of mandamus would likely be available, and the

98

**JA395**

Relief allowing plaintiffs to continue their roles as Board members without interference is therefore proper. Nevertheless, such injunctive relief will run only against subordinate defendants (not the President) and will be limited to the plaintiff Board members named before this Court. "[I]njunctive relief should be no broader than necessary to provide full relief to the aggrieved party." *Free Speech Coal., Inc. v. Att'y Gen.*, 974 F.3d 408, 430 (3d Cir. 2020) (alteration in original) (quoting *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 170 (3d Cir. 2011)). Plaintiff Board members' harms (being deprived of their positions, loss of independence, and harm to reputation) will be fully remedied by a declaration that the Board members' removals were unlawful and an injunction forbidding interference with their resumption of duties.

### (ii)    Resuming Plaintiff Moose's Position as USIP President

Plaintiffs next request an order that "Ambassador Moose may not be removed or in any way treated as having been removed, or otherwise be obstructed from his ability to carry out his respective duties, except as provided in . . . 22 U.S.C. §§ 4601-611." Pls.' Proposed Order at 2. Such injunctive relief follows from the declaration that Amb. Moose's removal was unlawful under 22 U.S.C. § 4606(a), given that the Board members' removal was unlawful, so the *ex officio* Board member defendants had no authority to remove him. Defendants do not raise any concerns with relief for Amb. Moose apart from the relief for other Board members.

### (iii)    Enjoining Further Trespass Against Property

---

effective relief provided to plaintiff[s] would be the same." *Wilcox*, 2025 WL 720914, at *16 n.22; *Swan*, 100 F.3d at 976 n.1 (noting "that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty"). Plaintiffs indeed referenced 18 U.S.C. § 1361, which allows district courts to issue writs of mandamus, in their Amended Complaint. *See* Am. Compl. at 18, 19, 21, 22 (mentioning this statute in Counts One through Four).

Plaintiffs request an order that "Defendants are enjoined from further trespass against the real and personal property belonging to the Institute and its employees, contractors, agents, and other representatives." Pls.' Proposed Order at 3. Defendants likewise do not specifically challenge this relief. The requested relief flows from the declaration that defendants' transfer of property out of USIP was invalid because they lacked the legal authority to effectuate the transfer (as illegitimate presidents of USIP). The headquarters building remains in USIP's possession, as does any personal property within it, and defendants may not take further action to reassign or transfer it.[44] This relief cannot run against those defendants who are *ex officio* Board members since, as lawful members of the Board, these three defendants may access USIP headquarters.

### (iv)    Enjoining Defendants from Maintaining Control over Institute Resources or Name.

Lastly, plaintiffs request that defendants be "enjoined from maintaining, retaining, gaining, or exercising any access or control over the Institute's offices, facilities, computer systems, or any other records, files, or resources, and from acting or purporting to act in the name of Institute, and from using the Institute's name, emblem, badge, seal and any other mark of recognition of the Institute." *Id.* At the hearing, plaintiffs amended this request to exclude the *ex officio* members of the Board from this injunction, given that due to their roles, they may

---

[44]    In plaintiffs' motion for relief under the All Writs Act to suspend defendants' transfer of property to GSA, plaintiffs expressed concern about getting the property returned by GSA even were the transfer found to have been improper. *See* Pls.' Mot. to Suspend Transfer of Prop. ¶¶ 8-9, ECF No. 14. Plaintiffs anticipated that in such an "event Defendants [would be] likely to contend that Plaintiffs' only recourse is to file a new complaint under the Quiet Title Act" with respect to real property and "seek relief from the Court of Federal Claims under the Tucker Act" for personal property, "including financial assets." *Id.* Defendants, however, have not so contended. *See* Defs.' Opp'n; *see also* Defs.' Opp'n to Mot. to Suspend Prop., ECF No. 15 (not making that argument). No precise details are set out in the order as to how the voided transfer of property shall be restored to plaintiffs, and no more should be necessary for the Administration and all of its components to comply fully and in good faith with the order issued to restore the USIP headquarters based on the declaration that the transfers undertaken by defendants were invalid and *ultra vires* and that defendants may not unlawfully enter or seize USIP property.

lawfully, to the extent allowed by their Board positions, control, maintain, and access USIP's

records and in certain contexts, use USIP's name and mark.  XMSJ Hr'g Tr. at 53:11-54:12.

Defendants do not specifically challenge this requested relief, and plaintiffs are so entitled, as

amended.

## IV.    CONCLUSION

The President second-guessed the judgment of Congress and President Reagan in

creating USIP 40 years ago, and the judgment of every Congress since then, including in 2024,

in appropriating funds to USIP, when he deemed this organization to be "unnecessary" three

months ago in EO 14217.  The President and his subordinates then used brute force and threats

of criminal process to take over USIP's headquarters, despite being cautioned that this

organization did not fall within the Executive branch and its leadership was not subject to the

President's unilateral Executive branch removal power.  This Administration then went even

further, taking severe actions to dissemble USIP, including terminating its appointed Board

members, its expert management, its dedicated staff and contractors located in both Washington,

D.C. and around the world, and dispersing its assets and headquarters building.  These actions

against USIP were unlawful.

USIP ultimately exercises no Executive branch power under the Constitution but

operates, through research, educational teaching, and scholarship, in the sensitive area of global

peace.  In creating this organization, Congress struck a careful balance between political

accountability, on the one hand, and partisan independence and stability, on the other.

Presidential appointment of Board members and the presence of two Cabinet members and the

National Defense University President helps ensure that USIP's work is supportive of and

consonant with U.S. interests, while removal protections and partisan balance requirements

**JA398**

ensure the accrual of expertise over time, long-term strategic prioritization, and insulation from political whims.

The Constitution makes clear that the President's constitutional authority only extends as far as Article II, but even Article II does not grant him absolute removal authority over his subordinates, under current binding caselaw precedent. Outside of Article II, he has little constitutional authority to act at all. The President's efforts here to take over an organization outside of those bounds, contrary to statute established by Congress and by acts of force and threat using local and federal law enforcement officers, represented a gross usurpation of power and a way of conducting government affairs that unnecessarily traumatized the committed leadership and employees of USIP, who deserved better.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: May 19, 2025

_____
**BERYL A. HOWELL**
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE FOR PEACE,
et al.,

                    Plaintiffs,

          v.

KENNETH JACKSON,
Assistant to the Administrator for
Management and Resources for USAID, et al.,

                    Defendants.

Civil Action No. 25-0804 (BAH)

## <u>NOTICE OF APPEAL</u>

Defendants respectfully provide notice that they hereby appeal to the United States Court

of Appeals for the District of Columbia Circuit from the Court's Order of May 19, 2025 (ECF

No. 39), and supporting Memorandum Opinion (ECF No. 40), which granted Plaintiffs' motion

for summary judgment and denied Defendants' motion for summary judgment.

Dated: May 21, 2025
          Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By: _____/s/ Brian P. Hudak_____
          BRIAN P. HUDAK
          Chief, Civil Division
          601 D Street, NW
          Washington, DC 20530
          (202) 252-2549

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES INSTITUTE FOR PEACE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KENNETH JACKSON, *in his official capacity*, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-804 (BAH) <br><br> **Judge Beryl A. Howell** |

## <u>ORDER</u>

Two days after this Court's order granting summary judgment to the United States Institute of Peace ("USIP" or "the Institute") and its Board members, Order, ECF No. 39, defendants President Donald J. Trump, various DOGE administrators, and the new purported presidents of USIP filed a motion to stay that judgment pending appeal. *See* Defs.' Mot. to Stay ("Defs.' Mot."), ECF No. 42. Plaintiffs oppose a stay. *See* Pls.' Opp'n to Defs.' Mot. to Stay ("Pls.' Opp'n"), ECF No. 45. This Court declared that President Trump's termination of USIP Board members violated the statutory removal protections in 22 U.S.C. § 4605(f), and because those protections posed no constitutional problem, the terminations were null and void. *See* Order at 1. This Court also declared null and void actions taken as a result of those improper removals, including the removal and replacement of USIP President Ambassador Moose, as well as the transfer of property and other actions taken by those illegitimately installed replacements. *Id.* at 2-3. This Court then ordered that plaintiff Board members and Ambassador Moose remain in their leadership positions for USIP and may not be treated as having been removed, among

1

other concomitant relief. *Id.* at 3. For the reasons explained below, defendants' motion to stay this Court's Order is **DENIED**.

Whether a stay is appropriate depends on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "The first two factors of the traditional standard are the most critical," *id.*, and the showing of likelihood of success must be "substantial," *Citizens for Resp. & Ethics in Washington* ("*CREW*") *v. Fed. Election Comm'n*, 904 F.3d 1014, 1018 (D.C. Cir. 2018).

For all of the reasons explained in this Court's Memorandum Opinion, defendants have not made the requisite showing that they are likely to succeed on the merits. *See* Mem. Op., ECF No. 40; *United States Inst. of Peace v. Jackson*, -- F. Supp. 3d --, 2025 WL 1428641 (D.D.C. May 19, 2025). President Trump removed the USIP Board members without complying with the statutory requirements in 22 U.S.C. § 4605(f). *See USIP*, 2025 WL 1428641, at *7. Defendants did not argue that the President met those requirements but rather challenged the constitutionality of the statutory removal restrictions, arguing that USIP is part of the Executive branch and its Board members are subject to at-will presidential removal under Article II of the Constitution. *See id.* at *12. As the Court explained, however, while USIP may be considered part of the federal government, USIP does not exercise executive power and thus is not part of the Executive branch, so the President does not have absolute constitutional removal authority over USIP Board members but must comply with the statute in exercising his removal power. *See id.* at 14-34. Further, even if USIP *were* part of the Executive branch, Congress's restrictions on the

**JA402**

President's exercise of constitutional removal authority in 22 U.S.C. § 4605(f) would be

permissible under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny,

given USIP's Board's multimember structure and *de minimis*, if any, exercise of executive

power.  *See USIP*, 2025 WL 1428641, at *34-39.  Thus, whether USIP is or is not part of the

Executive branch, the President must comply with the various mechanisms at his disposal, as

provided in the statute, 22 U.S.C. § 4605(f), to remove members of USIP's Board.

      Contrary to defendants' suggestion, the Supreme Court's recent stay in *Trump v. Wilcox*

has no bearing here.  *See Trump v. Wilcox* ("*Wilcox* Stay Order"), No. 24A966, -- S. Ct. --, 2025

WL1464804 (May 22, 2025); *see* Defs.' Notice of Supp'l Auth, ECF No. 44; Pls.' Opp'n at 3.

The Supreme Court there opined that the National Labor Relations Board ("NLRB") and Merit

Systems Protection Board ("MSPB") "exercise considerable executive power" and thus invoked

concerns about the President's Article II removal power.  *Wilcox* Stay Order at *1.  As explained

in the Memorandum Opinion, USIP exercises considerably *less* executive power than such

agencies.  *See USIP*, 2025 WL 1428641, at *36.  USIP is rather a "uniquely structured, quasi-

private entity that follows in the distinct historical tradition of the First and Second Banks of the

United States,"—the kind the Supreme Court explicitly noted are not "implicate[d]" by its stay

decision.  *Wilcox* Stay Order at *1; *Lebron v. Nat'l R. R. Passenger Corp.*, 513 U.S. 374, 386-87

(in considering the quasi-private yet governmental character of Amtrak, "plac[ing] [it] within its

proper context in the long history of corporations created and participated in by the United States

for the achievement of governmental objectives," the "first" of which "was the Bank of the

United States"); *USIP*, 2025 WL 1428641, at *20-22 (analogizing USIP to Amtrak when

analyzing its hybrid characteristics).

**JA403**

Defendants insist that the Court erred in concluding that USIP could be part of the government while not falling within one of the three branches. *See* Defs.' Mot. at 5-6. Defendants' cited authorities do not, however, hold that every entity must fall squarely within one of the three branches, and as the Court has previously pointed out, other entities also fall outside of this tripartite structure. *See USIP*, 2025 WL 1428641, at *24-26.[1]  Refraining from classifying USIP as squarely within a particular branch does not make it "unanswerable to the electorate or the Judiciary," as defendants contend.  Defs.' Mot. at 5.  To the contrary, the Institute is highly responsive to both Congress and the Executive branch through numerous oversight mechanisms (including mandatory biennial reporting to both branches), control of appropriations on which the organization is largely dependent, the President's ability to appoint all voting Board members (including two that are part of his Cabinet), and the President's broad—though not limitless—removal authority. *See USIP*, 2025 WL 1428641, at *38.[2]

Moreover, defendants' argument that USIP exercises "core executive powers" because the Institute "promot[es] peace and alternatives to war, including by distributing directly appropriated funds to private entities" and "travel[s] to foreign countries and attempt[s] to

---

[1]    This Court's Memorandum Opinion addressed explicitly many of the cases cited by defendants in their Stay Motion. *See USIP*, 2025 WL 1428641, at *24-26; Defs.' Mot. at 5-6.  Those not previously explicitly addressed likewise do not clearly hold that every governmental entity must fall within one of the three branches, nor are any of them binding on this Court. *See* Defs.' Mot. at 5-6; *VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 24-cv-2577 (TNM), 2024 WL 5056358, at *7 (D.D.C. 2024) (explaining that regulatory agencies are generally considered part of the executive branch, even when performing adjudicatory functions); *Commonwealth Edison Co. v. U.S. Nuclear Regul. Comm'n*, 830 F.2d 610, 619 (7th Cir. 1987) (using process-of-elimination reasoning to hold only that the Nuclear Regulatory Commission is an "executive or legislative agency" for a particular statutory purpose); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 787 F.2d 875, 896-97 (3d Cir. 1986) (Becker, J., concurring in part) (opining, only in a concurrence in a case that was subsequently reheard after the Supreme Court's opinion in *Bowsher v. Synar*, 478 U.S. 714 (1986), that agency powers must "fit within a government of three branches"); *see also* Pls.' Opp'n at 5-6 (distinguishing these cases).

[2]    *See also* 22 U.S.C. § 4611 (biennial reporting to Congress and the President); *id.* § 4607(g)-(h) (requiring an annual audit that is reported to Congress); *id.* § 4606(d)(2) (allowing the Secretary of State, Secretary of Defense, and the CIA Director to assign their own officers to the Institute for certain projects); *id.* § 4605(b) (providing for presidential appointment of Board members); *id.* § 4605(f)(2)-(3) (describing how the President may remove Board members without cause upon recommendation of eight other voting Board members or upon recommendation of a majority of certain House and Senate committees).

**JA404**

negotiate peace" is both legally and factually wrong.  Defs.' Mot. at 6-7.  Those activities are

not, as defendants suppose, inherently executive just because they involve foreign relations.  As

the Court explained, NGOs regularly engage in similar activities.  *See USIP*, 2025 WL 1428641,

at *33.  What matters is whether the entity is doing so under the auspices of the President of the

United States.  *See id.*  USIP neither represents nor acts on behalf of the Executive branch, and

instead operates abroad as an independent think tank.  *See id.* at *30-32.  Further, defendants

misrepresent the activities USIP undertakes abroad.  USIP is a scholarly, research-oriented,

educational institution or "think tank."  While its focus on peace leads USIP to deliver

workshops, conduct field research, and facilitate discussions on the subject of resolving conflicts,

the Institute in no way occupies the same role as the Executive branch in formally negotiating

foreign agreements.  *See id.* at *29-32.  Defendants' overly generic view of Executive power is

perhaps convenient, one conducive to aggrandizing presidential authority, but this Court must

take a more scrutinizing approach to the nature of executive power under the Constitution and

the character of the authority USIP wields.  *See Kuretski v. Comm'r of Internal Revenue*, 755

F.3d 929, 941 (D.C. Cir. 2014) (instructing courts, when resolving separation-of-powers

disputes, to look not to the nature of a particular branch's power "in 'an enlarged sense'" but

rather in the specific sense as meant by the Constitution (quoting *Murray's Lessee v. Hoboken

Land & Improvement Co.*, 592 U.S. 272, 280 (1856))).

Defendants next argue that the Court's issuance of injunctive relief was improper but cite

only dissenting opinions in support of that point.  *See* Defs.' Mot. at 7; *see also USIP*, 2025 WL

1428641, at *44 n.43 (noting that mandamus relief would be proper if injunctive relief were not).

The questions before this Court were indeed "novel," Defs.' Mot. at 1, but novelty is no

substitute for failure to demonstrate likelihood of success on the merits.

5

**JA405**

Indeed, defendants' failure to show likelihood of success is "an arguably fatal flaw for a stay application," *CREW*, 904 F.3d at 1019, but regardless, defendants also fail to satisfy the other factors.  Defendants do not describe any cognizable harm they will experience without a stay, let alone an irreparable one.  *See* Defs.' Mot. at 7-8 (describing only the harm of "unwinding" Executive branch efforts that were never lawful to take and spending of government funds that have been duly appropriated); *see also USIP*, 2025 WL 1428641, at *38-39 (describing other ways the President may remove USIP Board members or otherwise exert influence over the Institute in a lawful manner).  Defendants point to the *Wilcox* Stay Order to suggest that the government faces a "risk of harm from an order allowing a removed officer" to remain.  Defs.' Notice of Supp'l Auth. at 1 (quoting *Wilcox* Stay Order at *1).  Yet, the Supreme Court specified that the risk of harm was that of allowing a removed officer to "continue exercising the *executive* power."  *Id.* (emphasis added).  Such a risk is not present in this case because, again, the Institute's Board members do not exercise any meaningful executive power under our Constitution.  Plaintiffs and the public, on the other hand, experience harm every day that plaintiffs are not able to carry out their statutory tasks and operate USIP with independence and expertise.  *See USIP*, 2025 WL 1428641, at *41-43; *cf. New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) (describing irreparable harm to the government that occurs "any time" it is unable to "effectuat[e] statutes enacted by representatives of its people").  As plaintiffs explain, every day that goes by without the relief this Court ordered, "the job of putting [USIP] back together by rehiring employees and stemming the dissipation of USIP's goodwill and reputation for independence will become that much harder."  Pls.' Opp'n at 11.[3]

---

[3]    Plaintiffs also point out damage that occurred to the USIP headquarters building during the period where it was under GSA, rather than USIP, control.  *See* Pls.' Opp'n, Ex. A, Decl. of Amb. George Moose, USIP president

**JA406**

In the alternative, defendants have requested a "two-business-day administrative stay to allow defendants to seek a stay from the D.C. Circuit." *See* Defs.' Mot. at 9. Defendants do not provide any separate rationale to warrant such an administrative stay, and none is apparent in light of the equities and public interest just discussed.

Accordingly, it is hereby--

**ORDERED** that defendants' motion to stay the judgment pending appeal, ECF No. 42, is **DENIED**.

**SO ORDERED**.

Date:  May 23, 2025

*This is a final and appealable order.*



**BERYL A. HOWELL**
United States District Judge

---

¶¶ 10-12, ECF No. 45-1 (describing evidence of rats and roaches, leaks, and external damage resulting from the building having been vacant and unmaintained for weeks). Such damage is relevant to the weighing of the equities in considering the state of USIP's assets during the pendency of appellate litigation.

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2025, I electronically filed the foregoing Volume of the Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

/s/ Courtney E. Albini
COURTNEY E. ALBINI
*Attorney, Appellate Staff*
*Civil Division, Room 7511*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 598-7329*
*Courtney.E.Albini@usdoj.gov*

*Counsel for Defendants-Appellants*