## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

UNITED STATES INSTITUTE OF PEACE, *et al.*,

*Plaintiffs-Appellees*,

v.

KENNETH JACKSON, *et al.*,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-804-BAH, The Honorable Beryl A. Howell, District Judge

———————————

## BRIEF FOR APPELLEES

———————————

ANDREW N. GOLDFARB
JACOBUS P. VAN DER VEN
J. BENJAMIN JERNIGAN
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800

WILLIAM J. MURPHY
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 332-0444

September 25, 2025

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Appellees certify as follows:

**A.      Parties and *Amici***

All parties, intervenors, and *amici* appearing before the District Court and in this Court are listed in Brief for Appellants. Appellants' recitation of the parties omits that Plaintiffs-Appellees brought the action underlying this appeal in both their respective official and individual capacities. Am. Compl. (ECF 12).[*]

**B.      Ruling Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C.      Related Cases**

This case has not previously been before this Court. *Pippenger v. U.S. DOGE Service*, No. 1:25-cv-1090 (D.D.C. filed Apr. 10, 2025) also involves a challenge to the President's removal of USIP's Board members. Appellees dispute Appellants' suggestion (Br. ii) that this case, like others Appellants cite in their certificate as related cases, involves a challenge to the removal of directors and officers of an "Executive Branch agenc[y]."

---

[*] Appellees' position, contrary to footnote 1 of Appellants' certificate, is that USIP is properly named as a plaintiff in this action.

# RULE 26.1 DISCLOSURE STATEMENT

The United States Institute of Peace is an independent nonprofit corporation endowed by Congress with the powers of a District of Columbia non-member nonprofit corporation except the power to cease activities and dissolve. It has no parent corporation and no publicly held corporation owns 10% or more of its stock. As a non-member nonprofit corporation, USIP has no shareholders.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... i

RULE 26.1 DISCLOSURE STATEMENT ............................................ ii

TABLE OF AUTHORITIES .......................................................... v

GLOSSARY ........................................................................ x

INTRODUCTION .................................................................. 1

STATEMENT OF THE ISSUES .................................................... 2

PERTINENT STATUTES AND REGULATIONS ................................... 2

STATEMENT OF THE CASE ...................................................... 2

I.   THE UNITED STATES INSTITUTE OF PEACE: AN INDEPENDENT,
     NONPROFIT RESEARCH INSTITUTION ...................................... 2

     A.  USIP's Independent Structure ....................................... 2

     B.  USIP's Independent Education, Training, And Applied Research
         Functions ............................................................ 8

     C.  Appellants' Takeover Of USIP ...................................... 11

     D.  After Appellees File Suit, Appellants Dismantle USIP ............ 13

     E.  The District Court Ruling And Subsequent Events ................ 14

SUMMARY OF THE ARGUMENT .................................................. 16

ARGUMENT ...................................................................... 17

I.   STATUTORY RESTRICTIONS ON THE REMOVAL OF USIP
     BOARD MEMBERS ARE CONSTITUTIONAL ................................ 17

     A.  USIP Does Not Exercise Executive Power ........................ 17

         1.   USIP does not exercise executive foreign policy power. .... 18

2. USIP's incidental interpretation of its statutory authority is not an exercise of executive power. ...................................................26

3. USIP's grantmaking is not an exercise of executive power. ...............29

4. USIP's conduct of educational programs is not an exercise of executive power. ..................................................................31

B. Even If The Court Concludes USIP Exercises Some Modicum Of Executive Power, Its Multimember Bipartisan Board Would Not Be Subject To At-Will Presidential Removal. ..................................................32

1. *Humphrey's Executor* and *Wiener* remain binding precedent. ............33

2. The USIP Act's removal protections are constitutional under binding precedent. ...................................................................34

3. The USIP Act's removal protections are constitutionally valid. .........37

C. Not Every Entity Congress Creates To Further A Governmental Purpose Must Be Subject To At-Will Removal. .........................................43

II. THE DISTRICT COURT'S REMEDIAL ORDER WAS APPROPRIATE ...............................................................................46

A. The Government Does Not Challenge Most Of The Relief Ordered ..........................................................................................46

B. Courts Can Remedy The Clear Violation Of A Statutory Removal Restriction ..............................................................................48

CONCLUSION .......................................................................................53

# TABLE OF AUTHORITIES

## CASES

*American Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ................................................................ 16, 36

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ....................................................................40

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .........................................................................30

*Collins v. Yellen*,
  594 U.S. 220 (2021) .................................................................. 27, 45

*Delgado v. Chavez*,
  140 U.S. 586 (1891) ....................................................................51

*Dep't of Transp. v. Ass'n of Am. Railroads*,
  575 U.S. 43 (2015) ......................................................................20

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) .................................................. 28, 29

*Free Enterprise Fund v. PCAOB*,
  561 U.S. 477 (2010) .................................................................. 26, 44

*Herron v. Fannie Mae*,
  861 F.3d 160 (D.C. Cir. 2017) .....................................................20

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ..................... 16, 32, 33, 34, 35, 36, 37, 38, 42, 43

*In re Hennen*,
  38 U.S. 230 (1839) ................................................................... 39, 50

*In re Sawyer*,
  124 U.S. 200 (1888) .................................................................. 50, 51

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  684 F.3d 1332 (D.C. Cir. 2012) ...................................................27

*Jackson v. George,*
  146 A.3d 405 (D.C. 2016) ..................................................................52

*Kalbfus v. Siddons,*
  42 App. D.C. 310 (D.C. Cir. 1914)..................................... 17, 51, 53

*Kuretski v. Comm'r,*
  755 F.3d 929 (D.C. Cir. 2014) ...........................................................46

*Lebron v. National Railroad Passenger Corp.,*
  513 U.S. 374 (1995) ...........................................................................20

*Marbury v. Madison,*
  5 U.S. 137 (1803) ............................................................ 17, 49, 51, 52

*Mississippi v. Johnson,*
  71 U.S. 475 (1866) .............................................................................49

*Mistretta v. United States,*
  488 U.S. 361 (1989) .................................................................... 45, 46

*Myers v. United States,*
  272 U.S. 52 (1926) .............................................................................40

*PHH v. CFPB,*
  881 F.3d 75 (D.C. Cir. 2018).......................................................38, 42

*Printz v. United States,*
  521 U.S. 898 (1997) ...........................................................................28

*Putnam v. Langley,*
  133 Mass. 204 (1882) .........................................................................51

*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ...........................................................19

*Seila L. LLC v. CFPB,*
  591 U.S. 197 (2020) .................................................... 26, 34, 39, 48

*Severino v. Biden,*
  71 F.4th 1038 (D.C. Cir. 2023)....................................................34, 37

*Slaughter v. Trump*,
No. 25-5261 (Sept. 2, 2025) .......................................................... 34, 37

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) .........................................................................34

*Swan v. Clinton*,
100 F. 3d 973 (D.C. Cir. 1996) ................................................ 17, 48, 49

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) ..................................................................35

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) ............................................. 33, 34, 35, 44, 48

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) .....................................................................18

*United States v. Perkins*,
116 U.S. 483 (1886) .....................................................................41

*USIP v. Jackson*,
No. 25-5185, 2025 WL 1840572 (D.C. Cir. June 27, 2025) ...............................15

*White v. Berry*,
171 U.S. 366 (1898) .................................................................. 50, 51

*Wiener v. United States*,
357 U.S. 349 (1958) ....................................... 16, 32, 34, 35, 36, 42, 43

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ..................................................... 18, 20, 23, 36

**STATUTES**

2 Stat. 55....................................................................................31

14 Stat. 438 (1867) ......................................................................32

2 U.S.C.

§ 166.....................................................................................31
§§ 1811-1827 ..........................................................................28

5 U.S.C. § 2305 ................................................................................28

20 U.S.C.

   § 41 .......................................................................................45

22 U.S.C.

   § 4601 ...................................................................... 2, 3, 21, 22
   § 4603 ...................................................................... 3, 4, 5, 17, 52
   § 4604 ........................................................ 3, 4, 5, 8, 9, 10, 21, 52
   § 4605 ................................................................ 5, 6, 15, 38, 42
   § 4606 ...................................................................... 5, 6, 7, 10
   § 4607 .......................................................................................7
   § 4608 .......................................................................................7
   § 4609 .......................................................................................5
   § 4611 ......................................................................................10
   § 8422 ......................................................................................26
   § 8905 ......................................................................................26
   § 8928 ......................................................................................26
   § 10010 ....................................................................................26

28 U.S.C.

   § 604 .......................................................................................28
   § 620 .......................................................................................31
   § 624 .......................................................................................29
   § 994 .......................................................................................28
   § 1361 .....................................................................................52

31 U.S.C. § 711-717 ..........................................................................28

36 U.S.C.

   § 220505 ........................................................................... 19, 28
   § 300105 ........................................................................... 19, 28

42 U.S.C. § 10702 ............................................................................32

Act of X, 1827, 6 Stat. 356 ..............................................................30

Pub. L. 87-567 (1962) .......................................................................2

Pub. L. 101–513 (1990) ........................................................25

Pub L. 100-238 (1988) ..........................................................7

Pub. L. 116–92 (2019) ..........................................................26

D.C. Nonprofit Corp. Act, D.C. Code § 29-401 ...........................52

**OTHER AUTHORITIES**

1 Annals of Congr. 389 (May 19, 1789) ....................................40

6 Annals of Congr. 1717-26 (Dec. 28, 1796).............................30

Aaron L. Nielson & Christopher J. Walker,
   The Early Years of Congress's Anti-Removal Power,
   63 Am. J. Legal Hist. 219 (2023) ........................................45

Executive Order No. 14217 ............................................11, 21

GAO,
   Federally Created Entities: An Overview of Key Attributes (2009)....................43

Kevin R. Kosar,
   Congressional Research Service, The Quasi Government:
   Hybrid Organizations with Both Government and Private Sector Legal
   Characteristics (June 22, 2011) .........................................43

Michele L. Landis,
   "Let Me Next Time Be 'Tried by Fire'": Disaster Relief and the
   Origins of the American Welfare State 1789-1874,
   92 Nw. U. L. Rev. 967 (1998) ...........................................30

Natalie P. Love,
   Cong. Research Svce., Federal Grants to State and Local Governments:
   A Brief History (2008).....................................................30

Peter M. Shane,
   The Originalist Myth of the Unitary Executive,
   19 U. Pa. J. Const. L. 323 (2016) ......................................41

Power of the President to Remove Members of the Tennessee Valley
   Auth. from Off., 39 U.S. Op. Atty. Gen. 145 (1938)............................41

**GLOSSARY**

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| CPSC | Consumer Product Safety Commission |
| CSIS | Center for Strategic and International Studies |
| DOD | Department of Defense |
| DOGE | Department of Government Efficiency |
| FTC | Federal Trade Commission |
| FOIA | Freedom of Information Act |
| GAO | Government Accountability Office |
| GSA | General Services Administration |
| JA | Joint Appendix |
| MSPB | Merit Systems Protection Board |
| NGO | Non-Governmental Organization |
| NLRB | National Labor Relations Board |
| PCAOB | Public Company Accounting Oversight Board |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| USIP | United States Institute of Peace |

# INTRODUCTION

Appellants ask this Court to go where precedent forbids. USIP is an independent nonprofit corporation with a multimember bipartisan board of experts. Congress shares responsibility for foreign affairs and created USIP as a think tank principally focused on research and training on methods of nonviolent conflict resolution. USIP sometimes applies such methods by convening groups in conflict in the same way that other nonprofit organizations do. USIP does not represent the United States in these activities, nor is it perceived by foreign parties as doing so. USIP wields none of the regulatory and enforcement power at issue in recent stay decisions. Appellants' characterization of USIP as exercising executive power is factually inaccurate and based on a legally erroneous view of the distribution of foreign affairs power between Congress and the Executive. Congress acted within its constitutional authority when it restricted the removal of USIP's board members, and it was unlawful for the President—in connection with an executive order to shut USIP down without congressional authority—to fire them.

Courts are not powerless to remedy unlawful removals, as the Supreme Court recognized in *Marbury v. Madison* and this Court did in *Swan v. Clinton* and *Kalbfus v. Siddons*.

## STATEMENT OF THE ISSUES

1(A). Do USIP's activities constitute the exercise of executive power?

1(B). If so, are any USIP activities that involve executive power so extensive that statutory restrictions on removal of USIP's bipartisan multimember board of experts are unconstitutional?

2. Did the District Court have the authority to remedy the unlawful removal of members of USIP's board?

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Appellants.

## STATEMENT OF THE CASE

## I.     THE UNITED STATES INSTITUTE OF PEACE: AN INDEPENDENT, NONPROFIT RESEARCH INSTITUTION

## A.     USIP's Independent Structure

In 1984, President Reagan signed into law the United States Institute of Peace Act, No. 98-525, codified at 22 U.S.C. § 4601, *et seq*. (the "USIP Act"). USIP is an "independent nonprofit corporation" with authority to exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act,"[1] except that USIP does not have the power to "cease its corporate activities"

---

[1]     Pub. L. 87-569 (1962).

or dissolve itself. 22 U.S.C. § 4603(b); *id.* § 4604(a) (all powers except section 5(o) of the D.C. Nonprofit Corporation Act).

Congress established USIP as an independent think tank to "serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." *Id*. § 4601(b); *see also* JA695 (Senate committee report noting USIP's "primary function is to provide and finance research, education, training and information dissemination in effective and appropriate techniques and theories promoting international peace and the resolution of conflict without recourse to violence"). Rather than picking up on previous proposals to further peace through the creation of an Executive Branch agency or Department of Peace, JA682, Congress established a nonprofit institution that would function independently of the Executive Branch's foreign policymaking and diplomatic apparatus. JA703.

USIP's role is to generate knowledge—for both the Legislative and Executive Branches as well as private non-governmental organizations—not to create or implement the foreign policy of the United States. That role was left to Congress and the executive departments. *See* JA696-97 (Senate committee report stating USIP "should not perform a policy implementation role except to the extent that it provides

information, insight or training to those charged with formulating policy in conflict resolution and international affairs"); *see also* JA700 (report continuing that USIP "is not a national policy-setting agency, nor should it participate in the policy decision of any federal or non-federal body….[USIP] "should not act as an institution with either the role or the authority to undermine the ability of the Congress, President, Secretary of State, Secretary of Defense, or other policy-setting officials to develop and implement foreign policy.").

USIP's structure reflects its independent role. Unlike Executive Branch agencies or departments, USIP is a juridical person that may sue and be sued in its own name. 22 U.S.C. § 4604(k). And unlike those agencies, USIP is not covered by sovereign immunity, *see id.* § 4603(d), and is not represented in litigation by the Department of Justice (except where Congress specifically subjected USIP to federal law, such as the Freedom of Information Act). JA121. Also in contrast to Executive Branch agencies, which are automatically subject to FOIA, Congress included a separate provision subjecting USIP to FOIA. USIP owns its headquarters building in Washington, DC, and it—not the General Services Administration ("GSA"), landlord to much of the federal government[2]—is responsible for the building's security and upkeep. 22 U.S.C. § 4604(h)(3)(A). USIP constructed the building with

---

[2] USIP may obtain services from GSA, but only by purchasing them on market terms. § 4604(o).

the help of about $70 million in privately raised funds pursuant to § 4604(h)(3)(A), as well as specially appropriated funds from Congress. JA111-12. USIP controls the parcel of land on which its building sits. JA110-11.

Congress authorized USIP to create another private legal entity, the "Endowment of the United States Institute of Peace," under District of Columbia law. 22 U.S.C. § 4603(c). The Endowment holds assets for the benefit of USIP, including bank accounts for contributions from private sources for the purposes permitted by § 4604(h)(3), as well as accounts for unexpended appropriated funds transferred to the Endowment pursuant to § 4609(b). As of March 2025, when Appellants gained control of USIP via the actions challenged in this case, the Endowment's accounts held about $15 million in privately sourced funds and $10 million in funds sourced from rolled-over appropriations. JA112-13.

The powers of USIP are vested in its Board. 22 U.S.C. § 4605(a). Of the fifteen Board positions, three are filled by *ex officio* members: the Secretaries of State and Defense (or their Senate-confirmed designees) and the president or vice-president of the National Defense University. *Id.* § 4605(b)(1)-(3). The other twelve board members are individuals appointed by the President and confirmed by the Senate. *Id.* § 4605(b)(4) (the "(b)(4) directors").[3] The USIP Act requires partisan

---

[3] By using the term "individual" to refer to the (b)(4) directors while using "officers" in several other provisions of the USIP Act to refer to federal government

balance on the Board: "Not more than eight voting members of the Board . . . may be members of the same political party." *Id.* § 4605(c). The (b)(4) directors must have appropriate experience "in peace and conflict resolution efforts of the United States." *Id.* § 4605(d)(1). And importantly, "*Officers and employees of the United States Government may not be appointed to the Board under subsection (b)(4).*" *Id.* § 4605(d)(2) (emphasis added). The (b)(4) directors serve four-year staggered terms. *Id.* § 4605(e).

The President may remove (b)(4) directors only under three specific circumstances:

(1) in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties;

(2) upon the recommendation of eight voting members of the Board; or

(3) upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate.

*Id.* § 4605(f).

The USIP Board appoints the president, who is also a nonvoting member of the Board. USIP's president has the power to hire, fix the compensation of, and remove employees. *Id.* § 4606(c). "Officers and employees of the Institute shall not

---

personnel, Congress made clear that these Board members are not federal "officers." *E.g.*, *id.* §§ 4605(d)(2), (g); *id.* § 4606(d).

be considered officers and employees of the Federal Government" except for specified, limited purposes. *Id.* § 4606(f)(1). Instead, USIP employees are at-will employees. *See* JA131 (termination letters from Appellant Jackson referring to USIP employees' "at-will employment status").[4] Moreover, USIP employees are not eligible for federal health, retirement, or life insurance benefits. *See* P.L. 100-238 § 108 (1988) (barring access of employees of non-government entities to federal benefit programs).[5] Accordingly, USIP offers retirement, health, and life insurance benefits to eligible employees through private-sector sources. JA1046-47 (declaration of USIP CFO).

USIP has significant budgetary and fiscal independence. It is authorized to seek appropriations directly from Congress, and unlike Executive Branch agencies, does not have to go through OPM to establish its budget. OMB has only the limited authority "to review and submit comments on the Institute's budget request at the time it is transmitted to Congress." 22 U.S.C. § 4608(a). Unlike Executive Branch

---

[4]   Counsel for OPM, the personnel authority for the Executive Branch, concluded in 1987 that federal pay scales and civil service rules do not apply to USIP employees because USIP is "not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51." JA171-72; JA1031.

[5] *See* JA174; JA1034 (March 1988 Memo from Executive Office of the President to USIP). As such, the references in § 4606(f)(1) to USIP employees' eligibility for certain "compensation and benefits" under title 5 are vestiges of the past, long ago superseded by P.L. 100-238 § 108.

agencies, USIP retains a private-sector accountant (KPMG) to audit its books. *Id.* § 4607(g); JA504.

## B.   USIP's Independent Education, Training, And Applied Research Functions

USIP has no regulatory or enforcement powers and it does not make or implement foreign policy. Under the USIP Act, the principal activities that USIP may—but is not required to—pursue are to establish a fellowship program for domestic and global peace scholars; establish a scholarship program for high school and college students; establish a multidisciplinary research program on peace and conflict; develop programs to make peace education, research, and training "useful to persons in government, private enterprise, and voluntary associations"; support post-graduate peace research; conduct training "for practitioners, policymakers, policy implementers, and citizens and noncitizens" in the field of international peace and conflict resolution; and publish analyses and information gleaned from fieldwork to the public and the government. 22 U.S.C. § 4604(b). In other words, like the Carnegie Endowment for International Peace and similar nonprofit think tanks, USIP focuses on research, education, and training on methods of peaceful conflict resolution. To conduct its "extension and outreach activities," USIP may make grants to and contract with educational and research institutions, as well as state and federal government agencies. *Id.* § 4604(d). It may also obtain grants from federal agencies. *Id.* § 4604(h)(1).

A principal consumer of USIP's work is Congress, which turns to USIP as a factfinder and analyst to fulfill the roles the Constitution assigns to the Legislative Branch in the field of foreign affairs. USIP regularly briefs members of Congress and their staff upon request and has long facilitated congressionally coordinated expert working groups, such as the Iraq Study Group in 2006 and the Afghan Study Group in 2019. JA134-35.

Like other think tanks, USIP may share its research-driven insights with a variety of other groups, including other research institutions and foreign governments. Like other think tanks, USIP collaborates with U.S. government agencies. And like other think tanks, USIP does so on its own terms. USIP chooses what projects it undertakes in coordination with foreign and NGO groups. JA141-43. USIP "may respond" to requests for studies from federal departments and agencies, 22 U.S.C. § 4604(e), but it is not required to. USIP can and does decline collaboration requests from executive agencies when the proposed work would not be consonant with USIP's mission as the Board sees it, staffing capacity, or budgetary constraints. In short, USIP charts its own course, deciding how and where to engage its resources without consultation, input, or direction from Executive Branch agencies. JA514-15 (declaration of Amb. Moose); JA180 (USIP biennial

report stating it "can decide to undertake projects at the request or with the support of Governmental agencies, if the projects are in accord with Institute priorities").[6]

To fulfill its mission of developing programs to make "international peace and conflict resolution research, education, and training" more widely available and useful to the public and those engaged in peacebuilding activities, USIP has conducted on-the-ground research in communities in conflict around the world. 22 U.S.C. § 4604(b)(4); JA133-34. As part of this applied research work, USIP at times serves as a neutral, expert, non-governmental convener to resolve conflicts—just like other non-governmental organizations such as the Carter Center or CSIS. JA367-71 (Dist. Ct. Op.). USIP does not represent the United States when playing this role. USIP can act as a neutral convener precisely because parties on all sides understand USIP to be independent from, and not to speak for, the United States.

---

[6] The provisions Appellants cite for executive "oversight" of USIP do not support that claim. The purpose of the *ex officio* board members was to enhance *USIP's* effectiveness as an independent organization, not to place USIP under executive control. JA704 (S. Rep. No. 98-244). The provision allowing executive agencies to assign employees to USIP only if the employees agree further underscores that USIP is not a part of the Executive Branch to whom employees may be automatically detailed by an agency. 22 U.S.C. § 4606(d)(2). And Appellants wrongly claim (Br. 7) that USIP must submit reports under § 4611 to the President "annually." *Cf.* § 4611 (requiring a report every *two* years). USIP's reports in fact affirmed that USIP is "not an agency of Congress or the Executive Branch"; that Congress "insisted" USIP be "independent of control" by any group; that Congress used the nonprofit corporate form to "insulate[]" USIP from "political pressures"; and that USIP is not involved in the "foreign relations" conducted by Executive departments. JA168-69, 179-80.

JA141-43, 146-50. As an independent nonprofit, USIP has credibility as a neutral

that government representatives do not. JA138-43, 144-45, 147-50. USIP does *not*

engage or participate in governmental diplomacy, which is reserved for official

governmental representatives. JA143-44.

In sum, USIP is an independent institution that engages globally in furtherance

of its own research mission as its board sees fit. While federal government officials

have at times piggybacked on pre-existing, ongoing USIP initiatives (*e.g.*, JA496-97

(declaration describing US policymakers taking advantage of USIP programmatic

work with Iraqi tribes), there is no evidence in the record that in USIP's 40-year

history, an Executive Branch agency or department ***ever*** enlisted, engaged, or used

USIP to formulate or carry out United States foreign policy.[7]

## C. Appellants' Takeover Of USIP

On February 19, 2025, President Trump issued Executive Order No. 14217,

titled "Commencing the Reduction of the Federal Bureaucracy" ("EO 14217").

JA122-23. The President declared USIP and three other entities "unnecessary";

directed that their "non-statutory components and functions . . . be eliminated to the

---

[7]   113 former Executive Branch officials who have served in senior diplomatic,
military, and national security positions submitted an amicus brief attesting that
USIP "does not create United States government policy, and does not execute or
implement such policy. Rather, its work at times *informs and complements* United
States policies, such as by working to improve social cohesion in conflict-affected
areas, [or] crafting teaching or training programming for foreign audiences in areas
distressed by conflicts…." Dist. Ct. ECF 31 at 5 (emphasis in original).

maximum extent consistent with applicable law"; and directed that they "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* USIP's leadership resisted DOGE's ensuing efforts to take over USIP, communicating to DOGE that USIP is an independent nonprofit corporation that is not subject to presidential control. JA123-24.

On March 14, 2025, Appellant Trent Morse, Deputy Director of Presidential Personnel at the White House, sent all eleven of USIP's (b)(4) directors emails stating in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the United States Institute of Peace is hereby terminated, effective immediately." The emails provided no factual or legal justification for the purported terminations. JA125-26.

Later on March 14, USIP's outside counsel received a document labeled "Resolution of the Board of Directors" signed by the three *ex officio* Board members purporting to remove Ambassador George Moose as USIP's acting president and to replace him with Appellant Jackson. JA126-27.

Over the next three days, Appellants and other DOGE representatives repeatedly tried to gain access to USIP's headquarters building, enlisting the FBI, Chief of the Criminal Division of the U.S. Attorney's Office in Washington, the

District's Metropolitan Police Department (the "MPD"), and even USIP's own private security contractor to pressure USIP to capitulate. JA125-130.

On March 17, when USIP called the MPD for help at USIP headquarters, the MPD instead escorted all USIP personnel from the building and left Appellants in possession and control over USIP's headquarters. JA130-31.

### D. After Appellees File Suit, Appellants Dismantle USIP

On March 18, 2025, Appellees filed suit and sought emergency relief. By minute orders on March 19 and 20, the District Court first denied their request for a temporary restraining order and then ordered expedited summary judgment briefing.

Wasting no time, on March 21, 2025, Appellant Jackson sent termination notices to six USIP employees, citing their "at-will-employment status." JA131. On the night of March 28, 2025, Appellants caused termination notices to be sent to virtually all of USIP's 400 employees. JA131-32. On March 31, Appellees learned of an undated "Resolution of the Board of Directors" signed by only two *ex officio* directors (Appellants Hegseth and Rubio) that purported, as of March 25, 2025, to replace Jackson with Appellant Cavanaugh as USIP's acting president. The two *ex officio* Board members also fired the Endowment's officers and instructed their purported replacement to transfer the Endowment's assets to USIP. JA132. The resolution also purported to fire USIP's Chief Financial Officer and Chief Operating Officer, and directed Cavanaugh to transfer all of USIP's assets, including USIP's

real property and rights, to GSA. *Id.* Implementing the resolution, Cavanaugh sent paperwork requesting transfer to GSA of USIP's headquarters building—which he represented has a value of $500 million—for no consideration. JA132-33; JA489. GSA purported to approve the transfer on March 29, 2025. JA491.

While briefing proceeded in the District Court, Appellants shut down all of USIP's ongoing programmatic activity. The USIP employees fired by Cavanaugh included all staff working on the statutorily mandated Gandhi-King Academy program. JA1043. Cavanaugh also terminated overseas personnel contracts, including for security services for USIP staff and contract personnel, and office leases. The only employees who were not terminated—four IT, human resources, and finance employees in the D.C. office, and four in overseas locations—took DOGE-directed steps to close down USIP's operations. JA1043. USIP's new purported leadership did not themselves perform any work in furtherance of USIP's statutory mission. JA182; JA1044.

### E.    The District Court Ruling And Subsequent Events

On May 19, 2025, the District Court granted summary judgment for Plaintiffs. The Court held the purported removal of the (b)(4) directors and all actions that followed therefrom unlawful and void *ab initio*, including the termination and replacement of Ambassador Moose and the transfer of USIP's assets. JA294-97

(Order).[8] With respect to Appellees' requests that the (b)(4) directors and Ambassador Moose be permitted to continue in their roles leading USIP—the only form of requested relief seriously contested by Appellants—the Court determined that Appellees had suffered irreparable harm, and that since President Trump lacked the authority to remove them in the first place, the (b)(4) directors had never lost their positions. The Court enjoined Appellants (other than the President) from interfering with Appellees' performance of their statutory and fiduciary responsibilities as Board members. JA296-97, 394-98.

On May 21, Acting President Moose and other USIP staff regained control over USIP's headquarters and began the process of restoring USIP's functions. JA1051-54. The District Court denied Appellants' stay motion.

On June 27, a motions panel of this Court granted Appellants' request for a stay pending appeal, finding Appellants likely to succeed on their claim that USIP is an Executive Branch entity exercising "substantial executive power." *USIP v. Jackson*, No. 25-5185, 2025 WL 1840572 (D.C. Cir. June 27, 2025). The stay order returned control of USIP to Appellants during the pendency of this appeal.

---

[8] Because the (b)(4) directors were not lawfully removed, they were still part of the Board (JA294-95, 386, 390, 394) and the resolutions changing USIP's leadership and transferring its assets were invalid (JA296, 388-89, 396). The Board may only act (1) when there is a quorum—a majority—of the Board present or (2) by unanimous written consent of all Board members. 22 U.S.C. § 4605(h)(2); JA297.

On June 29, Appellees filed a petition for en banc review of the stay order. On July 11, within hours after Appellants filed their opposition to the en banc petition, Cavanaugh again terminated nearly all USIP staff, retaining only a few employees to conduct close-out activities and wind down USIP. On July 24, this Court denied the en banc petition.

## SUMMARY OF THE ARGUMENT

**I.** USIP does not wield executive power, and certainly not the "considerable" executive power that the Supreme Court has signaled may be the limit for upholding removal restrictions for bipartisan multimember boards of experts. The government's principal argument to the stay panel and its merits brief here is based on a legally inaccurate account of the constitutional distribution of power in foreign affairs and a factually inaccurate account of USIP's activities. There is no foreign affairs limitation to *Humphrey's Executor v. United States*, 295 U.S. 602 (1935): in *Wiener v. United States*, 357 U.S. 349 (1958), the Supreme Court readily applied the *Humphrey's* holding to a commission formed to resolve war claims, a function the Supreme Court has ascribed to the Executive. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003). Nothing USIP does, including making grants and developing educational programs, is inherently executive or approaches even the scope of the executive functions performed by the 1935 FTC. *See* JA366-72, 379 (Dist. Ct. op.). Indeed, the fact that Congress—in line with a long

history—gave USIP nonprofit corporate status undercuts Appellants' argument for presidential control through at-will removal of its (b)(4) directors.

II. The government's separate challenge to one remedy does not offer any basis to overturn the District Court's orders granting other relief, including unwinding the firing of Appellee Moose and the asset transfers. The orders declaring the removals of the (b)(4) directors void and invalidating them followed this Court's precedent in *Swan v. Clinton*, 100 F. 3d 973 (D.C. Cir. 1996), as well as numerous decisions recognizing that courts *can* remedy unlawful removals of public officers— starting with *Marbury v. Madison*, 5 U.S. 137, 173 (1803), and continuing through this Court's decision in *Kalbfus v. Siddons*, 42 App. D.C. 310, 319-21 (D.C. Cir. 1914). After the merger of law and equity, it no longer matters whether the order is labeled as a writ of mandamus or an injunction.

## ARGUMENT

## I. STATUTORY RESTRICTIONS ON THE REMOVAL OF USIP BOARD MEMBERS ARE CONSTITUTIONAL

### A. USIP Does Not Exercise Executive Power

As an "independent nonprofit corporation," 22 U.S.C. § 4603(b), USIP engages in activities, like those of other nonprofit corporations as well as governmental entities outside the Executive Branch, that are not exercises of executive power. Indeed, it was central to Congress's purpose that USIP neither act nor be understood to act on behalf of the Executive Branch. As a result, the President

is not politically accountable for the activities of USIP, and has no need for the same level of control as he would for an executive agency.

### 1. USIP does not exercise executive foreign policy power.

The government's argument rests principally on a breathtakingly overbroad claim of exclusive executive power over foreign policy. *See* Br. 21 ("Most fundamentally, USIP is a governmental entity participating in foreign affairs, a field uniquely committed to the Executive Branch."). To the contrary, Congress has a substantial constitutional role in foreign affairs: "In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. It is not for the President alone to determine the whole content of the Nation's foreign policy." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) (citations omitted); *id.* at 67 (Scalia, J., dissenting) (the Constitution "divides responsibility for the Nation's foreign concerns between the legislative and executive departments" and "international relations form[s] no exception" to the balance of powers between the political branches); *id.* at 66 (Roberts, C.J., dissenting) (noting Court's rejection of the "expansive language" of *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-320 (1936), and decrying the

Court's "perilous step—for the first time in our history—of allowing the President to defy an Act of Congress in the field of foreign affairs"). And Appellants' reference (Br. 21-22) to the portion of *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), discussing the powers committed to the Executive, skips over the two preceding paragraphs discussing the powers committed to Congress. *See id.* at 194-95. The political question holding of *Schneider* is about the *joint* foreign affairs powers of the political branches—not a monopoly power held by the Executive.

Article I of the Constitution gave Congress the power to enact the USIP Act to create a nonprofit corporation studying and promoting peacebuilding techniques, just as it had the power to designate the American Red Cross "to act in matters of relief" under federal treaties, or the U.S. Olympic Committee ("USOC") to "represent the United States" and "certify national governing bodies" within the realm of international sports. 36 U.S.C. § 300105(b); 36 U.S.C. § 220505(c).[9]

---

[9]   Appellants' contention (Br. 27-28) that the Executive has had the "longstanding position" that USIP is part of the Executive Branch has it backwards. As demonstrated *supra*, in both the USIP Act itself and its legislative history, Congress unequivocally expressed that USIP was to be independent of the Executive Branch. Similarly, in 1987 and 1988, Executive Branch officials, including counsel at OPM and the head of the White House's personnel office, issued determinations that USIP was a "non-Government entity" and not an Executive Branch agency. JA171-72, JA174-75, 180-82, 1031, 1034. In June 2008 remarks, President Bush referred to USIP as a "non-governmental organization." (available at https://perma.cc/2VXG-QVXN). And in every edition of the U.S. Government Manual (the "Manual"), the "official handbook of the federal government" published by the Executive Branch, the organizational chart of the federal government does not include USIP at all.

Appellants ignore the congressional role in foreign affairs and do not account for entities, like the Red Cross and USOC, that are indisputably not part of the Executive Branch yet "participate in foreign affairs."[10]

Thus, Appellants' assertion that USIP's activities relate to foreign affairs does not answer the question at hand: whether those activities constitute exercises of *executive* foreign affairs powers that must be subject to presidential control. The record demonstrates that they do not. *Zivotofsky* holds that the President has the

---

JA150-53. Rather, under the Executive Branch, the Manual identifies 15 agencies and 58 "independent establishments and government corporations," but USIP is not listed among them. *See id*. Instead, the Manual lists USIP as a "Quasi-Official Agency," along with Legal Services Corporation, Smithsonian Institution, State Justice Institute, and the United States Holocaust Memorial Museum. *Id.*

[10] The test set out in In *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), addresses whether an entity is governmental for purposes of protecting the rights of private parties. But that test does not and cannot answer the separation-of-powers questions raised in a removal-restriction case such as this. If the constitutionality of removal restrictions were to turn on whether the President appoints a majority of the corporation's board, Congress would have an easy path to assign, to entities not subject to *any* presidential control, powers that Appellants would classify as executive: by creating government-funded corporations with no executive role in choosing directors at all. None of the decisions applying the *Lebron* test involves the internal distribution of power between Congress and the Executive. *Lebron* concerned regulation of speech, *id.* at 399, as did this Court's decision in *Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017). The "separation of powers" issue in *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55–56 (2015), concerned the constitutionality of Amtrak's regulation of the rights of private party railroads under the private non-delegation doctrine. *Id.* at 55 ("the Court holds that Amtrak is a governmental entity, not a private one, for purposes of determining the constitutional issues presented in this case.").

exclusive power to recognize foreign governments. But none of USIP's activities involve recognizing foreign governments or conducting negotiations with those governments on behalf of the United States. 22 U.S.C. § 4604(b), (c). Acting as a "third party neutral in a peace mediation" like other nonprofit organizations (Br. 22-23) is not negotiating on behalf of the United States government. USIP's efforts to bring together parties in conflict, whether those parties are governmental or non-governmental, do not produce any form of treaty or executive agreement on behalf of the United States—indeed, they involve no commitments or participation of any kind by the Executive Branch.

Appellants indiscriminately use broad terms like "diplomacy" and "foreign affairs" (*e.g.*, Br. 21, 22, 23) to equate what the Executive Branch does with USIP's roles. Contrary to Appellants' claim (Br. 22, citing § 4601) that USIP was "expressly created to assist the Executive Branch's efforts in international peacekeeping and diplomacy" (*see also* Br. 23, 34), § 4601 does not mention the President or the Executive Branch, and the USIP Act does not refer to "diplomacy" anywhere. Indeed, Congress expressly designed USIP *not* "to participate in the policy decision of any" agency and "not" to "perform a policy implementation role." JA696-97, 700 (Senate committee report). Nothing in the USIP Act makes USIP an agent of the

Executive Branch or authorizes the Executive Branch to set USIP's agenda.[11] Rather, it "expressly" makes plain that Congress created USIP to "strengthen[]" a range of institutions across "government, private enterprise, and voluntary associations." § 4601(a)(5). Appellants skip past USIP's direct assistance to Congress. JA134-38, 307, 366. The Executive Branch is just one potential beneficiary of USIP's work.[12]

The undisputed record demonstrates how far removed USIP stands from actual executive foreign policy functions. *See* JA366-67 (District Court opinion

---

[11] Appellants (Br. 34) misleadingly quote a letter that USIP sent voluntarily to OMB in the spirit of cooperation after the issuance of EO 14217. The letter stresses that "USIP is not an entity of the Executive branch," and characterizes as "close" "collaborat[ion]" OMB's opportunity to comment on the budget request USIP submits directly to Congress (which includes USIP's annual program priorities). JA456-57. There is no suggestion in the letter that the Executive Branch *sets or directs* USIP's priorities, although USIP may and at times does work with agencies within the Executive Branch.

[12] Appellants wrongly suggest (Br. 25) that the *purpose* of USIP's on-the-ground research is "to facilitate the Executive Branch's foreign-affairs activities." Not only is that stated nowhere in the USIP Act's statement of purpose (§ 4601(b)), the record shows that when USIP provides information to U.S. foreign policy actors that is an incidental benefit of USIP's research, not its purpose—unless USIP has been engaged to serve as an external contractor. For example, the declaration about USIP's work with U.S. Africa Command shows that USIP acted as a nongovernmental think tank, providing analysis to executive branch officials "along with other information gathered from a range of sources *(including other nonprofits also engaged on these issues in a variety of ways)*." JA764 (italicized text omitted by Appellants). U.S. Africa Command asked USIP "to develop a publicly available tool" that was . . . "not to be specific to USG interests and to be fully transparent on its data and methodologies … similar to other publicly-available tools developed in academic environments." JA764-65.

rejecting government's argument that USIP is an "active foreign diplomacy agent of the Executive branch"). The record shows instead that USIP's independence from the government is crucial to its peacebuilding activities.[13] The international peacebuilding activities by USIP to which Appellants point are not inherently executive or even governmental.[14] Numerous nonprofit organizations perform similar work. JA144-46 (discussing Carter Center, CSIS, and International Studies Forum facilitating mediations or discussions involving, Uganda, Sudan, and China). In fact, it is critical to USIP's work that its staff are not, and are not mistaken for, representatives of the federal government.

USIP personnel do not have diplomatic credentials or authority.[15] Unlike governmental personnel who must report to the U.S. Chief of Mission in a foreign

---

[13] Appellants' recitation (Br. 21) of the President's powers, including "the power to open diplomatic channels by engaging in direct diplomacy with foreign heads of state and their ministers," describes precisely the contours of "Track 1" diplomacy in which USIP does *not* participate. And Appellants do not and could not contend that USIP has, let alone exercises, any of the other Article II powers related to foreign affairs—the power to make Treaties, appoint Ambassadors, "receive Ambassadors and other public Ministers," or recognize foreign states and governments. *See* Br. 21 (citations omitted); *see, e.g.*, *Zivotofsky*, 576 U.S. at 13.

[14] Contrary to Appellants' suggestion (Br. 27), statutory provisions allowing USIP personnel with proper clearances to (a) obtain classified information through FOIA requests and to (b) use classified material in providing services to "federal agencies" or fulfilling contracts do not distinguish USIP from legislative or judicial branch personnel or private parties or businesses with the required clearances.

[15] Appellants' recognition (Br. 23) of USIP's role as a third-party convener of "Track 1.5" dialogue only underscores USIP's independence from the Executive

country, USIP staff do not. JA369 (Dist. Ct. op.); JA520. Indeed, "USIP personnel are explicitly advised that they are not to take orders from U.S. ambassadors." JA520. Appellants cite the declaration of Scott Worden (JA758-60), who explains that USIP's work in Afghanistan was both *physically* and *legally* outside the U.S. government's diplomatic and national security channels: "We rented private office space in downtown Kabul outside the international security green zone and were not protected by any U.S. forces. For much of that time, U.S. government officials were not permitted to attend meetings at USIP's office because they were not allowed to travel to unsecured locations…." JA759. The declaration from which Appellants pluck one phrase (Br. 23) reads in relevant part:

> As part of my job at USIP, I frequently met with non-governmental organizations, foreign government officials, and officials of International Organizations. In my USIP capacity, I never had to ask or clear any of these meetings with U.S. government actors. I also published commentaries on USIP's website and with outside publications about national security issues that were never expected to be reviewed or cleared by U.S. government employees.

*Id.*

---

Branch. As the cited description of Track 1.5 dialogue makes clear, its main distinguishing feature is that the convening party—like the Carter Center or USIP—"***is not a representative of a political institution***." JA546 (emphasis added); *see also* JA549 (noting an advantage of the Carter Center's role in Track 1.5 discussions was the Center's "inability to impose solutions through political power").

Similarly, Appellants (Br. 23, citing JA521) extract a reference to a request to USIP from the Philippine government and a combatant group to facilitate ceasefire efforts, but use ellipses to omit the critical fact that the request was made by the two sides directly to USIP—"not by the U.S. government (who are barred from traveling in the region)." JA521 (declaration of S. Harding). Foreign actors call on USIP because "USIP personnel have served on the ground…for years fostering relationships and establishing trust," JA521, and they are able to be "on the ground" *because* they are not subject to Executive Branch restrictions.[16]

That USIP may at times *work with* Executive Branch foreign policy actors does not transform USIP itself into an arm of executive foreign policy power. Congress has directed the Executive Branch departments to engage and fund nongovernmental organizations for a range of purposes within the field of foreign affairs. *E.g.*, Pub. L. 101–513 (1990), title V, §531(h)(2) (establishing a fund for

---

[16] The District Court properly recognized (JA370-71) that "the act of meeting and conversing with foreign groups" to discuss conflict resolution or other important matters is not conduct exclusively reserved to the President. Were that the case, it would sweep within the Executive Branch a whole range of actors who plainly are not subject to presidential control—including members of Congress who meet with foreign officials and leaders individually or as part of traveling congressional delegations; Article III judges who take part in overseas rule of law initiatives; and nongovernmental organizations like the Carnegie Institute, CSIS, the James A. Baker III Institute for Public Policy, and the Carter Center. *See, e.g.*, JA501 (describing meetings of the congressional Iraq Study Group, comprised of former Executive Branch officials, senators, and a former Supreme Court justice, with "Iraq government officials, … Iraqi Prime Minister Al-Maliki, as well as foreign government officials….").

Secretary of State to enlist "appropriate organizations" such as the "Carter Center, National Democratic Institute for International Affairs, the National Republican Institute for International Affairs, and the Center for Electoral Assistance and Promotion (CAPEL) of San Jose, Costa Rica" to assist with election monitoring and support democracy-building efforts in El Salvador).[17] Thus, Appellants' citation (Br. 24) to 22 U.S.C. § 10010 (concerning State Department assistance through "institutions such as the Africa Center for Strategic Studies and [USIP]" to Sudan in professionalizing its security forces) does not suggest that USIP is exercising executive foreign policy power any more than the Carter Center does when it assists the State Department with electoral integrity efforts in El Salvador.

### 2. USIP's incidental interpretation of its statutory authority is not an exercise of executive power.

Appellants concede (Br. 33) that Congress did not confer on USIP any of the regulatory or enforcement powers which have been the central concern of the Supreme Court's recent officer removal cases. *See, e.g.*, *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 486 (2010) (noting parties' agreement that PCAOB members

---

[17] *See also* Pub. L. 116–92, div. A, title XII, §1213(d)(2) (2019) (requiring Secretary of Defense to consult with nongovernmental organizations for a program to evaluate and address allegations of civilian harm during conflict); 22 U.S.C. §§ 8905 & 8928 (directing the Secretary of State "directly or through nongovernmental or international organizations" to support democracy-building activities in Ukraine and Russia); 22 U.S.C. § 8422(d)(3) (authorizing funding for nongovernmental organizations to facilitate the implementation of a State Department program to increase respect among Pakistanis for civilian control of their nation's military).

were Officers of the United States in light of Board's extensive regulatory and enforcement powers that would otherwise present private non-delegation issues); *Seila L. LLC v. CFPB*, 591 U.S. 197, 206-07 (2020) (describing powers); 219 (summarizing extent of regulatory and enforcement powers); 222 (distinguishing other single-headed agencies that "do not involve regulatory or enforcement authority remotely comparable to that exercised by the CFPB"); *Collins v. Yellen*, 594 U.S. 220, 251-52 (2021) (comparing only the respective regulatory and enforcement powers of FHFA and CFPB). Likewise, this Court's decision concerning copyright judges focused on regulatory and enforcement power related to copyright, not the many other duties of the Librarian of Congress. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341-42 (D.C. Cir. 2012).

Appellants argue (Br. 32-33) that "[e]xecuting the law *against private parties*"—i.e., regulatory or enforcement power—"is not necessary to be considered a component of the Executive Branch." Indeed, according to Appellants, interpreting a governing statute is enough to constitute the exercise of executive power. But it cannot be that every entity that conforms its activities to its grant of statutory authority must be subject to unfettered presidential control.

Appellants' proposed rule would sweep in any entity created by Congress, including legislative entities like the GAO and the Architect of the Capitol (and the Librarian of Congress before and apart from copyright regulation), judicial entities

like the Administrative Office of the Courts and the Sentencing Commission,[18] state and tribal officials operating under cooperative regulatory schemes,[19] regional fishery management councils,[20] and nonprofit corporations like the Red Cross and USOC.[21] It would also sweep in the Smithsonian Institution, contrary to this Court's holding that the Smithsonian is neither an "authority of the government of the United States" nor an "establishment in the executive branch" for purposes of the Privacy Act notwithstanding the fact that it exercised discretion over how to spend "federally allocated funds." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 882 (D.C. Cir. 1997) ("To

---

[18]  5 U.S.C. § 2305 (GAO), 31 U.S.C. § 711-717 (Architect of the Capitol); 2 U.S.C. §§ 1811-1827 (Librarian of Congress); 28 U.S.C. § 604 (AO); 28 U.S.C. § 994 (Sentencing Commission).

[19]  *Printz v. United States*, 521 U.S. 898, 922 (1997), does not suggest that state governments voluntarily exercising federal statutory authority are part of the Executive. Both the *Printz* majority and dissent acknowledge this. 521 U.S. at 923 n.12 (distinguishing cooperative federalism programs because they are voluntary and less likely to be used by Congress to weaken the Executive); *id.* at 959-961 (dissenting opinion) (describing cooperative federalism programs).

[20]  The government is currently defending an appeal in the First Circuit, arguing that a regional fisheries council including state appointees is not subject to the appointments clause. *New Eng. Fisherman's Stewardship Ass'n v. Lutnick*, No. 25-1212.

[21]  *See* 36 U.S.C. § 220505(c), (d) (describing specific duties related to international sporting contests and the athletes participating in them); 36 U.S.C. § 300105(b) (designating Red Cross as the organization authorized to act for the United States in matters of relief under international treaties).

the extent the Smithsonian exercises anything approaching public authority, that authority appears to be entirely ancillary to its cultural and educational mission.").[22]

### 3. USIP's grantmaking is not an exercise of executive power.

Appellants argue (Br. 25-26 & nn.2, 3) that because some executive agencies make grants pursuant to statutory authority, grant-making must be an exercise of executive power. But many nonprofit corporations make grants and offer scholarships, as USIP does. Government entities outside the Executive Branch that offer grants or fellowships include the Smithsonian,[23] the Library of Congress (independent of the Register of Copyrights),[24] and the Federal Judicial Center.[25] There is nothing inherently executive, or even governmental, about grant-making. *Dong,* 125 F.3d at 882 (Smithsonian devoting part of its own budget to funding grants and fellowships is "no different from any private research university which

---

[22] The *Dong* Court stated: "It is plain that the Smithsonian is not an establishment in the executive branch. To begin with, nine of the seventeen members of its governing Board of Regents are appointed by joint resolution of Congress, 20 U.S.C. § 43, and six of the remaining eight *are* members of Congress, 20 U.S.C. § 42. (The other two are the Vice President and the Chief Justice of the United States, *id.*)." *Id.* at 879.

[23] Smithsonian, Office of Academic Appointment and Internships, Fellowship Programs, https://perma.cc/D8CN-4GJS (last visited on Sept. 25, 2025).

[24] Library of Congress, Internships and Fellowships, https://perma.cc/X5JX-LDL5 (last visited Sept. 25, 2025); Library of Congress, The John W. Kluge Center at the Library of Congress, https://perma.cc/2E5Z-J2ER (last visited Sept. 25, 2025).

[25] *See* 28 U.S.C. § 624(3) (authorizing Federal Judicial Center to contract with "private agencies and persons for research projects").

receives federal funds and enjoys some control over their use"). Federal grants are an exercise of the spending power, which belongs to Congress. Indeed, while it is more common today for Congress to delegate authority to make grants through executive agencies, Congress itself made grants of land and money during the early years of the Republic.[26] The language about determining "eligibility for funds," which Appellants quote from *Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976) (per curiam), is not about grant-making and does not suggest that making grants is a hallmark of executive power.[27] More to the point, *Buckley* cuts against Appellants on the question here, because the Court held that the Commission's non-regulatory functions, including determining a candidate's eligibility for funding, could be performed by independent agencies and "the President may not insist that such functions be delegated to an appointee of his removable at will." *Id.* at 141.

---

[26] *See* Natalie P. Love, Cong. Research Svce., Federal Grants to State and Local Governments: A Brief History (2008); Michele L. Landis, "Let Me Next Time Be 'Tried by Fire'": Disaster Relief and the Origins of the American Welfare State 1789-1874, 92 Nw. U. L. Rev. 967, 1008–16 (1998); 6 Annals of Congr. 1717-26 (Dec. 28, 1796) (discussing request for relief to Savannah after a major fire); Act of X, 1827, 6 Stat. 356 (private bill granting relief for major fire in Alexandria).

[27] The Court was referring to the determination of a candidate's eligibility for public matching funds "and even for federal elective office itself." *Id.* at 141. That eligibility determination is more akin to determining eligibility for programs like Social Security or Medicare than it is to making grants.

### 4. USIP's conduct of educational programs is not an exercise of executive power.

Appellants similarly argue (Br. 34) that because some executive agencies sponsor educational and training programs and conduct research, doing so must be an exercise of executive power. But the judicial and legislative branches also sponsor educational programs, as does the Smithsonian Institution, as well as nonprofit and for-profit corporations—including corporations founded and funded by Congress. *See, e.g.*, 28 U.S.C. § 620 (Federal Judicial Center). Indeed, the educational tasks assigned to the Federal Judicial Center include "to cooperate with and assist agencies of the Federal Government and other appropriate organizations in providing information and advice to further improvement in the administration of justice in the courts of foreign countries and to acquire information about judicial administration in foreign countries that may contribute to performing the other functions set forth in this section." 28 U.S.C. § 620(b)(6). And long before Congress created regulatory agencies, in 1800 it founded the Library of Congress. 2 Stat. 55. The Library's services include the Congressional Research Service. 2 U.S.C. § 166. But surely Appellants do not contend that either the Federal Judicial Center or the Congressional Research Service is part of the Executive Branch and must be subject to presidential control.

As for other nonprofit organizations, the State Justice Institute is a private corporation created and funded by Congress, inter alia, to "encourage education for

judges and support personnel of State court systems through national and State organizations, including universities." 42 U.S.C. § 10702(b)(4). Howard University is another example. 14 Stat. 438 (1867).[28] The Smithsonian's educational programs include international exhibits. And of course a myriad of private nonprofit and for-profit schools and universities receiving federal assistance offer educational programs.

In summary, none of the arguments posed by Appellants for the reasons why USIP should be viewed as exercising executive power withstands scrutiny. Each of these arguments was given careful consideration by the District Court and rejected. JA358-73. There is no basis to disregard the removal restrictions Congress imposed for USIP's board, even apart from the precedents upholding such restrictions for multimember bipartisan boards of experts.

**B.     Even If The Court Concludes USIP Exercises Some Modicum Of Executive Power, Its Multimember Bipartisan Board Would Not Be Subject To At-Will Presidential Removal.**

Appellants ask this Court to go much further than the precedents that currently govern this Court would allow it to go in repudiating the holdings of *Humphrey's Executor* and *Wiener*. Under even the narrowest supportable reading of governing

_____

[28]   The 2025 budget request includes $297 million for Howard. Howard Univ., Fiscal Year 2025 Budget Request, https://perma.cc/3B5K-RYMM (last visited Sept. 25, 2025).

precedent—that Congress may constitutionally legislate removal protections for members of multimember, bipartisan boards that do not wield considerable executive power—the USIP Act's removal protections are constitutional.

### 1. *Humphrey's Executor* and *Wiener* remain binding precedent.

In its application to stay the injunction invalidating the removal of Gwynn Wilcox from the NLRB, the Solicitor General argued that the government was likely to succeed on the merits because the "'exceptio[n]' recognized in *Humphrey's Executor*'s [sic] encompasses only 'multimember expert agencies that do not wield substantial executive power'" and that exception marked "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." App. for Stay at 11, *Trump v. Wilcox*, No. 24A264, 2025 WL 1101716 (Sept. 4, 2025) (citations omitted). The application asserted that both NLRB and MSPB wielded "substantial executive power," beyond that of the 1935 FTC, and therefore fell outside the exception recognized in the Court's precedents. *Id.* The brief majority opinion granting the application stated: "The stay reflects our judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power. But we do not ultimately decide in this posture whether the NLRB or MSPB falls within such a recognized exception; that question is better left for resolution after full briefing and argument." *Trump v. Wilcox*, 145 S. Ct. 1415 (2025).

The *Wilcox* stay order (and *Seila Law*) reaffirm that the Supreme Court has not overruled *Humphrey's Executor* or *Wiener*, and so these precedents stand and continue to bind this Court. Indeed, the government conceded that *Humphrey's Executor* "remains binding" in its stay application in *Slaughter v. Trump*, No. 25-5261, at 15 (D.C. Cir. July 21, 2025); *see also Severino v. Biden*, 71 F.4th 1038, 1047-48 (D.C. Cir. 2023). The Supreme Court's grant of the government's stay application and its petition for writ of certiorari before judgment in *Slaughter* a few days ago indicates that the Court soon may decide whether or not *Humphrey's Executor* should be overruled or modified, but there is no indication of how the Court will rule. As explained below, the Court will have good reasons to uphold removal conditions for multimember boards. In the meantime, *Humphrey's Executor* and *Wiener* govern this Court. Order Granting Stay, *Trump v. Slaughter*, No. 25-332 (Sept. 8, 2025); *E.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). And regardless of the outcome in *Slaughter*, the removal protections Congress enacted for USIP's (b)(4) directors do not impermissibly interfere with the President's authority under Article II of the Constitution because USIP is an independent nonprofit corporation that exercises little, if any, executive power.

### 2. The USIP Act's removal protections are constitutional under binding precedent.

Based on decisions invalidating removal protections for single-director agencies that explicitly did not alter the longstanding exception for multimember

bipartisan expert boards, Appellants ask this Court to assume that the Supreme Court will overrule *Humphrey's Executor* and *Wiener* or, failing that, cabin them to their precise facts. But even if this Court were inclined to disregard precedent and make a predictive judgment about what the Supreme Court will do when it decides a multimember board removal case on the merits, that predictive judgment must be based on whether the board in question is one—like the FTC, NLRB, and MSPB— that exercises "considerable" executive power. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."). Seeking a stay of an order reinstating a member of the CPSC, in *Boyle* the Solicitor General agreed that "considerable" executive power is the applicable standard: "*Wilcox* further establishes that the government is likely to show that agencies such as the NLRB and MSPB exercise "considerable" executive power - and that their members accordingly fall outside the *Humphrey's Executor* exception." App. to Stay at 12, *Trump v. Boyle*, No. 25A11, 2025 WL 1867283 (Jul. 2, 2025). In *Boyle*, the Court applied that same standard, finding that the CSPC "exercises executive power in a similar manner as the [NLRB], and the case does not otherwise differ from *Wilcox* in any pertinent respect." 145 S. Ct. at 2654.

If this Court applies that standard here, it must affirm. There is simply no comparison between the quantum of executive power that Appellants seek to

attribute to USIP (even while riding roughshod over the record and the findings of the District Court, as explained *supra*) and the extensive regulatory and enforcement powers of the current FTC, NLRB, MSPB, and CPSC. Here, Appellants do not even try to mount a serious effort (as the government has in other cases) to show that USIP's executive power, if any, is similar to the NLRB's or greater than that of the 1935 FTC. *Cf.* App. For Stay, *Slaughter v. Trump*, No. 25-5261, at 12-16 (describing powers of FTC in 1935 and today). Appellants' conclusory discussion (Br. 42) quotes what the Ninth Circuit said about CFPB, but offers no reason why USIP's functions—even if any of them is deemed executive—are comparable. And Appellants' suggestion (Br. 41) that *Humphrey's Executor* cannot support removal protections for an entity involved in foreign affairs, a "different" type of executive power than the regulatory powers of the FTC, is foreclosed by *Wiener*'s application of *Humphrey's Executor* to uphold removal protections for a multimember board involved in the core executive foreign affairs function of settling war claims against formerly belligerent states. 357 U.S. at 349, 350, 354; *see Garamendi*, 539 U.S. at 415–16; *see also Zivotofsky*, 576 U.S. at 21 ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue.").

This Court cannot reduce *Humphrey's Executor* and *Wiener* to the level of doctrinal insignificance that would be required to support the conclusion that the

statutory restrictions imposed by Congress in the USIP Act are unconstitutional and USIP's board is subject to at-will removal. Under current binding precedent this Court must affirm. *Severino*, 71 F.4th at 1047.[29]

### 3. The USIP Act's removal protections are constitutionally valid.

Even if this Court were not bound by *Humphrey's Executor* or if the Supreme Court were to overrule or limit it in *Slaughter*, the restrictions on removing USIP board members would be constitutional. Congress gave USIP independence to achieve foreign affairs objectives within Congress's own purview. For the reasons addressed at length above, removal restrictions for an entity like USIP do not encroach on executive regulatory or enforcement discretion, or on the Executive Branch's conduct of U.S. foreign policy. USIP's structure sufficiently accommodates Executive Branch influence (if required) while maintaining a multimember bipartisan board of experts in a manner consistent with a long tradition of congressional use of quasi-private, independent structures. This Court should not assume that fresh Supreme Court consideration of multimember regulators like the

---

[29] Unlike the Administrative Conference, the agency involved in *Severino*, which the Court deemed a body that Congress had situated within the Executive Branch exclusively to advise the Executive Branch, USIP substantially advises and assists Congress. *See* JA366 (Dist. Ct. finding that "many of [USIP's projects] derive from congressional committees rather than Executive branch officials").

modern FTC will yield a rule that precludes Congress from specifying removal conditions for an entity like USIP.

Then-Judge Kavanaugh's dissenting opinion in *PHH v. CFPB*, 881 F.3d 75, 165-198 (D.C. Cir. 2018) (en banc), explained why a partisan-balanced, multimember board, like those of the 1935 FTC and the many similar entities Congress has established since *Humphrey's Executor* in reliance on that decision, is constitutionally different from a single-headed agency like CFPB. As that opinion explained, both history—in the form of Congress's long practice of using corporate structures with multimember boards that Congress concluded could best pursue the nation's interests if outside the reach of direct presidential control—and the perceived benefits of distributing power among members of a board distinguished the structure upheld in *Humphrey's Executor* from CFPB. "In the absence of presidential control, the multimember structure of independent agencies serves as a critical substitute check on the excesses of any individual independent agency head." *Id.* at 183.[30]

The USIP Board has all the structural features that then-Judge Kavanaugh cited in support of the constitutionality of multimember bipartisan expert boards. Even aside from the multiple pathways to removal in § 4605(f) and staggered four-

___

[30] It is noteworthy that USIP was not included on then-Judge Kavanaugh's long list of multimember "independent agencies exercising substantial executive authority." *Id.* at 173.

year terms for (b)(4) directors (a provision that ensures that every President will have the opportunity to nominate new (b)(4) directors), the USIP Act gives the President still more influence over USIP in the form of the three *ex officio* board members. That only weakens Appellants' argument that USIP's removal restrictions are unconstitutional. And far from discarding the distinction between multimember boards and agencies headed by a single director, the *Seila Law* plurality suggested that Congress could cure the constitutional defect the Court found in CFPB's statute by replacing the single director with a board. *See* 591 U.S. at 237 ("Our severability analysis does not foreclose Congress from pursuing alternative responses to the problem—for example, converting the CFPB into a multimember agency.").

Then-Judge Kavanaugh's opinion reflects that multimember board structures with removal restrictions are historically common devices that should be assessed on their own constitutional merits, not as an anomalous exception to a general rule of at-will removal for all entities Congress creates. Indeed, there was no such general rule.

The "decision of 1789" debate in the first Congress was focused on what role, if any, Congress or the Senate would play in the removal of individual executive officers, not the statutory *standard* for presidential removal. *See In re Hennen*, 38 U.S. 230, 259 (1839) (describing debate as related "to the power of the President to remove officers appointed with the concurrence of the Senate: and the great question

was, whether the removal was to be by the President alone, or with the concurrence of the Senate, both constituting the appointing power."). That issue was important in *Myers v. United States*, 272 U.S. 52 (1926), because *Myers* involved the constitutionality of a statute that required the Senate to advise and consent to the removal of a postmaster.[31] But Congress did not decide in 1789 (even if it could have by a post-ratification debate) that the Constitution prohibits any statutory for-cause removal standards. Madison certainly did not think so: he told the House that "Congress may establish offices by law; therefore, most certainly it is in the discretion of the Legislature to say upon what terms the office shall be held, either during good behavior or during pleasure." 1 Annals of Congr. 389 (May 19, 1789). That is consistent with what Madison earlier wrote in Federalist 39: "The tenure of the ministerial [as distinct from judicial] offices generally, will be a subject of legal regulation, conformably to the reason of the case and the example of the State constitutions," which Madison knew provided varying standards for removal. *See*

---

[31] That was how the Supreme Court described the 1789 debate in *Bowsher v. Synar,* 478 U.S. 714, 723 (1986): "Madison's position ultimately prevailed, and a congressional role in the removal process was rejected." In *Bowsher*, the Court held unconstitutional "[a] direct congressional role in the removal of officers charged with the execution of the laws," like the statutory provision conferring executive powers on the Comptroller General who was "removable not by the President but only by a joint resolution of Congress or by impeachment." Like *Myers*, *Bowsher* involved congressional participation in removal—the issue Congress debated in 1789—not whether Congress could create positions subject to a for-cause standard for removal by the President.

Peter M. Shane, The Originalist Myth of the Unitary Executive, 19 U. Pa. J. Const. L. 323, 338-44 (2016). The question whether Congress or the Senate could interject itself into an individual removal decision is different from whether Congress, in legislation creating an office, may set standards for removal.[32] And, as discussed *infra*, Part II.C, from the beginning Congress vested corporations and commissions whose boards were not subject to at will removal with functions that Appellants would deem executive.

The Supreme Court held in 1886—contemporaneous with Congress' creation of the Interstate Commerce Commission with a multimember board subject to for-cause removal—that "[t]he constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed." *United States v. Perkins*, 116 U.S. 483, 485 (1886). While *Perkins* involved an inferior officer, and the Court stated it need not consider whether Congress could limit the removal of a principal officer, nothing in the text of the Appointments Clause suggests that Congress is limited to a lesser role in specifying standards for the removal of a

---

[32] Appellants (Br. 38-39) rely upon Attorney General Jackson's opinion advising the President that he could fire a member of the TVA board for misconduct, but it is inapposite here. Jackson's opinion was primarily based on his determination of the invalidity of the statute requiring *Congress* to remove TVA Board members by concurrent resolution. *Power of the President to Remove Members of the Tennessee Valley Auth. from Off.*, 39 U.S. Op. Atty. Gen. 145, 148 (1938).

principal officer (where the Senate must consent to the appointment) than an inferior officer, as to whom Congress could provide for no Senate role at all. The Court need not decide any of these issues to resolve this appeal, but even were it to disregard controlling precedent, there are strong grounds to conclude that any future re-examination of the constitutionality of removal protections for multimember boards will *not* cast aside the long-recognized reasons for those protections and end in the absolutist position proposed by Appellants (at Br. 42-44).[33]

In sum, *Humphrey's Executor* and *Wiener* continue to stand as precedents that bind this Court to affirm the judgment below because USIP exercises far less executive power than the 1935 FTC. JA379. Then-Judge Kavanaugh's *PHH* dissent explains why, apart from *Humphrey's Executor*'s precedential value, there are good reasons to preserve Congress's historically recognized ability to legislate removal restrictions for multimember boards when Congress has concluded a degree of independence is important to serve policy goals. And even without regard to those precedents, the structure and functions of USIP, based on the record in this case, demonstrate that the independence of its governing board poses no impediment to the authority of the President to govern the Executive Branch.

---

[33] Appellants (Br. 49) also briefly challenge a removal option (§ 4605(f)(3)) not at issue in this case. The constitutionality of permitting presidential removal of a (b)(4) director member upon the recommendation of congressional committees is not before the Court and that alternative provision would be severable without affecting the removal for cause standard in § 4605(f)(1).

### C. Not Every Entity Congress Creates To Further A Governmental Purpose Must Be Subject To At-Will Removal.

The ultimate question in this case is not whether *Humphrey's Executor* should be shrunk to "the precise considerations then before the Court" (Br. 42)—disregarding the Supreme Court's application of a broader rule in *Wiener*—but whether Article II mandates that the President must have at-will removal authority over directors of a nonprofit corporation Congress structured to be independent. Even if this Court were to conclude that USIP exercises some quantum of executive power, the answer is no. It vastly oversimplifies and contradicts the actual structure of the federal government to assume that all entities that carry out what Appellants classify as executive power must be subject to at-will presidential removal. Congress has created a wide array of such entities, especially for-profit and nonprofit corporate entities, that do not fit neatly into a framework that supposes that all government functions other than legislating and judging must be subject to direct Executive Branch control.[34]

---

[34] *See, e.g.*, GAO, Federally Created Entities: An Overview of Key Attributes 13-15 (2009) (listing corporations); *id.* at 21-23 (listing "other federally established organizations which are federally controlled non-profits); Kevin R. Kosar, Congressional Research Service, The Quasi Government: Hybrid Organizations with Both Government and Private Sector Legal Characteristics (June 22, 2011) (describing the wide range of structures Congress has authorized to carry out governmental purposes). The Executive Branch recognizes this too. *See* JA153-55 (Government Manual classifying USIP, Smithsonian, State Justice Institute, and Legal Services Corporation as "quasi-official agencies").

USIP is an independent nonprofit corporation with no regulatory or enforcement role. Congress chose this structure based on its determination that USIP must be independent from the Executive to serve as an adviser to Congress and to effectively and credibly fulfill its mission. In structuring USIP, Congress continued a longstanding historical practice, beginning at the founding, of using the corporate form and limitations on directors' removal to create entities that serve governmental purposes and operate with a measure of independence.[35] That history is relevant not only to the Federal Reserve, *see Wilcox,* 145 S. Ct. 1415 (disputing that stay order "necessarily implicate[s] the constitutionality of the for-cause removal protections" for the Federal Reserve because it "is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States"), but also to whether other corporations and similar entities established by Congress must be subject to presidential control through at-will removal.

The First Bank of the United States was governed by directors elected by shareholders, and the government held only one-fifth of the shares. The Second Bank's directors included five presidential appointees, but again representing only one-fifth of the board. As controversial as the Banks were, they were never

---

[35] No doubt Congress could run afoul of the private non-delegation doctrine if it conferred regulatory and enforcement powers on a nonprofit corporation, which explains why the PCAOB chose to embrace Executive Branch status as inferior officers in *Free Enterprise Fund*. But USIP's authority does not extend to regulation or enforcement of any kind—and thus poses no non-delegation problem.

challenged as incompatible with at-will presidential removal. The Sinking Fund Commission was comprised of five members, three of whom the President could remove and two of whom—the Chief Justice (the head of a different branch) and the Vice President (at that time a rival not a running mate)—he could not. *See Collins*, 594 U.S. at 253 n.19 (citing 1 Stat. 186 (1790)). The Mint Commission established in 1792 also included the non-removable Chief Justice. *See* Aaron L. Nielson & Christopher J. Walker, The Early Years of Congress's Anti-Removal Power, 63 Am. J. Legal Hist. 219, 226 (2023). In 1846, when Congress created a Board of Regents for the Smithsonian, its members also included the Chief Justice and the Vice President. *See* 20 U.S.C. § 41.

The Sentencing Commission is another example of an entity that—while clearly governmental—exposes the difficulty of classifying powers as "executive" and attributing dispositive importance to the assignment of an entity to a branch. Although Congress housed the Sentencing Commission within the Judicial Branch (just as it structured USIP as a nongovernmental nonprofit), the Commission engages in policymaking and issues the equivalent of regulations with a direct impact on criminal punishment. Yet the Supreme Court has upheld for-cause removal restrictions for members of the Sentencing Commission "to safeguard the independence of the Commission from executive control." *Mistretta v. United States*, 488 U.S. 361, 410 (1989). Or consider the Tax Court judges. In *Kuretski v. Comm'r*,

755 F.3d 929, 935 (D.C. Cir. 2014), this Court rejected a challenge to for-cause presidential removal of Tax Court judges, even while holding that the court was within the Executive Branch, so there was no "interbranch removal" issue to decide. This Court did not identify any inconsistency between locating the Tax Court within the Executive Branch and affirming the judges' relative independence from executive control. *Id.* at 943. That for-cause removal restrictions were upheld in both cases—one involving executive-type functions within the Judicial Branch (*Mistretta*) and the other involving adjudicative functions within the Executive Branch (*Kuretski*)—confirms that Appellants' formalistic view does not withstand scrutiny.

## II.  THE DISTRICT COURT'S REMEDIAL ORDER WAS APPROPRIATE

### A.  The Government Does Not Challenge Most Of The Relief Ordered

Appellants' assertions that the District Court exceeded its equitable authority by declaring unlawful the removal of the (b)(4) directors and by ordering that they continue to serve are wrong for the reasons given in the next section. At the outset, however, it is important to recognize that those arguments have no bearing on significant aspects of the relief the District Court ordered, including:

- Declaring "the purported removal of Ambassador George Moose as acting president of the Institute" invalid and that he remains acting president;

- Declaring the purported appointments of Appellants Jackson and Cavanaugh as successive acting presidents of USIP invalid;

- Declaring all actions taken or authorized by Jackson or Cavanaugh invalid, including the purported transfer to GSA of USIP's building and its physical and financial assets;

- Declaring the purported appointment of Adam Amar as president of USIP's Endowment invalid, along with the instruction for him to transfer the Endowment's assets to USIP (so USIP could transfer them to GSA);

- Ordering that Ambassador Moose (who was not removed by the President or subject to Presidential removal) shall continue to serve as USIP's acting president; and

- Enjoining defendants from trespassing on or controlling USIP's facilities or transferring USIP's assets.

Those unchallenged provisions of the judgment prevent Appellants from demolishing USIP without congressional authority. And those aspects of the District Court's judgment are wholly distinct from the "de jure reinstatement of a principal officer," which Appellants erroneously argue (Br. 50) is impermissible.

## B. Courts Can Remedy The Clear Violation Of A Statutory Removal Restriction

The Court in *Seila Law* referred to a "contested removal" as "one way to review a removal restriction." 591 U.S. at 212. The Court has also recognized, at least in the stay context, that "a wrongfully removed officer" suffers harm "from being unable to perform her statutory duty." *Wilcox*, 145 S. Ct. at 1415. Damages cannot remedy that kind of harm, necessitating an order invalidating the wrongful removal and its consequences.

The District Court here followed the path laid out in *Swan*, 100 F.3d at 973, 979-981, in the portion of the decision holding that Swan's asserted injury was redressable (and therefore within the Court's jurisdiction) without having "to determine whether, in light of *Franklin* [*v. Massachusetts*, 505 U.S. 788 (1992)], the President can be enjoined to perform a ministerial duty." Judge Silberman objected to the majority's discussion of the possibility of enjoining the President as unnecessary because he thought "we could grant appellant all the relief he would ever need in this case, using only a little ingenuity, without ever attempting to impose judicial power directly on the President of the United States." *Id.* at 989. Judge Silberman went on to explain how a court could "compel all officials at the Board to treat Swan as the rightful incumbent and, consequently, to ignore Wheat, at least officially. Moreover, the Secretary of Treasury could be directed to pay Swan's salary and not to pay Wheat a nickel in federal funds. If that hypothetical order would

not give Swan complete relief, I would be very surprised indeed." *Id. Swan* alone defeats Appellants' attack on the District Court's remedial order, an attack based on contrived readings of three cases while disregarding a landmark of American law.

The disregarded landmark is *Marbury v. Madison*, 5 U.S. 137, 173 (1803). As the Court explained in one of the principal authorities cited by Appellants, in *Marbury*: "the duty of delivery was imposed by law on the Secretary of State. It was held that the performance of this duty might be enforced by *mandamus* issuing from a court having jurisdiction." *Mississippi v. Johnson*, 71 U.S. 475, 498 (1866). *Mississippi v. Johnson* thus confirms the remedial authority of a court to enforce an officer's statutory right to an office, even over the opposition of the incumbent president. Here, the statutory requirements are clear, and it is the President who challenges the constitutionality of those requirements. The constitutionality of an act of Congress is a legal question for a court, not a matter of presidential discretion like the injunction sought by Mississippi against enforcement of the Reconstruction Acts.

Chief Justice Marshall expressed no doubts in *Marbury* about the availability of a judicial remedy to restore an appointed official to his office: "This, then, is a plain case for a mandamus, either to deliver the commission, or a copy of it from the record; and it only remains to be inquired, [w]hether it can issue from this court." 5 U.S. at 173. Marbury lost because the Supreme Court did not have original

jurisdiction (and Congress could not confer it), not because a court with jurisdiction could not issue an order compelling the issuance of his judicial commission.[36]

Appellants misread the three cases upon which they principally rely. The limits on equity power referred to in *White v. Berry*, 171 U.S. 366, 376-77 (1898), and *In re Sawyer*, 124 U.S. 200 (1888), were not about a specific rule that injunctions to restore a public official to office were beyond the traditional powers of a court of equity, but about the general and now obsolete rule, dating from before the merger of law and equity, that courts of equity would not intervene if legal relief was available. "The jurisdiction to determine the title to a public office belongs exclusively to the courts of law, and is exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*, according to the circumstances of the case, and the mode of procedure, established by the common law or by statute." *In re Sawyer*, 124 U.S. at 212; *id.* at 216 ("In Nebraska, as elsewhere, the validity of the removal of a public officer, and the title of the person removed, or of a new appointee, to the office, may be tried by *quo warranto* or *mandamus*."). The *Sawyer* Court concluded that the availability of legal relief in state court precluded a federal court from granting equitable relief on a federal constitutional claim. *Id.* at 220 ("If a person claiming to

---

[36] In *Hennen*, 38 U.S. at 230, the Court denied mandamus relief because the appointing judge had statutory authority to discharge the clerk, not because mandamus was not an appropriate remedy.

be such an officer is, by the judgment of a court of the state, either in appellate proceedings or upon a *mandamus* or *quo warranto*, denied any right secured to him by the constitution of the United States, he can obtain relief by a writ of error from this court. In any aspect of the case, therefore, the circuit court of the United States was without jurisdiction or authority to entertain the bill in equity for an injunction.").

Indeed, consistent with *Marbury*, the Supreme Court continued to view mandamus as a proper way to resolve an office-holder's disputed claim to an office at the time *Sawyer* and *White v. Berry* were decided. *See Delgado v. Chavez*, 140 U.S. 586, 591-92 (1891) (citing as "in point" *Putnam v. Langley*, 133 Mass. 204 (1882), in which "[i]t was held that *mandamus* was a proper remedy to compel Langley and Richards to recognize, receive, and act with the plaintiff as a member of the board"). So did this Court. *See Kalbfus v. Siddons*, 42 App. D.C. 310, 319-21 (D.C. Cir. 1914) (collecting cases and quoting with approval Lord Mansfield's statement that "[a] mandamus to restore is the true specific remedy where a person is wrongfully dispossessed of any office or function which draws after it temporal rights, in all cases where the established course of law has not provided a specific remedy by another form of proceeding.").[37]

---

[37] The District Court's remedy was also proper because USIP's (b)(4) directors are directors of a nonprofit corporation, not appointed federal employees. 22 U.S.C. §§

Following the merger of law and equity, an order declaring a purported removal by the President in violation of a clear statute, and denying that purported removal legal effect, is a valid exercise of judicial power whether the order is regarded as one under 28 U.S.C. § 1361 "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," or an equitable injunction. The order at issue here was not tantamount to the appointment by the District Court of USIP board members. There is no dispute that the (b)(4) directors, including Appellees, were duly appointed. Once the District Court rejected the President's constitutional challenge to the statute limiting their removal, the remedy followed as a matter of course, just as it would have in *Marbury* but for the lack of original jurisdiction. Appellants owed the (b)(4) directors a duty, no less than Madison owed Marbury a duty to deliver his commission. In cases such as these, courts are not powerless. *See Kalbfus*, 42 App. D.C. at 321 (holding that since the removal of an office holder violated due process, the appointment of a successor was "a mere nullity" and mandamus was "the most adequate remedy" to restore the plaintiff to his rights).

---

4603(b), 4604(a). Both the D.C. Nonprofit Corporation Act and District of Columbia case law are clear that courts have the power to reinstate wrongfully removed board members of a D.C. nonprofit corporation. *See, e.g.*, *Jackson v. George*, 146 A.3d 405, 410-11 (D.C. 2016) (upholding the trial court's order that the board of a D.C. nonprofit "shall consist . . . of the Board of Trustees that existed prior to the invalidated Resolution"); D.C. Nonprofit Corp. Act, D.C. Code § 29-401.22 (providing for judicial "[r]eview of contested corporate action").

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the

District Court.

September 25, 2025                          Respectfully submitted,

                                    */s/ Andrew N. Goldfarb*
                                    Andrew N. Goldfarb
                                    Jacobus P. van der Ven
                                    J. Benjamin Jernigan
                                    ZUCKERMAN SPAEDER LLP
                                    2100 L Street, NW, Suite 400
                                    Washington, DC 20037
                                    Telephone: (202) 778-1800
                                    agoldfarb@zuckerman.com
                                    cvanderven@zuckerman.com
                                    bjernigan@zuckerman.com

                                    William J. Murphy
                                    ZUCKERMAN SPAEDER LLP
                                    100 East Pratt Street, Suite 2440
                                    Baltimore, MD 21202-1031
                                    Telephone: (410) 332-0444
                                    wmurphy@zuckerman.com

                                    *Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the applicable type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,993 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(f).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word Office in a proportionally spaced typeface (Times New Roman, 14 point).

*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb