**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 25-5185**

# In the United States Court of Appeals for the District of Columbia Circuit

———————————

UNITED STATES INSTITUTE OF PEACE, et al.,

PLAINTIFFS–APPELLEES,

*v.*

KENNETH JACKSON, in his official capacity as Assistant to the Administrator for Management and Resources for USAID and in his purported capacity as Acting President of the United States Institute of Peace, et al.,

DEFENDANTS–APPELLANTS.

———————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (NO. 1:25-CV-00804) THE HONORABLE JUDGE BERYL A. HOWELL*

———————————

## BRIEF OF AMICI CURIAE
## FORMER SENIOR FOREIGN POLICY AND MILITARY OFFICIALS IN SUPPORT OF APPELLEES

———————————

HAROLD HONGJU KOH
SONIA MITTAL
PETER GRUBER RULE OF LAW
CLINIC
YALE LAW SCHOOL
*127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
(203) 432-4932
harold.koh@ylsclinics.org*

DAVID S. KURTZER-ELLENBOGEN
JONATHAN E. SPRATLEY
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
dkurtzer@wc.com*

*Counsel for Amici Curiae*

*Additional counsel on inside cover*

REBECCA LEGRAND
LEGRAND LAW PLLC
*1100 H Street NW, Suite 1220*
*Washington, DC 20005*
*(202) 587-5725*
*rebecca@legrandpllc.com*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae make the following certification:

**A.      Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are identified in the Brief for Appellees.

**B.      Rulings Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C.      Related Cases**

References to related cases appear in the Brief for Appellees.

                                        */s/ David S. Kurtzer-Ellenbogen*
                                        DAVID S. KURTZER-ELLENBOGEN

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ............................................................................1

SUMMARY OF THE ARGUMENT ..................................................................3

ARGUMENT ......................................................................................................6

I.    The Constitution Divides the Foreign Affairs Power Among the
      Three Branches. ........................................................................................6

II.   Congress Created the Institute to Be Independent of the Executive
      Branch, to Serve as a Resource for the Whole Government and the
      American People........................................................................................16

III.  Executive Seizure of the Institute Violates Separation of Powers. ......26

CONCLUSION.................................................................................................27

# TABLE OF AUTHORITIES

Page

## CASES

*Baker v. Carr*, 369 U.S. 186 (1962)................................................................6
*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) ..............7, 8
*Medellín v. Texas*, 552 U.S. 491 (2008) .........................................................6, 7
*U.S. Inst. of Peace v. Jackson,* No. 25-5185 (D.C. Cir. June 27, 2025) ......24, 25
*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) .............15, 16
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)...................6, 26
*Zivotofsky v. Clinton*, 566 U.S. 189 (2012)......................................................6
*Zivotofsky v. Kerry*, 576 U.S. 1 (2015).............................................6, 15, 16

## CONSTITUTION, STATUTES, REGULATION, AND RULE

U.S. Const.
    art. I, § 8..................................................................................7
    art. II, §§ 2–3............................................................................7
    art. III, § 2...............................................................................7
22 U.S.C.
    § 4601........................................................................5, 16, 17, 24
    § 4604....................................................................18, 19, 21, 25
    § 4611.......................................................................................19
Act of July 9, 1832, ch. 174, 4 Stat. 564 .........................................................10
Classified Information Procedures Act,
    Pub. L. No. 96–456, 94 Stat. 2025 (1980)..............................................18
Consolidated Appropriations Act, 2014,
    Pub. L. No. 113-76, 128 Stat. 5 ......................................................10, 11
Department of Defense Appropriations Act, 1985,
    Pub. L. No. 98-473, 98 Stat. 1837 (1984)................................................10
Foreign Service Act of 1924,
    Pub. L. No. 68-135, ch. 182, 43 Stat. 140 ..............................................10
National Security Act of 1947,
    Pub. L. No. 80-235, ch. 343, 61 Stat. 496 ..............................................10
National Defense Authorization Act for Fiscal Year 2016,
    Pub. L. No. 114-92, 129 Stat. 726 (2015)................................................11
United States Institute of Peace Act,
    Pub. L. 98-525, 98 Stat. 2649 (1984)
    (codified at 22 U.S.C. §§ 4601-4611) ......................................................4
15 C.F.R. § 4a.8 (2025)...................................................................................18

**Page**

**Constitution, Statutes, Regulation, and Rule—continued:**

Fed. R. App. P. 29 ................................................................1

## OTHER AUTHORITIES

9 *Abridgment of the Debates of Congress, from 1789 to 1856* (1858) ...............10

*A Pathway for Peace in Afghanistan: Examining the Findings and Recommendations of the Afghanistan Study Group: Hearing before the Subcomm. on Nat'l Sec. of the H.R. Comm. on Oversight and Reform*, 117th Cong., 1st Sess. (2021) ........................................20

*Afghanistan Study Group Final Report: A Pathway for Peace in Afghanistan*, U.S. Inst. of Peace (Feb. 3, 2021), https://perma.cc/F6J6-SNTZ ........................................20

Arthur Bestor, *Respective Roles of Senate and President in the Making and Abrogation of Treaties—The Original Intent of the Framers of the Constitution Historically Examined*, 55 Wash. L. Rev. 1 (1979)........................................8

*Bipartisan Congressional Dialogues*, U.S. Inst. of Peace, https://perma.cc/SW9L-XCGT........................................21

Br. of 113 Former Senior Mil. & Foreign Pol'y Gov't Offs. as Amici Curiae Supporting Pls., *U.S. Inst. of Peace v. Jackson*, No. 1:25-cv-00804 (D.D.C. Apr. 9, 2025), ECF No. 31 ....................................1

Committee on International Judicial Relations, https://perma.cc/FGG6-ZRNK ........................................13

64 Cong. Rec. 1219 (1923) ........................................10

*Congress,* Cong. Off. for Int'l Leadership, https://perma.cc/C6WQ-EN29 ........................................12

Ashley Deeks & Kristen E. Eichensehr, *Frictionless Government and Foreign Relations*, 110 Va. L. Rev. 1815 (2024)........................................9, 10

Lucila Del Aguila Llausás & Nicolás Devia-Valbuena, *Justice by Vote? Lessons for Mexico from Bolivia's Judicial Elections*, U.S. Inst. of Peace (Nov. 14, 2024), https://perma.cc/Z3YZ-97XC ........................................19

*The Federalist*
No. 29 ........................................9
No. 75 ........................................9

H.R. Con. Res. 43, 110th Cong. (as reported by H.R., Jan. 23, 2007) ...........20

iv

**Page**

**Other Authorities—continued:**

Sam F. Halabi & Nanette K. Laughrey, *Understanding the Judicial Conference Committee on International Judicial Relations*, 99 Marq. L. Rev. 239 (2015)................................................14

Susan Hammond & Bee Vang, *How to Support People with Disabilities in War-Impacted Regions of Laos*, U.S. Inst. of Peace (Dec. 12, 2024), https://perma.cc/YEE6-5WUF ............................................19

Louis Henkin, *Foreign Affairs and the Constitution* (1972) .......................8, 15

*History*, Fed. Jud. Ctr., https://perma.cc/KA7Y-9UCV .............................13, 14

Norah Huang, *A Taiwan Perspective on What Is at Stake After Nancy Pelosi's Visit to Taiwan*, Brookings Inst. (Sept. 26, 2022), https://perma.cc/9ZWN-MXHM....................................................12

*Iraq Study Group*, U.S. Inst. of Peace, https://perma.cc/M744-VN43............20

Harold Hongju Koh, *The National Security Constitution in the 21st Century* (2024)..................................................................................16

*Letters of Pacificus and Helvidius on the Proclamation of Neutrality of 1793* (1793), *reprinted* (J. & G. S. Gideon eds. 1845) .................................9

Mary E. Montgomery, *Working for Peace While Preparing for War: The Creation of the United States Institute of Peace*, 40 J. Peace Rsch. 479 (2003) ................................................16, 17

David H. Moore, *Beyond One Voice*, 98 Minn. L. Rev. 953 (2014) ...................7

Off. of the Dir. of Nat'l Intel., Nat'l Counterintelligence & Sec. Ctr., 2019 Annual Report on Security Clearance Determinations (2020), https://perma.cc/JB52-EQQ8 ........................................................18

Off. of Pol'y Planning, U.S. Dep't of State, *About Us—Policy Planning Staff*, https://perma.cc/5PGC-VVVF ..........22

Joel R. Paul, *The Geopolitical Constitution: Executive Expediency and Executive Agreements*, 86 Calif. L. Rev. 671 (1998)...............................9

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231 (2001) ........8

Press Release, Cong. Off. for Int'l Leadership, COIL Hosts First Regional Judicial Alumni Conference in Ulaanbaatar, Mongolia (June 5, 2025), https://perma.cc/2BTR-7GQF .............................................13

**Page**

**Other Authorities—continued:**

Project on Gov't Oversight, Tip Sheet on Congressional Access to
   Classified, Sensitive, or Privileged Information,
   https://perma.cc/A72M-HNLH ........................................................ 18
1 *The Records of the Federal Convention of 1787*
   (Max Farrand ed. 1911) ............................................................. 8, 9
Ryan M. Scoville, *Legislative Diplomacy,*
   112 Mich. L. Rev. 331 (2013) .................................................... 11, 12
Bruce Stein, *The Framers' Intent and the Early Years of the Republic*,
   11 Hofstra L. Rev. 413 (1982) .................................................... 8, 9
U.S. Comm'n on Proposals for the Nat'l Acad. of Peace & Conflict
   Resol., To Establish the United States Academy of Peace (1981) ............. 17
U.S. Inst. of Peace, Biennial Report of the United States Institute of
   Peace (1987) ........................................................................... 18
U.S. Jud. Conf., International Judicial Relations,
   https://perma.cc/FGG6-ZRNK ................................................. 14, 15
2 U.S. Dep't of State, Foreign Affairs Handbook (2024) ................... 23
Michael A. Weber, Cong. Rsch. Serv., R47890,
   *Democracy and Human Rights in U.S. Foreign Policy: Evolution,*
   *Tools, and Considerations for Congress* (Jan. 7, 2025),
   https://perma.cc/8ART-PDRU .................................................... 11
*What We Do,* Cong. Off. for Int'l Leadership,
   https://perma.cc/SZN7-4472 ................................................. 12, 13

vi

## STATEMENT OF INTEREST

Amici curiae are former senior American national security officials who served the United States around the world—including in numerous conflict zones—in presidentially appointed national security positions in every prior administration since President Nixon.[1] They have vast experience working in the world's most sensitive regions and grappling with the nation's most complex military and foreign policy challenges.

In Washington, amici served in senior national security positions up to and including Secretary of Defense, Director of the Central Intelligence Agency, National Security Advisor, Administrator of the United States Agency for International Development, and dozens of other critical foreign

---

[1] The full list of amici is set forth in Appendix A to this brief. Many of the undersigned amici signed an amicus brief filed in the district court, upon which this brief builds. Br. of 113 Former Senior Mil. & Foreign Pol'y Gov't Offs. as Amici Curiae Supporting Pls., *U.S. Inst. of Peace v. Jackson*, No. 1:25-cv-00804 (D.D.C. Apr. 9, 2025), ECF No. 31. Certain amici have past affiliations with the United States Institute of Peace, such as Board membership, employment, or service as a fellow or guest scholar. Amici file this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2). No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than amici and their counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

policy and national security roles. Those include leading subject-matter bureaus with responsibilities specific to conflict resolution, such as the State Department's Bureau of Conflict and Stabilization Operations, as well as regional bureaus with responsibilities for areas of the world wracked by violent conflict.

In civilian roles overseas, amici have served Presidents across six decades, as United States Ambassadors to dozens of countries, as Ambassadors to various international organizations including the United Nations and NATO, and as presidentially appointed Ambassadors, Special Envoys, and Special Coordinators for urgent subject matters and many regions and conflicts worldwide. In the military, amici served as flag-rank and other senior officers in combat positions and in leadership roles such as Commander in Chief, United States Central Command, Chief of Naval Operations, and Commander, United States Army Europe.

Amici have collectively dedicated centuries to advancing the national security interests of the United States in Executive Branch positions, serving Republican and Democratic Presidents alike. They have a deep breadth of experience, knowledge, and understanding of what it means to function within the Executive Branch and to exert executive power on issues of foreign policy and national defense. They also understand what it means to work outside the

2

Executive Branch with respect to such matters. They are deeply familiar with the work of the United States Institute of Peace (the "Institute"). They submit that, in their experience, the Institute's important functions entail no authority that can reasonably be characterized as falling within the exclusive executive foreign affairs power and hence, within exclusive presidential control.

## SUMMARY OF THE ARGUMENT

Appellants' purported justification for taking over and functionally eliminating the Institute rests on two related arguments that are factually and legally false: (1) that the Institute exercises executive power because it acts like an arm of the Executive Branch; and (2) that the President may unilaterally remove the Institute's leadership and functionally disband the organization altogether because the Institute falls within the Executive's exclusive foreign affairs authority.

Appellants' reductive claim (at 21)—that because it "participat[es] in foreign affairs," the Institute must *ipso facto* be within the Executive Branch—finds no support in fact or law. First, as a factual matter, the Institute neither creates nor executes government policy, promulgates no regulations, and has no enforcement powers. Rather, as charged by Congress, the Institute runs educational, training, and research programs, including on-the-

3

ground convenings, to fulfill its congressional mandate to advance international peace and conflict resolution.

With respect to the law, Appellants' arguments ignore the many ways in which the Constitution, as understood since the Founding, distributes responsibility for foreign affairs across *all three branches* of the federal government. Congress has always played a direct and powerful role in foreign affairs and looks to and regularly directs the Institute to support that role. The federal judiciary plays its own important foreign affairs role as well, including through the work of the Committee on International Judicial Relations of the Judicial Conference of the United States, which advances the rule of law abroad just as the Institute promotes peace globally.

The Institute does not fall within the limited scope of the Executive Branch's exclusive foreign affairs powers. Congress established the Institute in 1984 through the United States Institute of Peace Act, Pub. L. 98-525, 98 Stat. 2649–60, codified at 22 U.S.C. §§ 4601–11 (the "Act"). The Act recognized the value of "an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs" to "advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence." *Id.* § 4601(a)(8)–(9). The

4

Act accordingly established "an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace." *Id.* § 4601(b). Congress thereby designed an Institute that could undertake work for the *benefit* of the public, including the federal government, while remaining *separate* from the Executive Branch.

In amici's experience, the extensive work done by the Institute over the last forty years has immensely expanded scholarship and training in critical areas of peace studies, as Congress intended. These provisions reflect Congress's considered decision to create an institution that would operate *independently from the Executive Branch*, rather than under the direct supervision of the President. During their many years of national-security-related public service, amici have observed the wisdom of that congressional policy decision. It is the very fact that the Institute is *not* part of the Executive Branch and does *not* exert executive power that has made the Institute such an effective partner both to Congress and to Executive Branch officials addressing challenges in conflict zones. Just as Congress holds the constitutional power to declare war, it shares the constitutional power to promote peace, and

5

it designed the Institute to assist in that worthy effort.

## ARGUMENT

## I.     The Constitution Divides the Foreign Affairs Power Among the Three Branches.

As the Supreme Court has long recognized, the President's foreign affairs powers are neither absolute nor exclusive. Put simply, "[i]t is not for the President alone to determine the whole content of the Nation's foreign policy." *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). Congress plays an indispensable role in foreign affairs, and that role is particularly "essential" in our "ever more compressed and interdependent" world. *Id.* The President's foreign affairs authority thus is at its "lowest ebb" when exercised contrary to the will of Congress. *Medellín v. Texas*, 552 U.S. 491, 524–25 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

The federal judiciary also plays a key role in foreign affairs. It "is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). Resolving questions of constitutional foreign affairs powers is not beyond judicial review, it "is what courts do." *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012); *see also, e.g.*, *Medellín*, 552 U.S. at 504–32 (holding that a decision by the International

Court of Justice and the President's memorandum implementing that decision were not binding under U.S. law absent congressional implementation).

As text, structure, history, tradition, and precedent demonstrate, the foreign affairs power is divided among the three branches.

1.   Starting with the constitutional text, Article II confers on the President two exclusive foreign affairs powers (the role of commander in chief and the authority to receive ambassadors) and two powers shared with Congress (to make treaties and to appoint ambassadors, in both cases with the advice and consent of the Senate). U.S. Const. art. II, §§ 2–3. Article I, meanwhile, vests Congress with the power to declare war, provide an Army and Navy, regulate commerce with foreign nations, and define and punish offenses against the law of nations, along with other enumerated foreign affairs powers. *Id.* art. I, § 8; *see also* David H. Moore, *Beyond One Voice*, 98 Minn. L. Rev. 953, 997 (2014) ("Congress receives the lion's share of enumerated foreign affairs powers."). The judicial power, too, extends to foreign affairs, such as in cases arising under treaties, affecting ambassadors, or implicating admiralty and maritime jurisdiction. U.S. Const. art. III, § 2.[2]

---

[2] *See generally Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230

7

Any theory of foreign affairs power presuming presidential exclusivity is thus "fatally incomplete, for it lacks a textual basis." Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231, 238 (2001). That the Constitution provides for the branches to share foreign affairs authority is no accident.[3] Notwithstanding the string of foreign policy failures suffered under the Articles of Confederation, "the Framers were hardly ready to replace the representative inefficiency of the many with an efficient monarch," given their "unhappy memories of royal prerogative, fear of tyranny, and distrust of any one man." Louis Henkin, *Foreign Affairs and the Constitution* 33 (1972). Indeed, "[e]arly debates in the Convention demonstrate . . . a strong desire on the part of most of the delegates to constrain the executive in external matters."[4] Bruce Stein, *The Framers' Intent*

---

(1986) (refusing to "shirk [its] responsibility" to interpret a statute with significant foreign affairs overtones).

[3] *See* Arthur Bestor, *Respective Roles of Senate and President in the Making and Abrogation of Treaties—The Original Intent of the Framers of the Constitution Historically Examined*, 55 Wash. L. Rev. 1, 33–34 (1979) (observing that of the four enumerated foreign relations powers allocated to the President, two are expressly shared with Congress and two are half powers that "depend for [their] effectiveness upon the exercise of a complementary power specifically vested elsewhere").

[4] *See, e.g.*, 1 *The Records of the Federal Convention of 1787*, at 64–65 (Max

*and the Early Years of the Republic*, 11 Hofstra L. Rev. 413, 511 (1982).

Even Alexander Hamilton, the staunchest early advocate of executive power, characterized *Congress* as "that body which is constituted the guardian of the national security." *The Federalist* No. 29. By contrast, the "history of human conduct does not warrant that exalted opinion of human virtue which would make it wise in a nation to commit interests of so delicate and momentous a kind, as those which concern its intercourse with the rest of the world, to the sole disposal of . . . [the] President of the United States." *The Federalist* No. 75 (Alexander Hamilton). Structurally, the Constitution's division of foreign affairs authority helps protect against the threat of foreign governments shaping our foreign policy and promotes democratic accountability. Joel R. Paul, *The Geopolitical Constitution: Executive Expediency and Executive Agreements*, 86 Calif. L. Rev. 671, 679–80 (1998); *see also* Ashley Deeks & Kristen E. Eichensehr, *Frictionless Government and Foreign Relations*, 110 Va. L. Rev. 1815, 1876–77 (2024) (arguing that shared foreign affairs powers

---

Farrand ed. 1911) (Charles Pinckney warning that granting power over war to the President would create "a Monarchy, of the worst kind"); *Letters of Pacificus and Helvidius on the Proclamation of Neutrality of 1793*, at 76 (1793), *reprinted* (J. & G. S. Gideon eds. 1845) (James Madison describing the President's ability to receive ambassadors as a ceremonial responsibility).

reduce the risk of unintentional conflict and help to better manage foreign relations).

2.    History and tradition confirm the Constitution's textual and structural commitment to shared foreign affairs powers. Traditionally, it has been understood that "there is a grave difference . . . between the President's right to conduct our foreign relations and the question of what our foreign policy shall be." 64 Cong. Rec. 1219 (1923) (statement of Sen. Brandegee). Thus, "[i]f Congress be of the opinion that [the President's] course of policy is wrong, then . . . it [i]s in the power, . . . indeed, the duty of Congress to interfere, and to express its dissent." 9 *Abridgment of the Debates of Congress, from 1789 to 1856*, at 94 (1858) (statement of Rep. Webster). Acting on that understanding, Congress has created and restructured federal agencies that directly deal in foreign affairs.[5] It has exercised its power of the purse to prevent or condition foreign aid, promote human rights, or pursue other foreign policy objectives.[6]

---

[5] *See, e.g.*, Act of July 9, 1832, ch. 174, 4 Stat. 564 (Bureau of Indian Affairs); Foreign Service Act of 1924, Pub. L. No. 68-135, ch. 182, 43 Stat. 140 (Foreign Service); National Security Act of 1947, Pub. L. No. 80-235, ch. 343, 61 Stat. 496 (National Security Council and Central Intelligence Agency).

[6] *See, e.g.*, Department of Defense Appropriations Act, 1985, Pub. L. No. 98-473, § 8066, 98 Stat. 1837, 1935 (1984); Consolidated Appropriations Act, 2014,

And it has mandated reporting on foreign affairs issues such as human rights and religious freedom.[7]

Nor is Congress's role in foreign affairs limited to legislation. As amici know well from personal experience, congressional delegations (members and staff) travel regularly to foreign nations and discuss policy with foreign leaders on behalf of the United States. In just a single year, members of Congress carried out over 2,000 such official visits to more than 117 foreign countries. *See* Ryan M. Scoville, *Legislative Diplomacy*, 112 Mich. L. Rev. 331, 335 (2013). Since President Washington's administration, "international diplomacy" by Congress has been "longstanding, frequent, and widespread." *Id.* at 333, 371–76. Facilitated by myriad statutes, members of Congress "travel abroad to investigate conditions in other countries, lobby foreign governments, negotiate agreements, speak on behalf of the president and the U.S.

---

Pub. L. No. 113-76, div. K, § 7041, 128 Stat. 5, 522–28; National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, §§ 1031–1034, 129 Stat. 726, 968–71 (2015).

[7] Michael A. Weber, Cong. Rsch. Serv., R47890, *Democracy and Human Rights in U.S. Foreign Policy: Evolution, Tools, and Considerations for Congress* (Jan. 7, 2025), https://perma.cc/8ART-PDRU (describing Congress's history of mandating reporting requirements to advance its foreign policy objectives).

government, and even oppose executive policies." *Id.* at 333.[8] As an institution, Congress "receives foreign delegations, maintains official contacts with foreign parliaments, and supports the international travel of its members." *Id.*

Congress has even created its own Office for International Leadership to advance *"Congressional and citizen diplomacy* with global civic and political leaders." *What We Do,* Cong. Off. for Int'l Leadership (emphasis added).[9] As a "support agency of . . . Congress, the Congressional Office for International Leadership has hosted 32,000 delegates through its Open World program across all 50 states." *Congress,* Cong. Off. for Int'l Leadership.[10] In particular, Congress's Open World program has "utilized Congressional leadership and people-to-people engagement to provide foreign visitors with multi-level federal, state, and local introduction to accountable governance and American life." *What We Do,* Cong. Off. for Int'l Leadership, *supra.* In 2023

---

[8] *See also, e.g.*, Norah Huang, *A Taiwan Perspective on What Is at Stake After Nancy Pelosi's Visit to Taiwan*, Brookings Inst. (Sept. 26, 2022), https://perma.cc/9ZWN-MXHM.

[9] https://perma.cc/SZN7-4472.

[10] https://perma.cc/C6WQ-EN29.

alone, the office "hosted 87 in-person Open World groups comprising 532 delegates in 63 communities across 37 states." *Id.*[11]

Similarly, the judiciary's role in foreign affairs is not limited to adjudicating cases with foreign policy implications. Many amici who have served in overseas posts have facilitated official visits by members of the federal judiciary, under programs administered by the Federal Judicial Center and the Judicial Conference's Committee on International Judicial Relations.

Created by Congress over three decades ago on the recommendation of the Federal Courts Study Committee, the International Office of the Federal Judicial Center was designed "to assist in the development of judicial systems in foreign countries" and increase the judiciary's "engag[ment] with foreign counterparts." *History*, Fed. Jud. Ctr.[12] To fulfill its purpose of globally advancing the "basic tenets" of American "freedom" and the rule of law, the International Office facilitates visits and programs by federal judges overseas

---

[11] The federal judiciary also liaises with and participates in the Open World Program of the Congressional Office for International Leadership. *See* Committee on International Judicial Relations, https://perma.cc/FGG6-ZRNK; Press Release, Cong. Off. for Int'l Leadership, COIL Hosts First Regional Judicial Alumni Conference in Ulaanbaatar, Mongolia (June 5, 2025), https://perma.cc/2BTR-7GQF.

[12] https://perma.cc/KA7Y-9UCV.

and by foreign jurists to the United States. *Id.* The International Office has described its work as "help[ing] other nations build accountable judicial branch institutions, fostering the rule of law and facilitating economic development." *Id.*

Similarly, the stated mission of the Committee on International Judicial Relations of the Judicial Conference of the United States "is to coordinate the federal judiciary's relationship with foreign judiciaries . . ., the expansion of the Rule of Law, and the administration of justice." U.S. Jud. Conf., International Judicial Relations 2.[13] "The Committee's primary mission is to serve as a resource for the establishment and expansion of the rule of law and for the administration of justice worldwide." Sam F. Halabi & Nanette K. Laughrey, *Understanding the Judicial Conference Committee on International Judicial Relations*, 99 Marq. L. Rev. 239, 249 (2015). Through the Committee, federal judges, court administrators, federal public defenders, and other judicial officials are available to, among other things, "[p]rovide in-country technical assistance to foreign judiciaries, e.g., review and comment on new laws, consult with foreign counterparts . . . and make recommendations on specific subject-

---

[13] https://perma.cc/FGG6-ZRNK.

14

matter areas," including "counter-terrorism," "criminal procedure," and "human trafficking." U.S. Jud. Conf. at 1, *supra.* Moreover, the Committee can accept funding for these overseas rule-of-law engagements not only from the Executive Branch, but also from foreign countries and international organizations. *Id.*

3.    Faced with this textual, structural, and historical evidence, Appellants rely on dicta characterizing the President as "the sole organ of the federal government in the field of international relations," *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936), but that dicta cannot bear this weight. As the Supreme Court in *Zivotofsky* and numerous commentators have explained, this dicta was glaringly overbroad because *Curtiss-Wright* rested not on the President's inherent powers, but on his exercise of a narrower foreign affairs power that had been specifically *delegated by Congress*. 576 U.S. at 20–21.[14] Without support, Appellants advance an even more expansive view of exclusive executive foreign affairs powers than the "unbounded" theory the Supreme Court pointedly rejected in *Zivotofsky*. *Id.* at 20. This

---

[14] *See also* Louis Henkin, *Foreign Affairs and the U.S. Constitution* 16–21 (2d ed. 1996); Harold Hongju Koh, *The National Security Constitution in the 21st Century* 36–39 (2024).

15

Court's response should be the same as *Zivotofsky*'s: "[t]he *Curtiss–Wright* case does not extend so far as [Appellants] suggest[]." *Id.*

## II. Congress Created the Institute to Be Independent of the Executive Branch, to Serve as a Resource for the Whole Government and the American People.

By design and in practice, the Institute falls well outside the zone of the President's exclusive foreign affairs powers. When Congress established the Institute in 1984, legislators envisioned "an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs," designed to "advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence." 22 U.S.C. § 4601(a)(8)–(9). Earlier efforts to create a peace-focused organization had produced the Arms Control and Disarmament Agency championed by President Kennedy, but this agency ultimately generated widespread disenchantment because its involvement in policy recommendations meant it "operated unabashedly as an arm of the Department of State." Mary E. Montgomery, *Working for Peace While Preparing for War: The Creation of the United States Institute of Peace*, 40 J. Peace Rsch. 479, 480 (2003).

Learning from that experience, Congress deliberately created the Institute as "an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace." 22 U.S.C. § 4601(b). Notably, the Commission that proposed the Institute urged that, to "protect creative inquiry and dialogue," the Institute "not be used for policymaking or for intervention in disputes." U.S. Comm'n on Proposals for the Nat'l Acad. of Peace & Conflict Resol., To Establish the United States Academy of Peace 14 (1981). Adopting that recommendation, Congress "vested the Institute with a measure of intellectual freedom comparable in many respects to that enjoyed by institutions of higher education and . . . stipulated that the Institute focus exclusively on the development and extension of knowledge and skills important to international peace." U.S. Inst. of Peace, Biennial Report of the United States Institute of Peace 1 (1987).

Notably, Congress rejected several proposed amendments aimed at situating the Institute within the Executive Branch, specifically in the State Department. Montgomery, *supra* pp. 16, at 493. By so doing, Congress made clear that the Institute, which does not engage in policy planning or execution,

17

would be distinct from "in-house" foreign-policy planning entities within the Executive Branch. *See, e.g.*, JA737–39 (former foreign service officer explaining that she had more flexibility to work on peacebuilding issues at the Institute due to its distinct role).[15]

Instead, the Institute was tasked with non-policy functions such as promoting research on international peace and conflict resolution by establishing and running educational and training programs, entering into relationships with public and private institutions, providing financial support to scholars and educational programs, and granting an annual peace award. 22 U.S.C.

---

[15] The government erroneously argues that statutory provisions permitting Institute employees to access classified information establish that they are members of the Executive Branch. Appellants' Br. 27, 32; *see* 22 U.S.C. § 4604(b)(3), (b)(8)–(9), (e), (h)(1). But access to classified information is not limited to Executive Branch employees—both Congress and the judiciary can also access such materials. *See* Project on Gov't Oversight, Tip Sheet on Congressional Access to Classified, Sensitive, or Privileged Information, https://perma.cc/A72M-HNLH; Classified Information Procedures Act (CIPA), Pub. L. No. 96–456, 94 Stat. 2025 (1980) (providing for court access to classified information in criminal cases). Indeed, access to classified information is not even limited to government employees. Under the procedures established by the National Industrial Security Program, "[c]ertain bidders, contractors, grantees, educational, scientific, or industrial organizations may receive classified information." 15 C.F.R. § 4a.8 (2025). As of 2019, approximately 4.2 million individuals held security clearances. Off. of the Dir. of Nat'l Intel., Nat'l Counterintelligence & Sec. Ctr., 2019 Annual Report on Security Clearance Determinations 7 (2020), https://perma.cc/JB52-EQQ8.

§ 4604(b)(1)–(5), (c), (d). Additionally, Congress authorized the Institute to publish and disseminate its own original research for the benefit of the public. *Id.* § 4604(b)(7).[16]

At its core, the Institute is a research and information-gathering organization for Congress, as well as the other branches of the government, not an operating instrument of exclusive executive foreign affairs power. The Institute is tasked with a key information-supplying role, which includes providing biennial reports and information *both* to Congress and to the President. 22 U.S.C. § 4611. Furthermore, the Institute may respond to the request of any department or agency in the federal government "to investigate, examine, study, and report on any issue within [its] competence." 22 U.S.C. § 4604(e).

Congress undoubtedly has the power to engage in, or to commission others to conduct, research and information-gathering regarding peace operations to inform its decisions on appropriate legislation or other actions touching on foreign affairs. And this is how Congress designed and has repeatedly

---

[16] *See, e.g.*, Susan Hammond & Bee Vang, *How to Support People with Disabilities in War-Impacted Regions of Laos*, U.S. Inst. of Peace (Dec. 12, 2024), https://perma.cc/YEE6-5WUF; Lucila Del Aguila Llausás & Nicolás Devia-Valbuena, *Justice by Vote? Lessons for Mexico from Bolivia's Judicial Elections*, U.S. Inst. of Peace (Nov. 14, 2024), https://perma.cc/Z3YZ-97XC.

used the Institute—as a means for Congress, and the government as a whole, to gain information that informs foreign policy decision-making. For instance, facing two of the most momentous foreign policy issues in the past decade—our policies towards Iraq and Afghanistan—Congress commissioned the Institute to convene and facilitate study groups to report back to Congress.[17] Likewise, Congress has looked to the Institute as a facilitator for the Bipartisan Congressional Dialogues on foreign policy, in which "Republican and Democratic members of Congress join [Institute] leaders to discuss their shared interest in a specific foreign policy challenge and examine ways to address the

---

[17] *Iraq Study Group*, U.S. Inst. of Peace, https://perma.cc/M744-VN43; *Afghanistan Study Group Final Report: A Pathway for Peace in Afghanistan*, U.S. Inst. of Peace (Feb. 3, 2021), https://perma.cc/F6J6-SNTZ. Members of Congress carefully considered both reports when proposing legislation. For example, Representative Ron Paul introduced a concurrent resolution "[e]xpressing the sense of Congress that the President should implement Recommendation 9 of the Iraq Study Group Report." H.R. Con. Res. 43, 110th Cong. (as reported by H.R., Jan. 23, 2007). Additionally, the House Subcommittee on National Security held a hearing to discuss the Afghanistan Study Group Final Report shortly after its publication. *A Pathway for Peace in Afghanistan: Examining the Findings and Recommendations of the Afghanistan Study Group: Hearing before the Subcomm. on Nat'l Sec. of the H.R. Comm. on Oversight and Reform*, 117th Cong., 1st Sess. (2021).

problem."[18] Through all these efforts, the Institute seeks to fulfill its "*congressional mission* to reduce violent conflict abroad in accordance with America's national interests, approaches, and values." *Id.* (emphasis added).

Appellants are thus mistaken when they suggest in their brief (at 20, 24) that the Institute is engaged in *foreign affairs policymaking* entrusted exclusively to the Executive Branch. The Institute makes no policy. In fact, the Institute is prohibited from seeking to influence legislation, either domestically or internationally. *See* 22 U.S.C. § 4604(n). Unlike executive agencies, the Institute does not act on behalf of the United States in any way. When the Institute's employees engage with others, it is to develop and share expertise regarding what does and does not work in peace-building, not to advance or formulate American foreign policy.[19] In Washington, the functions that the Insti-

---

[18] *Bipartisan Congressional Dialogues*, U.S. Inst. of Peace, https://perma.cc/SW9L-XCGT.

[19] Declarations by Institute employees illustrate this point. *See, e.g.*, JA746–47 ("We also developed training for civil society organizations and peacebuilders in Africa, Latin America, and Asia[] on conflict resolution skills. These organizations worked with [the Institute] . . . because they knew we were similarly a non-profit institution, and independent from the Executive Branch."); *id.* at 751 ("I was able to travel to cities and rural areas and could meet with members of civil society throughout Latin America that . . . fell outside of Chief of

tute performs are entirely different from the in-house policy planning functions performed, for example, by the State Department's Policy Planning Staff,[20] and instead resemble the work of such think tanks as the Council on Foreign Relations, the Center for Strategic and International Studies, or the Carnegie Endowment for International Peace.

Tellingly, when overseas, the Institute's employees are *not* subject to "Chief of Mission" authority, meaning they do not answer to the United States

_____

Mission authority . . . . I could travel to places that the [government] could not reach and meet with people and organizations that the [government] would have trouble accessing."); *id.* at 755 ("[Our] partners trust us because we do not represent the [United States] government or any ideological group that is advocating for specific policies."); *id.* at 759 ("[The Institute] was able to convene a variety of Afghan and international stakeholders at [its] office *because we were viewed as non-governmental* and created a neutral space for peacebuilders to engage in open dialogue that would not have been possible at a . . . government facility.") (emphasis added).

[20] Internal responsibilities of the Policy Planning Staff (S/P) include "lead[ing] . . . the formulation of the National Security Strategy and other long-term planning initiatives and policy reviews," "support[ing] policy development on major priorities for the Secretary," "strengthen[ing] institutional initiatives and programs aimed at strategic foresight and policy planning, debate, and innovation, including the Department's Dissent Channel, and the Secretary's Foreign Affairs Policy Board," and "articulat[ing] the Secretary's strategic narrative and related policy and diplomatic priorities, both within the Department and to the public." Off. of Pol'y Planning, U.S. Dep't of State, *About Us—Policy Planning Staff*, https://perma.cc/5PGC-VVVF.

Ambassador at post.[21] As the many amici who served in the State Department affirm, there could be no more telling demonstration that the Institute is not part of the Executive Branch, because under federal law the "Chief of Mission" (COM)—*i.e.*, the Ambassador—has "the authority to direct, supervise, and coordinate *all U.S. government executive branch activities, operations, and employees* in the COM's country or area of responsibility." 2 U.S. Dep't of State, Foreign Affairs Handbook § FAH-2 H-112.1 (2024) (emphasis added).

Confronted with this voluminous evidence, Appellants concede, as they must, that the Institute is independent of both the State Department and the military and that Institute employees occupy a wholly different role than diplomats. JA256, 270. They nonetheless insist (at 21) that the Institute exercises

---

[21] *See, e.g.*, JA496 (noting that during 2003 and 2004, the Institute's offices in Iraq were located outside the security bubble known as the Green Zone "[t]o preserve credibility as a non-government[al] organization entirely separate from the military or State Department"); *id.* at 520 ("[B]ecause of [the Institute's] independence, our staff does not go through the embassy clearance process nor are they subject to diplomatic security rules when operating throughout the world."); *id.* at 532 ("[Institute] staff, as civilians and non-diplomats, can typically travel on regular tourist or business visas[,] . . . allowing for much faster, lower-profile deployment."); *id.* at 763 (describing the Institute "solely as [a] source of technical input based on its expertise, providing case studies, training, and convening on climate security issues, [but] never weighing in directly on specific strategic decisions made by [United States] military partners").

uniquely executive power. But Appellants distort the role that Congress has assigned the Institute. Its initiatives in foreign nations, much like its domestic activities, center around non-executive work, such as peacebuilding trainings or conducting conflict analysis, JA514–15, producing peace education programming, *id.* at 729–30, and helping to coordinate and convene conversations and dialogue between different networks and communities, often at the request of those groups themselves, *see, e.g.*, *id.* at 520–21, 742–43.

Even assuming *arguendo* that the Institute's actions overseas had overlapped or conflicted with those of the Executive Branch—and nothing in the record shows that they ever have—that would not convert the Institute into an agency subject to exclusive executive control. As part of its own foreign affairs agenda, Congress made it a priority to "promote international peace," 22 U.S.C. § 4601(b), and created the Institute as a means of effectuating that priority through its research, training and convening functions. That is certainly within the constitutional authority of Congress, which alone can decide when to dissolve the peace by declaring war.

Nor can a contrary conclusion be drawn from the examples of the Institute's activities cited by the stay panel. *U.S. Inst. of Peace v. Jackson*, No. 25-

24

5185 (D.C. Cir. June 27, 2025). The stay panel focused on just two of the Institute's Congressionally mandated roles—"engag[ing] in peacebuilding with conflict parties" and exercising "soft power," including through "'stipends, grants, fellowships, and other support to . . . leaders and scholars' from abroad"—and concluded that these were "significant executive power[s]" that were necessary for the President to guard his ability to "set and pursue *his* foreign policy objectives." *Id.* at 3 (emphasis added) (quoting 22 U.S.C. § 4604(b)(1)). But as shown above, our country's "foreign policy objectives" are set by the federal government as a whole and do not belong to the President alone. The Constitution divides foreign affairs authorities among the three branches so they could make that *shared* determination.

The implications of Appellants' contrary view extend far beyond the Institute. If "peacebuilding" and the exercise of "soft power" were within the executive's exclusive domain, then much of Congress's foreign affairs activities, such as congressional delegations to other countries, congressional receipt of visits from foreign leaders, and the entire Congressional Office for International Leadership, would be unconstitutional. *See supra* pp. 12–13. The same reasoning would invalidate the judiciary's foreign affairs work through

the Federal Judicial Center and the Committee on International Judicial Re-

lations. *See supra* pp. 12–13. Our Constitution's division of foreign affairs pow-

ers does not condone, much less require, that result.

## III.   Executive Seizure of the Institute Violates Separation of Powers.

Because the Institute is not a creature of the Executive Branch subject

to exclusive presidential direction, allowing the President to exercise un-

checked authority to remove its officials violates congressional intent and the

separation of powers. Without a hint of explanation or due process, the Exec-

utive summarily unraveled, in just a few weeks, what over many decades Con-

gress had carefully constructed—for Congress itself, the government as a

whole, and the American people.

"The accretion of dangerous power does not come in a day. It does come,

however slowly, from the generative force of unchecked disregard of the re-

strictions that fence in even the most disinterested assertion of authority."

*Youngstown*, 343 U.S. at 594 (Frankfurter, J., concurring). However concep-

tualized, the President's foreign affairs power cannot include the power uni-

laterally to remove the directors of an Institute that does not fall within the

President's exclusive foreign affairs powers. To conclude otherwise risks per-

26

manent damage to the constitutional framework that has undergirded our foreign policy and national security since the Founding.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the District Court.

Respectfully submitted,

/s/ *David S. Kurtzer-Ellenbogen*

HAROLD HONGJU KOH[22]
SONIA MITTAL
PETER GRUBER RULE OF LAW CLINIC[23]
YALE LAW SCHOOL
 *127 Wall Street, P.O. Box 208215*
 *New Haven, CT 06520-8215*
 *(203) 432-4932*
 *harold.koh@ylsclinics.org*

REBECCA LEGRAND
LEGRAND LAW PLLC
 *1100 H Street NW, Suite 1220*
 *Washington, DC 20005*
 *(202) 587-5725*
 *rebecca@legrandpllc.com*

DAVID S. KURTZER-ELLENBOGEN
JONATHAN E. SPRATLEY
WILLIAMS & CONNOLLY LLP
 *680 Maine Avenue SW*
 *Washington, DC 20024*
 *(202) 434-5000*
 *dkurtzer@wc.com*

---

[22] Law student interns Kaitlyn Van Baalen, Madeline Babin, Elizabeth Bailey, Cameron Cucuzzella, Emily Elledge, Isabel Gensler, Riler Holcombe, Caroline Kapp, Samantha Kiernan, and Jake Mattis contributed to this brief's drafting under supervision of counsel for Amici.

[23] This brief sets forth the position of the signatories, as represented by counsel and law student members of the Peter Gruber Rule of Law Clinic, but does not purport to state the views of Yale Law School or Yale University.

27

*Counsel for Amici Curiae*

OCTOBER 2, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, David S. Kurtzer-Ellenbogen, counsel for amici curiae and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached Brief of Amici Curiae Former Senior Foreign Policy And Military Officials in Support of Appellees, is proportionately spaced, has a serif typeface of 14 points or more, and contains 5,681 words.

*/s/ David S. Kurtzer-Ellenbogen*
DAVID S. KURTZER-ELLENBOGEN
*Counsel for Amici Curiae*

OCTOBER 2, 2025

## CERTIFICATE OF SERVICE

I, David S. Kurtzer-Ellenbogen, counsel for amici curiae and a member of the Bar of this Court, certify that on October 2, 2025, a copy of the foregoing document was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ David S. Kurtzer-Ellenbogen
DAVID S. KURTZER-ELLENBOGEN
Counsel for Amici Curiae

OCTOBER 2, 2025