**ORAL ARGUMENT NOT SET**

No. 25-5185

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES INSTITUTE OF PEACE, *et al.*,

*Plaintiffs-Appellees*,

v.

KENNETH JACKSON, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-804-BAH, The Honorable Beryl A. Howell, District Judge

# SUPPLEMENTAL BRIEF OF PLAINTIFFS-APPELLEES

ANDREW N. GOLDFARB
J. BENJAMIN JERNIGAN
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800

WILLIAM J. MURPHY
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 332-0444

*Counsel for Plaintiffs-Appellees*

August 28, 2026

Pursuant to the Court's Order of July 31, 2026 (Doc. 2186152), Appellees respectfully submit this Supplemental Brief addressing *Trump v. Slaughter*, 609 U.S. --, 146 S. Ct. 2283 (2026), and *Trump v. Cook*, 609 U.S. --, 146 S. Ct. 2234 (2026). *Cook* confirms that courts have the power to remedy unlawful officer removals. *Slaughter* confirms that Congress can create entities that may be governmental in character but do not exercise executive power, and supports the district court's holding that the United States Institute of Peace ("USIP") does not exercise executive power and therefore falls outside *Slaughter*'s rule of at-will presidential removal.[1]

***

In *Slaughter*, the Supreme Court held that commissioners of the Federal Trade Commission, whom Congress tasked with administering and enforcing 80 statutes, must be removable at will by the President. The Court reasoned that officials who assist the President in the exercise of the "[t]he executive Power" must be subject to the President's supervision so that the President maintains full responsibility over that power. 146 S. Ct. at 2291 (citation omitted). *Slaughter* was "not a close case" because the FTC's extensive regulatory and enforcement powers amounted to "the

[1] *Slaughter* eliminates the exception to at-will presidential removal for multimember boards, *see Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and therefore disposes of Appellees' *alternative* ground for affirmance. *See* Brief for Appellees at 32 ("Appellees Br."); *USIP v. Jackson*, 783 F. Supp. 3d 316, 367 (D.D.C. 2025).

very essence of execution of the law" and fell "well within the heartland" of executive power. *Id.* at 2304, 2305 (citation modified).

This case is not close either, but in the opposite direction. The question presented is whether, contrary to 22 U.S.C § 4605(f), the private-sector members of the board of USIP (appointed pursuant to 22 U.S.C. § 4605(b)(4)) must be removable at will by the President as an incident of his Article II executive power. The answer is no. *Slaughter* rejects Appellants' efforts to equate any governmental status with executive power; instead, Congress has long created entities that do not come with any "executive . . . power attached." 146 S. Ct. at 2305. These entities (even if governmental in some sense) "need not fall within the rule of presidential removal." *See id.* at 2302; *see* Appellees Br. at 43-46.

USIP, which Congress created as an independent District of Columbia nonprofit corporation, falls within this non-executive category. Consistent with *Slaughter*'s recognition that "the character of the office" governs whether it exercises executive power, 146 S. Ct. at 2301 (citation omitted), the district court ascertained USIP's "constitutional character" through an exhaustive analysis of USIP's functions "as outlined in its organic statute and exercised in practice." *Jackson*, 783 F. Supp. 3d at 358-60. The court held that "USIP does not exercise executive power." *Id.* at 340, 360, 367. Article II therefore does not invalidate the removal protections Congress established for board members. *See Slaughter*, 146 S. Ct. at 2310.

As Appellees explained in their opening brief, the district court was correct that (i) Congress did not task USIP with assisting the President's execution of any law, or with assisting his exercise of any Article II power; and (ii) nothing USIP does in its research and peacebuilding activities constitutes an exercise of executive power. These are the salient factors:

- Congress established USIP as an independent, District of Columbia nonprofit corporation to function as an educational and applied-research think tank. Appellees Br. at 2-8; 22 U.S.C. §§ 4603(b), 4604(a); *id.* § 4601(a)(5) (USIP is "a national institution devoted to international peace research, education and training, and information services").
- USIP's principal functions are to conduct and publish research and to convene educational programs on nonviolent conflict resolution. 22 U.S.C. § 4604(b)(4). USIP's activities mirror those of non-governmental think tanks that focus on international issues, such as the Carter Center or the Center for Strategic and International Studies ("CSIS"). Appellees Br. at 8-11, 31-32.
- USIP assists Congress in Congress's own foreign affairs responsibilities. *Id.* at 9; Br. of *Amici Curiae* Bipartisan Current and Former Members of Congress in Supp. of Appellees ("Congressional Brief"); Br. of *Amici Curiae* Former Senior Policy and Military Officials in Supp. of Appellees ("Former Officials Brief") at 16-21.
- Congress expressly structured USIP to be independent from the Executive Branch and not to be involved in the formulation of United States foreign policy. Appellees Br. at 3-11; JA696-97, 700 (Senate committee report explaining that USIP was designed not to "participate in the policy decisions of any federal or non-federal body" or in "policy-setting" and "not" to "perform a policy implementation role").
- USIP's structure reflects that it is not part of the Executive Branch. The majority of USIP's Board (the (b)((4) Board members) are not federal officers; USIP's employees are for most purposes not federal

employees and are barred from federal benefit programs; USIP is not covered by sovereign immunity; USIP is a separate legal entity that retains private counsel for litigation; USIP privately owns its headquarters building; and USIP raises private funds. Appellees Br. at 4-6 & n.1.

- USIP is in fact independent of the Executive Branch. USIP "may"—not must—respond to a request from an executive agency to undertake research. 22 U.S.C. § 4604(e). And USIP treats requests from the Executive Branch just like requests it receives from other nonprofits and foreign governments: it independently determines whether the requested activity is consistent with USIP's mission and budgetary priorities. Appellees Br. at 9; JA 514-15. NGO nonprofit groups collaborate with the Executive Branch in a similar manner. Appellees Br. at 25-26. The Office of Management and Budget may do no more than passively "comment" on USIP's budget requests to Congress. 22 U.S.C. § 4608(a).

- Congress did not authorize USIP to, and USIP does not in fact, represent the United States abroad, formulate or implement United States foreign policy, or engage in any other foreign affairs function that Article II assigns to the President. USIP staff are not subject to or protected by diplomatic "chief-of-mission" oversight. Like the Carter Center and CSIS, when USIP supports or mediates international conflict resolution efforts, it acts expressly as an independent neutral that does not represent the United States government. Appellees Br. at 21-26.

- Congress did not task USIP with administering or enforcing any statute or with promulgating any regulations. Nor are USIP's grantmaking activities an exercise of executive power. *Id.* at 26-30.

- To the extent USIP can be said to have any "power" at all, its "powers" are those "conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act," 22 U.S.C. § 4604(a)—not the executive power conferred upon the President by Article II.

*See also Jackson*, 783 F. Supp. 3d at 361-67.

## I. *Slaughter* affirms that USIP does not exercise executive power.

*Slaughter* refutes Appellants' contention that every "governmental entity" that touches on "foreign affairs" or even runs educational and research programs is "necessarily" "part of the Executive Branch." *See* Brief of Appellants at 20-35 ("Appellants Br.").

**1.** *Slaughter* relied on *Buckley v. Valeo* to recognize that Congress may create non-executive entities "to assist it with its functions," and may vest them with "independen[ce]" from presidential at-will removal. *Slaughter*, 146 S. Ct. at 2302. (citing *Buckley*, 424 U.S. 1, 137-38 (1976)). *Buckley* distinguished the FEC's enforcement powers, which were executive in nature, from its "investigative and informative" role supporting Congress, which was not. 424 U.S. at 137. Without causing any separation of powers problem, Congress could vest the latter role in officials who were not appointed by the President, and instead were appointed by members of Congress (the majority of the Commissioners). *See id.* at 126-27, 137-39.

Congress likewise created USIP to provide "investigative and informative" assistance "in aid of the legislative function[s] of Congress," *see Slaughter*, 146 S. Ct. at 2305 (quoting *Buckley*, 424 U.S. at 137-38), namely Congress's constitutionally-assigned foreign affairs responsibilities. *E.g.*, *Learning Res., Inc. v. Trump*, 607 U.S. 229, 286 (2026) (Gorsuch, J., concurring) ("Article I, § 8, vests in

Congress many powers that touch on 'foreign affairs.'"); Appellees Br. at 18-19. Thus, USIP briefs members of Congress and, upon their request, convenes expert working groups on policy questions facing Congress. Appellees Br. at 9; *Jackson*, 783 F. Supp. 3d at 328. *Amici* bipartisan former and current members of Congress, many of whom voted to establish USIP "with the specific intent to aid Congress in carrying out its constitutional responsibilities in foreign affairs," experienced USIP to be a "legislative instrument" on which Congress "regularly relies" for "research and analysis." Congressional Br. at 1, 3-11.

The portion of *Buckley* cited in *Slaughter* confirms that Congress permissibly vested USIP's research functions (supporting legislation and congressional oversight) in individuals not subject to the removal rules that govern principal Executive Branch officers. The President must have authority over those who "exercise *his* powers," 146 S. Ct. at 2295 (emphasis in original), but Congress need not grant the President unfettered removal authority over those who assist Congress in the exercise of *its own* powers.[2]

---

[2] Congress *chose* presidential appointment for USIP board members, but the Constitution did not *require* this appointment method (just as Congress chose to vest research functions both in the FEC's two presidentially-appointed commissioners and in its four congressionally-appointed commissioners). Where the Constitution does not require presidential appointment in the first place, it does not require at-will presidential removal. "Congress may prohibit the President from firing" officials who, like the (b)(4) Board members, are appointed by the President but "do not exercise his power." *See Slaughter*, 146 S. Ct. at 2309 n.9 (discussing *Marbury v. Madison*, 1 Cranch 137 (1803)).

**2.** USIP conforms with Congress's long tradition of exercising its Article I power to establish educational and philanthropic entities that do not exercise executive power. *Slaughter*, 146 S. Ct. at 2305-06; Appellees Br. at 28-31, 43-45 (discussing examples including Smithsonian Institution). *Slaughter* flatly rejects Appellants' contention that any entity Congress establishes to carry out a philanthropic or educational mission must be a component of the Executive. *Cf.* Appellants Br. at 32 (arguing USIP executes the law because under 26 U.S.C. § 4604(b) it "may . . . establish" scholarship, research, and information dissemination programs).

**3.** *Slaughter* refutes Appellants' supposition that any entity with any governmental character that "participat[es] in" anything that can be said to relate to "foreign affairs" necessarily exercises the President's power. *See* Appellants Br. at 21. The War Claims Commission in *Wiener v. United States*, 357 U.S. 349 (1958), plainly operated in the field of "foreign affairs": it resolved claims by American prisoners of war and others for damage inflicted "at the hands of" World War II "enem[ies]" using assets seized from these "foreign sources" and their citizens. *Id.* at 350, 354-55; 62 Stat. 1240. Yet in its *stare decisis* conclusion that the Court had already "all but limited [*Humphrey's*] to its facts," the Court necessarily reasoned that *Wiener* had *not* blessed removal protections for an agency exercising any "part of the executive power." 146 S. Ct. at 2302 (citation omitted). *Wiener* was not a

reaffirmation of *Humphrey's* but merely an endorsement of removal protections for a body that was "solely adjudicatory." *Id.* at 2303 (citation omitted). In other words, the *Wiener* commission was governmental, was focused on foreign affairs—*and was nonetheless non-executive*. Thus, contrary to Appellants' contention, it is simply not the case that any governmental body that touches on "foreign affairs" necessarily exercises executive power. *Cf.* Appellants Br. at 21.

Instead, Appellants must—but cannot—show that USIP board members "act for" the President in carrying out the foreign affairs powers that Article II specifically assigns to him. *See Slaughter*, 146 S. Ct. at 2291 (citation omitted). USIP does not assist the President in making treaties; in appointing or receiving ambassadors; in engaging in diplomatic relations on behalf of the United States; or in recognizing other nations. *See* Appellants Br. at 21 (listing these as the President's foreign affairs powers); Appellees Br. at 9-11; *Jackson*, 783 F. Supp. 3d. at 363-66; Former Officials Br. at 16-26. To the extent USIP "communicat[es] with foreign governments" and non-governmental factions when operating as a neutral in a fashion similar to the Carter Center, it does not do so *on behalf of the President* or at his direction, or even on behalf of the United States government. Appellees Br. at 22-25 & n.15 (citation omitted); JA138-47.

By contrast, Article II does not list among the President's powers research, education on conflict resolution, training conciliators, or interacting in a

nongovernmental capacity with parties in conflict as a neutral—the things USIP actually does. Appellees Br. at 10-11. The bottom line is that independent philanthropic, educational, and research activities that "relate to foreign affairs" do not constitute the exercise of executive power, even when they bear a nexus to the government and even when commissioned by Congress. The American Red Cross and U.S. Olympic Committee would be just as "surprise[d]" as the Boy Scouts, *Slaughter*, 146 S. Ct. at 2305, to learn that because Congress tasked them with carrying out United States treaty obligations and representing the United States before international sporting bodies, respectively, they exercise Article II power, and that the President therefore has unfettered authority to remove their leaders. Appellees Br. at 19-20; *Jackson*, 783 F. Supp. 3d at 365-66.

**4.** It makes little sense to conceive of USIP personnel as "assistants" to the President who must be subject to his "general administrative control," *Slaughter*, 146 S. Ct. at 2292, 2296, 2301 (citations omitted), given that "employees of the Institute shall not be considered officers and employees of the Federal Government" except for limited purposes, and the (b)(4) Board members may not be officers or employees of the United States. 22 U.S.C. §§ 4605(d)(2), 4606(f)(1). Unlike "assistants" to the President implementing his power abroad, USIP employees are not subject to chief-of-mission authority, which requires "[a]ny executive branch agency having employees in a foreign country [to] keep the chief of mission to that

country fully and currently informed with respect to all activities and operations of its employees in that country, and [to] insure that all of its employees in that country . . . comply fully with all applicable directives of the chief of mission." 22 U.S.C. § 3927(b); Appellees Br. at 23-26.

Under *Slaughter*, officials who exercise "*the President's* power, not their own," must be "'subordinate' to" him. *Slaughter*, 146 S. Ct. at 2295, 2310 (emphasis in original) (citation omitted). But Appellees do not fall within that category: USIP's "powers" are not those Article II vests in the President, but instead those the "District of Columbia Nonprofit Corporation Act" "confer[s] upon a nonprofit corporation," 22 U.S.C. § 4604(a). Congress's choice of a District of Columbia corporate form means that Board members' powers *are* their "own"—those vested in them by USIP's bylaws—not "the President's." JA771-2 (USIP Bylaws Art. I § 2 and Art. IV § 1 "vest[ing]" USIP's "powers" "in the Board").[3] By the same token, USIP's (b)(4) board members are "subordinate" not to the President, but to the interests of the USIP corporation pursuant to their fiduciary duties under District of Columbia law. *See* D.C. Code § 29-406.30; *cf. Beatty v. Trump*, No. 25-CV-4480 (CRC), 2026 WL 1505646, at *2, 16–22 (D.D.C. May 29, 2026). USIP's "quasi-private" status cuts

---

[3] Since the Founding era, Congress has used the corporate form to carry out governmental objectives through entities not subject to at-will presidential removal. *Cook*, 146 S. Ct. at 2242-44.

against concluding that it is part of the executive apparatus that assists the President with his duties. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025).[4]

Simply put, Congress designed USIP to operate as an independent nonprofit think tank, and that is what it does. USIP neither regulates, nor enforces, nor represents the United States to foreign sovereigns; it neither sets nor implements United States foreign policy. It does not execute or administer any law, or assist the President in the discharge of his foreign affairs duties; it does not exercise any "power" over anyone. As a result, there is no "constitutional impediment" to Congress's decision to insulate the (b)(4) Board members from at-will presidential removal. *See Slaughter*, 146 S. Ct. at 2302, 2305 (quoting *Mistretta v. United States*, 488 U.S. 361, 423–425, & n.3, (1989) (Scalia, J., dissenting)).

**II. *Cook* confirms courts' authority to remedy unlawful removals.**

Appellants contend that the portion of the district court's order providing that the Board members shall continue to serve in their rightful positions infringes on presidential power and exceeds the scope of judicial authority. Appellants Br. at 50-61; *see* Appellees Br. at 46-48. The government made the same arguments in *Cook* (in the context of challenging interim equitable relief). But the Supreme Court

[4] *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), and *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015), are inapposite; they analyze whether an entity is part of the government for purposes of its interactions with private parties, not whether an entity is executive in character. *See* Appellees Br. at 20 n.10.

rejected the idea that there is some categorical bar to a district court restoring a removed officer to her position; instead, courts have *always* had the power to undo an officer's unlawful removal. *Cook*, 146 S. Ct. at 2250 (court had equitable authority to enjoin removal pending action that would "finally settle title" to the office; rejecting proposition that all court could do "later" was award backpay). Before the merger of law and equity—"historically"—this remedy was exclusively at law, so equity could not "interfere." *Id.* (citation omitted). That is no obstacle for a post-merger court, which has the authority, however styled, to finally settle title to an office and to order effective relief. *Jackson*, 783 F. Supp. 3d at 381 n.43, 383; *see* Samuel L. Bray, *Remedies in the Officer Removal Cases*, 17 J. Legal Analysis 236, 249 (2025) (declaratory judgment available).

For these reasons and those set forth in Appellees' responsive brief, the Court should affirm the judgment of the district court.

August 28, 2026

Respectfully submitted,

*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb
J. Benjamin Jernigan
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800
agoldfarb@zuckerman.com
bjernigan@zuckerman.com

William J. Murphy
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 332-0444
wmurphy@zuckerman.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the applicable type-volume limitation set forth in the Court's Order of July 31, 2026 (Doc. 2186152) because it contains 2,999 words.

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word Office in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Andrew N. Goldfarb*
Andrew N. Goldfarb